**CASE # 3:20-cv-03098-WHO**
**MOTION FOR PRELIMINARY INJUNCTION TO RESTORE *STATUS QUO ANTE***

# EXHIBIT 2

# CHARLES CARREON

LAW FOR THE DIGITAL AGE

January 8, 2020

William T. McDermott, Assistant Administrator
Diversion Control Division
Attn: Liaison and Policy Section
Drug Enforcement Administration
8701 Morrissette Drive
Springfield, Virginia 22152

**Re: *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act***

Dear Mr. McDermott:

The North American Association of Visionary Churches ("NAAVC") is a non-profit corporation whose Associate Members are churches that use Ayahuasca as their sacrament ("Visionary Churches"). Individual member-churches have standing to object when aggrieved by administrative actions, and delegate that standing to NAAVC to advocate on this issue of shared importance. NAAVC sends this letter on behalf of its members regarding their Constitutional right to engage in religious ceremonies making use of Ayahuasca.

## 1.      The Agency's Guidance Document

Ten years ago, the Drug Enforcement Administration (the "Agency") made a document available on its website entitled *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act* (the "Guidance"). (Exhibit 1.) The Guidance describes an administrative procedure for submitting Petitions for Religious Exemption ("Petitions") from the Controlled Substances Act ("CSA"). The Guidance was adopted without public notice and comment, and has not been published in the Federal Register.

In the ten years since the Guidance was announced, there is no public record of any Petition being granted. Two Petitions were submitted by groups that were "invited" to submit a Petition by way of letters on the Agency's letterhead.[1]

## 2.      Analysis of the Agency's Guidance Document

There are several levels of legal analysis applicable to the Guidance, all of which support the conclusion that it does not pass constitutional muster or conform to recently-

---

[1] The DEA's Invitation Letter to Soul Quest is attached as Exhibit 2; the response from Soul Quest's lawyers is attached as Exhibit 3; and, the DEA's response to that letter is attached as Exhibit 4. NAAVC has not obtained a copy of the Invitation Letter to Ayahuasca Healings. The Petition submitted by Ayahuasca Healings is Exhibit 5. Soul Quest submitted a "157 page response" to the DEA, but copies of the same have not been obtained. https://www.clickorlando.com/news/2017/11/16/orlando-church-battles-to-use-hallucinogenic-tea/

**3241 E. Blacklidge Dr.
Tucson, Arizona 85716
Tel: 628-227-4059**

promulgated standards for guidance documents.  The presentation of authorities relevant to the Agency's review of the Guidance first sets forth the substance of three Executive Orders.  Discussions of First and Fifth Amendment protections follow.  The letter applies the requirements of the Executive Orders and Administrative Procedure Act to the Guidance, and suggests the Agency rescind the Guidance within the regulatory deadlines imposed upon the Agency by Executive Order 13892 (Exhibit 10) and the Office of Management and Budget's Implementing Memo (Exhibit 9.).

**3.      Three Executive Orders Require the Agency to Evaluate the Guidance and Decide Whether to Rescind or Carry On With It**

The President has issued three Executive Orders that directly bear upon the manner in which the Agency should review the Guidance.  In particular, EO 13891 imposes a deadline of February 28, 2020 for the Agency to rescind or officially affirm the continued viability of the Guidance.  To summarize briefly the importance of these three Executive Orders, in the chronological order of their issuance:

***Promoting Free Speech and Religious Liberty,* EO 13798, 82 FR 21675 (May 4, 2017).** This EO commits the Executive Branch and all administrative agencies to protect churches from regulatory entanglement and impingement upon rights of free exercise by structuring future programs and policies, and reviewing existing ones, to ensure that they effectively accommodate the needs of religious communities for exemptions from general law and special accommodations.  (EO 13798 is attached as Exhibit 6.)  A detailed Memorandum from Attorney General Sessions on the manner in which federal agencies should review and overhaul their practices is attached as Exhibit 7, *Federal Law Protections for Religious Liberty* (the "AG Memo").  The AG Memo devoted the bulk of its policy-formulation to explaining how administrative agencies must act to properly provide RFRA protections to churches and believers, and directed all federal agencies to "proactively consider the burdens on the exercise of religion and possible accommodation of those burdens," when "formulating rules, regulations, and policies."[2] The AG Memo states:

> "Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law.  Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government activity...."[3]

This principle applies to "all actions by federal administrative agencies, including rulemaking, adjudication, and other enforcement actions...."[4] A companion document that was circulated to all Asst. US Attorneys, entitled *Implementation of Memorandum on Federal Law Protections for Religious Liberty*, urging all agencies to review their

---

[2] AG Memo, Exhibit 7, page 7.

[3] AG Memo, Exhibit 7, page 1, "Principles of Religious Liberty."

[4] AG Memo, Exhibit 7, page 3, Principle 10.

regulatory systems for compliance with RFRA with the aid of the Department of Justice's Office of Legal Policy, is attached as Exhibit 11.

***Promoting the Rule of Law Through Improved Agency Guidance Documents***, **EO 13891, 84 FR 55235 (Oct. 15, 2019).** This EO establishes "the policy of the executive branch … to require that agencies treat guidance documents as non-binding both in law and in practice,"[5] Pursuant to Section 3 of EO 13891, the Office of Management and Budget issued an Implementing Memorandum (the "OMB Memo") that requires the Agency to decide, by February 28, 2020, whether to rescind the Guidance as Agency doctrine, or to publish it on "a single, searchable, indexed website that contains, or links to, all of the agencies' respective guidance documents currently in effect." (OMB Memo, p.1, attached as Exhibit 9.) Rescinded guidance documents will be citable only "to establish historical facts." (EO 13891, Sec. 3(b); 84 FR 55236; Exhibit 8.)

EO 13891 also directs the Agency, by February 28, 2020, to issue regulations for issuing guidance documents that: (i) require any future guidance document to "clearly state that it does not bind the public, except as authorized by law or as incorporated into a contract;" (ii) establish a procedure "for the public to petition for withdrawal or modification of a particular guidance document," and (iii) require a thirty-day public notice and comment period for all "significant guidance documents."[6] (EO 13891, Sec. 2(c); 84 FR 55236.)

***Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication* EO 13892, 84 FR 55239 (Oct. 15, 2019).** EO 13892, attached as Exhibit 10, provides a number of new procedural protections for parties subject to an assertion of administrative jurisdiction or authority over them. Most relevant to our discussion here, EO 13892 adjured Administrative Agencies to end the practice of using "guidance"[7] documents (1) to "impose new standards of conduct except as expressly authorized by law or contract," or, (2) to establish a regulated party's liability based on "noncompliance with a standard of conduct announced solely in a guidance document." Section 5 of EO 13892 also requires that agencies publish, in the Federal Register, documents supporting an agency's assertion of regulatory jurisdiction over new fields of activity (such as the Agency's declared intent to use the Guidance procedure to adjudicate requests for religious exemptions from the CSA pursuant to RFRA.)[8]

---

[5] "[E]xcept as incorporated into a contract." (EO 13891, Sec. 1; 84 FR 55235.)

[6] One definition of a "significant guidance document" is that it raises "novel legal or policy issues arising out of legal mandates." Thus, guidance that seeks to harmonize the Agency's obligations under the CSA with those of RFRA, based on the legal mandate of *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006), would likely be a "significant guidance document." Further regarding the significance of this provision, infra at page 10.

[7] "Guidance document" means an agency statement of general applicability, intended to have future effect on the behavior of regulated parties, that sets forth a policy on a statutory, regulatory, or technical issue, or an interpretation of a statute or regulation," and excludes rules promulgated pursuant to notice and comment under 5 U.S.C § 553. EO 13892, Sec. 2(c); 84 FR 55240.

[8] Neither the CSA nor RFRA authorize the Drug Enforcement Agency to establish an administrative procedure of the sort the Guidance purports to create; accordingly, the Agency is required to carry the

4.    **Under EO 13892, Before Asserting Jurisdiction Under the Guidance, The Agency Must Articulate and Publish a Jurisdictional Basis for the Regulatory Activity**

The Guidance does not state the basis for the Agency's assertion of jurisdiction over the activities of Visionary Churches.  The only reason that the Agency has ever been involved in regulating a religious group's importation, manufacturing, distribution, or possession of controlled substances stems from settlement agreements reached with the UDV and Santo Daime churches. Those settlement agreements would not sustain an assertion of jurisdiction over unrelated, third-party Visionary Churches, under EO 13892.

> "No person should be subjected to a civil administrative enforcement action or adjudication absent prior public notice of both the enforcing agency's jurisdiction over particular conduct and the legal standards applicable to that conduct."[9]

There is no statutory basis for the Agency to assert administrative jurisdiction over Visionary Churches.  The CSA contains no provision for granting religious exemptions from its proscriptions, and gives the Agency no authority to administer such a system. RFRA authorizes the District Courts to issue injunctions, and to adjudicate claims of religious exemption from civil and criminal general laws; however, it accords no role to any administrative agency.

Under the new requirements of EO 13892, if the Agency intends to use private contractual agreements as precedent for the assertion of jurisdiction over churches and believers who were not parties to those cases, it must publish both the agreements and the rationale for extending jurisdiction to prospective regulatory subjects who had no connection with the prior litigation.[10]  If the DEA cannot assert and publish a valid jurisdictional basis for the Guidance, it must rescind it.

/ / /

/ / /

/ / /

---

burden of showing that it has jurisdiction over the field, and has provided notice of the same to the potentially regulated parties.

[9] (EO 13892, Section 1; 84 FR 55239; Exhibit 10.)

[10] "If an agency intends to rely on a document arising out of litigation (other than a published opinion of an adjudicator), such as a brief, a consent decree, or a settlement agreement, to establish jurisdiction in future administrative enforcement actions or adjudications involving persons who were not parties to the litigation, it must publish that document, either in full or by citation if publicly available, in the Federal Register (or on the portion of the agency's website that contains a single, searchable, indexed database of all guidance documents in effect) and provide an explanation of its jurisdictional implications."
EO 13892, Section 5.

**5.      The Guidance's Requirement That Petitioners Stop Taking Controlled Substances While Their Petition is Pending Imposes an Unconstitutional Prior Restraint on the Free Exercise Rights of Visionary Churches**

**a.   The Guidance Requires Petitioners to Stop Taking Sacramental Controlled Substances Until the Agency Grants the Requested Certificate of Exemption**

Paragraph 7 of the Guidance contains its most significant feature.  Paragraph 7 requires every Petitioner to promise that its members will refrain from consuming controlled substances until the DEA issues a Certificate of Exemption.

**b.   The First Amendment Bars Prior Restraints on Free Expression**

The First Amendment provides:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

In *Near v. Minnesota*,[11] the seminal case on prior restraints on secular speech, the Supreme Court invalidated a Minnesota statute that established a judicial procedure to enjoin the publication of scandalous newspapers.  The Court explained that it had to protect the "preliminary freedom" to speak that "does not depend … on proof of truth." Subjecting a publisher to a duty to "produce proof of the truth of his publication, or of what he intended to publish, and of his motives, or stand enjoined" leaves "but a step to a complete system of censorship."[12]

**c.   Religious Practices are Protected From Prior Restraints, Like Secular Speech**

In *Cantwell v. Connecticut*,[13] the Court invalidated a statute that required religious groups to prove their legitimacy in order to obtain a license, by an administrative procedure similar to the Guidance.  The law at issue in *Cantwell* made it unlawful to "solicit money, services, subscriptions or any valuable thing for any alleged religious, charitable or philanthropic cause … unless such cause shall have been approved by the secretary of the public welfare council."[14]  Reversing the Connecticut courts, the Supreme Court explained that the First Amendment forbids governments from gate-keeping the right of free exercise:

> "It will be noted … that the Act requires an application to the secretary of the public welfare council of the State; that

---

[11] *Near v. Minnesota*,  283 U.S. 697 (1931).

[12] *Near v. Minnesota*, 283 U.S. 697, 721, *citing Patterson v. Colorado*, 205 U.S. 454, 462 (1907).

[13] *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

[14] *Id.*, 310 U.S. at 301-302.

> he is empowered to determine whether the cause is a
> religious one, and that the issue of a certificate depends
> upon his affirmative action. … He is authorized to withhold
> his approval if he determines that the cause is not a
> religious one. Such a censorship of religion as the means of
> determining its right to survive is a denial of liberty
> protected by the First Amendment and included in the
> liberty which is within the protection of the Fourteenth."[15]

Such a system cannot survive constitutional scrutiny, because "to condition aid for the solicitation of religious views or systems upon a license, the grant of which rests in the determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty forbidden by the Constitution."[16]

The Agency's use of the Guidance to exert a prior restraint on free exercise is evident from the text of the letter the Agency sent to Soul Quest:

> "We encourage you to file a petition and obtain a response
> to your request for an exemption *before* engaging in the
> distribution of DMT under the assumption that this conduct
> qualifies as an exempt religious exercise."[17]

Like the ordinance in *Cantwell*, the Guidance empowers an official to determine whether a Petitioner will be allowed to engage in the free exercise of religion.  Not long after *Cantwell*, in *Follett v. Town of McCormick*,[18] the Supreme Court held that Jehovah's Witnesses had properly refused to pay dollar-a-day city tax on bookselling where it operated as a prior restraint on free exercise and proselytizing and expressly stated in familiar language what was implicit in *Cantwell*: "Religious freedom, *i.e.*, free exercise, must not be subject to prior restraint."[19]

### d.  The Guidance Imposes an Unconstitutional Prior Restraint by Compelling Abstention From Religious Sacraments

Paragraph 7 of the Guidance requires that Petitioner's entire congregation voluntarily abstain from taking any sacrament that is a controlled substance while the Agency evaluates their Petition over an undefined time period.  The chilling effect of this requirement is evident in the response from Soul Quest's attorney to the DEA's invitation to submit a Petition:   "[T]he correspondence has effectively shuttered the ability of the Church to tend to its members."[20]  Because a Petitioner's congregation must wait to engage in free exercise until the Agency issues a Certificate of Exemption, the Guidance bans a Petitioner from engaging in religious practice during the pendency of its Petition.

---

[15] *Cantwell v. Connecticut*, 310 U.S. at 305 (emphasis added).

[16] *Cantwell v. Connecticut*, 310 U.S. at 307.

[17] (Exhibit 2, DEA Invitation Letter to Soul Quest, page 1, emphasis added.)

[18] *Follett v. Town of McCormick*, 321 U.S. 573 (1944).

[19] *Id.*, 321 U.S. at 576 (emphasis added).

[20]  (Exhibit 3, page 1.)

Such a ban substantially burdens the free exercise of an important religious practice by Visionary Church members.

> "In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion."[21]

Nothing in the Guidance indicates how long the Agency will take to review a Petition. Ayahuasca Healings submitted a Petition in April 2016,[22] and as of the date of this correspondence in January 2020, it has neither been approved nor denied.

### e. Visionary Churches Should Not be Required to Surrender Their Free Exercise Rights to Apply For an Exemption From the CSA

> "[I]ndividuals and organizations do not give up their religious-liberty protections by … interacting with federal, state, or local governments."[23]

The Agency's failure to act on petitions submitted under the Guidance stands in marked contrast to the manner in which the Agency administers requests for licensure from physicians, pharmacies, and pharmaceutical manufacturers. After holding the Guidance forth as the sole avenue for seeking exemption from the CSA, the Agency's failure to act on the pending Petitions provides dispositive evidence that the Guidance imposes a substandard process on applications for religious exemptions from the CSA. Long delay, or an indefinite term for processing applications for licensure, is an important factor in establishing the unconstitutionality of a non-judicial system of prior restraint.

> "Because the censor's business is to censor, there inheres the danger that he may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in free expression. And if it is made unduly onerous, by reason of delay or otherwise, to seek judicial review, the censor's determination may in practice be final."[24]

The Agency's inaction has left the only known actual Petitioners in suspense and legal peril for an extended period of time. The Agency's failure to timely process their Petitions shows that the Guidance process interferes with free exercise in violation of RFRA.[25] Finally, unreasonable processing delay is inconsistent with AG Sessions'

---

[21] AG Memo, page 4, Principle 13.

[22] Exhibit 5.

[23] AG Memo, page 2, Principle 4.

[24] *Freedman v. State of Maryland*, 380 U.S. 51, 57-58 (1965).

[25] "A [legal proscription] burdens the free exercise of religion if it 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs,'" including when, if enforced, it "results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution.'" *Guam*

exhortations to administrative agencies to act with alacrity when addressing the needs of religious organizations for exemptions from the constraints of general law, because even brief interference with the free exercise of religion can be constitutionally offensive.

6.      **The Guidance Imposes a Disparate Impact on Religious Applications for Exemption as Compared to The Agency's System for Secular Registrants**

In the Agency's Guidance-driven system, religious Petitions have the appearance of being abandoned promptly upon filing; whereas, secular applications for licensure or renewal are easily submitted via the DEA website, that allows applicants to establish accounts, update their status, obtain timely issuance of needed credentials, and various other administrative services.  Meanwhile, religious Petitioners subject to the Guidance face a daunting system that compromises their Constitutional rights and demands they abstain from religious practice to obtain – nothing!  Cast into a legal netherworld, Petitioners are left by the Agency to await a decision that the Agency shows no inclination to render.

Such unfair systems, founded on fundamental disrespect for religious beliefs, were condemned by Justice Samuel Alito, then sitting as a judge for the Third Circuit Court of Appeals, in *Blackhawk v. Pennsylvania*,[26] (affirming District Court injunction compelling Pennsylvania Game Commission to grant religious exemption from license requirements to Native American man who kept two bears for use in religious ceremonies, where licensure exemptions to circuses and researchers were liberally allowed).  In *Blackhawk*, Justice Alito drew support from three cases that overturned exemption systems that refused to accommodate exemption requests from religious applicants, while allowing secular requests.  The first was *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,[27] (declaring ordinance unconstitutional that allowed exemption from animal cruelty laws for virtually all reasons except the religious exemption sought by a cult that practices animal sacrifice).  Such a system is an unconstitutional "prohibition [because] society is prepared to impose [it] upon [religious outsiders] but not upon itself."  This, Justice Alito noted, is the "precise evil" to be condemned as unconstitutional.

The second case was *Fraternal Order of Police v. Newark*,[28] holding unconstitutional a police conduct rule that allowed police to wear beards for "health reasons," but barred wearing a beard for religious reasons.  The ban on religious beards was unconstitutional because government agencies may not use government policy to impose "a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not."

*v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002), *quoting Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) and *Braunfeld v. Brown*, 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).

[26] *Blackhawk v. Pennsylvania*, 381 F.3d 202, (3rd Cir. 2004).

[27] *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (3rd Cir. 1993).

[28] *Fraternal Order of Police v. Newark*, 170 F.3d 359 (3rd Cir. 1999).

The third case, *Tenafly Eruv Association v. The Borough of Tenafly,*[29] held unconstitutional the City of Tenafly's refusal to allow Orthodox Jews to use power poles to support a network of fibers that create an "eruv," a designated space in which observant Jews are permitted to carry loads or push carts on the Sabbath, without breaking religious vows.  Since virtually every other interest group had been allowed to hang papers and objects from power poles, the Borough's denial of the request "violates the neutrality principle … judging [the religious rationale] to be of lesser import than nonreligious reasons," and thus singles out "religiously motivated conduct for discrimination."[30]

7.     **The Guidance Violates the Establishment Clause, Because it Makes Intrusive Inquiries That Lead to Regulatory Entanglement**

Paragraph 2 of the Guidance, entitled *Contents of Petition,* requires every Petition to state, under oath:[31]

> "(1) the nature of the religion (e.g., its history, belief system, structure, practice, membership policies, rituals, holidays, organization, leadership, etc.); (2) each specific religious practice that involves the manufacture, distribution, dispensing, importation, exportation, use or possession of a controlled substance; (3) the specific controlled substance that the party wishes to use; and (4) the amounts, conditions, and locations of its anticipated manufacture, distribution, dispensing, importation, exportation, use or possession."

The Guidance does not define the outermost scope of the Agency's power to investigate Petitioner's activities.  Paragraph 5 gives the Agency an unlimited right to ask for more information, that must be provided within 60 days, or the Petition will be deemed "withdrawn."

The Guidance requires disclosures that administrative agencies may not compel from churches, because such informational demands lead to regulatory entanglement that violates the establishment clause of the First Amendment.  In *Surinach v. Pequera de Busquets,*[32] a federal appeals court quashed a subpoena from a Puerto Rican government agency that had been served on the Superintendents of the Roman Catholic schools on the island, demanding production of extensive records about how the Catholic schools were being operated.   The First Circuit held that the very demand to produce the records chilled free exercise.  The Establishment Clause, that forbids the government from becoming "entangled" in the internal affairs of religious groups, was offended by the government's effort to pry into the Church's private affairs.  The First Circuit held: "This

---

[29] *Tenafly Eruv Association v. The Borough of Tenafly*, 309 F.3d 144 (3rd Cir. 2002).

[30] *Tenafly Eruv Assoc.*, 309 F.3d at 168 (*quoting Lukumi, infra,* 508 U.S. at 537; *Fraternal Order of Police, infra,* 170 F.3d at 364–65).

[31] Paragraph 3 requires a Petition to be submitted under penalty of perjury.

[32] *Surinach v. Pequera de Busquets*, 604 F.2d 73 (1st Cir. 1979).

kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids."[33]

**8.     The Guidance Demands a Waiver of Fifth Amendment Rights As the Cost of Submitting a Bid to Confirm First Amendment Free Exercise Rights**

**a.   Compliance With the Guidance Requires Petitioners to Self-Incriminate**

The Agency is a law enforcement agency, and the Guidance contains no limitations on the extent to which the disclosures required by the Petition could be used by the Agency. The statements in the Petition itself could provide probable cause to arrest the individual who signed the Petition, and to issue search warrants of the places where sacramental controlled substances are kept or distributed.  The Petition would provide a roadmap for prosecution of church members for conspiracy to distribute controlled substances.  At trial for violating the CSA, the Petition could be admitted to impeach contrary testimony denying guilt by the person who signed the Petition or church members charged as co-conspirators.  Accordingly, the Guidance procedure is objectionable as a violation of the Fifth Amendment guarantee of freedom from self-incrimination.[34]

**b.   The Agency's "Invitations" to Submit Petitions Cross the Line from Promulgating the Guidance on Faulty Grounds to Using the Guidance to Compel Self-Incrimination**

On at least two occasions, the DEA has sent an "invitation to submit a Petition," that has been treated by these churches as a *de facto* investigative demand (Ayahuasca Healings and Soul Quest).[35]  In each case, these groups submitted Petitions.  This was an unsurprising result, because the "invitation" to submit a Petition carries the implied threat of enforcement action if a Petition were not submitted.  This threat of enforcement took the Agency from the position of having promulgated a Guidance document on faulty Constitutional grounds to actually seeking to compel individuals to engage in self-incrimination.

As the OMB Memo makes clear, the Agency's coercive issuance of "invitations" to submit a Petition were also a violation of the proper agency use of Guidance documents:

> "[A] *guidance document should never be used to establish new positions that the agency treats as binding*; any such requirements must be issued pursuant to applicable notice-and-comment requirements of the Administrative Procedure Act or other applicable law. *Nor should agencies use guidance documents*-including those that describe themselves as non-binding effectively *to coerce private-party conduct*, for instance by suggesting that a standard in

---

[33] *Surinach*, 604 F.2d at 78, *quoting Lemon v. Kurtzman*, 403 U.S. 602, 620 (1971).

[34] *Leary v. United States*, 395 U.S. 6 (1969); *Marchetti v. United States*, 390 U.S. 39 (1968).

[35] *See* note 1, *supra*.

> a guidance document is the only acceptable means of
> complying with statutory requirements, or by threatening
> enforcement action against all parties that decline to follow
> the guidance."[36]

### c.  Compliance With the Guidance Compels Individual Petition Signers to Risk Perjury by Representing Future Compliance by Other Individuals

An individual must sign the Petition under penalty of perjury, because an organization cannot take the oath, and that person would be directly incriminated by making the statements required in the Petition.  While it is understandable that the Agency wishes to obtain reliable information in a Petition, without protections from having the Petition used for prosecutorial purposes, the requirement violates the Fifth Amendment rights of the signer.  Further, given the implied duty to comply with the provisions of the Guidance while the Petition is pending, perjury charges could be premised on material omissions, or if some members of the church failed to keep the promise required by paragraph 7 to abstain from taking a sacramental controlled substance.  Thus, the proscription on sacramental use of the controlled substance under paragraph 7 presents a risk of perjury for the signer. This presents an unacceptable risk posed by the conduct of church members who may feel spiritually compelled to practice their religion by consuming the sacramental controlled substance, notwithstanding the fact that this would place the person who signed the Petition under penalty of perjury at risk of criminal liability.

### 9.   Conclusion: The Guidance Should Be Rescinded

After conducting the review required by Executive Orders 13891 and 13892, and the OMB Memo, the Agency should rescind the Guidance.  Under the plain language of these two Executive Orders, guidance documents may not be used to accomplish the purposes for which it was evidently promulgated – to establish new legal responsibilities for Visionary Churches and their congregations. It was prepared by an administration that had not been directed, as the Agency has been by Executive Order 13798 and the AG Memo, to proactively accommodate religious requests from exemption from general laws that infringe upon the right of free exercise.  The Guidance suffers from many Constitutional flaws, and is a supreme demonstration of administrative overreach.

The above analysis identifies what NAAVC considers to be the most egregious defects, and they cannot be remedied through small alterations.  The Guidance was adopted without sufficient administrative forethought, and has survived this long only because it has never been subjected to judicial testing.  It should now be rescinded and relegated to a past period of Agency history.

Finally, if the Agency decides to issue new guidance documents regarding the manner in which it will deal with requests for religious exemption from the CSA, those would be

---

[36] OMB Memo, Exhibit 9, p. 3, emphasis added.

"significant guidance documents."[37]   Accordingly, the Agency would be required to provide a minimum period of thirty days public notice and comment before adoption.[38]

NAAVC respectfully suggests that a thirty-day public comment period would be insufficient, given the amount of interest that such a process would generate, and the large number of persons affected by the Agency's rulemaking in the field of visionary religion.  Several peer-reviewed scientific studies establishing the safety and efficacy of Visionary Church practice have been conducted during the ten years since the Guidance was issued, and such materials belong in the Agency rulemaking record.  Visionary Churches have grown in number and size, and many of their members have experienced benefits from their practice.  These interested parties may wish to engage in the comment process, and could make invaluable contributions to the rulemaking process.  Thus, NAAVC requests that the Agency allow at least three months for public comment.

NAAVC and all members of the Visionary Church community thank you for your thoughtful consideration of these matters.

Very truly yours,


Charles Carreon (Cal. Bar # 127139)
Counsel to North American Assn. of Visionary Churches

---

[37] Sec. 2 of EO 13891; 84 FR 55236; Exhibit 8.
[38]  EO 13891, Sec. 4(iii); 84 FR 55237; Exhibit 8

# EXHIBIT LIST

| Exhibit | Document Title |
|---------|----------------|
| 1. | Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act |
| 2. | DEA "Invitation Letter" to Soul Quest |
| 3. | Soul Quest's Response to DEA's Invitation Letter |
| 4. | DEA's Response to Soul Quest's Response |
| 5. | Petition submitted by Ayahuasca Healings |
| 6. | Executive Order 13798, Promoting Free Speech and Religious Liberty |
| 7. | Federal Law Protections for Religious Liberty |
| 8. | Executive Order 13891, Promoting the Rule of Law Through Improved Agency Guidance Documents |
| 9. | OMB  Implementation Memorandum |
| 10. | Executive Order 13892, Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication |
| 11. | Implementation of Memorandum on Federal Law Protections for Religious Liberty |

# EXHIBIT 1

# Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act

In recent years, the Drug Enforcement Administration (DEA) has seen an increase in requests from parties requesting religious exemptions from the Controlled Substances Act (CSA) to permit the use of controlled substances. The Religious Freedom Restoration Act (RFRA) provides that the "Government shall not substantially burden a person's exercise of religion" unless the Government can demonstrate "that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-l. In **Gonzales** v. **O Centra Espirita Beneficente Uniao do Vegetal,** 126 S.Ct. 1211 (2006), the Supreme Court held that government action taken pursuant to the CSA is subject to RFRA. In order to obtain an exemption under RFRA, a party must, as a preliminary matter, demonstrate that its (1) sincere (2) religious exercise is (3) substantially burdened by the CSA. 42 U.S.C. § 2000bb et seq**.**

The guidelines that follow are an interim measure intended to provide guidance to parties who wish to petition for a religious exemption to the CSA:

1. *Filing Address.* All petitions for exemption from the Controlled Substances Act under RFRA shall be submitted in writing to Susan A. Gibson, Deputy Assistant Administrator, Diversion Control Division, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, Virginia 22152.

2. *Content of Petition.* A petition may include both a written statement and supporting documents. A petitioner should provide as much information as he/she deems necessary to demonstrate that application of the Controlled Substances Act to the party's activity would (1) be a substantial burden on (2) his/her sincere (3) religious exercise. Such a record should include detailed information about, among other things, (1) the nature of the religion {e.g., its history, belief system, structure, practice, membership policies, rituals, holidays, organization, leadership, etc.); (2) each specific religious practice that involves the manufacture, distribution, dispensing, importation, exportation, use or possession of a controlled substance; (3) the specific controlled substance that the party wishes to use; and (4) the amounts, conditions, and locations of its anticipated manufacture, distribution, dispensing, importation, exportation, use or possession. A petitioner is not limited to the topics outlined above, and may submit any and all information he/she believes to be relevant to DEA's determination under RFRA and the Controlled Substances Act.

3. *Signature.* The petition must be signed by the petitioner, who must declare under penalty of perjury that the information provided therein is true and correct. See *28 U.S.C. § 1746*.

4. *Acceptance of Petition for Filing.* Petitions submitted for filing are dated upon receipt by DEA. If it is found to be complete, the petition will be accepted as filed, and the petitioner will receive notification of acceptance. Petitions that do not conform to this guidance will not generally be accepted for filing. A petition that fails to conform to this guidance will be

returned to the petitioner with a statement of the reason for not accepting the petition for filing. A deficient petition may be corrected and resubmitted. Acceptance of a petition for filing does not preclude DEA from making subsequent requests for additional information.

5. *Requests for Additional Information.* DEA may require a petitioner to submit such additional documents or written statements of facts relevant to the petition as DEA deems necessary to determine whether the petition should be granted. It is the petitioner's responsibility to provide DEA with accurate contact information. If a petitioner does not respond to a request for additional information within 60 days from the date of DEA's request, the petition will be considered to be withdrawn.

6. *Applicability of DEA Regulations.* A petitioner whose petition for a religious exemption from the Controlled Substances Act is granted remains bound by all applicable laws and Controlled Substances Act regulations governing registration, labeling and packaging, quotas, recordkeeping and reporting, security and storage, and periodic inspections, among other things. See *21 C.F.R. §§ 1300-1316*. A petitioner who seeks exemption from applicable CSA regulations (as opposed to the CSA itself) may petition under *21 C.F.R. § 1307.03.* Such petition must separately address each regulation from which the petitioner seeks exemption and provide a statement of the reasons for each exemption sought.

7. *Activity Prohibited Until Final Determination.* No petitioner may engage in any activity prohibited under the Controlled Substances Act or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration. A registration granted to a petitioner is subject to subsequent suspension or revocation, where appropriate, consistent with CSA regulations and RFRA.

8. *Final Determination.* After the filed petition—along with all submissions in response to any requests for additional information—has been fully evaluated, the Deputy Assistant Administrator of the Diversion Control Division shall provide a written response that either grants or denies the petition. Except in the case of affirming a prior denial or when the denial is self-explanatory, the response shall be accompanied by a statement of reasons upon which the decision is based. This written response is a final determination under *21 U.S.C. § 877.*

9. *Application of State and Other Federal Law.* Nothing in these guidelines shall be construed as authorizing or permitting any party to take any action which such party is not authorized or permitted to take under other Federal laws or under the laws of the State in which he/she desires to take such action. Likewise, compliance with these guidelines shall not be construed as compliance with other Federal or State laws unless expressly provided in such other laws.

# EXHIBIT 2



**U. S. Department of Justice**

Drug Enforcement Administration

8701 Morrissette Drive
Springfield, Virginia  22152

---

*www.dea.gov*

**DEC 2 1 2016**

Derek B. Brett
Burnside Law Group
Park Central, Suite 9
109 Ilsley Avenue
Dartmouth, Nova Scotia B3B 1S8
Canada

Dear Mr. Brett:

The Drug Enforcement Administration ("DEA") is in receipt of your December 6, 2016, letter regarding the Soul Quest Church of Mother Earth.  Your letter references DEA's August 22, 2016, letter to your client in which we informed them that DEA was aware that they were offering "retreats" involving substances listed in Schedule I of the Comprehensive Drug Abuse Prevention and Control Act of 1970, also known as the "Controlled Substances Act" ("CSA").  As we noted in that August 22 letter, under the CSA and its implementing regulations, Congress prohibits the importation and distribution of Schedule I Controlled Substances except as authorized by law, Title 21, United States Code, Sections 841(a), 952(a)(2), 960 (21 U.S.C. §§ 841(a), 952(a)(2), 960).  DEA informed your client that, if they were purporting to distribute or use controlled substances for the purposes of religious exercise, the Religious Freedom Restoration Act ("RFRA") may be applicable.  For your clients' information, DEA included a copy of its guidance for those who seek to petition DEA for an exemption from the CSA pursuant to RFRA.

Your December 6, 2016, letter seeks "elaboration on what criteria are utilized by the DEA in scrutinizing exemption applications" and indicates your view that DEA is using "enhanced authority . . . to wield absolute discretion over the process."  I wish to assure you that DEA implements its petition process in full compliance with the requirements of RFRA.  DEA exercises no "enhanced authority" and has no "absolute discretion."  Rather, we apply the criteria set forth in the statute, as interpreted by the Supreme Court in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. § 418 (2006), and subsequent case law.  As we noted in our August 22, 2016, letter, RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion" unless the Government can demonstrate that "application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest," 42 USC § 2000bb-1.  To establish a *prima facie* case under RFRA, a claimant must demonstrate that application of the CSA's prohibitions on use of the specified controlled substances to the claimant would (1) substantially burden, (2) religious exercise (as opposed to a philosophy or way of life), (3) based on a belief that is sincerely held by the claimant.  *O Centro Espirita,* 546 U.S. at 428.  Once a claimant has established these threshold requirements, the burden shifts to the government to demonstrate that the challenged prohibition furthers a compelling governmental interest by the least restrictive means.  RFRA requires DEA to demonstrate that the compelling interest test is satisfied on a case by case basis, through application

Derek B. Brett                                                                                     Page 2

of the CSA to the particular claimant who believes that this sincere exercise of religion is being substantially burdened.  546 U.S. at 430-31.

Section 2 of DEA's "Guidance Regarding Petitions for Religious Exemption" provides further information about the contents of a petition, should you require it.  Once a petition is received, DEA fully considers the information provided and evaluates it in light of the statutory RFRA criteria noted above.  If necessary, DEA may request additional information from a petitioner as set forth in section 5 of the Guidance.  After the petition and any supplemental submissions have been evaluated, DEA provides a written response that either grants or denies the petition as provided in section 8 of the Guidance.

We trust this letter addresses your inquiry.  For information regarding the DEA Diversion Control Division, please visit www.DEAdiversion.usdoj.gov.  If you have additional questions on this issue, please contact the Diversion Control Division Liaison and Policy Section at (202) 307-7297.


Sincerely,


Louis J. Milione
Assitant Administrator
Diversion Control Division

# EXHIBIT 3

_bialabate.net



# BURNSIDE

L A W   G R O U P

**Derek B. Brett**
dbb@burnsidelaw.net

December 6, 2016

**VIA Registered Mail:**

Joseph T. Rannazzisi
Deputy Assistance Administrator
Office of Diversion Control
Drug Enforcement Administration
 8701 Morrissette Drive,
Springfield, Virgina 22152

Dear Mr. Rannazzisi:

I represent the interests of Soul Quest Church of Mother Earth ("Soul Quest"), a religious institution based in Orlando, Florida. I write in response to the correspondence your agency had previously directed to my client. That correspondence advised my client to cease and desist the use of Ayahuasca as a sacrament during its religious ceremonies.

The specific religious faith of Soul Quest and its members is a hybrid of Native American spirituality and Christianity, very much akin – in many ways to the institution that was the subject of the Supreme Court's 2006 decision in the O Centro Espirita Beneficente Uniao Do Vegetal matter. In other words, the ritual use of Ayahuasca in the Soul Quest ceremonies and services is deemed to be fundamental to its religious practices.

Soul Quest would normally be deemed to be protected in these practices under both the Religious Freedom Restoration Act of 1993, the subject of the O Centro Espirita decision before the Supreme Court. As federal authorities, of course, the DEA is subject to that decision, its progeny, and in recognizing the fundamental constitutional right of Soul Quest and its members to freely practice its religious beliefs.

The correspondence from the DEA – dated August 22, 2016, and attached, hereto – is troubling for several reasons. First, the correspondence has effectively shuttered the ability of the Church to tend to its members. As the use of Ayahuasca is so fundamental to its religious ceremonies, the Church and its members are wholly unable to exercise their sincere religious beliefs. It is the underlying nature of your

_bialabate.net

Page 2

agency, and its ability to arrest and have prosecuted the leadership and members of Soul Quest that has resulted in the shutdown of most Church operations and all affiliated religious services.

Second, even though the DEA will attest to the presence of an exemption process, that very process seems rife with defects that – we reasonably believe violate both the spirit of the RFRA and the letter of the Free Exercise Clause of the First Amendment. Such an exemption process, for which there appears virtually no definition, appears to allow for your agency – presumably, with the assistance of a designated Assistant U.S. Attorney – to wield absolute discretion over the process. Again, such enhanced authority seems in direct conflict with my client and its members' ability to freely exercise their faith according to the tenets of that faith. Further, our analysis of the DEA's exemption process further solidifies the impression that few, if any, exemptions are actually granted.

Indeed, the exemption process, for which there seems to be no mandated timetable for completion, serves to only exacerbate the injury to Soul Quest and its followers. Already, the Soul Quest Church has lost many of its members. Consequently, those adherents in the Central Florida area are left without any suitable religious venue upon which to practice their faith. The harm that has ensued is quickly approaching a permanent status.

We are seeking input from agency. We are seeking elaboration on what criteria are utilized by the DEA in scrutinizing exemption applications. We are seeking information to better understand a process which – despite the sincere nature of the religious beliefs being expressed by Soul Quest and its followers – would – on its face, at the very least – seems geared only to denying an exemption despite such actual, veritable sincerity and the core nature of the use of Ayahuasca. Of course, it is our ultimate hope that a suitable dialogue could be achieved between the DEA and Soul Quest to permit for a reputable exemption process allowing for Soul Quest to – in the near future – resume engagement in its religious sacraments.

I look forward to your forthcoming response. Due to the continuing nature of the injury to Soul Quest, we are requesting your response, via correspondence to this office, by no later than December 24, 2016.

Sincerely,

DEREK B. BRETT
Counsel for Soul Quest

# EXHIBIT 4



**U. S. Department of Justice**

Drug Enforcement Administration

8701 Morrissette Drive
Springfield, Virginia  22152

---

*www.dea.gov*

**DEC 2 1 2016**

Derek B. Brett
Burnside Law Group
Park Central, Suite 9
109 Ilsley Avenue
Dartmouth, Nova Scotia B3B 1S8
Canada

Dear Mr. Brett:

The Drug Enforcement Administration ("DEA") is in receipt of your December 6, 2016, letter regarding the Soul Quest Church of Mother Earth.  Your letter references DEA's August 22, 2016, letter to your client in which we informed them that DEA was aware that they were offering "retreats" involving substances listed in Schedule I of the Comprehensive Drug Abuse Prevention and Control Act of 1970, also known as the "Controlled Substances Act" ("CSA").  As we noted in that August 22 letter, under the CSA and its implementing regulations, Congress prohibits the importation and distribution of Schedule I Controlled Substances except as authorized by law, Title 21, United States Code, Sections 841(a), 952(a)(2), 960 (21 U.S.C. §§ 841(a), 952(a)(2), 960).  DEA informed your client that, if they were purporting to distribute or use controlled substances for the purposes of religious exercise, the Religious Freedom Restoration Act ("RFRA") may be applicable.  For your clients' information, DEA included a copy of its guidance for those who seek to petition DEA for an exemption from the CSA pursuant to RFRA.

Your December 6, 2016, letter seeks "elaboration on what criteria are utilized by the DEA in scrutinizing exemption applications" and indicates your view that DEA is using "enhanced authority . . . to wield absolute discretion over the process."  I wish to assure you that DEA implements its petition process in full compliance with the requirements of RFRA.  DEA exercises no "enhanced authority" and has no "absolute discretion."  Rather, we apply the criteria set forth in the statute, as interpreted by the Supreme Court in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. § 418 (2006), and subsequent case law.  As we noted in our August 22, 2016, letter, RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion" unless the Government can demonstrate that "application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest," 42 USC § 2000bb-1.  To establish a *prima facie* case under RFRA, a claimant must demonstrate that application of the CSA's prohibitions on use of the specified controlled substances to the claimant would (1) substantially burden, (2) religious exercise (as opposed to a philosophy or way of life), (3) based on a belief that is sincerely held by the claimant. *O Centro Espirita,* 546 U.S. at 428.  Once a claimant has established these threshold requirements, the burden shifts to the government to demonstrate that the challenged prohibition furthers a compelling governmental interest by the least restrictive means.  RFRA requires DEA to demonstrate that the compelling interest test is satisfied on a case by case basis, through application

Derek B. Brett                                                                        Page 2

of the CSA to the particular claimant who believes that this sincere exercise of religion is being substantially burdened.  546 U.S. at 430-31.

Section 2 of DEA's "Guidance Regarding Petitions for Religious Exemption" provides further information about the contents of a petition, should you require it.  Once a petition is received, DEA fully considers the information provided and evaluates it in light of the statutory RFRA criteria noted above.  If necessary, DEA may request additional information from a petitioner as set forth in section 5 of the Guidance.  After the petition and any supplemental submissions have been evaluated, DEA provides a written response that either grants or denies the petition as provided in section 8 of the Guidance.

We trust this letter addresses your inquiry.  For information regarding the DEA Diversion Control Division, please visit www.DEAdiversion.usdoj.gov.  If you have additional questions on this issue, please contact the Diversion Control Division Liaison and Policy Section at (202) 307-7297.

Sincerely,

Louis J. Milione
Assitant Administrator
Diversion Control Division

# EXHIBIT 5

bialabate.net

To.      Joseph T. Rannazzisi
         Deputy Assistant Administrator
         Office of Diversion Control
         Drug Enforcement Administration

From:    Blaine B. McGivern, Esq.
         Counsel for Petitioners

Date:    April 4, 2016

### AYAHUASCA HEALINGS NATIVE AMERICAN CHURCH'S
### PETITION FOR A CONTROLLED SUBSTANCES ACT EXEMPTION UNDER THE
### RELIGIOUS FREEDOM RESTORATION ACT

Petitioners (b)(6) _____ Christopher "Trinity" de Guzman, and (b)(6) _____ ("Petitioners"), individually and on behalf of and in their capacities as members and leaders of Ayahuasca Healings Native American Church ("AHNAC"), hereby respectfully petition the Drug Enforcement Administration ("DEA") for an Exemption from the Controlled Substances Act's ("CSA") prohibitions regarding Dimethyltryptamine ("DMT" or "Ayahuasca"), as provided by the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, *et seq*.

RFRA provides, in relevant part, that—

> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except . . . . [where the Government] demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.[1]

In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*[2] (*UDV*), a case involving a church whose members engaged in the sacramental use of Ayahuasca, the Supreme Court held that federal governmental actions that are taken pursuant to the CSA and which substantially burden a person's exercise of religion are subject to the strict scrutiny test set forth in RFRA. Thus, a person who demonstrates that his or her "sincere exercise of religion [is] substantially burdened" by the CSA has thereby established a *prima facie* claim for an exemption under RFRA[3], whereupon the burden of proof shifts to the government to show that enforcement of the relevant CSA prohibitions is the least restrictive means of furthering a compelling governmental interest.[4]

This petition will demonstrate: (1) that enforcement of the CSA against Petitioners would substantially burden their sincere exercise of religion; and (2) assuming the government does have a compelling interest, that there are less restrictive means to further that interest.

---

[1]    42 U.S.C. § 2000bb-1(a) and (b).
[2]    126 S.Ct. 1211 (2006).
[3]    *Id.* at 1219.
[4]    42 U.S.C. §2000bb-1(b).

bialabate.net

## I. Factual Background[5]

Ayahuasca Healings Native American Church is a 501(c)(3) organization formed by Petitioners for religious purposes. Petitioners intend very soon—within a few weeks of submitting this Petition—to change AHNAC's name to "Heart Energy Medicine Native American Church."

Petitioner [(b)(6)] title within the AHNAC organization is Creative Director and Spiritual Guide. Her role is to manage the creative aspects of AHNAC's activities, events, and community projects, and to coordinate the management team, volunteers, and members.

Petitioner [(b)(6)] [(b)(6)] roles and titles within the AHNAC organization are Chief Medicine Man and Church Director.

Petitioner [(b)(6)] His role and title within the AHNAC organization is Visionary Director.

Petitioners [(b)(6)] and Mr. de Guzman met in December of 2013. In May of 2015, they experienced a revelation "that the Creator had brought [them] together for a big and important reason," which was "to create healing communities all over the globe." In what Petitioners believe was "a series of divinely orchestrated events," Mr. [(b)(6)] and Mr. de Guzman felt divinely ordained to pursue the first step in fulfilling their mission to create such communities: "to partner up to bring this sacred medicine of Ayahuasca to the American public."

In pursuit of that goal, Petitioners began speaking out online about their intention of "bringing Ayahuasca to America." Petitioners also reached out to and received guidance from [(b)(6)] [(b)(6)] the founder of New Haven Native American Church (NHNAC—an independent branch of ONAC), who advised them that they "would have the complete and total legal protection of [a Native American Church], to be able to share Ayahuasca . . . with [AHNAC's] members" if AHNAC were a branch of NHNAC." Petitioners agreed and were inducted into NHNAC's fold.

Believing that they were now legally entitled to possess and distribute Ayahuasca to members of their church, Petitioners leased a plot of land in Elbe, Lewis County, Washington. There, with the help of volunteers, they erected a tipi for sacred ceremonial purposes and otherwise worked to prepare the land for its intended religious ceremonial purposes. Petitioners also began conducting interviews with prospective church members and began accepting contributions from members.

Petitioners scheduled and publicly announced (online) their first ceremonial retreat for January 22, 2016; following these announcements, AHNAC's social media presence "went viral." At that point, they were contacted by [(b)(6)] the founder of Oklevueha Native American Church (ONAC), who signaled his desire to support their mission. Petitioners saw in ONAC a church which shared "the same core beliefs [as AHNAC], as an Earth-based religion." Both churches "look at plants as teachers and spirits, and . . . turn to them for healing and guidance," and "share the same mission, to spread healing, truth, and love in the world, and together [ONAC and AHNAC] are working towards a vision where humans can live in harmony with each other and Mother Nature."

---

[5]     Unless otherwise noted, all content in this Petition that is placed in quotation marks is quoted from Mr. de Guzman's account, as related to Petitioner's counsel.

2

bialabate.net

However [(b)(6)] took issue with AHNAC's claims of legal protections, on the ground that NHNAC "did not have the full legal protections that ONAC has, and that . . . in order to have the full legal protection available, [AHNAC] would need to be" directly under the aegis of ONAC. [(b)(6)] provided Petitioners with guidance "on how to re-structure [their] organization and public image," and assured Petitioners that they "would receive the full legal protection that [ONAC itself has], to be able to share Ayahuasca . . . with [AHNAC's] members."

Based on Mr. [(b)(6)] advice, Petitioners took down their website and completely rewrote and restructured its content in order to comply with ONAC's Code of Ethics and Code of Conduct. Petitioners "followed all of [Mr. [(b)(6)] instructions, and [on December 22, 2015,] after a week of being offline," received "the full blessing from [(b)(6)] and ONAC, thus creating an official independent branch of ONAC."[6]

Believing once again that that they were now legally entitled to possess and distribute Ayahuasca to members of their church, Petitioners brought their new website online and continued receiving applications from prospective church members, conducting interviews, and receiving contributions to fund the building of their church.

Prior to hosting their first Ayahuasca retreat on January 22, 2016, Petitioners sent letters to (1) the Lewis County office and (2) the Lewis County District Attorney's office, informing the local government of their intent to host religious ceremonies involving scheduled substances. The County replied with approval to proceed, and a business number.

Between January 22, 2016 and February 29, 2016, Petitioners led a total of six retreats involving the sacramental use of Mother Ayahuasca and Father San Pedro.

In late January or early February of 2016, Petitioners received notice from the IRS that AHNAC had obtained status as a 501(c)(3) charitable organization.[7]

In mid-February of 2016, Petitioners received DEA's letter advising them of the necessity of obtaining an exemption from CSA prohibitions under RFRA. On February 29, 2016, Petitioners retained *pro bono* counsel, Blaine B. McGivern, for the purposes of assisting them in preparing this Petition. On advice of said counsel, Petitioners ceased all CSA-prohibited activities pending DEA's final decision on this Petition.

## II. Enforcement of the CSA against Petitioners would substantially burden their sincere exercise of religion.

### A. *Petitioners' belief system constitutes a religion.*

Petitioners derive their religious beliefs directly from the shamanic, animist religions of the Amazon in South America, which also incorporate elements of other belief systems, most prominently that of Christianity. Many of the indigenous South American cultures have *curanderos*, medicine men and women, or shamans, who act as their tribes' priests and healers. These cultures believe, as do Petitioners,

---

[6]   *See* Exhibit A, Declaration of [(b)(6)] Also, a video of [(b)(6)] ceremonial induction of AHNAC into the fold of ONAC is available at: https://www.youtube.com/watch?v=poUuORM3P1Q (last viewed 3/28/2016).
[7]   *See* Exhibit B, attached.

3

that all diseases and illnesses have spiritual root causes; the role of the *curanderos* or shamans is to enter the spirit world through the highly ritualized use of entheogenic substances—in Petitioners' case, Ayahuasca—in order to perform the tasks necessary to effectuate spiritual healing. Such tasks may include cleansing a diseased person's soul, or chasing away the evil spirits who are believed to be the cause of the disease.

The role of "Mother Ayahuasca" in Petitioners' belief system cannot be overstated. Petitioners believe, as do their spiritual forebears, that Ayahuasca is both a manifestation of the divine will and a divine, conscious entity in her own right. They consider Ayahuasca a "teacher plant," and the most powerful of all such plants. Petitioners believe that the ritualistic use of Ayahuasca as a sacrament—in combination with millennia-old prescribed rituals for cleansing and fasting, music, chanting, and shamanic guidance— allows those who partake in the Ayahuasca ceremonies not only a glimpse of the spirit world, but of the Great Spirit[8] that permeates and unites all of creation. This journey into the spirit world inevitably entails a journey into one's own soul. This journey of self-discovery is, to the voyager, indistinguishable from his or her "exterior" journey into the spirit world; indeed, the two journeys are in fact the same, and are inseparable. The effect is a simultaneous awakening of the sacramental Ayahuasca user to the Great Spirit, his or her own place in the Great Spirit, and the Great Spirit's place within him or her. The end result is almost always an indescribably profound religious experience.

The following is excerpted from an as-yet unpublished writing by Mr. de Guzman:



(b)(6)

As illustrated by the above excerpt, Petitioners' beliefs are indisputably religious in nature. As such, and for the following reasons, Petitioners ask that the government recognize their religion as one that is entitled to the protections afforded by RFRA and the Free Exercise Clause of the First Amendment to the U.S. Constitution.

---

[8]    Petitioners have a number of different names for their deity, including: the Universe, the Creator, the Great Spirit, or simply Spirit. For the purpose of clarity, this Petition will refer to Petitioners' deity as "Great Spirit" or "Spirit."

4

1. Petitioners' religion is not merely a "philosophy" or "way of life."

Petitioners' beliefs are primarily metaphysical in nature, as their belief system revolves around psychic entry into the spirit world. Naturally, there is some degree of overlap between Petitioners' non-secular belief system and secular concerns; however, such overlap is inevitable and common to virtually all religions. For example, Petitioners believe that the propagation of their religion will result in the medical and social betterment of people around the world—a belief which is analogous to the belief of Christians that Jesus Christ was (and is) able to cure the medical and social ills of the First Century (and today).

The critical point is that although Petitioners' goal is to catalyze a "Global Awakening," they believe that such an awakening hinges entirely on working with Mother Ayahuasca to enter the spirit world and heal the world's ills. This is not a philosophy or way of life; it is a belief in the metaphysical power of a corporeal manifestation of a divine, spiritual being (i.e., Ayahuasca).

Moreover, the Free Exercise case law is clear that a belief system need not be theistic—i.e., adhere to a belief in a Supreme Being—to qualify as a religion. It is enough for it to be "based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent."[9] Here, Petitioners' belief system inarguably includes a "transcendental or all-controlling force" in the forms both of Mother Ayahuasca and the omnipresent Great Spirit; thus, even a theistic definition of religion would have to encompass Petitioners' belief system. Nevertheless, application of a non-theistic definition would also necessarily encompass Petitioners' belief system, since everything in Petitioners' worldview is "ultimately dependent" upon working with Mother Ayahuasca.

Lastly, AHNAC has an express policy of taking "no position on any public or private controversy."[10] This stated policy should counsel against characterizing Petitioners' religion as a "philosophy" or "way of life," since it clearly eschews secular concerns in favor of spiritual matters.

2. Petitioners' religion satisfies the "indicia/guidelines for religion."

a. *Fundamental and ultimate ideas that address reality beyond the physical world.*

As noted by the Third Circuit in *Africa*, 662 F.2d at 1033, "above all else, religions are characterized by their adherence to and promotion of certain 'underlying theories of man's nature or his place in the Universe.'"[11]

Petitioners' belief system does address such "fundamental and ultimate ideas." Their belief in the existence of a metaphysical spirit world wherein human souls exist and interact with other spiritual beings and thereby incur benefit or harm to themselves or to others, combined with their belief in an omnipresent Great Spirit and the manifestations of its many facets—most prominently Mother Ayahuasca—provides a fundamental structure for answering such basic questions. For example, the perennial question of *purpose* is answered thusly:

I've walked this path for countless years, or really, countless lifetimes, and this is all about one thing...

---

9        *United States v. Seeger*, 380 U.S. 163, 176 (1965); *see also Africa v. Commonwealth*, 662 F.2d at 1031 (3d Cir. 1981).
10       *Available at* https://ayahuascahealings.com/ayahuasca-usa-church-vision/ (last viewed March 21, 2016).
11       Quoting *Founding Church of Scientology v. United States*, 409 F.2d 1146, 1160 (D.C. Cir. 1969.

Our Global Awakening.

You, me, the people around us, the communities we build, we are all serving something so much greater than us. We are serving the Whole, Mother Earth, our Collective Humanity, to achieve the peace that is destined for us.

Mother Ayahuasca, . . . our conscious communities, the infinite love that flows from all we live and exist as, this is all just in service for the Divine Plan to flow through.

. . . [AHNAC is] here to support you in this Divine Remembering.

Finding your purpose. Your reason for why you're really here. And helping you live that, unquestionably, unshakably, and without a doubt about any single aspect of it.[12]

In other words, Petitioners believe that humanity's purpose is to serve "something greater," namely "the Whole" (or the "Divine Plan," Great Spirit, etc.), Mother Earth, and Collective Humanity. Moreover, the following excerpt from AHNAC's website provides an informative description of Petitioners' mission:

To enhance our awareness, feeling and sensitivity to life, the spirit and the energy in the universe, through the interaction with others from around the globe and our living breathing planet.

To explore the mystery of life, question consciousness, reality, and the power of the mind.

. . .

To restore our deep inner connection with the natural world, and in doing so help guide people to guide themselves in re-discovering the path to spiritual enlightenment and the power of living in the now.

. . .

To be responsible volunteers, guardians, caretakers and protectors of these lands and the sacred sites of our ancestors.[13]

Themes of environmentalism, and even of filial piety through environmental stewardship, are ubiquitous throughout Petitioners' teachings. These themes may be analogized to, and in some cases rightly conflated with, those present in religions (or religious genera) such as Gaianism, Animism, and Shamanism.

Petitioners' religion, like the religions from which it derives, places great emphasis on environmental stewardship, recognizing that there are no actual (as opposed to invented) boundaries between humanity and nature, nor between matter and spirit, nor the self and the Whole. Having thus rejected Cartesian dualism and accepted this metaphysical understanding of universal interconnectedness, Petitioners' religion obligates its practitioners to alter their behaviors such that they are in alignment with the ecological and supernatural needs of the environment.

To put it another way (insofar as it is susceptible to verbal distillation), Petitioners' teleological reasoning is as follows: (1) we are part of the whole of existence, and the whole of existence is us—there is no distinction other than that which humanity has imagined; (2) the whole of existence is the Great Spirit; therefore, (3) any action taken by an individual affects not only that individual and his or her immediate

---

12      *Available at* https://ayahuascahealings.com/trinitys-welcome-message/ (last viewed March 21, 2016).
13      Https://ayahuascahealings.com/ayahuasca-usa-church-vision/ (last viewed March 21, 2016).

6

surroundings, but the entirety of existence and the Great Spirit; (4) actions not in alignment with the ecological and supernatural needs of the environment are contrary to the needs of ourselves and the plans of the Divine Consciousness; therefore, (5) our purpose and our moral duty is to conduct ourselves such that we act in harmony with the environment.

To be clear, the foregoing is only one facet of Petitioners' belief system. Petitioners have other non-secular reasons for their envirocentric morality, including their animistic beliefs (e.g., it is morally wrong to destroy a mountain to mine its minerals, in part because the mountain has a soul and is a conscious entity).

As for the question of life after death, Petitioners' belief in souls, a spirit world, and a fundamentally interconnected spiritual-physical ecology necessitates a belief in reincarnation. As Mr. de Guzman has publicly stated: "I've walked this path for countless years, or really, countless lifetimes . . . ." *See supra*.

Clearly, Petitioners' religion provides metaphysical answers to those questions that have haunted mankind from its first moments of self-awareness: our purpose in life; the meaning of self; and what happens after we die.

### b. *A comprehensive moral or ethical belief system.*

Petitioners believe that the question of their moral or ethical belief system has been adequately addressed in the foregoing subsection; nevertheless, they reiterate here that their religion imposes upon them a moral duty to act in accordance with the spiritual and ecological needs of the environment. The consequences of breaching that duty are analogous to those imposed by the Hindu principle of karma: whatever action one takes against anyone or anything else is simultaneously an action taken against oneself, and the effects of such actions will manifest either in this life or in the next.

By extension—by the transitive properties of animistic belief—Petitioners' religion also imposes upon them a moral duty to act in accordance with the spiritual and physical needs of other persons. This is analogous to the "Golden Rule," the most famous permutations of which are attributed to Jesus Christ: "Do unto others as you would have them do unto you."[14]

Lest there be any confusion about how Petitioners' religion characterizes particular conduct as "right" or "wrong," AHNAC has published on its website a comprehensive set of moral imperatives, which it refers to as "Philosophies" (which is, admittedly, something of a misnomer). These guidelines have been wholly adopted from AHNAC's parent church, the Oklevueha Native American Church, and Petitioners expect all members of AHNAC to adhere to them. As an example, consider the following:

#### Fifth Philosophy – TO THE EARTH

Our Mother Earth is the source of all life, whether it be plants, the two-legged, four-legged, winged ones or human beings. The Mother Earth is the greatest teacher, if we listen, observe and respect her. When we live in harmony with the Mother Earth, she will recycle the things we consume and make them available to our children. As an Indian man, I must teach my children how to care for the Earth so it is there for the future generations.

So from now on, I realize the Earth is our Mother. I will treat her with honor and respect.
I will honor the interconnectedness of all things and all forms of life.

---

[14]    Matthew 7:12.

7

bialabate.net

AHNAC's Petition for CSA Exemption under RFRA

I will realize the Earth does not belong to us, but that we belong to the Earth.

The natural law is the ultimate authority upon the lands and water. I will learn the knowledge and wisdom of the natural laws. I will pass this knowledge on to my children.

The Mother Earth is a living entity that maintains life. I will speak out in a good way whenever I see someone abusing the Earth. Just as I would protect my own mother, so I will protect the Earth. I will ensure that the land, water, and air will be intact for my children and for my children's children-the unborn.[15]

AHNAC's/ONAC's other "Philosophies" include extensive moral guidelines specifically regarding the treatment of women (e.g., ". . . I will look upon women in a sacred manner. . . . I will refrain from any form of emotional or physical abuse"); the treatment of children ("We are the caretakers of the children for the Creator. They are his children, not ours"); the treatment of one's family ("I will nurture our family's spiritual, cultural and social health"); the relationship to community (specifically Native American communities); and the Creator ("I will look with new eyes on the powers of our ceremonies and religious ways, for they are important to the very survival of our people").[16]

In addition, AHNAC has adopted in whole ONAC's Code of Ethics[17], and ONAC's Code of Conduct[18]. The Code of Ethics is generally applicable to ONAC/AHNAC clergy/leaders, which the Code of Conduct is applicable to church members. The Code of Conduct requires members to make such pledges as:

I commit to making effort to spend time each day in meditation and prayer, drawing closer to the Great Spirit and all of creation, the two-leggeds and the four-leggeds. . . .

I will never share sacraments or sell medicines to those who are not members of ONAC. I understand that doing so removes my legal protection and exposes me to prosecution.

### c. Structural characteristics.

#### i. Formal ceremonies or rituals.

Sacred ceremony is critical to Petitioners' exercise of religion, and is inextricably intertwined with their sacramental use of Ayahuasca. Petitioners believe that the rituals which comprise their ceremonies have been handed down from shaman to shaman over millennia, and that they were originally given to mankind by Mother Ayahuasca herself.

Petitioners employ a prescribed series of distinct ceremonies leading up to each sacramental use of Ayahuasca. The first ceremony is the Sweat Lodge, a traditional Native American cleansing and purification ceremony intended to allow the ceremonial congregants to "sweat out toxins" inside a steam-filled tipi. The Sweat Lodge ceremony is led by [b(6)] a septuagenarian Native American Elder whom Petitioners describe as "a powerful and important part" of their church.

---

15  Https://ayahuascahealings.com/ayahuasca-usa-church-vision/ (last viewed 3/21/2016).
16  Id.
17  Available at https://ayahuascahealings.com/about-oklevueha/onac-code-of-ethics/ (last viewed 3/21/2016).
18  Available at https://ayahuascahealings.com/about-oklevueha/onac-code-of-conduct/ (last viewed 3/21/2016).

8

Following the Sweat Lodge is another cleansing or purgative ceremony. Petitioners believe that both body and soul must be cleansed prior to consuming Ayahuasca, so that Mother Ayahuasca's magic can penetrate deeper to find the roots of the individual's problems. The cleansing ceremony comprises a series of rituals, performed over the course of at least a full day; these rituals include fasting, incantations/prayers, meditation, and consumption of plant-based emetics and purgatives. Following the cleansing ceremony is a ceremony intended to express gratitude for the sacrament the participants are about to receive, and to prepare the congregants' bodies and spirits for their rigorous journey into the spirit world and into their own souls. This ceremony comprises a series of prescribed rituals including prayers, incantations, drumming and singing.

Following the preparatory ceremonies is another ceremony—analogous in some ways to Communion for Catholics—for the ritualized ingestion of the Ayahuasca brew. Following ingestion, a prescribed series of songs and chants are performed while the congregants wait for their journey to begin. Once the journey is underway, the shaman overseeing the ceremony observes the congregants and helps them find their way through difficult passageways through the use of prescribed prayers and incantations, among other tools in the shaman's kit. Lastly, once the congregants have returned from their journeys, a ceremony is held to give thanks to Mother Ayahuasca and to mentally and emotionally process the profound knowledge that was gleaned from the experience.

### ii. Gathering places.

AHNAC's congregants gather in their sacred tipi, which they constructed themselves. This tipi is for ceremonial and sacramental use only, and it is where all spiritually significant activities undertaken by AHNAC take place.

### iii. Clergy and/or prophets.

AHNAC's clergy consists of shamans (or, in AHNAC's parlance, Medicine Men/Women) who have undergone long and extensive training with *curanderos* in the Amazonian jungles. They have experienced the medicine of Mother Ayahuasca and learned, over the course of many years, how to administer that medicine to others safely and in alignment with the ancient, sacred rituals prescribed by the *curanderos*' ancestors and, legend has it, by Mother Ayahuasca herself.

### iv. Structure and organization.

AHNAC's organizational structure is not intended to be hierarchical; in the eyes of Great Spirit and Mother Ayahuasca, all humans are equal in dignity. However, the church requires an executive body, and that consists, in part, of Petitioners Mr. (b)(6)       , Mr. de Guzman, and Ms. (b)(6)          is the Chief Medicine Man and Church Director. He is charged with leading, supervising and/or coordinating with other medicine men and women to run the ceremonies each week, and in general is responsible for the oversight of all church activities, from inception to on-the-ground management. Mr. de Guzman is the Visionary Director of the church, whose role is to act as a spiritual teacher to church members, often in the form of sermon-like videos published online, and often in one-on-one consultation with church members. Ms. (b) is Creative Director and Spiritual Guide; her role is partly administrative, functioning as a creative/operational coordinator, and partly ecclesiastical, giving spiritual guidance to persons seeking the church's help in spiritual matters.

In addition, there is the aforementioned clergy consisting of trained shamans, and the church's Code of Ethics provides that "'Controlled' substances must be used under the direction of medicine people [i.e., shamans] . . . ." https://ayahuascahealings.com/about-oklevueha/onac-code-of-ethics/.

bialabate.net

Therefore, all Ayahuasca ceremonies conducted under the auspices of AHNAC are required to be done only at Petitioners' direction and under the guidance of a shaman.

### v. Efforts at propagation.

The teleological sense of purpose held by Petitioners (*see* section (A)(2)(a), *supra*), in conjunction with their belief that Mother Ayahuasca's guidance is essential to fulfilling that purpose, means that Petitioners' faith requires them to grow their church and to spread the gospel of Mother Ayahuasca and Great Spirit.

However, Petitioners also recognize that propagation is a double-edged sword, as they have a strong countervailing interest in being in the good graces of the law, such as it is, and with those who are charged with enforcing the law. Petitioners are determined not to let their belief in the necessity of propagation derail any hope they have of fulfilling their divine purpose.

Moreover, ONAC/AHNAC's own Code of Ethics provides that growth may be attained not by "proselytizing for membership," but "through attraction through service."[19]

Petitioners humbly acknowledge that some of the materials that have been published by AHNAC may be interpreted as "marketing" efforts. In their religious zeal for spreading knowledge of Mother Ayahuasca, and armed with a misguided understanding of the state of the law, Petitioners admit that they went overboard in their efforts at propagation. To cure this and to improve the optics of their online presence, they have been working in earnest with counsel to amend their published materials as necessary. In addition, they would be happy to cede to DEA the right of pre-publication review and authorization for any written or audio/visual materials prepared for publication on AHNAC's website (provided that DEA's exercise of said oversight does not infringe upon Petitioners' statutory or constitutional rights). Petitioners reiterate that they are committed to working within the confines of the law, and look forward to cooperating with DEA to make sure of it.

Additionally, Petitioners have had a change of heart with respect to their publicly stated plans for the growth of their church. After much fasting and prayer, they have determined that they would better serve the Divine Plan for now by focusing their efforts in the U.S. on their church center in Elbe, Washington only. Petitioners still wish to grow their church at some point in the future; therefore, they do not want to foreclose on the possibility of opening additional ceremonial facilities elsewhere in the U.S. Petitioners still believe in the spiritual necessity of spreading the gospel of Mother Ayahuasca; they have simply readjusted their spiritual ambitions to a fuller understanding of the societal parameters and cultural and legal barriers confronting them.

### vi. Diet or fasting.

Diet and fasting are of enormous importance to the exercise of Petitioners' religion, for both spiritual and practical reasons. Fasting prior to taking part in an Ayahuasca ceremony is an essential part of the physical and spiritual cleansing ceremony, as Petitioners believe that a pre-ingestion period of fasting, emesis, and purgation will allow Mother Ayahuasca's magic to work its way deeper into the sojourner.

Dietary proscriptions are also strictly adhered to, due to *Banisteriopsis Caapi*'s biochemical attributes: in the human body it acts as a monoamine oxidase inhibitor (MAOI), which means that it inhibits the action

---

[19]  Https://ayahuascahealings.com/about-oklevueha/onac-code-of-ethics/ (last viewed 3/22/2016).

10

of the enzymes that break down certain neurotransmitters. Ingestion of certain foods within a window of time prior to or following ingestion of Ayahuasca can have deleterious effects.[20]

Aside from the chemical necessity of adhering to a certain diet, there are also religious rationales for these dietary restrictions:

> From the perspective of this shamanic tradition, each plant represents and holds a different spirit . . . . These plant spirits must be totally respected within the body. They can intensely heal and transform you, but if you disrespect their gifts by contaminating your body once they are inside you, there can be very serious consequences. Following the Ayahuasca diet can go a long way in demonstrating respect to these spirits.[21]

Petitioners provide their ceremony participants with a traditional Peruvian Ayahuasca diet, "cutting out salt, sugar, fatty foods, meat, and anything else that would counter the effects of the medicine that we are working to achieve."[22] The purpose of this diet is explained thusly:

> There is a current of energy flowing from the top of your head, down to the bottom of your spine. This is your connection to Father Sky, and Mother Earth; Divine Consciousness, and Unconditional Love. [An improper diet would clog] your energy flow, and your strong connection with these energies. That would slow down the movement and transmission of energy, and ultimately, your healing process, and the potential to give and receive life-changing insights and clarity.[23]

### vii. Belief in supernatural entities.

In addition to Mother Ayahuasca, Father San Pedro, and Great Spirit, Petitioners also believe in a number of other spiritual entities. The following is excerpted from an as-yet unpublished writing by Mr. de Guzman:

> We believe there are thousands, tens of thousands, of angels around us in every moment. They are here to support us, to guide us, to show us, and to be with us, to help us on our journey, and give us direction when we need it. They are here to protect us, and to remind us of what we need to be reminded of, when we need it most.

Petitioners' belief in angels encompasses a number of Archangels, including, among others: Rafael, who "wields the green sacred fires of healing;" Gabriel, "protector of Divine Truth;" Uriel, "archangel of compassion and change;" Azrael, "archangel of death and rebirth," and Raziel, "archangel of past lives, and the remembering of what once was."

Sitting above the Archangels in Petitioners' pantheon are the Ascended Masters Buddha and Jesus. Petitioners see Buddha as "the teacher of non-attachment and the path of liberation through the releasing of suffering via the letting go of desire." Petitioners see Jesus as "the master of compassion, forgiveness and grace," who "walks the path of the heart, and shows us the path to our spiritual truth through the loving of all beings and things."

---

[20]     Petitioners have published a dietary guide on AHNAC's website, available at
https://ayahuascahealings.com/ayahuasca-retreats-usa/ayahuasca-dietary-guidelines/ (last viewed 3/22/2016).
[21]     *Id.*
[22]     Https://ayahuascahealings.com/ayahuasca-retreats-usa/ (last viewed 3/22/2016)
[23]     *Id.*

11

bialabate.net

AHNAC's Petition for CSA Exemption under RFRA

However, aside from Great Spirit, Mother Ayahuasca, and Father San Pedro, the most important supernatural entities in Petitioners' belief system are the animistic spirits:

> The animal spirits, plant spirits, mountain spirits, and spirits of all that exists around us. . . . . We never open up a ceremony without first asking permission from the spirits of the land, for the permission to open sacred space on this land, and invite them to join us . . . . We offer our ceremonies, our prayers, and our highest intention for the service of all beings, but first, always to the spirits immediately around us.

### B. *Petitioners' Belief in their Religion is Sincerely Held.*

#### 1. Petitioners' religion was not created as an *ad hoc* justification.

Petitioners did not invent their religion; they learned it from its traditional practitioners in the Amazon, and founded AHNAC in an effort to bring their religion to the United States.

Further, Ayahuasca is not a "recreational drug." Rather, it is a powerful medicine which induces an intense revelatory experience that is frequently difficult or unpleasant. For this reason, Petitioners herein aver that they would not, did not, and cannot imagine anyone adopting their religion merely for the sake of being able to ingest Ayahuasca legally. It is also Petitioners' strongly-held belief that anyone who has experienced the magic of Mother Ayahuasca would necessarily be sincere in their belief in Her power and in Great Spirit.

#### 2. Petitioners regularly hold and participate in ceremonies and rituals.

Petitioners hold ceremonies frequently and regularly—weekly, when possible—and faithfully perform (or ensure the performance of) the many rituals attendant to each such ceremony. As noted above, these ceremonies are an integral and essential aspect of their religious practice. Just as removing Mother Ayahuasca from their religion would render their ceremonies empty, so would abandoning their ceremonies vastly diminish the spiritual power of the Ayahuasca; the two are inextricably linked.

#### 3. Other substances.

Petitioners believe, as do their spiritual teachers and forebears, that all plant medicines have a spirit and a divine purpose. Petitioners have in the past made sacramental use of Father San Pedro (*Trichocereus pachanoii*, a mescaline-containing cactus), as was taught to them by their *curanderos*. San Pedro is believed to be a male spirit counterpart to the female spirit Ayahuasca and, as such, holds an important place in the religious and ethnobotanical pantheon of the *curanderos*.

However, Petitioners are not seeking an exemption for mescaline. Although San Pedro is an important part of their exercise of religion, Ayahuasca is *absolutely essential* to it; and given the (non-controlling) precedent established by the Tenth Circuit in *United States v. Quaintance*,[24] Petitioners have decided to use and seek exemption for Ayahuasca only.

---

[24]    471 F. Supp. 2d 1153, 1174 (finding the defendants' use of "other illegal substances"—i.e., cocaine—to be evidence of insincerity).

12

That said, Petitioners believe that RFRA and the Free Exercise Clause do protect their right to sacramental use of both Ayahuasca and San Pedro, and do not believe that the district court's reasoning in *Quaintance* is applicable to the particular facts their case. Therefore, Petitioners do intend to petition for an exemption for mescaline at some point in the future, after having established a settled and cooperative working relationship with DEA Diversion Control.

### 4. Evidence of Commerce.

Petitioners have little or no commercial incentive to invent or adopt an Ayahuasca-based religion. They do not sell and have never sold Ayahuasca, and the contributions the church has received have gone almost entirely into overhead costs (e.g., rent payments, improvements to the land, food, fuel, etc.)[25].

In addition, Petitioners have recently recalibrated their goals. Petitioners do intend eventually to expand their presence in the U.S. beyond their center in Elbe, Washington. However, they retract previous announcements regarding existing plans to open numerous other retreat centers across the U.S. Rather, Petitioners wish to proceed with caution and humility, first testing the waters with their Elbe center, and then, resources and social and legal climate permitting, test the waters further with a second retreat center. This would likely be years down the road, and of course would be done in compliance with all applicable laws and in cooperation with DEA.

### C. *Enforcing the CSA's Prohibition on DMT Would Substantially Burden Petitioners' Exercise of Religion.*

As set forth in greater detail *supra*, Mother Ayahuasca is central to Petitioners' religious beliefs. Not only do they believe that Ayahuasca is the most important and viable "path up the mountain" to Great Spirit, but also that Mother Ayahuasca is a divine entity (a deity) in her own right. Not to receive her guidance would be a forsaking of her divinity—in other words, a sacrilege.

Moreover, Petitioners believe that the ceremonies and rituals attendant to the sacramental ingestion of Ayahuasca were given to mankind by Mother Ayahuasca herself, and passed down from generation to generation over untold millennia. Since the purpose of these religious traditions pertains directly to Ayahuasca, prohibiting Petitioners from using Ayahuasca would render their traditions useless and devoid of meaning, other than as an empty relic, like an oyster shell with no meat and no pearl.

In short, enforcement of the CSA's prohibition on DMT in Petitioners' case would substantially burden their exercise of their sincerely held religious beliefs.

### III. Enforcement of the CSA's Prohibition on DMT is Not the Least Restrictive Means of Furthering Compelling Government Interests.

In determining whether enforcement of a particular CSA prohibition is the least restrictive means of furthering a compelling government interest, the government must "'scrutinize the asserted harm of granting specific exemptions to particular religious claimants' and 'to look to the marginal interest in enforcing' the challenged government action in that particular context."[26] In this case, RFRA requires the

---

[25]   Petitioners are in the process of gathering their receipts for expenditures and compiling and identifying contributions from members. This information will be available to DEA shortly.

[26]   *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015), citing *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2779 (2014).

government to consider how its compelling interest in protecting persons' health and safety and in preventing diversion of Ayahuasca into the illicit drug market would be harmed by Petitioners' particular use of Ayahuasca.[27]

### A. *Accommodating Petitioners would not harm the Government's interest in protecting Health and Safety.*

As noted by the Supreme Court in *UDV*, "[t]he fact that the [CSA] itself contemplates that exempting certain people from its requirements would be 'consistent with the public health and safety' indicates that congressional findings with respect to Schedule I substances should not carry the determinative weight, for RFRA purposes, that the Government would ascribe to them."[28] Moreover, noting that there had long "been a regulatory exemption for use of peyote—a Schedule I substance—by the Native American Church," the Court observed that—

> —[i]f such use is permitted in the face of the congressional findings in § 812(b)(1) for hundreds of thousands of Native Americans practicing their faith, it is difficult to see how those same findings alone can preclude any consideration of a similar exception for the 130 or so American members of the UDV who want to practice theirs. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest 'of the highest order' ... when it leaves appreciable damage to that supposedly vital interest unprohibited'" (quoting *Florida Star* v. *B. J. F.*, 491 U.S. 524, 541-542 (1989) (SCALIA, J., concurring in part and concurring in judgment))).[29]

In the case of Ayahuasca, the Government has already made exceptions under RFRA; for example, the UDV and Santo Daime churches. If the Government's interest in protecting the health and safety of UDV and Santo Daime church members is not harmed by exempting their use of Ayahuasca, the same interest in Petitioners' health and safety would likewise be unharmed by granting Petitioners the same exemption.

Furthermore, Petitioners hereby aver that their safety record is unimpeachable. They and their church's medicine men and women have received many years of training from *curanderos*, whose practice in administering Ayahuasca goes back countless generations. Moreover, Petitioners have implemented a quality assurance regime with respect to their Ayahuasca

(b)(7)(E)

Petitioners also wish to note that they "deeply pray over the medicine to clear it of any energy that is less than the highest serving energy of love and light for our Church members, before sharing it in any Ceremony."

### B. *Accommodating Petitioners would not harm the Government's interest in Preventing Diversion.*

DEA has a system already in place for accommodating persons whose exercise of religion would be unduly burdened by CSA enforcement, while at the same time protecting the Government's interest in preventing diversion of scheduled substances into the illicit drug market. Thus, the Government "itself

---

[27]  *UDV*, 126 S. Ct. at 1220-1221.

[28]  *UDV*, 546 U.S. at 432 – 433, citing 21 U.S.C. § 822(d).

[29]  *Id.* at 433.

14

has demonstrated that it has at its disposal an approach that is less restrictive" than enforcement of the CSA against Petitioners.[30]   While bringing Petitioners into DEA's diversion control program would undoubtedly result in a marginal increase in DEA's operating expenses, the Supreme Court has held that RFRA "may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs."[31]

Denying Petitioners' request for a RFRA exemption on the ground that CSA enforcement is the least restrictive means of preventing diversion would require a finding that the particular circumstances of Petitioners' case renders it so.   Admittedly, there are facts which distinguish Petitioners' case from those of the UDV and Santo Daime churches.   However, to the extent that any such distinctions are not in Petitioners' favor, Petitioners hereby reiterate their sincere desire to be within the law and the good graces of the Government, and aver that they will modify their behavior and circumstances in whatever way DEA deems necessary for them to qualify for an exemption under RFRA (provided that any such modifications do not violate Petitioners' statutory or constitutional rights).   For example, as noted *supra*, Petitioners are willing to give DEA the right of pre-publication review of any of Petitioners' written or audio/visual materials prepared for online publication.

With respect to the source of Petitioners' supply of Ayahuasca

(ORDER RE)

Petitioners will gladly submit to any protocols DEA deems necessary for purposes of safety and diversion control.

Regarding quantities of Ayahuasca to be imported, possessed, and distributed, Petitioners aver the following facts:

(ENTRE)

---

[30]   *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2782 (2014).
[31]   *Id.*, at 2781.

15

AHNAC's Petition for CSA Exemption under RFRA



Petitioners believe that it would be a simple matter to (b)(7)(E)
Such a manageable amount of the substance should not be considered a threat to the government's interest in diversion prevention.

## IV. CONCLUSION.

Enforcing the CSA's prohibitions on Ayahuasca as to Petitioners would substantially burden their exercise of the sincerely held religious beliefs. Furthermore, given DEA's extant accommodation programs and Petitioners' sincere assurances of cooperation, enforcement of said CSA prohibitions is not the least restrictive means of furthering the government's interests in public safety and diversion control. Therefore, Petitioners respectfully ask that DEA grant their request for an exemption under RFRA for their sacramental use of Ayahuasca.

Respectfully submitted,

**Declaration:**

I, (b)(6) _____ , do hereby declare:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __03/29/2016__

(b)(6)

---

[32]   Considering the factors listed above, AHNAC's medicine men and women require higher doses than the typical congregant

16

bialabate.net

Declaration:

I, Christopher de Guzman, do hereby declare:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on   3-30-2016

Signed,

Declaration:

I, [(b)(6)]                           , do hereby declare:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on   03/31/16

Signed,

[(b)(6)]

Attached:
    Exhibit A – Declaration of ONAC [(b)(6)]
    Exhibit B – IRS 501(c)(3) Status Letter

17

bialabate.net

## OKLEVUEHA NATIVE AMERICAN CHURCH
## OF AYAHUASCA HEALING
### Declaration

The undersigned, being the Chief Executive Officer of Oklevueha Earthwalks Native American Church of Utah Inc.[1] a Utah State nonprofit Corporation[2] and Co-Founder of the allied and communal Native American Church with the Lakota Sioux Nation Native American Church of South Dakota[3]. And, as an American Native Indigenous 'earth' based and 'healing' religion that is known as Oklevueha Native American Church, Native American Church, ONAC and / or NAC.

(b)(6) ............................................ solemnly swear and:

A. Declare that OKLEVUEHA NATIVE AMERICAN CHURCH OF AYAHUASCA HEALING is a Branch ('Free Church') of Oklevueha Native American Church as long as the trees and grasses grow and rivers flow.

B. Declare that OKLEVUEHA NATIVE AMERICAN CHURCH OF AYAHUASCA HEALING Chief Executive Officer is MARC SHACKMAN, President is TRINITY DE GUZMAN, and COO is KIGAN M. SIENE as long as they walk Mother Earth.

C. Declare OKLEVUEHA NATIVE AMERICAN CHURCH OF AYAHUASCA HEALING will receive all rights and protections that the 'Free Church' of Oklevueha Earthwalks Native American Church of Utah Inc. (Federal ID Number: 841-402-813) receives.

D. OKLEVUEHA NATIVE AMERICAN CHURCH OF AYAHUASCA HEALING is authorized to utilize Oklevueha Native American Church symbol as being exhibited and or with similar alterations:



As Chief Executive Officer of Oklevueha EarthWalks Native American Church of Utah Inc and Co-Founder of Oklevueha Native American Church, I have personal knowledge of the facts of these declarations for OKLEVUEHA NATIVE AMERICAN CHURCH OF AYAHUASCA HEALING. With my signature, I acknowledge these facts to be true and accurate.

(b)(6)

Chief Executive Officer of Oklevueha EarthWalks Native American Church of Utah Inc
Co-Founder Oklevueha Lakota Sioux Nation Native American Church of South Dakota

Subscribed (b)(6) this 22 day of December, 20 15

By_____
          Notary Republic

Residing in: 251 E 1000 N        My Commission Expires: Sept 15 2017

[1] Federally Registered with the Federal ID number 8841402813, page 3
[2] State of Utah Division of Corporations – Certificate of Existence Registration #1353164-0140, page 6
[3] Oklevueha Lakota Sioux Nation Native Native American Church ARTICLES, page 11

Declaration of the organization and acceptance
Of
OKLEVUEHA NATIVE AMERICAN CHURCH OF AYAHUASCA HEALING
DECEMBER 10, 2015

# EXHIBIT 6

# Presidential Documents

Executive Order 13798 of May 4, 2017

## Promoting Free Speech and Religious Liberty

By the authority vested in me as President by the Constitution and the laws of the United States of America, in order to guide the executive branch in formulating and implementing policies with implications for the religious liberty of persons and organizations in America, and to further compliance with the Constitution and with applicable statutes and Presidential Directives, it is hereby ordered as follows:

**Section 1**. *Policy.* It shall be the policy of the executive branch to vigorously enforce Federal law's robust protections for religious freedom. The Founders envisioned a Nation in which religious voices and views were integral to a vibrant public square, and in which religious people and institutions were free to practice their faith without fear of discrimination or retaliation by the Federal Government. For that reason, the United States Constitution enshrines and protects the fundamental right to religious liberty as Americans' first freedom. Federal law protects the freedom of Americans and their organizations to exercise religion and participate fully in civic life without undue interference by the Federal Government. The executive branch will honor and enforce those protections.

**Sec. 2**. *Respecting Religious and Political Speech.* All executive departments and agencies (agencies) shall, to the greatest extent practicable and to the extent permitted by law, respect and protect the freedom of persons and organizations to engage in religious and political speech. In particular, the Secretary of the Treasury shall ensure, to the extent permitted by law, that the Department of the Treasury does not take any adverse action against any individual, house of worship, or other religious organization on the basis that such individual or organization speaks or has spoken about moral or political issues from a religious perspective, where speech of similar character has, consistent with law, not ordinarily been treated as participation or intervention in a political campaign on behalf of (or in opposition to) a candidate for public office by the Department of the Treasury. As used in this section, the term "adverse action" means the imposition of any tax or tax penalty; the delay or denial of tax-exempt status; the disallowance of tax deductions for contributions made to entities exempted from taxation under section 501(c)(3) of title 26, United States Code; or any other action that makes unavailable or denies any tax deduction, exemption, credit, or benefit.

**Sec. 3**. *Conscience Protections with Respect to Preventive-Care Mandate.* The Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health and Human Services shall consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg–13(a)(4) of title 42, United States Code.

**Sec. 4**. *Religious Liberty Guidance.* In order to guide all agencies in complying with relevant Federal law, the Attorney General shall, as appropriate, issue guidance interpreting religious liberty protections in Federal law.

**Sec. 5**. *Severability.* If any provision of this order, or the application of any provision to any individual or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other individuals or circumstances shall not be affected thereby.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*May 4, 2017.*

[FR Doc. 2017–09574
Filed 5–8–17; 11:15 am]
Billing code 3295–F7–P

# EXHIBIT 7



# Office of the Attorney General
## Washington, D.C. 20530
October 6, 2017

MEMORANDUM FOR ALL EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:        THE ATTORNEY GENERAL

SUBJECT:     Federal Law Protections for Religious Liberty

    The President has instructed me to issue guidance interpreting religious liberty protections in federal law, as appropriate. Exec. Order No. 13798 § 4, 82 Fed. Reg. 21675 (May 4, 2017). Consistent with that instruction, I am issuing this memorandum and appendix to guide all administrative agencies and executive departments in the execution of federal law.

## Principles of Religious Liberty

    Religious liberty is a foundational principle of enduring importance in America, enshrined in our Constitution and other sources of federal law. As James Madison explained in his Memorial and Remonstrance Against Religious Assessments, the free exercise of religion "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society."[1] Religious liberty is not merely a right to personal religious beliefs or even to worship in a sacred place. It also encompasses religious observance and practice. Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming. The following twenty principles should guide administrative agencies and executive departments in carrying out this task. These principles should be understood and interpreted in light of the legal analysis set forth in the appendix to this memorandum.

1. **The freedom of religion is a fundamental right of paramount importance, expressly protected by federal law.**

    Religious liberty is enshrined in the text of our Constitution and in numerous federal statutes. It encompasses the right of all Americans to exercise their religion freely, without being coerced to join an established church or to satisfy a religious test as a qualification for public office. It also encompasses the right of all Americans to express their religious beliefs, subject to the same narrow limits that apply to all forms of speech. In the United States, the free exercise of religion is not a mere policy preference to be traded against other policy preferences. It is a fundamental right.

---

[1] James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), *in* 5 THE FOUNDERS' CONSTITUTION 82 (Philip B. Kurland & Ralph Lerner eds., 1987).

Federal Law Protections for Religious Liberty
Page 2

**2. The free exercise of religion includes the right to *act* or *abstain from action* in accordance with one's religious beliefs.**

The Free Exercise Clause protects not just the right to believe or the right to worship; it protects the right to perform or abstain from performing certain physical acts in accordance with one's beliefs. Federal statutes, including the Religious Freedom Restoration Act of 1993 ("RFRA"), support that protection, broadly defining the exercise of religion to encompass all aspects of observance and practice, whether or not central to, or required by, a particular religious faith.

**3. The freedom of religion extends to persons *and* organizations.**

The Free Exercise Clause protects not just persons, but persons collectively exercising their religion through churches or other religious denominations, religious organizations, schools, private associations, and even businesses.

**4. Americans do not give up their freedom of religion by participating in the marketplace, partaking of the public square, or interacting with government.**

Constitutional protections for religious liberty are not conditioned upon the willingness of a religious person or organization to remain separate from civil society. Although the application of the relevant protections may differ in different contexts, individuals and organizations do not give up their religious-liberty protections by providing or receiving social services, education, or healthcare; by seeking to earn or earning a living; by employing others to do the same; by receiving government grants or contracts; or by otherwise interacting with federal, state, or local governments.

**5. Government may not restrict acts or abstentions because of the beliefs they display.**

To avoid the very sort of religious persecution and intolerance that led to the founding of the United States, the Free Exercise Clause of the Constitution protects against government actions that target religious conduct. Except in rare circumstances, government may not treat the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons. For example, government may not attempt to target religious persons or conduct by allowing the distribution of political leaflets in a park but forbidding the distribution of religious leaflets in the same park.

**6. Government may not target religious individuals or entities for special disabilities based on their religion.**

Much as government may not restrict actions only because of religious belief, government may not target persons or individuals because of their religion. Government may not exclude religious organizations as such from secular aid programs, at least when the aid is not being used for explicitly religious activities such as worship or proselytization. For example, the Supreme Court has held that if government provides reimbursement for scrap tires to replace child playground surfaces, it may not deny participation in that program to religious schools. Nor may

Federal Law Protections for Religious Liberty
Page 3

government deny religious schools—including schools whose curricula and activities include religious elements—the right to participate in a voucher program, so long as the aid reaches the schools through independent decisions of parents.

**7. Government may not target religious individuals or entities through discriminatory enforcement of neutral, generally applicable laws.**

Although government generally may subject religious persons and organizations to neutral, generally applicable laws—e.g., across-the-board criminal prohibitions or certain time, place, and manner restrictions on speech—government may not apply such laws in a discriminatory way. For instance, the Internal Revenue Service may not enforce the Johnson Amendment—which prohibits 501(c)(3) non-profit organizations from intervening in a political campaign on behalf of a candidate—against a religious non-profit organization under circumstances in which it would not enforce the amendment against a secular non-profit organization. Likewise, the National Park Service may not require religious groups to obtain permits to hand out fliers in a park if it does not require similarly situated secular groups to do so, and no federal agency tasked with issuing permits for land use may deny a permit to an Islamic Center seeking to build a mosque when the agency has granted, or would grant, a permit to similarly situated secular organizations or religious groups.

**8. Government may not officially favor or disfavor particular religious groups.**

Together, the Free Exercise Clause and the Establishment Clause prohibit government from officially preferring one religious group to another. This principle of denominational neutrality means, for example, that government cannot selectively impose regulatory burdens on some denominations but not others. It likewise cannot favor some religious groups for participation in the Combined Federal Campaign over others based on the groups' religious beliefs.

**9. Government may not interfere with the autonomy of a religious organization.**

Together, the Free Exercise Clause and the Establishment Clause also restrict governmental interference in intra-denominational disputes about doctrine, discipline, or qualifications for ministry or membership. For example, government may not impose its nondiscrimination rules to require Catholic seminaries or Orthodox Jewish yeshivas to accept female priests or rabbis.

**10. The Religious Freedom Restoration Act of 1993 prohibits the federal government from substantially burdening any aspect of religious observance or practice, unless imposition of that burden on a particular religious adherent satisfies strict scrutiny.**

RFRA prohibits the federal government from substantially burdening a person's exercise of religion, unless the federal government demonstrates that application of such burden to the religious adherent is the least restrictive means of achieving a compelling governmental interest. RFRA applies to all actions by federal administrative agencies, including rulemaking, adjudication or other enforcement actions, and grant or contract distribution and administration.

Federal Law Protections for Religious Liberty
Page 4

**11. RFRA's protection extends not just to individuals, but also to organizations, associations, and at least some for-profit corporations.**

RFRA protects the exercise of religion by individuals and by corporations, companies, associations, firms, partnerships, societies, and joint stock companies. For example, the Supreme Court has held that Hobby Lobby, a closely held, for-profit corporation with more than 500 stores and 13,000 employees, is protected by RFRA.

**12. RFRA does not permit the federal government to second-guess the reasonableness of a religious belief.**

RFRA applies to all sincerely held religious beliefs, whether or not central to, or mandated by, a particular religious organization or tradition. Religious adherents will often be required to draw lines in the application of their religious beliefs, and government is not competent to assess the reasonableness of such lines drawn, nor would it be appropriate for government to do so. Thus, for example, a government agency may not second-guess the determination of a factory worker that, consistent with his religious precepts, he can work on a line producing steel that might someday make its way into armaments but cannot work on a line producing the armaments themselves. Nor may the Department of Health and Human Services second-guess the determination of a religious employer that providing contraceptive coverage to its employees would make the employer complicit in wrongdoing in violation of the organization's religious precepts.

**13. A governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice.**

Because the government cannot second-guess the reasonableness of a religious belief or the adherent's assessment of the religious connection between the government mandate and the underlying religious belief, the substantial burden test focuses on the extent of governmental compulsion involved. In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion. For example, a Bureau of Prisons regulation that bans a devout Muslim from growing even a half-inch beard in accordance with his religious beliefs substantially burdens his religious practice. Likewise, a Department of Health and Human Services regulation requiring employers to provide insurance coverage for contraceptive drugs in violation of their religious beliefs or face significant fines substantially burdens their religious practice, and a law that conditions receipt of significant government benefits on willingness to work on Saturday substantially burdens the religious practice of those who, as a matter of religious observance or practice, do not work on that day. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself regards as unimportant or inconsequential imposes no substantial burden on that adherent. And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden.

Federal Law Protections for Religious Liberty
Page 5

**14. The strict scrutiny standard applicable to RFRA is exceptionally demanding.**

Once a religious adherent has identified a substantial burden on his or her religious belief, the federal government can impose that burden on the adherent only if it is the least restrictive means of achieving a compelling governmental interest. Only those interests of the highest order can outweigh legitimate claims to the free exercise of religion, and such interests must be evaluated not in broad generalities but as applied to the particular adherent. Even if the federal government could show the necessary interest, it would also have to show that its chosen restriction on free exercise is the least restrictive means of achieving that interest. That analysis requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program.

**15. RFRA applies even where a religious adherent seeks an exemption from a legal obligation requiring the adherent to confer benefits on third parties.**

Although burdens imposed on third parties are relevant to RFRA analysis, the fact that an exemption would deprive a third party of a benefit does not categorically render an exemption unavailable. Once an adherent identifies a substantial burden on his or her religious exercise, RFRA requires the federal government to establish that denial of an accommodation or exemption to that adherent is the least restrictive means of achieving a compelling governmental interest.

**16. Title VII of the Civil Rights Act of 1964, as amended, prohibits covered employers from discriminating against individuals on the basis of their religion.**

Employers covered by Title VII may not fail or refuse to hire, discharge, or discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of that individual's religion. Such employers also may not classify their employees or applicants in a way that would deprive or tend to deprive any individual of employment opportunities because of the individual's religion. This protection applies regardless of whether the individual is a member of a religious majority or minority. But the protection does not apply in the same way to religious employers, who have certain constitutional and statutory protections for religious hiring decisions.

**17. Title VII's protection extends to discrimination on the basis of religious observance or practice as well as belief, unless the employer cannot reasonably accommodate such observance or practice without undue hardship on the business.**

Title VII defines "religion" broadly to include all aspects of religious observance or practice, except when an employer can establish that a particular aspect of such observance or practice cannot reasonably be accommodated without undue hardship to the business. For example, covered employers are required to adjust employee work schedules for Sabbath observance, religious holidays, and other religious observances, unless doing so would create an undue hardship, such as materially compromising operations or violating a collective bargaining agreement. Title VII might also require an employer to modify a no-head-coverings policy to allow a Jewish employee to wear a yarmulke or a Muslim employee to wear a headscarf. An

employer who contends that it cannot reasonably accommodate a religious observance or practice must establish undue hardship on its business with specificity; it cannot rely on assumptions about hardships that might result from an accommodation.

**18. The Clinton Guidelines on Religious Exercise and Religious Expression in the Federal Workplace provide useful examples for private employers of reasonable accommodations for religious observance and practice in the workplace.**

President Clinton issued Guidelines on Religious Exercise and Religious Expression in the Federal Workplace ("Clinton Guidelines") explaining that federal employees may keep religious materials on their private desks and read them during breaks; discuss their religious views with other employees, subject to the same limitations as other forms of employee expression; display religious messages on clothing or wear religious medallions; and invite others to attend worship services at their churches, except to the extent that such speech becomes excessive or harassing. The Clinton Guidelines have the force of an Executive Order, and they also provide useful guidance to private employers about ways in which religious observance and practice can reasonably be accommodated in the workplace.

**19. Religious employers are entitled to employ only persons whose beliefs and conduct are consistent with the employers' religious precepts.**

Constitutional and statutory protections apply to certain religious hiring decisions. Religious corporations, associations, educational institutions, and societies—that is, entities that are organized for religious purposes and engage in activity consistent with, and in furtherance of, such purposes—have an express statutory exemption from Title VII's prohibition on religious discrimination in employment. Under that exemption, religious organizations may choose to employ only persons whose beliefs and conduct are consistent with the organizations' religious precepts. For example, a Lutheran secondary school may choose to employ only practicing Lutherans, only practicing Christians, or only those willing to adhere to a code of conduct consistent with the precepts of the Lutheran community sponsoring the school. Indeed, even in the absence of the Title VII exemption, religious employers might be able to claim a similar right under RFRA or the Religion Clauses of the Constitution.

**20. As a general matter, the federal government may not condition receipt of a federal grant or contract on the effective relinquishment of a religious organization's hiring exemptions or attributes of its religious character.**

Religious organizations are entitled to compete on equal footing for federal financial assistance used to support government programs. Such organizations generally may not be required to alter their religious character to participate in a government program, nor to cease engaging in explicitly religious activities outside the program, nor effectively to relinquish their federal statutory protections for religious hiring decisions.

Federal Law Protections for Religious Liberty
Page 7

## Guidance for Implementing Religious Liberty Principles

Agencies must pay keen attention, in everything they do, to the foregoing principles of religious liberty.

### Agencies As Employers

Administrative agencies should review their current policies and practices to ensure that they comply with all applicable federal laws and policies regarding accommodation for religious observance and practice in the federal workplace, and all agencies must observe such laws going forward. In particular, all agencies should review the Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, which President Clinton issued on August 14, 1997, to ensure that they are following those Guidelines. All agencies should also consider practical steps to improve safeguards for religious liberty in the federal workplace, including through subject-matter experts who can answer questions about religious nondiscrimination rules, information websites that employees may access to learn more about their religious accommodation rights, and training for all employees about federal protections for religious observance and practice in the workplace.

### Agencies Engaged in Rulemaking

In formulating rules, regulations, and policies, administrative agencies should also proactively consider potential burdens on the exercise of religion and possible accommodations of those burdens. Agencies should consider designating an officer to review proposed rules with religious accommodation in mind or developing some other process to do so. In developing that process, agencies should consider drawing upon the expertise of the White House Office of Faith-Based and Neighborhood Partnerships to identify concerns about the effect of potential agency action on religious exercise. Regardless of the process chosen, agencies should ensure that they review all proposed rules, regulations, and policies that have the potential to have an effect on religious liberty for compliance with the principles of religious liberty outlined in this memorandum and appendix before finalizing those rules, regulations, or policies. The Office of Legal Policy will also review any proposed agency or executive action upon which the Department's comments, opinion, or concurrence are sought, *see, e.g.*, Exec. Order 12250 § 1-2, 45 Fed. Reg. 72995 (Nov. 2, 1980), to ensure that such action complies with the principles of religious liberty outlined in this memorandum and appendix. The Department will not concur in any proposed action that does not comply with federal law protections for religious liberty as interpreted in this memorandum and appendix, and it will transmit any concerns it has about the proposed action to the agency or the Office of Management and Budget as appropriate. If, despite these internal reviews, a member of the public identifies a significant concern about a prospective rule's compliance with federal protections governing religious liberty during a period for public comment on the rule, the agency should carefully consider and respond to that request in its decision. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). In appropriate circumstances, an agency might explain that it will consider requests for accommodations on a case-by-case basis rather than in the rule itself, but the agency should provide a reasoned basis for that approach.

Federal Law Protections for Religious Liberty
Page 8

**Agencies Engaged in Enforcement Actions**

Much like administrative agencies engaged in rulemaking, agencies considering potential enforcement actions should consider whether such actions are consistent with federal protections for religious liberty. In particular, agencies should remember that RFRA applies to agency enforcement just as it applies to every other governmental action. An agency should consider RFRA when setting agency-wide enforcement rules and priorities, as well as when making decisions to pursue or continue any particular enforcement action, and when formulating any generally applicable rules announced in an agency adjudication.

Agencies should remember that discriminatory enforcement of an otherwise nondiscriminatory law can also violate the Constitution. Thus, agencies may not target or single out religious organizations or religious conduct for disadvantageous treatment in enforcement priorities or actions. The President identified one area where this could be a problem in Executive Order 13798, when he directed the Secretary of the Treasury, to the extent permitted by law, not to take any "adverse action against any individual, house of worship, or other religious organization on the basis that such individual or organization speaks or has spoken about moral or political issues from a religious perspective, where speech of *similar character*" from a non-religious perspective has not been treated as participation or intervention in a political campaign. Exec. Order No. 13798, § 2, 82 Fed. Reg. at 21675. But the requirement of nondiscrimination toward religious organizations and conduct applies across the enforcement activities of the Executive Branch, including within the enforcement components of the Department of Justice.

**Agencies Engaged in Contracting and Distribution of Grants**

Agencies also must not discriminate against religious organizations in their contracting or grant-making activities. Religious organizations should be given the opportunity to compete for government grants or contracts and participate in government programs on an equal basis with nonreligious organizations. Absent unusual circumstances, agencies should not condition receipt of a government contract or grant on the effective relinquishment of a religious organization's Section 702 exemption for religious hiring practices, or any other constitutional or statutory protection for religious organizations. In particular, agencies should not attempt through conditions on grants or contracts to meddle in the internal governance affairs of religious organizations or to limit those organizations' otherwise protected activities.

\*       \*       \*

Any questions about this memorandum or the appendix should be addressed to the Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue N.W., Washington, D.C. 20530, phone (202) 514-4601.

Federal Law Protections for Religious Liberty
Page 1a

# APPENDIX

Although not an exhaustive treatment of all federal protections for religious liberty, this appendix summarizes the key constitutional and federal statutory protections for religious liberty and sets forth the legal basis for the religious liberty principles described in the foregoing memorandum.

Constitutional Protections

The people, acting through their Constitution, have singled out religious liberty as deserving of unique protection. In the original version of the Constitution, the people agreed that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const., art. VI, cl. 3. The people then amended the Constitution during the First Congress to clarify that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, cl. 1. Those protections have been incorporated against the States. *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947) (Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (Free Exercise Clause).

A.  Free Exercise Clause

The Free Exercise Clause recognizes and guarantees Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Empl't Div. v. Smith*, 494 U.S. 872, 877 (1990). Government may not attempt to *regulate* religious beliefs, *compel* religious beliefs, or *punish* religious beliefs. *See id.*; *see also Sherbert v. Verner*, 374 U.S. 398, 402 (1963); *Torcaso v. Watkins*, 367 U.S. 488, 492–93, 495 (1961); *United States v. Ballard*, 322 U.S. 78, 86 (1944). It may not lend its power to one side in intra-denominational disputes about dogma, authority, discipline, or qualifications for ministry or membership. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 185 (2012); *Smith*, 494 U.S. at 877; *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724–25 (1976); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969); *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116, 120–21 (1952). It may not discriminate against or impose special burdens upon individuals because of their religious beliefs or status. *Smith*, 494 U.S. at 877; *McDaniel v. Paty*, 435 U.S. 618, 627 (1978). And with the exception of certain historical limits on the freedom of speech, government may not punish or otherwise harass churches, church officials, or religious adherents for speaking on religious topics or sharing their religious beliefs. *See Widmar v. Vincent*, 454 U.S. 263, 269 (1981); *see also* U.S. Const., amend. I, cl. 3. The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government. *Smith*, 494 U.S. at 877; *Sherbert*, 374 U.S. at 402; *see also West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

The Free Exercise Clause protects beliefs rooted in religion, even if such beliefs are not mandated by a particular religious organization or shared among adherents of a particular religious

Federal Law Protections for Religious Liberty
Page 2a

tradition. *Frazee v. Illinois Dept. of Emp't Sec.*, 489 U.S. 829, 833–34 (1989). As the Supreme Court has repeatedly counseled, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 531 (1993) (internal quotation marks omitted). They must merely be "sincerely held." *Frazee*, 489 U.S. at 834.

Importantly, the protection of the Free Exercise Clause also extends to acts undertaken in accordance with such sincerely-held beliefs. That conclusion flows from the plain text of the First Amendment, which guarantees the freedom to "*exercise*" religion, not just the freedom to "believe" in religion. *See Smith*, 494 U.S. at 877; *see also Thomas*, 450 U.S. at 716; *Paty*, 435 U.S. at 627; *Sherbert*, 374 U.S. at 403–04; *Wisconsin v. Yoder*, 406 U.S. 205, 219–20 (1972). Moreover, no other interpretation would actually guarantee the freedom of belief that Americans have so long regarded as central to individual liberty. Many, if not most, religious beliefs require external observance and practice through physical acts or abstention from acts. The tie between physical acts and religious beliefs may be readily apparent (e.g., attendance at a worship service) or not (e.g., service to one's community at a soup kitchen or a decision to close one's business on a particular day of the week). The "exercise of religion" encompasses all aspects of religious observance and practice. And because individuals may act collectively through associations and organizations, it encompasses the exercise of religion by such entities as well. *See, e.g., Hosanna-Tabor*, 565 U.S. at 199; *Church of the Lukumi Babalu Aye*, 508 U.S. at 525–26, 547; *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2770, 2772–73 (2014) (even a closely held for-profit corporation may exercise religion if operated in accordance with asserted religious principles).

As with most constitutional protections, however, the protection afforded to Americans by the Free Exercise Clause for physical acts is not absolute, *Smith*, 491 U.S. at 878–79, and the Supreme Court has identified certain principles to guide the analysis of the scope of that protection. First, government may not restrict "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the religious for special disabilities based on their religious status," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. ___, ___ (2017) (slip op. at 6) (internal quotation marks omitted), for it was precisely such "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." *Church of the Lukumi Babalu Aye*, 508 U.S. at 532 (internal quotation marks omitted). The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion" just as surely as it protects against "outright prohibitions" on religious exercise. *Trinity Lutheran*, 582 U.S. at ___ (slip op. at 11) (internal quotation marks omitted). "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* (quoting *Sherbert*, 374 U.S. at 404).

Because a law cannot have as its official "object or purpose . . . the suppression of religion or religious conduct," courts must "survey meticulously" the text and operation of a law to ensure that it is actually neutral and of general applicability. *Church of the Lukumi Babalu Aye*, 508 U.S. at 533–34 (internal quotation marks omitted). A law is not neutral if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; visits "gratuitous restrictions

Federal Law Protections for Religious Liberty
Page 3a

on religious conduct"; or "accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533–35, 538 (internal quotation marks omitted). A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," *id.* at 543, including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does" the prohibited conduct, *id.*, or enables, expressly or de facto, "a system of individualized exemptions," as discussed in *Smith*, 494 U.S. at 884; *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 537.

"Neutrality and general applicability are interrelated, . . . [and] failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531. For example, a law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable. *See Trinity Lutheran*, 582 U.S. at ___–___ (slip op. at 9–11). Likewise, a law that selectively prohibits the killing of animals for religious reasons and fails to prohibit the killing of animals for many nonreligious reasons, or that selectively prohibits a business from refusing to stock a product for religious reasons but fails to prohibit such refusal for myriad commercial reasons, is neither neutral, nor generally applicable. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533–36, 542–45. Nonetheless, the requirements of neutral and general applicability are separate, and any law burdening religious practice that fails one or both must be subjected to strict scrutiny, *id.* at 546.

Second, even a neutral, generally applicable law is subject to strict scrutiny under this Clause if it restricts the free exercise of religion and another constitutionally protected liberty, such as the freedom of speech or association, or the right to control the upbringing of one's children. *See Smith*, 494 U.S. at 881–82; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295–97 (10th Cir. 2004). Many Free Exercise cases fall in this category. For example, a law that seeks to compel a private person's speech or expression contrary to his or her religious beliefs implicates both the freedoms of speech and free exercise. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 707–08 (1977) (challenge by Jehovah's Witnesses to requirement that state license plates display the motto "Live Free or Die"); *Axson-Flynn*, 356 F.3d at 1280 (challenge by Mormon student to University requirement that student actors use profanity and take God's name in vain during classroom acting exercises). A law taxing or prohibiting door-to-door solicitation, at least as applied to individuals distributing religious literature and seeking contributions, likewise implicates the freedoms of speech and free exercise. *Murdock v. Pennsylvania*, 319 U.S. 105, 108–09 (1943) (challenge by Jehovah's Witnesses to tax on canvassing or soliciting); *Cantwell*, 310 U.S. at 307 (same). A law requiring children to receive certain education, contrary to the religious beliefs of their parents, implicates both the parents' right to the care, custody, and control of their children and to free exercise. *Yoder*, 406 U.S. at 227–29 (challenge by Amish parents to law requiring high school attendance).

Strict scrutiny is the "most rigorous" form of scrutiny identified by the Supreme Court. *Church of the Lukumi Babalu Aye*, 508 U.S. at 546; *see also City of Boerne v. Flores*, 521 U.S. 507, 534 (1997) ("Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law."). It is the same standard applied to governmental classifications based on race, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007), and

restrictions on the freedom of speech, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015). *See Church of the Lukumi Babalu Aye*, 508 U.S. at 546–47. Under this level of scrutiny, government must establish that a challenged law "advance[s] interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Id.* at 546 (internal quotation marks omitted). "[O]nly in rare cases" will a law survive this level of scrutiny. *Id.*

Of course, even when a law is neutral and generally applicable, government may run afoul of the Free Exercise Clause if it interprets or applies the law in a manner that discriminates against religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 537 (government discriminatorily interpreted an ordinance prohibiting the unnecessary killing of animals as prohibiting only killing of animals for religious reasons); *Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953) (government discriminatorily enforced ordinance prohibiting meetings in public parks against only certain religious groups). The Free Exercise Clause, much like the Free Speech Clause, requires equal treatment of religious adherents. *See Trinity Lutheran*, 582 U.S. at ___ (slip op. at 6); *cf. Good News Club v. Milford Central Sch.*, 533 U.S. 98, 114 (2001) (recognizing that Establishment Clause does not justify discrimination against religious clubs seeking use of public meeting spaces); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 837, 841 (1995) (recognizing that Establishment Clause does not justify discrimination against religious student newspaper's participation in neutral reimbursement program). That is true regardless of whether the discriminatory application is initiated by the government itself or by private requests or complaints. *See, e.g., Fowler*, 345 U.S. at 69; *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951).

B. Establishment Clause

The Establishment Clause, too, protects religious liberty. It prohibits government from establishing a religion and coercing Americans to follow it. *See Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1819–20 (2014); *Good News Club*, 533 U.S. at 115. It restricts government from interfering in the internal governance or ecclesiastical decisions of a religious organization. *Hosanna-Tabor*, 565 U.S. at 188–89. And it prohibits government from officially favoring or disfavoring particular religious groups as such or officially advocating particular religious points of view. *See Galloway*, 134 S. Ct. at 1824; *Larson v. Valente*, 456 U.S. 228, 244–46 (1982). Indeed, "a significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion." *Rosenberger*, 515 U.S. at 839 (emphasis added). That "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.* Thus, religious adherents and organizations may, like nonreligious adherents and organizations, receive indirect financial aid through independent choice, or, in certain circumstances, direct financial aid through a secular-aid program. *See, e.g., Trinity Lutheran*, 582 U.S. at ___ (slip op. at 6) (scrap tire program); *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) (voucher program).

C. Religious Test Clause

Finally, the Religious Test Clause, though rarely invoked, provides a critical guarantee to religious adherents that they may serve in American public life. The Clause reflects the judgment

Federal Law Protections for Religious Liberty
Page 5a

of the Framers that a diversity of religious viewpoints in government would enhance the liberty of all Americans. And after the Religion Clauses were incorporated against the States, the Supreme Court shared this view, rejecting a Tennessee law that "establishe[d] as a condition of office the willingness to eschew certain protected religious practices." *Paty*, 435 U.S. at 632 (Brennan, J., and Marshall, J., concurring in judgment); *see also id.* at 629 (plurality op.) ("[T]he American experience provides no persuasive support for the fear that clergymen in public office will be less careful of anti-establishment interests or less faithful to their oaths of civil office than their unordained counterparts.").

<u>Statutory Protections</u>

Recognizing the centrality of religious liberty to our nation, Congress has buttressed these constitutional rights with statutory protections for religious observance and practice. These protections can be found in, among other statutes, the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq.*; the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and the American Indian Religious Freedom Act, 42 U.S.C. § 1996. Such protections ensure not only that government tolerates religious observance and practice, but that it embraces religious adherents as full members of society, able to contribute through employment, use of public accommodations, and participation in government programs. The considered judgment of the United States is that we are stronger through accommodation of religion than segregation or isolation of it.

A.  Religious Freedom Restoration Act of 1993 (RFRA)

The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, prohibits the federal government from "substantially burden[ing] a person's exercise of religion" unless "it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(a), (b). The Act applies even where the burden arises out of a "rule of general applicability" passed without animus or discriminatory intent. *See id.* § 2000bb-1(a). It applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *see* §§ 2000bb-2(4), 2000cc-5(7), and covers "individuals" as well as "corporations, companies, associations, firms, partnerships, societies, and joint stock companies," 1 U.S.C. § 1, including for-profit, closely-held corporations like those involved in *Hobby Lobby*, 134 S. Ct. at 2768.

Subject to the exceptions identified below, a law "substantially burden[s] a person's exercise of religion," 42 U.S.C. § 2000bb-1, if it bans an aspect of the adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, *see Sherbert*, 374 U.S. at 405–06. The "threat of criminal sanction" will satisfy these principles, even when, as in *Yoder*, the prospective punishment is a mere $5 fine. 406 U.S. at 208, 218. And the denial of, or condition on the receipt of, government benefits may substantially burden the exercise of religion under these principles. *Sherbert*, 374 U.S. at 405–06; *see also Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987); *Thomas*, 450 U.S. at 717–18. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself

Federal Law Protections for Religious Liberty
Page 6a

regards as unimportant or inconsequential imposes no substantial burden on that adherent. And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448–49 (1988); *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986).

As with claims under the Free Exercise Clause, RFRA does not permit a court to inquire into the reasonableness of a religious belief, including into the adherent's assessment of the religious connection between a belief asserted and what the government forbids, requires, or prevents. *Hobby Lobby*, 134 S. Ct. at 2778. If the proffered belief is sincere, it is not the place of the government or a court to second-guess it. *Id.* A good illustration of the point is *Thomas v. Review Board of Indiana Employment Security Division*—one of the *Sherbert* line of cases, whose analytical test Congress sought, through RFRA, to restore, 42 U.S.C. § 2000bb. There, the Supreme Court concluded that the denial of unemployment benefits was a substantial burden on the sincerely held religious beliefs of a Jehovah's Witness who had quit his job after he was transferred from a department producing sheet steel that could be used for military armaments to a department producing turrets for military tanks. *Thomas*, 450 U.S. at 716–18. In doing so, the Court rejected the lower court's inquiry into "what [the claimant's] belief was and what the religious basis of his belief was," noting that no one had challenged the sincerity of the claimant's religious beliefs and that "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is struggling with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 714–15 (internal quotation marks omitted). The Court likewise rejected the lower court's comparison of the claimant's views to those of other Jehovah's Witnesses, noting that "[i]ntrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.* at 715. The Supreme Court reinforced this reasoning in *Hobby Lobby*, rejecting the argument that "the connection between what the objecting parties [were required to] do (provide health-insurance coverage for four methods of contraception that may operate after the fertilization of an egg) and the end that they [found] to be morally wrong (destruction of an embryo) [wa]s simply too attenuated." 134 S. Ct. at 2777. The Court explained that the plaintiff corporations had a sincerely-held religious belief that provision of the coverage was morally wrong, and it was "not for us to say that their religious beliefs are mistaken or insubstantial." *Id.* at 2779.

Government bears a heavy burden to justify a substantial burden on the exercise of religion. "[O]nly those interests of the highest order . . . can overbalance legitimate claims to the free exercise of religion." *Thomas*, 450 U.S. at 718 (quoting *Yoder*, 406 U.S. at 215). Such interests include, for example, the "fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history," *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983), and the interest in ensuring the "mandatory and continuous participation" that is "indispensable to the fiscal vitality of the social security system," *United States v. Lee*, 455 U.S. 252, 258–59 (1982). But "broadly formulated interests justifying the general applicability of government mandates" are insufficient. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). The government must establish a compelling interest to deny an accommodation to the particular claimant. *Id.* at 430, 435–38. For example, the military may have a compelling interest in its

Federal Law Protections for Religious Liberty
Page 7a

uniform and grooming policy to ensure military readiness and protect our national security, but it does not necessarily follow that those interests would justify denying a particular soldier's request for an accommodation from the uniform and grooming policy. *See, e.g.*, Secretary of the Army, Army Directive 2017-03, Policy for Brigade-Level Approval of Certain Requests for Religious Accommodation (2017) (recognizing the "successful examples of Soldiers currently serving with" an accommodation for "the wear of a hijab; the wear of a beard; and the wear of a turban or under-turban/patka, with uncut beard and uncut hair" and providing for a reasonable accommodation of these practices in the Army). The military would have to show that it has a compelling interest in denying that particular accommodation. An asserted compelling interest in denying an accommodation to a particular claimant is undermined by evidence that exemptions or accommodations have been granted for other interests. *See O Centro*, 546 U.S. at 433, 436–37; *see also Hobby Lobby*, 134 S. Ct. at 2780.

The compelling-interest requirement applies even where the accommodation sought is "an exemption from a legal obligation requiring [the claimant] to confer benefits on third parties." *Hobby Lobby*, 134 S. Ct. at 2781 n.37. Although "in applying RFRA 'courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries,'" the Supreme Court has explained that almost any governmental regulation could be reframed as a legal obligation requiring a claimant to confer benefits on third parties. *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)). As nothing in the text of RFRA admits of an exception for laws requiring a claimant to confer benefits on third parties, 42 U.S.C. § 2000bb-1, and such an exception would have the potential to swallow the rule, the Supreme Court has rejected the proposition that RFRA accommodations are categorically unavailable for laws requiring claimants to confer benefits on third parties. *Hobby Lobby*, 134 S. Ct. at 2781 n.37.

Even if the government can identify a compelling interest, the government must also show that denial of an accommodation is the least restrictive means of serving that compelling governmental interest. This standard is "exceptionally demanding." *Hobby Lobby*, 134 S. Ct. at 2780. It requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program. *Id.* at 2781. Indeed, the existence of exemptions for other individuals or entities that could be expanded to accommodate the claimant, while still serving the government's stated interests, will generally defeat a RFRA defense, as the government bears the burden to establish that no accommodation is viable. *See id.* at 2781–82.

B.  Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)

Although Congress's leadership in adopting RFRA led many States to pass analogous statutes, Congress recognized the unique threat to religious liberty posed by certain categories of state action and passed the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to address them. RLUIPA extends a standard analogous to RFRA to state and local government actions regulating land use and institutionalized persons where "the substantial burden is imposed in a program or activity that receives Federal financial assistance" or "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. §§ 2000cc(a)(2), 2000cc-1(b).

Federal Law Protections for Religious Liberty
Page 8a

RLUIPA's protections must "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [RLUIPA] and the Constitution." *Id.* § 2000cc-3(g). RLUIPA applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *id.* § 2000cc-5(7)(A), and treats "[t]he use, building, or conversion of real property for the purpose of religious exercise" as the "religious exercise of the person or entity that uses or intends to use the property for that purpose," *id.* § 2000cc-5(7)(B). Like RFRA, RLUIPA prohibits government from substantially burdening an exercise of religion unless imposition of the burden on the religious adherent is the least restrictive means of furthering a compelling governmental interest. *See id.* § 2000cc-1(a). That standard "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* § 2000cc-3(c); *cf. Holt v. Hobbs*, 135 S. Ct. 853, 860, 864–65 (2015).

With respect to land use in particular, RLUIPA also requires that government not "treat[] a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," 42 U.S.C. § 2000cc(b)(1), "impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination," *id.* § 2000cc(b)(2), or "impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction," *id.* § 2000cc(b)(3). A claimant need not show a substantial burden on the exercise of religion to enforce these antidiscrimination and equal terms provisions listed in § 2000cc(b). *See id.* § 2000cc(b); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 262–64 (3d Cir. 2007), *cert. denied*, 553 U.S. 1065 (2008). Although most RLUIPA cases involve places of worship like churches, mosques, synagogues, and temples, the law applies more broadly to religious schools, religious camps, religious retreat centers, and religious social service facilities. Letter from U.S. Dep't of Justice Civil Rights Division to State, County, and Municipal Officials re: The Religious Land Use and Institutionalized Persons Act (Dec. 15, 2016).

C. Other Civil Rights Laws

To incorporate religious adherents fully into society, Congress has recognized that it is not enough to limit governmental action that substantially burdens the exercise of religion. It must also root out public and private discrimination based on religion. Religious discrimination stood alongside discrimination based on race, color, and national origin, as an evil to be addressed in the Civil Rights Act of 1964, and Congress has continued to legislate against such discrimination over time. Today, the United States Code includes specific prohibitions on religious discrimination in places of public accommodation, 42 U.S.C. § 2000a; in public facilities, *id.* § 2000b; in public education, *id.* § 2000c-6; in employment, *id.* §§ 2000e, 2000e-2, 2000e-16; in the sale or rental of housing, *id.* § 3604; in the provision of certain real-estate transaction or brokerage services, *id.* §§ 3605, 3606; in federal jury service, 28 U.S.C. § 1862; in access to limited open forums for speech, 20 U.S.C. § 4071; and in participation in or receipt of benefits from various federally-funded programs, 15 U.S.C. § 3151; 20 U.S.C. §§ 1066c(d), 1071(a)(2), 1087-4, 7231d(b)(2), 7914; 31 U.S.C. § 6711(b)(3); 42 U.S.C. §§ 290cc-33(a)(2), 300w-7(a)(2), 300x-57(a)(2), 300x-65(f), 604a(g), 708(a)(2), 5057(c), 5151(a), 5309(a), 6727(a), 9858l(a)(2), 10406(2)(B), 10504(a), 10604(e), 12635(c)(1), 12832, 13791(g)(3), 13925(b)(13)(A).

Federal Law Protections for Religious Liberty
Page 9a

Invidious religious discrimination may be directed at religion in general, at a particular religious belief, or at particular aspects of religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 532–33. A law drawn to prohibit a specific religious practice may discriminate just as severely against a religious group as a law drawn to prohibit the religion itself. *See id.* No one would doubt that a law prohibiting the sale and consumption of Kosher meat would discriminate against Jewish people. True equality may also require, depending on the applicable statutes, an awareness of, and willingness reasonably to accommodate, religious observance and practice. Indeed, the denial of reasonable accommodations may be little more than cover for discrimination against a particular religious belief or religion in general and is counter to the general determination of Congress that the United States is best served by the participation of religious adherents in society, not their withdrawal from it.

1.   Employment

i.   Protections for Religious Employees

Protections for religious individuals in employment are the most obvious example of Congress's instruction that religious observance and practice be reasonably accommodated, not marginalized. In Title VII of the Civil Rights Act, Congress declared it an unlawful employment practice for a covered employer to (1) "fail or refuse to hire or to discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion," as well as (2) to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a); *see also* 42 U.S.C. § 2000e-16(a) (applying Title VII to certain federal-sector employers); 3 U.S.C. § 411(a) (applying Title VII employment in the Executive Office of the President). The protection applies "regardless of whether the discrimination is directed against [members of religious] majorities or minorities." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71–72 (1977).

After several courts had held that employers did not violate Title VII when they discharged employees for refusing to work on their Sabbath, Congress amended Title VII to define "[r]eligion" broadly to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *Hardison*, 432 U.S. at 74 n.9. Congress thus made clear that discrimination on the basis of religion includes discrimination on the basis of any aspect of an employee's religious observance or practice, at least where such observance or practice can be reasonably accommodated without undue hardship.

Title VII's reasonable accommodation requirement is meaningful. As an initial matter, it requires an employer to consider what adjustment or modification to its policies would effectively address the employee's concern, for "[a]n *ineffective* modification or adjustment will not *accommodate*" a person's religious observance or practice, within the ordinary meaning of that word. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (considering the ordinary

Federal Law Protections for Religious Liberty
Page 10a

meaning in the context of an ADA claim). Although there is no obligation to provide an employee with his or her preferred reasonable accommodation, *see Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986), an employer may justify a refusal to accommodate only by showing that "an undue hardship [on its business] would *in fact* result from *each available* alternative method of accommodation." 29 C.F.R. § 1605.2(c)(1) (emphasis added). "A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship." *Id.* Likewise, the fact that an accommodation may grant the religious employee a preference is not evidence of undue hardship as, "[b]y definition, any special 'accommodation' requires the employer to treat an employee . . . differently, *i.e.*, preferentially." *U.S. Airways*, 535 U.S. at 397; *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2034 (2015) ("Title VII does not demand mere neutrality with regard to religious practices—that they may be treated no worse than other practices. Rather, it gives them favored treatment.").

Title VII does not, however, require accommodation at all costs. As noted above, an employer is not required to accommodate a religious observance or practice if it would pose an undue hardship on its business. An accommodation might pose an "undue hardship," for example, if it would require the employer to breach an otherwise valid collective bargaining agreement, *see, e.g., Hardison*, 432 U.S. at 79, or carve out a special exception to a seniority system, *id.* at 83; *see also U.S. Airways*, 535 U.S. at 403. Likewise, an accommodation might pose an "undue hardship" if it would impose "more than a de minimis cost" on the business, such as in the case of a company where weekend work is "essential to [the] business" and many employees have religious observances that would prohibit them from working on the weekends, so that accommodations for all such employees would result in significant overtime costs for the employer. *Hardison*, 432 U.S. at 80, 84 & n.15. In general, though, Title VII expects positive results for society from a cooperative process between an employer and its employee "in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Philbrook*, 479 U.S. at 69 (internal quotations omitted).

The area of religious speech and expression is a useful example of reasonable accommodation. Where speech or expression is part of a person's religious observance and practice, it falls within the scope of Title VII. *See* 42 U.S.C. §§ 2000e, 2000e-2. Speech or expression outside of the scope of an individual's employment can almost always be accommodated without undue hardship to a business. Speech or expression within the scope of an individual's employment, during work hours, or in the workplace may, depending upon the facts and circumstances, be reasonably accommodated. *Cf. Abercrombie*, 135 S. Ct. at 2032.

The federal government's approach to free exercise in the federal workplace provides useful guidance on such reasonable accommodations. For example, under the Guidelines issued by President Clinton, the federal government permits a federal employee to "keep a Bible or Koran on her private desk and read it during breaks"; to discuss his religious views with other employees, subject "to the same rules of order as apply to other employee expression"; to display religious messages on clothing or wear religious medallions visible to others; and to hand out religious tracts to other employees or invite them to attend worship services at the employee's church, except to the extent that such speech becomes excessive or harassing. Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, § 1(A), Aug. 14, 1997 (hereinafter "Clinton

Federal Law Protections for Religious Liberty
Page 11a

Guidelines"). The Clinton Guidelines have the force of an Executive Order. *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order."); *see also* Memorandum from President William J. Clinton to the Heads of Executive Departments and Agencies (Aug. 14, 1997) ("All civilian executive branch agencies, officials, and employees must follow these Guidelines carefully."). The successful experience of the federal government in applying the Clinton Guidelines over the last twenty years is evidence that religious speech and expression can be reasonably accommodated in the workplace without exposing an employer to liability under workplace harassment laws.

Time off for religious holidays is also often an area of concern. The observance of religious holidays is an "aspect[] of religious observance and practice" and is therefore protected by Title VII. 42 U.S.C. §§ 2000e, 2000e-2. Examples of reasonable accommodations for that practice could include a change of job assignments or lateral transfer to a position whose schedule does not conflict with the employee's religious holidays, 29 C.F.R. § 1605.2(d)(1)(iii); a voluntary work schedule swap with another employee, *id.* § 1065.2(d)(1)(i); or a flexible scheduling scheme that allows employees to arrive or leave early, use floating or optional holidays for religious holidays, or make up time lost on another day, *id.* § 1065.2(d)(1)(ii). Again, the federal government has demonstrated reasonable accommodation through its own practice: Congress has created a flexible scheduling scheme for federal employees, which allows employees to take compensatory time off for religious observances, 5 U.S.C. § 5550a, and the Clinton Guidelines make clear that "[a]n agency must adjust work schedules to accommodate an employee's religious observance—for example, Sabbath or religious holiday observance—if an adequate substitute is available, or if the employee's absence would not otherwise impose an undue burden on the agency," Clinton Guidelines § 1(C). If an employer regularly permits accommodation in work scheduling for secular conflicts and denies such accommodation for religious conflicts, "such an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness." *Philbrook*, 479 U.S. at 71.

Except for certain exceptions discussed in the next section, Title VII's protection against disparate treatment, 42 U.S.C. § 2000e-2(a)(1), is implicated *any time* religious observance or practice is a motivating factor in an employer's covered decision. *Abercrombie*, 135 S. Ct. at 2033. That is true even when an employer acts without actual knowledge of the need for an accommodation from a neutral policy but with "an unsubstantiated suspicion" of the same. *Id.* at 2034.

ii.   Protections for Religious Employers

Congress has acknowledged, however, that religion sometimes *is* an appropriate factor in employment decisions, and it has limited Title VII's scope accordingly. Thus, for example, where religion "is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise," employers may hire and employ individuals based on their religion. 42 U.S.C. § 2000e-2(e)(1). Likewise, where educational institutions are "owned, supported, controlled or managed, [in whole or in substantial part] by a particular religion or by a particular religious corporation, association, or society" or direct their curriculum "toward the

Federal Law Protections for Religious Liberty
Page 12a

propagation of a particular religion," such institutions may hire and employ individuals of a particular religion.  *Id.*  And "a religious corporation, association, educational institution, or society" may employ "individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." *Id.* § 2000e-1(a); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335–36 (1987).

Because Title VII defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j), these exemptions include decisions "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *see also Killinger v. Samford Univ.*, 113 F.3d 196, 198–200 (11th Cir. 1997). For example, in *Little*, the Third Circuit held that the exemption applied to a Catholic school's decision to fire a divorced Protestant teacher who, though having agreed to abide by a code of conduct shaped by the doctrines of the Catholic Church, married a baptized Catholic without first pursuing the official annulment process of the Church. 929 F.2d at 946, 951.

Section 702 broadly exempts from its reach religious corporations, associations, educational institutions, and societies. The statute's terms do not limit this exemption to non-profit organizations, to organizations that carry on only religious activities, or to organizations established by a church or formally affiliated therewith. *See Civil Rights Act of 1964*, § 702(a), *codified at* 42 U.S.C. § 2000e-1(a); *see also Hobby Lobby*, 134 S. Ct. at 2773–74; *Corp. of Presiding Bishop*, 483 U.S. at 335–36. The exemption applies whenever the organization is "religious," which means that it is organized for religious purposes and engages in activity consistent with, and in furtherance of, such purposes. Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008). Thus, the exemption applies not just to religious denominations and houses of worship, but to religious colleges, charitable organizations like the Salvation Army and World Vision International, and many more. In that way, it is consistent with other broad protections for religious entities in federal law, including, for example, the exemption of religious entities from many of the requirements under the Americans with Disabilities Act. *See* 28 C.F.R. app. C; 56 Fed. Reg. 35544, 35554 (July 26, 1991) (explaining that "[t]he ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations").

In addition to these explicit exemptions, religious organizations may be entitled to additional exemptions from discrimination laws. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 180, 188–90. For example, a religious organization might conclude that it cannot employ an individual who fails faithfully to adhere to the organization's religious tenets, either because doing so might itself inhibit the organization's exercise of religion or because it might dilute an expressive message. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 649–55 (2000). Both constitutional and statutory issues arise when governments seek to regulate such decisions.

As a constitutional matter, religious organizations' decisions are protected from governmental interference to the extent they relate to ecclesiastical or internal governance matters. *Hosanna-Tabor*, 565 U.S. at 180, 188–90. It is beyond dispute that "it would violate the First Amendment for courts to apply [employment discrimination] laws to compel the ordination of

Federal Law Protections for Religious Liberty
Page 13a

women by the Catholic Church or by an Orthodox Jewish seminary." *Id.* at 188.  The same is true for other employees who "minister to the faithful," including those who are not themselves the head of the religious congregation and who are not engaged solely in religious functions.  *Id.* at 188, 190, 194–95; *see also* Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008) (noting that the First Amendment protects "the right to employ staff who share the religious organization's religious beliefs").

Even if a particular associational decision could be construed to fall outside this protection, the government would likely still have to show that any interference with the religious organization's associational rights is justified under strict scrutiny.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (infringements on expressive association are subject to strict scrutiny); *Smith*, 494 U.S. at 882 ("[I]t is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns.").  The government may be able to meet that standard with respect to race discrimination, *see Bob Jones Univ.*, 461 U.S. at 604, but may not be able to with respect to other forms of discrimination.  For example, at least one court has held that forced inclusion of women into a mosque's religious men's meeting would violate the freedom of expressive association.  *Donaldson v. Farrakhan*, 762 N.E.2d 835, 840–41 (Mass. 2002).  The Supreme Court has also held that the government's interest in addressing sexual-orientation discrimination is not sufficiently compelling to justify an infringement on the expressive association rights of a private organization.  *Boy Scouts*, 530 U.S. at 659.

As a statutory matter, RFRA too might require an exemption or accommodation for religious organizations from antidiscrimination laws.  For example, "prohibiting religious organizations from hiring only coreligionists can 'impose a significant burden on their exercise of religion, even as applied to employees in programs that must, by law, refrain from specifically religious activities.'"  *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act*, 31 Op. O.L.C. 162, 172 (2007) (quoting *Direct Aid to Faith-Based Organizations Under the Charitable Choice Provisions of the Community Solutions Act of 2001*, 25 Op. O.L.C. 129, 132 (2001)); *see also Corp. of Presiding Bishop*, 483 U.S. at 336 (noting that it would be "a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court w[ould] consider religious" in applying a nondiscrimination provision that applied only to secular, but not religious, activities).  If an organization establishes the existence of such a burden, the government must establish that imposing such burden on the organization is the least restrictive means of achieving a compelling governmental interest.  That is a demanding standard and thus, even where Congress has not expressly exempted religious organizations from its antidiscrimination laws—as it has in other contexts, *see, e.g.*, 42 U.S.C. §§ 3607 (Fair Housing Act), 12187 (Americans with Disabilities Act)—RFRA might require such an exemption.

2.  Government Programs

Protections for religious organizations likewise exist in government contracts, grants, and other programs.  Recognizing that religious organizations can make important contributions to government programs, *see, e.g.*, 22 U.S.C. § 7601(19), Congress has expressly permitted religious organizations to participate in numerous such programs on an equal basis with secular

Federal Law Protections for Religious Liberty
Page 14a

organizations, *see, e.g.*, 42 U.S.C. §§ 290kk-1, 300x-65 604a, 629i.  Where Congress has not expressly so provided, the President has made clear that "[t]he Nation's social service capacity will benefit if all eligible organizations, including faith-based and other neighborhood organizations, are able to compete on an equal footing for Federal financial assistance used to support social service programs." Exec. Order No. 13559, § 1, 75 Fed. Reg. 71319, 71319 (Nov. 17, 2010) (amending Exec. Order No. 13279, 67 Fed. Reg. 77141 (2002)).  To that end, no organization may be "discriminated against on the basis of religion or religious belief in the administration or distribution of Federal financial assistance under social service programs." *Id.* "Organizations that engage in explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization)" are eligible to participate in such programs, so long as they conduct such activities outside of the programs directly funded by the federal government and at a separate time and location. *Id.*

The President has assured religious organizations that they are "eligible to compete for Federal financial assistance used to support social service programs and to participate fully in the social services programs supported with Federal financial assistance without impairing their independence, autonomy, expression outside the programs in question, or religious character." *See id.*; *see also* 42 U.S.C. § 290kk-1(e) (similar statutory assurance).  Religious organizations that apply for or participate in such programs may continue to carry out their mission, "including the definition, development, practice, and expression of . . . religious beliefs," so long as they do not use any "direct Federal financial assistance" received "to support or engage in any explicitly religious activities" such as worship, religious instruction, or proselytization. Exec. Order No. 13559, § 1.  They may also "use their facilities to provide social services supported with Federal financial assistance, without removing or altering religious art, icons, scriptures, or other symbols from these facilities," and they may continue to "retain religious terms" in their names, select "board members on a religious basis, and include religious references in . . . mission statements and other chartering or governing documents." *Id.*

With respect to government contracts in particular, Executive Order 13279, 67 Fed. Reg. 77141 (Dec. 12, 2002), confirms that the independence and autonomy promised to religious organizations include independence and autonomy in religious hiring.  Specifically, it provides that the employment nondiscrimination requirements in Section 202 of Executive Order 11246, which normally apply to government contracts, do "not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." Exec. Order No. 13279, § 4, *amending* Exec. Order No. 11246, § 204(c), 30 Fed. Reg. 12319, 12935 (Sept. 24, 1965).

Because the religious hiring protection in Executive Order 13279 parallels the Section 702 exemption in Title VII, it should be interpreted to protect the decision "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little*, 929 F.2d at 951.  That parallel interpretation is consistent with the Supreme Court's repeated counsel that the decision to borrow statutory text in a new statute is "strong indication that the two statutes should be interpreted pari passu." *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427 (1973) (per curiam); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich L.P.A.*, 559

Federal Law Protections for Religious Liberty
Page 15a

U.S. 573, 590 (2010).  It is also consistent with the Executive Order's own usage of discrimination on the basis of "religion" as something distinct and more expansive than discrimination on the basis of "religious belief."  *See, e.g.*, Exec. Order No. 13279, § 2(c) ("No organization should be discriminated against on the basis of religion *or* religious belief . . . " (emphasis added)); *id.* § 2(d) ("All organizations that receive Federal financial assistance under social services programs should be prohibited from discriminating against beneficiaries or potential beneficiaries of the social services programs on the basis of religion or religious belief.  Accordingly, organizations, in providing services supported in whole or in part with Federal financial assistance, and in their outreach activities related to such services, should not be allowed to discriminate against current or prospective program beneficiaries on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to actively participate in a religious practice.").  Indeed, because the Executive Order uses "on the basis of religion or religious belief" in both the provision prohibiting discrimination against religious organizations and the provision prohibiting discrimination "against beneficiaries or potential beneficiaries," a narrow interpretation of the protection for religious organizations' hiring decisions would lead to a narrow protection for beneficiaries of programs served by such organizations. *See id.* §§ 2(c), (d).  It would also lead to inconsistencies in the treatment of religious hiring across government programs, as some program-specific statutes and regulations expressly confirm that "[a] religious organization's exemption provided under section 2000e-1 of this title regarding employment practices shall not be affected by its participation, or receipt of funds from, a designated program."  42 U.S.C. § 290kk-1(e); *see also* 6 C.F.R. § 19.9 (same).

Even absent the Executive Order, however, RFRA would limit the extent to which the government could condition participation in a federal grant or contract program on a religious organization's effective relinquishment of its Section 702 exemption.  RFRA applies to all government conduct, not just to legislation or regulation, *see* 42 U.S.C. § 2000bb-1, and the Office of Legal Counsel has determined that application of a religious nondiscrimination law to the hiring decisions of a religious organization can impose a substantial burden on the exercise of religion. *Application of the Religious Freedom Restoration Act to the Award of a Grant*, 31 Op. O.L.C. at 172; *Direct Aid to Faith-Based Organizations*, 25 Op. O.L.C. at 132.  Given Congress's "recognition that religious discrimination in employment is permissible in some circumstances," the government will not ordinarily be able to assert a compelling interest in prohibiting that conduct as a general condition of a religious organization's receipt of any particular government grant or contract. *Application of the Religious Freedom Restoration Act to the Award of a Grant*, 31 Op. of O.L.C. at 186.  The government will also bear a heavy burden to establish that requiring a particular contractor or grantee effectively to relinquish its Section 702 exemption is the least restrictive means of achieving a compelling governmental interest.  *See* 42 U.S.C. § 2000bb-1.

The First Amendment also "supplies a limit on Congress' ability to place conditions on the receipt of funds." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2328 (2013) (internal quotation marks omitted)).  Although Congress may specify the activities that it wants to subsidize, it may not "seek to leverage funding" to regulate constitutionally protected conduct "outside the contours of the program itself." *See id.*  Thus, if a condition on participation in a government program—including eligibility for receipt of federally backed student loans—would interfere with a religious organization's constitutionally protected rights, *see, e.g.*,

Federal Law Protections for Religious Liberty
Page 16a

*Hosanna-Tabor*, 565 U.S. at 188–89, that condition could raise concerns under the "unconstitutional conditions" doctrine, *see All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. at 2328.

Finally, Congress has provided an additional statutory protection for educational institutions controlled by religious organizations who provide education programs or activities receiving federal financial assistance. Such institutions are exempt from Title IX's prohibition on sex discrimination in those programs and activities where that prohibition "would not be consistent with the religious tenets of such organization[s]." 20 U.S.C. § 1681(a)(3). Although eligible institutions may "claim the exemption" in advance by "submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions . . . [that] conflict with a specific tenet of the religious organization," 34 C.F.R. § 106.12(b), they are not required to do so to have the benefit of it, *see* 20 U.S.C. § 1681.

3. Government Mandates

Congress has undertaken many similar efforts to accommodate religious adherents in diverse areas of federal law. For example, it has exempted individuals who, "by reason of religious training and belief," are conscientiously opposed to war from training and service in the armed forces of the United States. 50 U.S.C. § 3806(j). It has exempted "ritual slaughter and the handling or other preparation of livestock for ritual slaughter" from federal regulations governing methods of animal slaughter. 7 U.S.C. § 1906. It has exempted "private secondary school[s] that maintain[] a religious objection to service in the Armed Forces" from being required to provide military recruiters with access to student recruiting information. 20 U.S.C. § 7908. It has exempted federal employees and contractors with religious objections to the death penalty from being required to "be in attendance at or to participate in any prosecution or execution." 18 U.S.C. § 3597(b). It has allowed individuals with religious objections to certain forms of medical treatment to opt out of such treatment. *See, e.g.*, 33 U.S.C. § 907(k); 42 U.S.C. § 290bb-36(f). It has created tax accommodations for members of religious faiths conscientiously opposed to acceptance of the benefits of any private or public insurance, *see, e.g.*, 26 U.S.C. §§ 1402(g), 3127, and for members of religious orders required to take a vow of poverty, *see, e.g.*, 26 U.S.C. § 3121(r).

Congress has taken special care with respect to programs touching on abortion, sterilization, and other procedures that may raise religious conscience objections. For example, it has prohibited entities receiving certain federal funds for health service programs or research activities from requiring individuals to participate in such program or activity contrary to their religious beliefs. 42 U.S.C. § 300a-7(d), (e). It has prohibited discrimination against health care professionals and entities that refuse to undergo, require, or provide training in the performance of induced abortions; to provide such abortions; or to refer for such abortions, and it will deem accredited any health care professional or entity denied accreditation based on such actions. *Id.* § 238n(a), (b). It has also made clear that receipt of certain federal funds does not require an individual "to perform or assist in the performance of any sterilization procedure or abortion if [doing so] would be contrary to his religious beliefs or moral convictions" nor an entity to "make its facilities available for the performance of" those procedures if such performance "is prohibited by the entity on the basis of religious beliefs or moral convictions," nor an entity to "provide any personnel for the performance or assistance in the performance of" such procedures if such performance or assistance "would be contrary to the religious beliefs or moral convictions of such

Federal Law Protections for Religious Liberty
Page 17a

personnel." *Id.* § 300a-7(b).  Finally, no "qualified health plan[s] offered through an Exchange" may discriminate against any health care professional or entity that refuses to "provide, pay for, provide coverage of, or refer for abortions," § 18023(b)(4); *see also* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, § 507(d), 129 Stat. 2242, 2649 (Dec. 18, 2015).

Congress has also been particularly solicitous of the religious freedom of American Indians.  In 1978, Congress declared it the "policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites."  42 U.S.C. § 1996.  Consistent with that policy, it has passed numerous statutes to protect American Indians' right of access for religious purposes to national park lands, Scenic Area lands, and lands held in trust by the United States.  *See, e.g.*, 16 U.S.C. §§ 228i(b), 410aaa-75(a), 460uu-47, 543f, 698v-11(b)(11).  It has specifically sought to preserve lands of religious significance and has required notification to American Indians of any possible harm to or destruction of such lands.  *Id.* § 470cc.  Finally, it has provided statutory exemptions for American Indians' use of otherwise regulated articles such as bald eagle feathers and peyote as part of traditional religious practice.  *Id.* §§ 668a, 4305(d); 42 U.S.C. § 1996a.

*        *        *

The depth and breadth of constitutional and statutory protections for religious observance and practice in America confirm the enduring importance of religious freedom to the United States. They also provide clear guidance for all those charged with enforcing federal law:  The free exercise of religion is not limited to a right to hold personal religious beliefs or even to worship in a sacred place.  It encompasses all aspects of religious observance and practice.  To the greatest extent practicable and permitted by law, such religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming.  *See Zorach v. Clauson*, 343 U.S. 306, 314 (1952) ("[Government] follows the best of our traditions . . . [when it] respects the religious nature of our people and accommodates the public service to their spiritual needs.").

# EXHIBIT 8

Federal Register

Vol. 84, No. 199

Tuesday, October 15, 2019

# Presidential Documents

---

Title 3—

The President

Executive Order 13891 of October 9, 2019

## Promoting the Rule of Law Through Improved Agency Guidance Documents

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to ensure that Americans are subject to only those binding rules imposed through duly enacted statutes or through regulations lawfully promulgated under them, and that Americans have fair notice of their obligations, it is hereby ordered as follows:

**Section 1**. *Policy.* Departments and agencies (agencies) in the executive branch adopt regulations that impose legally binding requirements on the public even though, in our constitutional democracy, only Congress is vested with the legislative power. The Administrative Procedure Act (APA) generally requires agencies, in exercising that solemn responsibility, to engage in notice-and-comment rulemaking to provide public notice of proposed regulations under section 553 of title 5, United States Code, allow interested parties an opportunity to comment, consider and respond to significant comments, and publish final regulations in the *Federal Register*.

Agencies may clarify existing obligations through non-binding guidance documents, which the APA exempts from notice-and-comment requirements. Yet agencies have sometimes used this authority inappropriately in attempts to regulate the public without following the rulemaking procedures of the APA. Even when accompanied by a disclaimer that it is non-binding, a guidance document issued by an agency may carry the implicit threat of enforcement action if the regulated public does not comply. Moreover, the public frequently has insufficient notice of guidance documents, which are not always published in the *Federal Register* or distributed to all regulated parties.

Americans deserve an open and fair regulatory process that imposes new obligations on the public only when consistent with applicable law and after an agency follows appropriate procedures. Therefore, it is the policy of the executive branch, to the extent consistent with applicable law, to require that agencies treat guidance documents as non-binding both in law and in practice, except as incorporated into a contract, take public input into account when appropriate in formulating guidance documents, and make guidance documents readily available to the public. Agencies may impose legally binding requirements on the public only through regulations and on parties on a case-by-case basis through adjudications, and only after appropriate process, except as authorized by law or as incorporated into a contract.

**Sec. 2**. *Definitions.* For the purposes of this order:

(a) ''Agency'' has the meaning given in section 3(b) of Executive Order 12866 (Regulatory Planning and Review), as amended.

(b) ''Guidance document'' means an agency statement of general applicability, intended to have future effect on the behavior of regulated parties, that sets forth a policy on a statutory, regulatory, or technical issue, or an interpretation of a statute or regulation, but does not include the following:

(i) rules promulgated pursuant to notice and comment under section 553 of title 5, United States Code, or similar statutory provisions;

(ii) rules exempt from rulemaking requirements under section 553(a) of title 5, United States Code;

(iii) rules of agency organization, procedure, or practice;

(iv) decisions of agency adjudications under section 554 of title 5, United States Code, or similar statutory provisions;

(v) internal guidance directed to the issuing agency or other agencies that is not intended to have substantial future effect on the behavior of regulated parties; or

(vi) internal executive branch legal advice or legal opinions addressed to executive branch officials.

(c) ''Significant guidance document'' means a guidance document that may reasonably be anticipated to:

(i) lead to an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

(ii) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(iii) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(iv) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles of Executive Order 12866.

(d) ''Pre-enforcement ruling'' means a formal written communication by an agency in response to an inquiry from a person concerning compliance with legal requirements that interprets the law or applies the law to a specific set of facts supplied by the person. The term includes informal guidance under section 213 of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (Title II), as amended, letter rulings, advisory opinions, and no-action letters.

**Sec. 3.** *Ensuring Transparent Use of Guidance Documents.* (a) Within 120 days of the date on which the Office of Management and Budget (OMB) issues an implementing memorandum under section 6 of this order, each agency or agency component, as appropriate, shall establish or maintain on its website a single, searchable, indexed database that contains or links to all guidance documents in effect from such agency or component. The website shall note that guidance documents lack the force and effect of law, except as authorized by law or as incorporated into a contract.

(b) Within 120 days of the date on which OMB issues an implementing memorandum under section 6 of this order, each agency shall review its guidance documents and, consistent with applicable law, rescind those guidance documents that it determines should no longer be in effect. No agency shall retain in effect any guidance document without including it in the relevant database referred to in subsection (a) of this section, nor shall any agency, in the future, issue a guidance document without including it in the relevant database. No agency may cite, use, or rely on guidance documents that are rescinded, except to establish historical facts. Within 240 days of the date on which OMB issues an implementing memorandum, an agency may reinstate a guidance document rescinded under this subsection without complying with any procedures adopted or imposed pursuant to section 4 of this order, to the extent consistent with applicable law, and shall include the guidance document in the relevant database.

(c) The Director of OMB (Director), or the Director's designee, may waive compliance with subsections (a) and (b) of this section for particular guidance documents or categories of guidance documents, or extend the deadlines set forth in those subsections.

(d) As requested by the Director, within 240 days of the date on which OMB issues an implementing memorandum under section 6 of this order, an agency head shall submit a report to the Director with the reasons for maintaining in effect any guidance documents identified by the Director.

The Director shall provide such reports to the President. This subsection shall apply only to guidance documents existing as of the date of this order.

**Sec. 4**. *Promulgation of Procedures for Issuing Guidance Documents.* (a) Within 300 days of the date on which OMB issues an implementing memorandum under section 6 of this order, each agency shall, consistent with applicable law, finalize regulations, or amend existing regulations as necessary, to set forth processes and procedures for issuing guidance documents. The process set forth in each regulation shall be consistent with this order and shall include:

(i) a requirement that each guidance document clearly state that it does not bind the public, except as authorized by law or as incorporated into a contract;

(ii) procedures for the public to petition for withdrawal or modification of a particular guidance document, including a designation of the officials to which petitions should be directed; and

(iii) for a significant guidance document, as determined by the Administrator of OMB's Office of Information and Regulatory Affairs (Administrator), unless the agency and the Administrator agree that exigency, safety, health, or other compelling cause warrants an exemption from some or all requirements, provisions requiring:

(A) a period of public notice and comment of at least 30 days before issuance of a final guidance document, and a public response from the agency to major concerns raised in comments, except when the agency for good cause finds (and incorporates such finding and a brief statement of reasons therefor into the guidance document) that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest;

(B) approval on a non-delegable basis by the agency head or by an agency component head appointed by the President, before issuance;

(C) review by the Office of Information and Regulatory Affairs (OIRA) under Executive Order 12866, before issuance; and

(D) compliance with the applicable requirements for regulations or rules, including significant regulatory actions, set forth in Executive Orders 12866, 13563 (Improving Regulation and Regulatory Review), 13609 (Promoting International Regulatory Cooperation), 13771 (Reducing Regulation and Controlling Regulatory Costs), and 13777 (Enforcing the Regulatory Reform Agenda).

(b) The Administrator shall issue memoranda establishing exceptions from this order for categories of guidance documents, and categorical presumptions regarding whether guidance documents are significant, as appropriate, and may require submission of significant guidance documents to OIRA for review before the finalization of agency regulations under subsection (a) of this section. In light of the Memorandum of Agreement of April 11, 2018, this section and section 5 of this order shall not apply to the review relationship (including significance determinations) between OIRA and any component of the Department of the Treasury, or to compliance by the latter with Executive Orders 12866, 13563, 13609, 13771, and 13777. Section 4(a)(iii) and section 5 of this order shall not apply to pre-enforcement rulings.

**Sec. 5**. *Executive Orders 12866, 13563, and 13609.* The requirements and procedures of Executive Orders 12866, 13563, and 13609 shall apply to guidance documents, consistent with section 4 of this order.

**Sec. 6**. *Implementation.* The Director shall issue memoranda and, as appropriate, regulations pursuant to sections 3504(d)(1) and 3516 of title 44, United States Code, and other appropriate authority, to provide guidance regarding or otherwise implement this order.

**Sec. 7.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) Notwithstanding any other provision in this order, nothing in this order shall apply:

(i) to any action that pertains to foreign or military affairs, or to a national security or homeland security function of the United States (other than guidance documents involving procurement or the import or export of non-defense articles and services);

(ii) to any action related to a criminal investigation or prosecution, including undercover operations, or any civil enforcement action or related investigation by the Department of Justice, including any action related to a civil investigative demand under 18 U.S.C. 1968;

(iii) to any investigation of misconduct by an agency employee or any disciplinary, corrective, or employment action taken against an agency employee;

(iv) to any document or information that is exempt from disclosure under section 552(b) of title 5, United States Code (commonly known as the Freedom of Information Act); or

(v) in any other circumstance or proceeding to which application of this order, or any part of this order, would, in the judgment of the head of the agency, undermine the national security.

THE WHITE HOUSE,
*October 9, 2019.*

[FR Doc. 2019–22623
Filed 10–11–19; 11:15 am]
Billing code 3295–F0–P

# EXHIBIT 9



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

October 31, 2019

M-20-02

MEMORANDUM FOR REGULATORY POLICY OFFICERS AT EXECUTIVE
DEPARTMENTS AND AGENCIES AND MANAGING AND EXECUTIVE DIRECTORS OF
CERTAIN AGENCIES AND COMMISSIONS

FROM:      Dominic J. Mancini, Acting Administrator
           Office of Information and Regulatory Affairs

SUBJECT:   Guidance Implementing Executive Order 13891, Titled "Promoting
           the Rule of Law Through Improved Agency Guidance Documents"

       OMB issues this memorandum to implement Executive Order (EO) 13891, titled
"Promoting the Rule of Law Through Improved Agency Guidance Documents," per Section 6 of
that Order.  A central principle of EO 13891 is that guidance documents should only clarify
existing obligations; they should not be a vehicle for implementing new, binding requirements on
the public.  Even guidance documents that do not create binding requirements, however, can
significantly affect the public, and EO 13891 recognizes that these documents warrant a
thorough review prior to issuance.  This memorandum provides agencies with instructions for
complying with the requirements of EO 13891; agencies should refer to this memorandum when
developing or reviewing new or existing guidance documents, as well as when proposing and
finalizing regulations under Section 4 of the Order.  OMB may revise or supplement this
memorandum in light of agency experience with this new Order.

**Deadlines**

**Q1:   What are the key deadlines for agencies?**

       A:  The EO builds upon the requirements in FOIA and requires each agency by February
28, 2020 to establish a single, searchable, indexed website that contains, or links to, all of
the agencies' respective guidance documents currently in effect.  By that same date,
agencies should send to the Federal Register a notice announcing the existence of the new
guidance portal and explaining that all guidance documents remaining in effect are
contained on the new guidance portal.  Agencies should also make the notice available on
the new guidance portal.  In addition, since some stakeholders may not see the Federal
Register Notice, agencies are encouraged to send the notice to their stakeholders through
the normal means of distributing important announcements.

If an agency determines that it failed to include on its new guidance portal a guidance document that existed on October 31, 2019 it may reinstate the guidance document provided it does so by June 27, 2020.  Any rescinded guidance document that has not been reinstated by June 27, 2020, may be reinstated only by following all necessary steps associated with the issuance of a new guidance document.

The EO requires agencies to finalize new or amend existing regulations that set forth a process for issuing guidance documents no later than April 28, 2020. To meet this deadline, agencies should submit proposed regulations or amendments to OIRA for review by January 29, 2020.

**Definition of a Guidance Document**

**Q2:     What constitutes a "guidance document" under this EO?**

A:  Guidance documents come in a variety of formats, including interpretive memoranda, policy statements, manuals, bulletins, advisories, and more. Any document that satisfies the definition of "guidance" under Section 2(b) of the EO would qualify, regardless of name or format.  If an agency is unsure if an item qualifies as guidance, it should consult with its OIRA desk officer prior to publication.

While broad, the term "guidance" as used in the EO is not boundless.  The definition excludes the following:

- Agency statements of specific, rather than general, applicability.  This would exclude from the definition of "guidance" advisory or legal opinions directed to particular parties about circumstance-specific questions; notices regarding particular locations or facilities; and correspondence with individual persons or entities, including congressional correspondence or notices of violation.  If, however, an agency issues a document ostensibly directed to a particular party but designed to guide the conduct of the broader regulated public, such a document would qualify as guidance.

- Agency statements that do not set forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statute or regulation.  This would exclude from the definition of "guidance" documents that merely communicate news updates about the agency, such as most speeches and press releases (although a speech or press release could be a guidance document if it sets forth for the first time a new regulatory policy).

- Legislative rules promulgated under 5 U.S.C. 553 (or similar statutory provisions), or exempt from rulemaking requirements under 5 U.S.C. 553(a).

- Rules of agency organization, procedure, or practice.  Whether a document is exempt as a rule of agency organization, procedure, or practice is a functional test; the exemption does not exclude from the definition of "guidance" statements of agency practice that are designed to shape the behavior of regulated parties.  For instance, a memo addressed to regional agency officials directing them to issue permitting

2

decisions based on a particular construction of a statute, and to be released to the public with the predictable result of dissuading regulated parties from pursuing permits not consistent with the statute as thus construed, would be a guidance document within the terms of the EO.

- Decisions of agency adjudication.

- Documents that are directed solely to the issuing agency or other agencies (or personnel of such agencies) and that are not anticipated to have substantial future effect on the behavior of regulated parties or the public. This includes the typical documents issued for government-wide use by GSA, OPM, OMB, and similar departments and agencies. Such documents are often publicly released by the relevant agencies according to standard agency disclosure practices. This type of standard release would not trigger coverage under this EO, and we encourage agencies to continue their transparency practices in this area. Documents that are not publicly disseminated would also be excluded. Internal agency documents that are made public only because release is required under FOIA or agency disclosure policies would be presumptively excluded as well.

- Legal briefs and other court filings, because these are intended to persuade a court rather than affect the conduct of regulated parties.

- Legal opinions by the Office of Legal Counsel at the Department of Justice.

**Q3:**  **How does this memorandum interact with the 2007 OMB Good Guidance Bulletin?**

A: Where they apply, EO 13891 and this memorandum supersede the 2007 Bulletin. We note, however, that many of the practices specified by the EO and explained in this memorandum are identical to practices discussed in the Good Guidance Bulletin; therefore, in specific instances identified below, this Q and A document refers to the Good Guidance Bulletin which continues to describe best practices that agencies should follow.

**Q4:**  **What types of policies may appropriately be issued through guidance documents?**

A: Guidance documents can provide a valuable means for an agency, *inter alia*, to interpret existing law through an interpretive rule or to clarify how it intends to enforce a legal requirement through a policy statement. However, a guidance document should never be used to establish new positions that the agency treats as binding; any such requirements must be issued pursuant to applicable notice-and-comment requirements of the Administrative Procedure Act or other applicable law. Nor should agencies use guidance documents—including those that describe themselves as non-binding— effectively to coerce private-party conduct, for instance by suggesting that a standard in a guidance document is the only acceptable means of complying with statutory requirements, or by threatening enforcement action against all parties that decline to follow the guidance.

3

**Calculating the Economic Impact of a Guidance Document**

**Q5:    How should agencies calculate the economic impact of a guidance document?**

A: OMB Circular A-4 sets forth principles governing analysis of the costs and benefits of regulations.[1]  For the most part, the same principles apply when assessing guidance; however, there may be some differences as compared with the regulatory context.  Some of these potential analytic differences are discussed below:

- Estimating behavior change.  Because guidance is non-binding, and regulated parties are thus legally free to decline to conform their behavior to it, estimating behavior change due to a new guidance document can present unique challenges.  In estimating behavior change, agencies should focus on how the guidance affects the incentives of regulated parties, including, e.g., incentives to avoid investigation by or litigation with the government, as well as potential pressure from industry peers or consumers to conform to "best practices" or norms provided or recommended by the agency.  Agencies should rely on empirical estimates of behavior change whenever reasonably available, but should discuss potential behavior changes qualitatively where such empirical estimates are unavailable.  In some instances, analysis of the impact of a guidance document should reflect an assumption that, because the document is not legally binding, less than all affected entities or individuals will conform their behavior to the policy set forth in the document.[2]

- Baseline.  With guidance as with regulations, the analytic baseline is the state of the world in the absence of the document at issue.  Where a guidance document materially alters the interpretation or implementation of a statute or regulation, the baseline is ordinarily the prior interpretation or implementation, adjusted for any non-conformity as discussed above.  Where a guidance document instead simply provides specificity that falls within the range of the possible interpretive or implementation choices, agencies should attempt to acquire information about the interpretive or

---

[1] Other helpful references include OIRA's Regulatory Impact Analysis FAQ, available at www.whitehouse.gov/sites/whitehouse.gov/files/omb/assets/OMB/circulars/a004/a-4_FAQ.pdf, which among other things, provides a list of examples of transfer impacts and offers guidance on valuing time costs; the 'Recommendations for Reform' chapter of OMB's 2015 Report to Congress on the Benefits and Costs of Federal Regulations, available at www.whitehouse.gov/sites/whitehouse.gov/files/omb/inforeg/inforeg/2015_cb/2015-cost-benefit-report.pdf, which elaborates on often-misunderstood analytic concepts; and OIRA's Regulatory Impact Analysis Primer, available at www.whitehouse.gov/sites/whitehouse.gov/files/omb/inforeg/inforeg/regpol/circular-a-4_regulatory-impact-analysis-a-primer.pdf, which provides a more condensed introduction to RIA concepts than the full Circular A-4.

[2] Although the estimation of non-compliance may be more widely necessary in the guidance context than with regulations, non-compliance merits serious analytic attention as a general matter.

implementation choices that regulated parties made in the absence of the guidance.

- Rigor of Analysis.  When an agency is assessing or explaining whether it believes a guidance document is significant, it should, at a minimum, provide the same level of analysis that would be required for a major determination under the Congressional Review Act.[3]  When an agency determines that a guidance document will be economically significant, the agency should conduct a Regulatory Impact Analysis of the sort that would accompany an economically significant rulemaking, to the extent reasonably possible.

Agencies with further questions about how to apply or adapt the concepts of Circular A-4 to the assessment of guidance should consult with their OIRA desk officers.

**Q6:**   **Which guidance documents require a separate Regulatory Impact Analysis?**

A: An analysis is required for any guidance document that may bring about $100 million in benefits, costs, or transfer impacts in at least one year (i.e., in one consecutive twelve-month period), or that otherwise qualifies as economically significant under Executive Order 12866.

**Q7:**   **Is a separate document needed for the analysis?**

A: No, a separate document is not needed for the analysis, although it is permitted.  In choosing between placing a guidance and its accompanying analysis in the same or separate documents, agencies should prioritize clarity and transparency for the public.

**Q8:**   **Will the analysis be published?**

A: Yes, absent highly unusual and compelling circumstances.

**Process for Complying with Section 3(a)**

**Q9:**   **How should agencies set up their guidance portal for public access to all guidance documents?**

A:   Agency guidance portals should comply with all existing Federal web policies such as OMB Memorandum M-17-06, with particular emphasis on ensuring that all guidance documents are machine readable and can be indexed and searched by commonly used commercial search engines.[4]

Additionally, agencies must ensure that their guidance portal is either located at, or can be accessed from (through a URL redirect) the domain on their site **www.[agencyname].gov/guidance.** Some agencies may already group guidance

---

[3] See OMB Memorandum M-19-14, Guidance on Compliance with the Congressional Review Act (April 11, 2019).

[4] https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/m-17-06.pdf

documents by program or subject matter throughout various webpages on their main agency website. In such cases, the specific websites housing those guidance documents should be linked from the main guidance portal.

Agencies should also review their web traffic analytics and ensure the guidance portal is accessible from the main points of entry through which most users come to their main agency website.

**Q10:** **What information should agencies provide on their guidance portal for each guidance document?**

A: For each guidance document agencies publish on their guidance portal established under the EO, they should include the following information:

- A concise name for the guidance document.
- The date on which the guidance document was issued.
- The date on which the guidance document was posted to the website.
- An agency unique identifier.
- A hyperlink to the guidance document.
- The general topic addressed by the guidance document (e.g., pensions, healthcare, vehicle safety standards).
- One or two sentences summarizing the guidance document's content.

**Q11:** **What is the "unique identifier" that an agency should include on a guidance document?**

A: The agency should develop a system that will allow a member of the public easily to search for and locate a specific guidance document by its unique identifier. This identifier can be a series of letters and numbers and should be preceded by a well-known acronym for the agency (example: OMB 1X34). In addition, if a guidance is deemed "significant" by OIRA, the document should be assigned a Z-RIN in the ROCIS system, and the agency should include that as an identifier, or at least part of the guidance name, on its website.

**Q12:** **What other information should agencies provide on their guidance portal?**

A: In addition to the information associated with each guidance document, agencies should also include a clearly visible note expressing that (a) guidance documents lack the force and effect of law, unless expressly authorized by statute or incorporated into a contract; and (b) the agency may not cite, use, or rely on any guidance that is not posted on the website existing under the EO, except to establish historical facts. The agency should also include a link to the proposed or final regulations required by Section 4 of the EO.

6

## Process for Complying with Section 3(b)

**Q13:** **How should agencies notify the public that all guidance documents remaining in effect may be found on the new guidance portal?**

A:  Agencies should publish in the Federal Register a notice announcing the existence of the guidance portal required by the EO and explaining that, by February 28, 2020, all guidance documents remaining in effect may be found on the guidance portal.  At the same time as publication in the Federal Register, agencies should also make the notice available on the new guidance portal and send the notice to its stakeholders through its normal means of distributing important announcements.

**Q14:** **How should an agency reinstate a guidance document under Section 3(b)?**

A:  If an agency wishes to reinstate a guidance document that it rescinded under Section 3(b) of the EO by June 27, 2020 it may do so by uploading the guidance document to its guidance portal, ensuring that it includes the date on which it posted the guidance document to the guidance portal.  The agency should, at the time it uploads the document, notify OIRA for purposes of implementing Section 3(d) of the Order.

**Q15:** **How should an agency determine which documents or statements are appropriate for inclusion on the website existing under the EO?**

A:  Agencies should post on their guidance portal all guidance documents as defined in the EO which the agency expects to cite, use, or rely upon.  If any agency is uncertain whether a particular document should be posted to its guidance portal, it should consult with its OIRA desk officer.

## Process for Requesting a Waiver under Section 3(c)

**Q16:** **How should agencies request a waiver from the OMB Director?**

A:  Requests for waivers from the OMB Director should be submitted through OIRA. The request should come in the form of a letter signed by a senior policy official at the agency.

**Q17:** **What information should agencies provide to the OMB Director when requesting a waiver?**
A:  If the agency requests that the Director waive the requirement to upload a particular guidance document or category of guidance documents, the agency should clearly explain the purpose of the document(s) and why making the document(s) publicly available on an agency website would cause specific harm or otherwise interfere with the agency's mission.  If the agency requests an extension of the timing requirements in sections 3(a) or 3(b), the agency should clearly explain the circumstances that prevent the agency from complying with the timing requirements and why an extension would alleviate those circumstances.

7

**Process for Submitting a Report under Section 3(d)**

**Q18:   For any guidance document for which the OMB Director has asked for a report under Section 3(d), what information should agencies provide to the Director to explain the need for retaining in effect the guidance document in question?**

A:  The head of the agency should draft a response to the OMB Director, which the OMB Director will make available to the President, explaining how the guidance document in question aligns with the President's priorities and is net beneficial.  The letter should clearly explain why rescinding the guidance document would cause public harm, as well as any alternatives the agency considered regarding possibly amending the guidance document in question and why the agency rejected those alternatives.

**Q19:   How will the report be evaluated?**

A:  The report will be evaluated in a review by the Executive Office of the President as coordinated by OIRA.  The review will evaluate whether the guidance document is net beneficial and whether the policy outlined in the document aligns with the President's priorities.  The OIRA Administrator may issue a letter summarizing the conclusions reached in the review.

**Compliance with Section 4(a)(i) and (ii) (all guidance documents)**

**Q20:   What language should agency regulations require to be included in their guidance documents to make clear that the documents do not bind the public?**

A:  Agencies should include the following disclaimer prominently in each guidance document:

> "The contents of this document do not have the force and effect of law and are not meant to bind the public in any way.  This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies."

When an agency's guidance document is binding because binding guidance is authorized by law or because the guidance is incorporated into a contract, the agency should modify the disclaimer above to reflect either of those facts.

**Q21:   What information should agency regulations require that agencies provide to the public regarding a request to withdraw or modify an existing guidance document?**

A:  Agencies should provide clear instructions on the agency's website to members of the public regarding how to request the withdrawal or modification of an existing guidance document, including, but not limited to, an email address or web portal where requests can be submitted, a mailing address where hard copy requests can be submitted, and an office at the agency responsible for coordinating such requests.  The agency should respond to all requests in a timely manner, but no later than 90 days after receipt of the request.

**Q22:   What information should agency regulations require to be included in a published guidance document?**

A:  In general, each guidance document should, at a minimum:

- Include the term "guidance."

- Identify the agency or office issuing the document.

- Identify the activities to which and the persons to whom the document applies.

- Include the date of issuance.

- Note if it is a revision to a previously issued guidance document and, if so, identify the guidance document that it replaces.

- Provide the title of the guidance and the document identification number.

- Include the citation to the statutory provision or regulation (in Code of Federal Regulations format) to which it applies or which it interprets.

- Include the disclaimer from Q20 above.

- Include a short summary of the subject matter covered in the guidance document at the top of the document.

**Compliance with Section 4(a)(iii) (significant guidance documents)**

**Q23:   When should agency regulations require publication of a significant guidance document for notice and comment?**

A:  Section 4(a)(iii)(A) of the EO requires that, at a minimum, significant guidance documents must receive 30 days of public notice and comment before issuance, as well as a public response from the agency to major concerns raised in comments.

Agencies should follow best practices for collecting and responding to public comments associated with their significant guidance documents.  An agency should publish a notice in the Federal Register announcing the availability of a significant guidance document and should also make the draft guidance document available on the agency's website; additional methods of notice may be appropriate as well.  Persons with disabilities should be able reasonably to access and comment during the guidance development process. Agencies should also make the public comments available to the public for review online, on or linked to the website existing under this Order.

For more specific details and best practice recommendations regarding notice and comment processes for guidance documents, see OMB's *Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432, 3438–39 (Jan. 18, 2007).*

**Q24:   How should an agency present its responses to public comments?**

A:  After reviewing the public comments on a draft guidance document, agencies should incorporate any suggested changes as appropriate into a final version and then make the final guidance document available to the public.  Agencies should also provide a public response-to-comments document that is similar to the response-to-comments that typically appears in the preamble to a final rule.  The response to comments may appear in the final guidance document itself or in a companion document.  Agencies need not respond to every comment or every issue raised; the goal, rather, is to provide a robust explanation of the agency's choices in the final guidance document, including why the agency did not agree with relevant suggestions from commenters.

**Q25:   Which official should agency regulations require to sign a significant guidance document?**

A:  On a non-delegable basis, a significant guidance document should be signed by an agency head, or by a component head who is appointed by the President (with or without confirmation by the Senate), or by an official who is serving in an acting capacity as either of the foregoing.

**Q26:   When should agencies explain how the guidance document complies with the relevant EOs?**

A:  When an agency submits a guidance document to OIRA for review, it should demonstrate how the guidance document complies with EOs 12866, 13563, 13609, 13771, and 13777, under EO 13891 section 4(a)(iii)(D).  Such demonstration may be similar to the corresponding demonstration in a regulation's preamble.

- EO 12866 and EO 13563: The agency should explain the analysis it has conducted that shows that the regulation at issue maximizes net benefits, as well as the alternatives the agency has considered.  The agency should also explain if it is issuing the guidance as a result of any retrospective review.

- EO 13609: The agency should explain how the guidance, if applicable, promotes international regulatory cooperation and how the agency considered the effect the guidance may have on interactions with other countries.

- EO 13771: The agency should explain whether the guidance is a "regulatory" or "deregulatory" action per the definitions in OMB's EO 13771 Implementing Memorandum, or whether the guidance falls into one of the other categories under EO 13771.[5]

---

[5] See M-17-21 Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs" April 5, 2017.

- EO 13777: The agency should explain whether the guidance is being issued as a result of the agency's regulatory reform agenda or through a recommendation from the agency's Regulatory Reform Task Force, noting that EO 13777 charges agency Task Forces with identifying regulatory reforms consistent with the previous EOs mentioned here.

## Process for Determining If a Guidance Document Meets the Definition of "Significant Guidance Document"

**Q27:   What is the process for seeking significance determinations from OIRA?**

A:  Agencies should seek significance determinations for guidance documents from OIRA in the same manner as for rulemakings.  Prior to publishing the guidance document, and with sufficient time to allow OIRA to review the document in the event that a significance determination is made, agencies should provide their OIRA desk officer with an opportunity to review the document to determine if it meets the definition of "significant" or "economically significant" under EO 13891.

**Q28:   What information do agencies need to submit to OMB regarding upcoming guidance documents?**

A:  Each agency should notify OIRA regularly of upcoming guidance documents.  An agency may provide such a notification by submitting a list of planned guidance documents, including summaries of each guidance document and the agency's recommended designation of "not significant," "significant," or "economically significant," as well as a justification for that designation.  For example, an agency may recommend that a guidance document should not be deemed significant by explaining in the summary that it is routine, ministerial, or otherwise does not meet the EO criteria for a significant guidance document.  To make the significance determination, OIRA may request additional information from the agency.

**Q29:   How may agencies request categorical determinations that classes of guidance documents presumptively do not qualify as significant under the EO?**

A:  To request categorical exemptions, agencies should submit to OIRA a written request signed by a senior policy official that explains why the proposed category of guidance document generally is only routine or ministerial, or is otherwise of limited importance to the public.  The agency should provide examples of such guidance documents to support the request.  Should OIRA grant a categorical exemption, agencies remain responsible for determining if a future planned document in the category may trigger one of the four criteria for significant guidance and should submit such a document to OIRA for review pursuant to the requirements of EO 13891. OIRA reserves the right to revoke categorical exemptions or to deem significant, and hence to review, a particular guidance document notwithstanding a presumption that documents of that category are not significant.

**Q30:   How should agencies submit significant guidance documents for OIRA review?**

A:  The agency should submit the significant guidance document for review electronically in the ROCIS system.  At the time of submission, the agency should also upload any supporting documents as part of the same package.

**Q31:   Does OIRA need to review all significant guidance documents?**

A:  Agencies should work with their OIRA desk officer to determine the appropriate process for reviewing guidance documents that have been deemed significant.  An agency should assume that any guidance document that has been deemed significant will be reviewed unless told otherwise by its OIRA desk officer.

**Q32:   When can an agency publish a significant guidance document?**

A:  Agencies may publish significant (including economically significant) guidance documents only when OIRA has concluded review under EO 13891. If an agency is not sure if review has concluded, it should consult its OIRA desk officer.

**Q33:   Is it possible to waive the need for a significance determination or EO 12866 review in the event of an emergency?**

A:  Agencies may request that a significance determination or review be waived due to exigency, safety, or other compelling cause.  A senior policy official must explain the nature of the emergency and why following the normal clearance procedures would result in specific harm.  The OIRA Administrator will review and make a determination as to whether granting such a request is appropriate.

## Exemptions

**Q34:   What categories of documents that might otherwise constitute guidance are excepted from the requirements of this EO?  What is the process for requesting additional exceptions?**

A:  Section 4(b) of the EO authorizes the Administrator of OIRA to articulate exceptions from the requirements of the EO for certain categories of documents as may be appropriate.  Please contact your OIRA desk officer if you would like to suggest an exception under section 4(b).  OIRA will release a list of government-wide exceptions, as well as of categorical presumptions of non-significance, at a future date.

OMB has found that standard issue documents associated with grants and procurements such as Notices of Funding Opportunities (NOFOs) and Requests for Proposals (RFPs) are, as a general matter, not significant guidance documents.  OMB also clarifies this EO is not meant to alter any existing OMB process for reviewing documents of this nature.  OMB further notes, however, that OIRA has on a few occasions found documents of this type to be significant regulatory actions under EO 12866 and has reviewed accordingly. accordingly.

# EXHIBIT 10

# Presidential Documents

Executive Order 13892 of October 9, 2019

## Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Policy.* The rule of law requires transparency. Regulated parties must know in advance the rules by which the Federal Government will judge their actions. The Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.,* was enacted to provide that "administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished *ad hoc* determinations." *Morton* v. *Ruiz,* 415 U.S. 199, 232 (1974). The Freedom of Information Act, America's landmark transparency law, amended the APA to further advance this goal. The Freedom of Information Act, as amended, now generally requires that agencies publish in the *Federal Register* their substantive rules of general applicability, statements of general policy, and interpretations of law that are generally applicable and both formulated and adopted by the agency (5 U.S.C. 552(a)(1)(D)). The Freedom of Information Act also generally prohibits an agency from adversely affecting a person with a rule or policy that is not so published, except to the extent that the person has actual and timely notice of the terms of the rule or policy (5 U.S.C. 552(a)(1)).

Unfortunately, departments and agencies (agencies) in the executive branch have not always complied with these requirements. In addition, some agency practices with respect to enforcement actions and adjudications undermine the APA's goals of promoting accountability and ensuring fairness.

Agencies shall act transparently and fairly with respect to all affected parties, as outlined in this order, when engaged in civil administrative enforcement or adjudication. No person should be subjected to a civil administrative enforcement action or adjudication absent prior public notice of both the enforcing agency's jurisdiction over particular conduct and the legal standards applicable to that conduct. Moreover, the Federal Government should, where feasible, foster greater private-sector cooperation in enforcement, promote information sharing with the private sector, and establish predictable outcomes for private conduct. Agencies shall afford regulated parties the safeguards described in this order, above and beyond those that the courts have interpreted the Due Process Clause of the Fifth Amendment to the Constitution to impose.

**Sec. 2.** *Definitions.* For the purposes of this order:

(a) "Agency" has the meaning given to "Executive agency" in section 105 of title 5, United States Code, but excludes the Government Accountability Office.

(b) "Collection of information" includes any conduct that would qualify as a "collection of information" as defined in section 3502(3)(A) of title 44, United States Code, or section 1320.3(c) of title 5, Code of Federal Regulations, and also includes any request for information, regardless of the number of persons to whom it is addressed, that is:

(i) addressed to all or a substantial majority of an industry; or

(ii) designed to obtain information from a representative sample of individual persons in an industry.

(c) ''Guidance document'' means an agency statement of general applicability, intended to have future effect on the behavior of regulated parties, that sets forth a policy on a statutory, regulatory, or technical issue, or an interpretation of a statute or regulation, but does not include the following:

(i) rules promulgated pursuant to notice and comment under section 553 of title 5, United States Code, or similar statutory provisions;

(ii) rules exempt from rulemaking requirements under section 553(a) of title 5, United States Code;

(iii) rules of agency organization, procedure, or practice;

(iv) decisions of agency adjudications under section 554 of title 5, United States Code, or similar statutory provisions;

(v) internal guidance directed to the issuing agency or other agencies that is not intended to have substantial future effect on the behavior of regulated parties; or

(vi) internal executive branch legal advice or legal opinions addressed to executive branch officials.

(d) ''Legal consequence'' means the result of an action that directly or indirectly affects substantive legal rights or obligations. The meaning of this term should be informed by the Supreme Court's discussion in *U.S. Army Corps of Engineers* v. *Hawkes Co.,* 136 S. Ct. 1807, 1813–16 (2016), and includes, for example, agency orders specifying which commodities are subject to or exempt from regulation under a statute, *Frozen Food Express* v. *United States,* 351 U.S. 40, 44–45 (1956), as well as agency letters or orders establishing greater liability for regulated parties in a subsequent enforcement action, *Rhea Lana, Inc.* v. *Dep't of Labor,* 824 F.3d 1023, 1030 (DC Cir. 2016). In particular, ''legal consequence'' includes subjecting a regulated party to potential liability.

(e) ''Unfair surprise'' means a lack of reasonable certainty or fair warning of what a legal standard administered by an agency requires. The meaning of this term should be informed by the examples of lack of fair notice discussed by the Supreme Court in *Christopher* v. *SmithKline Beecham Corp.,* 567 U.S. 142, 156 & n.15 (2012).

(f) ''Pre-enforcement ruling'' means a formal written communication from an agency in response to an inquiry from a person concerning compliance with legal requirements that interprets the law or applies the law to a specific set of facts supplied by the person. The term includes informal guidance under section 213 of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (Title II), as amended (SBREFA), letter rulings, advisory opinions, and no-action letters.

(g) ''Regulation'' means a legislative rule promulgated pursuant to section 553 of title 5, United States Code, or similar statutory provisions.

**Sec. 3**. *Proper Reliance on Guidance Documents.* Guidance documents may not be used to impose new standards of conduct on persons outside the executive branch except as expressly authorized by law or as expressly incorporated into a contract. When an agency takes an administrative enforcement action, engages in adjudication, or otherwise makes a determination that has legal consequence for a person, it must establish a violation of law by applying statutes or regulations. The agency may not treat noncompliance with a standard of conduct announced solely in a guidance document as itself a violation of applicable statutes or regulations. When an agency uses a guidance document to state the legal applicability of a statute or regulation, that document can do no more, with respect to prohibition of conduct, than articulate the agency's understanding of how a statute or regulation applies to particular circumstances. An agency may cite a guidance document to convey that understanding in an administrative enforcement action or adjudication only if it has notified the public of such document in advance through publication, either in full or by citation if publicly available, in the *Federal Register* (or on the portion of the agency's website

that contains a single, searchable, indexed database of all guidance documents in effect).

**Sec. 4**. *Fairness and Notice in Administrative Enforcement Actions and Adjudications.* When an agency takes an administrative enforcement action, engages in adjudication, or otherwise makes a determination that has legal consequence for a person, it may apply only standards of conduct that have been publicly stated in a manner that would not cause unfair surprise. An agency must avoid unfair surprise not only when it imposes penalties but also whenever it adjudges past conduct to have violated the law.

**Sec. 5**. *Fairness and Notice in Jurisdictional Determinations.* Any decision in an agency adjudication, administrative order, or agency document on which an agency relies to assert a new or expanded claim of jurisdiction—such as a claim to regulate a new subject matter or an explanation of a new basis for liability—must be published, either in full or by citation if publicly available, in the *Federal Register* (or on the portion of the agency's website that contains a single, searchable, indexed database of all guidance documents in effect) before the conduct over which jurisdiction is sought occurs. If an agency intends to rely on a document arising out of litigation (other than a published opinion of an adjudicator), such as a brief, a consent decree, or a settlement agreement, to establish jurisdiction in future administrative enforcement actions or adjudications involving persons who were not parties to the litigation, it must publish that document, either in full or by citation if publicly available, in the *Federal Register* (or on the portion of the agency's website that contains a single, searchable, indexed database of all guidance documents in effect) and provide an explanation of its jurisdictional implications. An agency may not seek judicial deference to its interpretation of a document arising out of litigation (other than a published opinion of an adjudicator) in order to establish a new or expanded claim or jurisdiction unless it has published the document or a notice of availability in the *Federal Register* (or on the portion of the agency's website that contains a single, searchable, indexed database of all guidance documents in effect).

**Sec. 6**. *Opportunity to Contest Agency Determination.* (a) Except as provided in subsections (b) and (c) of this section, before an agency takes any action with respect to a particular person that has legal consequence for that person, including by issuing to such a person a no-action letter, notice of noncompliance, or other similar notice, the agency must afford that person an opportunity to be heard, in person or in writing, regarding the agency's proposed legal and factual determinations. The agency must respond in writing and articulate the basis for its action.

(b) Subsection (a) of this section shall not apply to settlement negotiations between agencies and regulated parties, to notices of a prospective legal action, or to litigation before courts.

(c) An agency may proceed without regard to subsection (a) of this section where necessary because of a serious threat to health, safety, or other emergency or where a statute specifically authorizes proceeding without a prior opportunity to be heard. Where an agency proceeds under this subsection, it nevertheless must afford any person an opportunity to be heard, in person or in writing, regarding the agency's legal determinations and respond in writing as soon as practicable.

**Sec. 7**. *Ensuring Reasonable Administrative Inspections.* Within 120 days of the date of this order, each agency that conducts civil administrative inspections shall publish a rule of agency procedure governing such inspections, if such a rule does not already exist. Once published, an agency must conduct inspections of regulated parties in compliance with the rule.

**Sec. 8**. *Appropriate Procedures for Information Collections.* (a) Any agency seeking to collect information from a person about the compliance of that person or of any other person with legal requirements must ensure that such collections of information comply with the provisions of the Paperwork Reduction Act, section 3512 of title 44, United States Code, and section

1320.6(a) of title 5, Code of Federal Regulations, applicable to collections of information (other than those excepted under section 3518 of title 44, United States Code).

(b) To advance the purposes of subsection (a) of this section, any collection of information during the conduct of an investigation (other than those investigations excepted under section 3518 of title 44, United States Code, and section 1320.4 of title 5, Code of Federal Regulations, or civil investigative demands under 18 U.S.C. 1968) must either:

(i) display a valid control number assigned by the Director of the Office of Management and Budget; or

(ii) inform the recipient through prominently displayed plain language that no response is legally required.

**Sec. 9**. *Cooperative Information Sharing and Enforcement.* (a) Within 270 days of the date of this order, each agency, as appropriate, shall, to the extent practicable and permitted by law, propose procedures:

(i) to encourage voluntary self-reporting of regulatory violations by regulated parties in exchange for reductions or waivers of civil penalties;

(ii) to encourage voluntary information sharing by regulated parties; and

(iii) to provide pre-enforcement rulings to regulated parties.

(b) Any agency that believes additional procedures are not practicable—because, for example, the agency believes it already has adequate procedures in place or because it believes it lacks the resources to institute additional procedures—shall, within 270 days of the date of this order, submit a report to the President describing, as appropriate, its existing procedures, its need for more resources, or any other basis for its conclusion.

**Sec. 10**. *SBREFA Compliance.* Within 180 days of the date of this order, each agency shall submit a report to the President demonstrating that its civil administrative enforcement activities, investigations, and other actions comply with SBREFA, including section 223 of that Act. A copy of this report, subject to redactions for any applicable privileges, shall be posted on the agency's website.

**Sec. 11**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) Notwithstanding any other provision in this order, nothing in this order shall apply:

(i) to any action that pertains to foreign or military affairs, or to a national security or homeland security function of the United States (other than procurement actions and actions involving the import or export of non-defense articles and services);

(ii) to any action related to a criminal investigation or prosecution, including undercover operations, or any civil enforcement action or related investigation by the Department of Justice, including any action related to a civil investigative demand under 18 U.S.C. 1968;

(iii) to any action related to detention, seizure, or destruction of counterfeit goods, pirated goods, or other goods that infringe intellectual property rights;

(iv) to any investigation of misconduct by an agency employee or any disciplinary, corrective, or employment action taken against an agency employee; or

(v) in any other circumstance or proceeding to which application of this order, or any part of this order, would, in the judgment of the head of the agency, undermine the national security.

THE WHITE HOUSE,
*October 9, 2019.*

[FR Doc. 2019–22624
Filed 10–11–19; 11:15 am]
Billing code 3295–F0–P

# EXHIBIT 11



# Office of the Attorney General
## Washington, D.C. 20530

October 6, 2017

MEMORANDUM FOR ALL COMPONENT HEADS AND UNITED STATES ATTORNEYS

FROM:      THE ATTORNEY GENERAL

SUBJECT:   <u>Implementation of Memorandum on Federal Law Protections<br>for Religious Liberty</u>

The President has instructed me to issue guidance interpreting religious liberty protections in federal law. Exec. Order 13798, § 4 (May 4, 2017). Pursuant to that instruction and consistent with my authority to provide advice and opinions on questions of law to the Executive Branch, I have undertaken a review of the primary sources for federal protection of religious liberty in the United States, along with the case law interpreting such sources. I also convened a series of listening sessions, seeking suggestions regarding the areas of federal protection for religious liberty most in need of clarification or guidance from the Attorney General.

Today, I sent out a memorandum to the heads of all executive departments and agencies summarizing twenty principles of religious liberty and providing an appendix with interpretive guidance of federal-law protections for religious liberty to support those principles. That memorandum and appendix are no less applicable to this Department than to any other agency within the Executive Branch. I therefore direct all attorneys within the Department to adhere to the interpretative guidance set forth in the memorandum and its accompanying appendix.

In particular, I direct the Department of Justice to undertake the following actions:

- All Department components and United States Attorney's Offices shall, effective immediately, incorporate the interpretative guidance in litigation strategy and arguments, operations, grant administration, and all other aspects of the Department's work, keeping in mind the President's declaration that "[i]t shall be the policy of the executive branch to vigorously enforce Federal law's robust protections for religious freedom." Exec. Order 13798, § 1 (May 4, 2017).
- Litigating Divisions and United States Attorney's Offices should also consider, in consultation with the Associate Attorney General, how best to implement the guidance with respect to arguments already made in pending cases where such arguments may be inconsistent with the guidance.
- Department attorneys shall also use the interpretive guidance in formulating opinions and advice for other Executive Branch agencies and shall alert the appropriate officials at such agencies whenever agency policies may conflict with the guidance.
- To aid in the consistent application of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, and other federal-law protections for religious liberty, the Office of Legal Policy shall coordinate with the Civil Rights Division to

Implementation of Memorandum on Federal Law Protections for Religious Liberty
Page 2

review every Department rulemaking and every agency action submitted by the Office of Management and Budget for review by this Department for consistency with the interpretive guidance.  In particular, the Office of Legal Policy, in consultation with the Civil Rights Division, shall consider whether such rules might impose a substantial burden on the exercise of religion and whether the imposition of that burden would be consistent with the requirements of RFRA.  The Department shall not concur in the issuance of any rule that appears to conflict with federal laws governing religious liberty, as set forth in the interpretive guidance.

- In addition, to the extent that existing procedures do not already provide for consultation with the Associate Attorney General, Department components and United States Attorney's Offices shall notify the Associate Attorney General of all issues arising in litigation, operations, grants, or other aspects of the Department's work that appear to raise novel, material questions under RFRA or other religious liberty protections addressed in the interpretive guidance.  The Associate Attorney General shall promptly alert the submitting component of any concerns.

Any questions about the interpretive guidance or this memorandum should be addressed to the Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue N.W., Washington, D.C. 20530, phone (202) 514-4601.

Thank you for your time and attention to this important matter.