CHARLES CARREON (CSB # 127139)
3241 E. Blacklidge Drive
Tucson, Arizona 85716
Tel: 628-227-4059
Email: chascarreon@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly,
North American Association of Visionary Churches, and
Clay Villanueva

ERRATA NOTICE
THIS DOCUMENT IS THE IDENTICAL DOCUMENT
AS DOCKET # 33, WITH PAGINATION CORRECTED
AS NOTED IN NOTICE OF ERRATA (DOCKET #35)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIZONA YAGÉ ASSEMBLY, NORTH AMERICAN ASSOCIATION OF VISIONARY CHURCHES, and CLAY VILLANUEVA, <br><br> Plaintiffs, <br><br> vs. <br><br> WILLIAM BARR, Attorney General of the United States; UTTAM DHILLON, Acting Administrator of the U.S. Drug Enforcement Administration; CHAD F. WOLF, Acting Secretary of the Dept. of Homeland Security; MARK A. MORGAN, Acting Commissioner of U.S. Customs and Border Protection; THOMAS PREVOZNIK, Deputy Assistant Administrator of the DEA Dept. of Diversion Control, in his personal capacity; the UNITED STATES OF AMERICA; the STATE OF ARIZONA; MARK BRNOVICH, Arizona Attorney General; MARICOPA COUNTY, a political subdivision of the State of Arizona; and, MATTHEW SHAY, <br><br> Defendants. | Case No.: 3:20-CV-03098-WHO <br><br> PLAINTIFF ARIZONA YAGÉ ASSEMBLY'S MOTION FOR PRELIMINARY INJUNCTION <br><br> Date: September 9, 2020 <br> Time: 2:00 P.M. <br> Courtroom: 2 (17th floor) |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD HEREIN, PLEASE TAKE

NOTICE THAT at 2:00 p.m. on September 9, 2020 in Courtroom 2 on the 17th floor of the

United States Courthouse at 450 Golden Gate Avenue, San Francisco, California, plaintiff

Arizona Yagé Assembly ("AYA") will move the Court for an order pursuant to L.R. 7-2, L.R. 65-2, F.R.Civ.P. 65, 42 U.S.C. § 1983, and 28 U.S.C. § 2201 − 2202, preliminarily enjoining the Drug Enforcement Administration ("DEA") and Customs and Border Patrol ("CBP") from prohibiting, or in any way interfering with AYA's importation, storage, distribution, and use of Ayahuasca tea or its herbal constituents for AYA's religious ceremonies.

The motion will be made based on the attached memorandum of points and authorities, the declarations of Winfield Scott Stanley III and Charles Carreon, the associated exhibits, the proposed Order submitted herewith, and such further evidence and argument as the Court finds relevant.

Dated:  August 5, 2020                    CHARLES CARREON, ESQ.
                                          By: /s/Charles Carreon
                                          CHARLES CARREON (127139)
                                          Attorney for Plaintiffs
                                          Arizona Yagé Assembly.
                                          North American Association of Visionary Churches,
                                          Clay Villanueva

# **TABLE OF CONTENTS**

I.      PREFATORY STATEMENT ................................................................................ 1

II.     FACTS ........................................................................................................... 2

III.    ARGUMENT ................................................................................................. 13

        A.      AYA is a Proper RFRA Plaintiff to Protect the Free Exercise Rights of
                AYA's Minister and Congregation ........................................................ 13

        B.      AYA Is Likely to Prevail on the First Claim for Relief Under RFRA ....... 13

        C.      AYA's System of Belief and Practice is Ethically Grounded.................... 16

        D.      AYA Ceremonies are Safe for Participants................................................ 17

        E.      There Is No Substantial Risk of Diversion of Ayahuasca From AYA ....... 17

        F.      AYA's Procedures for Handling Ayahuasca Eliminate the Risk of
                Diversion .................................................................................................. 18

        G.      Denial of the Requested Exemption Would Substantially Burden AYA's
                Exercise of Religion ................................................................................ 19

        H.      No Compelling Government Interest Justifies Prohibiting AYA's Use of
                Sacramental Ayahuasca in Free Exercise of Religion, Nor Is Total
                Prohibition of AYA's Use of Ayahuasca the Least Restrictive Means of
                Advancing the Government's Goal of Fighting Illicit Drug Trafficking.... 20

        I.      The Balance of the Hardships Tips Sharply Towards AYA ...................... 20

        J.      The Public Interest Favors Injunctive Relief............................................. 22

        K.      AYA is Entitled to A Simple Preliminary Injunction Prohibiting Interferenc
                With Free Exercise .................................................................................. 22

        L.      Plaintiffs Should Not Be Required to Post a Bond. ................................... 22

IV.     CONCLUSION ............................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Motorcyclist Ass'n v. Watt*,
    714 F.2d 962 (9th Cir. 1983) ............................................................ 22

*Barahona-Gomez v. Reno*,
    167 F.3d 1228 (9th Cir. 1999) ...................................................... 22, 23

*Braunfeld v. Brown*,
    366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) .................................. 19

*Burwell v. Hobby Lobby Stores, Inc*.
    573 U.S. 682, 134 S. Ct. 2751, 189 L.Ed.2d 675 (2014) ............................. 13

*Church of the Holy Light of the Queen v. Holder*,
    443 Fed. App'x 302 (9th Cir. 2011) ................................................... 17

*Church of the Holy Light of the Queen v. Mukasey*,
    615 F.Supp.2d 1210 (2006) ......................................................... *passim*

*Gonzales v. O Centro Espírita Beneficente União*
    *do Vegetal*, 546 US 418 (2006) .................................................... *passim*

*Guam v. Guerrero*,
    290 F.3d 1210 (9th Cir. 2002) ......................................................... 19

*Hynix Semiconductor Inc. v. Rambus Inc.*
    250 F.R.D. 452 (N.D. Cal. 2008) ....................................................... 9

*In re IBM Peripheral EDP Devices Antitrust Litig.*
    444 F. Supp. 110 (N.D. Cal. 1978) ..................................................... 9

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress*,
    No. 15-cv-03522-WHO, 2016 U.S. Dist. LEXIS 14485 (N.D. Cal. Feb.
    5, 2016) ............................................................................. 21

*Navajo Nation v. US Forest Svc.*
    535 F.3d 1058 (9th Cir. 2008) (en banc), cert. denied, 129 S.Ct. 2763
    (2009) ............................................................................... 19

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
  389 F.3d 973 (10th Cir. 2004) (en banc) (McConnell, J. concurring) ...................... 17

*Thomas v. Review Bd. of Ind. Employment Sec. Div.*
  450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ............................................. 19

*United States v. Christie*,
  825 F.3d 1048 (2016) ...................................................................................... 15, 17

*Worldwide Church of God v. Phila. Church of God, Inc.*
  227F.3d 1110, 1121 (9th Cir. 2000) ........................................................................ 19

**Statutes**

21 U.S.C. Sec. 841(a)(1) ................................................................................................. 1

28 U.S.C. § 2201 − 2202 ............................................................................................... 2

42 U.S.C. § 2000bb-1(a) .............................................................................................. 14

42 U.S.C. § 2000bb-1(b) ........................................................................................ 13, 15

42 U.S.C. § 1983 P. 65 .................................................................................................. 2

Controlled Substances Act ................................................................................... 1, 14, 15

Religious Freedom Restoration Act ...................................................................... *passim*

**Rules**

F.R.E. 702 .................................................................................................................... 11

F.R.E.1006 .................................................................................................................... 11

Federal Rule of Evidence 804(b)(1)(B) ........................................................................... 9

L.R. 7-2 .......................................................................................................................... 2

L.R. 65-2 ......................................................................................................................... 2

**Other Authorities**

First Amendment ........................................................................................................ 4, 22

Barbosa Opinion Letter ...................................................................................... 11, 12, 13

John H. Halpern, et al. *Evidence of health and safety in American members of a religion who use a hallucinogenic sacrament* ....................................... 10

John H. Halpern, et al. *Psychological and cognitive effects of long-term peyote use among Native Americans* (2005) ............................................... 10

Los Angeles Times .................................................................................. 21

Walsh R. 2015, *Mysticism: Contemplative and Chemical, ZigZag Zen* ............................ 5

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    PREFATORY STATEMENT

Plaintiff Arizona Yagé Assembly ("AYA") moves the Court for an order preliminarily enjoining the Drug Enforcement Administration (the "Agency") from enforcing the Controlled Substances Act ("CSA") prohibitions on possession of Ayahuasca tea, AYA's sacramental communion substance, that contains a small amount of Dimethyltryptaline ("DMT").[1]   AYA makes its claim under the Religious Freedom Restoration Act ("RFRA") and controlling judicial precedents enunciated in the unanimous Supreme Court decision in *Gonzales v. O Centro Espírita Beneficente União do Vegetal,* 546 US 418, (2006) and its progeny.   The RFRA test for a religious exemption from the CSA's prohibitions on the use of Ayahuasca is now well-ploughed ground.   The federal courts have granted RFRA exemptions to two churches, the Uniao do Vegetal (the "UDV"), the prevailing party in *O Centro, supra*, and the Daime (the "Daime"), that won its RFRA exemption in *Church of the Holy Light of the Queen v. Mukasey*, 615 F.Supp.2d 1210 (2006).

The core jurisprudence of RFRA actions for CSA exemptions was laid down in *O Centro*, where the Supreme Court recognized that the UDV's Free Exercise rights trumped the CSA's prohibitions, because they fail the test of strict scrutiny.   They fail the test of strict scrutiny because each RFRA applicant's claim of exemption must be judged individually, and the DEA's unvarying prohibition of Ayahuasca is not the least restrictive means of accomplishing the goal of preventing illicit diversion of DMT.

The evidence presented in support of the individual merits of AYA's RFRA claim establishes that it is likely to prevail at trial on the claim.   The evidence also establishes the other elements the moving party must establish to be entitled to a preliminary injunction.   The balance of the hardships tips sharply towards AYA, that stands in peril of having its Free Exercise interrupted, its minister prosecuted on drug charges, and its sacrament seized as contraband.   An injunction will be in the public interest.

---

[1] A Schedule I substance made unlawful under 21 U.S.C. Sec. 841(a)(1).

## II. __FACTS__

AYA uses Sacramental Ayahuasca prepared from the same two plant materials used by the UDV and the Daime to prepare their Sacramental teas.  (Stanley Dec. ¶ 15.) Findings made by courts in analogous cases, e.g. *O Centro*, *supra*, and *CHLQ v. Mukasey*, 615 F.Supp.2d 1210 (2006) (vacated on other grounds), are relevant and persuasive.  *See, CHLQ v. Mukasey,* 615 F.Supp.2d at 1220 ("[T]he opinions issued by the trial and appellate courts in the UDV litigation are persuasive.").

The Supreme Court described the contents of the "hoasca" tea used by the UDV:

> "Central to the UDV's faith is receiving communion through *hoasca*(pronounced "wass-ca"), a Sacramental tea made from two plants unique to the Amazon region. One of the plants, *Psychotria Viridis,* contains dimethyltryptamine (DMT), a hallucinogen whose effects are enhanced by alkaloids from the other plant, *Banisteriopsis Caapi.*"

> *Gonzales v. O Centro, supra*, 546 US at 425.

Like the UDV, the Daime qualified for a RFRA exemption to administer Ayahuasca prepared from *Banisteriopsis Caapi* and *Psychotria Viridis*.  *CHLQ v. Mukasey,* 615 F.Supp.2d 1210 (2006).  AYA's manner of preparation is essentially identical to that of the Daime, as recorded in the Oregon District Court's findings:

> "The Santo Daime church brews Daime tea in Brazil during an *elaborate* religious ritual. Men gather the woody *B. caapi* vine and pound it for hours with mallets, while women collect and clean the *P. viridis* leaves. The shredded vine is boiled for many hours, constantly tended. *P. viridis* leaves are not added until boiling is nearly complete because the DMT dissolves rapidly."

> *CHLQ v. Mukasey,* 615 F.Supp.2d at 1215.

Like the Sacraments of the Daime and the UDV, AYA's Sacrament is a tea containing only two ingredients – *Banisteriopsis Caapi* and one of two alternative traditional dimethyltryptamine sources – *Psychotria Viridis* or *Diplopterys Cabrerana*. (Exhibit 2, CI, ¶ 1.)  The plants are gathered in Peru by people familiar with the needs of AYA, that requires that these sacred plants be gathered with respect for their extraordinary capacity to benefit those who receive the Sacrament.  (Stanley Dec. ¶ 15;

Exhibit 2, CI, ¶ 2.)  AYA's Ayahuasca Sacrament is brewed by an experienced facilitator trained by the Minister of the Assembly, or by persons skilled in the art of brewing Ayahuasca in Peru, by boiling the plant material together for several hours to create a reddish-brown tea, bitter in flavor. (Exhibit 2, CI, ¶¶ 3 - 4.)  In an AYA ceremony, the lead facilitator serves ceremonial doses of Ayahuasca of similar strength to that used by the Daime and the UDV.  (Exhibit 2, CI, ¶¶ 6 and 13.)  The lead facilitator controls the dispensing of the Sacrament so that practitioners receive a first serving of between15 and 30 milliliters (between 0.5 and 1 fluid ounces).  (Exhibit 2, CI, ¶ 13.)

AYA uses essentially identical and interchangeable plant materials and preparation methods to brew a tea of substantially identical effective strength, and administers it at similar dosage levels, producing comparable effects upon practitioners. (Stanley Dec. ¶ 15.)  AYA's use of Ayahuasca is effectively parallel to that of the Daime and the UDV; accordingly, prior evidence, findings, and judicial rulings regarding Ayahuasca should be persuasive authority for reaching similar conclusions on similar issues in this proceeding.

Each person who wishes to participate in a ceremony must complete an online questionnaire that asks the questions recorded in the document attached as Exhibit 3. (Exhibit 2, CI, ¶ 7; Stanley Dec. ¶ 12.)  After eliciting contact information and an emergency contact phone number, the questionnaire requires each prospective communicant to list allergies, medications, and to answer the "yes" or "no" question: "Have you used Antidepressant medications?"  (Exhibit 3; Stanley Dec. ¶ 12.)  A "yes" answer to this question will end the online questionnaire process and notify the submitter that they are, unfortunately, not able to receive communion at an AYA ceremony. (Stanley Dec. ¶ 12.)  Thus, no one who is taking anti-depressant medications partakes of the communion Sacrament in AYA ceremonies.  (Stanley Dec. ¶ 12.)  The health questionnaire also requires disclosure of recent hospitalizations, surgeries, cardiac problems, high blood pressure, use of hypertensive medications, pregnancy, seizures, psychoses, or other mental or physical health conditions or restrictions that might be

adversely affected by participating in the ceremony.  (Stanley Dec. ¶ 12;  Exhibit 3.)  If such conditions are disclosed, further inquiries are made of the prospective practitioners, and participation may be denied or conditioned upon the approval of the individual's physician.  (Stanley Dec. ¶ 12.)

AYA follows a screening protocol quite similar to one the Oregon District Court found adequate to protect the health of ceremonial participants in Daime ceremonies:

> "Plaintiffs give applicants detailed medical questionnaires to determine whether an applicant has a medical condition or is taking drugs, such as antidepressants, that might conflict with drinking Daime tea.  CHLQ has prepared a seven-page list of drugs that might cause problems in combination with Daime tea. CHLQ periodically updates the list.  CHLQ also advises members to avoid certain foods, such aged cheese, and drink, such as red wine, before drinking Daime tea.

> "Plaintiffs ask applicants about psychiatric histories, criminal records, and drug and alcohol abuse. Goldman testified that if an applicant has a history of psychiatric problems, plaintiffs try to determine whether a person might benefit from the Daime tea. If a screener determines that an applicant needs the type of attention or environment that the church cannot provide, the screener will turn the applicant away no matter how enthusiastic the applicant is."

> *CHLQ v. Mukasey,* 615 F.Supp.2d at 1217.

The Supreme Court's *O Centro* decision recognizes that genuine religious experiences, fully entitled to the enhanced First Amendment protection provided by RFRA, can arise in the context of ceremonies in which a controlled substance plays a sacramental role.  The Court's opinion thus appears to validate an emerging scientific paradigm that "some drugs can indeed induce genuine mystical experiences in some people on some occasions [particularly where] the contemplative has acquired a belief system that provides an explanation for the experience, a discipline that can cultivate it, a tradition and social group that support it, and an ethic that can guide its expression."[2]

---

[2] Walsh R. 2015, *Mysticism: Contemplative and Chemical, ZigZag Zen*, editors Badiner A. and Grey A. Synergetic Press.

AYA's belief system explains the Ayahuasca experience to congregants as a communion with Divine Love made available through the beneficent nature of the Sacrament.  The ceremony is conducted with attention to ethics and discipline, in an atmosphere of kindness and respect.  Preparation for ceremony includes a controlled diet, limited sexual contact, and the use of the South American teas Pau D'arco and Cat's Claw.  (Stanley Dec. ¶ 13; Exhibit 4, Confirmation Letter.)  The proscription on drinking alcohol and taking non-medicinal drugs in and around the ceremony is enforced. (Exhibit 3. Code of Ethics ("Ethics"), Sec. XII.)  Dosage is controlled by a facilitator who makes an assessment of the congregant's condition before allowing additional servings of tea.  (Exhibit 2, Ceremonial Instructions ("CI") ¶ 15.)  Facilitators provide a physically supportive, psychologically protective, spiritually-inspired ceremonial environment. (Stanley Dec. ¶ 13.)  AYA is a social group that supports each congregant in sacred Communion.  (Stanley Dec.  ¶ 13.)

The Daime ceremonial setting is similar to[3] AYA's own practice setting:

> "Turning to setting, CHLQ permits plaintiffs to drink Daime tea only in a controlled and supportive religious ceremony. Access to the Daime tea is limited to three or four church leaders. The spiritual leader who conducts the service dispenses Daime tea individually to each worshiper. Consumption of Daime tea outside of the church is a serious sacrilege.
>
> During services, men and women sit separately. Members generally are required to wear modest white clothing. They are forbidden to leave the ceremony once the service begins.
>
> The church designates experienced church members as "guardians" to monitor the congregation during services and tend to members, particular new ones, who are suffering from nausea, diarrhea, or other discomforts. The spiritual leader conducting the ceremony circulates among the congregation to counsel those who appear anxious or upset. Three church members are physicians and two are registered nurses, so a person with medical training is often present during services.
>
> *CHLQ v. Mukasey,* 615 F.Supp.2d at 1217.

---

3 AYA does not segregate the congregation by sex.  Although numerous medical professionals have attended AYA ceremonies, AYA has CPR and first aid certified facilitators on staff.  AYA does not represent that medical personnel are always present in ceremony.

AYA ceremonies incorporate similar protections.  Ceremonies are conducted in a congregation of between two and twenty-four practitioners, who all promise to stay in the ceremony until the end. (Stanley Dec. ¶ 14; Exhibit 2, CI, ¶ 8.)  Facilitators monitor this commitment.  (Exhibit 2, CI, ¶ 8.)  Ceremonies are usually conducted in the evening after dark, and conclude at dawn.  (Exhibit 2, CI, ¶ 3.)  The ceremony is preceded by the cleansing of the ceremonial land.  (Exhibit 2, CI, ¶ 9.)  The ceremony begins with an invocation to the Spirit and a call for the cleansing of the congregation's individual and collective intent to participate in ceremony.  (Exhibit 2, CI, ¶¶ 9 and 12.)

Each ceremony is directed by an experienced, lead facilitator, and after the invocation of the Spirit, practitioners come forward one at a time to the altar to receive a single serving of the Sacrament.  (Exhibit 2, CI, ¶ 12.)  The lead facilitator controls the dispensing of the Sacrament so that practitioners receive a first serving of between 15 and 30 milliliters (between 0.5 and 1.0 fluid ounces).  (Exhibit 2, CI, ¶ 13.)  Practitioners then return to their place in the circle to receive the blessings of communion.  (Exhibit 2, CI, ¶ 14.)  During the ceremony, Palo Santo incense and candles are lit, sacred objects are displayed to stimulate inspiration, and holy water is blessed and offered to the members of the circle.  (Exhibit 2, CI, ¶ 10.)  Purifying tobacco is ritually shared, and sacred songs (icaros) are sung. (Exhibit 2, CI, ¶ 10.)

An hour and a half after the first offering of the Sacrament, a facilitator rings a singing bowl, and practitioners are offered the opportunity to receive an additional serving of the Sacrament.  (Exhibit 2, CI, ¶ 15.)  Those who wish to may approach the altar and request a second cup from the lead facilitator, who evaluates the practitioner's status and, depending upon their evaluation, may dispense a second cup.  (Exhibit 2, CI, ¶ 15.)  The lead facilitator will sometimes recommend to the practitioner who is requesting a second serving to sit with the Sacrament a bit longer before drinking an additional cup.  (Exhibit 2, CI, ¶ 15.)  Administration of the Sacrament in this measured fashion permits practitioners to gradually adjust to perceptual changes. (Exhibit 2, CI, ¶ 15.)

Facilitators attend to the physical needs of practitioners during the ceremony. (Exhibit 2, CI, ¶ 16.)  Because the experience of communion induces deep introspection and reverie, they provide mats and pillows so practitioners can recline.  (Exhibit 2, CI, ¶ 11.)  A sensation of nausea is not an uncommon effect during the initial phase of the communion experience; thus, practitioners are encouraged to remain close to their chosen seat.  (Exhibit 2, CI, ¶¶ 11 and 17.)  The Sacrament may have an emetic effect that stimulates expulsion of spiritual impurities; accordingly, the likely contingency that a practitioner will have a need to purge is anticipated, and each practitioner is provided with a purge receptacle, which facilitators remove after use and replace with a clean receptacle.  (Exhibit 2, CI, ¶ 17.)

Facilitators also monitor the psychic well-being of practitioners, and lend assistance to those who require it, guiding their awareness and ensuring their comfort and sense of security.  (Exhibit 2, CI, ¶ 18.)  Facilitators quietly visit each congregant over the course of the night with blessings for inner silence, Love, and well-being.  (Exhibit 2, CI, ¶ 18.)  Practitioners may experience vivid recollections, and feel the need to express feelings evoked by memories.  (Exhibit 2, CI, ¶ 20.)  Practitioners may feel the urge to confess the commission of regrettable acts, or wish to forgive people who caused them unhappiness.  (Exhibit 2, CI, ¶ 20.)  Facilitators listen to these expressions non-judgmentally, encouraging practitioners to speak freely in an encouraging atmosphere of acceptance and understanding.  (Exhibit 2, CI, ¶ 20.)  Facilitators balance the needs of individual practitioners with the needs of the group, seeking to maintain a peaceful atmosphere during the ceremony; thus, practitioners who need to move about or speak in a manner that might disturb others at communion are lead to an area outside the main ceremony, where they can express themselves freely.  (Exhibit 2, CI, ¶¶ 21 - 22.)

When the ceremony is concluded with a closing prayer, practitioners are encouraged to take a few hours to rest, and to reflect on their experience in an attitude of contemplation.  (Exhibit 2, CI, ¶¶ 23 - 24.)  Practitioners share their experiences in quiet discussions, taking turns listening, so that all practitioners may express their feelings

about the ceremony in a warm and supportive atmosphere before returning to their daily lives.  (Exhibit 2, CI, ¶ 24.)  Practitioners are given ample time to return to their baseline state of awareness, and facilitators take care that each practitioner departs the ceremonial location in a state of clear awareness.  (Exhibit 2, CI, ¶ 25.)  Should any practitioners require assistance or transportation after the ceremony, facilitators are trained to identify the need, and provide whatever additional care is required to assure the safety of the individual, the community, and the public.  (Exhibit 2, CI, ¶ 26.)

AYA's Code of Ethics (Exhibit 3) expresses the moral commitments that make the congregation a suitable vessel to receive the blessings made accessible through the Sacrament.  The Introduction to the AYA Code of Ethics provides:

> "The intent of the Arizona Yagé Assembly (AYA) is to engage in an ethically minded community consistent with the spirit of Divine love and forgiveness.  This requires impeccability for those participating in our community.  The tenets and precepts of the AYA call for honesty, humility, personal responsibility, and equitably resolving conflicts as they arise.  Mutual respect among everyone participating within the sphere of our church is essential.  Our code of ethics is born out of a living moral standard based on love and compassion. We seek to maintain healthy boundaries and behavior among practitioners."

The Code of Ethics formalizes AYA's intention to "bring people to Divine love through the holy Sacrament."  (Exhibit 3, Ethics , Section II.)  Members of AYA participate in the "sharing of knowledge and feedback among peers," and adopt a philosophy of self-purification in order to serve others "with grace, compassion, and appropriate action."  (Exhibit 3, Ethics , Section VII.)  Financial dealings within AYA are conducted in a spirit of stewardship, with due attention to the virtues of simplicity and economy, and with respect to rights of human dignity and property.  (Exhibit 3, Ethics III.)  To bring conduct into line with the purposes of the Ceremony, the Code of Ethics exhorts practitioners to engage in wholesome speech and gentle, respectful conduct towards all who are present.  (Exhibit 3, Ethics, Section VIII.)  Facilitators "protect the rights and welfare of all participants," and respect their "intuition and views."  (Exhibit 3, Ethics, Section VIII.)  Facilitators act with integrity, and all members of the congregation

are reminded to refrain from hostile, accusatory, discriminatory, or deceptive speech. (Exhibit 3, Ethics , Section VI.)  Sexual advances by or toward ceremonial participants are prohibited, as is all sexually harassing conduct in connection with AYA-sponsored activities.  (Exhibit 3, Ethics, Section IV.)  The simplest summary of the ethical values of AYA is presented in The Beatitudes (Matthew 5:3-12; Exhibit 3, Ethics, Section X.)

AYA's Ayahuasca is brewed according to a simple formula that produces a tea that is functionally identical to the Ayahuasca used by the Daime and the UDV.  (Stanley Dec. ¶ 15.)  The declarations of experts admitted into evidence in support of the plaintiff's cases in *CHLQ v. Mukasey, supra,* are admissible in this civil proceeding pursuant to Federal Rule of Evidence 804(b)(1)(B).[4]  Accordingly, the conclusions drawn by the District Court in *CHLQ v. Mukasey*, *supra,* are equally applicable to AYA's ceremonial use of Ayahuasca, and the same conclusions should be drawn in this proceeding as were reached by Judge Panner in *CHLQ v. Mukasey*.

The District Court began its assessment of the safety of Ayahuasca by assuming that "any substance can be toxic under the right conditions," and reviewed all of the evidence for indicia of physical or psychological injury caused by Ayahuasca.  *CHLQ v. Mukasey,* 615 F.Supp.2d at 1214.  Judge Panner found that Daime's ceremonial use of Ayahuasca effectively eliminated all known health risks, and found no reliable evidence of physical or psychological harm due to ceremonial Ayahuasca consumption.  615 F.Supp.2d at 1214 - 1218.

The testimony of Jonathan Goldman in *CHLQ v. Mukasey* established that, during the time period in which he administered Ayahuasca to participants in the Daime

---

[4]   F.R.E. 804(b)(1)(B) provides: "The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness: (1) Former Testimony. Testimony that: (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and (B) is now offered against a party who had — or, in a civil case, whose predecessor in interest had — an opportunity and similar motive to develop it by direct, cross-, or redirect examination."  *In re IBM Peripheral EDP Devices Antitrust Litig.* 444 F. Supp. 110, 113 (N.D. Cal. 1978); *Hynix Semiconductor Inc. v. Rambus Inc.* 250 F.R.D. 452, 458 (N.D. Cal. 2008).  The declarants are unavailable, and the DEA was the adverse party in *CHLQ v. Mukasey, supra,* where identical issues were raised and cross-examination was possible; accordingly, the declarations of the Daime experts are properly admitted in support of AYA's contentions.

ceremonies, he had not seen anyone suffer serious physical or mental harm during ceremony. *CHLQ v. Mukasey*, 615 F.Supp.2d at 1215. Stanley likewise avers that he has not seen anyone suffer serious physical or mental harm during an AYA ceremony. (Stanley Dec. ¶ 13.)

In addition to the testimony of the Daime church leader, the District Court relied heavily on a study of 32 of the 40 members of the Daime conducted by Dr. John H. Halpern,[5] "a psychiatrist who has written extensively on use and abuse of hallucinogenic drugs, including a paper on the health of members of the Native American Church who consume peyote as a sacrament."[6] Finding Dr. Halpern's study of Daime practitioners "relevant and useful in evaluating the health effects" of Ayahuasca, the District Court summarized Dr. Halpern's findings in its opinion:

> "Five members who reported past alcohol dependence, and one who reported past alcohol abuse, attributed their recovery and continued abstinence from alcohol to attending CHLQ services. [Internal scientific citation omitted.] About 60% of CHLQ members interviewed reported histories of psychiatric conditions. Dr. Halpern stated that the study suggests that participation in the Santo Daime church 'is not proving harmful even to those members most susceptible to mental health problems.' [Citation omitted.] Dr. Halpern cites a double blind study of Brazilian Santo Daime members which noted acute amelioration of anxiety and panic in church ceremonies. [Citation omitted.]"

> *CHLQ v. Mukasey,* 615 F.Supp.2d at 1216.

The Oregon District Court also gave considerable weight to the scholarly opinion of Robert Gable,[7] who "systematically reviewed the available scientific literature" and determined that, of an estimated 25,000 hoasca experiences, "somewhere from 13 to 24 subjects displayed transient psychotic states that resolved spontaneously." Accordingly,

---

[5]   John H. Halpern, et al. *Evidence of health and safety in American members of a religion who use a hallucinogenic sacrament*. Dr. Halpern's declarations submitted in support of the Daime case in *CHLQ v. Mukasey* are attached hereto as Exhibit 7, and his peer-reviewed paper referred to above, is attached as Exhibit 8.

[6]   John H. Halpern, et al. *Psychological and cognitive effects of long-term peyote use among Native Americans* (2005).

[7]   Robert Gable, *Risk assessment of ritual use of oral dimethyltryptamine (DMT) and harmala alkaloids* (2007).

the District Court rejected the Agency's contention that "Daime tea could cause acute or long-term psychosis," finding the assertion based "more on speculation than empirical evidence."  *CHLQ v. Mukasey*, 615 F.Supp.2d at 1216.  The District Court found that the Daime's Ayahuasca ceremonies did not cause mental illness, tended to relieve addictions, and caused some measurable improvements in the congregation's mental health as measured by standardized tests.  615 F.Supp.2d at 1214-1218.  Since Judge Panner's decision in *CHLQ v. Mukasey*, a good number of scientific studies of sacramental Ayahuasca users have confirmed the correctness of his conclusions.  A summary of that research has been provided by AYA's expert witness, Dr. Paulo Barbosa.  Dr. Barbosa's opinions,  supported by a summary of voluminous scientific evidence admissible under F.R.E.1006, establishing the safety and efficacy of sacramental Ayahuasca. Dr. Barbosa's opinions are evidence that is admissible because they will be helpful to determination of issues before the Court.  F.R.E. 702.

Dr. Barbosa's Opinion Letter begins by drawing an important distinction between Ayahuasca and Dimethyltryptamine.  Although DMT is present in Ayahuasca, "DMT and ayahuasca are very different in their effects, with DMT being more powerful and less subject to control than ayahuasca."  (Barbosa Opinion Letter, Exhibit 10, p. 2.)

"Ayahuasca affects users slowly and progressively.  Effects are felt 45 to 60 minutes after administration, reach their maximum effects 2 hours later, decline thereafter, and cease after 4 to 6 hours (Riba, 2003; dos Santos, 2011).  DMT provokes a swift, intense experience that ends within an hour.  (Barbosa Opinion Letter at *id*.)  Thus, the effects of ayahuasca are much more controllable than those of pure DMT."

(Barbosa Opinion Letter at *id*.).

Ayahuasca "is a non-toxic psychedelic tea whose main adverse physical effects are nausea and vomiting [that] causes slight impact on the cardiovascular system." Further, "ayahuasca does not have adverse effects on physical health, and is associated with reduced pain and decreased impairment of life activities due to physical infirmities." (Exhibit 10, Barbosa Opinion Letter, Appendix I, Chart A. p. 2.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dr. Barbosa's Opinion Letter allays virtually all concern that ceremonial ayahuasca use might lead to habituation to ayahuasca itself or increased use of addictive substances. He explains that if anything, the reverse is true: "In my professional opinion, the scientific evidence does not support any hypothesis that religious use of ayahuasca continues or leads to drug abuse. Indeed, the reverse appears to be the effect. For many users, religious ayahuasca use diminishes or eliminates abuse of alcohol and other substances." (Exhibit 10, Barbosa Opinion Letter, p. 3.) Dr. Barbosa's opinions are supported by his summary of relevant peer-reviewed science summarized in Appendix I. (Exhibit 10, Barbosa Opinion Letter, Appendix I.)

Dr. Barbosa's summary conclusion rules out any injurious mental health effects resulting from attending Ayahuasca ceremonies: "In my professional opinion the scientific evidence does not support the hypothesis that ritual use of ayahuasca adversely affects mental health." (Exhibit 10, Barbosa Opinion Letter, p. 3.) Dr. Barbosa's Opinion Letter explains that the evidentiary basis for his summary conclusion was drawn from five controlled experiments performed specifically to assess psychological effects of Ayahuasca on ceremonial users. Four studies have administered standardized mental health assessments to ceremonial ayahuasca users and compared them with assessments of control groups of non-ayahuasca-using subjects. A fifth study assessed the mental health of a group of ceremonial ayahuasca users against "normative groupings," and standardized scoring. (Exhibit 10, Barbosa Opinion Letter, Appendix I, Chart C.)

Ayahuasca's cognitive effects have been the subject of three studies: (1) the first study found that ayahuasca users had somewhat better word-recall in memory tests; (2) the second study found better performance among ayahuasca users than among members of the control group on a "comprehensive battery of neuropsychological tests to determine the attention, psychomotor speed, verbal and visual abilities, memory, and mental flexibility." (Exhibit 10, Barbosa Opinion Letter, p. 6 - 7, and Chart D.)

## III.    ARGUMENT

### A.    AYA is a Proper RFRA Plaintiff to Protect the Free Exercise Rights of AYA's Minister and Congregation

AYA filed this action in California, its state of incorporation, and properly joined the federal defendants in this venue.  While Stanley is not personally named in the original Complaint, as a Board member he is subject to the Court's jurisdiction, and AYA's party status is for his benefit, as alleged in the FASC (Docket # 12).  Thus religious corporations may properly seek and obtain rights to facilitate the Free Exercise of their directors, as the Supreme Court explained in *Burwell v. Hobby Lobby Stores*:

> [T]he purpose of extending rights to corporations is to protect the rights of people associated with the corporation, including shareholders, officers, and employees. Protecting  the free-exercise rights of closely held corporations thus protects the religious liberty of the humans who own and control them.
>
> *Burwell v. Hobby Lobby Stores, Inc*. 573 U.S. 682, 683-684, 134 S. Ct. 2751, 2759, 189 L.Ed.2d 675, 683 (2014).

Likewise, AYA sued the DEA to protect Stanley and his congregation, the "humans who control AYA."

### B.    AYA Is Likely to Prevail on the First Claim for Relief Under RFRA

In the seminal case of *Gonzales v. O Centro Espírita Beneficente União do Vegetal,* 546 US 418, (2006), a New-Mexico church (the "UDV") claimed the right to use a DMT-containing substance. The Supreme Court held that "[T]he Religious Freedom Restoration Act … prohibits the Federal Government from substantially burdening a person's exercise of religion, unless the Government 'demonstrates that application of the burden to the person' represents the least restrictive means of advancing a compelling interest. 42 U.S.C. § 2000bb-1(b)." *O Centro,* 546 US at 423. "Congress legislated … 'the compelling interest test' as the means for the courts to 'strik[e] sensible balances between religious liberty and competing prior governmental interests.'" "RFRA operates by mandating consideration, under the compelling interest test, of exceptions to 'rule[s] of general applicability.'" *O Centro* at 436, *citing* 42 U.S.C. § 2000bb-1(a).

The Court held that the Government bears the burden of proving the existence of a "compelling interest" sufficient to outweigh a RFRA exemption for the use of a DMT-containing tea. *O Centro* at 429.[8]  The Court then found that the Government had failed to articulate any compelling interests that would satisfy denying an exemption for the religious use of DMT under RFRA.  *First,* the Court found that the Government's interest in maintaining a "closed regulatory system" was not a "compelling interest" within the meaning of RFRA.  Additionally, the Court held that the "well-established peyote exception also fatally undermines the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA [because] there is no evidence that it has 'undercut' the Government's ability to enforce the ban on peyote use by non-Indians." *Gonzales v. O Centro, id.* at 434.  *Second,* the Court held that the Government's asserted interest in complying with the 1971 United Nations Convention on Psychotropic Substances did not rise to the level of a compelling interest.  "[I]nvocation of such general interests, standing alone, is not enough." *O Centro id.* at 438.

The Supreme Court's teachings in *O Centro* have been imbibed by Ninth Circuit jurisprudence, as demonstrated by its rejection of the Government's efforts to resuscitate the "closed system" argument in a case that denied a RFRA exemption for the use of cannabis:  "*O Centro* specifically held that the CSA is not like the tax code or other 'closed regulatory system[s] that admit of no exceptions under RFRA.'  *Like it or not, when religious objectors raise RFRA as a defense to prosecution under the CSA, RFRA requires courts to 'strike sensible balances' on a case-by-case basis, in light of*

---

8    The Government had argued that the burden should be on the moving party at the preliminary injunction stage: "The Government argues that, although it would bear the burden of demonstrating a compelling interest as part of its affirmative defense at trial on the merits, the UDV should have borne the burden of disproving the asserted compelling interests at the hearing on the preliminary injunction. … Congress's express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test, including at the preliminary injunction stage." *Gonzales v. O Centro,* at 420 - 430.

*'the particular practice at issue.'*"  *United States v. Christie,* 825 F.3d 1048, 1060-1061 (2016), *quoting O Centro,* 546 U.S. at 435-36, 126 S.Ct. 1211 (emphasis added).

The *O Centro* decision teaches that "RFRA, and the strict scrutiny test it adopted … requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' — the particular claimant whose sincere exercise of religion is being substantially burdened. 42 U.S.C. § 2000bb-1(b)." The "person," in this case, is AYA, acting on behalf of its minister and congregation. Thus AYA's RFRA claim must be judged on its individual merits, considering the particular controlled substance, and the individual characteristics of the applicant.  *United States v. Christie,* 825 F.3d 1048, 1060-1061 (2016), *quoting O Centro,* 546 U.S. at 435-36, 126 S.Ct. 1211 (emphasis added).

The Court should consider the following specific merits and individual characteristics of AYA and Ayahuasca that lay the predicate for AYA's probable success on the merits of its RFRA claim: (1) AYA is a sincere faith that uses Ayahuasca as its essential Sacrament of Communion; (2) Ayahuasca is essential to AYA's practice of Communion with the Divine; (3) AYA has in place the necessary protections for the congregation and the public to administer Ayahuasca safely; and, (4) AYA's Free Exercise use of Ayahuasca gives rise to no identifiable risk of diversion.

Application of strict scrutiny to the DEA's denial of AYA's right to Free Exercise use of Ayahuasca requires the DEA to show that a total prohibition on AYA's use of Ayahuasca is the least restrictive means of advancing a compelling government interest. While there is no disputing the compelling nature of the DEA's mission to combat the illicit drug trade, there is equally no dispute that a total prohibition on AYA's use of Ayahuasca is not the least restrictive means of advancing the DEA's mission. Accordingly, this case should conclude as did the *O Centro* and *CHLQ* cases cited *supra*, with the issuance of an injunction directing the DEA to do nothing to interfere with the Free Exercise rights of AYA.

## C.    AYA's System of Belief and Practice is Ethically Grounded

AYA ministers to a gender-balanced congregation that is 58% male, 41% female, and 1% cross-gender.  (Stanley Dec. ¶ 20.)  These are mature individuals, 46% percent over age 40, and 24% over age 50, with an existing religious and meditative practice -- 96% pray or meditate.  (Stanley Dec. ¶ 20.)  Almost all, 91.1%, approach Ayahuasca communion as a religious experience, and 90.3% say AYA connects them with a community of sacred Ayahuasca use. (Stanley Dec. ¶ 20.)

The AYA Precepts & Tenets, the Ethical Code, and the Ceremonial Instructions, provide a safe, encouraging environment for the gathered congregation, assuring that the ceremony is conducted in a sacramental frame of mind.   (Exhibit 1, Precepts & Tenets; Exhibit 2, Ethical Code.)

The Code of Ethics makes express the intent of the AYA to "bring people to Divine Love through the holy Sacrament." (Exhibit 3, Ethics, Section II.) Members of AYA participate in the "sharing of knowledge and feedback among peers," and adopt a philosophy of self-purification in order to serve others "with grace, compassion, and appropriate action." (Exhibit 3, Ethics, Section VII.) Financial dealings within AYA are conducted in a spirit of stewardship, with due attention to the virtues of simplicity and economy, and with respect to rights of human dignity and property. (Exhibit 3, Ethics III.) To bring conduct into line with the purposes of the Ceremony, the Code of Ethics exhorts practitioners to engage in wholesome speech and gentle, respectful conduct towards all who are present. (Exhibit 3, Ethics, Section VIII.) Facilitators "protect the rights and welfare of all participants," and respect their "intuition and views." (Exhibit 3, Ethics, Section VIII.)  Facilitators act with integrity, and all members of the congregation are exhorted to eschew hostile, accusatory, discriminatory, or deceptive speech. (Exhibit 3, Ethics, Section VI.) Sexual advances by or toward ceremonial participants, or sexually harassing conduct at any time within the context of AYA activities, are prohibited. (Exhibit 3, Ethics, Section IV.) The simplest summary of the ethical values of AYA is presented in The Beatitudes (Matthew 5:3-12; Exhibit 3, Ethics, Section X.) Thus, the

AYA ceremony is a wholesome social environment where practitioners are free to open themselves to the Sacrament, and receive maximal benefit from communion. (AYA Exhibit 3, Ethics, generally.)

**D.     AYA Ceremonies are Safe for Participants**

The closing section of Dr. Barbosa's summary supports the conclusion that AYA's use of Ayahuasca in religious ceremony is safe for the congregation, indeed beneficial.

> "*Ayahuasca does not adversely affect mental health. \*\*\**
> *Ayahuasca has not been observed to impair cognitive function, and*
> *on some testing scales, is associated with improved functioning.*
> *Ayahuasca has not been observed to impair cognitive functioning,*
> *and on some testing scales, is associated with improved*
> *functioning.*"

(Barbosa Opinion Letter, page 7, emphasis added.)

In addition to the safety of the Sacrament itself, the wholesome, protective set and setting provided by AYA, provides security and stability for individual practitioners and sustains the health of the congregation.  (*Eg.*, Stanley Dec. ¶¶ 9 – 22.)

**E.     There Is No Substantial Risk of Diversion of Ayahuasca From AYA**

The Ninth Circuit has determined that there is no substantial risk of diversion of sacramental Ayahuasca, drawing a distinction between the amenability to Ayahuasca sacramental use, in part because there is no 'thriving market for diverted Ayahusaca," as there is for cannabis.

> "As courts have repeatedly emphasized, cannabis differs critically
> from peyote and hoasca precisely because there is a thriving market
> for diverted cannabis, whereas there is no comparable demand for
> recreational peyote and hoasca."
>
> *United States v. Christie*, 825 F.3d 1048, 1060-1061 (2016), citing *O*
> *Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d
> 973, 1020 (10th Cir. 2004) (en banc) (McConnell, J. concurring);
> *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d
> 1210, 1220-21 (D. Or. 2009), *Church of the Holy Light of the Queen*
> *v. Holder*, 443 Fed. App'x 302 (9th Cir. 2011), and other cases.

In *CHLQ v. Mukasey*, George Gerding expressed the prevailing scientific opinion that risk of diversion of Ayahuasca is a *de minimis* concern for policymakers:

> "**With regard to the substance at issue here**, Daime,[9] it cannot be said that there is any illicit trafficking [and] given that it is only administered by a church leader during the actual service, that it is foul-tasting, that it is both self-limiting and not a recreational drug or drug for pleasure that is taken to get 'high,' **the unlikely prospect of any diversion is clearly not a compelling reason to deny this religion the right to practice its sacrament**."

Declaration of George Gerding, ¶ 38. (Exhibit 9, emphasis added.)

## F.    AYA's Procedures for Handling Ayahuasca Eliminate the Risk of Diversion

The sacramental character of the Daime's use of Ayahuasca was held to provide an adequate form of security against the diversion of Ayahuasca by the District Court in *CHLQ v. Mukasey*:

> "Because plaintiffs believe that Daime tea is a sacrament, use of Daime tea outside of the church violates church doctrine."

*CHLQ v. Mukasey,* 615 F. Supp. 2d at 1218.

AYA's faithful adherence to its own precepts, that sanctify Ayahuasca as its communion sacrament, provides the same guarantee against diversion of the Sacrament. The evidence submitted in support of this motion establishes that AYA's faith is sincere, imbues the handling of the Sacrament with sacred intent, and has adopted meaningful protections against diversion of the Sacrament to profane purposes.  As the Code of Ethics states, "We respect the sacredness of our work in serving our communities, and refrain from placing financial benefit above the freedom of the human spirit." (Exhibit 3, Ethics, Section III.)  Experienced members of the AYA congregation prepare the Sacrament in a reverent fashion, whenever possible, at a place near the ceremonial site. (Exhibit 2, CI, ¶ 3.)  When the Sacrament cannot be prepared at the ceremonial site, it is transported in sealed containers by trusted and experienced members of the congregation. (Exhibit 2, CI, ¶ 3.)  The quantities of the Sacrament are measured by volume, and each member who is entrusted with a duty of transporting the Sacrament is responsible for delivering all of the Sacrament to the ceremonial location.  (Exhibit 2, CI, ¶ 3.)  The

---

[9]    The traditional word for Ayahuasca used by the Daime church.

Sacrament is always dispensed by facilitators in ceremony.  (Exhibit 2, CI, ¶¶ 6 - 15.)
Facilitators are supplied with the Sacrament by AYA for use in ceremony.  (Exhibit 2, CI,
¶ 3.)  Any portion of the Sacrament that remains unconsumed after a ceremony is
returned to AYA leadership and accounted for.  (Exhibit 2, CI, ¶ 27.)  The Minister of the
Assembly monitors all activities involving the acquisition and dispensing of the
Sacrament, and is authorized to take disciplinary action towards any person who breaches
their duties with regard to the sacred handling of the Sacrament.  (Exhibit 2, CI, ¶¶ 28 -
29.)  In summary, the evidence submitted in support of this application establishes that
the sincere faith of AYA's congregation provides the best security bond to ward off the
possibility of diversion to the illicit market.

## G.    Denial of the Requested Exemption Would Substantially Burden AYA's Exercise of Religion

Ninth Circuit jurisprudence holds that a law imposes a "substantial burden" on the
practice of religion: "when individuals are ... coerced to act contrary to their religious
beliefs by the threat of civil or criminal sanctions."  *Navajo Nation v. US Forest Svc.* 535
F.3d 1058 (9th Cir. 2008) (en banc), cert. denied, 129 S.Ct. 2763 (2009).  "A statute
burdens the free exercise of religion if it 'put[s] substantial pressure on an adherent to
modify his behavior and to violate his beliefs,'" including when, if enforced, it 'results in
the choice to the individual of either abandoning his religious principle or facing criminal
prosecution.'"  *Guam v. Guerrero,* 290 F.3d 1210, 1222 (9th Cir. 2002), *quoting Thomas v.
Review Bd. of Ind. Employment Sec. Div.* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d
624 (1981) and *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563
(1961).  "A substantial burden must be more than an 'inconvenience.'" *Guam v.
Guerrero*, at *id. quoting Worldwide Church of God v. Phila. Church of God, Inc.* 227F.3d
1110, 1121 (9th Cir. 2000).  Total prohibition of a central religious practice always
substantially burdens Free Exercise.

The evidence also shows that the effect of the shadow of illegality that falls on
AYA's minister and congregation has a chilling effect.  A substantial majority of

congregants – 69.7% -- hesitate to tell others of their experience with AYA, because of questions about the legality of the practice. (Stanley Dec. ¶ 22; Exhibit 6.)

**H.     No Compelling Government Interest Justifies Prohibiting AYA's Use of Sacramental Ayahuasca in Free Exercise of Religion, Nor Is Total Prohibition of AYA's Use of Ayahuasca the Least Restrictive Means of Advancing the Government's Goal of Fighting Illicit Drug Trafficking**

The Government bears the burden of proving the existence of a compelling interest. *O Centro* at 429. "The strict scrutiny standard applicable to RFRA is exceptionally demanding." (AG's Memo, 14th Principle, Exhibit J, p. 5.) No compelling government interest sufficient to justify an absolute prohibition on the use of Ayahuasca was shown in *O Centro, supra,* or *CHLQ v. Mukasey, supra,* nor can any be shown with respect to this application. Neither the government's asserted interested in maintaining a closed system of controlled substance regulation, nor treaty obligations, provide justification for prohibiting a sincere believer from drinking Ayahuasca as their core religious practice.

**I.     The Balance of the Hardships Tips Sharply Towards AYA**

The DEA and other government agencies will suffer no hardship from the grant of the requested injunction. On the other hand, denial of the injunction will subject AYA to a continuing injury causing irreparable harm due to the stifling of the minister and congregation's right of Free Exercise. Further, it will place its minister and congregation at enhanced risk of physical injury or death that could arise from being taken into criminal custody in Arizona, where the COVID-19 pandemic is raging beyond control. Arizona Department of Health Services ("DHS") recently published "COVID-19 Addendum: Allocation of Scarce Resources in Acute Care Facilities Recommended for Approval by State Disaster Medical Advisory Committee (SDMAC) – 6/12/2020." (Exhibit 11, the "Triage Rules".)

The Triage Rules direct many Arizona hospitals to triage medical care, *i.e.*, deny medical care to some by allocating scarce resources such as ventilators and ICU care on the basis of factors set by health administrators trying to cope. The Triage Rules use a

color-coded system for determining which color is assigned to which patient, and what kind of care that entitles them to, given which color other patients are. (Exhibit 11.) The triage system assigns older persons scores that are likely to deprive them of equal access to care in this deathbed competition. (Carreon Dec. ¶¶ 7 – 8.) The Los Angeles Times published an article on the subject of Arizona's institution of the Triage Rules that reports misstatements by DHS regarding whether other states have adopted Triage Rules, and asserts that the Triage Rules incorporate a waiver of malpractice liability for persons dying or suffering enhanced injury due to the application of the rules. (Exhibit 12.)

This news is particularly alarming after the HIDTA raid of Clay Villanueva's home and his Vine of Light Church on May 19, 2020 in Phoenix, Arizona (*see* Plaintiffs' Motion for Preliminary Injunction, Docket # 22), where HIDTA officers ransacked Villanueva's house while wearing no protective equipment. (Photograph of HIDTA officers searching Villanueva's office; Docket # 22-14.)   Along with Villanueva, AYA's minister has been struggling with the chilling effects of the HIDTA raid. (Stanley Dec. ¶ 42.) Fourteen years after the Supreme Court's decision in *O Centro*, sincere religious practitioners are still risking their freedom to engage in Free Exercise. This Court should take note that the risk for AYA has now escalated to a potentially lethal level, and protect AYA's minister and congregation from suffering a risk of death – an irreparable harm.

This Court has found a risk of irreparable harm arising from the risk that the acts of defendants might indirectly expose plaintiffs to the risk of death:

> "This significant increase in harassment and violent acts — including the most recent attack in Colorado Springs at the clinic where "target" Dr. Ginde is the medical director — has been adequately linked to the timing of the release of the Project videos by CMP."
>
> *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-cv-03522-WHO, 2016 U.S. Dist. LEXIS 14485, at *76 (N.D. Cal. Feb. 5, 2016) (granting preliminary injunction preventing release of inflammatory videos obtained by breach of confidentiality agreements).

In this action, DEA and CBP enforcement activities could lead to the arrest and incarceration of AYA's minister or congregation members in the highly risky state of Arizona, where they would be exposed to a near likelihood of death, under some scenarios. Accordingly, that is a risk of irreparable harm that this Court may properly enjoin.

**J.    The Public Interest Favors Injunctive Relief**

"[T]he public interest is a factor which courts must consider in any injunctive action in which the public interest is affected." *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 967 (9th Cir. 1983). NAAVC's ministry includes increasing awareness of the substantial burdens on visionary church Free Exercise. This action was filed, to advance the public interest in the Free Exercise of visionary religion for the benefit all people and society as a whole. AYA exists to serve the public interest, and its services are open to all sincere persons who meet the health requirements. (Stanley Dec. ¶ 12.) The public interest favors the prophylactic prohibition of further unlawful governmental conduct that furthers First Amendment Free Exercise, Free Speech, and Free Association.

**K.    AYA is Entitled to A Simple Preliminary Injunction Prohibiting Interferenc With Free Exercise**

AYA has relied on the *CHLQ* case as a source of guidance in preparing its submissions to this Court. The final injunction issued by the Oregon District Court was a model of simplicity, providing only that "Defendants are enjoined from prohibiting plaintiffs' importation, storage distribution, and use of Daime tea for plaintiffs' religious ceremonies." (Exhibit 13.) Such a straightforward prohibition will suffice in this case.

**L.    Plaintiffs Should Not Be Required to Post a Bond.**

The Ninth Circuit allows no bond, or a nominal one, where there is little or no likelihood of harm to the party enjoined. *E.g. Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). Security may be waived where the injunction serves a public interest. *Barahona-Gomez*, 167 F.3d at 1237. That is the case here, where AYA's Free

Exercise conduces to the public benefit, and there is no evidence indicating that granting the injunction exposes any party to the litigation, or the public, to a risk of harm.

## IV.    **CONCLUSION**

For all of the above reasons, the Court is requested to issue a preliminary injunction in the form submitted herewith, to remain in force until entry of final judgment.

Dated:  August 5, 2020                    CHARLES CARREON, ESQ.
                                          By: /s/Charles Carreon
                                          CHARLES CARREON (127139)
                                          Attorney for Plaintiffs
                                          Arizona Yagé Assembly.
                                          North American Association of Visionary Churches,
                                          Clay Villanueva