1 | Evan F. Hiller (No. 294420)
2 | Hiller@SacksTierney.com
  | SACKS TIERNEY P.A.
3 | 4250 N. Drinkwater Blvd., 4th Floor
  | Scottsdale, AZ 85251-3693
4 | Telephone:  480.425.2600

5 | *Attorney for Defendants Maricopa County and Matthew Shay*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| ARIZONA YAGÉ ASSEMBLY, et al., | Case No.  3:20-cv-03098-WHO |
|---|---|
| Plaintiffs, | **MARICOPA COUNTY DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| WILLIAM BARR, et al., | Date:  Sept. 9, 2020 |
| Defendants. | Time: 2:00 p.m. |
| | Place: Courtroom 2, 17th Floor |
| | Hon. William H. Orrick |

Defendants Maricopa County and Matthew Shay (collectively, the "Maricopa County Defendants") hereby respond in opposition to Plaintiffs' Motion for Preliminary Injunction (Doc. 22) (the "Motion").  For the reasons set forth in the below Memorandum of Points and Authorities, and supported by the attached exhibits, the Motion should be denied.

# TABLE OF CONTENTS
TABLE OF AUTHORITIES ................................................................................................3

MEMORANDUM OF POINTS AND AUTHORITIES ................................................5

I. Introduction ..............................................................................................................5

II. The Court Lacks Authority to Grant the Motion ......................................................6

III. Legal Standard..........................................................................................................7

    A. Preliminary injunction ........................................................................................7

    B. Retaliatory investigation / conspiracy to violate civil rights ..............................8

IV. Plaintiffs Are Unlikely to Succeed on the Merits of their Claim .............................9

    A. Probable cause existed to support the issuance of the Warrant. .......................9

    B. The Warrant was properly issued. ....................................................................11

    C. The search uncovered substantial evidence of criminal acts............................13

    D. There was no agreement between the DEA and the Maricopa County Defendants to violate constitutional rights. ......................................................14

    E. The DEA's purportedly retaliatory motive was not a "but-for" cause of the criminal investigation of Villanueva. ................................................................15

V. This Court Should Not Enjoin the Maricopa County Defendants.........................15

VI. Conclusion ...............................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ...................................................................................................8

*Earth Island Institute v. Carlton*,
  66 F.3d 462 (9th Cir. 2010) ....................................................................................16

*Ex parte Young*,
  209 U.S. 123 (1908) .................................................................................................8

*Goldie's Bookstore, Inc. v. Superior Court*,
  739 F.2d 466 (9th Cir. 1984) ....................................................................................8

*Hartman v. Moore*,
  547 U.S. 250 (2006) .................................................................................................8

*Hendricks v. Bank of America, N.A.*,
  408 F.3d 1127 (9th Cir. 2005) ..................................................................................6

*Hungerstation LLC v. Fast Choice LLC*,
  Case No. 19-cv-05861-HSG, 2020 WL 137160 (N.D.Cal. Jan. 13, 2020) ................6

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ..................................................................................7

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ...........................................................................................7, 12

*Mendocino Envtl. Ctr. v. Mendocino County*,
  192 F.3d 1283 (9th Cir. 1999) ..............................................................8, 9, 14, 15

*Midgett v. Tri-Cty. Metro. Transp. Dist. of Oregon*,
  254 F.3d 846 (9th Cir. 2001) ....................................................................................7

*Mitchum v. Foster*,
  407 U.S. 225 (1972) .................................................................................................8

*Paccar Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.*,
  757 F.2d 1058 (9th Cir. 1985) ..................................................................................6

*Rizzo v. Good*,
  423 U.S. 362 (1976) ...........................................................................................7, 8

*Ruhrgas AG v. Marathon Oil Co.*,
   526 U.S. 574 (1999) .................................................................................................6

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .....................................................................................................7

*Younger v. Harris*,
   401 U.S. 37 (1971) ...................................................................................................8

**Statutes**

21 U.S.C. § 801 ..............................................................................................................5

28 U.S.C. § 2283 ............................................................................................................8

A.R.S. § 13-3401(6)(a) .................................................................................................16

A.R.S. § 13-3405 ..........................................................................................................16

A.R.S. § 13-3407 ..........................................................................................................16

A.R.S. § 36-2801 ..........................................................................................................10

A.R.S. § 36-2804.02(A)(3)(f) .......................................................................................11

A.R.S. § 36-2811(B)(3), (E), (F) ..................................................................................11

A.R.S. § 36-2815(C) .....................................................................................................11

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     Introduction**

This matter was originally filed against various federal officials in their official capacities (the "Federal Defendants") and against Thomas Prevoznik, in his personal capacity. *See* Complaint (Doc. 1). In their original Complaint, Plaintiffs Arizona Yagé Assembly ("AYA") and Native American Association of Visionary Churches ("NAAVC") asserted Free Exercise claims arising from the alleged refusal of the Federal Defendants and Prevoznik to grant them a religious exemption to import, distribute, and possess ayahuasca, an herbal tea containing Dimethyltryptamine ("DMT"), a schedule I controlled substance under the Controlled Substances Act, 21 U.S.C. § 801 *et seq*. *See* Complaint (Doc. 1), ¶¶ 5-10.

On May 19, 2020, deputies of the Maricopa County Sheriff's Office ("MCSO") searched the home of Clay Villanueva ("Villanueva"). The search of Villanueva's home and the seizure of evidence were carried out pursuant to a search warrant (the "Warrant") issued by Commissioner Gregory J. Gnepper of the Maricopa County Superior Court. *See* Motion, Ex. 9 (Doc. 22-12), at 2-7.[1]

Following those events, on June 16, 2020, Plaintiffs filed a First Amended and Supplemental Complaint (Doc. 12) (the "FASC") adding Villanueva as a plaintiff and adding as additional defendants the Maricopa County Defendants, the State of Arizona, and Arizona Attorney General Mark Brnovich.[2] In the FASC, Plaintiffs alleged that based upon the May 19, 2020 execution of the Warrant, the Arizona Defendants had conspired with the Drug Enforcement Agency (the "DEA") to violate the civil rights of Villanueva and NAAVC. In particular, Plaintiffs allege that the Arizona Defendants undertook drug

---

[1] Page references are to the numbers generated at the top corner of the documents by the Court's ECF system.

[2] The State of Arizona and Attorney General Brnovich are referenced collectively as the "State Defendants." The Maricopa County Defendants and State Defendants are referenced collectively as the "Arizona Defendants."

enforcement actions against Villanueva at the initiation of the DEA, in furtherance the DEA's retaliatory animus against Plaintiffs and to injure NAAVC's position in the existing litigation. FASC, ¶ 195. The Arizona Defendants have all moved for the dismissal of Plaintiffs' claims against them because, *inter alia*, this Court lacks personal jurisdiction over the Arizona Defendants and venue is improper. *See* Maricopa County Defendants' motion to dismiss (Doc. 20); State Defendants' motion to dismiss (Doc. 29).

Plaintiffs have now moved for a preliminary injunction to restore the purported *status quo ante* the May 19, 2020 search of Villanueva's residence. The Motion should be denied as to the Maricopa County Defendants because this Court lacks personal jurisdiction over the Maricopa County Defendants, who are located in Arizona and are alleged to have taken actions only in Arizona and against parties and property located in Arizona. The Motion should also be denied because Plaintiffs are unlikely to succeed on the merits of their claim, because the weight of the evidence is against any finding of a conspiracy and supports the conclusion that the investigation of Villanueva and search of his property would have occurred regardless of the DEA's alleged retaliatory animus.

## II.     The Court Lacks Authority to Grant the Motion

Personal jurisdiction "is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999). Thus, a district court lacks authority to grant relief through a preliminary injunction if it lacks personal jurisdiction or if venue is improper. *Hendricks v. Bank of America, N.A.*, 408 F.3d 1127, 1134-35 (9th Cir. 2005) (citing *Ruhrgas AG*, 526 U.S. at 584); *see also Paccar Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.*, 757 F.2d 1058, 1066 (9th Cir. 1985) (vacating order granting preliminary injunction because the district court did not have personal jurisdiction); *Hungerstation LLC v. Fast Choice LLC*, Case No. 19-cv-05861-HSG, 2020 WL 137160 (N.D.Cal. Jan. 13, 2020), at *7 ("[A] district court does not have authority to grant a preliminary injunction when it lacks personal jurisdiction over defendants….").

The issues of personal jurisdiction and improper venue are briefed in the Maricopa

County Defendants' motion to dismiss (Doc. 20), which is scheduled to be argued the same day as this Motion.[3]  The Maricopa County Defendants did not purposefully direct their activities to California; the claims do not arise from California-related activities; and asserting jurisdiction over the Maricopa County defendants would not comport with due process.  Therefore, the Court lacks personal jurisdiction over the Maricopa County Defendants and is without authority to order the requested relief.  The Arizona Defendants are all located in Arizona; the events giving rise to Plaintiffs' claims against the Arizona Defendants occurred in Arizona; and the property at issue is in Arizona.  Therefore, venue is improper in the Northern District of California.

## III.  Legal Standard

### A.  Preliminary injunction

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); *see also Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  To obtain a preliminary injunction, the moving party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008).

Moreover, "because Plaintiff seeks to enjoin a government agency, 'his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs.'" *Midgett v. Tri-Cty. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 850 (9th Cir. 2001) (quoting *Rizzo v. Good*, 423 U.S. 362, 378-79 (1976)).  "This 'well-established rule' bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." *Id.* (citation omitted).

---

[3] The arguments and evidence from the motion to dismiss (Doc. 20) are not repeated here in the interest of efficiency, but are instead incorporated herein by reference.

Section 1983 is an exception to the Anti-Injunction Act, 28 U.S.C. § 2283, which establishes that federal courts may not enjoin state-court proceedings unless expressly authorized to do so by Congress. *See Mitchum v. Foster*, 407 U.S. 225, 242-43 (1972); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 468 (9th Cir. 1984). However, this does "not displace the normal principles of equity, comity and federalism that should inform the judgment of federal courts when asked to oversee state law enforcement authorities." *City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983); *Mitchum*, 407 U.S. at 243. In fact, injunctive relief should be used "sparingly, and only . . . in clear and plain case[s]." *Rizzo*, 423 U.S. at 378 (citation and internal quotation marks omitted). "Ordinarily, there should be no interference with [state] officers; primarily, they are charged with the duty of prosecuting offenders against the laws of the state, and must decide when and how this is to be done. The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection." *Younger v. Harris*, 401 U.S. 37, 45 (1971) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

### B.     Retaliatory investigation / conspiracy to violate civil rights

In order to prove a retaliatory investigation claim, a plaintiff must demonstrate that (1) defendants possessed an impermissible motive to interfere with his First Amendment rights, (2) defendants' conduct would chill someone of ordinary firmness from future First Amendment activities, and (3) the defendants would not have engaged in the conduct in question but for the retaliatory motive. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999); *Hartman v. Moore*, 547 U.S. 250 (2006).

Further,

> To establish the defendants' liability for a conspiracy, *a plaintiff must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights*. The defendants must have, by some concerted action, intended to accomplish some unlawful objective for the purpose of harming another which results in damage. Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants. For example, a showing that the alleged conspirators have committed acts that are unlikely to have been undertaken without an agreement may allow a jury to infer the existence of a conspiracy. Whether

> defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives. To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.

*Mendocino Envtl. Ctr.*, 192 F.3d at 1301-02 (emphasis added) (internal quotation marks and citations omitted).

### IV. Plaintiffs Are Unlikely to Succeed on the Merits of their Claim

Plaintiffs claim that "[t]he HIDTA raid had no legitimate criminal prosecution purpose, because Shay lacked probable cause to believe a crime had been committed at the Villanueva home, and didn't acquire any evidence of criminal conduct while he was there." Motion (Doc. 22), at 27:5-7. This is entirely false—there was probable cause to believe that Villanueva possessed, manufactured, and sold DMT; that Villanueva possessed, produced, and sold marijuana; and that Villanueva fraudulently submitted false information to the Arizona government to conceal his illegal marijuana production. Plaintiffs' contention is also false because MCSO acquired substantial evidence of criminal conduct, including some 70 pounds of DMT, evidence of the sale and shipment of DMT, more than 100 marijuana plants, five pounds of processed marijuana, psilocybin mushrooms, and a small quantity of methamphetamine. Because the so-called "HIDTA raid" served a legitimate criminal prosecution purpose unconnected to any purported retaliatory animus of DEA, Plaintiffs cannot succeed on the merits of their claims against the Maricopa County Defendants.

#### A. Probable cause existed to support the issuance of the Warrant.

There was probable cause to believe that a crime had been committed at Villanueva's residence. The investigation of Villanueva's activities began when Detective Shay received a notice of a tip forwarded from the DEA tip line. *See* Declaration of Matthew Shay ("Shay Decl."), attached hereto as **Exhibit A**, at ¶¶ 8, 15; *see also* E-mail from M. Paddy to M. Kaskavage (the "DEA tip e-mail"), attached hereto as **Exhibit B**. The DEA tip e-mail repeated the caller's allegations that Villanueva was conducting "Ayahuasca Ceremonies,"

at a location other than his residence, at which he provided DMT to others at a cost. Shay Decl. (Ex. A) at ¶ 16. The caller claimed that Villanueva collected payment from those interested in receiving DMT through his PayPal account (Vol@Wavz.net). *Id*. Based upon Detective Shay's experience, he determined that this tip was credible. *Id.* at ¶ 17.

Detective Shay researched the allegations, including by observing Villanueva's publicly available social media and his advertising of the ayahuasca ceremonies. Shay Decl. (Ex. A) at ¶ 19. Detective Shay learned that Villanueva required each customer to sign up online and provide information; once Villanueva accepted that customer to attend the ceremony, he charged a fee payable through PayPal. *Id.* at ¶ 20. At Detective Shay's request, another investigator obtained a search warrant for a financial check on Villanueva's PayPal accounts, which revealed that the PayPal accounts had received more than $248,000.00 between January 1, 2019 and February 12, 2020. *Id.* at ¶ 21. Detective Shay concluded that there was probable cause to believe that Villanueva possessed DMT and was selling, transferring, or offering to sell DMT. *Id.* at ¶ 22.

Detective Shay believed it was likely that the DMT being provided by Villanueva was being manufactured at Villanueva's home. Shay Decl. (Ex. A) at ¶ 23. Accordingly, he began efforts to check whether Villanueva had disposed of waste from manufacturing DMT in a trash can brought out to the curb for collection by the city. *Id*. at ¶ 24. Although trash cans were never available for inspection during Detective Shay's visits to Villanueva's home between February and May 2020, Detective Shay could detect the odor of green, growing marijuana on each such visit. *Id.* at ¶ 25. Detective Shay concluded that it was likely that marijuana was being produced on the premises. *Id.* at ¶ 26.

Detective Shay secured a search warrant for applications filed with the Arizona Department of Health Services ("DHS") under the Arizona Medical Marijuana Act ("AMMA"), Ariz. Rev. Stat. ("A.R.S.") § 36-2801 *et seq*., relating to Villanueva and his residence. Shay Decl. (Ex. A) at ¶ 29. Detective Shay has significant prior experience investigating marijuana growers, including those that have attempted to immunize themselves as a "caregiver" growing operation under the AMMA. *Id.* at ¶ 27. Many

marijuana growers within the boundaries of metropolitan Phoenix use the AMMA to hide their excessive marijuana growth and/or sales operations. *Id.* at ¶ 28. In these cases, the most common indicators are when the patients and/or caregivers themselves provide DHS with false residential information (*i.e.*, addresses) to make it appear they reside more than 25 miles outside of the radius of any licensed dispensary in Arizona.[4] *Id.* at ¶ 28. Once cultivation permission is fraudulently received, it is transferred to a "caregiver" who uses the fraudulently obtained cultivation permissions to grow up to 12 plants per "patient." *Id.* at ¶ 28.

Detective Shay's analysis of DHS medical marijuana card records, as well as of other records, revealed that although Villanueva and his wife consistently maintained a residential address in Phoenix, Arizona, they falsely listed their residential address as being in Williams, Arizona and requested cultivation permissions from DHS because that address was more than 25 miles from a licensed dispensary. Shay Decl. (Ex. A) at ¶ 30. Villanueva received transferred cultivation privileges from seven other qualified patients. *Id.* at ¶ 31. Several of these individuals appear to have given false addresses to secure cultivation permissions, and two of Villanueva's current "patients" were actually purchasing medical marijuana from licensed dispensaries. *Id*. There was thus probable cause to believe that Villanueva was engaged in a fraudulent scheme to falsely obtain "caregiver" cultivation permissions, possessed marijuana in excess of the quantities permitted under the AMMA, was producing marijuana far beyond any quantity that would be permitted under the AMMA, and—based upon the very large amounts of money being received through PayPal—was selling marijuana.[5] *Id.* at ¶ 32.

**B.    The Warrant was properly issued.**

On May 17, 2020, Detective Shay applied for a search warrant. Shay Decl. (Ex. A)

---

[4] The AMMA only permits cultivation of marijuana if a registered nonprofit medical marijuana dispensary is not operating within twenty-five miles of the qualifying patient's home. See A.R.S. § 36-2804.02(A)(3)(f).

[5] Under the AMMA, marijuana can be grown for personal use by a patient or their caregiver, but can only be sold to patients or caregivers by licensed dispensaries. *See* A.R.S. §§ 36-2811(B)(3), 36-2811(E) and (F), 36-2815(C).

at ¶ 33.  The search warrant application was supported by a sworn affidavit from Detective Shay describing his investigation and conclusions.  *See* SW 2020-006651 (the "Warrant"), attached hereto as **Exhibit C**; Shay Decl. (Ex. A) at ¶ 33.  That same day, the Warrant was granted by Commissioner Gregory J. Gnepper of the Maricopa County Superior Court.  Search Warrant (Ex. C) at 1, 33.

Plaintiffs claim that the Warrant was obtained by a bad faith affidavit, *see* Motion (Doc. 22) at 19:22, but do not otherwise explain or present any evidence of the supposed impropriety of the warrant application and supporting affidavit.  Plaintiffs have previously alleged that "The warrant to search Villanueva's home and the Vine of Light Church was unconstitutionally obtained with an affidavit that Shay submitted in bad faith, that concealed material exculpatory facts from the issuing magistrate, misrepresented true facts to conceal their exculpatory aspect, and created the materially false impression that Villanueva's home was a run-of-the-mill Phoenix drug packaging house, not a church."  FASC at ¶ 203.  These allegations are *not* taken as true in resolving a motion for preliminary injunction, which requires "a clear showing" carrying "the burden of persuasion" by the movant.  *See Mazurek*, 520 U.S. at 972.  Plaintiffs have not identified any materially exculpatory facts omitted from the affidavit and have not explained the purportedly exculpatory aspects of any true facts.

In fact, the evidence refutes any allegation that the Warrant was illegally obtained or that the supporting affidavit was submitted in bad faith.  The contents of the search warrant application and supporting affidavit were true to the best of Detective Shay's knowledge and information at that time.  Shay Decl. (Ex. A) at ¶ 34.  In fact, the only thing about which Detective Shay appears to have been mistaken was his conclusion that the DMT was being refined at Villanueva's residence; it was instead being shipped and received in refined form.  *Id.*  Nor did Detective Shay *create* the impression that Villanueva's home was a clandestine lab rather than a church.  There is no signage or other indication that Villanueva's residence is a church, and the ayahuasca ceremonies are conducted thirteen miles away.  *Id.* at ¶ 35.  To the extent that it appears from the face of the affidavit (and the Warrant) that

Villanueva's home was a "run-of-the-mill Phoenix drug packaging house," FASC at ¶ 203, it is because the actual facts as observed by Detective Shay give rise to that conclusion.

### C. The search uncovered substantial evidence of criminal acts.

Upon searching Villanueva's residence, investigators found 4.19 pounds of marijuana (which field tested positive for THC), 91 pounds of ayahuasca paste, 15 bottles of ayahuasca liquid, 260.5 grams of suspected psilocybin mushrooms, and $14,025 in U.S. currency. Shay Decl. (Ex. A) at ¶ 38; *see also* J. Felix IR Supplement, attached as **Exhibit D**, at 3. Investigators also found (and confiscated) 107 marijuana plants, weighing approximately 33 pounds. Shay Decl. (Ex. A) at ¶ 38; *see also* M. Shay IR Supplement 1 (summarizing search), attached as **Exhibit E**, at 4. Investigators found numerous customer lists, price lists, and ledgers. *Id.* Finally, a search of Villanueva's cellular phone revealed that he has been engaging in sales of marijuana and DMT for months if not years. *Id.* These findings are substantial evidence that Villanueva possessed and has sold DMT and has possessed, produced, and sold marijuana outside the protections of the AMMA. Shay Decl. (Ex. A) at ¶ 39.

During the search, Detective Shay interviewed Villanueva and his wife, who were read their Miranda rights directly from an MCSO-provided warning card and acknowledged that they understood those rights. Shay Decl. (Ex. A) at ¶¶ 40-41; *see also* M. Shay IR Supplement 2 (summarizing audio interview), attached as **Exhibit F**. Villaneuva confirmed that he performs ayahuasca "ceremonies" for approximately 25 people at a time, for which each person is charged $360.00. *Id.* at ¶ 42. He also admitted to having only two current marijuana caregiver cards and stated that he does not even know the patients. *Id*. He explained that he pays a doctor's office for the caregiver cards and providing one ounce of marijuana per month to the doctor's office in addition. *Id*. Villanueva admitted that he has always purchased transferred cultivation rights in this manner and provided marijuana to the doctor's office rather than the patients. *Id*. These admissions make clear that Villanueva has been producing and selling marijuana outside the protections of the AMMA, and that Villanueva has been engaged in the fraudulent scheme discussed in Section IV.A, *supra* (of

providing false information to obtain caregiver growing permissions under the AMMA). *Id.* at ¶ 43.

As noted in Detective Shay's synopsis of the execution of the Warrant, samples of the drugs and suspected drugs were sent for laboratory analysis. Shay Decl. (Ex. A) at ¶ 44; M. Shay IR Supplement 1 (Ex. E) at 5. Detective Shay has not yet submitted his report and charging recommendations to the AG's Office, where a prosecutor will decide whether to bring charges. *Id.* at ¶¶ 45-46. Based upon the evidence seized from Villanueva's residence, and upon Villanueva's admissions when interviewed, it appears that such charges are warranted.

### D. There was no agreement between the DEA and the Maricopa County Defendants to violate constitutional rights.

It is not unusual for the DEA to forward tips that it receives to local law enforcement. Shay Decl. (Ex.A) at ¶ 9. DEA agents do not generally investigate DMT possession, manufacturing, or distribution. *Id*.

Prior to forwarding the tip regarding Villanueva, Special Agent Marco Paddy of the DEA reached out via telephone to Detective Shay. Shay Decl. (Ex. A) at ¶ 10. The purpose of the call was to confirm that MCSO had availability to handle the tip. *Id*. Special Agent Paddy did not inform Detective Shay that Villanueva was related to the NAAVC, nor was Detective Shay aware of that connection. *Id.* at ¶ 11. Special Agent Paddy did not inform Detective Shay, and Detective Shay did not know, that the NAAVC had petitioned the DEA for changes in the DEA's system for issuing exemptions to the Controlled Substances Act under the Religious Freedom Restoration Act. *Id.* at ¶ 12. Rather, the only "meeting of the minds" was that Detective Shay would evaluate the tip and, if appropriate, investigate the criminal activities described therein. *Id.* at ¶ 13. Special Agent Paddy and Detective Shay did not communicate further concerning Villanueva after sending the tip, and never communicated regarding the NAAVC petition or lawsuit. *Id.* at ¶ 14.

Plaintiffs must demonstrate that the Maricopa Defendants "intended to accomplish some unlawful objective" to succeed in their conspiracy claim. *Mendocino Envtl. Ctr.*, 192

F.3d at 1301-02. But the Maricopa County Defendants were completely unaware of the connection between Villanueva and NAAVC, and of the dispute between NAAVC and the DEA, and thus could not "share the common objective of the [alleged] conspiracy" to retaliate against NAAVC through Villanueva. *Id.*

Moreover, it was impossible for such a conspiracy to have existed when the Maricopa County Defendants received the tip that resulted in the criminal investigation of Villanueva. The DEA tip e-mail was received on January 8, 2020. *See* Shay Decl. (Ex.A) at ¶ 15; DEA tip e-mail (Ex. B). However, the DEA did not receive the NAAVC's letter until January 10, 2020. *See* Declaration of Winfield Scott Stanley III (Doc. 33-1) at ¶ 37. Given this timing, there is no circumstantial evidence to support the existence of such a conspiracy, and it is impossible for Plaintiffs to succeed on the merits of their claims against the Maricopa County Defendants.

  **E.**  **The DEA's purportedly retaliatory motive was not a "but-for" cause of the criminal investigation of Villanueva.**

Following receipt of the DEA tip e-mail on January 8, 2020, Detective Shay conducted his investigation as he would with any other tip that he deemed credible. Shay Decl. (Ex. A) at ¶ 18. Detective Shay did not communicate further with Special Agent Paddy regarding Villanueva, and never communicated with anyone regarding the NAAVC letter or lawsuit. *Id.* at ¶ 14. Ultimately, Detective Shay determined that probable cause existed to secure a search warrant because various crimes had been and were being committed on Villanueva's property: possession, production, and sale of DMT; possession, production, and sale of marijuana outside the permissions of the AMMA; and fraudulent submission of false information to DHS to disguise misconduct under the AMMA. *See* Part IV.A, *supra*. It is thus beyond dispute that the criminal investigation would have occurred independently of the DEA's purported retaliatory animus and independently of any alleged conspiracy, and the Motion must therefore be denied.

**V.**  **This Court Should Not Enjoin the Maricopa County Defendants**

The Motion should be denied because Plaintiffs have failed to make the threshold

showing as to likelihood of success on the merits. Even if Plaintiffs could make such a showing, however, the other factors still would not support granting injunctive relief.

Plaintiffs claim that "defendants will suffer no hardship from being enjoined that will remotely compare with the potential future injury to plaintiffs[]." Motion (Doc. 22) at 30:19-25 (citing *Earth Island Institute v. Carlton*, 66 F.3d 462, 475 (9th Cir. 2010)). It is not clear how *Earth Island Institute* supports Plaintiffs' position; in that case, the Ninth Circuit *upheld* the denial of a preliminary injunction, finding that the district court did not abuse its discretion by concluding that safety concerns weighed in favor of not issuing an injunction. 66 F.3d at 475-76. That is precisely the injury to the Maricopa County Defendants that should be considered here: interference with efforts to address public safety concerns.

A.R.S. § 13-3407 prohibits the possession, use, administration, acquisition, sale, manufacture, and transportation of dangerous drugs. Materials, compounds, mixtures, and preparations containing DMT are defined as dangerous drugs because DMT is a hallucinogenic substance. *See* A.R.S. § 13-3401(6)(a). Similarly, A.R.S. § 13-3405 prohibits the possession, use, production, sale, and transportation of marijuana. These regulations are unquestionably within the State of Arizona's general police powers, and Plaintiffs do not challenge the validity of the statutes in question. There was probable cause to believe that Villanueva was violating these statutes and the search of his residence uncovered evidence of such violations. *See* Parts IV.A and C, *supra*.

Plaintiffs ask this Court to enjoin the Maricopa County Defendants from criminally investigating individuals associated with Plaintiffs, including Villanueva; from using the materials seized in the search of Villanueva's residence in this litigation; from retaining the seized property; and from utilizing police resources to investigate individuals associated with Plaintiffs, including Villanueva. *See* Motion (Doc. 22) at 2-3. Plaintiffs thus seek to immunize Villanueva and others from criminal investigation and prosecution (even as to charges unrelated to allegedly religious use of ayahuasca) and to have illegal contraband returned to Villanueva (including marijuana plants and methamphetamine unrelated to

allegedly religious use of ayahuasca); this is unquestionably the kind of federal judicial interference in ongoing state law enforcement that is cautioned against by *Rizzo* and *Younger*.

Critically, the injunction does not merely seek to immunize Villanueva and others for activities regarding ayahuasca; as written, the injunction would prohibit investigation and use of evidence of fraud and of illegal possession, production, and sale of marijuana and would even prohibit hypothetical investigation of the NAAVC's personnel for serious and unrelated crimes like murder. The public interest is not served by the imposition of broad criminal immunity during the pendency of this litigation.

## VI. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (Doc. 22) should be denied.

Respectfully submitted this 12th day of August, 2020.

**SACKS TIERNEY, P.A.**

*/s/ Evan F. Hiller*
Evan F. Hiller


# PROOF OF SERVICE

On August 12, 2020, I served the following foregoing Maricopa County Defendants' Response to Plaintiffs' Motion for Preliminary Injunction, and the exhibits thereto, on the person or persons below, as follows:

a. via Northern District of California ECF

Charles Carreon
3241 E. Blacklidge Drive
Tucscon, Arizona 85716
*Attorney for Plaintiffs*

Kevin P. Hancock
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
*Attorney for Defendants William Barr, Timothy Shea, Chad Wolf, Mark Morgan, and United States of America*

Leah Brownlee Taylor
U.S. Department of Justice
Torts Branch, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
*Attorney for Defendant Thomas Prevoznik*

Drew C. Ensign
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004
*Attorney for Defendants State of Arizona and Mark Brnovich*

I declare under penalty of perjury that the foregoing is true and correct.

8/12/2020                                    */s/ Michelle L. Curtsinger*
Date                                         Michelle L. Curtsinger