# Exhibit A

Evan F. Hiller (No. 294420)
Hiller@SacksTierney.com
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone:  480.425.2600

*Attorney for Defendants Maricopa County
and Matthew Shay*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIZONA YAGÉ ASSEMBLY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM BARR, et al., <br><br> Defendants. | Case No.  3:20-cv-03098-WHO <br><br> **DECLARATION OF MATTHEW SHAY** |

I, MATTHEW SHAY, hereby declare as follows:

1. I am over the age of eighteen years and am competent to state the facts recited herein. If called upon to testify, I would give testimony consistent with the facts stated herein.

2. I am a Deputy Sheriff with the Maricopa County Sheriff's Office (MCSO).

3. I am assigned as a detective to the Maricopa County Drug Suppression Task Force (MCDST), part of the Phoenix High Intensity Drug Trafficking Area (HIDTA).

4. Prior to joining MCSO about three years ago, I was a police officer with the City of Phoenix for approximately 23 years.  For 18 years, I was assigned to the Drug Enforcement Bureau of the Phoenix Police Department.

5. I have been part of the investigation of more than 200 clandestine drug laboratories and have investigated more than 300 illicit marijuana grows.

6. Unless otherwise indicated herein, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify completely

and truthfully to such facts.

7. I make and submit this declaration in support of Defendants Maricopa County and Matthew Shay's Response to Plaintiffs' Motion for Preliminary Injunction (the "Response").

8. The investigation of Villanueva's activities began I received notice from Special Agent Marco Paddy of the DEA that he would be forwarding a tip received by the DEA tip line.

9. It is not unusual for the DEA to forward tips that it receives to local law enforcement. DEA agents do not generally investigate DMT possession, manufacturing, or distribution.

10. Prior to sending the DEA Tip e-mail, Special Agent Paddy contacted me to check whether MCSO had availability to investigate the tip and to let me know he was providing it to us.

11. Special Agent Paddy did not tell me (and I did not know) that Villanueva was connected to the NAAVC.

12. Special Agent Paddy did not tell me (and I did not know) that NAAVC had petitioned the DEA concerning an exemption to the Controlled Substances Act under the Religious Freedom Restoration Act.

13. To the extent that there was any understanding between myself and Agent Paddy concerning the substance of his call and the tip, that understanding was that I would evaluate the tip and investigate appropriately.

14. After our single phone conversation regarding forwarding the tip, Agent Paddy and I did not communicate further regarding the Villanueva tip or the investigation. I did not ever communicate with anyone regarding the circumstances of the NAAVC petition or lawsuit, which were unknown to me until the filing of the First Amended and Supplemental Complaint naming me as a defendant in this matter.

15. A true and correct copy of the e-mail providing a tip that Villanueva was producing and selling DMT (the "DEA tip e-mail") is attached to the Response as **Exhibit**

CASE NO. 3:20-CV-03098     DECLARATION OF MATTHEW SHAY
2798169.v2

**B**. The DEA tip e-mail is electronically addressed to my direct supervisor, Micah Kaskavage. I received it on January 8, 2020.

16. The DEA tip e-mail repeated the caller's allegations that Villanueva was conducting "Ayahuasca Ceremonies," at a location other than his residence, at which he provided DMT to others at a cost. The caller claimed that Villanueva collected payment from those interested in receiving DMT through his PayPal account (Vol@Wavz.net).

17. Based upon my extensive experience, I determined that the DEA tip e-mail was credible on its face.

18. Following receipt of the DEA tip e-mail on January 8, 2020, I conducted an investigation the same way I would with any other tip that I deem credible.

19. I began researching the allegations by confirming Clay Villanueva's identity and residential address. I observed Villanueva's publicly available social media and saw numerous instances where he advertised ayahuasca ceremonies.

20. Through my investigation of openly available social media, I learned that Villanueva required each customer to sign up online and provide information and that once Villanueva accepted that customer to attend the ceremony, he charged a fee payable through PayPal.

21. At my request, another investigator obtained a search warrant for a financial check on Villanueva's PayPal accounts, which revealed that the PayPal accounts had received more than $248,000.00 between January 1, 2019 and February 12, 2020.

22. Based upon Villanueva's social media posts about ayahuasca and his PayPal account activity, I concluded that there was thus probable cause to believe that Villanueva possessed DMT and was selling, transferring, or offering to sell DMT.

23. In my experience, most ayahuasca is extracted from plant sources by those who are selling it. Thus, I believed it was likely that the DMT being provided by Villanueva was being manufactured at Villanueva's home.

24. Manufacturing DMT create waste that is often found disposed of in city trash cans that are brought out to the curb. Thus, I began efforts to check whether

CASE NO. 3:20-CV-03098                    DECLARATION OF MATTHEW SHAY
2798169.v2

Villanueva had disposed of DMT waste in such a way by visiting Villanueva's residence at various times between February and March 2020.

25. Although trash cans were never available for inspection during my visits to Villanueva's home between February and May 2020, I was able to detect the odor of green, growing marijuana on each such visit.

26. I concluded that it was likely that marijuana was being grown on the premises of Villanueva's home.

27. I have significant prior experience investigating marijuana growers, including those that have attempted to immunize themselves as a "caregiver" growing operation under the AMMA.

28. Many "caregiver" growing operations occurring within the boundaries of metropolitan Phoenix are using the AMMA to hide their excessive marijuana growth and/or sales operations. In such cases, the most common indicators are when the patients and/or caregivers themselves provide DHS with false residential information (*i.e.*, addresses) to make it appear they reside more than 25 miles outside of the radius of any licensed dispensary in Arizona. Once cultivation permission is fraudulently received, it is transferred to a "caregiver" who uses the fraudulently obtained cultivation permissions to grow up to 12 plants per "patient."

29. Based upon this known form of fraudulent scheme, I secured a search warrant for applications filed with the Arizona Department of Health Services ("DHS") under the Arizona Medical Marijuana Act ("AMMA") relating to Villanueva and his residence.

30. The DHS medical marijuana card records, and other records that I reviewed, revealed that although Villanueva and his wife consistently maintained a residential address in Phoenix, Arizona, they falsely listed their residential address as being in Williams, Arizona and requested cultivation permissions from DHS because that address was more than 25 miles from a licensed dispensary.

31. Villanueva received transferred cultivation privileges from seven other

qualified patients. Several of these individuals appear to have given false addresses to secure cultivation permissions, and two of Villanueva's current "patients" were actually purchasing medical marijuana from licensed dispensaries.

32. Based upon the presence of green growing marijuana at Villanueva's residence and the records I reviewed, I concluded that there was probable cause to believe that Villanueva was engaged in a fraudulent scheme to falsely obtain "caregiver" cultivation permissions; that he possessed marijuana in excess of the quantities permitted under the AMMA; that he was producing marijuana far beyond any quantity that would be permitted under the AMMA; and—based upon the very large amounts of money being received through PayPal—that he was selling marijuana.

33. Based upon my investigation and conclusions, I prepared an affidavit and application for a search warrant to be executed on Villanueva's property. A true and correct copy of that search warrant, including my supporting affidavit, is attached to the Response as **Exhibit C**.

34. The contents of the search warrant application and my affidavit were true to the best of my knowledge and information at the time. I now know that Villanueva was importing DMT in a refined form, and not producing it himself from plant products, but I am not aware of anything else in the search warrant that was not borne out by the search.

35. There is no signage (nor anything else) to indicate that Villanueva's residence is a church. Villanueva conducts the ayahuasca ceremonies at a completely different location roughly 13 miles away from his home.

36. A true and correct copy of an Incident Report supplement prepared by Detective J. Felix is attached to the Response as **Exhibit D**. Detective Felix was assigned to record and package evidence seized during the search.

37. A true and correct copy of an Incident Report supplement that I prepared summarizing the events that occurred when we executed the search warrant is attached to the Response as **Exhibit E**.

38. Upon searching Villanueva's residence, we found 4.19 pounds of marijuana

(which field tested positive for THC), 91 pounds of ayahuasca paste, 15 bottles of ayahuasca liquid, 260.5 grams of suspected psilocybin mushrooms, and $14,025 in U.S. currency. We also found (and confiscated) 107 marijuana plants, weighing approximately 33 pounds. We found numerous customer lists, price lists, and ledgers. A search of Villanueva's cellular phone revealed that he has been engaging in sales of marijuana and DMT for months if not years.

39. The evidence seized pursuant to the search warrant shows that Villanueva possessed and has sold DMT and has possessed, produced, and sold marijuana outside the protections of the AMMA.

40. During the search, I interviewed Villanueva and his wife, who were read their Miranda rights directly from an MCSO-provided warning card and acknowledged that they understood those rights.

41. A true and correct copy of an Incident Report supplement that I prepared summarizing the recorded interviews that I conducted during the search is attached to the Response as **Exhibit F**.

42. During my interview, Villaneuva confirmed that he performs ayahuasca "ceremonies" for approximately 25 people at a time, for which each person is charged $360.00. He also admitted to having only two current marijuana caregiver cards and stated that he does not even know the patients. He explained that he pays a doctor's office for the caregiver cards and providing one ounce of marijuana per month to the doctor's office in addition. Villanueva admitted that he has always purchased his patients in this manner and provided marijuana to the doctor's office rather than the patients.

43. Villanueva's admissions make clear that Villanueva has been producing and selling marijuana outside the protections of the AMMA and that he engaged in a textbook example of the fraudulent scheme by which marijuana growers use falsely obtained "caregiver" cultivation permissions to try to shield their activities under the AMMA.

44. Samples of the drugs and suspected drugs seized during the search were sent

to the Arizona Department of Public Safety for laboratory analysis.

45. I have not yet submitted my report and charging recommendations to the Arizona Attorney General's Office.

46. Ultimately, it is the prosecutor's decision whether to bring charges based upon my investigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of August, 2020.

*Matthew J Shay 2148*

Matthew Shay

CASE NO. 3:20-CV-03098                           DECLARATION OF MATTHEW SHAY

2798169.v2