CHARLES CARREON (CSB # 127139)
3241 E. Blacklidge Drive
Tucson, Arizona 85716
Tel:  628-227-4059
Email: chascarreon@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly,
North American Association of Visionary Churches, and
Clay Villanueva

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIZONA YAGÉ ASSEMBLY, NORTH AMERICAN ASSOCIATION OF VISIONARY CHURCHES, and CLAY VILLANUEVA,<br><br>        Plaintiffs,<br><br>    vs.<br><br>WILLIAM BARR, Attorney General of the United States; UTTAM DHILLON, Acting Administrator of the U.S. Drug Enforcement Administration; CHAD F. WOLF, Acting Secretary of the Dept. of Homeland Security; MARK A. MORGAN, Acting Commissioner of U.S. Customs and Border Protection; THOMAS PREVOZNIK, Deputy Assistant Administrator of the DEA Dept. of Diversion Control, in his personal capacity; the UNITED STATES OF AMERICA; the STATE OF ARIZONA; MARK BRNOVICH, Arizona Attorney General; MARICOPA COUNTY, a political subdivision of the State of Arizona; and, MATTHEW SHAY,<br><br>        Defendants. | Case No.: 3:20-CV-03098-WHO<br><br>PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF MARICOPA COUNTY AND MATTHEW SHAY<br><br>Date:  September 9, 2020<br>Time:  2:00 P.M.<br>Courtroom:  2 (17th floor) |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**1.   SUMMARY OF ARGUMENT**

Maricopa County and Matthew Shay ("Shay") have moved to dismiss on grounds that personal jurisdiction over them is lacking in this action.  The Court must determine whether this Court has (1) general jurisdiction over each moving defendant, based on pervasive purposeful availament of the laws and resources of the State of California, and (2) specific jurisdiction over each defendant for causing an effect in the forum state by an act outside the forum state.

Neither defendant has submitted the standard affidavit negating the existence of minimum contacts with the forum state that is *de rigeur* on a motion such as this one. Neither defendant denies having economic or legal contacts with California that would subject them to general jurisdiction here.  Neither defendant denies committing the specific acts alleged in plaintiffs' Third Claim for Relief for Conspiracy to Violate 42 U.S.C. § 1983 which clearly constitute an assault upon a witness to this action, a quintessential tort committed outside of California, causing effects in this United States District Court for the Northern District of California.  (Docket # 12, ¶¶ 194 – 205, quoted *infra* at section 1.H).  While paying lip service to the principle that all allegations of the First Amended and Supplemental Complaint ("FASC") must be construed in favor of plaintiffs, moving defendants stealthily seek to raise a factual dispute without tendering any facts. Accordingly, the motion must be denied, because jurisdiction is established by the FASC, that alleges: Arizona SW HIDTA is a federally-funded multistate entity that extends into California and neighboring states; the States of California and Arizona have extensive interjurisdictional criminal justice compacts in force; and Matthew Shay (Shay"), commanding a team of federally-funded HIDTA Maricopa County Sheriff's Office ("MCSO") deputies, conducted a retaliatory search of the home and church of NAAVC Board Member Clay Villanueva ("Villanueva"), in order to deter Villanueva from testifying and participating in this litigation in this California forum.

## 2.   FACTS

### A.   Plaintiffs AYA and NAAVC Assert RFRA Claims to Protect Free Exercise

This action was filed by Arizona Yage Assembly ("AYA"), a California religious nonprofit corporation, for the benefit of Winfield Scott Stanley III ("Stanley").  AYA and North American Association of Visionary Churches ("NAAVC") joined as co-plaintiffs in the original Complaint (Docket # 1).  The Complaint alleged a first claim for relief under RFRA, a second claim for relief under the Judicial Review of Administrative Action statute, 5 U.S.C. § 702; and a third claim for relief under the Federal Declaratory Relief Act, 28 U.S.C. § 2201-2202.

### B.   AYA is a Visionary Church, and NAAVC is an Interdenominational Association of Visionary Churches

Plaintiffs are religious nonprofit corporations whose religious exercise, and that of their member churches and congregants, are substantially burdened by laws prohibiting importation, distribution, and possession of Ayahuasca, an herbal tea that contains a small amount of Dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act 21 U.S.C. § 801 et. seq. (the "CSA").  (FASC, Docket #12, ¶ 6 and ¶ 125.)  Ayahuasca, *i.e.*, yagé, is the religious sacrament of the Arizona Yagé Assembly ("AYA"), a visionary church[1] incorporated as a nonprofit corporation in the State of California.  After working with Ayahuasca for six years, Stanley established AYA as a visionary church in 2015, using Ayahuasca as AYA's communion sacrament.  (FASC, Docket #12, ¶ 42.)

North American Association of Visionary Churches ("NAAVC") is an interdenominational association of visionary churches, formed as a religious nonprofit corporation in the State of California in 2019, operated by its Board of Directors, of which Stanley is Chair, and Clay Villanueva ("Villanueva") is a Director.  Villanueva is

---

[1] "Visionary churches" use sacramental plant-based herbal preparations that contain substances scheduled or subject to scheduling under the CSA.

also the founder of the Vine of Light Church ("VOLC") that, along with Stanley's AYA, was the first visionary church to join NAAVC.   All of the members of NAAVC are members of Ayahuasca visionary churches seeking to advance the Free Exercise of visionary religion.   NAAVC promotes the study of visionary religion by sponsoring scholarship and media events. (First Amended and Supplemental Complaint "FASC" # 12, ¶ 62.)

NAAVC's central act of Free Exercise is initiating and operating a lawful system for importing and sharing sacramentally-prepared Ayahuasca with visionary churches at reasonable cost, so that they may share the communion sacrament with their congregations.  (FASC # 12, ¶ 64.)  NAAVC has devoted its corporate resources to securing legal permissions necessary to the fulfillment of this religious corporate mission to expand the Free Exercise rights of all visionary churches and their congregations. (FASC # 12, ¶ 64.)

The members of the Board of Directors are personally and institutionally devoted to helping visionary churches and practitioners to obtain a pure and efficacious Ayahusaca sacrament, free from the onus of illegality that substantially burdens visionary religious Free Exercise.  (FASC # 12, ¶ 63.)  All NAAVC Board members, including Stanley and Villanueva, have suffered injuries and damages alike in type and kind to those suffered by members of all of NAAVC's member churches and their congregations; thus, NAAVC Board members are personally aggrieved by the acts of the DEA and DOJ alleged herein, and their interests are closely tied to those of the churches and congregations on whose behalf NAAVC asserts associational standing. (FASC # 12, ¶ 63.)

## C.  The DEA's Application of the CSA Substantially Burdens AYA's Free Exercise, and NAAVC's Efforts to Begin Its Ministry

AYA, its congregation, NAAVC, and NAAVC's member churches and congregations, are substantially burdened by the prohibitions on manufacturing,

distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA, that impose criminal penalties for violations. (FASC # 12, ¶ 125.)

The prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and the prohibition on importation in § 952(a) of the CSA, coerce AYA and NAAVC to act contrary to their religious beliefs by the threat of criminal sanctions. (FASC # 12, ¶ 131.) The potential for prosecution under the CSA places substantial pressure on AYA, its Founder, and the congregation to modify their behavior and violate their beliefs, forcing them to choose between either abandoning religious principle or risking criminal prosecution. (Complaint # 12, ¶ 131.)

NAAVC is substantially burdened in its ministry to visionary churches, because many very sincere congregations and their leadership are accustomed to practicing "underground," and are uncertain whether associating with a church association to advance the rights of visionary churches will accomplish the desired goal of greater Free Exercise, or stimulate DEA enforcement. (FASC # 12, ¶ 132.) The mission of the DEA places AYA and NAAVC squarely within the scope of its stated enforcement activities. HIDTA is a cross-border entity that extends into California. NAAVC is California-based, and a shipment of Ayahuasca intended for NAAVC and AYA was intercepted by Department of Homeland Security in California. (FASC ¶ 135.) Accordingly, AYA and its congregation, and NAAVC and its member churches, have suffered concrete deprivation of property, and their leadership are in peril of prosecution in California. (FASC # 12, ¶ 128.)

### D. The May 19th HIDTA Raid of Villanueva's House and VOLC Sanctuary Was A Retaliatory Act by the DEA

The Maricopa County Sheriff's Office ("MCSO"), the Arizona Attorney General ("Arizona AG"), the State of Arizona, and Det. Matthew Shay ("Shay") (collectively, the "Arizona defendants") searched the Vine of Light Church sanctuary and Villanueva's

home.  As set forth in much greater detail in the Motion for Preliminary Injunction of Clay Villanueva (Docket # 22-3), the only reasonable interpretation of the facts leads to the conclusion that the DEA directed MCSO and the Arizona AG to seize the Ayahuasca in the possession of an NAAVC Board member to "rein in" the activist organization. (Carreon Dec. ¶¶ 4 – 22, Docket # 22-3.)  Judicial notice of the evidence cited in the Carreon Declaration, and of the Villanueva Declaration (Docket # 22-1) and their respective exhibits, is respectfully requested pursuant to F.R.E. 201(b)(2), to avoid duplication of evidence and needless redundancy in the Court's file.

### E. <u>Arizona SW HIDTA Spans a Vast Interstate Geographic Area from San Diego, California, Covering Much of Arizona, to the Gulf Coast of Texas, and the Jurisdictional Implications are Subject to Discovery</u>

The Arizona SW HIDTA area is one of the largest in the nation. As depicted on Exhibit 5 to the Villanueva Motion for Preliminary Injunction (Docket # 22-8, page 3), and on the Government website,[2] the Arizona SW HIDTA  begins on the West Coast, in San Diego, extends all along California's southern border, then encompasses much of Arizona, New Mexico, and western coast of the Texas peninsula down to the Gulf of Mexico.  (HIDTA map enlargement, Exhibit 1.)  The purpose of HIDTA is to encourage collaboration between and among state, county, city and federal law enforcement. (Carreon Dec. ¶ 13.)  This activity presumably means that law enforcement officers from Arizona, in particular MCSO HIDTA deputies, will be taking action to assist HIDTA and other law enforcement officers in California, particularly in San Diego County, that appears to be part of the Arizona SW HIDTA.  (Carreon Dec. ¶ 13.)  Because HIDTA activity with MCSO in Maricopa County is the focus of the Third Claim for Relief against the moving defendants, it should be subject of discovery that plaintiffs will be proposing at meet and confer sessions to prepare the Joint Case Management Conference Statement ("JCMS").  (Carreon Dec. ¶ 14.)  Plaintiffs will advise the Court of its

---

[2] https://www.dea.gov/high-intensity-drug-trafficking-areas-hidta.

proposals in the JCMS, and requests leave of Court to conduct discovery into these jurisdictional matters.  (Carreon Dec. ¶ 14.)

**F.  <u>Arizona SW HIDTA is Based in Chandler Arizona, and received Direct Payments From the DEA From the $254 Million HIDTA Appropriation to Encourage Interjurisdictional Collaboration</u>**

Arizona SW HIDTA hosts a training facility that invites law enforcement professionals from around the United States, undoubtedly many from California. (Carreon Dec. ¶ 15.)  The DOJ's latest budget request notes that since 2019, HIDTA funding comes out of the DEA's budget, and DEA directly controls HIDTA:

> **High Intensity Drug Trafficking Areas (HIDTA) Programs: +254.0 million, transferred from the Office of National Drug Control Policy**
> The FY 2019 President's Budget permanently transfers $254 million to DEA from the Office of National Drug Control Policy (ONDCP) for the purpose of facilitating coordination of the HIDTA Program with other drug enforcement assets.  DEA currently participates in and coordinates with the various HIDTAs. Transferring the administration of the program will allow HIDTA resources to be focused on combating drug trafficking in areas where the threat is the greatest and where there is a coordinated law enforcement presence. There are currently 28 HIDTAs located in 49 states, as well as in Puerto Rico, the U.S. Virgin Islands, and the District of Columbia.
>
> U.S. Department of Justice FY 2019 Budget Request (Exhibit 6 to Villanueva's Motion for Preliminary Injunction; Docket # 22-9.)

That level of funding is focused on building up the types of purposeful availments between states and municipal entities.  (Carreon Dec. ¶ 16.)  The DEA's HIDTA website says the money is used for the following purposes:

- Facilitating cooperation among Federal, state, local, and tribal law enforcement agencies to share information and implement coordinated enforcement activities;

- Enhancing law enforcement intelligence sharing among Federal, state, local, and tribal law enforcement agencies;

- Providing reliable law enforcement intelligence to law enforcement agencies to facilitate the design of effective enforcement strategies and operations; and

- Supporting coordinated law enforcement strategies that make the most of available resources to reduce the supply of illegal drugs in designated areas of the United States and in the Nation as a whole.

(https://www.dea.gov/hidta)

Thus, HIDTA funds have presumptively been used to coordinate law enforcement relations between California and Arizona to an even higher degree than was already the case.  As is discussed in greater detail infra, the extent of California/Arizona interstate legal cooperation was already most pronounced in the area of reciprocal law enforcement administration.

### G. <u>Arizona and California Were Engaged in Vast Amounts of Interstate Commerce to Accomplish Law-Enforcement Objectives, Even Before HIDTA Appeared to Fertilize the Relationship</u>

The question for the Court is whether plaintiffs have plead sufficient jurisdictional facts to establish jurisdiction over the moving defendants. The facts stated below have not been alleged, but are part of the framework of state laws of which this Court may properly take judicial notice.  Further, if the Court concludes that these facts must be alleged for plaintiffs' claims to be viable, plaintiffs pray the Court's leave to file a Second Amended Complaint, alleging these facts.

Arizona shares its entire western border with California; accordingly, law enforcement collaboration between the two states has been established by a series of Interstate Compacts to which both states are co-signatories. (Carreon Dec. ¶ 17.)  Each one of these Compacts establishes the basis for a vast network of economic transactions between the states of California and Arizona and their governmental subunits.  (Carreon Dec. ¶ 17.)  The integration of criminal justice systems allows the processing of the criminally accused in either state to be accomplished swiftly and efficiently, and results in very large expenditures for transportation.  (Carreon Dec, ¶ 17.)  The Compacts are evidence of widespread purposeful availment of each state of the laws of the neighboring state, and lead to vast economic expenditures by the State of Arizona and

Maricopa County to pursue collaborative law enforcement activities.  (Carreon Dec. ¶ 17.)  The amounts of these purposeful availments are reasonably believed to be so vast as to establish general jurisdiction over Maricopa County and the Arizona Attorney General. (Carreon Dec. ¶ 17.)

Some of those compacts are exclusive to Arizona and California, indicative of their long recognition of harmonious cross-border legal and economic relations.  Arizona SW HIDTA extends all the way up Arizona's western border with California, an area that is the subject of two exclusive California-Arizona Compacts, (1) the Boundary Compact, adopted  in 1963 by California as Cal. Gov. Code § 175, and (2) the Colorado River Crime Enforcement Compact, codified at A.R.S. § 37-620.11 and Cal. Penal Code § 853.1 and 853.2.  The Compact provides for shared jurisdiction in a twenty-five mile border that allows for prosecution of like crimes in either jurisdiction:

> All courts and officers now or hereafter having and exercising jurisdiction in any county which is now or may hereafter be formed in any part of this state bordering upon the Colorado River, or any lake formed by, or which is a part of, the Colorado River, shall have and exercise jurisdiction in all criminal cases upon those waters concurrently with the courts of and officers of the State of Arizona, so far and to the extent that any of these bodies of water form a common boundary between this state and the State of Arizona. In addition, the officers shall have concurrent jurisdiction with the officers of the State of Arizona on any land mass within 25 air miles of the Colorado River, or within 25 air miles of any lake formed by, or that is a part of, the Colorado River.

Cal. Penal Code § 853.2.

Among the compacts signed by the two states, those regarding law enforcement and the courts appear to preponderate.  Both California and Arizona signed the Interstate Agreement of Detainers, codified in Arizona as ARS Sec. 31- 481, and in California as Cal. Pen. Code Sec. 1389 et seq., that provides uniform standards for transferring prisoners incarcerated in one state (i.e., the sending state) to a different state (i.e., the receiving state) where there are outstanding charges pending against the prisoner. The Drivers License Compact, adopted at A.R.S. § 28-1851 *et seq.*, and Cal. Vehicle Code § 15000 *et  seq.*, standardizes reporting of criminal offenses among all signatory states:

The licensing authority of a party state shall report each conviction of a person from another party state occurring within its jurisdiction to the licensing authority of the home state of the licensee. Such report shall clearly identify the person convicted, describe the violation, specifying the section of the statute, code or ordinance violated, identify the court in which action was taken, indicate whether a plea of guilty or not guilty was entered, or the conviction was a result of the forfeiture of bail, bond or other security, and shall include any special findings made in connection therewith.

A.R.S. § 28-1852.

The Interstate Corrections Compact codified at A.R.S. §§ 31-1491 - 31-1492 and Cal. Penal Code § 11190 provides in Article II:

The party states, desiring by common action to improve their institutional facilities and provide programs of sufficiently high quality for the confinement, treatment and rehabilitation of various types of offenders, declare that it is the policy of each of the party states to provide such facilities and programs on a basis of co-operation with one another, thereby serving the best interests of such offenders and of society. The purpose of this compact is to provide for the development and execution of such programs of co-operation for the confinement, treatment and rehabilitation of offenders.

Cal. Penal Code § 11190.

## H. NAAVC and Villanueva Allege a Section 1983 Conspiracy in the FASC

Shay is a 22-year veteran of the City of Phoenix drug squad, now detailed to the federally-funded HIDTA Task Force.[3] Arizona SW HIDTA funds collaboration between the DEA, the Arizona AG, and MCSO for purposes of disrupting international narcotics cartels and money laundering operations -- vast criminal enterprises. (Carreon Dec. ¶ 5.) Villanueva had no contact with drug cartels or money laundering, indeed no criminal history whatsoever, which put him outside HIDTA's declared area of expertise and interest.  VOLC was not known by "word on the street."  VOLC kept a very low profile, as Villanueva administered the Ayahuasca sacrament only to trusted individuals whose

---

[3] The Arizona-Southwest area is one of the largest out of the 28 HIDTA areas so designated by the Office of National Drug Control Policy, that funds operations, equipment, and training for local law enforcement.

faith was confirmed.  VOLC and Villanueva had no contacts with local law enforcement. In law enforcement, only the DEA knew of his VOLC ministry, due to his NAAVC Board membership.  (Carreon Dec. ¶ 6.)  Given that Shay is an expert narcotics officer with a specialty in disrupting large cartel-funded manufacturing facilities,[4] Shay would have no investigative interest in a small Ayahuasca church.  (Carreon Dec. ¶ 7.)

Given all the indicia of a conspiracy between DEA and Maricopa County, and/or of the DEA's simple commandeering of HIDTA as its catspaw, it was necessary for NAAVC to protect one of its chief witnesses, Villanueva, from witness tampering by the Government, in violation of 18 U.S.C. § 1512(a)(2)(A).  (Carreon Dec. ¶ 11.)  For if the retaliatory purpose of the HIDTA May 19th raid is assumed, as the Court must at this stage of the proceedings, then DEA intent to affect Villanueva's testimony is ineluctably deduced from its occurrence.  Accordingly, NAAVC and Villanueva alleged that they have been damaged by the DEA's actions, through its HIDTA catspaw, just as the DEA directly injured two other visionary churches that became so insistent in their demands for CSA exemptions under RFRA, that the DEA executed search warrants on them. (FASC ¶¶ 77 – 78.)  They further sought protection via Preliminary Injunction from further incursions on their Rights to Petition for Redress of Grievances and engage in Free Exercise.  (Motions for Preliminary Injunction of NAAVC and Villanueva, Docket # 22; Stanley's Motion for Preliminary Injunction, Docket # 33.)

Some of the key allegations of the FASC regarding Maricopa County and  Shay are quoted in full below:

> 194.     MCSO detective Shay was prompted to initiate enforcement action against Villanueva by agents of the DEA with whom he had contact through HIDTA, or through some other agency.  Shay agreed to proceed with the DEA's suggestion or request, intending thereby to further the conspiracy against Villanueva.

> 195.     Pursuant to the conspiracy formed at the DEA's instigation, and using HIDTA as their meeting ground and funding source, the

---

[4] www.ecsforall.org/detective-matthew-shay.html

Arizona Attorney General, the State of Arizona, Maricopa County, and Shay, initiated an investigation of Villanueva to further the purposes of the conspiracy. The first objective of the conspiracy was to attack Villanueva's person and his Fourth Amendment rights by conducting a retaliatory search and seizure based on a warrant issued based on a bad faith affidavit. The retaliatory search and seizure was intended to, and did injure, Villanueva's rights of Free Exercise, Free Expression, his Right to Petition the Government for Redress of Grievances, his right to not be deprived of his property without due process of law, and his right to have counsel present during custodial interrogation. The ultimate purpose of all of these constitutional invasions of Villanueva's rights was to injure NAAVC's position in this litigation by extrajudicial means.

196.    The DEA, the State of Arizona, the Arizona Attorney General, Maricopa County, MCSO, and Shay, were all acting under color of law, and consciously indifferent to Villanueva's civil rights, when they performed acts in furtherance of the conspiracy. The conspiracy that arose between federal, state, and county law enforcement, allowed the DEA to attack NAAVC's Board using state agents.

197.    Employees of defendant the State of Arizona, including but not limited to one or more attorneys in the office of the Arizona Attorney General, instead of discouraging the unlawful collaboration, aided in the formation and operation of the conspiracy, providing legal advice, and financial investigative expertise, to enable, authorize, and execute unlawful searches and seizures, notwithstanding their knowledge that Villanueva's sacramental use of Ayahuasca was protected Free Exercise.

198.    MCSO personnel have extensive experience in acting deceptively, and as previously alleged, were for many years trained in how to be consciously indifferent to the constitutional rights of persons falling under their law enforcement jurisdiction. Law enforcement agents at both federal and state agencies share information useful in violating the civil rights of investigative subjects like Villanueva through official and unofficial communications systems. Shay's policing practices have developed within MCSO's culture of disrespect for the constitutional rights of citizens. MCSO, DEA, DHS, and CBP personnel utilize social media websites, including Facebook, to share information, and postings on Facebook, or in other social media, may have been used by the defendants to initiate, form, or implement the goals of the conspiracy.

199.    The attack on Villanueva's civil rights took place in the early morning hours of May 17, 2020. Accompanied by a large number of heavily armed deputies who announced themselves by pounding on the

front door and threatening to bring it down if it were not opened immediately, Shay delivered a search warrant issued by a Maricopa County Justice of the Peace, and had his deputies place Villanueva in handcuffs as he stood in his underwear.  Shay indulged in an extreme and unnecessary show of force to serve a warrant on a fifty-nine year-old religious man, a retired Navy non-commissioned officer, at his church-residence.  Villanueva had no weapons, no criminal record, and an announced history of conducting visionary church ceremonies.

200.     Shay's armed raid accomplished the following tactical goals: (1) subjecting Villanueva to the fearful and humiliating experience of being arrested in his own home by armed men, *i.e.*, inspiring him with "shock and awe," (2) seizing the Vine of Light Church's Ayahuasca sacrament, thus interrupting the entire congregation's Free Exercise, silencing its Free Religious Expression, and disrupting Villanueva's ministry of sharing Ayahuasca communion, (3) disrupting Villanueva's lawful business of growing cannabis for medical marijuana users and medicinal hemp by destroying the crop and seizing lawfully-grown medicinal plants, (4) seizing mobile telephones and copying their media, (5) interrogating Villanueva while handcuffed in his underwear, (6) engaging in *ex parte* contact with a represented party in litigation, and circumventing the discovery process in this action by fishing for evidence via search warrant for use in this litigation, (7) attacking Villanueva's resolve to remain steadfast in NAAVC's pursuit of its rights of Free Exercise, (8) injuring Villanueva financially by seizing his property and causing him to default on his caregiver-duties to grow medical marijuana for specified patients,  (9) injuring Villanueva financially by imposing on him the cost of engaging skilled criminal defense counsel, and (10) chilling Villanueva's Free Exercise, Free Expression, and Rights to Petition by establishing the predicates for his criminal prosecution.

201.     The fact that Villanueva has a Hispanic surname, and the fact that Ayahuasca originates from Latin American indigenous culture, gave rise to unconstitutional bias that the conspirators showed in making Villanueva the target of their attack on his civil rights.

202.     Shay and agents from the Arizona Attorney General's office violated Villanueva's Fourth Amendment rights by secretly obtaining financial records from PayPal and other sources, because they knew they were investigating the activities of the Vine of Light Church, and their investigation showed that Vine of Light Church was engaged in lawful Free Exercise and Free Expression activities, and accordingly, funds derived from those activities were not the proceeds of criminal conduct, and should not have been demanded and obtained from third party financial services providers without Villanueva's consent or knowledge.

203.     The conspiracy to violate Villanueva's civil rights was furthered by Shay's fabrication of a false narrative of criminal conduct in violation of the Fourteenth Amendment that protects persons from being criminally accused with false evidence. The warrant to search Villanueva's home and the Vine of Light Church was unconstitutionally obtained with an affidavit that Shay submitted in bad faith, that concealed material exculpatory facts from the issuing magistrate, misrepresented true facts to conceal their exculpatory aspect, and created the materially false impression that Villanueva's home was a run-of-the-mill Phoenix drug packaging house, not a church.

204.     During his custodial interrogation of Villanueva, Shay revealed that the matter "came across his desk in February." Shay made it clear he knew Villanueva was running a church called the Vine of Light, and expressed wide knowledge of the church's website, expressing admiration of the beauty of the travel photos from Vine of Light Church trips to Peru. Shay told Villanueva he was familiar with the *O Centro* decision.

205.     Shay said he did not know whether charges would be filed against him. By this statement, Shay admitted that probable cause to believe a crime had been committed at the Vine of Light church by Villanueva had been lacking all along, and the search had been a pretext for another purpose altogether – chilling Villanueva's Free Exercise, Free Expression, and the Right to Petition this Court for redress of grievances.

**3.     UNDER C.C.P. § 410.10, THE COMMISSION OF ONE CONSTITUTIONAL TORT DIRECTED AT AFFECTING THE TESTIMONY OF ONE WITNESS IN THIS ACTION WILL ESTABLISH JURISDICTION OVER THE TORTFEASORS**

Code of Civil Procedure section 410.10 states: "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Hudnall v. Payne*, No. 13-cv-04728-WHO, 2014 U.S. Dist. LEXIS 15016, at *8-9 (N.D. Cal. Feb. 6, 2014), *quoting Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-801 (9th Cir. 2004). California's long arm jurisdiction statute asserts jurisdiction over state acts directed at causing injury in California.

[D]oing [an] act outside the state with the intention of causing effects in the state will give the state judicial jurisdiction over the actor, or the one

who caused the act to be done, as to causes of action arising from these effects. So one who intentionally shoots a bullet into a state is as subject to the judicial jurisdiction of the state as to causes of action arising from the effects of the shot as if he had actually fired the bullet in the state." (1) Thus, the rule we apply is that where the effect giving rise to the tort is intentionally caused, jurisdiction is justified unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable.

*Schlussel v. Schlussel*, 141 Cal. App. 3d 194, 197, 190 Cal. Rptr. 95, 96 (1983), *citing Hanson v. Denckla,*357 U.S. 235 (1958) and  *McGee v. International Life Ins. Co.*355 U.S. 220 (1957).

Plaintiffs have alleged that the search of Villanueva's home by HIDTA deputies from Maricopa County and at least one HIDTA investigator from the Arizona Attorney General's Office acted for the purpose and with the intent of terrifying Villanueva, a witness and, through his status as an NAAVC Board Member, a litigant in this case. Accordingly, a *prima facie* case of jurisdiction over the alleged tortfeasors is made.

The prison litigant in the *Boyd* case cited by moving parties provides an excellent example of a well-plead allegation of a tort committed outside the state to cause tortious effects in the state:

> Boyd clearly alleged that Ward constructed a police report based on information received from New Jersey prosecutors, that Ward put together and presented the photo array used by the victim of Crime #1 to identify Boyd, that Ward traveled to New Jersey to procure from Boyd a DNA sample, that Ward testified before the Arizona grand jury that produced the indictment, that Ward prepared an affidavit in support of Boyd's extradition from New Jersey to Arizona, and that Ward entered into a conspiratorial agreement to provide the New Jersey extradition court with false or misleading information.
> *Boyd v. Arizona*, 469 F. App'x 92, 99 (3d Cir. 2012)

This allegation is quite similar to the allegations of the FASC against Shay and Maricopa County, quoted *supra*.  Though the *Boyd* plaintiff's language is parsimonious, it alleges the same thing as NAAVC and Villanueva – that a detective contrived to cause legal injury to them in another state by unlawful means for a retaliatory purpose. Similarly, acting at the behest, direction, or actual order of the DEA, Shay and the

HIDTA MCSO team injured NAAVC and Villanueva in this judicial proceeding by terrifying Board member Villanueva with an illegal search conducted pursuant to a warrant obtained with a bad faith affidavit.  (FASC, Docket # 12, ¶ 200.)

## 4. PLAINTIFFS HAVE ALLEGED SUFFICIENT JURISDICTIONAL FACTS BY CHARGING THE MOVING DEFENDANTS WITH COMMITTING A TORTIOUS ACT IN ARIZONA DIRECTED AT CALIFORNIA

> [W]hen a district court acts on a defendant's motion to dismiss without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss. That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant.
> *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir. 2001)

As this Court has observed, the defendants' "actions must be 'expressly aimed' at the forum state based upon an analysis of "the totality of the circumstances surrounding the events." *Hudnall v. Payne*, *supra*, at *11.  A totality of the circumstances analysis of all the facts alleged in the FASC supports the conclusion that the moving defendants committed the tort against Villanueva to influence this action, and subjects them to jurisdiction. As noted previously, the moving defendants have not denied the operative facts of the constitutional tort alleged against them; accordingly, those facts, deemed true, establish jurisdiction.  Consider: if  private persons had done to Villanueva what MCSO HIDTA deputies and Arizona AG personnel did to him, with the intent, as alleged in the FASC, of interfering with his participation as a witness in a case pending anywhere in the country, they would be haled into the affected court on charges of witness tampering. Nor would it surprise any individual so charged to discover that they were subject to jurisdiction in the court whose course of justice they attempted to pervert.  Accordingly, there is nothing unreasonable about exercising personal jurisdiction over these defendants, who by their silence on this motion, admit the central tort that gives rise to jurisdiction.

## 5. DISCOVERY INTO MARICOPA COUNTY AND SHAY'S JURISDICTIONAL CONTACTS WITH CALIFORNIA SHOULD BE PERMITTED

In the Ninth Circuit, "discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."

*Hudnall v. Payne*, *supra*, at *19, *quoting, Laub v. U.S. Dep't of the Interior,* 342 F.3d 1080, 1093 (9th Cir. 2003) (further citations omitted).

The discovery of the facts surrounded the central constitutional tort lying at the heart of the claims against Maricopa County and Shay should proceed with dispatch, because once plaintiffs can prove the tort occurred as alleged, with evidence obtained in discovery from the defendants themselves, then personal jurisdiction will be established beyond doubt.  Jurisdictional discovery should be allowed in this case, because it will not be redundant of the merits, and will not distract from trial preparation.  Accordingly, should the Court not deny the defendants' motion outright, plaintiffs request the Court to defer its decision until after plaintiffs have taken jurisdictional discovery of Shay, Maricopa County, and the Arizona defendants, and can submit the results of that discovery to Court as admissible evidence.

## 6. PLAINTIFFS HAVE MOVED SEPARATELY FOR RELIEF FROM THE ADMITTED BUT HARMLESS ERROR OF FAILING TO OBTAIN LEAVE OF COURT TO FILE THE FASC

The Ninth Circuit has stressed that, in considering motions to amend, district courts must bear in mind the underlying purpose of Rule 15, which is to "facilitate decisions on the merits, rather than on the pleadings or technicalities."

*United States Chess Fedn., Inc. v. Polgar*, 2009 U.S. Dist. LEXIS 31606, *3, 2009 WL 981257 (N.D. Cal. April 13, 2009) , *quoting Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2003).

Plaintiff's counsel has admitted excusable neglect when acting under pressing circumstances in failing to move the Court for leave to file the FASC.  (Docket # 34.) Plaintiffs submit that the error should be deemed harmless because if plaintiffs had not named moving defendants in the FASC, Villanueva and NAAVC would have filed a new

complaint alleging the Section 1983 claim, and submitted a Notice of Related Case and a Motion to Consolidate the Action with this case.  (Carreon Dec. ¶ 19.)  The reason for this approach would simply be that waiting 35 days for the Court to rule on a motion to file a supplemental complaint would not have accorded with the urgency of the situation. (Carreon Dec.  ¶ 19.)  Thus, the defendants would still have been subjected to a lawsuit, and thus, they have not suffered prejudice.  (Carreon Dec. ¶ 19.)

### 7.   VENUE IS PROPER, ESPECIALLY BECAUSE MOVING DEFENDANTS' ATTACKS ON CALIFORNIA LITIGANTS FORSEEABLY PROMPTED CLAIMS AGAINST THEM IN THIS COURT

We now consider the venue factors argued by moving defendants.  They do not, collectively, or individually, establish grounds to change venue.

*First*, the moving defendants directed their acts towards causing injury to a litigant and witness in this California forum – NAAVC and Villanueva.  The defendants have filed no denials; accordingly, those facts are deemed true on this motion.

*Second*, moving defendants will not be substantially burdened by the distance from their residence by any of the proceedings in this matter, unless and until a trial date arrives, and even then, in this COVID-19 era, teleconferenced deposition recordings and transcripts may well supplant the need to appear in the witness stand.  Thus, there is no burden on defendants but a conjectural one that is unsupported by evidence, and cannot provide the basis for a venue change.

*Third*, there is no conflict with the sovereignty of the moving defendants' state, either, because the law of Section 1983 is federal, and Villanueva's state claim under the Arizona Free Exercise of Religion Act ("FERA") is Arizona law that this Court has discretion to apply, as briefly discussed *infra*.

*Fourth*, California has an interest in adjudicating the dispute.  NAAVC has incorporated and has its place of business in California. (Carreon Dec. ¶ 20.)  Many churches for which NAAVC asserts associational standing are located in this venue.

(Carreon Dec. ¶ 20.)  Many visionary church leaders travel to minister to the needs of small groups that depend on what might be considered "itinerant preachers," and a good number of those small groups are in California.  (Carreon Dec. ¶ 20.)  NAAVC had its Sacramental Ayahuasca seized in California.  (FASC, Docket # 12, ¶ 135).

This Court is the most efficient judicial forum for resolving this dispute.  Let us consider a similar scenario -- the Court is conducting a trial, and one of the parties comes forward, claiming inability to produce a witness due to tampering by the opposing party that took place in Arizona.  Does this Court wait for Arizona courts to deal with the tampering?  No.  It has the U.S. Marshals bring the tampering individual, and the tampered witness before the Court.  And if charges were to be filed under 18 U.S.C. § 1512, they would most certainly be filed in this Court.  No different result should obtain here, simply because the defendants were acting under color of law, with all the millions of dollars and intelligence resources of the federal HIDTA program at their disposal.  Indeed, as the ability to commit wrongs increases, the need for the Court to assert lawful jurisdiction over the wrongdoers also increases.  In the light of these concerns, venue issues are less than secondary.

Arizona is not a satisfactory alternative forum for NAAVC, a California corporation, that has been injured in this litigation by the acts of moving defendants.  (Carreon Dec. ¶ 21.)  The Arizona forum has already been surreptitiously used by the DEA to obtain a state court warrant that it would likely not have been able to obtain in Federal District Court, given the current state of the law of visionary religion.  (Carreon Dec. ¶ 22.)

## 8.   THIS COURT HAS SUPPLEMENTAL DISCRETIONARY JURISDICTION OVER VILLANUEVA'S ARIZONA FREE EXERCISE OF RELIGION CLAIM

Plaintiffs alleged, in the first paragraph of the FSAC, as follows:

This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over state law claims and defendants named therein arising from a common

nucleus of facts as the federal claims over which this Court has original jurisdiction.

(FASC ¶ 1, Docket # 12.)

The operation of Section 1367 was explained by Judge Patel:

Section 1367 [provided] a statutory grant of pendent or, thanks to section 1367 what is now known as, supplemental jurisdiction. Section 1367 (a) provides as follows:

…in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. *Such supplemental jurisdiction shall include claims that involve joinder or intervention of additional parties*. (Emphasis added)

The critical inquiry is whether "the federal and state law claims 'derive from a common nucleus of operative fact' and comprise 'but one constitutional case'" .
*United States Chess Fedn., Inc. v. Polgar*, 2009 U.S. Dist. LEXIS 31606, *6-7, 2009 WL 981257 (N.D. Cal. April 13, 2009), *quoting Raygor v. Regents of the University of Minnesota*, 534 U.S. 533, 539 (2002), *quoting United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966).

Moving defendants concede this standard, but argue that "Plaintiffs' claims against Maricopa County Defendants are built around a completely different 'wrong' and set of operative facts …." This is a desperate argument. The FASC alleges that the DEA used the HIDTA MCSO deputies, including Shay, as its catspaw to visit unconstitutional retaliation upon NAAVC and Villanueva to affect the outcome of this action. The acts of Maricopa County and Shay show that, with full awareness of the wrongfulness of their conduct, they became ensnared in a retaliatory scheme that, like taking HIDTA money, wearing HIDTA t-shirts, and carrying out DEA commands while HIDTA-funded and attired, has consequences. In this case, the consequence is answering to this Court for the misconduct committed in Arizona with the intent to affect this Court's proceedings.

/ / /

## 9.   CONCLUSION

Plaintiffs respectfully request that the Court deny the motion to dismiss of defendants Maricopa County and Matthew Shay, and allow discovery into jurisdictional facts.

Dated:  August 12, 2020            CHARLES CARREON, ESQ.


By: /s/Charles Carreon
CHARLES CARREON (127139)
Attorney for Plaintiffs
Arizona Yagé Assembly.
North American Association of Visionary Churches,
Clay Villanueva