CHARLES CARREON (CSB # 127139)
3241 E. Blacklidge Drive
Tucson, Arizona 85716
Tel: 628-227-4059
Email: chascarreon@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly,
North American Association of Visionary Churches, and
Clay Villanueva

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIZONA YAGÉ ASSEMBLY, NORTH AMERICAN ASSOCIATION OF VISIONARY CHURCHES, and CLAY VILLANUEVA,<br><br>Plaintiffs,<br><br>vs.<br><br>WILLIAM BARR, Attorney General of the United States; UTTAM DHILLON, Acting Administrator of the U.S. Drug Enforcement Administration; CHAD F. WOLF, Acting Secretary of the Dept. of Homeland Security; MARK A. MORGAN, Acting Commissioner of U.S. Customs and Border Protection; THOMAS PREVOZNIK, Deputy Assistant Administrator of the DEA Dept. of Diversion Control, in his personal capacity; the UNITED STATES OF AMERICA; the STATE OF ARIZONA; MARK BRNOVICH, Arizona Attorney General; MARICOPA COUNTY, a political subdivision of the State of Arizona; and, MATTHEW SHAY,<br><br>Defendants. | Case No.: 3:20-CV-03098-WHO<br><br>**AYA'S REPLY BRIEF IN SUPPORT OF AYA'S MOTION FOR PRELIMINARY INJUNCTION, RESPONDING TO THE OPPOSITION OF ALL FEDERAL AGENCY DEFENDANTS**<br><br>Date: September 9, 2020<br>Time: 2:00 P.M.<br>Courtroom: 2 (17th floor) |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. SUMMARY OF ARGUMENT

The Motion for Preliminary Injunction (Docket # 33, "AYA's Motion") of Arizona Yagé Assembly ("AYA") asks this Court to find that it is likely to prevail on its First Claim for Relief under the Religious Freedom Restoration Act ("RFRA"), that the balance of the hardships tips sharply in AYA's favor, that AYA will suffer irreparable harm in the absence of an injunction, and that public interest supports the issuance of an injunction that protects the First Amendment right of Free Exercise of AYA and its congregation, and the safety, privacy, and Free Exercise of its minister, Winfield Scott Stanley III ("Stanley").  The Drug Enforcement Agency ("DEA") and other federal agencies have filed a fact-free opposition, lined with legal arguments that are largely inapposite, and all of which lack weight, presented as they are, in a factual void.

## II. FACTS

The facts adduced in support of AYA's Motion will establish at trial that (1) AYA's practice of Ayahuasca communion is a lawful form of Free Exercise; (2) the DEA's absolute prohibition on AYA's use of Ayahuasca[1] substantially burdens AYA's Free Exercise rights; (3) the DEA's absolute prohibition on AYA's use of Ayahuasca is not the least restrictive means of advancing the Government's compelling interest in preventing diversion of controlled substances into the illicit market; wherefore, (4) AYA is entitled to a preliminary injunction restraining the DEA from interfering with its right to use Ayahuasca as its communion sacrament in ceremony as religious Free Exercise.

Stanley is a sincere religious leader who began practicing Ayahuasca communion in California in 2009 (Docket # 33-1; Stanley Dec. ¶ 2), and studied Ayahuasca communion for several years with Eladio Melendez Garcia in a small community near the Ukayali River in Peru.  (Reply Declaration of Winfield Scott Stanley III, ¶ 15,

---

[1] "Use of Ayahuasca" is substituted throughout for the lengthy formulation, "importation, manufacturing, distribution or possession of Ayahuasca."

"Stanley Reply Dec.")  Stanley began offering Ayahuasca communion to other practitioners in ceremony in around 2014, and for the past six years has dedicated himself to leading hundreds of ceremonies under the aegis of AYA, incorporated in California, Arizona, and Oregon (Docket # 33-1, Stanley Dec. ¶ 3).  AYA's California branch has 839 California residents who have participated in AYA ceremonies. (Stanley Reply Dec. ¶ 4.)  Stanley estimates he's driven 120,000 miles in California administering Ayahuasca communion to AYA congregants. (Stanley Reply Dec. ¶ 7.)  Stanley has administered Ayahuasca communion 120 times in California, 65 ceremonies in Northern California, and 55 in Southern California. (Stanley Reply Dec. ¶ 7.)  This RFRA lawsuit was filed by the California AYA corporation for the benefit of AYA congregants residing in California.  (Stanley Reply Dec. ¶¶ 2 – 3.)

AYA has a careful screening program that uses an online questionnaire to screen out people under the age of 18 (Stanley Reply Dec. ¶ 8) and people with health vulnerabilities (Exhibit 4, Docket # 33-6).  All prospective congregants are required to disclose their "spiritual interests in taking part in ceremony," and to "describe [their] current health and spiritual practice."  (Stanley Reply Dec. ¶ 10.)  Ceremonial candidates who are accepted receive a Confirmation Letter that instructs them in restrictions on diet and sexual conduct that they are to adhere to in advance of ceremony. (Exhibit 5, Docket # 33-7.)

AYA's Ayahuasca, and its manner of conducting Ayahuasca communion ceremonies, is standardized in a booklet of Ceremonial Instructions. (Exhibit 2, Docket # 33-40.)  AYA has a Code of Ethics that governs the conduct of facilitators and congregants during ceremony, forbids sexual harassment and other negative behavior, and exhorts congregants to "engage in an ethically minded community consistent with the spirit of Divine love and forgiveness." (Docket # 33-5.)

The fruits of AYA's ministry are a testimonial to the efficacy of Ayahuasca communion as a form of legitimate Free Exercise.  Congregants responding to a survey

administered by AYA expressed what can only be called deep religious sentiments when describing their experience of AYA Ayahuasca communion.

> "I was in search of spiritual growth and didn't feel or find it with the Catholic Church."
>
> "I am not a Christian but I believe in the Christ-like vibratory state that speaks to me through Ayahuasca: Love, Kindness, Compassion and Forgiveness."
>
> "I feel that ayahuasca brings us closer to what other religions would consider to be "God". It is an extremely religious and spiritual experience for me."
>
> "Because it connects you with divine love."
>
> "Oneness with the creator."
>
> "It has opened my eyes to the God of the universe and allowed me to connect."
>
> (Exhibit 6, Survey Summary, Docket 33-8, pages 4 – 5.)

### III.   ARGUMENT

#### A.   AYA WAS NOT REQUIRED TO SUBMIT A REQUEST FOR EXEMPTION

> [W]e are unpersuaded by the Government's assertion that Plaintiffs' request for prospective relief is unripe because Plaintiffs did not request an exception to the CSA from the DEA.
>
> *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012)

#### B.   RFRA HAS NO EXHAUSTION REQUIREMENT

> We decline … to read an exhaustion requirement into RFRA where the statute contains no such condition, see 42 U.S.C. §§ 2000bb-2000bb-4, and the Supreme Court has … recognized that RFRA "plainly contemplates that courts would recognize exceptions [to the CSA] — that is how the law works."
>
> *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012), *quoting Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 434 (2006).

*Cassirer v. Kingdom of Spain*, cited by the Government, similarly holds that since the statute granting the private right of action imposes no exhaustion requirement, the Court will not look to engineer a method to allow it.  From the opinion:

> [Defendant] objects to the district court's [inferring] the absence of [an exhaustion requirement] in § 1605(a)(3) …. We do not … we rely on the plain language of § 1605(a)(3) which contains no exhaustion requirement.
>
> Cassirer v. Kingdom of Spain, 616 F.3d 1019, 1034 (9th Cir. 2010).
>
> For this reason, we do not consider whether exhaustion may apply to the claims asserted in this case.
> Cassirer v. Kingdom of Spain, 616 F.3d at 1037 (italics in original).

If prudential exhaustion analysis were applied, this Court applied the *Puga* factors, recently in *Hilario Pankim v. Barr*, 20-CV-02941-JSC, 2020 U.S. Dist. LEXIS 88084, 2020 WL 2542022 (N.D. Cal. May 19, 2020), where the Court stated:

> "[C]ourts may require prudential exhaustion if (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review."
>
> *Hilario Pankim, supra, quoting Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007) (internal quotation marks and citation omitted).

This Court cannot apply the *Puga* factors in a factual void, however. Considering the first factor, the DEA's silence about what type of "agency consideration" it considers "necessary to generate a proper record" precludes serious consideration of its proposal. The second factor – deterring bypass of an administrative scheme – is similarly impossible to discuss when the DEA has not even described its administrative scheme. Finally, the third factor – encouraging agency self-correction – is one for which all of the evidence in the record runs the other way. As long as the DEA is allowed to handle religious exemptions from the CSA its own way, it ends up as it has in the past, fighting tooth and nail against the religious exemption claimant until at last an injunction is rendered against it. Finally, "even if the three *Puga* factors weigh in favor of prudential exhaustion, a court may waive the prudential exhaustion requirement if administrative remedies are inadequate or not efficacious, pursuit of the administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Sahota v. Allen*, No. 20-cv-03180-WHO, 2020 U.S. Dist. LEXIS 98421, at *11-12 (N.D. Cal. June 4, 2020), *quoting Hernandez v. Sessions*, 872 F.3d 976, 988 (9th

Cir. 2017). "Exhaustion may be waived when irreparable injury would result." *Alfaro v. Sessions*, No. 3:18-cv-02959-WHO, 2018 U.S. Dist. LEXIS 93820, at *5 (N.D. Cal. June 4, 2018)(waiving prudential exhaustion requirement), *quoting Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004). Since AYA would suffer irreparable harm in the absence of injunctive relief, prudential exhaustion would be denied under that circumstance as well. Accordingly, there are no grounds for a finding of failure to exhaust administrative remedies.

### C. RFRA WAIVES SOVEREIGN IMMUNITY TO PERMIT INJUNCTIVE RELIEF

> RFRA waives immunity from some forms of relief. Its judicial relief provision states: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). This provision, however, does not define "relief," so the issue is whether the waiver extends to relief in the form of money damages.

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 840 (9th Cir. 2012)(finding damages claims not waived by RFRA).

### D. AYA HAS STANDING TO ASSERT A RFRA CLAIM BASED ON ITS DECLARED INTENT TO PRACTICE AYAHUASCA COMMUNION AS FREE EXERCISE

> According to Plaintiffs, they have used marijuana in violation of the CSA countless times, and plan to continue to do so. We have explained that the "concrete plan" element of the genuine threat inquiry is satisfied where plaintiffs had "more than a 'concrete plan'" to violate the laws at issue because they "actually did violate them on a number of occasions."

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 836 (9th Cir. 2012), *quoting Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006)

### E. AYA HAS STANDING TO ASSERT A RFRA CLAIM BASED ON PROPERTY SEIZURE

> When the Government seized Plaintiffs' marijuana pursuant to the CSA, a definite and concrete dispute regarding the lawfulness of that seizure came into existence.

*Oklevueha Native Am. Churc*, 676 F.3d at 836.

> Because this is not an abstract disagreement but rather involves the application of well-developed law (including the First Amendment right to religious freedom, RFRA and the CSA) to an existing case and controversy (the seizure of Plaintiffs' marijuana), we conclude Plaintiffs' claims are fit for review.

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d at 838.

> [W]hen challenging the applicability of a criminal statute, arrest is not necessarily a prerequisite for an individual to bring a pre-enforcement claim. *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 313 F. Supp. 3d 1225, 1232 n.6 (S.D. Cal. 2018), *citing Oklevueha, supra*, 676 F.3d at 835.

F. **THIS MOTION WAS FILED AS PROMPTLY AS POSSIBLE, GIVEN THE DEMANDS OF PREPARING FOR FEDERAL LITIGATION WITH THE UNITED STATES**

The DEA's contention that AYA's Motion (Docket # 33) was filed after long delay is incorrect. The Carreon Reply Declaration submitted herewith establishes that the decision to refrain from submitting a Petition for Religious Exemption ("PRE") to the DEA, and to file this lawsuit instead, was made on April 2, 2019, not in "late 2017," as Stanley had mistakenly noted. (Carreon Reply Dec. ¶ 7; Stanley Reply Dec. ¶ 17.) During 2018 and 2019, AYA's counsel's personal obligations took precedence over his legal duties while he cared for his wife during treatment for cancer that involved multiple chemotherapy treatments, surgeries, and radiation, that imposed many time consuming caregiver duties that he was obliged to perform. (Carreon Reply Dec. ¶¶ 9 – 10.) Mr. Carreon further explains all of the duties that he was performing for AYA and NAAVC during this time period, with quotations and date citations to his billing records, that confirm the accuracy of his averments. Initially, AYA had not intended to file a Motion for Preliminary Injunction; however, after the arrest of Villanueva and the search of his home on May 19, 2020, when AYA's counsel was unable to obtain assurances from the DEA's attorney that a raid on AYA or Stanley would not follow, he decided that filing AYA's Motion was necessary, and proceeded to do so after receiving Stanley's authorization. (Carreon Reply Dec. ¶¶ 13 - 19.) Accordingly, AYA's Motion was filed as promptly as possible. (Carreon Reply Dec. ¶ 20.) No party to this litigation has been prejudiced in any way that would have been avoided if AYA's Motion had been filed sooner. (Carreon Reply Dec. ¶ 21.)

G. **VENUE IS PROPER UNDER 28 U.S.C. § 1391(e)(1)(c)**

The AYA corporation that is suing the DEA is a California corporation that serves the California congregation of AYA, numbering at present approximately 839 members.

(Stanley Reply Dec. ¶ 4.) Stanley's travels in California total approximately 120,000 miles ministering to the AYA California congregation. He has performed 120 California ceremonies in the last five years, 65 in Northern California, making him a regular presence in the State. The "muscle center" of AYA in California is in all of the ceremonial locations where the ceremonies have been conducted, and in the homes of all the congregants who reside in California, and rely upon its laws and social structure for the support of their lives, and to protect their rights of Free Exercise. There could be no other appropriate venue for a California religious corporation with a California congregation seeking a RFRA exemption from the DEA than in the current venue.

### H. SINCERITY OF RELIGIOUS INTENT IS FOR THIS COURT ALONE TO JUDGE

Under the RFRA statute, this Court has the authority and the duty to determine the sincerity of AYA's religious claim of Free Exercise. The DEA cannot take this job over, because as *Cantwell v. Connecticut* declared:

> [T]o condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution.
>
> *Cantwell v. Connecticut*, 310 U.S. 296, 307 (1940) (overturning statute conditioning religious or charitable solicitation on a permit from a public welfare council to "determine whether such cause is a religious one").

/ / /

This weighty judgment is not entrusted to any other entity in our system of government, as the matter under examination is that deepest part of an individual – their beliefs. In *Welsh v. United States*, the Supreme Court considered the question of whether those who express their deepest moral conviction in non-theistic language can qualify as conscientious objectors.

> There was never any question about the sincerity and depth of Seeger's convictions as a conscientious objector, and the same is true of Welsh. In this regard the Court of Appeals noted, "the government concedes that [Welsh's] beliefs are held with the strength of more traditional religious convictions." [Citation.] But in both cases the Selective Service System

>concluded that the beliefs of these men were in some sense insufficiently "religious" to qualify them for conscientious objector exemptions under the terms of § 6 (j). Seeger's conscientious objector claim was denied "solely because it was not based upon a 'belief in a relation to a Supreme Being' as required by § 6 (j) of the Act," [citation], while Welsh was denied the exemption because his Appeal Board and the Department of Justice hearing officer "could find no religious basis for the registrant's beliefs, opinions and convictions."
>
>*Welsh v. United States*, 398 U.S. 333, 337-338 (1970).

The purpose of the sincerity test for First Amendment Free Exercise is simply to prevent the unscrupulous from taking advantage of First Amendment protections to indulge in behavior that, but for the Free Exercise exemption, would be unlawful.  In Welsh, the Supreme Court went beyond doctrinal formulations and socially-approved beliefs to ascertain what lay within the plaintiff's conscience, and is therefore entitled to deference before the law:

>Welsh elaborated his beliefs in later communications with Selective Service officials. On the basis of these beliefs and the conclusion of the Court of Appeals that he held them "with the strength of more traditional religious convictions," [citation], we think Welsh was clearly entitled to a conscientious objector exemption. Section 6 (j) requires no more. That section exempts from military service all those whose consciences, spurred by deeply held moral, ethical, or religious beliefs, would give them no rest or peace if they allowed themselves to become a part of an instrument of war.
>
>*Welsh v. United States*, 398 U.S. 333, 337-338 (1970).

Here the Supreme Court showed how the law must gradually outgrow cultural biases in favor of familiar doctrinal formulations, and mature into a genuinely human appreciation of what motivates religious sentiment and the impulse to Free Exercise.  The DEA has shown a structural unwillingness to make such a move, and yet, this is not in any way a problem.  The RFRA statute has given this Court the power to apply the law of Free Exercise in such a way as to give full effect to the First Amendment's unbiased protections of all religious beliefs and practices by varying the requirements of general law in order to find the least restrictive means of advancing governmental interests, while eliminating substantial burdens on Free Exercise.

I. **CONTINUING FREE EXERCISE ACTIVITY WHILE UNDER THE RISK OF PROSECUTION PROVIDES EVIDENCE OF SINCERITY**

The DEA appears to imply from its opposition rhetoric that it believes Mr. Stanley and AYA to simply be scofflaws for continuing Free Exercise in the face of the DEA's insistence that Freedom of Religion will begin after the agency grants its legendary, but never glimpsed, "Certificate of Exemption."  The DEA made this argument to Judge Panner in the Daime case, and he rejected it.

> In the UDV litigation, at least at the preliminary injunction hearing, the government conceded that the UDV plaintiffs had [**25] made a prima facie claim under RFRA. Here, however, defendants challenge plaintiffs' sincerity, citing plaintiffs' decision to conduct ceremonies in secret until the Supreme Court ruling in favor of the UDV plaintiffs. Plaintiffs' secrecy does not show a lack of sincerity. Instead, it shows that plaintiffs remained committed to practicing their religion despite the threat of criminal prosecution and loss of professional status.
>
> *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1219 (D. Or. 2009).

The situation with AYA is identical.  Stanley's fortitude in continuing to engage in his ministry is evidence of his sincerity.

J. **THE SAFETY AND EFFICACY OF CEREMONIAL AYAHUASCA USE IS WELL ESTABLISHED**

The Letter Opinion of Dr. Barbosa is a very useful piece of evidence for the Court, because it summarizes virtually all of the extant scientific studies on the efficacy and safety of ceremonial Ayahuasca use.  As he explains, Ayahuasca is "a physically non-toxic psychedelic … subject to the caveat that … dietary restrictions [such as AYA imposes] to avoid tyramine-containing substances should be observed." (Docket # 33-11, Barbosa Letter Op., page 5.)    Ayahuasca does not adversely affect the mental health of ceremonial Ayahuasca users.  (Docket # 33-11, page 8.)  Ayahuasca has no adverse effects on cognitive function.  (Docket # 33-11, page 9.)  "Ayahuasca consumed in a religious context is not being used as a drug of abuse, nor does the religious use of ayahuasca lead to the abuse of other drugs; instead, religious ayahuasca users generally abandon abuse of alcohol after they become members of an ayahuasca church. These data

are backed up by pre-clinical evidence indicating that ayahuasca blocks many abuse-related behavioral effects of drugs of abuse." (Docket # 33-11, page 10.)

### K. THE DEA'S TOTAL BAN ON AYA'S USE OF AYAHUASCA IS NOT THE LEAST RESTRICTIVE MEANS FOR ADVANCING THE GOVERNMENT'S ANTI-DRUG PROGRAM

The DEA's effort to introduce new variations on its "compelling interests" is bootless. The problem isn't that the government's interests aren't compelling enough, and more compelling ones need to be found. Keeping drugs out of the illicit market is as compelling an interest as the DEA will find; however, RFRA requires application of strict scrutiny test to the precise circumstances of *this case*. The Court must answer the question whether, given AYA's characteristics, and Ayahuasca's characteristics, a complete ban is the least restrictive means of accomplishing the goal of combating illicit drugs. The clear answer is "No."

### L. THE DEA'S UNWILLINGNESS TO ADMIT THE RISK OF IRREPARABLE HARM EPITOMIZES THE AGENCY'S DELIBERATE INDIFFERENCE TO THE BURDEN IT IMPOSES ON AYA'S FREE EXERCISE

The DEA claims to see no risk of irreparable harm from the risk of arrest, the danger of prosecution, or even the danger of being infected by COVID 19 while incarcerated. AYA has already emphasized, at length, the nature of the risks to Stanley and AYA, should the DEA's Sword of Damocles choose to suddenly descend. Indeed, the tone of the DEA's opposition is quite nearly menacing in its recitation of the extent of Stanley's Free Exercise activity, implying, without the need to underline the implication, that Stanley is skating on thin ice. The idea that Stanley is safe from DEA investigative activity, or Customs and Border Patrol seizures, or DHS seizures, because he has the courage to continue his ministry, is a *non sequitur*. What the DEA's response discloses is simply its state of mind – deliberate indifference to the injuries it causes to the Free Exercise rights of the religious persons it would seek to regulate.

With respect to the risks of COVID 19 injury, the courts have decided to take the matter far more seriously than the executive branch.  In a recent ruling in a class action filed by detainees seeking release from ICE detention due to COVID 19 risks, the court chastised the agency bluntly:

> The conditions of confinement do not merely threaten detainees; they also threaten facility staff, not to mention the greater community whose health is put at risk by the congregation of large groups in cramped spaces. *** ICE is thus hereby ordered to provide the Court and class counsel with information and records regarding each detainee at the facilities … to enable the Court to implement a system for considering individual bail applications, modeled after a system created and successfully implemented by Judge Young in the District of Massachusetts. In extraordinary cases like this, federal judges have the authority to release detainees on bail while their habeas cases are pending.
>
> *Rivas v. Jennings*, 2020 U.S. Dist. LEXIS 76788, *7-8 (N.D. Cal. April 29, 2020)

In *Rivas*, the Northern District has taken a hands-on approach to correcting the problems in the ICE detention system to protect vulnerable persons who have already been detained.  The DEA suggests that unlawful detention of AYA members or Stanley would cause no prejudice, because they could prove their innocence through the criminal justice system; however, even the criminally accused and alleged violators of immigration laws are entitled to be free from pretrial detention that would endanger their lives.  An injunction in this case, to protect those who have demonstrated that the conduct that puts them at risk of prosecution is in fact constitutionally-protected Free Exercise, would be all the more appropriate.

## IV.   Conclusion

The Court should grant AYA's motion for preliminary injunction.

Dated:  August 26, 2020          CHARLES CARREON, ESQ.

By: /s/Charles Carreon
CHARLES CARREON (127139)
Attorney for Plaintiffs
Arizona Yagé Assembly.
North American Association of Visionary Churches,
Clay Villanueva