JOHN SULLIVAN (CSB#204648) Pro Hac Vice
10857 Kling Street
North Hollywood, California 91602
Tel:818-769-7236 Fax:818-301-2175
Email:Sullivan.John84@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly,
North American Association of Visionary Churches,
Clay Villanueva, and the Vine of Light Church

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Yagé Assembly, North American Association of Visionary Churches, Clay Villanueva, and the Vine of Light Church,<br><br>Plaintiffs,<br><br>vs.<br><br>William Barr, Attorney General of the United States; Timothy J. Shea, Acting Administrator of the U.S. Drug Enforcement Administration; Chad F. Wolf, Acting Secretary of the Dept. of Homeland Security; Mark A. Morgan, Acting Commissioner of U.S. Customs and Border Protection; the United States of America; Maricopa County, Matthew Shay, and Marco Paddy,<br><br>Defendants. | Case No.:20-CV-02373-PHX-ROS<br><br>FOURTH AMENDED COMPLAINT<br><br>1. RELIGIOUS FREEDOM RESTORATION ACT [42 U.S.C. § 2000bb-1(c)]<br>2. REVIEW OF AGENCY ACTION [5 U.S.C § 702]<br>3. VIOLATION OF 42 U.S.C. § 1983 BY UNREASONABLE SEARCH AND SEIZURE<br>4. ARIZONA FREE EXERCISE OF RELIGION ACT [A.R.S. § 41-1493.016.]<br>5. TRESPASS<br>6. BATTERY<br>7. CONVERSION<br>8. NEGLIGENCE<br>9. LOSS OF CONSORTIUM<br>10. DECLARATORY RELIEF [28 U.S.C. § 2201 – 2202]<br><br>JURY DEMAND |

I.     JURISDICTION ...................................................................... 5

II.    NATURE OF THE CASE ...................................................... 5

III.   THE LAW OF THE LAND ................................................... 8

    A.    The First Amendment of the United States Constitution ....................... 8

    B.    Prior Restraints on Free Exercise Violate the First Amendment ......... 10

    C.    First Amendment Protections for Religion Before and After RFRA ... 10

    D.    Corporate Standing to Assert RFRA Claims ........................................ 13

    E.    RFRA Plaintiffs May Sue for Exemption from Laws or Administrative Regulations That Threaten Financial Penalties, Property Seizure, or Arrest As a Consequence of Free Exercise ............................................ 14

    F.    O Centro Beneficente – Application of RFRA to the CSA .................... 15

IV.   SUBSTANTIVE ALLEGATIONS ..................................... 16

    A.    Ayahuasca, The Sacramental Substance ................................................ 16

        a.    Ayahuasca's Sacramental Character is Intrinsic to Its Origins 16

        b.    Ayahuasca Use Provides a Warrant of Religious Sincerity That Justifies Minimal Regulatory Intrusion as the Least Restrictive Means ................................................................................................ 18

    B.    Arizona Yagé Assembly ......................................................................... 19

    C.    The North American Association of Visionary Churches ..................... 22

    D.    Clay Villanueva and the Vine of Light Church .................................... 25

    E.    The Drug Enforcement Administration ................................................. 27

    F.    Plaintiffs Need DEA Regulatory Services to Engage in Free Exercise 27

    G.    The DEA's Policy of Denying Regulatory Services to Visionary Churches ................................................................................................ 28

    H.    DEA Regulatory Regimes Imposed by Statute or Injunction ............... 30

        a.    The Peyote Regulatory Regime Was Allowed by Statute ........... 31

        b.    The UDV Regulatory Regime Was Required by Injunction ...... 31

        c.    The Santo Daime Regime Was Required by Injunction ............ 32

        d.    The UDV and Santo Daime Regulatory Regimes Provide No Jurisdictional Basis for Regulating Plaintiffs ............................. 32

I.   The DEA's "Guidance" Is A Pretext to Deny Plaintiffs Regulatory Services and Deter Visionary Churches from Filing RFRA Lawsuits . 32

J.   The Guidance Imposes an Unconstitutional Prior Restraint on Free Exercise .................................................................................................. 33

K.   The Guidance Adjudication Process Substantially Burdens Free Exercise .................................................................................................. 34

L.   The Guidance Lays a Large, Useless Financial Burden Upon Free Exercise .................................................................................................. 35

M.   The Guidance Substantially Burdens Free Exercise When Used As a Pretext for Issuing de facto Stop Orders and Administrative Subpoenas ............................................................................................... 36

N.   The Guidance Substantially Burdens Free Exercise by Extracting Inculpatory Statements from Visionary Church Leaders .................... 38

O.   The Guidance Remains Extant Because the DEA Ignored the AG's Memorandum on Federal Law Protections for Religious Liberty ....... 40

P.   The Guidance Wasn't Reviewed by the DEA As Required by EO 13891 ....................................................................................................... 40

Q.   President Trump Rescinded the Guidance ........................................... 42

V.   FIRST CLAIM FOR RELIEF BY AYA, NAAVC, VILLANUEVA AND VOLC AGAINST THE UNITED STATES, ALL AGENCY DEFENDANTS, AND DEA AGENT MARCO PADDY IN HIS PERSONAL CAPACITY ..... 43

VI.   SECOND CLAIM FOR RELIEF BY AYA AND NAAVC AGAINST THE UNITED STATES OF AMERICA AND TIMOTHY J. SHEA ON BEHALF OF THE DRUG ENFORCEMENT ADMINISTRATION FOR REVIEW OF AGENCY ACTION (5 U.S.C. § 702) ...................................................... 61

VII.   THIRD CLAIM FOR RELIEF BY VILLANUEVA AND NAAVC AGAINST DEFENDANTS MARICOPA COUNTY, MATTHEW SHAY, MARK A. MORGAN ON BEHALF OF THE DEA, AND DEA AGENT MARCO PADDY ...................................................................................................... 66

VIII.   FOURTH CLAIM FOR RELIEF BY VILLANUEVA AGAINST DEFENDANTS SHAY AND MARICOPA COUNTY UNDER THE ARIZONA FREE EXERCISE OF RELIGION ACT (A.R.S. § 41-1493.01) . 77

IX.   FIFTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR TRESPASS .............................................. 79

**X.    SIXTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR BATTERY** ........................................... **79**

**XI.   SEVENTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR CONVERSION AND REPLEVIN** .................. **80**

**XII.  EIGHTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR NEGLIGENCE** .................................................. **81**

**XIII. NINTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR LOSS OF CONSORTIUM** .............................. **82**

**XV.   PRAYER FOR RELIEF** .................................................................... **87**

For their Fourth Amended Complaint against defendants, plaintiffs Arizona Yagé Assembly ("AYA"), the North American Association of Visionary Churches ("NAAVC"), and Clay Villanueva ("Villanueva") and the Vine of Light Church ("VOLC"), ("plaintiffs") allege:

## I.   JURISDICTION

1.      This Court has jurisdiction over this action pursuant to 28 USC §§ 1331, because it is an action arising under the Constitution and federal statutes.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over state law claims and defendants named therein arising from the same common nucleus of facts as the federal claims over which this Court has original jurisdiction.

2.      This Court has authority pursuant to 28 U.S.C. §§ 2201-2202, to grant declaratory relief and to issue preliminary and permanent injunctions. The Court further has authority under 5 U.S.C. § 702 to compel agency action unlawfully withheld or unreasonably delayed, and to set aside an agency's acts or failures to act that are: contrary to constitutional right, privilege or immunity; in excess of statutory jurisdiction, authority or limitations; or, carried on without the procedure required by law.

3.      Venue is proper under 28 USC § 1391(b)(1) and (2).

## II.   NATURE OF THE CASE

4.      This action is brought under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(c) ("RFRA"); the Judicial Review of Administrative Action statute, 5 U.S.C. § 702; 42 U.S.C. § 1983 ("Section 1983"); the Arizona Free Exercise of Religion Act, A.R.S. § 41-1493-01 ("FERA"), and the Federal Declaratory Relief Act, 28 U.S.C. § 2201-2202.

5.      Plaintiffs AYA and NAAVC are two religious nonprofit corporations whose religious exercise, and that of their member churches and congregants, is substantially burdened by laws prohibiting importation, distribution, and possession of Ayahuasca, an herbal tea that contains a small amount of Dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act 21 U.S.C. § 801

et. seq. (the "CSA"). Because of the presence of non-scheduled herbal compounds known as beta-carbolenes in Ayahuasca tea, the small amount of DMT present therein has a markedly different effect than that of pure DMT. Ayahuasca is not listed by the DEA as a drug of abuse; whereas, DMT was one of the first drugs of abuse scheduled by Congress when it enacted the CSA.

6.      Plaintiff Villanueva is a resident of Phoenix, Arizona, and the founder of plaintiff VOLC, based in Phoenix, the first visionary church to join NAAVC.  As alleged in the original Complaint (Docket # 1), in his capacity as NAAVC Board member, Villanueva directly authorized the commencement of this litigation, by which he sought to protect the VOLC, his congregation, and his pastoral status from Government interference.

7.      Merrick Garland, Attorney General of the United States, is named in his capacity as Chief Law Enforcement Officer of the United States, head of the Department of Justice, and the ultimate head of the Drug Enforcement Agency ("DEA").[1]  Timothy J. Shea is named in his official capacity as Acting Administrator of the DEA.  Chad F. Wolf is named in his official capacity as the Acting Secretary of the Department of Homeland Security ("DHS").  Mark A. Morgan is named in his official capacity as Acting Commissioner of Customs and Border Protection ("CBP").  Each of these agencies (separately and collectively, "the Government"), enforces the CSA's proscriptions in various aspects of their operations, exerting legal authority over all movements of controlled substances, that thus affect the Free Exercise of plaintiffs.

8.      Marco Paddy is a DEA Agent ("Agent Paddy") who committed acts in furtherance of a conspiracy to violate the Free Exercise and Right to Petition of NAAVC

---

[1] The DEA originated from President Nixon's Executive Order 11727, and has no enabling legislation. *United States v. Lippner*, 676 F. 2d 456, 461 (11th Cir., 1982), *citing* 28 U.S.C. § 510; 28 C.F.R. § 0.100.  Authority over the DEA is split.  "The Attorney General does not have the sole delegated authority under the CSA. He must instead share it with, and in some respects defer to, the Secretary [of Health and Human Services], whose functions are likewise delineated and confined by the statute."  *Gonzales v. Oregon*, 546 U.S. 243, 265, 126 S. Ct. 904, 920, 163 L.Ed.2d 748, 772 (2006).

and Villanueva, and the Fourth, Fifth, and Fourteenth Amendment rights of Villanueva, and is named in his personal capacity.

9.     The United States of America is a defendant in this action for purposes of seeking review of DEA agency action pursuant to 5 U.S.C. § 702.[2]

10.     Maricopa County is a political subdivision of the State of Arizona named as a defendant herein for acts committed by its employees and agents under color of law, pursuant to a municipal policy, pursuant to a policy of complying with federal requests for local law enforcement assistance, and a policy of unfair policing of Latino citizens.

11.     Matthew Shay is an employee of Maricopa County, employed as a detective by the Maricopa County Sheriff's Office ("MCSO"), a non-jural entity.

12.     As RFRA claimants seeking religious exemptions from the proscriptions of general law, plaintiffs AYA and NAAVC allege a *prima facie* case of sincere religious belief.  Plaintiffs further allege that specified statutes and regulations found in the CSA and 21 CFR 1300 *et seq.,* and the DEA's *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act*[3] (the "Guidance") substantially burden their religious exercise.  Plaintiffs further allege that the provisions of the CSA, 21 CFR 1300 *et seq.* and the Guidance are not reasonably tailored to fit the needs of visionary churches and impose a substantial burden on their rights of Free Exercise by way of visionary communion.  As further alleged hereinbelow, Villanueva asserts a parallel claim for a religious exemption from state law under the Arizona Free Exercise of Religion Act, A.R.S. § 41-1493.01.

---

[2] Section 702 provides in relevant part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  *** The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."

[3] *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act*, https://www.deadiversion.usdoj.gov/pubs/rfra_exempt_022618.pdf.January 2009.

III.    **THE LAW OF THE LAND**

A.    **The First Amendment of the United States Constitution**

13.    The United States is strongly committed to protecting the rights of Free Exercise, Free Expression of religious thought, and, under the Establishment Clause, freedom from state entanglement with religion.  The nation's deep commitment is enshrined in the First Amendment, that provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

14.    Although religious groups seeking freedom from religious oppression in England and Europe founded many of the first American colonies, most did not extend freedom of religious belief to churches outside their particular sects.  The insular character of organized religion changed in the wake of the Great Awakening of 1742, a worldwide religious up-swelling that kindled countless independent religious ministries in the American colonies.  Diversity of religion gave fertile soil to an attitude of tolerance that, aided by the effort of principled advocates within the religious and legal communities, ripened into the commitment to universal religious freedom that the nation now embraces.

15.    Among the Framers, James Madison is remembered as the foremost champion of the First Amendment; accordingly, his views on freedom of religion carry particular weight in our jurisprudence.  Although he published them without disclosing his authorship, Madison's views first came to light in 1785 in *A Memorial and Remonstrance Against Religious Assessment*, opposing a proposed Virginia state tax to fund churches.  Madison argued that the law violated the freedom to exercise one's conscience to decide matters of religion, which he deemed an "unalienable right." Madison gave two reasons for this pronouncement.  *First*, each person is disposed to establish their own relationship with the Creator, "based on the evidence," and cannot follow "the dictates of other men" regarding that relationship.  *Second*, it is an

unalienable right because prior to the claims of society, we are all subject to "the duty … to render to the Creator such homage … as he believes is acceptable to him."[4]

16.    Having strenuously argued for the right to worship one's Creator in a way that suits one's disposition, Madison argued equally forcefully for the right to disbelieve:

> Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us.

17.    Madison thus grounded the right to disbelieve in our "*equal* title to the free exercise of religion according to the dictates of Conscience."[5]  Supremacy of Conscience has become the law of the land:

> Putting aside dogmas with their particular conceptions of deity, freedom of conscience itself implies respect for an innate conviction of paramount duty. The battle for religious liberty has been fought and won … upon the very ground of the supremacy of conscience within its proper field.[6]

18.    The First Amendment protects a personal code of conscience that serves the same purposes as religion serves in the life of the religious.

> The central consideration in determining whether the registrant's beliefs are religious is whether these beliefs play the role of a religion and function as a religion in the registrant's life.[7]

---

[4] "The Religion … of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him. This duty is precedent, both in order of time and in degree of obligation, to the claims of Civil Society." https://founders.archives.gov/documents/Madison/01-08-02-0163

[5] Madison here quoted Article XVI of the Virginia Declaration of Rights, adding emphasis to the word "equal."

[6] *United States v. Seeger*, 380 U.S. 163, 176, 85 S. Ct. 850, 859, 13 L.Ed.2d 733, 742-43 (1965), *quoting United States v. Macintosh*, 283 U.S. 605, 634, 51 S. Ct. 570, 578, 75 L.Ed. 1302, 1315 (1931).

[7] *Welsh v. United States*, 398 U.S. 333, 339, 90 S. Ct. 1792, 26 L. Ed. 2d 308 (U.S. June 15, 1970).

B.    <u>Prior Restraints on Free Exercise Violate the First Amendment</u>

19.    Free Exercise enjoys overlapping protections under the First Amendment, as Free Exercise, and as expressive activity, protected independent of its religious character.  Sharing religious beliefs, group and solitary prayer, sacred songs and communion ceremonies, are all expressive acts of Free Exercise.  Religious expression, like secular expression, is accorded the highest level of Constitutional protection.

20.    "Religious freedom, *i.e.*, free exercise, must not be subject to prior restraint."[8]  Administrative or judicial schemes that require religious practitioners to obtain a license issued by a Government authority that determines "what is a religious cause" do not pass Constitutional muster, because they lay "forbidden burdens" on religious practitioners.  In *Cantwell v. Connecticut*, the Court held:

> [T]o condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution.[9]

C.    <u>First Amendment Protections for Religion Before and After RFRA</u>

21.    Congress enacted RFRA to protect what Madison declared an unalienable right, precedent to the claims of Civil Society – Free Exercise.  "Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty."[10]  RFRA protects religious liberty by requiring the Government to justify substantially burdening Free Exercise by establishing that the prohibition or compulsion at issue is the least restrictive means of advancing a compelling Government interest.

22.    RFRA was enacted to legislatively overrule *Employment Division v. Smith*, that denied a Native American Church practitioner's claim of religious exemption from

---

[8] *Follet v. Town of McCormick,* 321 U.S. 573, 576, 64 S.Ct. 717, 88 L.Ed. 938 (1944).

[9] *Cantwell v. Connecticut*, 310 U.S. 296, 307, 60 S. Ct. 900, 904-05, 84 L.Ed. 1213, 1219 (1940) (statute imposed "forbidden burdens" on Free Expression and Free Exercise by prohibiting religious door-to-door solicitation without a permit from a "public welfare council" authorized to "determine whether such cause is a religious one").

[10] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693, 134 S. Ct. 2751, 2760, 189 L.Ed.2d 675, 687 (2014).

Oregon regulations that denied him unemployment compensation benefits as a penalty for consuming sacramental peyote at a Native American Church meeting. *Smith* held that the law criminalizing peyote possession was facially neutral, not directed at curtailing Native American religious rights, and therefore, the Government's "ability to enforce generally applicable prohibitions … 'cannot depend on measuring the effects of a Governmental action on a religious objector's spiritual development.'"[11]

23.    *Smith* marked a sharp turn away from traditional Free Exercise jurisprudence, as Justice Blackmun's dissent pointedly noted:

> This Court over the years painstakingly has developed a consistent and exacting standard to test the constitutionality of a state statute that burdens the free exercise of religion. Such a statute may stand only if the law in general, and the State's refusal to allow a religious exemption in particular, are justified by a compelling interest that cannot be served by less restrictive means.  Until today, I thought this was a settled and inviolate principle of this Court's First Amendment jurisprudence.[12]

24.    In 1993, "Congress responded to *Smith* by enacting RFRA" to protect Free Exercise from facially neutral laws that "may burden religious exercise as surely as laws intended to interfere with religious exercise."[13]

25.    RFRA grants Free Exercise claimants a private right of action in federal court to obtain exemptions from civil or criminal laws and regulations that substantially burden their Free Exercise, and to sue federal agents for damages.[14]  RFRA mandates the strict scrutiny standard of review for determination of the Constitutional issues raised in such cases, reinstating the standard that Justice Blackmun articulated in his *Smith* dissent.

---

[11] *Employment Div. v. Smith,* 494 U.S. 872, 885, 110 S. Ct. 1595 (1990), *quoting Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 441, 108 S. Ct. 1319, 1321 (1988).

[12] *Smith*, 494 U.S. 872, 907-908, 110 S. Ct. 1595, 1615-1616, 108 L. Ed. 2d 876, 904-905 (1990).

[13] *Burwell*, 573 U.S. 682, 694 (U.S. June 30, 2014).

[14][14] "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a Government."  42 U.S.C. §2000bb-1(c). *Tanzin v. Tanvir*, 141 S.Ct.406 (2020)

26.    RFRA claimants may challenge a federal law or regulation[15] that forbids conduct that a religious person's Free Exercise requires.  RFRA plaintiffs must show that sincere religious practice is substantially burdened by the Governmental law, regulation or policy.  Free Exercise is substantially burdened "when individuals are … coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions."[16]

27.    Once a RFRA plaintiff establishes that its Free Exercise rights are substantially burdened by a federal law or regulation, the burden of persuasion shifts to the Government to demonstrate that application of a substantial burden to the person is the least restrictive means of furthering a compelling Government interest.  The least restrictive means standard is "exceptionally demanding," and requires the Government to show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases."[17]

28.    In *Burwell v. Hobby Lobby*, the Court summarized the RFRA standard:

> RFRA prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling Governmental interest; and (2) is the least restrictive means of furthering that compelling Governmental interest."

29.    In 1994, Congress expanded RFRA's definition of Free Exercise by passing the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"),[18] and incorporating RLUIPA's definition of the "exercise of religion" into RFRA, making the two statutory schemes congruent.[19]  Justice Alito's opinion in *Burwell* explains the significance of the change:

---

[15] Congress enacted RFRA to apply to states and municipalities as well, but the Court found the application to non-federal Governmental units unconstitutional. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 (2014), *quoting City of Boerne v. Flores*, 521 U.S. 507, 533-553, 117 S. Ct. 2157, 138 L. Ed. 2d 6244 (1997).

[16] *Navajo Nation v. United States Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc), *cert. denied*, 129 S.Ct. 2763 (2009).

[17] *Burwell*, 573 U.S. 682, 728, 134 S. Ct. 2751, 2780, 189 L.Ed.2d 675, 709 (2014).

[18] *Burwell, supra.*, 573 U.S. 682, 695-696, *quoting* 42 U.S.C. §2000cc *et seq.*

[19] *Burwell, at id., quoting* §2000bb-2(4) (importing RLUIPA definition).

Before RLUIPA, RFRA's definition made reference to the First Amendment. In RLUIPA, in an obvious effort to effect a complete separation from First Amendment case law, Congress deleted the reference to the First Amendment and defined the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." And Congress mandated that this concept "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."[20]

RFRA standing is flexible and expansive, and is not limited by pre-RFRA Free Exercise precedents.[21]

### D.   Corporate Standing to Assert RFRA Claims

30.   RFRA provides a private right of action to "a person whose religious exercise has been burdened," which includes churches, ministers, their congregations, church associations, and corporations, both non-profit corporations like NAAVC and AYA, and for-profit closely-held corporations. Such closely-held corporations can be large and profitable, like Hobby Lobby, that employed over 13,000 people when the *Burwell* case was decided. Religious corporations, of whatever size, are equally as entitled to assert RFRA claims when burdened by Government regulation, as traditional churches, ministers and congregations.  In *Burwell*, the Court held that the federal courts are well able to determine the "sincerity of corporate religious belief," and found "no evidence that the purported problem of determining the sincerity of an asserted religious belief moved Congress to exclude for-profit corporations from RFRA's protection."[22]

---

[20] *Burwell, at id., quoting* §2000cc-5(7)(A) and *citing* §2000cc-3(g)(emphasis by the Court).

[21] It "would be absurd if RFRA merely restored this Court's pre-*Smith* decisions in ossified form and did not allow a plaintiff to raise a RFRA claim unless that plaintiff fell within a category of plaintiffs one of whom had brought a free-exercise claim that this Court entertained in the years before Smith." *Burwell*, 573 U.S. 682, 715-716, 134 S.Ct. 2751, 2760, 189 L.Ed.2d 675, 687 (2014).

[22] *Burwell*, 573 U.S. 682, 718.

### E.   RFRA Plaintiffs May Sue for Exemption from Laws or Administrative Regulations That Threaten Financial Penalties, Property Seizure, or Arrest As a Consequence of Free Exercise

31.   RFRA plaintiffs need not wait for the Government to take adverse action targeting them to allege actionable claims for injunctive relief under RFRA to protect their right of Free Exercise from prior restraints, enforcement activity, and prosecution. RFRA allows plaintiffs to seek protection from laws and regulations that impose prior restraints upon, or chill, Free Exercise and Free Religious Expression by threat of criminal or regulatory sanctions.  Where performing acts of Free Exercise will expose a religious person to civil or criminal penalties, RFRA plaintiffs may obtain a declaration that their conduct is subject to exemption as Free Exercise before being forced to bend their principles to comply with administrative prior restraints and prohibitory criminal statutes.  *E.g.*, in *Burwell*, plaintiffs Hobby Lobby, Conestoga, and Mardel showed only that they had been put to a Hobson's choice between Free Exercise and compliance with the Department of Health and Human Service's regulations issued pursuant to the Affordable Care Act.  They could pay for insurance for abortions and sin before God, or violate the regulation and pay a financial penalty.  Alternatively, they could cancel everyone's insurance altogether, and violate the religious principle of being charitable to employees. This, the Court held, gave the plaintiffs standing under RFRA to sue for a judicial exemption from the effects of the HHS regulations.

> Protecting corporations from government seizure of their property without just compensation protects all those who have a stake in the corporations' financial well-being. And protecting the free-exercise rights of corporations like Hobby Lobby, Conestoga, and Mardel protects the religious liberty of the humans who own and control those companies.[23]

32.   Likewise, AYA, NAAVC, and NAAVC's member churches and congregations all stand at risk of having their sacramental Ayahuasca seized, and their Free Exercise punished by arrest, trial, conviction and a term of years in the custody of

---

[23] *Burwell*, 573 U.S. 682, 707.

the Bureau of Prisons. Plaintiffs can only obtain sacramental Ayahuasca from South America by international shipping that is subject to interdiction and seizure.  Plaintiffs have had Ayahusaca seized by DHS, as further alleged below.

33.    NAAVC members and their congregations have suffered seizure of sacramental Ayahuasca destined for sharing with congregations in Free Exercise of their right to practice visionary communion in sacred ceremony.

34.    The dangers of seizures of the sacrament, invasion of religious services, and arrest of church leaders and congregants are clear and present dangers to the visionary church community. The raid of Villaneuva's home due to a DEA-initiated tip, by a DEA-funded task force, as alleged hereinbelow, makes it clear that these dangers remain imminent despite the DEA's assertions in Docket #49, 13:16-20, that "the Supreme Court's ruling in *O Centro* … required the DEA to abandon its previous practice of categorically not considering exemptions to the CSA's ban," and further, that "DEA's past history of past prosecutions or enforcement of the CSA against Ayahuasca use [shows] Plaintiff faces no genuine threat of imminent prosecution." (Docket #49, 12:21-24.)  Plaintiffs have given notice of intent to rely on this affirmative representation to the Court, that resulted in a ruling favorable to the Government. Wherefore, the Government is judicially stopped from contradicting that position in future litigation.

## F.    O Centro Beneficente – Application of RFRA to the CSA

35.    Under the principles enunciated by the United States Supreme Court in *Gonzalez v. O Centro Beneficente Uniao do Vegetal*,[24] it is the law of the land that a sincere religious practitioner may consume Ayahuasca tea for sacramental purposes, that the DEA must exempt that conduct from criminal and administrative sanction, and that the right is enforceable in a RFRA action.

36.    In *O Centro*, a crucial element of the Supreme Court's decisional process was its conclusion that an absolute prohibition on sacramental Ayahuasca was not the

---

[24] *Gonzalez v. O Centro Beneficente Uniao do Vegetal,* 546 U.S. 418, 126 S. Ct. 1211, 163 L.Ed.2d 1017 (2006).

least restrictive means of furthering the Government's compelling interests.  In reaching this conclusion, the Court *first* observed that strict scrutiny applies case-by-case analysis to "the particular claimant whose sincere exercise of religion is being substantially burdened."[25]  *Second*, the Court applied strict scrutiny and found that, although Schedule I substances are exceptionally dangerous, "there is no indication that Congress, in classifying DMT, considered the harms posed by the particular use at issue here -- the circumscribed, sacramental use of hoasca by the UDV."[26] Indeed, Ayahuasca was a substance unknown to Congress at the time.

37.    Thus, under *O Centro*, RFRA claimants seeking exemption from the CSA on Free Exercise grounds are given an opportunity to demonstrate that, as applied to them, the CSA is not the least restrictive means for the Government to further its compelling interests.  If they are able to make that showing, then less restrictive options must be made available to the plaintiff, which in the case of the UDV, meant licensing the church to import, manufacture and distribute its sacrament exclusively to its church members, pursuant to a religious exemption from the prohibitions of the CSA and related regulations.[27]

## IV.    SUBSTANTIVE ALLEGATIONS

### A.  Ayahuasca, The Sacramental Substance

#### a.  Ayahuasca's Sacramental Character is Intrinsic to Its Origins

38.    Ayahuasca, referred to as "Hoasca" in *O Centro*, is an herbal tea made of two herbs drunk as a ceremonial sacrament in religious ceremonies that arose among Amazonian tribes in Brazil, Peru, Ecuador, and other Latin American countries.

---

[25] *O Centro*, 546 U.S. 418, 431-432, 126 S. Ct. 1211, 1226, 163 L.Ed.2d 1017, 1032 (2006).
[26] *O Centro*, 546 U.S. 418, 432, 126 S. Ct. 1211, 1221, 163 L.Ed.2d 1017, 1032.
[27] Affirming "a preliminary injunction prohibiting the Government from enforcing the Controlled Substances Act with respect to the UDV's importation and use of *hoasca*. The injunction requires the church to import the tea pursuant to federal permits, to restrict control over the tea to persons of church authority, and to warn particularly susceptible UDV members of the dangers of *hoasca*."  *O Centro*, 546 U.S. 418, 427, 126 S. Ct. 1211, 1218, 163 L.Ed.2d 1017, 1029 (italics in original).

Ayahuasca is an herbal preparation that is not listed as a drug of abuse in the latest DEA Resource Guide, *Drugs of Abuse*.[28]

39.     As a compound purposely created by Amazonian natives for spiritual purposes, Ayahuasca is a tea made of two herbs that have a joint effect on the human metabolism that neither herb alone will produce.  DMT, the controlled substance that subjects Ayahuasca to the prohibitory sanctions of the CSA, ordinarily produces no effect when consumed by mouth.  DMT as a drug of abuse is smoked to create a sudden, overpowering hallucinogenic experience that fades in minutes.  The Ayahuasca recipe, however, makes DMT orally active by brewing leaves from DMT-containing plants jointly with slices of *Banisteropsis Caapi*, the "yagé" vine.  Yagé is rich in beta-carbolenes, chemicals that sensitize the human metabolism so that a small amount of DMT, taken in a sacramental environment with persons of positive intent, becomes activated, and along with the yagé vine that has its own divine character, generates a spiritually uplifting experience of approximately four hours.

40.     Those who prepare the sacramental Ayahuasca used by AYA have not industrialized the process in an effort to maximize production.  Such an attitude would be antithetical to the very reason for brewing Ayahuasca, which is to bring healing and wisdom to those who imbibe the sacred tea.  Ayahuasca is traditionally prepared in an atmosphere of sacramental respect for the spirits that animate the plants, and transmit blessings to those who drink the tea.[29]

---

[28] *Drugs of Abuse,* A DEA Resource Guide / 2020 Edition.
https://www.dea.gov/sites/default/files/2020-04/Drugs%20of%20Abuse%202020-Web%20Version-508%20compliant.pdf
[29] Describing the practices of a Brazilian church that sued the Government under RFRA in the District of Oregon, the late Judge Owen Panner wrote: "The Santo Daime church brews Daime tea in Brazil during an elaborate religious ritual. Men gather the woody B. caapi vine and pound it for hours with mallets, while women collect and clean the P. viridis leaves. The shredded vine is boiled for many hours, constantly tended. P. viridis leaves are not added until boiling is nearly complete because the DMT dissolves rapidly."  *Church of the Holy Light of the Queen v. Mukasey*, 615 F.Supp.2d 1210, 1215 (2006) (vacated on other grounds).

41.    The similarities between Ayahuasca and peyote are significant, and indicate that a like manner of relaxed regulation would be indicated under RFRA's least-restrictive means test.  Like peyote, Ayahuasca has a long history of sacramental use by native peoples, and like those who eat peyote, virtually all persons who drink Ayahuasca drink it at a religious ceremony.  Like peyote, Ayahuasca has an unpleasant taste and emetic qualities that render ingestion physically uncomfortable, and discourages recreational users.  Like peyote, Ayahuasca's emetic effects are concurrent with purging forces that impede the sacramental communion experience.  Like peyote, Ayahuasca induces introspective states of awareness that facilitate reflection and contemplation, rather than inducing the stimulation and euphoria sought by social and recreational drug users.  Thus, like peyote, Ayahuasca is not a drug of abuse, and the courts have recognized that it tends not to be diverted into the illicit market.  "As courts have repeatedly emphasized, cannabis differs critically from peyote and hoasca precisely because there is a thriving market for diverted cannabis, whereas there is no comparable demand for recreational peyote and hoasca."[30]

### b.  Ayahuasca Use Provides a Warrant of Religious Sincerity That Justifies Minimal Regulatory Intrusion as the "Least Restrictive Means"

42.    To pass muster under RFRA, an exemption process would have to be tailored to avoid substantially burdening the right of Free Exercise. As the courts have recognized, Ayahuasca is almost exclusively consumed in religious ceremonies; accordingly, visionary churches whose sacrament is Ayahuasca are using a sacrament that in itself affirms their claim of religious sincerity.  The very activity of drinking Ayahuasca confirms their religious intent, because it is a demanding visionary experience that delivers rewards commensurate with sincerity.  Further, visionary churches emphasize the importance of preparation as part of sincere intention in approaching the

---

[30] *United States v. Christie*, 825 F.3d 1048, 1060-1061 (2016), *citing O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1020 (10th Cir. 2004) (en banc)(McConnell, J., concurring).

use of the sacrament, since an initially casual mindset often leads to hard lessons that appear necessary to ripen the practitioner's sincerity.  Thus, the very use of Ayahuasca in a sacramental setting provides a warrant of sincerity; accordingly, the sincerity of the faith of visionary churches should be taken at face value, and in the absence of evidence that their faith is feigned, they should be able to obtain an exemption from general law for the limited purpose of dispensing Ayahuasca as the communion sacrament in visionary churches, without being subject to a searching inquiry by any administrative agency or judicial officer.

**B.**    **Arizona Yagé Assembly**

43.    Ayahuasca, *i.e.*, yagé, is the religious sacrament of the Arizona Yagé Assembly ("AYA"), a visionary church incorporated as a nonprofit corporation in the State of Arizona and California.  After working with Ayahuasca for six years, the founder (the "Founder") established AYA as a visionary church in 2015, using Ayahuasca as AYA's communion sacrament.  As the Founder expressed it -- "Ayahuasca is the holy Sacrament of AYA, of which congregants must partake to receive the blessing of Communion."  AYA's doctrine teaches that sharing Ayahuasca sacramentally in ceremony is sharing a sacred substance that is not merely physical, but has the capacity to heal the entire human being, body, spirit, and mind, so that congregants can extend this healing to others and our entire world environment.  The experience of communion through Ayahuasca is the receipt of Divine Love and wisdom by the congregation.  The Founder has explained that in AYA, the doctrine "comes from the vine and the leaf."

44.    The Founder has imbued AYA with the religious intention to benefit all living beings through sharing Ayahuasca in sacred ceremony with those called to communion.  AYA's spiritual practice is a healing practice, and its healing practice is a spiritual practice.

45.    In AYA, healing takes place in sacred communion by means of drinking sacramental Ayahuasca.  Healing power is received in visions, in the direct experience of Divine Love, and through songs called "icaros" that are learned in and through the

experience of communion, and by means of sacramentally drinking Ayahuasca.  Some icaros are drawn from South American traditions, and equally often are received directly by congregants during Ayahuasca communion.  Icaros bring healing in many forms, purifying, cleansing, restoring, calming, nurturing, energizing, and in many other ways vivifying the practitioner.

46.    AYA shares communion with congregants who express an avowedly sincere religious intention to receive the sacrament, and have been screened for physical or psychological vulnerabilities.

47.    The demographics and religious attitudes of AYA's congregation are indicative of the sincerity of its membership.  Seventy-one percent are over 30, and forty-six percent are over the age of 40.[31]  Ninety-six percent pray or meditate, and the same percentage state that their only use of Ayahuasca has been as a religious or spiritual practice.  Ninety-eight percent consider participation in AYA ceremonies as beneficial to their spiritual growth.  Sixty-four percent connect with other church members between ceremonies.  Ninety-four percent see themselves returning to future ceremonies.

48.    AYA ceremonies are conducted by trained facilitators who apply AYA's Ceremonial Instructions, following best practices for the safe and efficacious administration of sacramental Ayahuasca.  Ninety-eight percent of AYA congregants reported that ceremony facilitators capably perform their ceremonial duties, and the same percentage said they felt physically and emotionally safe throughout the ceremony.

49.    AYA congregants prepare for the experience with set dietary restrictions the week before the ceremony.  Ceremonies begin in the evening.  When possible, ceremonies are conducted in a circular "maloka," traditionally made of natural wood with a palm roof.  Congregants are provided comfortable places to sit and recline, and commit to remain for the entire ceremony.

---

[31] This statistic and all other percentages are drawn from a statistically significant sampling of responses to a questionnaire sent to all AYA congregants by AYA in 2018.

50.     After the congregants have gathered quietly and focused their attention, the lead facilitator performs an invocation, rings a ceremonial bell, and offers each congregant a cup of Ayahuasca.  The lead facilitator may administer more drinks of tea at intervals, and uses discretion to provide each congregant with only so much of the sacrament as is necessary for them to receive a meaningful experience of communion.

51.     During ceremonies, many congregants experience deep religious sentiments directly connected with their own life experience, reviewing incidents from their past, recognizing their errors and those of others, purging their own guilt and forgiving others their wrongs, receiving mercy and forgiveness from the divine source, and experiencing the restful peace of Divine Love.  The ceremony concludes slowly, as the visionary experience subsides over the course of the night.  Facilitators attend to the condition of each congregant, and appropriate action is taken for their physical and psychological well-being.

52.     The experience of visionary communion is profound and uniquely personal. For many AYA congregants, communion through Ayahuasca has proven pivotal to their spiritual growth and ethical development, helping them reconnect with their innate religious feeling, and learn how to express it in positive action.

53.     AYA's congregants' religious practice places them in potential peril of criminal prosecution by the federal Government.  Many AYA congregants censor their own speech about their religious beliefs and practices when speaking with some or all of their friends, family, employers, and coworkers.  Sixty-nine percent of AYA congregants are hesitant to tell others about their positive experiences because of questions surrounding the legality of this form of Free Exercise.  Fifty-three-point-nine percent are hesitant to tell family, close friends or associates about Ayahuasca for the same reason.

54.     Members of AYA's congregation may find themselves at a disadvantage when their credibility and law-abidingness is scrutinized, *i.e.*, when job-seeking, when testifying, as party to a lawsuit, when applying for a passport or visa, license, permit, or in countless other situations.  By prohibiting their central act of Free Exercise, the CSA's

criminal prohibitions impose a severe and substantial burden upon AYA's Free Exercise of religion, and that of its congregants.  AYA's commercial relationships and ability to contract freely are impaired by the shadow of illegality that falls over the church, and by regulatory takings of sacramental Ayahuasca that interrupt Free Exercise by disrupting the flow of visionary communion sacrament.

55.     AYA's ability to share Ayahuasca with its congregants is substantially burdened by the prohibitions on importing, manufacturing, or dispensing a controlled substance in § 841(a) (2), by the prohibition on importation in § 952(a) of the CSA, and by 21 CFR 1312.11.

56.     AYA has associational standing to assert the claims of its members to receive sacramental Ayahuasca in AYA ceremonies, because their Free Exercise is substantially burdened by AYA's inability to obtain DEA regulatory services necessary to the practice of AYA communion.

57.     AYA seeks a decree establishing that its administration of sacramental Ayahuasca to its congregants is protected as Free Exercise; that AYA's Free Exercise is substantially burdened by the proscriptions of the CSA and the DEA's denial of regulatory services to visionary churches; that DHS is required to exempt its imports of Sacramental Ayahuasca from regulatory takings by forfeiture without just compensation; and that the DEA is required to issue a certificate of exemption to AYA, to grant it a DEA Number, and to provide it with all regulatory services necessary to allow the importation and dispensing of Ayahuasca to its congregation.

C.     **The North American Association of Visionary Churches**

58.     North American Association of Visionary Churches ("NAAVC") is an interdenominational association of visionary churches,[32] formed as a religious nonprofit corporation in the States of Arizona and California.  NAAVC was incorporated in 2019 in California, and in 2020 in Arizona.  NAAVC is operated by members of existing

---

[32] The term "visionary churches" encompasses all churches using sacramental plant-based herbal substances that contain substances scheduled under the CSA.

Ayahuasca visionary churches for purposes of engaging in the Free Exercise of visionary religion. NAAVC funds and promotes the study of visionary religion, sponsoring scholarship and media events that serve to increase understanding of and interest in visionary religious practice.

59.    The members of the Board of Directors are personally and institutionally devoted to helping visionary churches and practitioners to obtain a pure and efficacious Ayahuasca sacrament, free from the onus of illegality that substantially burdens visionary religious Free Exercise.  NAAVC's religious beliefs are embodied in its corporate statements of religious purpose and belief, affirming the sacramental nature of Ayahuasca.  AYA is a member of NAAVC, and the Founder of AYA is a member of the NAAVC board.  All NAAVC Board members are members of visionary churches. All NAAVC Board members have suffered injuries and damages alike in type and kind to those suffered by members of all of NAAVC's member churches and their congregations; thus, NAAVC Board members are personally aggrieved by the acts of the DEA and DOJ alleged herein, and their interests are closely tied to those of the churches and congregations on whose behalf NAAVC asserts associational standing.

60.    NAAVC's central act of Free Exercise is initiating a lawful system for importing and sharing sacramentally-prepared Ayahuasca with visionary churches at reasonable cost, so that they may share the communion sacrament with their congregations.  NAAVC has adopted this definition of corporate Free Exercise by formal corporate resolution.  NAAVC has defined its Free Exercise as expanding the reach of visionary teachings through use of Ayahuasca as a communion sacrament by freeing visionary churches from the burdens and risks of importing Ayahuasca. NAAVC has devoted its corporate resources to the attainment of all legal permissions necessary to the fulfillment of this religious corporate mission to fulfill the promise of *O Centro* to secure the Free Exercise rights of all visionary churches and their congregations.

61.    Sharing Ayahuasca in communion is an expressive Free Exercise of religion that transmits AYA's essential doctrine, and that of other visionary churches.

NAAVC seeks the exemptions necessary to transmit the doctrine to visionary churches by distributing Ayahuasca to visionary churches that obtain their own exemptions, and will need Ayahuasca for communion services.

62.     To fulfill its mission of Free Exercise by sharing the Ayahuasca sacrament with visionary churches, NAAVC requires regulatory services from the DEA; accordingly, it has joined in this action to complain of and seek relief from the substantial burdens on Free Exercise imposed by the CSA, and to obtain an order directing the DEA to provide NAAVC with a DEA Number and regulatory services to allow it to engage in importation and dispensing of Ayahuasca to visionary churches.

63.     The proposed importation and distribution of Ayahuasca as NAAVC's primary Free Exercise activity might be likened to the work of a kosher or halal food producer, that provides kosher or halal food that satisfies religious requirements.  Just as Free Exercise protects the right of religious persons to have food that satisfies their religious requirements, so also those who manufacture that food are protected by the right of Free Exercise. Just as the seizure of halal or kosher food without just compensation would be a regulatory taking in violation of the Fifth Amendment, so also is DHS's seizure and forfeiture of Plaintiffs' imported Sacramental Ayahuasca.

64.     Because the sharing of Ayahuasca in communion is a sharing of doctrine, NAAVC may also be likened to a supplier of host and communion wine for churches that celebrate mass, or sellers of devotional books and art, which inspire the spirits of the faithful.

65.     NAAVC is ready, willing and able to import sacramentally prepared Ayahuasca from South American sources, and to distribute Ayahuasca to visionary churches as soon as it obtains:

(a) Exemption from the prohibitions on manufacturing, distributing and dispensing in Section 841(a)(2), and the prohibition on importation in Section 952(a); and,

(b)  Issuance of a DEA Registration Number to use on DEA Form 357, the importation permit application form.

66.     The Ayahuasca that NAAVC is ready to acquire and import is gathered in the Amazon jungle by traditional gatherers steeped in reverence towards sacramental plants, who brew the traditional herbs in a ceremonial fashion that safeguards its sacramental quality and visionary efficacy.  Once brewed, the importation and manufacturing of Ayahuasca for domestic dispensing must be handled in the same way, respectfully, with a loving and helpful intention, because these intentions pervade the Ayahuasca sacrament itself.

67.     NAAVC has associational standing to bring this action under RFRA and 5 U.S.C. § 702  for the benefit of its member churches to seek relief to which they are entitled and would have standing to assert directly, to aid in their ability to obtain their sacraments by obtaining an exemption from the CSA for the importation of Ayahuasca. A determination in favor of NAAVC in this action will be beneficial to its member visionary churches, who will be incentivized to secure individual RFRA exemptions, knowing that a source of safe, lawful and efficacious sacrament will be available to serve communion to their congregations.

68.     As alleged hereinbelow, all NAAVC member churches, like AYA, have suffered a substantial burden on their Free Exercise of religion due to the DEA's conscious indifference to their First Amendment rights, and denial of regulatory services that greatly inhibits, and for some entirely denies, the right to engage in their practice of visionary communion.

### D.     Clay Villanueva and the Vine of Light Church

69.     Villanueva came by his interest in visionary religion unexpectedly, and it transformed his life.  Villanueva left his home in rural Florida in 1979 to join the Navy. He qualified for technical occupations based on vocational testing, and became trained in communications and diving.  He was regularly promoted and was honorably discharged in 1985 as a Petty Officer First Class, equivalent to an Army Sergeant in rank.

70.     Villanueva worked successfully in various technical fields after his discharge from the Navy, in communications, multimedia systems, sound recording, and

computer-aided design, eventually becoming the top IT professional at a major business furnishings manufacturer that was acquired by Target in 2007, for whom Villanueva continued to work as a contract consultant until 2013.

71.     In 2011, Villanueva was prompted to use a search engine to look up the word "Ayahuasca," when he discovered it written on a labeled packet among his personal effects from years past.  Villanueva remembered that, almost twenty years before, someone had given him the packet with the statement, "I somehow feel that you should have this."  That person had no knowledge of what the word "Ayahuasca" meant or what was in the packet.  Villanueva had never investigated the packet contents or been curious enough to research the topic, so when he finally did, he was astounded to discover the existence of the world of Amazonian visionary religion, based on this sacrament called Ayahuasca.

72.     Villanueva immediately felt compelled to travel to Peru and drink Ayahuasca at a shamanic healing center in Iquitos, Peru.  When he arrived, he discovered that he was the only "passenger" (as the center described those who came to receive Ayahuasca) scheduled to attend ceremonies during the time he was there.

73.     Villanueva's experiences were unusually powerful, and radically restructured his view of reality.  His background in the military, technology, and commerce had given him a materials-based perspective on reality that allowed him to manipulate material reality effectively.  Ayahuasca communion revealed a realm of human action where the power of Divine Love is the central governing force, and harmonious human action flows from continuous compassionate awareness.  The healing center facilitators perceived the unusual intensity of Villanueva's communion experience, which were intensely visionary and unusually prolonged.  During the communion state, Villanueva displayed an intuitive ability to play traditional shamanic musical instruments, and in other ways demonstrated a comfort level with the Ayahuasca communion experience that is rarely seen among novices.

74.    Villanueva's life slowly transformed over the next six years.  He returned to Peru to receive communion again in 2014 and 2015, and eventually received guidance to drink Ayahuasca regularly on a weekly basis, a discipline he continued for approximately one year.  Eventually, he began to share Ayahuasca with a small circle in California, and then in Arizona as well.

75.    In 2017, Villanueva incorporated the Vine of Light church as an Arizona nonprofit corporation.  In 2019, the Vine of Light church joined NAAVC as its first member church.

## E.    The Drug Enforcement Administration

76.    The DEA describes its mission,[33] in relevant part, as follows:

> The mission of the Drug Enforcement Administration (DEA) is to enforce the controlled substances laws and regulations of the United States and bring to the criminal and civil justice system of the United States, or any other competent jurisdiction, those organizations and principal members of organizations, involved in the growing, manufacture, or distribution of controlled substances appearing in or destined for illicit traffic in the United States….

77.    The DEA operates 222 Domestic Offices, organized into 22 Domestic Field Divisions.  DEA also operates 91 foreign offices in 70 countries.  In its Fiscal Year 2019 Budget Request, the DEA requested $2,862,200,000.  The DEA described its FY 2019 Strategy,[34] in relevant part, as follows:

> DEA continues to prioritize its resources to disrupt and dismantle the "most wanted" drug trafficking and money laundering organizations believed to be primarily responsible for the nation's illicit drug supply. This includes the Consolidated Priority Organization Targets (CPOTs) identified by DOJ, plus other Priority Target Organizations (PTOs) identified by DEA.

## F.    Plaintiffs Need DEA Regulatory Services to Engage in Free Exercise

78.    DEA regulatory services are necessary to give substance to the Free Exercise rights of AYA, its congregation, NAAVC, its member churches, and their congregations.

---

[33] https://www.dea.gov/mission
[34] https://www.justice.gov/jmd/page/file/1033151/download

1

2

### G.    The DEA's Policy of Denying Regulatory Services to Visionary Churches

3

4

79.    The DOJ has at all times exerted control over all of the DEA's decision-making in the field of visionary religion, and all unconstitutional or otherwise unlawful acts alleged against the DEA herein are equally alleged against the DOJ.  The DEA had and has a policy of denying regulatory services to visionary churches and refusing all requested religious exemptions from the CSA until and unless compelled by court order (the "Policy").  The Policy was developed and applied by various DOJ and DEA Government employees whose names are yet unknown, with conscious disregard for the Constitutional rights of AYA and its congregation, NAAVC, its member churches, and the member-church congregations.  The Policy informed the DEA's institutional commitment to a total prohibition on controlled substance use as the least restrictive way of advancing the Government's policy against illicit drug use, despite having been informed by the Supreme Court to the contrary in *O Centro*.[35]  The DEA and the DOJ falsely equate the Policy with the "closed system of regulation," and by mantric repetition of the quoted phrase, subject the decisions of the Supreme Court to their own, unconstitutionally obstructive interpretations of the law.

80.    The Policy precludes issuing exemptions from the CSA and 21 CFR 1300 *et. seq.*, for religious purposes.  DEA's reports to oversight agencies show no staffing expenditures for employees to consider the needs of churches and religious persons seeking exemptions from the CSA on religious grounds.  DEA has no individuals uniquely tasked with evaluating requests for exemptions from the CSA on religious grounds.  The DEA's lack of preparation to provide regulatory services to religious exemption seekers stands in marked contrast to the assiduous nature of the DEA's preparation to deal with illicit drug enforcement and pharmaceutical regulation.

---

[35] "Also rejected is the Government's central submission that, because it has a compelling interest in the *uniform* application of the Controlled Substances Act, no exception to the DMT ban can be made to accommodate the UDV." *O Centro*, 546 U.S. 418, 423, 126 S. Ct. 1211, 1216.

81.     The DEA thoroughly studies the activities of criminal entities and regulatory clients, produces reports that announce what its agents and attorneys have learned, and announces initiatives about how it will put its new knowledge to work to accomplish its mission policing the illicit drug trade and regulating medical, manufacturing, and research registrants.

82.     Through its website at DEA.gov, the DEA treats medical, pharmaceutical, manufacturing, research, and law enforcement regulatory clients as valued customers, providing convenient online systems where they can log in and perform their work involving controlled substances.  The DEA website provides secular regulatory clients with webpages for account-creation, online access to submit reports, and automated process to obtain legally-required forms required for lawful importation, distribution, and dispensing of controlled substances.

83.     By contrast, the DEA has entirely avoided provisioning itself to provide regulatory services to the seekers of CSA exemptions because, pursuant to the Policy, it will not provide any.

84.     The Policy is also a notable deviation from the Government's otherwise consistent advocacy in favor of the rights of churches and religious freedom principles, evidenced by the many cases in which it has intervened, filed amicus briefs, and statements of interest in support of Free Exercise, as detailed at the USDOJ's "Religious Freedom in Focus" webpage.[36]

85.     The Policy has dominated the DEA's conduct, causing it to be deceptive when it has given signals of softening its position, engaging in apparent negotiation with both the UDV and the Santo Daime, while simultaneously planning seizures of sacramental Ayahuasca from both churches.  In May 1999, while a DOJ task force established by Attorney General Janet Reno was negotiating with both the UDV and the Santo Daime, the DEA staged coordinated raids on the Santo Daime and the UDV,

---

[36] https://www.justice.gov/crt/religious-freedom-focus-volume-84-january2020#montana

arresting Jonathan Goldman in rural Oregon and seizing a drum of the Daime's Ayahuasca on May 20, 1999, and seizing the UDV's Ayahuasca in New Mexico on the very next day, May 21, 1999.[37]  Thus ended badly the efforts of the two visionary churches to "lay their cards on the table" while negotiating with the DEA and the DOJ.

86.     The DEA declined to prosecute Goldman, but consistent with the Policy, continued to engage in prosecutorial threats, allowing the Damoclean sword to dangle over the Oregon Santo Daime congregation's head for another eight years, until at last they could bear the threat to their Free Exercise no longer.  Finally, on September 5, 2008, the Daime Church and six members of the Ashland, Oregon congregation (none of whom had been arrested or had property seized from their possession) filed their RFRA lawsuit.

87.     During the Santo Daime litigation, the Policy was on display repeatedly. Unlike in the UDV litigation, where the DEA conceded the sincerity of the UDV church's faith, the DEA made a serious effort to portray Goldman as a multiple drug user under suspicion for other drug offenses, and manifested committed hostility to the Santo Daime's position until the final imposition of the Court's injunction barring further enforcement activity.

## H.     DEA Regulatory Regimes Imposed by Statute or Injunction

88.     As alleged hereinabove, under the Policy, the DEA denies regulatory services to visionary churches until compelled to act by force of law.  The DEA peyote regulatory system was devised exclusively for the benefit of the Native American Church ("NAC").  The DEA established the peyote regulatory system pursuant to statutory authorization.  The DEA manages two other regulatory schemes for importation and

---

[37]  "On May 21, 1999, United States Customs Service agents seized a shipment of hoasca labeled 'tea extract' bound for Jeffrey Bronfman and Uniao do Vegetal-United States." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1175 (10th Cir. 2003). "On or about May 20, 1999, the defendants intercepted a shipment of the Holy Daime tea lawfully sent from the Santo Daime Church in Brazil to plaintiff Goldman…."Complaint, Docket # 1, ¶¶ 25 and 26 at page 8, filed 09/05/08 in *Church of the Holy Light of the Queen v. Mukasey*, Oregon District Court Case No. 1:08-cv-03095-PA.

distribution of large quantities of Ayahuasca for the UDV and the Santo Daime, pursuant to District Court injunctions, having negotiated the particulars of the regulatory systems with the two Brazilian churches separately.

### a.   The Peyote Regulatory Regime Was Allowed by Statute

89.    The DEA's authorization to establish a peyote distribution regime appears in 42 U.S.C. § 1996a, that makes lawful the "use, possession or transportation of peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion."[38]  The section permits "such reasonable regulation and registration by the Drug Enforcement Administration of those persons who cultivate, harvest, or distribute peyote as may be consistent with the purpose of this Act."[39]  The DEA regulatory regime thus covers the distribution of peyote from its sole point of origin in Texas, where "peyoteros" registered with the DEA collect the sacred cactus and may lawfully deliver it to any Native American who presents a "Certificate of Indian Blood."[40]  Neither the NAC nor its branch churches register with the DEA, and the last DEA registrant to handle a peyote button in the supply chain is the DEA-licensed peyotero.  The NAC and its congregants are not subject to DEA registration or any other regulatory requirements.

### b.   The UDV Regulatory Regime Was Required by Injunction

90.    The DEA has regulated the importation and distribution of Ayahuasca by the Uniao do Vegetal (the "UDV") since 2006, when the Supreme Court upheld the New Mexico District Court's grant of the UDV's motion to preliminarily enjoin the DEA from interfering with its importation of Hoasca.  The UDV is a very large church with many practitioners that imports tea in barrels from Brazil, and its relationship with the DEA is

---

[38] 42 U.S.C. § 1996a(b)(1).
[39] 42 U.S.C. § 1996a(b)(2).
[40] https://www.texasstandard.org/stories/in-the-only-state-where-selling-peyote-is-legal-the-cactus-is-threatened-and-still-controversial/

the subject of a settlement agreement that imposes security, recordkeeping, and disclosure obligations on the UDV.

### c.   The Santo Daime Regime Was Required by Injunction

91.    The Santo Daime, another church with Brazilian origins, sought and won an exemption from the CSA in *Church of the Holy Light of the Queen v. Mukasey*.[41] Since then, the Santo Daime has imported large quantities of Ayahuasca for distribution to Santo Daime churches, under license granted pursuant to RFRA exemption.

### d.   The UDV and Santo Daime Regulatory Regimes Provide No Jurisdictional Basis for Regulating Plaintiffs

92.    The regulatory regimes established by the DEA with the UDV and the Santo Daime resulted from settlement agreements after the DEA was judicially enjoined to provide regulatory services to the two Brazilian churches. Those regulatory regimes thus provide no jurisdictional basis for the DEA to impose regulatory compliance requirements on plaintiffs.[42]

### I.   The DEA's "Guidance" Is A Pretext to Deny Plaintiffs Regulatory Services and Deter Visionary Churches from Filing RFRA Lawsuits

93.    Notwithstanding its commitment to the Policy, the DEA publicly contends that it opened an avenue to obtaining an exemption from the CSA in January 2009 in a publication downloadable from the DEA's website, and styled as a "Guidance" document.[43]  The DEA contends that the Guidance is an administrative remedy that must be exhausted before a plaintiff may file a RFRA action.  However, the Guidance was not

---

[41] *Church of the Holy Light of the Queen v. Mukasey*, 615 F.Supp.2d 1210 (Oregon 2006).

[42] "Agencies may impose legally binding requirements on the public only through regulations and on parties on a case-by-case basis through adjudications, and only after appropriate process, except as authorized by law or as incorporated into a contract." *Promoting the Rule of Law Through Improved Agency Guidance Documents*, Executive Order 13891, 84 Federal Register 55235 (Oct. 9, 2019).

[43] The *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act* was not published in the Federal Register, but based on a digital date of creation found in the pdf document, was published in January 2009, https://www.deadiversion.usdoj.gov/pubs/rfra_exempt_022618.pdf.

adopted pursuant to rulemaking with notice-and-comment under 5 U.S.C. § 553 of the Administrative Procedure Act (the "APA"), and was never published in the Federal Register. Accordingly, the Guidance provisions are not regulations, lack all independent force of law, and impose no exhaustion requirement.[44]

94.     RFRA allows plaintiffs to seek protection from laws and regulations that impose prior restraints upon, or chill Free Exercise and Free Religious Expression by threat of criminal or regulatory sanctions.  The DEA has no statutory authority under either the CSA or RFRA to regulate Free Exercise by judging which visionary religion is sincere and which is not.[45]  The DEA interposed the Guidance to deter visionary churches from filing RFRA lawsuits.  The Guidance, as alleged in detail hereinbelow, accomplishes precisely the opposite – it imposes a prior restraint on Free Exercise pending review of every petition, and petitions go unprocessed for years.

95.     The DEA issued the Guidance without jurisdiction or lawful basis, under color of law to further the Policy, with the purpose and effect of frustrating the Free Exercise rights of those persons and visionary churches seeking exemption from the CSA to consume communion sacraments that contain controlled substances.

**J.     The Guidance Imposes an Unconstitutional Prior Restraint on Free Exercise**

---

[44] "The Manual and Handbook are not promulgated in accordance with the procedural requirements of the Administrative Procedure Act. Neither is published in the Federal Register or the Code of Federal Regulations.  They are not subjected to notice and comment rulemaking; they are not regulations. *** We hold that the Manual and Handbook do not have the independent force and effect of law." _W. Radio Servs. Co. v. Espy_, 79 F.3d 896, 901 (9th Cir. 1996), *citations omitted*; (affirming District Court's retention of jurisdiction on grounds that manual and handbook imposed no administrative exhaustion requirement).

45 "There is no allowance for a 'certificate of registration' from the DEA for constitutionally protected religious exercise, which is not contemplated as a registered activity under the CSA and administration regulations.  In other words, the DEA RFRA Guidance establishes a new, substantive requirement for DEA registration for religious exercise where none currently exists under Federal law." B.Bartlett, *The U.S. Drug Enforcement Administration Problematic Process for Religious Exemption for Use of Prohibited Psychoactive Substances* (July 16, 2019). https://tinyurl.com/y8kplc73

96.     Paragraph 7 of the Guidance provides: "No petitioner may engage in any activity prohibited under the Controlled Substances Act or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration." Paragraph 7 of the Guidance imposes an unconstitutional prior restraint on Free Exercise upon those who would petition the DEA for an exemption from the CSA.

K.     **The Guidance Adjudication Process Substantially Burdens Free Exercise**

97.     The Guidance establishes an adjudicative body (the "Guidance Adjudicator") that works in secret to determine the validity of any applicant's claim of religion in order to determine their entitlement to Free Exercise of Religion.  The identity or qualifications of the Guidance Adjudicator are not disclosed.

98.     The DEA has drafted no rules to guide the activities of the Guidance Adjudicator.  There is no timeline for processing an application, and inquiries to the DEA regarding the status of applications that have been pending for over two years go unanswered.  The Guidance Adjudicator has unfettered authority to delay decision indefinitely, which renders the process a sham.

99.     The Guidance Adjudicator may request "additional information" of an applicant as a condition of processing an application, and may dismiss any application if the applicant declines to respond to a request for additional information.  The Guidance leaves the term "additional information" open to unlimited interpretation, and thus presents an unlimited basis for overreaching demands and pretextual dismissals.

100.     The Guidance provides no avenue for a prompt final judicial determination of the validity of the Guidance Adjudicator's decision.

101.     The Guidance Adjudicator's activities chill the Free Exercise of visionary churches who are the targets of the Guidance process, particularly by using the Guidance to compel disclosure of internal church operations, and subjecting them to prior restraint of Free Exercise.  The Guidance Adjudicator has used the Guidance to infringe Free

Exercise, and entangle the Government in unconstitutional regulation of religion in violation of the Establishment Clause.[46]

**L.   The Guidance Lays a Large, Useless Financial Burden Upon Free Exercise**

102.   The Guidance imposes a financial barrier for visionary churches, because no church would submit a Guidance-compliant petition to the DEA without first consulting with informed legal counsel.

103.   A visionary church board of directors seeking a formal opinion of counsel to proceed with submission of a Guidance-compliant petition to the DEA would be required to fund considerable research into Constitutional and administrative law.

104.   AYA has learned this by direct experience, having first engaged legal counsel to prepare a petition under the Guidance, only to learn that submitting a petition would waive the Fifth Amendment rights of the Founder, subject the entire congregation to an interruption in Free Exercise due to paragraph 7 of the Guidance, and expose the congregation to potential criminal enforcement based on the contents of a petition. Further, as is alleged *infra*, as the DEA's failure to even process petitions became widely known, it became apparent to AYA that assuming substantial burdens to file a petition under the Guidance would never produce the promised "Certificate of Exemption." Accordingly, AYA did not submit a petition, and instead chose to exercise its statutory rights under RFRA to obtain a judicial ruling of exemption.  AYA thus discovered, after considerable legal expense, claimed as damages herein, that the Guidance was simply a blind alley created by the DOJ and DEA in conscious disregard of the Free Exercise rights of visionary churches, to consume their time, resources, and funds, while adhering to the central directive of the Policy – denying regulatory services to visionary churches until compelled by judicial order.

---

[46] *Surinach v. Pequera de Busquets*, 604 F.2d 73 (1st Cir. 1979)(quashing subpoena from Puerto Rican Government agency to the Superintendents of the Roman Catholic schools on Establishment and Free Exercise grounds).

105.     Plaintiffs AYA and its congregation, NAAVC, and NAAVC's member churches and their congregations, have been damaged by being required to pay legal fees to discover that the Guidance was merely a ruse that a visionary church careful of its Free Exercise rights would avoid as a matter of self-protection.

**M.      The Guidance Substantially Burdens Free Exercise When Used As a Pretext for Issuing de facto Stop Orders and Administrative Subpoenas**

106.     The DEA has on two occasions "invited" visionary churches to submit petitions for RFRA exemptions from the CSA.

107.     Christopher Young and Soul Quest Church of Mother Earth Inc. ("Young and Soul Quest") were targeted by a DEA *de facto* administrative subpoena and cease and desist order, the opening to which states, in relevant part:

> It has come to our attention that prior to August 4, 2016, you were involved in offering "retreat" through your website, www.soulquest-retreat.com, at which you provided Ayahuasca and other controlled substances to your clientele.

108.     Placement of the word "retreat" in quotations, and reference to church congregants as "clientele" clearly implied that the DEA was seeing the church's activities through the skeptical lens of drug traffic surveillance.

109.     The attorneys for Young and Soul Quest notified the DEA that the "correspondence advised my client to cease and desist the use of Ayahuasca as a sacrament," and therefore "the Church and its members are wholly unable to exercise their sincere religious beliefs."  This result was in conformity with the DEA's wishes, as the agency tacitly acknowledged by saying nothing about Young and Soul Quest's complaint that the cease and desist order infringed their Free Exercise when it responded to their attorney's letter with the assurance that the "DEA implements its petition process in full compliance with the requirements of RFRA."  Since RFRA provides no instructions to any administrative agency regarding how to process an application for exemption, this statement had no meaning; however, the DEA's knowing, silent

persistence in its Policy of imposing prior restraints to chill the Free Exercise rights of Young and Soul Quest displayed its conscious indifference to the Free Exercise rights of any and all visionary churches.

110.    Pursuant to the DEA's "invitation,", Soul Quest, and another visionary church, Ayahuasca Healings Native American Church, submitted "petitions for exemption" to the DEA.  The Ayahuasca Healings petition lists five individuals who all jointly disclosed the range of their activities distributing Ayahuasca, thus waiving their Fifth Amendment right to be free of self-incrimination, and admitting to a series of actions that, absent exemption, would expose them to considerable criminal penalties for operating a drug distribution conspiracy.  By submitting petitions, they sought to bargain for rights of Free Exercise by waiving or surrendering other constitutional rights.  It was an unconstitutional violation of the rights of those visionary churches and their leaders for the DEA to force them to choose which constitutional rights to surrender – their Free Exercise, or their personal rights to be free of compelled self-incrimination.  It was a further unconstitutional violation, committed with conscious disregard for the rights of the petitioners, for the DEA to solicit and receive the petitions, then provide no response whatsoever, leading the petitioners to dangle in legal uncertainty for years.  The negative message to the visionary church community was unmistakable, and consistent with the Policy.

111.    The issuance of the invitations to submit petitions resulted in the disclosure of detailed inculpatory information from the invitees by an implied threat of criminal prosecution, in violation of the Fifth Amendment rights of the individuals who submitted the petitions.  The pretextual nature of the invitations has become apparent as years have passed since the petitions were submitted under duress, and since submitting their petitions, neither petitioner has received a reply communication, notwithstanding their repeated efforts to elicit a response from the DEA.

112.    The clear import of the DEA's "invitations" to submit exemption applications was to order the churches targeted for invitation to cease and desist from their religious practice.

113.    The Guidance Adjudicator thus adhered to the Policy by violating the civil rights of visionary churches with conscious indifference, using the Guidance to issue *de facto* stop orders and administrative subpoenas that have the effect of imposing a system of unlawful prior restraint upon the Free Exercise of religion.[47]

### N.    The Guidance Substantially Burdens Free Exercise by Extracting Inculpatory Statements from Visionary Church Leaders

114.     The Fifth Amendment's prohibition on compelled self-incrimination guarantees every natural person in the United States that he or she "shall [not] be compelled in any criminal case to be a witness against himself." A noted constitutional scholar has written:

> The privilege historically goes to the roots of democratic and religious principle. It prevents the debasement of the citizen which would result from compelling him to "accuse" himself before the power of the state. The roots of the privilege … go to the nature of a free man and his relationship to the state.[48]

115.    Administrative regimes that attempt to institute compelled self-disclosure of prosecutable conduct under the rubric of taxation or regulatory reporting are unconstitutional violations of the Fifth Amendment prohibition on compelled self-incrimination.[49]

---

[47] *Cantwell v. Connecticut*, 310 US 296 (1940).

[48] McKay, *Self-Incrimination and the New Privacy*, citing *United States v. Wade*, 388 U.S. 218, 261 (1967). The Supreme Court Review, Vol. 1967 193, 210 (1967)(emphasis added).

[49] The Wagering Act was held unconstitutional because "[t]he terms of the wagering tax system make quite plain that Congress intended information obtained as a consequence of registration and payment of the occupational  tax to be provided to interested prosecuting authorities." *Marchetti v. United States*, 390 U.S. 39, 58-59, 88 S. Ct. 697, 708, 19 L.Ed.2d 889, 904 (1968). *See also Leary v. United States*, 395 U.S. 6, 10, 89 S. Ct. 1532, 1534, 23 L.Ed.2d 57, 66 (1969)(federal Marihuana Tax Act held unconstitutional as compelling self-incrimination under guise of taxing regime).

116.    To submit a Guidance-compliant application for an exemption from the CSA on religious grounds, a representative of the applicant church must sign an application under penalty of perjury that discloses activities that expose the signatory and the church congregation to potentially severe criminal penalties under the CSA.

117.    The Guidance thus demands a waiver of Fifth Amendment right against self-incrimination from the leaders of any visionary church who would be required to submit an application for exemption under penalty of perjury disclosing matters that will subject them to the risk of enforcement, prosecution, imprisonment, and seizure of property.

118.    The Guidance demands disclosure of self-inculpating information under oath, information individuals are privileged not to divulge under coercion due to the Fifth Amendment prohibition on compelled self-incrimination. Associational groups may not be required to disclose their membership lists when it would expose the members to prosecution, and the associational group has standing to assert the Fifth Amendment rights of its members.[50]

119.    While the Fifth Amendment privilege against self-incrimination inures to the benefit of natural persons only, membership organizations may assert the Fifth Amendment rights of their members, and AYA here asserts the Fifth Amendment rights of its members on their behalf.  NAAVC's member churches have standing to seek redress of Fifth Amendment injury to their congregations, and NAAVC asserts that standing herein on behalf of those individual congregants of its member churches whose Fifth Amendment rights stand at risk. Villanueva asserts direct Fifth Amendment standing as a natural person.

---

[50] *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 86 S. Ct. 194, 15 L.Ed.2d 165 (1965(American Communist Party secured injunction on behalf of undisclosed members to prevent disclosure of identities, that would have lead to prosecution, since Party was illegal).

120.   The Guidance procedure does not protect the applicant from the risk that the Guidance Adjudicator may share inculpatory information submitted by an applicant for religious exemption with the DEA's enforcement agents and prosecutors.

### O.   The Guidance Remains Extant Because the DEA Ignored the AG's Memorandum on Federal Law Protections for Religious Liberty

121.   On May 4, 2017, the President of the United States issued EO 13798, *Promoting Free Speech and Religious Liberty*,[51] and shortly thereafter, Attorney General Jeff Sessions published his *Memorandum on Federal Law Protections for Religious Liberty,*[52] that outlined how the DEA and other agencies must proactively accommodate the needs of religious groups seeking exemptions from general law. The *Memorandum* directed agencies to review old policies affecting the rights of religious groups and bring them into compliance with RFRA and the principles outlined in the *Memorandum*.  The *Memorandum* emphasized that RFRA requires every federal agency, in every aspect of their activity, to be mindful of the need to avoid interfering with Free Exercise:

> "Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all Government activity…."

122.   Hewing to the Policy it has pursued in conscious disregard of the Free Exercise rights of plaintiffs, the DEA effectively ignored AG Sessions, making no changes to the Guidance in response to the Attorney General's exhortations. This attitude of conscious indifference to Free Exercise rights is antithetical to the ethic AG Sessions sought to inculcate by writing and circulating the *Memorandum* to the DOJ and the DEA.

### P.   The Guidance Wasn't Reviewed by the DEA As Required by EO 13891

123.   On October 15, 2019, the President issued Executive Order 13891, *Promoting the Rule of Law Through Improved Agency Guidance Documents*.  To remedy

---

[51] 82 Federal Register 21675 (May 4, 2017).
[52] 82 Federal Register 49668 (Oct. 26, 2017).

the abuse of administrative agency guidance documents that subject the public to *ad hoc* rulemaking without the notice-and-comment procedure required by the Administrative Procedure Act, the Office of Management and Budget ("OMB") issued an Implementing Memorandum (the "OMB Implementing Memo") pursuant to EO 13891 that directed all federal administrative agencies to review all extant guidance documents.[53]   The OMB Implementing Memo set a February 28, 2020 deadline for administrative agencies to either rescind existing guidance documents, or affirm their continued vitality and publish them on a special website.   That special website was required to bear a legend informing the public that a guidance document "does not bind the public, except as authorized by law or as incorporated into a contract."   Thus, EO 13891 and the OMB Implementing Memo targeted deficient guidance documents for rescission on February 28, 2020.

124.    EO 13891 forbids agencies from using guidance documents to promulgate law, and the OMB Implementing Memo explicitly condemns the use of guidance documents to coerce compliance with  administrative demands, such as the DEA did when it coerced disclosures from visionary churches under the cloak of "invitations" to submit petitions for exemption, as above alleged.[54]

125.    Presuming that the then-impending February 28, 2020 deadline imposed by the OMB Implementing Memo would put the DEA to a decision about whether to carry on with the Guidance as DEA policy, or to rescind it, NAAVC sent a letter dated January 8, 2020 to the DEA on behalf of its member churches, addressed to William T. McDermott, Assistant Administrator for Diversion Control Division, and copied via

---

[53] "Within 120 days of the date on which OMB issues an implementing memorandum under section 6 of this order, each agency shall review its guidance documents and, consistent with applicable law, rescind those guidance documents that it determines should no longer be in effect."  EO 13891, 84 Federal Register 55235, 55236 (Oct. 9, 2019).

[54] "Nor should agencies use guidance documents-including those that describe themselves as non-binding effectively to coerce private-party conduct, for instance by suggesting that a standard in a guidance document is the only acceptable means of complying with statutory requirements, or by threatening enforcement action against all parties that decline to follow the guidance."  *Memorandum for Regulatory Policy Officers at Executive Departments and Agencies and Managing and Executive Directors of Certain Agencies and Commissions*, October 31, 2019, from D.J. Mancini, Acting Administrator, Office of Information and Regulatory Affairs.

email to several Government attorneys at the DEA and the Department of Justice at official Government email addresses, including Thomas Prevoznik (the "DEA Letter"). The DEA Letter cited EO 13891 and other sources of law, recommending that the DEA review the Guidance as required by the Executive Order, and rescind it.

126.    The DEA has taken no action required by EO 13891.  It has not rescinded or reaffirmed the Guidance.  It has not created a webpage with all other DEA guidance documents bearing the legend required by the OMB Implementing Memo.

127.    Pursuant to the executive authority of the President as set forth in EO 13891 and the OMB Implementing Memo, the Guidance has been affirmatively withdrawn as the policy of the Government; however, the DEA refuses to acknowledge it.

128.    The DEA did not respond to the DEA Letter, notwithstanding that attorneys within the DEA and the DOJ, including Thomas Prevoznik, Acting Deputy Assistant Administrator of the Office of Diversion Control, are reasonably believed to have reviewed the letter. The DEA was thereby made aware of NAAVC's advocacy for rescission of the Guidance because of its constitutional and other legal defects, pursuant to EO 13891.

## Q.    **President Trump Rescinded the Guidance**

129.    EO 13891 states in relevant part:

> No agency shall retain in effect any guidance document without including it in the relevant database referred to in subsection (a) of this section, nor shall any agency, in the future, issue a guidance document without including it in the relevant database. No agency may cite, use, or rely on guidance documents that are rescinded, except to establish historical facts.

130.    Accordingly, the Guidance was affirmatively withdrawn as the policy of the Government by the Chief Executive, and is unenforceable by the Government.  Any attempt to impute the authority of law to the Guidance would run directly contrary to the President's directives and the Administrative Procedure Act, and is therefore precluded.

1
2
3
4

**V.  FIRST CLAIM FOR RELIEF BY AYA, NAAVC, VILLANUEVA AND VOLC AGAINST THE UNITED STATES, ALL AGENCY DEFENDANTS, AND DEA AGENT MARCO PADDY IN HIS PERSONAL CAPACITY  UNDER THE RELIGIOUS FREEDOM RESTORATION ACT (42 U.S.C. § 2000bb-1(c))**

5
6

131.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

7
8
9
10
11
12
13

132.    Drinking sacramental Ayahuasca is the central communion ceremony of AYA.  In AYA communion, congregants receive the transmission of wisdom and Divine Love that comes through sacramental use of Ayahuasca. Without Ayahuasca, AYA does not have a religious practice to share, and AYA congregants are unable to practice their religion.  AYA's religious belief is sincere, and its practice of drinking sacramental Ayahuasca has been deemed a lawful practice worthy of protection under the Free Exercise clause of the First Amendment.

14
15
16
17
18

133.    AYA, Villanueva, VOLC, NAAVC, and NAAVC's member churches and congregations ("RFRA Plaintiffs") are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA, that impose criminal penalties for violations.

19
20
21
22
23

134.    The effect of the said provisions of the CSA is to coerce RFRA Plaintiffs to act contrary to their religious beliefs by the threat of criminal sanctions.  The potential for prosecution under the CSA places substantial pressure on RFRA Plaintiffs to modify their behavior and violate their beliefs, forcing them to choose between either abandoning religious principle or risking criminal prosecution.

24
25
26
27
28

135.    NAAVC is substantially burdened in its efforts to engage in Free Exercise by sharing the Ayahuasca communion sacrament with exempt churches, and its ministry to visionary churches is substantially burdened, because many sincere congregations and their leadership are accustomed to practicing "underground," and are uncertain whether

associating with a church association to advance the rights of visionary churches will accomplish the desired goal of greater Free Exercise, or stimulate DEA enforcement.

136.    The mission of the DEA, as set forth *supra,* places RFRA Plaintiffs squarely within the scope of its stated enforcement activities.  Accordingly, RFRA Plaintiffs are in peril of prosecution.

137.    Without an exemption from specified sections of the CSA and related regulations, RFRA Plaintiffs fear prosecution for importing, manufacturing and dispensing Ayahuasca.

138.    On April 22, 2020, NAAVC and AYA were notified that their joint property, a container of Ayahuasca ordered for the use of NAAVC and AYA, had been seized by DHS during the customs process.  DHS notified NAAVC and AYA's designated addressee of the seizure of NAAVC and AYA's property by sending a notice in the empty box from which the Ayahuasca had been removed.  DHS sent the empty box to NAAVC and AYA's designated agent at their mailing address in the State of California, in lieu of an international parcel, stating:

<u>NOTICE</u>

NARCOTICS AND/OR OTHER CONTRABAND PROHIBITED FROM ENTRY INTO THE UNITED STATES HAVE BEEN SEIZED AND REMOVED FOR APPROPRIATE ACTION UNDER 19CFR145.59. YOU WILL BE RECEIVING CORRESPONDENCE FROM OUR FINES, PENALTIES AND FORFEITURES BRANCH IN THE NEAR FUTURE.

139.    On October 21, 2020, a shipment of Sacramental Ayahuasca from Peru, Serpost tracking number EE011369264PE, addressed to AYA and Scott Stanley, was intercepted in transit by the Department of Homeland Security in Los Angeles, and has never been received.  After this interception of AYA's Sacramental Ayahusaca, plaintiffs notified counsel for the Government in this action that they objected to the interception, and requested release of this property, which the Government refused, stating that DHS had regulatory authority to seize, forfeit and destroy Sacramental Ayahuaca destined for AYA.

140.    During November, 2020, a third shipment of Sacramental Ayahuasca from Peru, Serpost tracking number EE011368873PE, addressed to AYA and Scott Stanley, was seized by DHS.

141.    On December 31, 2020, a fourth shipment of Sacramental Ayahuasca from Peru, Serpost tracking number EE011186439PE, addressed to AYA and Scott Stanley, was seized by DHS.

142.    These seizures prevent AYA from engaging in Free Exercise, and from sharing the Ayahuasca Sacrament with its congregation.

143.    Without an exemption under 21 CFR 1312.11, RFRA Plaintiffs risk repeated seizure of its sacrament by the DHS, administrative sanctions, and referral of the matter to the DEA for prosecution for violation of 21 U.S.C. § 952(a).

144.    DHS provides no post-seizure procedure for recovery of seized Ayahuasca Sacrament.  AYA has requested that seized Ayahuasca Sacrament be released to its custody, as the Government has full knowledge via AYA's Motion for Preliminary Injunction (Docket # 33) that AYA's Ayahuasca use is entirely sacramental in character, and DHS is a subordinate agency of the Government whose conduct should conform to a single, lawful standard in compliance with RFRA.

145.    There exists a clear and present danger: (1) that RFRA Plaintiffs and their congregations may be arrested for violations of the CSA, (2) that warrants could be issued for the arrest of RFRA Plaintiffs and their members, (3) that warrants may be issued allowing the search of RFRA Plaintiffs' properties or that of their members, and (4) that RFRA Plaintiffs' sacramental Ayahuasca may be seized during the importation, manufacturing, or dispensing process.

146.    RFRA Plaintiffs and their members are aggrieved by this situation, that forces them to procure, share and celebrate their communion sacrament secretly, and to risk the loss of liberty and bear an unmerited stain of criminality, in order to engage in the Free Exercise of religion protected by the First Amendment.

147.   The Government has no compelling interest in prohibiting any of the RFRA Plaintiffs from using Ayahuasca as a religious sacrament.

148.   The Government is required to utilize the least restrictive means to accomplish its legitimate interests by granting RFRA Plaintiffs appropriate exemptions from the criminal prohibitions of the CSA on importation, distribution and dispensing of Ayahuasca.  Importation of Ayahuasca requires an Importation Permit issued under 21 CFR 1312.12, a regulatory service available only to DEA registrants who have been assigned a DEA number for use in submitting applications for permits.  Each of the RFRA Plaintiffs needs to be assigned a DEA number to obtain regulatory services necessary to supply sacramental Ayahuasca to its congregation.

149.   Application of § 841(a)(2) and §952(a) of the CSA and related federal regulations to RFRA Plaintiffs is not the least restrictive means for the Government to accomplish its interests in preventing the illicit distribution of controlled substances.

150.   RFRA Plaintiffs are entitled to a decree establishing its right to exemptions from the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA.  RFRA Plaintiffs are further entitled to register with the DEA as exempt persons under 21 CFR 1312.11, and to receive all further administrative clearances necessary to eliminate substantial burdens on RFRA Plaintiffs' Free Exercise rights.

151.   NAAVC and NAAVC's member churches and congregations are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA.

152.   NAAVC and NAAVC's member churches and congregations are substantially burdened by the DEA's denial of regulatory services to visionary churches, and its Policy of doing nothing that would assist them to obtain DEA Numbers that would eliminate the substantial burdens on Free Exercise imposed by the prohibitions on importation and distribution of sacramental Ayahuasca.

153.    NAAVC is entitled to pursue importation and distribution of sacramental Ayahuasca as Free Exercise.

154.    To enable its Free Exercise, NAAVC is entitled to receive exemptions from the prohibitions on manufacturing, distributing, or dispensing Ayahuasca, that contains a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA.

155.    NAAVC is entitled to be granted a DEA Number for use in obtaining importation permits to import sacramental Ayahuasca for distribution to exempt visionary churches.

156.    If defendants are not enjoined, plaintiffs will suffer irreparable harm for which they have no remedy at law.  The requested injunction will serve the public interest in protecting Free Exercise from prior restraint and *post-hoc* detention, prosecution, and punishment.

157.    Plaintiffs have been damaged by the unconstitutional Policy that has presented the Guidance as a genuine path to regulatory services from the DEA, when in truth it is merely a blind alley intended to induce visionary churches to misdirect their efforts.

158.    RFRA Plaintiffs, and their congregations and member churches, are substantially burdened by the DEA's use of the Guidance to issue *de facto* demands for disclosure of information that is protected from compelled disclosure by the Fifth Amendment privilege against self-incrimination, and by the First Amendment Establishment Clause prohibition on Government regulatory entanglement in a religion's internal affairs.

159.    Agent Paddy conceived and communicated retaliatory animus towards NAAVC and Villanueva for their activism in promoting an online petition calling on the DEA to "Stop Regulating Visionary Religion," and for initiating this litigation against the DEA.  Agent Paddy acted with conscious indifference towards the Fourth Amendment rights of Villanueva by passing a tip to Micah Kaskavage ("Kaskavage"), a Phoenix

Police Department officer detailed to the HIDTA Arizona SW Task Force, accusing Villanueva of selling DMT.   Agent Paddy averred in Docket # 41-1 that the basis for the accusation was a phone call to a DEA tip line from a person in the 310 area-code who wanted to remain nameless, but left his phone number. Agent Paddy did not disclose the name of the caller in his email to Kaskavage, but provided the telephone number. The telephone number is listed to Rami Joseph Najjar ("Najjar"), a California resident who had (1) never been to Villanueva's house, (2) never observed a sale of DMT by Villanueva, (3) had only communicated with Villanueva via email, (4) had recently received a refund of his deposit to attend an Ayahuasca ceremony after expressing anger towards Villanueva, and (5) had threatened to cause him to suffer due to "bad karma."

160.    Agent Paddy initiated the process of investigating Villanueva to satisfy the retaliatory animus of the DEA and officials within the DEA.  There was no other reason why one call made to the DEA tip line about one person holding religious ceremonies would warrant an immediate investigative referral to local drug-lab law enforcement, whose hands are full with major drug cartels moving countless doses of opiates and methamphetamine through the Phoenix area.

161.    As previously plead hereinabove, plaintiffs allege in the alternative facts regarding Najjar's employment as a DEA informant that are developing through investigation and discovery.  The facts known currently fit two alternatives, both which establish liability for defendants.

162.    Consistent with the first alternative, Najjar was recruited by a Department of Justice Law Enforcement Agency ("JLEA") as a Confidential Informant ("CI") before January 8, 2021, and assigned to the DEA to infiltrate NAAVC.  The infiltration of NAAVC was undertaken by the DEA for the retaliatory purpose repeatedly alleged hereinabove.

163.    Agent Paddy joined the DEA in 2018 as a GS-1811 Criminal Investigator. The starting salary for a GS-1811 Criminal Investigator at Grade 07 is $42,698 per year (exclusive of locality and LEAP adjustments).  According to Office of Personnel

Management standards for the 1811 series, Agent Paddy could qualify for the GS-1811 position with either one year of specialized experience OR a grade point average of 2.95 or higher.  Agent Paddy's pay scale is well below the 2020 Median Pay of $67,290/per year reported by the U.S. Bureau of Labor Statistics for "Police and Detectives."  Agent Paddy is neither highly skilled nor highly compensated, and in this case, his lack of experience resulted in his being used by the DEA to "pull the trigger" on a retaliatory operation that wiser, more experienced agents would have rejected.  He was handled by his own superiors on a need-to-know basis, and his full understanding of the purpose and scope of the conspiracy he was launching was neither necessary nor desirable.  Nevertheless, he knew enough of it to be liable for all the purposes and effects of the conspiracy, including the May 19th Raid.

164.    In January 2019, Paddy had less than a year of experience as a DEA Special Agent.  In 2018 when Paddy became a Special Agent, DEA had two separate "acting" DEA Administrators (Uttam Dhillon, Robert Patterson) and a rotating cast of characters at the upper levels of the Department of Justice.  After receiving the alleged tip from Najjar, Agent Paddy picked up the phone and spoke to Kaskavage off-the-record about the alleged tip.  After his phone call with Kaskavage, Paddy then followed-up this phone call with an email.

165.    Agent Paddy was required to apply The Attorney General's Guidelines Regarding the Use of Confidential Informants (the "AG Guidelines") to his relationship with Najjar.  But as the OIG Report makes clear, the DEA Agent's Manual did not accurately reflect the AG Guidelines, because it has been a policy of the DEA to mismanage the CI program in a wide variety of ways that have resulted in payments of over $40,000 on the average to an army of informants whose performance is rarely if ever reviewed for legal compliance.  Informants who manipulate their assigned DEA agents often act with progressively greater impunity under DEA protection, skillfully utilizing law enforcement to tag their enemies and eliminate competition by having them arrested for the same crimes they commit, while collecting tax-free drug-dealing income and DEA

incentive payments, and on many occasions, death and disability benefits exceeding in their generosity those packages paid out to real Federal employees.  The DEA has never corrected the defects in the CI program identified by the OIG, and thus, far from it being implausible that the DEA engaged in misconduct with its CI Najjar, such misconduct is commonplace at the DEA, and occurred in this case.

166.    The DEA trained Agent Paddy to mismanage informants, and his mismanagement of Najjar caused injury and damage to Villanueva and NAAVC by deliberately obscuring the true retaliatory purpose of Najjar's infiltration efforts, and thus performing an act in furtherance of the conspiracy to violate civil rights – the concealment of the conspiracy.  Agent Paddy failed to enter Villanueva's name into The Narcotics and Dangerous Drugs Information System ("NADDIS") database, which would have alerted Kaskavage, Shay, and other DEA and HIDTA team members who conducted the May 19th Raid that Villanueva was an NAAVC Director who initiated both the Change.org Petition and this lawsuit, and was thereby a represented party and a prospective witness in this pending lawsuit.  Agent Paddy improperly documented and misstated the nature of his communications with Najjar.  Agent Paddy failed to have his Field Manager approve using Najjar as a CI.  Agent Paddy failed to properly register Najjar in the DEA's internal database.  Agent Paddy did not comply with the registration requirement that Najjar review the CI's Written Instructions with another agent present, nor did he "review the content and meaning of the … instructional points" of the Written Instructions, nor did he confirm Najjar's understanding of the Written Instructions, nor did he or any other agent "document that the instructions were reviewed with the CI and that the CI acknowledged the instructions and his or her understanding of them."  (AG Guide, II.C., pages 11 -12.)  The purpose of Agent Paddy's failures in documenting his relationship with Najjar was to conceal its true purpose and avoid the creation of a paper trail that would reveal the retaliatory motive that had instigated the effort to infiltrate NAAVC.

167.   The AG Guidelines require that the initial decision to employ a CI must include consideration of factors in an "Initial Suitability Determination."  Agent Paddy has, through his silence, attempted to imply his ignorance of Najjar's status as a CI. Whatever Agent Paddy's claimed state of mind, it arose from conscious indifference to the AG Guide's suitability factors, that when applied to Najjar, establish his clear unsuitability to serve as a CI:

a.   Najjar is an admitted controlled substance user;

b.   Najjar was a member of the media (a SAG Actor, with an agent and a resume posted on IMDb.com);

c.   Najjar has an Arizona criminal record, and is currently under criminal prosecution in California (as further alleged *infra*);[55]

d.   Najjar is persistently short of money, has filed bankruptcy twice, most recently in January of this year, and has funding sources concealed by his bankruptcy filings;[56]

e.   Najjar was not a member of any visionary religion, had no existing sources of information about NAAVC, Villanueva, or VOLC, and provided only publicly available information;

f.   Najjar's information could not be corroborated, and he had no past record as a favorable witness for the Government;

g.   Najjar uses aliases, as he did when communicating with Villanueva;

---

[55] Najjar has a criminal record in Maricopa County, with an arrest record that includes charges for Assault, Theft, and Preventing or Interfering with a Telephonic Emergency.  At a name-change hearing on April 30, 2021, in Santa Monica, California, Superior Court Judge Chester Horn denied Najjar's request for name change, recording his reasons in a minute order:  "the petitioner has an active restraining order against him that expires 03/22/2022 and a pending criminal hearing 06/24/2021."

[56] Arizona Bankruptcy Case No. 2:08-bk-03721; Cal. Central District Bankruptcy Case No. 2:21-bk-10035-WB.

h.    Najjar lives and drives without a license in the State of California, a misdemeanor that carries a jail term and a $1,000 fine, a law so harshly enforced that few Californians flaunt it;[57]

i.    Najjar is a flight risk, as he often changes addresses, and has over twenty street addresses, a dozen telephone numbers, and a large number of email addresses that map back to him.

168.    Najjar, whose roles in movies and TV have occasionally cast him as an Arab terrorist, became an adept infiltrator of the visionary church movement.  The DEA acted unlawfully in using Najjar for a retaliatory purpose, and assigned retaliatory tasks to Agent Paddy because of his conscious indifference to the DEA's own rules and the AG's Guidelines.

169.    Najjar's status as an actor and member of the Screen Actors Guild makes him a "CI who is affiliated with the media."  Accordingly, the AG Guidelines required that, before Najjar was used as a CI, Agent Paddy was required to obtain the written approval of the Confidential Informant Review Committee (the "CIRC").  (AG Guidelines, II.D.2., at page 14.)  Agent Paddy did not obtain the written approval of the CIRC to use Najjar as a CI.

170.    As documented by the OIG, the DEA often infiltrates specific industries, like the Fed Ex and UPS, to obtain information that the DEA induces employees to steal from their employers by means of "incentive payments" that can sometimes exceed the pay they receive from the employers whose data they are stealing.  The OIG Report documented the DEA's unconstitutional use of a "hands off approach," to paid CIs to simply "give us what you think is helpful."  Thus, DEA CI's who work for carriers and couriers are induced to violate the privacy rights of their customers by disclosing stolen

---

[57] Najjar has an Arizona driver's license with a listed address in Glendale, Arizona, but at all times relevant to this case was a resident of California.  As a California resident without a California Driver's License, Najjar has been illegally operating a motor vehicle in California in violation of California Vehicle Code 12504(b).

customer lists, manifests, delivery schedules, and other information not lawfully
obtainable by the DEA without a search warrant.

171.    By allowing and compensating CIs for unlawful conduct, DEA CI's are
induced to do things that the DEA cannot do directly, like infiltrate social media by lying
about their identity in social media signup pages.  The DEA has sought to infiltrate the
movie industry to obtain persons skilled at pretending to be who they are not, who are
physically attractive and well-spoken, who have, in other words, "social-engineering
skills."

172.    In order to do what Agent Paddy and the DEA could not do for themselves,
Najjar first reached out to Villanueva's friends on social media, and established a close
relationship with two of them, whom he then "worked" as references to induce
Villanueva's trust and deflect suspicion.  Since Najjar was assigned to penetrate
NAAVC, that meant infiltrating Villanueva's home and church, VOLC.

173.    In his email purporting to express interest in attending an Ayahuasca
ceremony hosted by the Vine of Light Church, Najjar lied about his past experience with
a shaman.  At the time he contacted the Vine of Light Church, Najjar was residing in Los
Angeles, California.  Rather than try to attend one of the numerous Ayahuasca
ceremonies held by churches in California, Najjar registered for a ceremony at the Vine
of Light Church which was more than six hours away in Arizona.

174.    Najjar contacted the Vine of Light Church by email on December 7, 2019,
and signed up on the Internet, using the false name "Rami Joseph," in his online request
to participate in two nights of Ayahuasca Ceremony scheduled for January 10-11,
2020.[58]  Najjar recruited a second person to attend the VOLC ceremony with Villanueva,
and she signed up, providing false information about her employment and other life facts
in her application, claiming to be a "Fed Ex driver," when she actually runs a nail salon,
and claiming to have children, when she is actually single.  Three days before the

---

[58]  Najjar's email to the Vine of Light Church came less than three months after NAAVC posted
its online petition on Change.org openly challenging DEA.

ceremony, on January 8, 2021, after he had received all of the information and details about the ceremony, Najjar emailed Villanueva to cancel the second night of attendance because "work hit hard."  After initially requesting a refund, Najjar quickly shifted to heated language, accusing Villanueva of being "greedy," even though Villanueva promptly gave him the requested refund of his ceremonial attendance fee.  Najjar concluded by saying he would report Villanueva to the authorities.

175.    Najjar's real reason for cancelling his attendance at the ceremony was because he was told to do so by Agent Paddy or another DEA agent, after the DEA decided not to attempt to infiltrate NAAVC, VOLC, and Villanueva's home in this manner.  Given that Najjar would have participated in the very ceremony that he was trying to implicate as criminal, the infiltration plan was defective, and would not have produced usable evidence, because the DEA does not present evidence from CIs who admit to consuming the substance they were sent to investigate.  Najjar broke off communications with Villanueva the same day that Agent Paddy passed the purported tip to Sgt. Kaskavage.

176.    Najjar was instructed to end the relationship abruptly, but to warn Villanueva that Najjar would be reporting him to the authorities, in an effort to chill First Amendment Free Exercise by Visionary Churches.

177.    To avoid being tracked by Villanueva's friends, Najjar immediately abandoned his new social media "friends," sending an angry text message to one of them, and thereafter "blocking" all of Villanueva's friends from further communication, thus closing off that avenue for discovering his identity.

178.    Najjar is a petty criminal, but in his own mind, thanks to his CI status, he is a man of many aliases, addresses, mobile phones, and email addresses.  In response to Plaintiffs' subpoena service efforts, in a transparent effort to elude lawful legal process issued in a matter in which he could properly be made a defendant, he initiated a new identity.  This bizarre turn is alleged below, based on records of the Los Angeles Superior Court.

179.    On January 14, 2021, counsel for plaintiffs issued a subpoena for Najjar's deposition and production of documents, and sent a process server to his last known address in the city of Pacific Palisades, at a locked building, where the process server made inquiries regarding Najjar.  It was not possible to serve him.  Najjar immediately filed a Name Change Petition in Santa Monica Superior Court, using a P.O. Box as his address – 200 South Barrington, Box # 491579, Los Angeles, CA 90049.  *See In the matter of Rami Joseph Najjar*, Case No. 21SMCP00015 (Super. Ct. Cal. 2021).  Although Najjar apparently has plenty of money to rent apartments and pay movers, as set forth hereinbelow, he nevertheless applied for and received a Fee Waiver for the cost of filing the Name Change Petition.

180.    On April 30, 2021, Superior Court Judge Chester Horn denied the request for name change because, based on Najjar's sworn testimony, the Court found that "the petitioner has an active restraining order against him that expires 03/22/2022 and a pending criminal hearing 06/24/2021."[59]  Thus, a Superior Court judge swiftly determined Najjar's unreliability, and denied him the opportunity to conceal his true identity from official and private persons.

181.    Notwithstanding the fact that the DEA has greater access to criminal histories than Superior Court Judges, through its database of CIs and NADDIS, the DEA has accommodated Najjar's misconduct, protecting him from harm, and helping him to obtain new residences, by providing money and perhaps, references to landlords who otherwise would uniformly reject Najjar's rental application based on the results of a

---

[59]On March 1, 2021, Najjar was sued by a company called Cirrus, and an individual named Kevin Kim, for "Workplace Violence Prevention" and "Civil Harassment Prevention."  *See* Cirrus Asset Management, Inc. v. Najjar, Case No. 21STRO01002 (Super. Ct. Cal. 2021); *Kim v. Najjar*, Case No. 21STRO01003 (Super. Ct. Cal. 2021).  Cirrus runs the Mitchell Arms, Najjar's last residence before moving to the Sherman Oaks Riviera.  Mr. Kim is presumably an employee who obtained the restraining order against Najjar arising out of violence at his workplace, the Mitchell Arms.  *Ergo*, Najjar attacked the landlord and was found to be a danger to him.

standard civil litigation search that records two bankruptcies and a restraining order from the last landlord.

182.    When Plaintiffs' private investigator sought Najjar in his Pacific Palisades apartment, he learned that Najjar had decamped to the Mitchell Arms, another Los Angeles apartment house.

183.    Plaintiffs' private investigator arrived at the Mitchell Arms the morning of March 20, 2021, just in time to take a video of Najjar moving to his third apartment in three months.  Notwithstanding his sworn statements therein as to his lack of income, Najjar was able to employ three men to fill a large moving van with furniture, while he attended to his dog, and to come up with enough money to pay first and last month's rent (between $1,795 and $2,195 per month for a one bedroom) and a third month as security (at least $5,485) at the Sherman Oaks Riviera.

184.    Najjar left the Mitchell Arms in a late-model 350 SL black Mercedes SUV with blacked-out windows and **_no license plates_**.  Checking carefully that he was not being followed, Najjar drove this mystery vehicle to the Sherman Oaks Riviera.  But not directly.  After surveilling to be sure he was not being followed as he left, he drove directly to the San Fernando Valley, got off the freeway, and took a circuitous route to his new home, engaging in anti-surveillance maneuvers such as getting ahead of all following vehicles, turning a corner and stopping in the middle of the street to catch anyone following.  The private investigator nevertheless eluded detection, and followed Najjar to his new home at the Sherman Oaks Riviera.

185.    As alleged above, Najjar filed for bankruptcy on January 4, 2021, Case No. 2:21-BK-10035-WB (C.D. Cal.) and submitted a 36-month Chapter 13 plan, but on March 1, 2021, Najjar was able to dismiss the bankruptcy proceedings.  Also on March 1, 2021, the two restraining orders were entered on behalf of Cirrus, Najjar's landlord at the Mitchell Arms, and Mr. Kim.

186.    In summary, Najjar was an extremely poor choice for a CI job in the first place; however, his mishandling by Agent Paddy enabled new levels of misconduct that

caused serious injury to Villanueva, infringed the Free Exercise rights of the entire VOLC congregation, and caused associational injury and financial damage to NAAVC.'

187.    Najjar's mishandling was not unusual for the DEA, that not only initiated the retaliatory conduct and made Agent Paddy the triggerman for the job, but also ratified his conduct thereafter by pushing ahead with the search of Villanueva's home and church, and assisting him to conceal the purpose, scope, and means that the retaliatory conspiracy employed.  This was all part of the pattern and practice that characterizes the DEA's historic and continuing misuse of CIs, as documented by the Office of the Inspector General in a multi-year investigation that revealed extensive misconduct by DEA agents and CIs that effectively aids and abets criminal behavior with Government funding.

188.    In 2016, the Department of Justice's Office of Inspector General produced a report called: "Audit of the Drug Enforcement Administration's Management and Oversight of its Confidential Source Program." (hereinafter "OIG Report").

189.    According to the OIG Report, a confidential source is assigned to the Limited Use category if the following are established: (1) the person may be recruited by DEA, but must provide information independently (without direction by DEA); (2) the person would not be required to testify as a witness in any legal proceeding (DEA could independently corroborate); (3) DEA anticipates rewarding this person for information/services provided; and (4) the information obtained by this person is not provided because of criminal association with a person of investigative interest to the DEA.  OIG Report at 11.  ***Tipsters were some of the highest paid DEA confidential sources.***  *Id.*

190.    Among other things, the OIG Report found problems related to DEA's oversight of confidential sources the agency categorizes as "Limited Use," often referred to as "tipsters."  OIG Report at 4.  The OIG "found that DEA Special Agents do not always include evidence that the investigation involved confidential source information in the applicable DEA-6 investigative report and do not always accurately cross-file the

DEA-6 to the applicable confidential source file." OIG Report at 26. One Special Agent reported to the OIG that "prosecution and defense lawyers know that this information is derived from confidential source 'tips,' so it is not necessary to explicitly explain this fact in the DEA-6." *Id.* Special Agents also reported to the OIG that "they do not always mention the confidential sources' contributions because the DEA hopes to minimize exposure of the confidential source in the event that the DEA-6 must be provided for legal proceedings." *Id.*

191. The OIG Report also found that DEA's practices with regard to Tipsters "call into question whether the source was truly providing information independently or acting as DEA's agent, the latter of which could have implications related to compliance with the Fourth Amendment's protections against unreasonable searches and seizures." OIG Report at 22.

192. Najjar received an email from AYA on September 8, 2019, notifying him and all AYA members that NAAVC had been launched, and in response, Najjar opted in to the AYA email list on September 8, 2019. Najjar opened email from Plaintiff AYA as recently as February 2021 with the subject line: "Invitation to Ceremony (March 12th – 14th in Ukiah, CA)." Najjar continues to conduct surveillance on Plaintiffs. Najjar had been directed to infiltrate AYA as his infiltration target of choice; however, due to differences in their procedures for vetting applicants for ceremonies, Villanueva became Najjar and Agent Paddy's target of convenience.

193. Najjar and/or the DEA became aware of NAAVC and Villanueva's visionary religion activism through the Change.Org petition and the AYA, NAAVC, and/or Villanueva's Facebook groups, that distributed the Petition hyperlink and shared an outline of the contents of the DEA Letter on Facebook on September 17, 2019. The Change.org petition reached over 6,900 visionary religion Facebook members directly, and likely three times that many people by standard measures of social media dissemination. Najjar had put himself and the DEA on the email lists of one or more of these three visionary religion Facebook groups founded by Plaintiffs, in order to surveil

their activities, and pass along the information to the DEA, which Najjar did, thus providing the DEA with the knowledge that inflamed its institutional hostility towards visionary religion and stimulated the retaliatory raid on Villanueva's home and VOLC on May 19, 2020.

194.    There are thousands of Ayahuasca ceremonies held in the United States annually, and the only DEA enforcement action they have stimulated are the two cease and desist letters sent to the Soul Quest and Ayahuasca Healing groups.  And as previously quoted herein, the DEA has stated in this litigation that "the Supreme Court's ruling in *O Centro* … required the DEA to abandon its previous practice of categorically not considering exemptions to the CSA's ban," (Docket #49, 13:16-20) to argue that "Plaintiff faces no genuine threat of imminent prosecution." (Docket #49, 12:21-24.) Thus Paddy's initiation of the investigation was a marked departure from DEA practice for the last twelve years, by the agency's own admission.

195.    Pleading in the alternative, plaintiffs allege that Agent Paddy either (a) initiated the tip from Najjar to give vent to the DEA's retaliatory animus against Villanueva and NAAVC, or (b) utilized Najjar's call as a convenient vehicle for the DEA's retaliatory animus.  In either case, Agent Paddy's accusations of Villanueva to Kaskavage were a substantial factor in causing Kaskavage to initiate an investigation by Shay, an MCSO detective detailed to HIDTA.  Agent Paddy had communicated to Kaskavage that the DEA wished for HIDTA to conduct a search of Villanueva's home, by whatever means might be required, including the fabrication of evidence.  Thus, at Agent Paddy's instigation, Shay procured a warrant to search Villanueva's home, making inculpatory accusations against Villanueva in the warrant affidavit with knowledge of their falsehood, a reckless disregard for the truth, and the preconceived intention to mislead the reviewing magistrate.

196.    DEA has a long-standing policy prohibiting the initiation of criminal investigations based solely on anonymous tips in order to avoid becoming a vehicle used

to cause damage between warring neighbors, lovers, business partners, or being tricked into "swatting" a person who is the target of retaliatory animus.[60]

197.    Shay knew that Villanueva's activities at VOLC were sincere Free Exercise, but in his affidavit he implied that Villanueva's religious activities were fraudulent.

198.    Agent Paddy's email reciting his recollection of Najjar's call said Villanueva was dealing DMT out of his home.  Shay found Najjar's tip "credible on its face." (Shay Declaration, Docket # 39-1, ⁋ 17.)

199.    In fact, Najjar had never been to Villanueva's home, and knew nothing about what he did there.

200.    Shay had a telephone number to call Najjar, which made Najjar available for further questioning as to his credibility and basis of knowledge for the tip; however, Shay deliberately created the false impression in the affidavit that Najjar's call was "anonymous."

201.    After's Shay's own investigation discovered no evidence of DMT manufacturing in Villanueva's trash after several visits, he concealed that negative discovery in his warrant affidavit, and presented Najjar's "tip" as if it had been corroborated, rather than dis-corroborated, and used the false impression to ramp up the probable cause calculus.

202.    When the false statements are excised from Shay's warrant affidavit, and true, exculpatory facts are included, the facts that remain in the affidavit fall far short of establishing probable cause to believe that a crime was occurring in Villanueva's house and evidence of the crime would be found.  All of Shay's actions were contemplated, intended and furthered by Agent Paddy's initiating the investigation of Villanueva from a retaliatory motive.

---

[60] http://obedinandweissman.com/blog/swatting-is-a-federal-crime.html

203.    As further alleged in detail hereinbelow, Villanueva has been damaged by Agent Paddy's actions, suffering the search of his home, a false arrest and interrogation in handcuffs and underwear, the seizure of his Sacramental Ayahuasca and personal property, and the invasion of the privacy of his home, papers, financial records, and personal life.

204.    Due to the acts of Agent Paddy, Villanueva has been damaged, including lost property, lost income, lost liberty, humiliation, anger, frustration, anxiety, and other forms of painful thoughts and feelings.

205.    AYA has expended substantial legal fees to discover that the Guidance presented a risk to the Free Exercise and Fifth Amendment rights of visionary churches and their leadership, rather than, as the DEA represented, a genuine path to regulatory services necessary for Free Exercise.  For the cost of unearthing that deception, AYA is entitled to recover the attorney's fees expended.

## VI.    SECOND CLAIM FOR RELIEF BY AYA AND NAAVC AGAINST THE UNITED STATES OF AMERICA AND TIMOTHY J. SHEA ON BEHALF OF THE DRUG ADMINISTRATION FOR REVIEW OF AGENCY ACTION (5 U.S.C. § 702)

206.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

207.    The DEA's concerted denial of regulatory services to churches that practice visionary religion is subject to the presumption of reviewability, and no statute precludes review.[61]  The Policy that supports the denial of regulatory services, and the Guidance adopted in furtherance of the Policy, are contrary to constitutional right, privilege or immunity, in excess of statutory jurisdiction, authority or limitations, and were carried on without the procedure required by law.

---

[61] "As we explained recently, 'legal lapses and violations occur, and especially so when they have no consequence. That is why this Court has so long applied a strong presumption favoring judicial review of administrative action.'" *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 370, 202 L.Ed.2d 269, 281 (2018).

208.   Plaintiffs seek review of the DEA's use of the Guidance as a tactic for the Policy of denying regulatory services to visionary churches and refusing all requested religious exemptions from the CSA until and unless compelled by court order.  This Policy and the Guidance were drafted and put into practice with conscious disregard for the First Amendment Free Exercise and Fourteenth Amendment due process rights of plaintiffs and other visionary churches and church associations, as well as the Fifth Amendment rights of church leaders and congregations.  The Policy was therefore unconstitutional and resulted in agency inaction that is reviewable under 5 U.S.C. § 702.

209.   The Government, through its administrative agency, the DEA, is obliged to treat plaintiffs' claims for religious exemption from the CSA and the DEA's regulatory requirements in the Code of Federal Regulations in the same way as it treats secular requests for regulatory services.[62]  However, it has not.  A site-specific Google search of DEA.org for references to "religious exemption" or "RFRA exemption" will find nothing but the Guidance, which as alleged hereinabove, is merely a ruse published to further the Policy.

210.   The DEA website is conspicuously solicitous of the needs of secular registrants, providing webpages for account-creation, online access to submit reports, and automated process to obtain legally-required forms required for lawful importation, distribution, and dispensing of controlled substances.

211.   NAAVC and NAAVC's member churches utilizing Ayahuasca as their sacrament are deprived of their right of Free Exercise of religion by the DEA's conscious indifference to their need to receive religious exemptions to secure an exemption from the CSA proscriptions on importation, distribution and dispensing.  Fourteen years after the Supreme Court announced that Ayahuasca churches that adhere to best practices could obtain CSA exemptions under RFRA, the DEA adheres to the Policy of denying visionary churches regulatory services by failing to adopt a religious CSA exemption to

---

[62] *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).

list next to the exemptions for medical, pharmaceutical and law enforcement workers at 21 CFR 1301.22 – 1301.24, inclusive.  The exemptions from the prohibitions on possession of controlled substances adopted by the DEA in the above CFR sections are as subject to abuse as an exemption for religious purposes, if not more so.  Police officers have abused their exemption to plant drugs on suspects, and commit other crimes.[63]  Medical personnel, likewise, have misused their exemptions.

212.   The DEA created and used the Guidance to further the Policy of denying regulatory services to visionary churches, with conscious disregard for the disparate impact the Guidance would have and had on the efforts of plaintiffs and other visionary churches and church associations to obtain regulatory services from the DEA on grounds of religious exemption.

213.   A law that burdens religiously motivated conduct is not neutral, and must satisfy strict scrutiny.[64]  Applying strict scrutiny to the Guidance means considering whether it was the least restrictive way of handling the process of issuing exemptions pursuant to RFRA – the stated purpose of the document.  The Guidance is not the least restrictive means of advancing the Government's compelling interest in providing religious exemptions to visionary churches.  Nor is it the least restrictive means of preventing diversion of sacramental Ayahuasca into the illicit market.  Accordingly, it fails to pass strict scrutiny.

214.   Pursuant to the Policy, the DEA has denied religious claimants regulatory services equivalent to the services it provides to secular DEA registrants.  Physicians, pharmacies, drug manufacturers, and importers and exporters of controlled substances are treated like valued customers at the DEA.gov website; whereas, the needs of religious exemption-seekers are addressed only by the deceptive Guidance.

---

[63] *E.g., United States v. Cortes-Caban,* 691 F3d. 1 (1st Cir. 2012 (officers convicted of CSA violations after they abused exemptions under 21 U.S.C. § 885(d) and the related CFRs).
[64] *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).

215.    By giving full weight to the needs for secular exemptions from the CSA and DEA regulations, and ignoring the needs of churches and religious groups for those services, the DEA has established a regulatory system that has a disparate impact upon them.  Such regulatory schemes, due to their disparate impact, are violations of the First Amendment Free Exercise rights of religious persons.

216.    After receiving EO 13891, the OMB Implementing Memo, and NAAVC's letter, the DEA was under a duty of which it was fully aware, imposed by the President in his authority as the head of the Executive Branch, to rescind the Guidance under the legal doctrines set forth in the Administrative Procedure Act, EO 13891 and the OMB Implementing Memo.

217.    By continuing the Guidance in force, with all of its Constitutional and administrative defects, the DEA adhered to the Policy adopted under color of law, and failed to rescind a Guidance process so loaded with "poison pills" that any visionary church would decline to submit a petition, preferring to continue with the risks of practicing "underground," rather than submit a confession to the DEA in hopes of gaining an exemption.

218.    The DEA is under the direct injunction of the Attorney General to "proactively consider the burdens on the exercise of religion and possible accommodation of those burdens [when] formulating rules, regulations, and policies."[65] Nevertheless, the DEA has remained consciously indifferent to the Plaintiffs' First and Fourteenth Amendment rights of Free Exercise and due process, in denying visionary churches a path to regulatory services necessary to give substance to RFRA's promise of Free Exercise to visionary churches.

219.    The DEA's publication of the Guidance, and its subsequent failure to withdraw it when faced with the unambiguous directives of Executive Order 13891 and the OMB Implementing Memo, demonstrate the DEA's commitment to pursuing the

---

[65] *Memorandum on Federal Law Protections for Religious Liberty*, 82 Federal Register 49668, 4671.

Policy, and the agency's conscious indifference to the Free Exercise rights of AYA,
AYA's congregation, NAAVC, NAAVC's member churches, and their congregations.

220.    AYA, its congregation, NAAVC and NAAVC's member churches and
congregations have suffered injury to their Free Exercise rights due to the DEA's denial
of regulatory services and ignorance of its duties to visionary churches seeking
exemptions from the CSA.

221.    In pursuit of the Policy, the DEA's Guidance has had a disparate impact on
visionary churches, depriving them of any access to a system for obtaining exemptions
from those provisions of the CSA that substantially burden plaintiffs' religious Free
Exercise.

222.    The Government's adoption and implementation of the Policy, in conscious
disregard of the rights of visionary churches, has injured AYA, AYA's congregation,
NAAVC, and NAAVC's visionary church members, frustrating their sincere, lawful
desire to engage in Free Exercise through sacramental use of Ayahuasca, and to minister
to congregants and the visionary church community.  Plaintiffs have been forced into a
state of legal peril that causes persons who would otherwise join AYA or similarly-
situated visionary churches, to avoid association with visionary churches for fear of
prosecution, negative publicity, loss of employment, loss of standing in the community,
loss of individual freedom, and imprisonment.

223.    Sixty-nine percent of AYA congregants are hesitant to tell others about
their positive experiences because of questions surrounding the legality of this form of
Free Exercise.  Fifty-three-point-nine percent are hesitant to tell family, close friends or
associates about Ayahuasca for the same reason.

224.    AYA suffers from the Policy's chilling effects, that prevent people who
would join the congregation from doing so out of fear of the legal and reputational risks.
NAAVC suffers from a severe disadvantage in recruiting visionary churches into its
association because of the fear that membership in NAAVC may expose them to
enforcement scrutiny from the Government.

225.    The DEA agency action and inaction due to the Policy and the Guidance, and the concerted denial of regulatory services to plaintiffs and other visionary churches, congregations, and visionary church associations, was arbitrary, capricious, an abuse of discretion, not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and, without observance of procedure required by law; wherefore, the actions should be held unlawful and set aside, and the DEA and DOJ compelled to take the action which has been unreasonably delayed, to wit, the implementation of a system of providing regulatory services to visionary churches that gives effect to their rights of Free Exercise, and does not impose substantial burdens under the guise of helpful procedure.

**VII.    THIRD CLAIM FOR RELIEF BY PLAINTIFFS VILLANUEVA AND NAAVC AGAINST DEFENDANTS MARICOPA COUNTY, MATTHEW SHAY, TIMOTHY J. SHEA ON BEHALF OF THE DEA, AND DEA AGENT MARCO PADDY FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

226.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

227.    Villanueva placed himself under the jurisdiction of this Court on May 5, 2020, when NAAVC filed this action, because he was a Board member of NAAVC. Villanueva has now joined the action as a name plaintiff, and the plaintiff most centrally aggrieved by the acts alleged in this supplemental claim for relief under Section 1983.

228.    The DEA conceived animus for NAAVC and its Board when it learned of the Change.org petition promoting the DEA Letter.  The Government, and the DEA in particular, conceived retaliatory animus towards Villanueva when it discovered that he was one of the three Board members who decided to exercise NAAVC's First Amendment right to petition for redress of grievances by promoting the Change.org petition, by sending the DEA Letter requesting rescission of the Guidance, and by commencing this action.

229.    The DEA Letter put the Government on alert that litigation could be forthcoming.  The DEA wished to be proactive.  The USDOJ and the DEA, and private contractors working for the Government, monitor court filings against the United States and the DEA.  The DEA had actionable notice of this litigation shortly after its filing in the ECF system.  Services such as LexisNexis CourtLink perform such monitoring, and are available to all Government attorneys; accordingly, any one of a number of Government attorneys who received the DEA Letter may have set up the monitoring.  Alternatively, the filing of this action was discovered by a Government investigator or other conspirator in a single query through the PACER party locator for NAAVC's full business name.  Monitoring and/or searching for this litigation to proactively retaliate against NAAVC were material acts in furtherance of the conspiracy herein alleged.  And, as the allegations set forth hereinabove regarding Najjar establish, the DEA obtained knowledge of NAAVC, AYA, the Change.org Petition, and the plan to send the DEA Letter by infiltrating the Visionary Religion community.

230.    The DEA and/or other conspirators named herein were able to determine the identity and address of NAAVC's Board members from the public record.  All Board members permitted their addresses to be posted in the California Secretary of State's business entity directory, which accordingly records the address of Villanueva's home and the Vine of Light Church.

231.    The decision to file this action was made directly by Villanueva and his fellow Board members. NAAVC initiated this action for the declared purpose of protecting ministers and congregations of visionary churches, including themselves and their own congregations, from enforcement action by the Government. NAAVC and its Board of Directors, of which Villanueva is a founding member, placed themselves under the jurisdiction of this Court by filing this action.

232.    The DEA's retaliatory animus encompassed the intent to chill Villanueva's Free Exercise, to silence his Free Religious Expression, and to obtain tactical leverage in the pending litigation by placing an NAAVC Board member at risk of prosecution.

Adhering to a pattern of institutional conduct, the DEA has deployed essentially the same tactic it utilized when it arrested Jonathan Goldman of the Oregon Santo Daime even as the Santo Daime believed they were in negotiations with the USDOJ to obtain a negotiated exemption from the CSA on religious grounds.  And as also previously alleged, the very day after Goldman's arrest, the DEA seized the UDV's sacramental hoasca in New Mexico, conducting an enforcement action against the church even as the UDV also conducted negotiations with the USDOJ.  The DEA now seeks to dominate this proceeding using unlawfully-obtained leverage over NAAVC's Board based on an unconstitutional search and seizure of Villanueva.

233.    Federally-funded DEA/MCSO collaboration in the field of controlled substances enforcement has been ongoing for twenty-three years in Maricopa County, since 1997 when Sheriff Joe Arpaio secured federal-funding for the High Intensity Drug Trafficking Areas ("HIDTA") program.  The HIDTA grant funds the HIDTA Task Force, that emphasizes "investigations focusing on cartel-led drug transportation organizations (DTO's), and money laundering organizations (MLO's)."   The HIDTA Task Force also includes "prosecutors from the Attorney General's Office and agents from the DEA."[66] Villanueva's home was searched by the HIDTA Task Force, DEA personnel aided in the raid, so there was explicit federal/MCSO coordination of the operation initiated by Agent Paddy, for the DEA.

234.    In addition to federal funding for HIDTA, that thus became the operational locus of the conspiracy that had originated in the DEA, the DEA had fertile ground in which to instigate unconstitutional activity in Maricopa County against Villanueva, because unlawful collaboration between Maricopa County and the federal government against people with Hispanic surnames, *e.g.,* Villanueva, has been the longstanding policy of Maricopa County.  Arizona law enforcement has a long history of anti-Hispanic bias that Sheriff Joe Arpaio ("Arpaio") raised to a fever pitch during his divisive tenure.

---

[66] https://www.mcso.org/SpecialOps/Hidta

Arpaio infused MCSO culture with contempt for virtually all constitutional restraints on the power of MCSO deputies.  Arpaio was rewarded with twenty-four years of re-election, administrative leeway, and litigation support by Maricopa County, for punishing jail inmates with humiliation and harsh environmental exposure, dressing them in pink underwear, and housing them in uncooled, unheated tents in Phoenix, a city in the middle of the Sonora desert, renowned for severe extremes of temperature. [67]  Arpaio and his top commanders forged policies designed to comprehensively violate the civil rights of Hispanics and other people of color who they subjected to pretextual traffic stops, pedestrian stop-and-frisks, and mass roundups.  Openly defying federal court orders by continuing to promulgate and enforce unlawful, banned policies,[68] Arpaio trained MCSO deputies to violate constitutional rights in defiance of federal court orders.  Conscious indifference to the civil rights of persons in Maricopa County thus became endemic within MCSO.

235.    MCSO remains under a federal court-ordered injunction that appointed a monitor that submits quarterly reports on MCSO's progress in eliminating unconstitutional conduct.  The most recent court-ordered report on MCSO's performance in the area of traffic stops showed that MCSO deputies continue to be tainted by unconstitutional bias that results in conducting a disproportionate number of traffic stops of people of color.

236.    Maricopa County has long been on notice that humiliating people by standing them in their nightclothes in public view while their home is searched by armed police is a practice condemned by the federal courts.  Thirteen years ago, this Court stated:

---

[67] Verdicts against Maricopa County for jail violations exceeded $33 Million two years ago. *Joe Arpaio just cost Arizona taxpayers another $7 million,* The Republic March 5, 2018. https://www.azcentral.com/story/opinion/op-ed/laurieroberts/2018/03/05/joe-arpaio-just-cost-arizona-taxpayers-another-7-million/397695002/
[68] Convicting Arpaio of contempt of court in violation of 18 U.S.C. § 401(3), Judge Bolton found that the Sheriff had "announced to the world and to his subordinates that he was going to continue business as usual no matter who said otherwise."

> A troubling aspect to this case is that the Maricopa County Attorney's Office, Defendants and Defendants' expert, with over thirty years police experience, urge the court to find the way Plaintiff was seized and interrogated to be perfectly acceptable. Defendants' expert describes the actions as "standard police practice." DSOF, Exh. 3 at 5. But Defendants' conduct is of the nature which has been repeatedly condemned by the federal courts. [Citations omitted.] The Court is left to wonder if such actions are standard policy at the Maricopa County Sheriff's Office?

*Bettin v. Maricopa County*, 2007 U.S. Dist. LEXIS 42979, *37, 2007 WL 1713319 (D. Ariz. June 11, 2007).

237.    MCSO's conscious indifference towards the civil rights of the persons found in Maricopa County has been encouraged by the highest levels of Government. The President's pardon of Arpaio, and Vice President Pence's public praise of the convicted ex-sheriff, encouraged an attitude of impunity within MCSO.  The taxpayers of Maricopa County have paid over $100 Million to deal with the consequences of the lawless lawman's legacy;[69] however, as MCSO's monitor recently reported, the culture of unlawful policing remains.  Defendant William Barr also gave an inflammatory speech at the August 2019 convention of the Fraternal Order of Police, using his office as the Government's chief law enforcement officer, to encourage police to use harsh tactics and be unconcerned about injuries to the rights or persons of citizens.  The Attorney General thus announced conscious indifference to the constitutional rights of all Americans to be the official policy of his office.  Barr's announcement that infringement of the rights of Americans was Government policy actively encouraged the DEA and all other conspirators in the raid on Villanueva's home and the Vine of Light Church to commit their various unconstitutional acts in furtherance of the conspiracy.[70]

238.    As alleged hereinabove, MCSO detective Shay was prompted to initiate enforcement action against Villanueva by his HIDTA boss, Kaskavage.  Shay was

---

[69] *Joe Arpaio just cost Arizona taxpayers another $7 million,* The Republic March 5, 2018, as linked *supra*.

[70] *AG Barr said there must be 'zero tolerance for resisting police' and went after 'social-justice reformers' in a heated speech to the US's largest law-enforcement organization* https://www.businessinsider.com/william-barr-zero-tolerance-fraternal-order-police-speech-2019-8?op=1

directed to procure a search of Villanueva's home, by whatever means necessary, including by fabricating evidence to support the warrant, if necessary.

239.    Pursuant to the conspiracy formed at the DEA's instigation, and using HIDTA as their meeting ground and funding source, Maricopa County and Shay initiated an investigation of Villanueva to further the purposes of the conspiracy. The first objective of the conspiracy was to attack Villanueva's person and his Fourth Amendment rights by conducting a retaliatory search and seizure based on a warrant issued based on a bad faith affidavit.  The retaliatory search and seizure was intended to, and did injure, Villanueva's rights of Free Exercise, Free Expression, his Right to Petition the Government for Redress of Grievances, his right to not be deprived of his property without due process of law and just compensation, and his right to have counsel present during custodial interrogation.  The ultimate purpose of all of these constitutional invasions of Villanueva's rights was to injure NAAVC's position in this litigation.

240.    The DEA, Maricopa County, MCSO, and Shay, were all acting under color of law, and consciously indifferent to Villanueva's civil rights, when they performed acts in furtherance of the conspiracy.  The conspiracy that arose between federal, state, and county law enforcement, allowed the DEA to attack NAAVC's Board using state agents.

241.    MCSO personnel have extensive experience in acting deceptively, and as previously alleged, were for many years trained in how to be consciously indifferent to the constitutional rights of persons falling under their law enforcement jurisdiction.  Law enforcement agents at both federal and state agencies share information useful in violating the civil rights of investigative subjects like Villanueva through official and unofficial communications systems.  Shay's policing practices have developed within MCSO's culture of disrespect for the constitutional rights of citizens.  MCSO, DEA, DHS, and CBP personnel utilize social media websites, including Facebook, to share information, and postings on Facebook, or in other social media, may have been used by the defendants to initiate, form, or implement the goals of the conspiracy.

242.    The attack on Villanueva's civil rights took place in the early morning hours of May 19, 2020.  Accompanied by a large number of heavily armed deputies who announced themselves by pounding on the front door and threatening to bring it down if it were not opened immediately, Shay delivered a search warrant issued by a Maricopa County Justice of the Peace, and had his deputies place Villanueva in handcuffs as he stood in his underwear.  Shay indulged in an extreme and unnecessary show of force to serve a warrant on a fifty-nine-year-old religious man, a retired Navy non-commissioned officer, at his church-residence. Villanueva had no weapons, no criminal record, and an announced history of conducting visionary church ceremonies.

243.    Shay's armed raid accomplished the following tactical goals: (1) subjecting Villanueva to the fearful and humiliating experience of being arrested in his own home by armed men, *i.e.*, inspiring him with "shock and awe," (2) seizing the Vine of Light Church's Ayahuasca sacrament, thus interrupting the entire congregation's Free Exercise, silencing its Free Religious Expression, and disrupting Villanueva's ministry of sharing Ayahuasca communion, (3) disrupting Villanueva's lawful, state-licensed cannabis-growing operation for medical marijuana users and medicinal hemp, by destroying the crop, seizing lawfully-grown medicinal plants, and confiscating growing equipment (4) seizing mobile telephones and copying their media, (5) interrogating Villanueva while handcuffed in his underwear, (6) engaging in *ex parte* contact with a represented party in litigation, and circumventing the discovery process in this action by fishing for evidence via search warrant for use in this litigation, (7) attacking Villanueva's resolve to remain steadfast in NAAVC's pursuit of its rights of Free Exercise, (8) injuring Villanueva financially by seizing his property and causing him to default on his caregiver-duties to grow medical marijuana for specified patients,  (9) injuring Villanueva financially by imposing on him the cost of engaging skilled criminal defense counsel, and (10) chilling Villanueva's Free Exercise, Free Expression, and Rights to Petition by placing him under imminent threat of criminal prosecution.

244.    The fact that Villanueva has a Hispanic surname, and the fact that Ayahuasca originates from Latin American indigenous culture, gave rise to unconstitutional bias that the conspirators showed in making Villanueva the target of their attack on his civil rights.

245.    Shay and agents from the Arizona Attorney General's office violated Villanueva's Fourth Amendment rights by secretly obtaining financial records from PayPal and other sources, because they knew they were investigating the activities of the Vine of Light Church, and their investigation showed that Vine of Light Church was engaged in lawful Free Exercise and Free Expression activities. Accordingly, funds derived from those activities were not the proceeds of criminal conduct, and should not have been demanded and obtained from third party financial services providers without Villanueva's consent or knowledge.

246.    The conspiracy to violate Villanueva's civil rights was furthered by Shay's fabrication of a false narrative of criminal conduct in violation of the Fourteenth Amendment that protects persons from being criminally accused with false evidence. The warrant to search Villanueva's home and the Vine of Light Church was unconstitutionally obtained with an affidavit that Shay submitted in bad faith, that concealed material exculpatory facts from the issuing magistrate, misrepresented true facts to conceal their exculpatory aspect, and created the materially false impression that Villanueva's home was a run-of-the-mill Phoenix drug packaging house, not a church. If all false statements had been excised from the warrant, and all relevant exculpatory facts had been included, the warrant affidavit could not have appeared to establish probable cause to issue the warrant.

247.    During his custodial interrogation of Villanueva, Shay revealed that the matter "came across his desk in February." Shay made it clear he knew Villanueva was running a church called the Vine of Light, and expressed wide knowledge of the church's website, expressing admiration of the beauty of the travel photos from Vine of Light Church trips to Peru. Shay told Villanueva he was familiar with the *O Centro* decision.

73

248.     Shay said he did not know whether charges would be filed against
Villanueva.  By this statement, Shay admitted that probable cause to believe a crime had
been committed at the Vine of Light church by Villanueva had been lacking all along,
and the search had been a pretext for another purpose altogether – chilling Villanueva's
Free Exercise, Free Expression, and the Right to Petition this Court for redress of
grievances.

249.     Villanueva had a right to engage in Free Exercise and Free Religious
Expression, by drinking and sharing Ayahuasca in communion ceremony, free from
criminal liability, pursuant to the First Amendment, RFRA and FERA.  Villanueva had a
right to possess the Ayahuasca sacrament as necessary to his Free Exercise and that of the
Vine of Light congregation.

250.     The conspirator defendants, the DEA, Maricopa County, and Shay, had a
duty to respect the plaintiff's rights, and not to engage in any conspiracy to deprive him
of his civil rights.  By the acts above-alleged, each of the conspirator defendants
committed one or more overt acts in furtherance of the conspiracy to violate Villanueva's
civil rights.

251.     The defendants performed their roles and committed acts in furtherance of
the conspiracy with conscious indifference to Villanueva's rights, and by the above-
alleged acts, caused constitutional injury, and resulting economic and non-economic
damages, to Villanueva.

252.     The full scope of the conspiracy may or may not have been known to all of
the conspirators; however, the conspirators, having committed acts in furtherance of the
conspiracy, are all deemed to have intended the naturally foreseeable consequences of
their joint, unlawful course of conduct, committed under color of law.

253.     The conspirators violated Villanueva's Fourth Amendment right to be free
of unreasonable searches and seizures by obtaining his financial records, and searching
his home and church pursuant to a warrant obtained by means of a misleading, deceptive,
bad faith affidavit.  Shay's submission of the bad faith affidavit as evidence in support of

the request for the warrant falsely described Villanueva's Free Exercise as drug dealing, and falsely likened Villanueva's provision of sacramental Ayahuasca to his congregation as drug manufacturing. Shay knew this depiction was false.

254.    The conspirators violated Villanueva's Fourth Amendment right to be free of unlawful arrest or detention by demanding entry to his home and the Vine of Light Church, holding him at gunpoint, handcuffing him, and keeping him a prisoner in his own home for several hours.

255.    The conspirators violated Villanueva's Fifth Amendment rights by seizing his sacramental Ayahuasca, medical cannabis, medical hemp, currency, telephones, and other property without just compensation.  MCSO did not record the amount of currency seized on any receipt, thus providing the opportunity for theft and authentication problems that may prejudice efforts to obtain return of the currency.

256.    The conspirators violated Villanueva's Free Exercise and Free Religious Expression, and that of his congregation, by seizing the Vine of Light Church's sacramental Ayahuasca, necessary for their religious practice and the health of their souls.

257.    The conspirators violated Villanueva's First Amendment Right to Petition for Redress of Grievances by retaliating against him for directing NAAVC to send the DEA Letter and sue the Government in this action.

258.    The conspirators violated Villanueva's right to Equal Protection of the laws under the Fourteenth Amendment, by according him a lesser standard of constitutional rights due to his Hispanic surname and the Latin American origins of his religion, and by submitting distorted, incomplete, fabricated evidence about his religious activities to make them appear inculpatory.

259.    The raid on the Vine of Light Church caused direct injury to NAAVC, at which it was primarily directed.  Having extended an open door to the DEA to communicate with NAAVC on matters of importance to the visionary church community as was urged by AG Sessions in his *Memorandum*, NAAVC's Board was rewarded with

a search warrant served on one of its directors, and the complete shut-down of one of its member churches.  Villanueva was targeted because of his status as an NAAVC Board Member.  Villanueva's church was a tactically convenient target, because his church is in Maricopa County, where collaboration by MCSO with the DEA's plan of attack was well-received by Shay, who began the investigation promptly and obtained the search warrant shortly after this lawsuit was filed, so that NAAVC could not fail to make the connection between this lawsuit, Villanueva's unlawful arrest and search, and the shutdown of the Vine of Light Church by seizure of its sacrament and the threat of pending prosecution and future enforcement by state actors operating at the behest of the DEA.

260.    The DEA, through the conspiracy to attack NAAVC by attacking Villanueva, sought to obtain leverage in this court proceeding by placing an NAAVC Board member at risk of prosecution, after subjecting him to a harrowing experience of being hauled out of bed and served a warrant by a SWAT team.  The DEA intended to have, and had, a chilling effect on the NAAVC's First Amendment Right to Seek Redress of Grievances, and has caused irreparable harm to Villanueva's ministry by unilaterally silencing his congregation's Free Exercise.  For these outrageous acts of Government aggression, NAAVC has no remedy at law; wherefore, NAAVC seeks declaratory and injunctive relief as prayed herein.

261.    The conspirator defendants' constitutional violations caused economic damages to plaintiff in an amount to be established according to proof.

262.    The conspirator defendants' constitutional violations caused non-economic damages to plaintiff in the amount of not less than $1,000,000, in the form of humiliation, frustration, grief, anxiety, fear, and other painful emotions naturally resulting from the defendants' conscious indifference, malice, and oppression.

263.    If the DEA, Maricopa County, and Matthew Shay, are not enjoined from taking further unlawful action under color of state law, Villanueva and NAAVC will

suffer irreparable harm for which they have no remedy at law; wherefore, they seek declaratory and injunctive relief as prayed herein.

264.    The injunctive relief requested by Villanueva and NAAVC will be in the public interest, as it will protect the First Amendment rights of Free Exercise, Free Religious Expression, and the Right to Petition for Redress of Grievances from unlawful oppression by state law enforcement agencies and the Government, giving vent to retaliatory animus.  It will further remedy the seizure and forfeiture of private property without just compensation by the Government, Maricopa County, and Shay, as is required by the Fifth Amendment when Government takes private property for public ends.

265.    As the conspirators have acted with malice, fraud and oppression, exemplary damages are claimed to deter the defendants, and each of them, from future such conduct.

## VIII.    FOURTH CLAIM FOR RELIEF BY VILLANUEVA AGAINST DEFENDANTS SHAY AND MARICOPA COUNTY UNDER THE ARIZONA FREE EXERCISE OF RELIGION ACT (A.R.S. § 41-1493.01)

266.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

267.    Villanueva is the minister of the Vine of Light Church.  The Vine of Light Church shares the doctrine of Divine Love that Villanueva has received through Ayahuasca communion.

268.    Villanueva's sole avenue of Free Exercise and Free Religious Expression is through Ayahuasca communion.

269.    Nurturing the Vine of Life Church congregation through offerings of sacramental Ayahuasca in ceremony is the central feature of Villanueva's religious life, and in order to do so, he needs to be free to obtain and share Ayahuasca with his congregation.

270.    The search of Villanueva's residential church, the seizure of his person, the seizure of the Vine of Light Church's sacramental Ayahuasca, and the seizure of

Villanueva's personal property and currency, substantially burden Villanueva's Free Exercise of religion and Free Religious Expression.

271.    A complete ban on Villanueva's use of Ayahuasca is not the least restrictive means of advancing Maricopa County's interest in regulating the illegal market in DMT, or any other substance.

272.    The Supreme Court's holding that an exemption from the CSA is required under RFRA is binding upon the State of Arizona and its political subdivisions, including Maricopa County, because the CSA, and all controlling Supreme Court precedent interpreting the CSA, pre-empts conflicting state law.[71]   The Arizona Supreme Court has declared that FERA, at A.R.S. § 41-1493.01, provides protections for Free Religious Expression under the Arizona Constitution that are co-extensive with the protections provided by RFRA under *O Centro*.   Accordingly, the result under FERA and RFRA must be the same.

273.    Villanueva has a right, under FERA, to possess and distribute Ayahuasca as Free Exercise and Free Religious Expression as the sacrament of the Vine of Light Church without fear of prosecution under any provision of Title 36 of the Arizona Revised Statutes.   Villanueva is entitled to an exemption from registration pursuant to subsection D of ARS § 36-2522, with respect to dispensing Ayahuasca as the communion sacrament of the Vine of Light Church.

274.    Villanueva has been economically and non-economically damaged as alleged hereinabove, by the invasion of his home pursuant to a warrant procured by Shay and Maricopa County in bad faith, by the seizure of his person and property, and by the interference with his Free Exercise of Religion.

275.    Villanueva has incurred attorney's fees in the enforcement of his rights under A.R.S. § 41-1493.01.

---

[71] *Preemption of the Ariz. Medical Marijuana Act (Proposition 203),* Op. Ariz. Att'y Gen. No. 112-001 (Aug. 6, 2012).

IX.  **FIFTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR TRESPASS**

276.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

277.  Villanueva timely served notices of government claim on Maricopa County regarding the herein alleged claim.

278.  Villanueva's home is real property, and he and his wife had the exclusive right to enter into their own home, and the right to exclude all others therefrom.

279.  Shay was acting in the course and scope of his employment by Maricopa County at all times alleged herein.

280.  Shay and Maricopa County intentionally entered upon the premises of the Villanueva home, and by means of their trespass thereupon, caused the personal injuries and property damages hereinabove alleged.

281.  Villanueva suffered the economic and non-economic damages above alleged and here incorporated by reference.

282.  The acts of the said defendants were intentionally injurious, fraudulent, oppressive, and worthy of deterrence, wherefore punitive damages are prayed.

X.  **SIXTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR BATTERY**

283.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

284.  Villanueva timely served notices of government claim on Maricopa County regarding the herein alleged claims.

285.  Shay, and all of the deputies under his direction, were acting in the course and scope of their employment by Maricopa County at all times alleged herein.  Any acts alleged herein against Shay and Maricopa County deputies were either authorized by Maricopa County or ratified thereafter by taking no disciplinary action against Shay and the said deputies for the matters alleged herein.

286.    Shay directed Maricopa County deputies, and others under his command, to subject Villanueva to the harmful touching above-alleged.

287.    The harmful touching of Villanueva's person caused the personal injuries hereinabove alleged, and was aggravated by the failure of Shay, or any of the other persons under his supervision, to wear masks, gloves, or any other sort of PPE, notwithstanding that the raid took place during the first severe wave of the COVID pandemic in the Phoenix area.

288.    Villanueva suffered the economic and non-economic damages above alleged and here incorporated by reference.

289.    The acts of the said defendants were intentionally injurious, fraudulent, oppressive, and worthy of deterrence, wherefore punitive damages are prayed.

## XI.    SEVENTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR CONVERSION AND REPLEVIN

290.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

291.    Shay, and all of the deputies under his direction, were acting in the course and scope of their employment by Maricopa County at all times alleged herein.  Any acts alleged herein against Shay and Maricopa County deputies were either authorized by Maricopa County or ratified thereafter by taking no disciplinary action against Shay and the said deputies for the matters alleged herein.

292.    Shay directed Maricopa County deputies, and others under his command, to interfere with and seize Villanueva's personal property, including Sacramental Ayahuasca, medical marijuana, United States currency, and mobile telephones.

293.    Due to the above-alleged acts of Shay and Maricopa County, Villanueva has lost possession and use of the said personal property.

294.    Villanueva suffered the economic and non-economic damages above alleged and here incorporated by reference.

295.    Plaintiff is entitled to the equitable remedy of replevin of all seized property.

296.    The acts of the said defendants were intentionally injurious, fraudulent, oppressive, and worthy of deterrence, wherefore punitive damages are prayed.

## XII.    EIGHTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR NEGLIGENCE

297.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

298.    Shay, and all of the deputies under his direction, were acting in the course and scope of their employment by Maricopa County at all times alleged herein.  Any acts alleged herein against Shay and Maricopa County deputies were either authorized by Maricopa County or ratified thereafter by taking no disciplinary action against Shay and the said deputies for the matters alleged herein.

299.    Shay and Maricopa County had a duty of reasonable care towards Villanueva.

300.    As Shay's employer, Maricopa County had a duty to train him to respect the sanctity of the home, which enjoys the highest level of constitutional protection from unlawful intrusion under the Anglo-American system of jurisprudence.  Maricopa County failed to train Shay in proper investigative, enforcement, and warrant-drafting technique and ethics.  Due to Shay's inadequate training and moral compass, he fabricated the existence of probable cause to obtain the warrant to search Villanueva's home.

301.    The above-alleged acts of Shay and Maricopa County, to wit, the planning of a search based upon a bad faith warrant, the conduct of the raid with an excessive and unnecessary show of force and heavy weapons, the arrest of a religious practitioner in his underwear in his own front yard, the detention without probable cause of Villanueva's spouse, and the search conducted without PPE, were all breaches of the duty of reasonable care owed to Villanueva.

302.   Due to the above-alleged acts of Shay and Maricopa County, Villanueva has suffered the economic and non-economic damages above alleged and here incorporated by reference.

**XIII.   NINTH CLAIM FOR RELIEF AGAINST MATTHEW SHAY AND MARICOPA COUNTY FOR LOSS OF CONSORTIUM**

303.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

304.   Shay and all of the deputies under his direction were acting in the course and scope of their employment by Maricopa County at all times alleged herein.  Any acts alleged herein against Shay and Maricopa County deputies were either authorized by Maricopa County or ratified thereafter by taking no disciplinary action against Shay and the said deputies for the matters alleged herein.

305.   Shay and Maricopa County had a duty of reasonable care towards Villanueva and his spouse.

306.   The above-alleged acts of Shay and Maricopa County, to wit, the planning of a search based upon a bad faith warrant, the conduct of the raid with an excessive and unnecessary show of force and heavy weapons, the arrest of a religious practitioner in his underwear in his own front yard, the detention without probable cause of Villanueva's spouse, and the search conducted without PPE, were all breaches of the duty of reasonable care owed to Villanueva.

307.   Due to the above-alleged acts of Shay and Maricopa County, Villanueva's spouse has suffered severe and permanent emotional injury that has caused Villanueva to suffer a loss of the companionship, affection and other spousal benefits and sources of marital happiness.  Mrs. Villanueva now suffers from PTSD that causes her to fear being in her own home, the location of her trauma.  She is anxious, fearful, and uncomfortable in a wide variety of situations where she would not previously have suffered any discomfort.

308.    Villanueva has been damaged, and suffers depression, frustration, powerlessness and anger due to his inability to relieve his wife's suffering stemming from the raid.

309.    Wherefore, Villanueva is entitled to recover non-economic damages for the above-alleged personal injuries.

## XIV.    TENTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR DECLARATORY RELIEF (28 U.S.C. §§ 2201 – 2202)

310.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

311.    An actual controversy exists between the plaintiffs and the Government. RFRA Plaintiffs are interested parties to this controversy, and seek a declaration of their respective rights and relations with the Government, as further alleged hereinbelow.

312.    Plaintiffs contend that:

a.    The Government has a substantial interest in the preservation of the free exercise of religion;

b.    The power of self-determination reserved to the people by the 10th Amendment empowers a religious congregation to form its own governance, beliefs, and practices, grounded in freedom of conscience;

c.    The *prima facie* sincerity of a religious person, within the meaning of RFRA, may be established by a true averment of sincere religious intent;

d.    Ayahuasca is not subject to the risks of diversion applicable to other substances regulated by the CSA;

e.    RFRA Plaintiffs are religious persons within the meaning of RFRA, endowed with the right of self-determination, sincerely professing a doctrine of visionary religion, whose central practice is communion with Divine Love through drinking sacramental Ayahuasca in sacred ceremony;

f.    RFRA Plaintiffs' rights of religious Free Exercise are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing

a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

g.  The CSA's absolute prohibition on RFRA Plaintiffs' importation, distribution, and dispensing of Ayahuasca to its congregation is not the least restrictive means of preventing diversion of Ayahusca to the illicit market;

h.  DHS's policy of seizing and forfeiting Sacramental Ayahuasca from AYA and NAAVC, is a Fifth Amendment taking of personal property for public purpose by regulatory forfeiture, for which just compensation is due, in an amount to be established;

i.  RFRA Plaintiffs are entitled to exemptions from the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

j.  RFRA Plaintiffs are entitled to receive DEA Numbers as exempt persons under 21 CFR 1312.11;

k.  The DEA, the Government's administrative agency, had and has an official policy of denying regulatory services to persons seeking exemption from the CSA for purposes of Free Exercise, except where compelled by court order (the "Policy");

l.  The DEA's Policy, and its issuance of the Guidance thereunder, was a reviewable agency action within the meaning of 5 U.S.C. § 702;

m.  The Guidance established no administrative remedy exhaustion requirement;

n.  The Guidance established a system for adjudicating the religious character of petitioners;

o.  Under the Guidance, the petition adjudicator is anonymous, operates without legal guidelines or timelines for completing the adjudication, and there is no swift method of appeal from an adverse decision;

p.  The Guidance process, and the Adjudicative Body, have failed to approve any petitions for exemption in fourteen years;

q.  The Guidance substantially burdens the Free Exercise of AYA and its congregation, and NAAVC and its member visionary churches;

r.  The Guidance is directed at imposing legal detriment upon visionary churches particularly, and is not a neutral enactment, law or policy;

s.  The Guidance is not the least restrictive means of advancing any compelling governmental interest;

t.  The Guidance has been used under color of law as a pretext for propounding *de facto* administrative subpoenas backed by an implied threat of prosecution;

u.  By falsely promising to provide a path to obtaining regulatory services from the DEA, the DEA obtained inculpating statements from persons who signed petitions that were submitted to the DEA in good faith;

v.  The Guidance does not prevent the DEA from using inculpating statements in petitions to investigate and/or prosecute petitioners;

w.  The DEA has never acted on the petitions that it compelled the petitioners to submit;

x.  The DEA's use of the Guidance in furtherance of the Policy had and has a chilling effect upon AYA's rights of Free Exercise, upon NAAVC, and upon the community of visionary churches represented by NAAVC;

y.  The DEA's use of the Guidance as a vehicle for the Policy has accomplished the constitutionally impermissible goal of frustrating the

sincere Free Exercise rights of AYA, AYA's congregation, NAAVC, and NAAVC's member churches and congregations;

z. The Policy, the Guidance, and all other agency actions that have served to impede the Free Exercise of plaintiffs, were arbitrary, capricious, an abuse of discretion, not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and, without observance of procedure required by law;

aa. Pursuant to the executive authority of the Office of the President as set forth in EO 13891 and the OMB Implementing Memo, the Guidance was affirmatively withdrawn as the policy of the Government, and is unenforceable;

bb. The DEA's use of the Guidance as a ruse to present the appearance of a legitimate path for visionary churches to obtain regulatory services, was an act of conscious indifference that caused compensable injury to the civil rights of plaintiffs; and

cc. The Guidance has no legal validity, and was adopted under color of law, pursuant to the Policy, to frustrate the legal rights of Free Exercise of plaintiffs, their members, and other religious persons;

dd. If not enjoined, the DEA will continue to use the Guidance as a springboard for *de facto* stop orders and administrative subpoenas that chill Free Exercise and violate the Establishment Clause of the First Amendment by making administrative inquiries into church business that constitutes an entanglement with religion;

ee. Ayahuasca seized by DHS was the lawful property of NAAVC and AYA, imported as an act of Free Exercise, and not subject to seizure;

ff. The pre-search investigations and May 19, 2020 search of the Vine of Light Church and Villanueva's home and premises were unconstitutional violations of the First, Fourth, Fifth and Fourteenth Amendments by the Government, the DEA, and Maricopa County;

gg. Proceeds of the unconstitutional pre-search investigations and May 19, 2020 search of the Vine of Light Church and Villanueva's home and premises may not be admitted in any proceeding against NAAVC, Villanueva, or any parties aligned with them in this litigation;

hh. Villanueva is entitled to replevin of all personal property seized by Shay and Maricopa County during the May 19, 2020 search of his home;

ii. The Government is judicially estopped from initiating enforcement action against AYA for the Free Exercise activity disclosed in this litigation; and,

jj. The requested injunction will serve the public interest.

313. Defendants dispute the Plaintiffs' contentions.

314. Wherefore, there is an actual dispute between the parties that this Court is authorized to adjudicate, and to resolve by issuing a declaration stating the rights and relations of the parties.

## XV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Arizona Yage Assembly, and North American Association of Visionary Churches, Clay Villanueva and VOLC, request entry of judgment in their favor and against defendants, by the issuance of a decree providing as follows:

1. FINDINGS:

   a. The Government has a substantial interest in the preservation of the free exercise of religion;

b.  The power of self-determination reserved to the people by the 10th Amendment empowers a religious congregation to form its own governance, beliefs, and practices, grounded in freedom of conscience;

c.  The *prima facie* sincerity of a religious person, within the meaning of RFRA, may be established by a true averment of sincere religious intent;

d.  Ayahuasca is not subject to the risks of diversion applicable to other substances regulated by the CSA;

e.  RFRA Plaintiffs are religious persons within the meaning of RFRA, endowed with the right of self-determination, sincerely professing a doctrine of visionary religion, whose central practice is communion with Divine Love through drinking sacramental Ayahuasca in sacred ceremony;

f.  RFRA Plaintiffs' rights of religious Free Exercise are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

g.  The CSA's absolute prohibition on RFRA Plaintiffs' importation, distribution, and dispensing of Ayahuasca to its congregation is not the least restrictive means of preventing diversion of Ayahuasca to the illicit market;

h.  DHS's policy of seizing and forfeiting Sacramental Ayahuasca from AYA and NAAVC, is a Fifth Amendment taking of personal property for public purpose by regulatory forfeiture, for which just compensation is due, in an amount to be established;

i.  RFRA Plaintiffs are entitled to exemptions from the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

j.  RFRA Plaintiffs are entitled to receive DEA Numbers as exempt persons under 21 CFR 1312.11;

k.  The DEA, the Government's administrative agency, had and has an official policy of denying regulatory services to persons seeking exemption from the CSA for purposes of Free Exercise, except where compelled by court order (the "Policy");

l.  The DEA's Policy, and its issuance of the Guidance thereunder, was a reviewable agency action within the meaning of 5 U.S.C. § 702;

m.  The Guidance established no administrative remedy exhaustion requirement;

n.  The Guidance established a system for adjudicating the religious character of petitioners;

o.  Under the Guidance, the petition adjudicator is anonymous, operates without legal guidelines or timelines for completing the adjudication, and there is no swift method of appeal from an adverse decision;

p.  The Guidance process, and the Adjudicative Body, have failed to approve any petitions for exemption in fourteen years;

q.  The Guidance substantially burdens the Free Exercise of AYA and its congregation, and NAAVC and its member visionary churches;

r.  The Guidance is directed at imposing legal detriment upon visionary churches particularly, and is not a neutral enactment, law or policy;

s.  The Guidance is not the least restrictive means of advancing any compelling governmental interest;

t.  The Guidance has been used under color of law as a pretext for propounding *de facto* administrative subpoenas backed by an implied threat of prosecution;

u.  By falsely promising to provide a path to obtaining regulatory services from the DEA, the DEA obtained inculpating statements from persons who signed petitions that were submitted to the DEA in good faith;

v.  The Guidance does not prevent the DEA from using inculpating statements in petitions to investigate and/or prosecute petitioners;

w.  The DEA has never acted on the petitions that it compelled the petitioners to submit;

x.  The DEA's use of the Guidance in furtherance of the Policy had and has a chilling effect upon AYA's rights of Free Exercise, upon NAAVC, and upon the community of visionary churches represented by NAAVC;

y.  The DEA's use of the Guidance as a vehicle for the Policy has accomplished the constitutionally impermissible goal of frustrating the sincere Free Exercise rights of AYA, AYA's congregation, NAAVC, and NAAVC's member churches and congregations;

z.  The Policy, the Guidance, and all other agency actions that have served to impede the Free Exercise of plaintiffs, were arbitrary, capricious, an abuse of discretion, not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and, without observance of procedure required by law;

aa. Pursuant to the executive authority of the Office of the President as set forth in EO 13891 and the OMB Implementing Memo, the Guidance was affirmatively withdrawn as the policy of the Government, and is unenforceable;

bb. The DEA's use of the Guidance as a ruse to present the appearance of a legitimate path for visionary churches to obtain regulatory services, was an

act of conscious indifference that caused compensable injury to the civil rights of plaintiffs; and

cc. The Guidance has no legal validity, and was adopted under color of law, pursuant to the Policy, to frustrate the legal rights of Free Exercise of plaintiffs, their members, and other religious persons;

dd. If not enjoined, the DEA will continue to use the Guidance as a springboard for *de facto* stop orders and administrative subpoenas that chill Free Exercise and violate the Establishment Clause of the First Amendment by making administrative inquiries into church business that constitutes an entanglement with religion;

ee. Ayahuasca seized by DHS was the lawful property of NAAVC and AYA, imported as an act of Free Exercise, and not subject to seizure;

ff. The pre-search investigations and May 19, 2020 search of the Vine of Light Church and Villanueva's home and premises were unconstitutional violations of the First, Fourth, Fifth and Fourteenth Amendments by the Government, the DEA, and Maricopa County;

gg. Proceeds of the unconstitutional pre-search investigations and May 19, 2020 search of the Vine of Light Church and Villanueva's home and premises may not be admitted in any proceeding against NAAVC, Villanueva, or any parties aligned with them in this litigation;

hh. Villanueva is entitled to replevin of all personal property seized by Shay and Maricopa County during the May 19, 2020 search of his home;

ii. The Government is judicially estopped from initiating enforcement action against AYA for the Free Exercise activity disclosed in this litigation; and,

jj. The requested injunction will serve the public interest.

WHEREFORE,

1. The Government and all named defendants, on behalf of their respective agencies, to wit, William Barr on behalf of the Department of Justice; Timothy J. Shea on behalf of the Drug Enforcement Administration; Chad F. Wolf on behalf of the Department of Homeland Security; and, Mark A. Morgan on behalf of Customs and Border Protection, are prohibited from:

    a. Utilizing the Guidance as a source of law or procedure in any way, including but not limited to, issuing any *de facto* administrative subpoenas to AYA or NAAVC, or contending that the plaintiffs must adhere to the requirements of the Guidance;

    b. Denying regulatory services to AYA or NAAVC;

    c. Commencing investigations of AYA, or NAAVC, or their members, based upon the matters disclosed in this action;

    d. Imposing any system of prior restraints on the Free Exercise of religion by AYA, NAAVC, or their respective members;

    e. Taking any enforcement action under the CSA against AYA for importing, manufacturing, or dispensing sacramental Ayahuasca to its congregants;

    f. Taking any enforcement action under the CSA against NAAVC for importing, manufacturing, or dispensing sacramental Ayahuasca to exempt visionary churches;

    g. Interfering with shipments of sacramental Ayahuasca to or from AYA, or to its congregants;

    h. Interfering with shipments of sacramental Ayahuasca from NAAVC to exempt visionary churches; or,

    i. Utilizing any evidence derived from the unconstitutional pre-search investigations and May 19, 2020 search of the Vine of Light Church and

Villanueva's home and premises in any proceeding against NAAVC,

Villanueva, or any parties aligned with them in this litigation;

2. Timothy J. Shea, on behalf of the DEA, is ordered to:

    a. Issue a valid DEA Number to each of the RFRA Plaintiffs, and to enter them upon the records of the DEA as exempt registrants; and,

    b. Provide all other regulatory services to RFRA Plaintiffs as are necessary to allow their Free Exercise of religion by means of importing, manufacturing and dispensing Ayahuasca.

3. Chad F. Wolf, on behalf of DHS, is ordered to deliver the sacramental Ayahuasca seized from NAAVC and AYA to AYA.

PLAINTIFFS FURTHER PRAY:

1. That defendant Marco Paddy be held liable in damages to AYA and NAAVC, in an amount to be established by proof.

2. For an injunction prohibiting the DEA, Maricopa County, Matthew Shay, and all of their employees, contractors and agents, from conspiring to infringe or chill the Free Exercise, Free Religious Expression, and Right to Petition for Redress of Grievances, of any member of the NAAVC Board of Directors;

3. That plaintiffs be awarded their attorneys fees pursuant to 42 U.S.C. § 1988(b).

4. That plaintiffs be awarded such other and further relief as the Court deems just.

PLAINTIFF CLAY VILLANUEVA PRAYS:

1. For economic damages, non-economic damages, and punitive damages in amounts according to proof, in favor of plaintiff Clay Villanueva, and against defendants Maricopa County, and Marco Paddy;

2. For an injunction prohibiting the DEA, Maricopa County, Matthew Shay, and all of their employees, contractors and agents, from conspiring to infringe or chill Villanueva's Free Exercise, Free Religious Expression, and Right to Petition for Redress of Grievances;

3. For an injunction compelling the return of all property seized from the Villanueva residence, the Vine of Light Church, and all premises searched by MCSO deputies on May 19, 2020;

4. For an injunction prohibiting the above-named defendants from acting in furtherance of any such conspiracy;

5. For an injunction prohibiting the Government, the DEA, and Maricopa County from utilizing any of the evidence derived from the unconstitutional pre-search investigations and May 19, 2020 search of the Vine of Light Church and Villanueva's home and premises in any proceeding;

6. For an award of attorney's fees pursuant to 42 U.S.C. § 1988(b) and A.R.S. § 41-1493.01.D; and,

7. For such other and further relief as the Court deems just.

NORTH AMERICAN ASSOCIATION OF VISIONARY CHURCHES PRAYS:

1. For economic damages and punitive damages in amounts according to proof, in favor of plaintiff NAAVC, and against defendants Maricopa County and Marco Paddy;

2. For an injunction prohibiting the DEA, Maricopa County, Matthew Shay, and all of their employees, contractors and agents, from conspiring to infringe or chill the Free Exercise, Free Religious Expression, and Right to Petition for Redress of Grievances of any member of the NAAVC Board of Directors;

3. From acting in furtherance of any such conspiracy;

4. Of conducting criminal investigations of NAAVC's Board, officers, office premises, financial activities, or those of its member visionary churches and congregations;

5. For an injunction prohibiting the Government, the DEA, Maricopa County, from utilizing any of the evidence derived from the unconstitutional pre-search

investigations and May 19, 2020 search of the Vine of Light Church and

Villanueva's home and premises in any proceeding;

6. For an award of attorney's fees pursuant to 42 U.S.C. § 1988(b) and A.R.S. § 41-1493.01.D; and,

7. For such other and further relief as the Court deems just.

Dated:  May 27, 2021          JOHN SULLIVAN
                              /s/John Sullivan
                              JOHN SULLIVAN
                              Attorney for Plaintiffs
                              Arizona Yagé Assembly,
                              North American Association of Visionary Churches,
                              Clay Villanueva, and the Vine of Light Church

1

## **<u>JURY DEMAND</u>**

2

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial.

3

4  Dated:  May 27, 2021          JOHN SULLIVAN
                                          /s/John Sullivan
5                                        JOHN SULLIVAN
                                          Attorney for Plaintiffs
6                                        Arizona Yagé Assembly,
                                          North American Association of Visionary Churches,
7                                        Clay Villanueva, and the Vine of Light Church

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28