Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 1

JOHN SULLIVAN (CSB#204648)
17532 Miranda Street
Encino, CA 91316
Tel:818-769-7236
Email:Sullivan.John84@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly,
North American Association of Visionary Church,
Clay Villanueva, and the Vine of Light Church

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Arizona Yagé Assembly, North American Association of Visionary Churches, Clay Villaneuva, and the Vine of Light Church,

Plaintiffs,

vs.

Merrick Garland, Attorney General of the United States, *et al.*,

Defendants.

**Case No.:20-CV-02373-ROS**

**DECLARATION OF WINFIELD SCOTT STANLEY III IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Winfield Scott Stanley III, hereby declares and affirms:

**1.** I am the founder of plaintiff Arizona Yage Assembly ("AYA"), and the Chair of the Board of Directors of plaintiff North American Association of Visionary Churches ("NAAVC"). I make this declaration in support of AYA's Motion for Preliminary Injunction. If called as a witness, I could and would so competently testify.

**2.** AYA is a religious nonprofit corporation whose religious exercise, and that of their member churches and congregants, is substantially burdened by laws prohibiting importation, distribution, and possession of Ayahuasca, an herbal tea that contains a

small amount of Dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act 21 U.S.C. § 801 et. seq. (the "CSA").

**3.** In 2009 I was introduced to Ayahuasca in the forests north of San Francisco from a traveling troupe of Ayahuasqueros from South America. From that point forward I began my ongoing introduction to the sacrament of Ayahuasca and the attendant plant medicines of the Amazon, eventually conducting my own small ceremonies. In June 2015, I incorporated our small church, the Arizona Yage Assembly ("AYA"). The founding of the church was a group effort expressing the clear intention of our growing congregation for healing. Our belief, born out of experience, is that a spiritual practice is a healing practice and a healing practice is a spiritual practice. To that I would add, that an organized spiritual practice is a religion. To that end, our church is engaged in a sacred religious practice.

**4.** Based on my practice of Ayahuasca communion, I have developed AYA Tenets and Precepts (Exhibit 3). I have learned that we can begin with the experience of love and forgiveness itself, and do not need to create or cling to dogmatic structures. A man takes the measure of religion using his own conscience. It must be so, and I am proud and thankful that as an American, it is my right to make conscience my guide in choosing my own path of Free Exercise, and my right to petition this Court to protect that right.

**5.** Our scripture and song are to be found within the sacrament itself. In organized spiritual practice we trust each individual's direct connection with the Divine. We do not seek to intervene in that connection. We trust the sanctity of each practitioner's conscience. With a clear conscience and an open heart comes peace of mind.

**6.** What could possibly be worth sacrificing one's peace of mind? This is both our query and our message.

**7.** A meaningful number of AYA's congregation come to ceremony seeking healing from wounds to their spirits suffered in a variety of traumatic environments.

Indeed, many people carry injuries to their body, mind, and spirit that express their need for healing in the course of ceremony. As I mentioned above, my belief, born of experience, is that a spiritual practice is a healing practice, and a healing practice is a spiritual practice. To that I would add, that an organized spiritual practice is a religion; accordingly, our church is engaged in a sacred religious practice.

**8.** In AYA, establishment of the proper ceremonial environment and inner mindset are essential. AYA's Ceremonial Instructions and Code of Ethics instruct facilitators in how to establish the ceremonial environment and embody the ceremonial mindset.

**9.** The proper ceremonial environment is established by dedicating the space, ideally a "maloka," a circular structure in a quiet rural area, by commencing the ceremony in a peaceful, harmonious spirit, by administering the sacrament with sensitivity and respect for the sacrament and the congregation, and by facilitating the communion experience of the practitioners.

**10.** The mindset of the practitioners must also be properly prepared. The congregants have been screened for contraindicated health conditions, and have undertaken some dietary restrictions in advance of ceremony. Additionally, they have been asked to refine and focus their wholesome intention for receiving the Ayahuasca sacrament. With this outer and inner preparation, ceremony becomes a sacred space where inner growth can occur, with the help of the Ayahuasca communion.

**11.** The experience of Ayahuasca communion mediates a connection to Divine Love, that has qualities of forgiveness, renewal, healing, joy, and peace. We experience Ayahuasca cleansing our spirits, strengthening our wholesome inspiration, and inspiring us to exert ourselves to do good in our lives.

**12.** AYA simply teaches love, acceptance, and forgiveness – we apply the same spiritual principles in ceremony that serve us best in daily life. (See, Exhibit 3 -- Tenets and Precepts; Exhibit 4 - Ceremonial Instructions; Exhibit 5 - Code of Ethics.) AYA

does not dictate dogma. Our scripture and song arise during communion from within the sacrament itself.

**13.** AYA practitioners perceive, and sometimes express, profound visions that reveal insights into ourselves, our world, and our fellow beings. This stream of visionary insights is unique to each individual, and yet leads to a unifying understanding of what it means to lead a meaningful, dignified life. In organized spiritual practice we trust each individual's direct connection with the Divine. We do not seek to intervene in that connection. We trust the sanctity of each practitioner's conscience. With a clear conscience and an open heart comes deep peace of mind, what all have acknowledged as life's most priceless attainment.

**14.** AYA practitioners can only enter into the stream of profound visionary understanding through Ayahuasca communion. Therefore, Ayahuasca communion is our visionary religious practice, and the AYA congregation is our church.

**15.** We have established through our own experience that Ayahuasca communion is safe when administered with the proper guidelines, utilizing pre-signup health-questionnaires to screen out all non-adults, and persons with physical or psychological vulnerabilities, dietary restrictions, or conflicting medication regimens. The testimony of Dr. Paulo Barbosa, attached as Exhibit 13, provides a summary of the peer-reviewed evidence establishing not only the physical and psychological safety of ceremonial Ayahuasca practice, but also the personal and pro-social benefits that accrue to a substantial number of practitioners.

**16.** Since we founded our church, I have led more than 300 ceremonies, participated in many more, and have been privileged to work and learn with the extraordinarily dedicated, focused, talented, and kind people in both our congregation and the people of Peru. We continue to bring small groups for teaching and healing to the Upper Amazon in Peru. I have deepened my experience of Ayahuasca communion through apprenticeship with Eladio Melendez Garcia, a third generation Ayahuasquero who lives and conducts Ayahuasca ceremonies in Jenaro Herrera, Peru, a small

community off the banks of the Ukayali River about 20 kilometers upriver from the confluence of the Ucayali, the Marañon, and Amazon rivers. After four or five years of personal practice, following my very first experience with Ayahuasca in 2009, I began to conduct small ceremonies sharing the sacrament with others. Eladio's letter of recognition and support is attached as "Eladio's Letter," Exhibit 15.

**17.** Although Visionary Churches have often eschew written scriptures and officially promulgated doctrine, its adherents share beliefs in Divine Love and spiritual powers. AYA members put Visionary Church beliefs at the center of their spiritual lives in much of the same way that members of the Catholic Fellowship put Catholic Church beliefs at the center of their spiritual lives.

**18.** AYA members attend all-night Ayahuasca ceremonies conducted pursuant to AYA's Ceremonial Instructions, attached as Exhibit 4. The Ayahuasca tea used by AYA is pharmacologically identical to that utilized by the UDV and Santo Daime churches, whose ceremonies have been held worthy of RFRA exemptions. Our ceremonies stand equal to the safety and religious sincerity of these two RFRA-exempt churches. The very activity of drinking Ayahuasca confirms and clarifies the Church member's religious intent, because it is a demanding visionary experience that can provoke deep re-evaluations of oneself, one's life, and one's relationship to the Divine. I have heard many participants in AYA ceremonies express their gratitude for the spiritual insights received in ceremony. It is clear from my perspective that Visionary Communion through Ayahuasca delivers rewards commensurate with sincerity.

**19.** The sacramental use of Ayahuasca is firmly grounded in the history of the Visionary Church and central to the principles and rituals of the religion. Taking Ayahuasca is the very cornerstone of a Visionary Church gathering and the use of Ayahuasca is the *sine qua non* of AYA and Visionary Churches everywhere.

**20.** Visionary Churches UDV and Santo Daime have already been granted religious exemptions to the Controlled Substances Act, which allow them to import and possess Sacramental Ayahuasca. AYA uses Sacramental Ayahuasca prepared from the

same two plant materials used by Visionary Churches UDV and Santo Daime. Specifically, AYA prepares their Sacramental teas using the plant materials *Banisteriopsis Caapi* (the yagé vine) and one of two alternative traditional dimethyltryptamine sources (*Psychotria Viridis* (Chacruna) or *Diplopterys Cabrerana* (Huambisa). The plants are gathered in Peru by people familiar with the needs of AYA, that requires that these sacred plants be gathered with respect for their extraordinary capacity to benefit those who receive the Sacrament.

**21.** As a RFRA claimant seeking religious exemptions from the proscriptions of general law, AYA alleges a *prima facie* case of sincere religious belief. AYA further alleges that specified statutes and regulations found in the CSA and 21 CFR 1300 et seq., and the DEA's Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act (the "Guidance") substantially burden AYA's religious exercise. AYA further alleges that the provisions of the CSA, 21 CFR 1300 et seq. and the Guidance, are not reasonably tailored to fit the needs of visionary churches, and impose a substantial burden on their rights of Free Exercise by way of visionary communion.

**22.** AYA is substantially burdened by laws prohibiting importation, distribution, and possession of Ayahuasca. Because DMT is listed as a Schedule I controlled substance under the Controlled Substances Act (the "CSA"), and because the DEA, DHS, CBP and DOJ interpret the law to enact a complete ban against the religious sacrament Ayahuasca, members are forced to choose between obedience to their religion and criminal sanction.

**23.** AYA undertook a years-long process to prepare to submit a Petition for Religious Exemption with the DEA pursuant to the Guidance. However, after seeing that the DEA never granted any claims of exemption under the Guidance, and after receiving advice of counsel concerning the Guidance process, and the outlines of the critique of the Guidance expressed in the complaint commencing this action, in April, 2019, I decided

that AYA should instead proceed with this Religious Freedom Restoration Act ("RFRA") lawsuit.

**24.** Currently, I and all other members of AYA practice visionary communion with an uncertain shield against prosecution. By way of the letter attached as Exhibit 18, AYA's counsel advised the Department of Justice ("DOJ") that AYA is relying on the DOJ's representations to Judge Orrick that AYA is not at imminent risk of federal prosecution, as represented in the federal agencies' successful opposition to AYA's first motion for preliminary injunction (Docket # 33). Neither does the DOJ's response to AYA's counsel's letter (Exhibit 19) instill confidence in the apparent promises of non-prosecution offered to Judge Orrick to convince him that AYA required no injunctive relief to protect it from federal agencies imposing substantial burdens on Free Exercise. While it has provided some slender comfort, this letter did nothing to alleviate concerns that AYA, members of the congregation, or I, as its minister, may be exposed to state court prosecutions incited, funded, directed, and participated in by the federal government, as was the case in the May 19, 2020 HIDTA armed raid on the home of co-plaintiff and fellow NAAVC director Clay Villanueva.

**25.** Beyond the risk of prosecution, the federal policy currently most injurious to AYA's Free Exercise, is the federal ban on importation of Ayahuasca. As stated in the DOJ's response to AYA's counsel's letter presenting AYA's request for an exemption from the Department of Homeland Security ("DHS") and Customs and Border Protection ("CBP"), these federal agencies identify, seize and destroy all Ayahuasca during the customs process. DHS and CBP claim the right to destroy all seized Ayahuasca without notice to AYA, or any means to seek release of the seized Ayahuasca, rejecting AYA's claim that importation of a necessary religious sacrament is exempt from federal constraints pursuant to RFRA, except as they may satisfy the least-restrictive means test.

**26.** My fear that seizures will prevent me from conducting AYA ceremonies is based on experience, because AYA's sacrament has been seized during importation more than once. As alleged at paragraph 138 of the Fourth Amended Complaint ("FAC"), on

April 22, 2020, AYA was notified that its property, a container of Ayahuasca ordered for the use of NAAVC and AYA, had been labeled contraband and seized by DHS during the customs process. DHS seized a second shipment of Ayahuasca on October 21, 2020, (Peruvian postal service "Serpost" # EE011369264PE, addressed to AYA and Scott Stanley). It was after the second interception of AYA's Sacramental Ayahusaca that AYA's counsel addressed the Exhibit 18 letter to the DOJ objecting to the seizure, and requesting release of this property as exempt from prohibitions on importation pursuant to RFRA. This the Government refused, stating that DHS had regulatory authority to seize, forfeit and destroy Sacramental Ayahuaca destined for AYA. (Exhibit 19.)

**27.** DHS and/or CBP seizures of AYA's Ayahuasca (both addressed to AYA and Scott Stanley) occurred again during importation in November 2020 (Serpost # EE011368873PE), and December 2020 (Serpost # EE011186439PE). Without access to the Ayahuasca seized by the Federal Defendants, AYA does not have a sacrament to share, I cannot conduct ceremonies, and AYA congregants are unable to practice their religion.

**28.** Based on these four past seizures, AYA is reasonably assured that future attempts to import Ayahuasca will result in interception. Each seizure imposes a financial loss on the congregation, and interrupts Free Exercise in much the same way as Catholic Mass would be desecrated by a ban on the distribution of communion hosts. The ceremony simply cannot be held, and visionary communion cannot be achieved, without the invocation and ingestion of the communion sacrament. When AYA is unable to hold ceremonies because its Ayahuasca was seized and destroyed by DHS and/or CBP, our Free Exercise is substantially burdened. Accordingly, we ask the Court to lift this burden.

**29.** Because Ayahuasca is virtually all produced in South America and other tropical lands, far from the continental United States, and DHS and CBP seizures block importation of Ayahuasca via international post and freight, AYA must import sacrament via the assistance of an international courier who must cross the border into the United

States through DHS and CBP security. The courier's imported items are subject to search, and a search could result in seizure of AYA's Ayahuasca. The courier could also be exposed to prosecution by federal or state authorities.

**30.** The case of Clay Villanueva, who was arrested on August 22, 2021 at LAX on an Arizona felony warrant, is an object lesson for how airports are hazardous to a sincere practitioner of visionary religion, even when he has previously sought the aid of this Court to practice his religion without fear of prosecution. Some of the details of Mr. Villanueva's travails in California and Arizona custody are set forth in his Application for Writ of Habeas Corpus (Docket # 125). As averred therein, Mr. Villanueva's was arrested at LAX on a Maricopa County Superior Court felony warrant based on the May 19, 2020 HIDTA raid that is the subject of the Section 1983 claim alleged in three successive iterations of the complaint, including the FAC.

**31.** The indictment and warrant against Mr. Villanueva issued in June 2021, the same month that Maricopa County's attorneys were urging the Court to disregard Mr. Villanueva's fears of prosecution as "conjectural." An event is rarely deemed "conjectural" when it has already occurred, and in this case, when Evan Hiller's brief was filed, his client, Maricopa County, and very likely Det. Matt Shay as well, knew without a doubt that there was a warrant for Mr. Villanueva's arrest sitting in a file in the Maricopa County Superior Court. Thus, Mr. Villanueva was affirmatively led into danger by the representations of the very defendants from whom he feared prosecution, who had dismissed those fears as fancy.

**32.** To protect himself from just such a surprise as occurred at LAX this August, Mr. Villanueva had also employed an attorney, Richard Gaxiola, to monitor felony filings charging Mr. Villanueva with a crime in Maricopa County, and Mr. Gaxiola had told him that he wanted to withdraw from representation because no case had been filed. (Gaxiola Dec., Docket # 129-1.) Thus, Mr. Villanueva acted with unusual care to protect himself from prosecution, and nevertheless, fell into one of the worst possible situations – detention by federal officials at the airport, prosecution by California

on a fugitive warrant, lodging in temporary housing in LA County awaiting extradition, and transfer to Maricopa County jail under apparently compromised circumstances. As a result, the prosecuting Attorney General's office sought, and the court imposed, an unachievably high bail amount -- $150,000, all in cash, no property bond permissible.

**33.** The high bail resulted in Mr. Villanueva's extended detention in Maricopa County custody. Because Mr. Villanueva is suffering from Stage III lymphoma, the lack of wholesome food and warmth in jail provoked two hospitalizations for imminent organ failure due to malnutrition. During this health crisis, Mr. Villanueva was taken to death's very door, before he was finally released after the County Commissioner, learning of the second hospitalization, amended the bail order to allow a $150,000 property bond. Mr. Villanueva's family was able to post $15,000 secured bail amount, but not until a month of confinement in a panoply of harsh detention centers had wrecked his health. Mr. Villanueva suffered from bloating in the legs induced by excessive hydration, and now must wear an ankle monitor that is not conducive to exercise, causes stress, and impedes his therapeutic cancer regimen.

**34.** Little did we expect to see Mr. Villanueva in such difficult straits when we began this litigation, full of hope that our Free Exercise rights would be recognized in the judicial process. In 2019, Clay Villanueva ("Villanueva") joined NAAVC as one of three founding Board members. Villanueva also enrolled his own Visionary Church, the Vine of Light Church ("VOLC") as the first Visionary Church to join NAAVC.

**35.** Villanueva responded to NAAVC's message that more needs to be done with the DEA and the courts before visionary churches can truly enjoy Free Exercise, free of the fear of unlawful searches, seizures, and arrests, all of which seem to be promised in the Supreme Court's seminal O Centro decision.

**36.** Villanueva voted in favor of sending the DEA Letter (FAC ¶ 159), and in favor of commencing this litigation on behalf of NAAVC. By initiating the NAAVC lawsuit, Villanueva and I placed ourselves under the jurisdiction of this court.

**37.** Villanueva and I both sought to protect our own, personal religious Free Exercise, and that of our respective visionary church congregations, when, acting as Board members, we directed NAAVC's counsel to file this action.

**38.** Neither Villanueva nor I expected that, by taking action as a member of NAAVC's Board, we would bring ourselves into a position of danger with respect to the DEA.

**39.** The HIDTA raid and Villanueva's prosecution has chilled my Free Exercise, in my capacity as the minister of AYA.

**40.** Like Villanueva, I too reside in the State of Arizona, and the federal law enforcement presence here is considerable. Now that I know that the DEA funds and directs the activities of many local law enforcement agencies through the HIDTA program, in Arizona and in twenty-seven other HIDTA zones throughout the nation, I am concerned about the threat DEA poses to my Free Exercise rights. DEA has used HIDTA once to harass a NAAVC Board member, and it may again pursue investigation, surveillance, search, and prosecution of myself and/or members the AYA congregation who are engaged in protected First Amendment activity.

**41.** AYA members reasonably believe that DEA will investigate and/or arrest them for freely exercising their religion. Notwithstanding the Government's assertions that Visionary Churches face no "imminent threat of prosecution," the threat of more police raids has forced AYA and other Visionary Churches and congregations into the shadows and underground.

**42.** The DEA has suggested in filings herein that AYA might administer Ayahuasca to minors. This is not the case. The application process screens out minors at the outset.

**43.** In its reply brief to the Motion to Dismiss the FAC, the DEA states that AYA "does not claim to use any screening process to evaluate the religious sincerity of its participants, as other religious groups do." The contention is strange. When people approach any other faith seeking spiritual fellowship, they are presumed to be sincere.

Why should a reverse presumption apply to those who express an interest in practicing Visionary Religion? Considering the DEA's claim on the merits, the DEA must know of, and be indifferent to the evidence AYA submitted in support of its first motion for preliminary injunction, establishing how it performs pre-ceremony screening of prospective congregants, using questionnaires, preparation materials addressing a prospective congregant's spiritual interests, commitment, and intention in seeking Ayahuasca communion. Of course, all of these matters speak to the religious sincerity of its prospective and current congregants.

**44.** AYA, in fact, has several layers of pre-ceremony screening and preparation for all participants in its ceremonies, including inquiries such as: "What are your spiritual interests in taking part in ceremony, including, for example your intentions for healing or personal growth," and "Briefly describe your current health and spiritual practice."

**45.** AYA has an open process of email, phone, and direct communication, engaging with the sincere spiritual interests of the members of its congregation.

**46.** AYA's Member Survey, summarized as Exhibit 8 submitted in support of AYA's Motion (Docket # 33-8), provides substantial evidence of the religious sincerity of our congregation.

**47.** AYA does not compare its path and method with the paths and methods of other religions. AYA does not claim religious sincerity to be objectively testable. The only arbiter of religious sincerity in this litigation is the Court. I respectfully submit that AYA and I are completely sincere in making this submission, and accordingly, we ask the Court to grant the injunctive relief requested in the proposed order submitted herewith.

I declare and affirm, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct, and that this declaration was signed on November 8, 2021, at Iquitos, Peru.



Winfield Scott Stanley III