Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 12

**Roy S. Haber**, OSB No. 800501
haberpc@cyber-dyne.com
**ROY S. HABER P.C.**
570 East 40th Avenue
Eugene, OR 97405
Telephone: 541.485.6418
FAX: 541.434.6360

**Don H. Marmaduke**, OSB No. 53072
don.marmaduke@tonkon.com
**TONKON TORP LLP**
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2099
Direct Dial: 503.802.2003
Direct FAX: 503.972.3703

**Gilbert Paul Carrasco**, California Bar No. 90838
*(Appearing pro hac vice)*
carrasco@willamette.edu
No. 451
245 Winter Street SE
Salem, OR 97301
Telephone: 503.370.6432
FAX: 503.370.6375

**Jack Silver**, California Bar No. 160575
warrioreco@yahoo.com
*(Appearing pro hac vice)*
PO Box 5469
Santa Rosa, CA 95402-5469
Telephone: 707.528.8175
FAX: 707.528.8675

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(Medford Division)

THE CHURCH OF THE HOLY LIGHT OF
THE QUEEN, a/k/a The Santo Daime Church,
an Oregon religious corporation, on its own
behalf and on behalf of all of its members,
JONATHAN GOLDMAN, individually and as
Spiritual Leader of the "Santo Daime Church,"
JACQUELYN PRESTIDGE, MARY ROW,
M.D., MIRIAM RAMSEY, ALEXANDRA
BLISS YEAGER and SCOTT FERGUSON,
members of the Santo Daime Church,

Plaintiffs,

v.

MICHAEL B. MUKASEY, Attorney General of
the United States; KARIN J. IMMERGUT,
United States Attorney, District of Oregon;
HENRY M. PAULSON, Secretary of the U.S.
Department of the Treasury,

Defendants.

Civil No. 08-cv-03095-PA

AMENDED EXPERT WITNESS
STATEMENT OF GEORGE
GERDING, R.Ph. – EVALUATION
OF HEALTH AND SAFETY
ISSUES CONCERNING
SACRAMENTAL INGESTION OF
THE SANTO DAIME HOLY TEA

I, George Gerding, state under penalty of perjury as follows:

1.    My name is George Gerding.  I live in Portland, Oregon.  I am married

and am the father of five children.  I am a licensed pharmacist.  I received a BS degree in

pharmacy from Drake University, and have done post-graduate work at Oregon State University,

Memphis State University, University of Utah and various professional centers.  My practical

experience has been varied, and includes specialization in geriatrics and research coordination.  I

have had teaching experience at Oregon State University and Portland State University, as well

as at the Community Colleges in the Portland metropolitan area.  I served nine years on the

Oregon Board of Pharmacy, including twice as its elected president.  My professional

publications and presentations are listed in my CV, which is annexed.

2.    My Amended Expert Witness Statement was prepared at the request of

counsel for the Santo Daime Church.  I have been asked to comment on specific law

enforcement, health and safety concerns regarding use of a tea called Daime which is imbibed by

Santo Daime Church members as the central  practice of their religion and as its sacrament.  The

Page 2 -    AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

Daime tea (called ayahuasca by people who do not use the tea as the sacrament of the Santo Daime Church) is made from brewing a vine, *Banisteriopsis caapi* together with the leaves of *Psychotria viridis*, which contain trace amounts of a short-acting psychoactive agent N,N-dimethyltryptamine (DMT), which is currently listed as a Schedule 1 Drug under the Controlled Substances Act.

3.      I was asked to comment upon a number of public policy considerations that are generally evaluated by state and federal officials when deciding whether or not to permit use of a particular "substance" prohibited from importation and distribution under the Controlled Substance Act.

4.      Society expects pharmacists to assure that when anything that affects living cells is taken, that it is appropriate.  The benefit must clearly outweigh any risk.  Thus, issues such as toxicity, side effects and safety are very important.  Agents having pharmacological activity but not used medicinally are also judged on their risk of abuse. Increasingly, especially with natural substances, considerations of cultural and psycho social concerns come into the deliberation.

5.      Obviously petitioning for any form of exemption from application of the Controlled Substance Act requires serious consideration.  When the Native American Church came before the Oregon Board of Pharmacy in 1989, and then the Oregon Legislature, seeking an exemption for the sacramental use of peyote, the Board considered questions similar to the ones I discuss in this report.  Since I was serving as the President of the Board at the time, I offered testimony for our position, some of which is referred to below.

6.      As noted above, the substance under consideration today is Daime, a tea brewed from two plants indigenous to the Amazon jungle.  There are small trace amounts of DMT in the *Psychotria viridis*; DMT is a psychoactive agent listed as a controlled substance by the U.S. Drug Enforcement Agency ("DEA"), as well as other international agencies.

Page 3 -      AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

7.     As one might expect in the case of naturally derived substances, there is a rich history of anecdotal information and not so much scientific data on Daime. Fortunately, there has been some credible analysis of ayahuasca, as well as a thorough investigation by the Brazilian equivalent of our DEA. Additionally, the sacramental use of Daime spans several continents, so there are well-documented, practical accounts of its effects upon those who ingest it. As used in this report "ayahuasca" refers to a liquid having only the same components as "Daime" tea, the substance that is in issue in this case, *i.e.,* only the vine *Banisteriopsis caapi* and the leaves of *Psychotria viridis* brewed in water.

8.     In my discussion, I will minimize the minutia of things such as analysis of samples and detail of religious ceremonies, some of which is covered in other expert reports and are available upon request.

9.     In preparing for this report, I was asked to review a number of articles and other written material. They generally include:

a.     My previous testimony before the Oregon Legislature.

b.     Plaintiffs' Ex. 1: The Report of the Brazilian Federal Council on Narcotics (CONFEN) regarding his issue, annexed to this report.

c.     Several articles regarding the pharmacology of Daime and peyote.

d.     Several articles that discuss the historical use of Daime. (It is also called "ayahuasca" by persons other then the followers of the Santo Daime Church) for religious purposes and healing by indigenous tribes in the Amazonian region of South America.

e.     Articles regarding contemporary medical research regarding the properties and effects of the Daime.

f.     Testimony provided to Congress by certain officials of the United States Department of Justice when Congress was considering

Page 4 -     AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

amending the Indian Religious Freedom Act to protect persons who wished to use peyote as the sacrament of the Native American Church from threat of criminal prosecution.

g. The expert Declarations of Dr. Cozzi, Dr. Halpern, and Dr. Winkelman.

h. Plaintiffs' Ex. 3: Letters from the Oregon Board of Pharmacy to Roy Haber in November 2000 and June 2008, annexed hereto.

i. Plaintiffs' Ex. 5: Interrogatory Responses 16 and 17 of Defendants' Responses to Plaintiffs' Interrogatories in *O Centro v. Ashcroft*, also annexed hereto.

10. I have been asked to review this information and provide an opinion as to whether or not there is sufficient evidence that would justify a decision by federal (and state) drug enforcement agencies to refuse to exempt from application of the drug laws the sacramental use of Daime in religious ceremonies.

11. The most important issues that I considered when having to decide whether to advise the Oregon Legislature to grant an exemption for the non-drug use of peyote in the Native American Church services were:

a. The pharmacology of the "substance"[1]

b. The short and long term effects, both physiological and psychological

c. The extent to which it is part of illicit drug trafficking in the United States[2]

_____

[1] The Controlled Substances Act uses the term "substances" and "drug" often interchangeably. I will discuss below, why it is not appropriate to refer to Daime tea as a "drug."

[2] "(a) The Congress finds that—

(1) Drug and alcohol abuse are problems of grave concern and consequence in American society;
(2) Over 500,000 individuals are known heroin addicts; 5 million individuals use cocaine; and at least 7 million individuals regularly use prescription

       d.      The context in which it is administered

       e.      Whether there is evidence of significant abuse of the substance, including addiction

## I.    PHARMACOLOGY OF THE SUBSTANCE

12.      There are two major active ingredients in ayahuasca, or the tea called Daime, Dimethyltrytamine (DMT) and Harmine. The DMT is in the leafy plant *Psychotria virdis* and is a short acting hallucinogen.

13.      The Harmine is in the bark and stems of a vine, *Banisteriopsis caapi* and while not a controlled substance, may have some pharmacological activity. Its purpose here is to activate the DMT in the mix. When DMT is ingested, it is quickly inactivated by the mono amine oxidase in the stomach. The Harmine inhibits this action, thus making the DMT active.

14.      In order to ingest the quantity of DMT for toxicity or overdose, one would have to drink 3 to 4 liters of the tea. Ceremonial use involves only small quantities, 50-100 milligrams or so, barely above the threshold dose. The vomiting quickly limits the amount in the stomach, and the pharmacological effects last only between two to four hours. Because of the vomiting effect, it is simply not possible to consume much more then 100 milligrams.

---

      drugs, mostly addictive ones, without medical supervision;

(3)     Ten million adults and 3 million children and adolescents abuse alcohol, and an additional 30 to 40 million people are adversely affected because of close family ties to alcoholics;

(4)     the total cost of drug abuse to the Nation in 1983 was over $60,000,000,000; and

(5)     the vast majority of health benefits plans provide only limited coverage for treatment of drug and alcohol addiction, which is a fact that can discourage the abuser from seeking treatment or, if the abuser does seek treatment, can cause the abuser to face significant out of pocket expenses for the treatment. 21 U.S.C.S. @ 801 at 10."

My understanding is that there only about 50 Santo Daime Church members in Oregon who are using the tea in a "non-drug" environment.

Page 6 -    AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

## II. PHYSIOLOGICAL AND PSYCHOLOGICAL EFFECTS

15. I found the comparison of DMT and mescaline (the active ingredient of peyote) useful in my review. Here are the DEA internet definitions for each.

### a. Peyote & Mescaline

16. Peyote is a small, spineless cactus, *Lophophora williamsii*, whose principal active ingredient is the hallucinogen mescaline. From earliest recorded time, peyote has been used by natives in Northern Mexico and the Southwestern United States as a part of traditional religious rites. The hallucinogenic dose for mescaline is about 0.3 to 0.5 grams (330-500 mg) (equivalent to about 5 grams of dried peyote) and lasts about 12 hours. While peyote produced rich visual hallucinations which were important to the native peyote cults, the full spectrum of effects served as a chemically induced model of mental illness. Mescaline can be extracted from peyote or produced synthetically.

### b. Dimethyltryptamine (DMT)

17. Dimethyltryptamine (DMT) has a long history of use worldwide as it is found in a variety of plants and seeds, and can also be produced synthetically. The effective hallucinogenic dose in humans is about 50 to 100 milligrams and lasts for about 45 to 60 minutes. Because the effects last only about an hour, the experience was called a "businessman's trip."

18. The DEA discussion does not discuss the fact that DMT, in its natural state in the *Psychotria viridis* leaf, is not orally active, being metabolized by the enzyme MAO in the stomach.

19. The initial common effects of the ingestion of this tea can include psychoactivity in various stages, nausea, vomiting, dizziness, palpitations, anxiety and discomfort. The second phase of action has been reported to include feelings of comfort, well-being and euphoria accompanied by deep insights inspired by the altered state, and visions interpreted to have a spiritual quality to them.

20.     My evaluation of the actual effects of the Daime, include, as did our evaluation of peyote, the historic context in which the plants were used. In 1857, in the Ecuadorian Andes, Botanist Spruce encountered the Záparo Indians using a drink called ayahuasca which he considered to be the identical species found in the Vaupés of Brazil (SPRUCE 1873). The tea has been used for hundreds and perhaps thousands of years by indigenous tribes in the Amazon basin.

**III.     NO EVIDENCE OF TOXICITY OR HARMFUL EFFECTS FROM AYAHUASCA USE REPORTED**

21.     In the context of this discussion, I refer to toxic as a serious unwanted reaction to ingestion of a substance that the medical community would generally see as involving a threat to the current or future health of the person. In that regard, vomiting after ingestion of peyote or ayahuasca has more of a tonic side effect than causing toxicity, and is considered cleansing by religious users.

22.     When I provided testimony to the Oregon legislature, I noted then that:

> [O]ne of the problems with things like peyote is there are very few scientific studies done on it. It isn't a drug that we use every day. . . and as such it makes it very difficult to go to a textbook and open it up and say oh yeah, that has a risk rating of such-and-such in pregnancy. With medicines, any of them, they all have a level of toxicity and it's dose related. So the toxicity pretty much depends on the way it's given, and there is not much you can do about that. I'm sure somebody could get into serious trouble taking peyote. I'm sure it could be toxic. But from what we are seeing here and the experience that I read about, it seems to be safe enough for that use."

Gerding, April 24, 1990.

23.     In the case of Daime, I could find no reports of overdose or toxicity related to the Harmines contained in the Daime Tea. Similarly, there are no reported cases of toxicity due to the ingestion of DMT as an ingredient in the Daime tea. The DEA reports the threshold hallucinogenic dose of DMT is 50 to 100 milligrams. In my readings about quantities of the tea used in ceremonies, I find from the articles referred to below and my oral interviews

Page 8 -     AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

with Santo Daime Church leaders establish that the normal dose ranges from 40-150 milligrams of Daime depending on the particular type of ceremony being conducted, the amount taken generally to be between 15 to 60 milligrams.  It would take a dose of several liters to be toxic. Because of the vomiting effect, a person cannot possibly take and retain a dose of Daime that is much more then just a fraction of a liter (a shot glass or two).

24.     The common purgative effects are, as noted above, considered to be tonic, and also limit the amount of absorption of the ingredients.  The relatively short action of DMT is an additional limiting factor in consideration of any risk of toxicity.

## IV.     THE SACRAMENTAL USE OF THE DAIME

### a.     Brief Review of the Santo Daime Religion

25.     I understand that the Santo Daime religion was founded back in the 1920s by an indigenous rubber-tapper Raimundo Irineu Serra, who was living in the state of Acre, deep in the Amazon.  After participating in a traditional ayahuasca ceremony, Irineu was visited in a vision by a woman whom he identified with the Virgin Mary and whom he further identified as both "Our Lady of Conception" and the "Forest Queen."

26.     She instructed him to found a new spiritual path or doctrine in which the drinking of ayahuasca would be central to the ritualistic worship.  The Forest Queen also gave the tea the new name "Daime."  The name in Portuguese means "give me," which has been interpreted to mean both a gift and a prayer to "give me love, give me light, and give me strength."  I understand that the religion is what is called a "syncretic" religion, combining many elements of traditional Christian beliefs and practices with ancient indigenous religious and healing practices.

27.     I note that the above description of the Santo Daime is similar to the description of the founding of the Native American Church that we made at the Board of Pharmacy regarding peyote.  There we found that it was well-documented that even before the establishment of the Native American Church in the early 1900s, peyote had been used for

Page 9 -     AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

centuries as a religious sacrament and for healing purposes by Native Americans.

28.     In my April 24, 1991 testimony regarding ingestion of peyote, I stated:

> It seems to be well documented that people are not hurt by that,
> they seem to keep very tight control on both the quality of the
> sacrament and the use of it, and it seemed basically the right thing
> to do to make an exemption on that ground.

29.     The "set and setting" influences are the extra pharmacological factors derived from expectations and situational circumstances that are important to determine how the individual reacts to biologically induced experiences.  Set refers to the individuals' purpose and expectations about the experience, while setting refers to the environment within which the experiences take place.

30.     The classic example of the importance of set and setting is illustrated in the recognition by the U.S. DEA which lists peyote whose active substance is mescaline as a Schedule 1 controlled "drug."  However, in granting an exemption from the prohibition of taking peyote, the DEA has acknowledged the importance of set and setting by permitting the "non-drug use of peyote" in Native American Church services.  Thus, the DEA does not consider peyote a Schedule I drug when it is used in the religious ceremony.  Likewise, DMT cannot be considered a drug when used in the Santo Daime religious services for the reasons set forth herein.

31.     The Santo Daime ceremony wherein the tea is consumed is a highly structured church service.  I have viewed videos of several Brazilian services wherein the Daime tea is served.  The following description by the Brazilian drug enforcement that studied the religious ceremonies stated:

> The men were wearing white three-piece suits.  The women wore
> white dresses with green belts, and a head decoration resembling a
> small garland.  They give these clothes the name of "uniform," and
> they are only provided to those who have chosen the "doctrine." . .
> . The ambiance was quite similar to that found in the places of
> worship of other religions:  candles, crosses, rosaries, effigies of
> the Virgin Mary, Jesus Christ and St. John the Baptist.

Page 10 -     AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

They (services) exalt the virtues of mankind, and encourage love, humility and repentance for one's faults. They proclaim the joy and the power of those who have faith in divine power and do good deeds.

The actual ceremonies include reading of hymns, singing and rhythmic movement. Hymns are chanted throughout the ceremonies, accompanied by instruments such as a guitar or accordion, sometimes to the rhythm of maracas. Each time the Daime sacrament is served, each participant makes the "Sign of the Cross" and returns to his or her place, which is reminiscent of a Catholic service.

32. From the evidence that I have gathered from reading the cited articles, I am persuaded that the use of Daime in strict religious services of the Santo Daime Church promote positive cultural, social, physical, and psychological health. Similar to the healing value of peyote, Daime is often used to promote the process of physical and mental well-being of Church members.

33. Testimonials in the literature refer to the revealing power of the tea, of promoting positive personal values and self-discipline when combined with the religious ritual. As mentioned earlier, the induction of vomiting is considered a cleansing action by many of the church members.

**b.** **Extent of illicit drug trafficking in the United States**

34. With respect to the substance at issue here, Daime, it cannot be said that there is any illicit trafficking or that there has been any problem reported. It is virtually unknown in the U.S., and I could find no evidence of illicit use or marketing. It is clear from Ex. 5 that as of October 19, 2001, when the government answered Interrogatories 16 and 17 in the O Centro case, the government had no evidence that ayahuasca tea had been diverted from the Church's sacramental use of the tea, nor any evidence that any peyote has ever been diverted from any member of the Native American Church for non-religious use. Similarly, I know of no evidence that any Daime tea has ever been diverted by any member of the Santo Daime Church for non-religious use.

Page 11 -   AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

35.     Daime is not grown or produced in this country.  Even in Brazil, it is difficult to gather the vines and leaves that grow deep in the jungle.  Traditionally, harvesting was mostly done by tribes and the Santo Daime communities.  There is now some cultivation of the plants in Brazil.  There is no known illicit drug market in Brazil for DMT manufactured from the *Psychotria viridis* leaf.

36.     Because, as DEA notes, DMT can be produced synthetically, it would stand to reason that any illicit market in DMT would more likely result from the synthetic forms rather then as a result of any diversion of Daime tea.  I understand that the process of extracting the very minute quantities of DMT from the Daime tea would be technically difficult and would require a great deal of tea to obtain an amount that would be sufficient for purposes of even entering the illicit drug market.

37.     In preparation for writing this report, I reviewed the testimony of Gene Haislip, Deputy Assistant Administrator, Office of Diversion Control before the House of Representatives, wherein the DEA argued in favor of granting an exception for the non-drug use of peyote.  He stated:

> Peyote simply is not a popular drug; its distribution for use in
> religious rituals has nothing to do with the vast and violent traffic
> in illegal narcotics that plagues this country.

38.     Haislip did note that "On occasion, peyote has been found in the illicit traffic.  It has not been reported by the DEA, state or local enforcement agencies to be anything other than a sporadic problem."  With regard to the substance at issue here, Daime, it cannot be said that there is any illicit trafficking or that there has been any "problem" with state or local enforcement agencies.  It is virtually an unknown substance in the United States, and to my knowledge plays no discernible role in the illicit drug market.  And while it is possible that some Daime could get into the illicit market, given that it is only administered by a church leader during the actual service, that it is foul-tasting, that it is both self-limiting and not a recreational

Page 12 -    AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

drug or drug for pleasure that is taken to get "high," the unlikely prospect of any diversion is clearly not a compelling reason to deny this religion the right to practice its sacrament.

39.     Finally, as we noted above, it would appear from the evidence to date that only those persons who are committed to following the spiritual path for which the Daime is intended will even be inclined to ingest it.  The findings of the CONFEN regarding this issue are accurate:

> Moreover, the typical reactions of vomiting and diarrhea (the latter being less frequent) leads us to suppose that ayahuasca does not lend itself to easy, indiscriminate or recreational use by the general public.  Indeed, this can be verified by the fact that, despite receiving a good deal of coverage in major Brazilian newspapers, to date ayahuasca has not been fancied by hedonistic consumers.

## V.     USING THE DAIME (AYAHUASCA) IN THE CONTEXT OF THE SANTO DAIME  RELIGIOUS SERVICE CAUSES NO HARM TO THE PUBLIC WELFARE

40.     My investigation revealed no instances of any aggressive, violent or any antisocial behavior in any persons who have taken the Daime.  There is no evidence that the Daime is a cause of any problems to society at large.  In this regard, it would appear that the following description by the CONFEN is accurate:

> What can be affirmed is that the search for a particular form of perception, as undertaken by the users of ayahuasca during their "work," does not appear to be hallucination if this term is taken to mean derangement or insanity. Among all of the groups we visited, there was one common goal which they all strictly adhered to: the search for holiness and self-knowledge. It does not fall to the Working Group to determine whether the term hallucination, defined as illusion, daydreaming or fantasy, applies to their way of experiencing holiness or self-knowledge.

41.     Obviously, it would not be tolerable if the perceptions in question led those who experience them to engage in antisocial behavior harmful to the rights of others.  In this regard, it bears repeating what was stated in the first travel report from nearly two years ago, as quoted in item 11 above, *i.e.*:

> Moral and ethical standards of behavior, similar in every respect to

Page 13 -     AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

those which exist and are recommended in our society, are
observed within the various sects, at times in an even stricter
manner. Respect for the law always appeared to be emphasized.
The followers of the sects appear to be calm and happy people.
Many of them attribute family reunification, regained interest in
their jobs, finding themselves and God, etc., to the religion and the
tea.

The ritual use of the tea does not appear to be disruptive or to have
adverse effects upon the social interactions of the various sects'
followers. On the contrary, it appears to orient them towards
seeking social contentment in an orderly and productive manner.

(CONFEN Report at 33.)

## VI.     NO EVIDENCE OF ABUSE OF THE SUBSTANCE

42.     In our society, substance abuse usually refers to the use of an agent
recreationally and it often goes hand-in-hand with illicit trafficking. Psychoactive chemicals
certainly have fallen into that category in recent decades. Despite the fact that this class of
agents may not carry the risk of dependence, withdrawal or even addiction, the hazards of bodily
harm to self and others is enough to control their distribution.

43.     In the case of the religious use of Daime, like peyote, the psychoactive
ingredients are used as a sacrament and rigidly administered and monitored. The doses are very
low and the side effects limit any risk of overdose. I could find no record of Daime abuse in the
international literature. Indeed, most often there is reference to both healing physical and
psychological ills in relation to the ritual use of Daime.

44.     There seems to be no evidence of tolerance (need to increase the dose over
time), or dependence (withdrawal symptoms following abstinence). Similarly, I found no
writings indicating addictive behavior among those taking sacramental Daime.

## VII.    SUMMARY AND CONCLUSION

45.     Medicine today encompasses a much broader scope then even a decade
ago. Clearly, the holistic approach with a global appreciation of therapies is blending with

western high-tech medicine.  For example, in Fundamentals of Nursing, Chapter 1, Health-Illness Continuum, at pp. 3-6, the importance of spiritual health is stressed as a central tenet of holistic health which seeks to "maintain a state of physical, emotional, intellectual, social, developmental and spiritual well-being."

46.     In a dynamic, transitional period such as this there is frequently a disconnection between the rules and regulations based upon traditional experience and science and the need to expand the boundaries to accommodate new options.  Regulators have the formidable task of protecting the public while striking a balance.

47.     In conclusion, from the perspective of the underlying drug policy considerations that exist to protect public health and safety, it is my opinion that there is no compelling reason in this case to prohibit the members of the Santo Daime Church from taking their sacrament.  The sacramental ingestion of the Daime tea as part of the Santo Daime religious doctrine and teachings, facilitates the internal and external environments that promote positive spiritual, physical, and emotional health which are goals that are central to the religious doctrine.  Such a socially desirable non-dangerous tradition must be recognized and respected.  There is no pharmacological evidence of ill-health effects or danger of toxicity, virtually no danger of illicit drug use or diversion for recreational use, and no issue of addiction that would justify infringing on this sacred religious practice.

48.     Furthermore, to the extent that one might argue there is a compelling reason to regulate the Daime, total prohibition is not the least restrictive way in which the government can protect whatever interests are asserted.  Whenever controlled substances are manufactured, imported, distributed and/or used, a regulatory scheme similar to that which is used to track the transport and delivery of peyote which is ingested by over 250,000 NAC members would suffice to ensure that the products do not enter the illicit market.  The registration and accounting procedures routinely used provide the government with the necessary

Page 15 -    AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

controls to ensure the protection of its legitimate interests.

49.     In the year 2000, after receiving evidence from the Santo Daime Church similar to what I have stated herein, the Pharmacy Board found that the sacramental use of the tea was a "non-drug use," and advised the Church that it did not intend to regulate its religious practice.  See Ex. 3, the Board's official notification of its decision to the Church.  The Board's action is consistent with my findings that there is no evidence of ill-health effects from the tea.

50.     And while the Pharmacy Board does not intend to regulate the tea, the Santo Daime Church requested that the Board act as an unofficial repository of copies of all Sacrament Receipt Forms which record each batch of tea being imported from Brazil to Oregon. See Ex. 3.  This would add a layer of protection from diversion, and more importantly it establishes the intent of the Church to satisfy all concerned that the tea will not be diverted from its intended sacramental use.

51.     However, as evidenced by the most recent letter from the Board dated June 20, 2008 (See Ex. 3), because the Pharmacy Board concluded after investigation and hearing that the Santo Daime Church's importation and use of its sacramental tea in bona fide religious ceremonies does not constitute abuse of a controlled substance and is consequently not an activity that the Board has authority to regulate, the Board declined the Church's request.

52.     Because the Oregon Pharmacy Board found that the importation, distribution and ingestion of the tea does not implicate any danger to public health or safety in Oregon, it impinges on Oregon's sovereignty when the United States Attorney General threatens to arrest and prosecute Church members for religious activities that occur in Oregon.

53.     In 2006 or 2007 I was asked to offer my expert opinion in a case involving a disputed fine that the Oregon Department of Human Services had levied on a nursing home. Since medications were involved in the violation, I was asked to give expert testimony regarding the efficacy of certain medications.  I do not recall anything else about my involvement in that

Page 16 -    AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

matter.

54.      I have received $1,250 in compensation for my time in preparing this report.  I coauthored a study published in *The Consultant Pharmacist* in 2005.  My CV is annexed.

Pursuant to 28 USC §1746, I declare under penalty of perjury that the facts set forth above are true and correct.

DATED:  December ___1___, 2008.

_____
George Gerding, R.Ph.

034557\00001\1298078 V001

Page 17 -    AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

# GEORGE ROBERT GERDING

# CV

# GEORGE ROBERT GERDING
**Licensed Pharmacist-Senior Care Specialist**

1429 SE 55th Ave.                                    (503) 232-2566
Portland, OR 97215                                   mggerding@msn.com

## Background:

Born and raised in Chicago, IL.  Educated in the public school system. Served in the U.S. Army, honorable discharge. Married (Mary Elizabeth), five children.

## Education:

BS Pharmacy, Drake University, Des Moines, IA

## Pharmacy Practice:

Feb 2004-present   Private consulting practice

Jan 2003-Feb 2004 Assisted Living Specialist, Omnicare National Marketing Team

Jan 2002-2003 National Senior Care Specialist, NCS HealthCare

1999-2001-National Research Coordinator, NCS HealthCare

2000-2001 Projects include INNOVATE Study, AVALON Study, Medication Use in ALFs, Treatment of Resistant Gram-positive Infections in LTC Facilities

1998-1999- Investigational pharmacist, research team, NCS HealthCare, Portland
      Investigator: Overactive Bladder Study, 1999
      Sub-investigator: Trovan Study 1998,99
      Sub-investigator: Influenza Prophylaxis Study 1999
       Others: Gain Registry (1000 patients nationwide)
            Metrifonate Investigational study
            Levofloxacin study

1993-1999- Consultant pharmacist, director of consulting services, NCS HealthCare, formerly IPAC Pharmacy Services

1977-1993- Manager/partner, Professional Plaza 102 Pharmacy (community practice, specializing in long term care and compounding)

Prior to 1976- Staff pharmacist- Colonial Drug, Collins Pharmacy, Seaton Pharmacy

www.bialabsite.net

**Teaching Experience:**

- Instructor, Oregon State University College of Pharmacy
- Active in externship, clerkship programs
- Recipient, Preceptor of the Year
- Presenter, Partners in Pharmacy, IPAC-NCS Pharmacy
- Instructor, Pharmacology for Long Term Care Nurses, Clackamas Community College
- Instructor, Pharmacology for Respiratory Therapists, Mt. Hood Community College
- Co-instructor, Drugs and Society, Continuing Education Division, Portland State University
- Instructor, OTC Medications Review for Chiropractors, Portland Community College
- Guest Speaker, Nursing Program, Portland Community College
- Health Classes, Mt. Hood Community College
- Video Production-Management of Respiratory Disease,
- Rhone-Poulenc Rorer
- Guest trainer, Pain Management in Long Term Care, Hastings Institute
- Presenter, Gastrointestinal Disease Training, Pharmacists' Service Group, Salem, OR
- Reviewer, Drug Regimen Review, Pharmacists' Service Group
- Speaker, Kos Pharmaceutical
- Speaker, Wyeth Laboratories

**Professional Publication:**

Co-author (J. Carlson, M. Estoup, G. Gerding)
Evaluation of Demographics and Medication Use in Patients with Dementia in Assisted Living and Skilled Nursing Facilities, *The Consultant Pharmacist, July 2005*

**Professional Presentations:**

When Bad Drugs are Given to Good People. Oregon State Pharmacists Association

Medicare Part D—Historical and Hysterical, Oregon Society of Consultant Pharmacists

Through a Glass Darkly, OSEC Summer institute 2005

Drugs and the Free-Range Elderly, Oregon State Phamacists Association

When Good Drugs go Bad, Oregon Alliance of Senior and Health Services

Medication Management for Community-based Care, Oregon Dept. of Human Services, various sites

Understanding Older Adults, Oregon State Pharmacist's Assn. Meeting, Tualatin, OR

From Greyhound to Hertz, Oregon Health Care Assn. Meeting, Bend, OR

New Strategies for Alzheimer's Dementia, Washington Health Care Association Meeting, Yakima, WA

The Silent Epidemic- Medication Errors in Assisted Living, Oregon Medical Directors Meeting, Sun River, OR

The Paradox of Modern Drug Therapy, Regional Meeting, Prestige Care, Portland, OR,

Making Medications Work Better, Oregon Health Care Association Meeting, Portland, OR

Creating a Pain Management Team, American Society of Consultant Pharmacists Meeting, Nashville, TN.

Consultant Practice, Challenges and Opportunities, Oregon State Pharmacists' Association Meeting, Portland, OR

Sjogren's Syndrome, American College of Apothecaries Meeting, Philadelphia, PA

Ten Ways to Make Your Board Work For You, American College of Apothecaries Dallas, TX

Professional organization presentations for Nurses, Caregivers, Social Workers, Physical Therapists, Denturists, Ward Clerks

Various community organization presentations

**Postgraduate Professional Training:**

Alzheimer's/Dementia Traineeship, American Society of Consultant Pharmacists, Dearborn, MI, Dec. 1998

Certified Geriatric Pharmacy Practitioner, June 1998

Assessment of the Geriatric Patient, Oregon State University, College of Pharmacy, Portland

Specialty Training in Diabetes Care, American College of Apothecaries, Memphis State University, Memphis, TN.

Specialty Training in Respiratory Diseases, American College of Apothecaries, Memphis State University, Memphis, Tn.

Specialty training in Compounding, Professional Compounding Centers of America, Houston, TX.

Pain Management Training, University of Utah, Bal Harbour, FL

Research Training, Pharmatech, Portland, OR

Speaker's Education Network, Rhone-Poulenc Rorer
- 

## Poster Presentations:

- Evaluation of Functional Status and Treatment Outcome in Patients with Alzheimer's Disease in NF and ALF settings.
  American Society of Consultant Pharmacists, Anaheim, CA Nov. 2002

- Cost of Treating MRSA Infections in Lon-Term Care Facilities
  American Society of Consultant Pharmacists, Chicago, IL Nov. 2001

- Treatment of Osteoarthritis and Rheumatoid Arthritis in Long Term Care
  American Society of Consultant Pharmacists, Boston, MA Nov 2000

## Professional Membership:

- Full Fellow, Past President, American College of Apothecaries
- Full Fellow, American College of Consultant Pharmacists
- Oregon State Pharmacists' Association, past secretary, delegate
- Oregon Society of Consultant Pharmacists, past president
- Professional Society of Pharmacists, past president
- Joint Commission of Pharmacy Practitioners
- American Pharmaceutical Association
- Appointed to Oregon Board of Nursing Home Administrators, 2003
- Appointed by two Oregon Governors to the State Board of Pharmacy (serving nine years), elected president twice.
- Appointed to the Oregon Council on Alcohol and Drug Problems

www.bialabate.net

## Awards and Honors:

- Bowl of Hygeia Award, Philadelphia, PA, Sept. 2002
- 50 Years of Dedicated Service, OR Soc. Cons. Pharmacists, Dec 2005
- Life Member, ACA Research and Development Foundation
- Leadership Award, Region XI Director, ACA
- Outstanding Achievement in the Practice of Pharmacy
- Pharmacy Innovative Practice Award
- Community Service Award
- Pharmacist of the Year, Portland Retail Druggists' Association
- Special Service Award, Professional Society of Pharmacists
- Honorary Alumnus, Oregon State University, College of Pharmacy
- APHA Foundation member

## Specialized Training:

- A.A., Television Production

## Published Articles:

- Timing is everything, OHCA Quarterly
- Dangers of Acetaminophen, ODS Quarterly
- Medications and Falls, ODS Quarterly
- Crazy Dirt, (short story), Northwest Writers Quarterly
- The Technician Issue, Oregon Board of Pharmacy Quarterly

## Visual Arts:

- Feeling Different, 8mm sound film
- The Trustee Series, Multi-image training presentations for hospital trustees, Brim and Associates
- Fairlawn, A Love Story, Multi-image presentation

## Community Service:

- Board Member, Oregon State Pharmacists Association
- Board Member, Geriatric Dental Group
- Board Member, Oregon Drug Utilization Review
- Pharmacy Advisory Committee, Oregon State University
- Board Member, Benedictine Foundation
- Ruling Elder, Mt. Tabor Presbyterian Church
- Toastmasters International
- Dale Carnegie Training
- Eastside Professional Group

PLAINTIFFS' EXHIBIT 1:

THE REPORT OF THE BRAZILIAN
FEDERAL COUNCIL ON NARCOTICS
(CONFEN)

www.bialabate.net

# WORKING GROUP

# FINAL REPORT

"Examination of the issue of the production and consumption of substances derived from plant* species" – Recommendations.



PLAINTIFF'S EXHIBIT

---

* Translator's Note: The term "plant" (Portuguese: *vegetal*), as used herein, refers specifically to the psychotropic plants discussed in this report.

www.bialabate.net

the activities carried out by the Working Group appointed by CONFEN Resolution No. 4 of July 30, 1985, the makeup of which was modified by CONFEN Resolution No. 7 of July 9, 1986, with the purpose of "examining the issue of the production and consumption of substances derived from plant species" – Recommendations.

## I

## PROLOGUE

1 -     The Federal Council on Narcotics ("Conselho Federal de Entorpecentes," or CONFEN), was directed by Administrative Ruling 02/85 of the DIMED (Division of Medications of the Ministry of Health) to issue a declaration regarding the inclusion of *Banisteriopsis caapi* among the drugs listed as illicit substances, which includes references, in parentheses, to "cipó de chinchona" (cinchona liana), "chacrona" or "mariri." The solicitation was formalized by a petition addressed to the then President of the CONFEN, Dr. Técio Lins e Silva, registered under no. 019547, on July 23, 1985, with the Communications Division of the Ministry of Justice. The request was signed by attorney Luís Felipe Belmonte dos Santos, and was accompanied by the power of attorney granted to him by the "Centro Espírita Beneficente União do Vegetal" ("União do Vegetal Beneficent Spiritual Center") (Attachment No. 1).

2 -     The President of the CONFEN at that time dispatched the petition determining the establishment of a proceeding by way of which the matter would be subsequently examined by Commission, to be appointed pursuant to a resolution which was to come into effect as Resolution No. 4 of July 30, 1985, published in the *Diário Oficial da União* (*D.O.U.*, the Official Gazette of Brazil) on August 8, 1985. Hence, the Working Group was appointed by Resolution No. 4/85 and consisted of the following members: Antonio Carlos de Moraes, vice-president of the CONFEN and representative of the Ministry of Public Finances; Suely Rozenfeld, representative of the National Division of Sanitary Surveillance (of the DIMED); Isac Germano Karniol, representative of the Brazilian Medical Association; Sérgio Dario Seibel, representative of the Ministry of Social Security and Welfare; and Paulo Gustavo Magalhães Pinto, representative of the Narcotics Repression Division of the Federal Police Department.

Dr. António Carlos de Morais (sic?) was appointed chairman of the Working Group (Attachment No. 2)

www.bia...

027

3 - Two members of th . . Germano Karniol and Dr. Sérgio
Dario Seibel—traveled to Rio Branco, capital of the State of Acre, in order to gather
further information so as to better support the group's work, given that various
communities which use the beverage under investigation were, and indeed still are,
located in said State. Their visit resulted in the report submitted to the final plenary
session of the CONFEN of 1985, on December 19, during which it was unanimously
decided to postpone its decision upon the matter until the following session, to be held in
January 1986. In addition, during said session of December 1985, the honorable advisor
Antonio Carlos de Moraes requested to be relieved of the chairmanship of the Working
Group on account of insufficient time to dedicate himself to his duties to the extent he
had intended. Consequently, Dr. Domingos Bernardo Gialluisi da Silva Sá was appointed
both as a member of the Working Group and as its chairman.

4 -      The Working Group subsequently met in the city of Rio de Janeiro, and its
members unanimously approved the terms of the opinion submitted to the plenary session
of the CONFEN, held on January 31, 1986, which it also approved unanimously
(Attachment No. 3). Said opinion, which follows, is transcribed in its entirety, taking into
account the overriding importance, for this final report, of the presuppositions upon
which it is based, and the fact that it was approved unanimously by the members of the
Working Group and of the Federal Council on Narcotics (CONFEN) itself:

> "The Working Group directed by Resolution No. 04/85 to
> examine the matter relating to the production and consumption
> of substances derived from plant species;
>
> CONSIDERING the investigation and corresponding report
> organized and prepared by Dr. Isac Germano Karniol and Dr.
> Sérgio Dario Seibel with regard to the plants popularly known
> as "mariri" and "chacrona," the scientific names of which are
> *Banisteriopsis caapi* and *Psychotria viridis*;
>
> CONSIDERING that the aforementioned investigation was
> carried out in Rio Branco, capital of the State of Acre, among
> religious communities which make ritual use of the substance
> derived from a decoction of "mariri" and "chacrona," said
> product corresponding to the tea commonly referred to as
> "daime";
>
> CONSIDERING that the aforementioned ritual use of "daime"
> has existed for many decades without resulting in any known
> social harm;
>
> CONSIDERING that, according to the above-mentioned
> report, "moral and ethical standards of behavior, similar in
> every respect to those which exist and are recommended in our

society, are of ..... sects, at times in an even stricter manner";

CONSIDERING that Resolution No. 04/85 addresses the various aspects involved in the ritual use of substances derived from plant species, by religious or indigenous communities, including sociological, anthropological, chemical, medical and general health aspects, it requires the examination of ALL of these aspects, which must therefore be taken into account when deciding upon issues relating to the use of said plant species;

CONSIDERING that, by way of Administrative Ruling 02/85, issued by the DIMED, *Banisteriopsis caapi* was included among the drugs on the list of illicit substances without observing the provisions of Art. 3, § 1 of Decree No. 85110 of 9/2/1980, which requires a prior hearing of the CONFEN, which is responsible for orienting policy and for the technical supervision of the activities regulated by the National System for the Prevention, Taxation and Repression of Narcotics Use;

CONSIDERING, in conclusion, the need to carry out various other studies referred to in Resolution No. 04/85, in addition to those carried out by Dr. Isac Germano Karniol and Dr. Sérgio Dario Seibel, the Working Group suggests to the distinguished Plenary Session of the Federal Council on Narcotics that it reexamine the process of including *Banisteriopsis caapi* in the aforementioned DIMED list so as to temporarily suspend said inclusion until the study of every aspect referred to in Resolution No. 04/85 has been completed, while strictly maintaining the status quo prior to above-mentioned DIMED Administrative Ruling 02/85, and officially notifying the sects which use "daime" or the beverage known by any other name which results from the decoction of the aforementioned species. Notwithstanding, the CONFEN may at any time reverse the temporary suspension decision suggested herein in the event that facts are verified which in any way indicate the misuse of said tea, including a corresponding rise in the number of users.

Such is our opinion. – Submitted with all proper reserves"

5 - The approval of the above-quoted opinion resulted in Resolution No. 6 of February 4, 1986, published in the *D.O.U.* on the 5th of the same month, by way of which the inclusion of *Banisteriopsis caapi* in DIMED Admin. Ruling 02/85 was suspended until the conclusion of the studies of the Working Group, with a deadline of six months (Attachment No. 4).

6 - The CONFEN met on June 26 and 27, 1986, at which time the Working Group

officially notified the Pres[...] [...] way in which it organized its activities, in addition to reporting on the phases already completed. The Working Group also reported that professionals from various fields, referred to in item VI of the official notice, had been invited to advise it.

In conclusion, by way of the same official notice, an extension of the period provided for in CONFEN Resolution No. 06/86 was requested, based on the following reasons:

> "Hence, taking into account the great significance to the CONFEN of gathering all necessary information which may provide knowledge which is indispensable to reaching a final and unbiased decision regarding the issue of the religious and/or cultural use of psychoactive plant species; and in accordance, moreover, with the recommendations made to the governments of the Americas during the 9[th] Congress of the Inter-American Indian Institute (Resolution 10), the W.G. hereby submits the present request to the Plenary Session for an extension of the period determined by Resolution No. 6/86, which would thereby extend the deadline from August 5 of this year to June 30, 1987.

> The request made herein needs to be considered since the W.G. can directly affirm, based on the observations it has already made, that to date it has not encountered any verifiable individual or social harm resulting from the use of the tea ("Holy Daime") obtained by decocting the plant species scientifically known as *Banisteriopsis caapi* and *Psychotria viridis* in their natural state, i.e., not having undergone any type of chemical processing, and which are used for ritual or religious purposes.

> Moreover, to date the W.G. has observed that the users of said tea comply with the rules of social behavior both within and without their respective communities, and demonstrate full compliance with the standards of conduct adopted by society in general.

> Wherefore, the W.G. proposes the continued authorization of exclusively ritual or religious use, without prejudice to whatever decision the CONFEN reaches under the terms of the final opinion to be submitted by this W.G."

7 - Two further resolutions resulted from the report submitted by the Working Group, on June 26, 1986. The first, Resolution No. 7 of July 9, 1986, published in the *D.O.U.* on the 10th of the same month, formalized the replacement of Dr. Antonio Carlos de Moraes as president of the Working Group by Dr. Domingos Bernardo Gialluisi da Silva Sá, and incorporated the following group of advisors into the Working Group's coordination activities: Dr. Francisco Cartaxo Rolin, Associate Professor of Sociology of the Universidade Federal Fluminense (Federal University of the State of Rio de Janeiro); Dr. João Manoel de Albuquerque Lins, Professor of Philosophy of the Pontifícia

Universidade Católica (Pon ................... f Rio de Janeiro with doctorates
030

in Philosophy and Theology from the Gregorian University of Rome; Dr. João Romildo Bueno, Professor of the Department of Psychiatry of the School of Medicine of the Federal University of Rio de Janeiro; Gilberto Alves Velho, Professor and Anthropologist of the National Museum, member of the board of the Sociedade Brasileira para o Progresso da Ciência (SBPC, Brazilian Society for Scientific Progress), board member and former President of the Associação Brasileira de Antropologia (Brazilian Anthropology Association), and board member of the Conselho do Patrimônio Histórico e Artístico Nacional (National Historical and Artistic Heritage Council); Regina Maria do Rego Monteiro de Abreu, Professor and Anthropologist; and Dr. Clara Lúcia de Oliveira Inem, Clinical Psychologist, member of the Sociedade de Psicanálise de Grupo (SPAG, the Group Psychoanalysis Society) and Technical Advisor of the Fundação Nacional do Bem-Estar do Menor (FUNABEM, the National Foundation for the Well-Being of Minors) (Attachment No. 5).

The second resolution, Number 9 of August 8, 1986, published in the *D.O.U.* on the 12th of the same month, extended the deadline for submitting the final report of the Working Group to June 30, 1987 (Attachment No. 6).

8 - Lastly, His Excellency the current President of the CONFEN, Dr. Miguel Reale Junior, on account of changes to the makeup of the CONFEN's board of directors, whereby various members of the Working Group ceased to belong to said board, made the following statement in official notice No. 310/CONFEN/SG/87 of May 14, 1987, addressed to the president of said Group:

> "I refer to CONFEN Resolutions 04/85 and 07/86 referring to the creation and reformulation of the Working Group in order to examine the issue of the production and consumption of the substances derived from plant species, of which you are the President, in order to request that the final report of the Group be examined by the plenary session of the CONFEN during its upcoming July meeting period.
> Therefore, I would greatly appreciate it if the report were sent to the Executive Secretary of the Council as soon as it is completed, so that it can be distributed to its members beforehand.
> In addition, I am instructing the Secretary to keep you informed of the agenda of said meetings so that the proper measures are taken to allow you to attend them."
> (Attachment No. 7)

## II

## OBJECTIVES

9 - Notwithstanding the generic references made by Resolution No. 4/85 to the

examination of issues persp... spects of the production and consumption of substances derived from plant species, the Working Group restricted itself to the study of the production and consumption of the beverage which the communities it visited commonly refer to as "daime" or "vegetal," and which the media generally refer to as "ayahuasca." Regardless of the names given to the beverage (there are several others), what is important to remember for the purposes of the Working Group's investigation is that said beverage is always a product of the decoction of the vine stem and of the leaf of the species scientifically known as *Banisteriopsis caapi* and *Psychotria viridis*, respectively. In addition, various names are given to these two ingredients. The liana is sometimes also called "jagube," "mariri," or simply "cipó" ("liana"), and other names given to the leaf include "rainha" ("queen") and "chacrona."

It is listed in the dictionary by Aurélio Buarque de Holanda Ferreira as "caapi," a plant discovered and classified by Richard Spruce, an English botanist and explorer of the 19th century (cf. p. 180 of *O Índio e as Plantas Alucinógenas* [The Indian and Hallucinogenic Plants] by Sangirardi, Jr., Alhambra, 1983).

Having initially defined the plant species of concern to the Working Group, the activities performed by the Group need to be reported, along with the results of the studies it carried out.

## III

## ACTIVITIES CARRIED OUT

10 - The Working Group carried out various activities with the purpose of understanding the aspects referred to in Resolution No. 4/85, "including sociological, anthropological, chemical, medical and general health aspects". The main activities carried out are described below.

11 - A number of visits were made to locations where Ayahuasca is used ritually.

Visit No. 1, from October 23 to 26, 1985, was made by Dr. Isac German Karniol and Dr. Sérgio Dario Seibel to three places where Ayahuasca users meet ritually, all of which are located in Rio Branco, capital of the State of Acre. The three groups in question are known by the names of "União do Vegetal," "Colônia 5000," and "Alto Santo." A report on this visit was prepared, and is an invaluable aid in the examination of the issue. It is therefore considered to be an integral and complementary part of this final report. (Attachment No. 8)


a few of the topic highlighted, in view of their importance to the study presented herein.

"4)   moral and ethical standards of behavior, similar in every respect to those which exist and are recommended in our society, are observed within the various sects, at times in an even stricter manner. Respect for the law always appeared to be emphasized.
..........................................................................
5)    The effect observed is probably due not only to the tea but also to the entire ambience, the music and accompanying dances, etc.
..........................................................................
9)    Once the ceremonies have ended, apparently all in a normal and orderly fashion, they return to their homes.

The followers of the sects appear to be calm and happy people. Many of them attribute family reunification, regained interest in their jobs, finding themselves and God, etc., to the religion and the tea.
..........................................................................
12)   Among the sects only one seems to have used a drug other than the tea (i.e., cannabis) during its religious pursuits. This practice was abandoned under the Cavalheiros agreement made with the military and police authorities of the time, and is apparently still being respected.
..........................................................................
13)   Historically, cipó and chacrona were only found in the virgin forest. Some sects have attempted to cultivate these plants, with relative success. It should be emphasized, however, that the preparation of the tea is fairly difficult and time-consuming, and involves a whole "technology" (sic) dating back to time immemorial which is used during a given ritual. In view of how it is prepared, it would appear difficult for an amount much greater than that needed by the sects to be feasibly prepared. In other words, it would appear difficult to prepare the tea in amounts which could be abused in a non-ritual way in society at large.
..........................................................................
17)   We encountered isolated cases of young adults from large cities in other Brazilian States who, in search of a life path, appear to have discovered these religions. They appear nonetheless to be well-adjusted in personal and occupational terms."

Other integral aspects of the "travel report" which resulted from this first visit will be addressed later.

www.bial

Silva Sá and Dr. Sérgio Dario Seibel to the religious community called "Céu do Mar," located at Estrada das Canoas 3036 in the Zona Sul (southern zone) of the city of Rio de Janeiro. This visit was preliminary in nature. Its objective was to prepare for another visit which would be made during the performance of what the followers of the sect call "work." The "work" is actually the religious practice of the community during which they drink the beverage, sing hymns, dance and recite prayers, some of which are from the Christian tradition, such as the "Lord's Prayer," the "Hail Mary," the "Hail, Holy Queen" and the "Glory Be to the Father."

We were greeted by the spiritual leader of the community, the psychologist Paulo Roberto Silva e Souza, who took us to the place where the "work" is performed, which is called the "church." There we met with six other followers of the "doctrine," the name given to all of the principles contained in the hymns which are chanted during the ceremonies.

12 - The anthropologist Regina Abreu, who is a researcher from the National Historical Museum and a professor of anthropology at the University of the State of Rio de Janeiro, reflected upon the basic characteristics, both in terms of doctrine and ritual, found within the community of "Padrinho (Godfather) Sebastião" (currently in the "Céu do Mapiá" Rubber Plantation, deep in the Amazon jungle), the supreme leader of the "doctrine." However, said basic characteristics are also found right in the Zona Sul area of Rio de Janeiro.

"Padrinho Sebastião" and his wife, "Madrinha (Godmother) Rita" are respected by all and recognized as the Father and Mother of the community, as well as the earthly representatives of the spiritual Father and Mother. In general terms, what appears to matter are the group, the whole, the community, more than individuals or isolated family units. In this sense the Santo (Holy) Daime Community resembles the societal model which the French anthropologist Louis Dumont described as "holistic."

From an astral or spiritual standpoint, "the basic principle is Daime," says the eldest son of the Padrinho, designated by him to be future leader and who is already taking on the administration of the community, "because Daime is the Mestre (Mentor). [In our healing work] the sick person only has to come speak to the chief, the Mestre already knows what's going to happen."

The Mestre is Juramidan, commander of all of the movement in the universe, a spiritual entity identified with Jesus Christ and the Eternal Father (God the Father of Christianity). "In spirituality, Daime takes the name of Juramidan," he continued. "Daime is the drink, but the drink contains the divine being which comes from the forest (...) The presence of Daime is the presence of Christ." (Cf. the work of Professor

---

* This should have been number 12 and subsequent sections should have been adjusted accordingly.

The supreme importance of "Padrinho Sebastião" in the "Holy Daime doctrine" is demonstrated by the fact that no "church" has the legitimacy to function in Brazil or even abroad unless the interested party goes personally to the "Céu do Mapiá" Rubber Plantation in the Amazon jungle and there obtains the direct authorization of the "Padrinho."

It is interesting to note that Dr. Paulo Roberto Silva e Souza went to Cape Code, Boston (sic) in the United States, where he performed "work" four times at the invitation and expense of a group of American psychotherapists who, reportedly, intend to found a "Church" in Boston. In addition, according to Dr. Paulo Roberto, he has received invitations to perform "work" in Madrid; on the island of Maui in Hawaii; in London; in Brisbane, Australia; and in Oslo, Norway.

It should be made clear that the data contained here in item 12 were not all collected on the same day during visit no. 2, although they were all reported on the basis of various interviews held with Dr. Paulo Roberto over the course of approximately one year. However, the undersigned author of this report felt that organizing this first batch of information would make the present study easier to understand.

It was agreed that we would be in attendance during the "work" which was to be performed the following day.

13 - <u>Visit No. 3</u>, made on April 25, 1986. The "church" was lit up and there was a great deal of movement among the followers of the "doctrine" who were preparing and decorating the premises, considered sacred, where the ceremonies were to take place. The men were wearing white three-piece suits with a blue fringe on their pants, and ties of the same color. On their lapels some of them were wearing a circle containing a star and, inside of it, a moon, all in gold. The women wore white dresses with green belts, and a head decoration resembling a small garland. They give these clothes the name of "uniform," and they are only provided to those who have chosen the "doctrine." They were tuning instruments which were to be played during the "work" (an accordion and guitars) and were teaching chants. The ambience was quite similar to that found in the places of worship of other religions: candles, crosses, rosaries, effigies of the Virgin Mary, Jesus Christ and St. John the Baptist. At the rear of the temple there was an isolated chamber in which the "Daime" was kept, and it was interesting to observe that the connection with the assembly room, in which the ceremony was to be held, was through two tabernacle-like openings.

www.bialabate.net

Before initiating the "work," the spiritual head, Paulo Roberto, called us aside and cautioned us that, in the event we wanted to take "Daime," we should know about the fundamentals of said practice. He then said: "We take Daime under the power of our Lord Jesus Christ, the protection of the Virgin Mary, of St. John the Baptist and of the Patriarch St. Joseph. Daime requires courage and strength in order to directly face what people are. If such is not the case it's better not to take Daime. We believe in the power of love, that men are brothers and that pride is what separates people."

14 - The "work" lasted around six hours and began with the recital of Christian prayers, specifically the "Lord's Prayer," the three "Hail Marys" and the "Hail, Holy Queen," in addition to ejaculatory prayers. Next, the men and the women—in two separate groups with a table between them covered with candles, crosses, water, rock crystals and rosaries—formed two lines and moved towards the "tabernacles" (one for the women and the other for the men). In each one some "Holy Daime," in an amount equivalent to 100 ml or 150 ml, is served to each participant who, before receiving his or her serving, contritely makes the "Sign of the Cross" and returns to his or her place. Hymns are chanted throughout the "work," accompanied by instruments such as the guitar and the accordion, to the rhythm of maracas. The two groups of men and women dance, with lateral, repetitive, uniform and alternating movements. Occurrences such as vomiting and diarrhea are viewed as natural. (The latter appear to be less frequent.) Such events are considered to be a form of purification of the ills of the spirit and the body. Participants who are in such conditions are always looked after by members of the community who, during all of the "work," are charged with supporting those who are expiating their ills. The "church" is located in a place which, by necessity, anticipates the indispensable conditions which allow this genuine "rite of expiation" (through vomiting or diarrhea or both combined). It can be said, however, that the performance of "work" does not fail to anticipate the "rite of expiation," with spaces and places which allow the purging (vomiting and diarrhea) of any suffering participants. The hymns evoke the forces of nature, the power of God, of the Virgin Mary and of all of the saints. They exalt the virtues of mankind, and encourage love, humility and repentance for one's faults. They proclaim the joy and the power of those who have faith in divine power and do good deeds. There are brief intervals between the hymns, during which ejaculatory prayers are recited in a lively manner to the "Divine Eternal Father," to the authors of the hymnals, and to the visitors, among others. The beverage was served two more times, following the

www.bialabate.net

same ritual, [separate line present "tabernacles," respectful ingestion), in a manner similar to the lines for receiving communion among Catholics. The last time, the "work" participants took a smaller amount of "daime," for the purpose of concluding the contemplative experiences and thereby returning to the ordinary rhythm of life. The "work" is formally concluded with the recitation of prayers and with thanks to God. After the conclusion, the participants disperse. We sat down with some of them, including Dr. Paulo Roberto, and had coffee or tea, and biscuits and cake—in short, a little snack—after which each of us took leave of each other cordially and calmly and returned home.

15 -    The two of us who visited both participated in the "work," during which we drank the beverage three times (in a smaller amount the last time). The liquid is brownish, with an extremely acrid, repulsive and nauseating taste which, in both our cases, provoked serious nausea and vomiting. In my case (that of the author of this report), it also caused serious diarrhea. With our eyes closed or half-open, in a state of varying torpor, as if half asleep, we experienced perceptions which apparently were unexplainable by external objects. It was possible to observe these characteristics—eyes closed or half-closed with slight fluttering—among the participants when they were having visions.

16 -    OTHER INFORMATION ON THE VISITED COMMUNITY. The legal name of the sect is "Centro Eclético de Fluente Luz Universal Sebastião Mota Melo" ("Sebastião Mota Melo Eclectic Center of Universal Flowing Light") or "CEFLUSMME," which owns the building which serves as its headquarters. Although it is located right in the city of Rio de Janeiro, the occupied area is covered with dense vegetation in a 200,000 m² (≅ 50 acre) forest reserve of the Brazilian Forest Development Institute (IBDF), 20,000 m² (≅ 5 acres) of which are buildable. The congregation includes about 200 followers, approximately 30 of whom already live at the location, as a community. The latter (including some physicians, university professors, journalists and even a state assemblyman) have outside activities and share housekeeping expenses. The other "uniformed" followers contribute to the "church" in keeping with their means, in accordance with their testimony. It should be remembered that the "uniformed" are those who have definitively chosen the "doctrine." The organization has received a certificate of public interest from the State and its date of establishment is 11/01/1982.

17 -    Visit No. 4, from June 13 to 15, 1986, was made by Dr. Domingos Bernardo Gialluisi da Silva Sá, Dr. Isac Germano Karniol and Dr. Sérgio Dario Seibel to the community known as the Centro Eclético de Fluente Luz Universal Rita Gregório ("CEFLURG"), based at the Fazenda Nova Redenção (New Redemption Ranch) in Visconde de Mauá-Resende, State of Rio de Janeiro, postal code CEP 27500. The

www.bial

director of the center is a journalist and writer. The basic characteristics of the CEFLURG in terms of doctrine and ritual are similar in every way to those encountered at the CEFLUSMME in the city of Rio de Janeiro, which are described in items 11 to 14 above and which therefore do not need repeating. Naturally, since the CEFLURG is a rural community, there are differences which result from this particular fact. Such differences in social organization are best stated by the declaration of Sonia Maria Palhares, professor and vice-president of the CEFLURG, in a document sent to the undersigned author of this report. The following words are her own: (Attachment No. 10)

"The CEFLURG is a non-profit organization, duly registered with the Registry of the 1st Registrar's Office of Deeds and Documents, and which has as its activity the organization of a Community and its spiritual practices.

The Community has an administrative framework consisting of several commissions managed by people who oversee daily tasks and divide them among their members. The Commissions (Agriculture, Works, Teaching, Nutrition, Janitorial, Ritual, Secretarial, Archive and Documentation, Healing, etc.) meet monthly. All of the members of the community meet daily at Dawn (7 a.m.) to plan the day's work. Depending upon the needs of the Community, work may be assigned by gathering the majority in one area or by having individuals stay within their own specific area and operating several areas at the same time.

Due to the Microsystemic nature of a Community, all of those who arrive find a field in which to develop their skills, and the tendency is towards choosing to spend all of their work time within the Community.

Family support is provided for all those who work full time, and we have a collective dining hall and a general supply plan.

There are, however, persons who maintain other employment ties. They generally work in the town of Mauá or provide services to private parties.

There are also the members of the Center who attend the Spiritual Work, wear the "uniform of the Doctrine," and live in urban centers (Rio and São Paulo).

Our source of revenue at this time, aside from private donations, is "Flor das Águas – Producer of Natural Foods" and the cheese dairy.

Workers:

1)    In the Community only:

1 Civil Engineer – in the Works Commission, with two years of Doctrine.

1 Architect – in the Works Commission, with four years of Doctrine.

1 Draftsman – in the Works Commission, with two years of Doctrine

www.bialabate.net

2 Teachers — in the Teaching Commission, who teach at the Community Preschool in the morning: one of them has four years of Doctrine and the other has two years of Doctrine.

2) In the town of Mauá:

1 Teacher of the Visconde de Mauá State School (a State employee) who has five years of Doctrine.

1 Doctor with an office in Visconde de Mauá who serves the local population, with three years of Doctrine.

1 Forest Engineer – providing consecutive services to landholders and individuals in the region. He has one year of Doctrine.

3) In Rio, São Paulo and other urban centers:

1 Psychologist who is currently working in the United States and returns in October. He has one year of Doctrine.

1 Doctor with the Services Support Institute of the State of Rio de Janeiro (IASERJ). She has three years of Doctrine.

1 Attorney with a private office. He has three years of Doctrine.

1 Freelance Journalist, with six months of Doctrine.

1 Publisher, with two years of Doctrine.

Conclusion:

The people listed herein have some academic training, however the members of the Community work in many capacities which are specific to the rural environment, with the result that new fields of study and research are opening up. For example: the cheese dairy, poultry farming, herbal healing, farming and the Works Commission (research has been carried out on cement and adobe floors by studying books, texts from the Banco Nacional da Habitação (BNH, the National Housing Bank), and correspondence with architects in other countries). All of the members of the Community are registered, and these records are available to you.

Mauá, May 20, 1987

Sonia Maria Palhares
Vice-President of the CEFLURG

18 - One piece of information which is indicative of the unity of the "doctrine" followed by the two centers—the one in Rio de Janeiro and the other in Visconde de Mauá, is that their respective names include the name of the "Padrinho" Sebastião Mota Melo (the Rio de Janeiro center) and the name of the "Madrinha" Rita Gregório (the Visconde de Mauá center), who are the earthly representatives of the spiritual Father and Mother.

As visitors we all participated in the "work" performed, which merits the same

www.bialabate.net

description as that given in items 13 and 14 above, with minor differences of no real importance, akin to the differences one would notice between two Catholic masses celebrated in two different parishes.

As occurred in Rio de Janeiro, we all took part in the "work," and ingested the beverage which, once again, provoked nausea and vomiting. It should be noted, however, that we visitors concluded that the strong emetic effects of the drink are attenuated by participating in the dancing and the chants.

Special mention should also be given to the special "work" performed on Sunday mornings, the so-called "Children's Daime," when the drink is served to the children in much smaller doses (the youngest, some of them still nursing, take "daime" from a teaspoon). There were pregnant women who had participated in the "work" both on Sunday and the day before. Some of them told of their experiences, which they considered highly positive, of using "daime" during childbirth.

One of the women, to give an example, described the perception which can be experienced during childbirth, which led her to a full understanding of that moment and her profound loving relationship with her son being born. She then added that her subsequent relationship with this son was more intense and positive than that experienced with her older son.

This Community, just as the one in Rio de Janeiro had done, provided all requested information and gave full support to the visitors, treating them with hospitality and giving them full access to all of the outbuildings and areas of the Ranch.

19 -    <u>Visit No. 5</u>, from July 14 to 20, 1986, was made by Dr. Domingos Bernardo Gialluisi da Silva Sá, Dr. Sérgio Dario Seibel, Dr. Sérgio Sakon and Dr. Clara Lúcia de Oliveira Inem, and included three destinations: Rio Branco, capital of the State of Acre; the locality known as Boca do Acre, in the State of Amazonas; and the Céu do Mapiá Rubber Plantation, in the Amazon jungle.

Preliminary clarifications: Although Dr. Sérgio Sakon is not a member of the Working Group under the terms of Resolutions no. 04/85 and no. 07/86, it should be noted that he is a member of the CONFEN board, a representative of the Federal Police, and is the substitute, within the CONFEN, of the representative from the Federal Police Department, Dr. Paulo Gustavo Magalhães Pinto. He was therefore invited to join the team making the journey in question. This invitation was made because, at the time, board member Paulo Gustavo Magalhães Pinto was unable to make said trip due to his professional obligations with the Federal Police Department. Dr. Clara Inem participated

www.bialabate.net

040

CONFEN Resolution No. 07/86.

We were also joined by Dr. Paulo Roberto Silva e Souza, from the previously mentioned "Céu do Mar" community, located in the city of Rio de Janeiro, who met us at Rio de Janeiro International Airport and accompanied us until our arrival at the Céu do Mapiá Rubber Plantation. We were informed by him in detail about the various phases of the upcoming journey, in view of the complexities involved (various means of transportation; food and potable water supplies during the river passage; medications, including anti-malarial treatment, smallpox vaccinations, etc.). Dr. Paulo Roberto was perfectly acquainted with the route, having periodically met with "Padrinho Sebastião" and his community at the "Céu do Mapiá" Rubber Plantation.

20 - Date: 07/14/86 – We arrived at Rio Branco and, on the same day, we continued in a single-engine airplane to Boca do Acre, about a 30-minute flight. The locality known as Boca do Acre is located on the banks of the Purus river and its population, overall, appeared fairly poor. Located there is what the followers of the "Santo Daime doctrine" call a "first-aid clinic." This is emergency treatment, administered by followers of the sect authorized by "Padrinho Sebastião," to persons requiring help for their physical or spiritual suffering. We obtained this and other information from the various members of the "doctrine," some of whom reside there, and from others who had come from elsewhere in Brazil.

It is interesting to note that the community living in the Amazon jungle, known as "Céu do Mapiá," was running a commercial business like a restaurant or snack bar in Boca do Acre. This activity is managed by one of its members—the same who had provided us with these clarifications. In any event, this location is an important part of the structure of the jungle-based community, since, as we later observed, it serves as a small consumer market for the products produced in "Céu do Mapiá," such as the latex they extract in the rubber plantation, refined sugar, and agricultural products, including those consumed at the above-mentioned business. At the same time, Boca do Acre serves as a supplier of necessities for the inhabitants of the rubber plantation, including goods such as clothing, medicine, tools, household utensils, etc.

[21 -] Date: 07/15/1986. In the morning we left Boca do Acre aboard the "Tucuxi," a vessel from the INCRA (Instituto Nacional de Colonização e Reforma Agrária, the National Institute for Agrarian Settlement and Reform), and followed the Purus river up to the mouth of the Mapiá narrows [text cut off at page bottom]

[...] can be made by [...] under protective netting, in an unoccupied hut on the banks of the narrows. Indeed, to continue the journey during the night would have been extremely hazardous, on account of reduced visibility and the highly sinuous nature of the narrows, along with the numerous trunks and branches which need to be avoided all along the way. Moreover, we were warned many times that we would need to take great care in walking on the riverbed through the narrows on account of the ferocious sting of the freshwater rays there. This brief narration is important in that it conveys the difficulties and adverse conditions which travelers must face in order to reach the community of "Padrinho Sebastião" and "Madrinha Rita" at the "Céu do Mapiá Rubber Plantation." Indeed, we encountered people from a number of regions of Brazil (including Brasília, Bahia, Rio de Janeiro and Visconde de Mauá) during our journey. The impression of the author of this study was that many of these people had the characteristics of genuine pilgrims making their way to the center of the "Santo Daime doctrine," in search of sacred contact with the elderly man with an apostle's beard: "Padrinho Sebastião," thus justifying the many inconveniences and difficulties confronted. All of this, together with the attempt to live in harmony with nature, appears to be very rich material for later analysis by sociologists. In addition, witnessing the interaction among members of groups from different regions and cultures of Brazil is essential in order to accurately assess the topic and final considerations of this report.

[22 -] Date: 07/16/1986. Arrival at the "Céu do Mapiá Rubber Plantation," where we stayed until our departure on the 19th of the same month. The village is small, with around 250 inhabitants, as reported to us by members of this community, which was founded and nurtured in the heart of the Amazon jungle. There are a number of huts of the type shown in the photos attached hereto (Attachment No. 10, photos I to XII, all of which are reproduced with the permission of the historian Vera Fróes, author of the book *História do Povo Juramidan -A Cultura do Santo Daime*, i.e.: *History of the Juramidan People - The Santo Daime Culture*, which received the Suframa Prize for History in 1983).

As stated previously, there were people from various parts of Brazil, and even outside the country. Currently, since the time of our visit, there are people who are moving there permanently; such is the case of the clinical psychiatrist who is pictured alone in photo no. II, in the center of photo no. VIII, and beside "Padrinho Sebastião" in photo no. IV. This psychiatrist, a married man with children, was met by the author of this study during Visit No. 4, at Visconde de Mauá. His move was reported to us by the historian Vera Fróes.

www.bia...

13 ... Date: 07/17/1986. A ........ vening of the following day, all of the most important moments of our visit were recorded on video. In addition to this documentary, a number of interviews were recorded with members of the community, both male and female, and of various ages. All of this material is available for the CONFEN to examine.

The first place we visited was where the leaves ("rainha" or "chacrona") were stored for use in the "feitio" ("craft"), the term given to the entire "Daime" preparation process. These leaves, we were told, came from Rio Branco. The leaf plantation is much smaller than the liana plantation, with the latter numbering some 5,000 plants. We went to see the so-called *jagube* grove (a plantation of the *cipó* or *jagube* liana) where it was explained to us that the ideal harvest time is after five years, and that it is possible to use the vine after three years, although at that point it is still slender.

The new "craft house" was being completed. It contained a hearth for preparing the beverage in large aluminum pots, with a capacity of up to 120 liters ($\cong$ 30 gallons), and tree stumps arranged in two rows of seven, one in front of the other, with small benches where the followers of the "doctrine" sit during the "pounding" (*bateção*). The "pounding" is the process of macerating the liana. This was done, with rhythmic strokes, using mallets fashioned by the community members themselves.

We also visited sites planned for the milling of sugar cane, and for the production and storage of refined sugar. The community also farms the land for its own sustenance, and reportedly the only thing it needs to obtain from the outside (in Boca do Acre) is salt. It should also be noted that the harvesting and sale of latex sap play a significant role in the economy of the community.

Photograph no. II shows the "Healing House" (*Casa de Cura*), which, as its name suggests, is intended for the rituals which aim to ease or eliminate the physical or spiritual suffering of those who seek succor from the "doctrine."

At nighttime, all of the visitors took part in a "work" ritual. Once again, we remarked upon the similarity of the ritual to what we had witnessed in Rio de Janeiro and in Visconde de Mauá, to such an extent that it is entirely possible to rely once again upon the description given previously in items 13 and 14 for a fairly accurate picture of how the "work" on the night of 4/17/1986 was performed. The visitors participated fully in the ingestion of the beverage, in the chants and in the dance.

There were also occurrences of nausea and forceful vomiting. It is noteworthy that the greater the amount of the beverage ingested [text cut off at page bottom]

24 - <u>Date: 07/18/1986</u>. The "craft house" was completed during the day. The women selected, cleaned and arranged the leaves, while the men vigorously scrubbed the *cipó* liana in order to prepare it for steeping.

Fresh *Psychotria* leaves and macerated *Banisteriopsis* are arranged in alternating layers inside of the big boiling pots. This preparation is handled by "specialists," since appearance, flavor and immediate effect are important factors in verifying whether the preparation is suitable. The same liquid is generally used to boil three successive batches of fresh material from said plants. The end result is a thick brownish liquid which is filtered in order to remove fibrous matter. Depending upon its phase of boiling, "daime" is designated as either first, second or third degree. The first degree is the strongest, since it results from boiling with a third batch. However, the final beverage may be more or less active as a result of using more or less material (plants) or, reportedly, depending on the use of the branch (the mildest part), the main stalk of the liana, or its roots (the strongest part).

Stored adequately, some samples may remain fully active for several years. This contradicts the notion that ayahuasca preparations are only active for a short period.

This beverage is usually prepared during special ceremonies with great symbolic and religious significance.

25 - We all took part in the "craft" ceremony, which culminated with the drinking of the fresh "daime." This was unlike other "work." The beverage was drunk in the "craft house" itself, which is situated in an open clearing in the middle of the jungle, at a distance from the other huts. The new beverage seemed to taste less acrid and repulsive, however, once again, a number of participants vomited. It is interesting to observe that, during the "mirações" (moments of ecstasy, of clairvoyant contemplation or of visionary experience), people's eyes are generally closed or half shut, and their eyelids appear to flutter lightly.

From then on we all remained seated as chants were sung. It is important to note that the setting, the contact with the Amazon forest at nighttime under a full moon, the hymns and their words evoking the force of the elements and the divine power, and the reciprocal will to encounter the other and the sacred, have a significant influence [text cut off at page bottom]

This special "work" was led by Alfredo, son of "Padrinho Sebastião," whom we were only able to converse with briefly on account of his ongoing illness.

A few brief accounts concerning "Padrinho Sebastião" and the "Céu do Mapiá Rubber Plantation" are therefore included below. These accounts have been extracted from the aforementioned *História do Povo Juramidam*, by Vera Fróes:

> "Sebastião Mota de Melo was born in Eirunepé in the State of Amazonas on October 7, 1920. As early as 1975 the members of his rural "Santo Daime" community began calling him "padrinho" ("godfather"), a word which expresses respect for and recognition of his abilities as a spiritual mentor, while at the same time making whoever so addresses him his "godchild" and protégé under his spiritual guidance.

> Padrinho Sebastião reports that he lived with health problems as soon as he was born, and that, as a child, he heard voices from the spirit world and had visions and dreams which revealed events which had yet to occur. At the age of eight, he had a dream which he interprets a sign of the mission he was to accomplish years later, with Santo Daime:

>> "I was alone in the middle of the jungle, wearing a felt hat on my head and dark clothes, when suddenly a fire arose and that terrifying roar was coming and I saw the little tongue of fire engulf everything, it burned everything, nothing was left, only the place where I was... I was going to see the vision of my life fifteen years forward, there in Amazonas: of the water, of the jungle and of the astral plane. But I didn't understand any of that and everything was like a dream... I willfully ignored it, but it was happening and then I was seeing the result. It kept up and I began to fly. As I flew and saw what the astral plane is like, I entered the forest and the waters and as I did so I saw the visions. With time I began to work with a spiritualism (sic) which appeared and a voice began to call me: 'Bastião!', and I answered 'Hey there!' Then the light went out and the voice stopped. But time went by and I caught an astral airplane and I arrived in Acre. I didn't delay, I came, I was coming materially."

> For the Padrinho there is a difference between dreams, hallucinations and visions, and it is very important for a healer to know how to differentiate between these phenomena:

>> "Don't go thinking that a miração is a dream or that a vision is a miração. The miração leaves you doubtful, you saw it but you didn't see it, and when it's a vision, it's still like you're having a dream, but it's not, it's the truth, you're seeing everything, you're hearing and seeing. Dreams are more muddled, you wander aimlessly, get on a narrow path and head down it, but when you wake up you're not conscious of it. During a vision you are fully conscious, more than ever..."

> Just as in the case of Mestre (Mentor) Irineu, the initiation of Padrinho Sebastião was guided by a shaman, Mestre Osvaldo, a São Paulo-born black man also known as "Cumpade (God-Daddy) Osvaldo" on account of his being the godfather of Sebastião's son, Pedro Mota.

> During a year spent in the jungle near the [illegible] river,

to perform work with a spiritual group, a communion altar and activities, and hosted the medium and surgeon Dr. Bezerra de Menezes. Depending upon the condition of the ill who came to see Osvaldo, he would send for Padrinho Sebastião to perform the healing." (Op. cit., pp. 41-42)

"Céu do Mapiá" is now the headquarters of the Centro Eclético de Fluente Luz Universal Raimundo Irineu Serra (CEFLURIS), which was previously based in "Colônia Cinco Mil" ("Settlement 5000"), at kilometer 9 of the Porto Acre highway. It was given the name "5000" because, "once the rubber plantation ceased operations, the land was divided into settlements which were each sold for five thousand old cruzeiros." (Vera Fróes, op. cit., p. 43-44.)

Padrinho Sebastião and "his people," namely the community which has him as its spiritual leader, moved to the "Rio do Ouro Rubber Plantation" in the region of the Endimari river, on the banks of the Igarapé Trena narrows. Vera Fróes narrates:

> "To the surprise of all, the Padrinho announced in 1981 that this was not the location determined by the astral plane where the New Jerusalem was to be built. At the same time, persons interested in the land cultivated by the community had begun to exert pressure on account of the discovery of a land deed—dating back to the early 1900s and containing numerous irregularities—which stated that the area was the property of a southern rancher.

> Despite the fact that the community had been authorized to settle at the Rio do Ouro rubber plantation by the regional agency of the National Institute for Agrarian Settlement and Reform (INCRA), this organization informed the community of the existence of another area, in Federal custody and with no owners, where they could move. Said area, located in the Municipality of Pauini (Amazonas State) along the narrows of the Mapiá river, a tributary of the Purus river, was 150 kilometers ($\cong$ 95 miles) from the Rio do Ouro rubber plantation.

> The community, confronting innumerable difficulties yet again, undertook the move to the Mapiá river narrows with the aim of establishing a new rubber plantation called Céu do Mapiá. They did so even though this also meant leaving behind a rubber plantation without receiving any compensation from the alleged landowners, notwithstanding the fully-realized agricultural and rubber-production capacity of said plantation or the many enhancements built for it by the community.

> The rural community's move from Colônia 5000 to the heart of the Amazon forest is meaningful from both a material and spiritual standpoint: Daime shall protect his children, the Midam, who await the call to return to the origins, to the groves of rubber trees where many were born and raised. It is also a return to the time when Mestre Irineu worked in the jungle tapping rubber, and came to know Daime." (op. cit., pp. 120-121)

www.bialabate.net

by the time we arrived. Along the return route we came across a canoe of "pilgrims" (about six people) hailing from Brasília, Bahia and Rio de Janeiro in search of the sacredness which the Céu do Mapiá Plantation signifies for them.

27 -   Date: 07/20/1986. Arrival, in the morning, in Rio Branco, whence we visited "Colônia Cinco Mil." There remains little to add to what has already been stated about it. Compared to our preceding visits, this one was much quicker. At present, this community does not appear to be as well organized as the others mentioned herein. We visited the "craft house," the church and a few lodgings. It should be recalled, however, that "Colônia Cinco Mil" was visited by Dr. Isac Germano Karniol and Dr. Sérgio Dario Seibel in October of 1985, as reported previously.

28 -   Visit No. 6, on September 12 and 13, 1986, was made by Dr. Domingos Bernardo Gialluisi da Silva Sá, Dr. Isac Germano Karniol, Dr. Sérgio Dario Seibel and Dr. Clara Lucia de Oliveira Inem, who went to the Centro Espírita Beneficente União do Vegetal, which has its Rio de Janeiro headquarters at Estrada do Carretão S/N, with its entryway at Estrada de Boca do Mato, after no. 695 – Vargem Pequena, Jacarepaguá.

The União do Vegetal, also known simply as the UDV, has characteristics which differ in many respects from those of the communities referred to up to this point, although, with regard to the essential purpose of this study, it is basically identical to them. It is a spiritual center which uses the same beverage which we are concerned with: ayahuasca. The UDV, however, has another Mestre (mentor), i.e., other than Raimundo Irineu Serra ("General Juramidan" to the followers of the "Santo Daime Doctrine," which he created). The União do Vegetal defers to José Gabriel da Costa, its spiritual mentor, who founded it on July 22, 1961 (cf. the statements contained in the letter issued by the legal representatives of the UDV, in Attachment No. 11).

In an article appearing in *América Indígena* (volume XLVI, January-March 1986), a quarterly publication of the Inter-American Indian Institute, Anthony Richard Henman (University of London), accurately addresses

www.bialabate...

the use of ayahuasca by the                              le is entitled "Ayahuasca Use in an Authoritarian Context. The Case of the União do Vegetal in Brazil".

Henman states that the UDV was founded in Porto Velho in 1962. The article in question presents a fairly faithful depiction of this other branch of "ayahuasqueiros," including, in Brazil, the adepts of Mestre Raimundo Irineu Serra, founder of the Santo Daime Doctrine, who form the people of Jurimadan; and the adepts of Mestre José Gabriel da Costa, founder of the União do Vegetal (UDV), which is analyzed in detail in the aforementioned article by Henman. The issue of *América Indígena* which featured the article in question was devoted entirely to ayahuasca, and has therefore been incorporated herein as an integral part of this report (Attachment No. 12). It is worthwhile reading, particularly the aforementioned article by A. R. Henman, and the article by Professor Richard Evan Schultes on "The Historical Development of Identifying *Malpighiaceae* Employed as Hallucinogens," both of which are essential in order to understand this report.

29 - The UDV took the initiative (cf. Prologue, item 1) of requesting that the CONFEN review the inclusion of *Banisteriopsis caapi* among the drugs listed as illicit substances. This request and its supporting documents brought about the proceeding registered under no. 019547, available at the Secretariat of the CONFEN. The perusal of these records reveals the numerous depositions which were given by professionals, with titles including: doctor, public official, lawyer, serviceman, business manager, psychologist, state attorney general, university professor, architect, engineer, radio announcer, economist, publicist, writer, banker, cocoa grower, state tax inspector, chief collections officer of the Federal Revenue Service, and student—all of them members of the UDV, which has around two dozen centers, with locations in Bahia, Ceará, Espírito Santo, Rio de Janeiro, Amazonas, São Paulo and Rondônia. Attachment No. 13 lists all of the UDV's officials in Brazil, together with their respective addresses. Attachment No. 13-A is the UDV's own report on its history and myths.

30 - Moreover, both our visits to the UDV and our relationships with its followers, over the course of nearly two years, have allowed us to confirm Henman's assertion that said followers are middle-class members of urban society.

www.bialabate.net

31 - The "work" [of the] does not include hymns or dances. However, they do play records or tape recordings of familiar works and artists. Those of us visiting all took part in the ceremony. We witnessed the same "purification" process, as did Henman, who remarks: "(…) the act of vomiting is considered to be the expulsion of harmful material, an act of purification" (cf. the above-cited *América Indígena*, p. 232). The rituals we had the opportunity to observe are so faithfully described in Henman's article that to recapitulate them here would be pointless. Moreover, said article provides additional insights, especially with regard to social organization, creation myths and other information referred to previously.

32 - The UDV in Rio de Janeiro owns the site of its headquarters, a wooded property of nearly one and half acres. It has about 117 members in Rio de Janeiro and around 2000 members throughout Brazil. Those members who have the means to do so contribute 10% of their earnings to the organization, while those who are poor or unable to pay do not make a contribution. There are also members who make higher contributions, as they fit.

A *cipó* vine, brought back from the Amazon rainforest, is used for the *preparo*, i.e., "preparation." (The Daimista term for this, *feitio*, i.e., "craft," is not employed by the UDV). I was told that the leaf can be found at a place called Pedra Branca, in Rio de Janeiro.

I was also informed that, for "special" gatherings, the men wear a uniform consisting of white pants and a green shirt, and the women wear golden-yellow pants or skirts and a green blouse. The officiating mestre is the only one to wear a blue shirt.

This was the final visit made to an ayahuasca-using community.

33 - Interview with Antonio Alves Leitão Neto, a journalist working for the newspaper *O Rio Branco*. The interviewee was the designated "secretary and spokesman" of the "Alto Santo" religious community. I will only be reporting the most relevant points from the two-hour recorded interview, taking into account that "Alto Santo" constitutes another branch of the Santo Daime Doctrine. Thus, although "Alto Santo" recognizes the same founder—Mestre Raimundo Irineu Serra—its spiritual leader is not "Padrinho Sebastião."

www.bialabate.net

The spiritual teaching ... ministered by the High Council, which, according to the interviewee, was founded by "Mestre Irineu" himself. Said Council has offices-in-perpetuity, which are:   a) The Mestre Imperador (Emperor-Mentor) and Chief of Doctrine: Mestre Raimundo Irineu Serra;  b) The President Leôncio Gomes da Silva (deceased), also called Mestre Imediato, whom Mestre Irineu, while still alive, chose to head the community;   c) The Councilor José das Neves, who is quite advanced in age, and practically never participates in the work.   These three offices are held in perpetuity and are non-transferable. Underneath the High Council there is the Community Council, which directs the community in accordance with "orders emanating from above." It provides for the material needs of the organization. (The Council comprises positions and duties which include: president, monitors, secretary, Daime preparation, custodianship of the community's patrimony, etc.)

At present, the leadership of the center is held incontestably by the "Dignitary," a title which Mestre Irineu gave to his wife, Mistress Peregrina Gomes Serra, while he was still alive.

For Alto Santo, the only padrinho was Mestre Irineu, who has no successors. It is at variance with the community which follows the "Padrinho" for two main reasons. First, because Mestre Irineu set the maximum number of hymns that one can receive in one's lifetime at 132. Beyond this number, Mestre Irineu would no longer be responsible because they would no longer be inspired by him. Also, the interviewee affirms that said number has been surpassed by a number of Padrinho Sebastião's followers. The second reason was the use of "Saint Mary's Wort" (i.e., cannabis) in Colônia 5000 which, in '81-'82 caused the Federal Police crackdown, casting troubles and stigma upon the ten other centers in Rio Branco, where only "daime" was used, but whose followers were nonetheless persecuted by the police, summoned for depositions, and harassed at school and at work, just because they used "daime," on account of which they were automatically called "potheads."

Notwithstanding, the interviewee expresses the willingness to seek common ground, with the main exception being marijuana use.

Currently, there are perhaps some 200 members who live on small properties registered with the INCRA, most of them originally from farmers. Nowadays the community is more spiritual, since everyone produces their own products and sells them

Normally they assemble twice per month, during sessions which are attended by families, children of all ages and pregnant women, in order to partake of Daime, a long-standing tradition. They seek physical, mental and spiritual health. Daime promotes deep meditation and spiritual fitness.

34 - <u>Effects upon the human body as a whole</u> – On this subject, Professor Isac Germano Karniol points out that psychotropic drugs—drugs which act upon the central nervous system—are classified in different ways by different sources. The chemical structures of these substances are a potential approximation. Pharmacological effect is the more widely accepted distinguishing factor. Hence, hallucinogenic drugs are ones which, on the whole, provoke changes in sensory perception, most often hallucinations, i.e., perceptions in the absence of an external object. Visual hallucinations are characteristically caused by such substances, and this is what distinguishes them from the altered states which are typical of certain mental disorders, such as schizophrenia, involving the manifestation of auditory hallucinations.

Certain hallucinogenic drugs, such as LSD, are taken as pure substances. More commonly, however, a plant is used or, in rare instances, a mixture of plants, as in the case of ayahuasca.

The most important work on the hallucinogenic compounds of ayahuasca is by Rivier and Lindgren (1972). As it happens, betacarbolines such as harmine, harmaline and tetrahydroharmine, as well as N-dimethyltryptamine, are found in the admixture of *Banisteriopsis caapi* and *Psychotria viridis*. Dimethyltryptamine is much more active than the other compounds. Notwithstanding, when it is taken on its own, through oral ingestion, its effect appears to be limited, since it is metabolized quickly in the peripheral tissues by enzymes known as monoamine oxidase. The betacarbolines inhibit these enzymes, thereby prolonging the effect of the N-dimethyltryptamine. This mechanism was the subject of recent study by McKenna et al.

The chemical makeup of its compounds or compounds notwithstanding, the indisputable result is that ayahuasca, as a unified whole, has a hallucinogenic effect.

As this preparation acts within the body, it produces the intense hallucinatory effects for which it is known, in addition to other possible peripheral effects, such as vomiting, diarrhea, etc. To date, no data is available which would allow an adequate assessment of the chronic mental and clinical effects of its long-term use. Other unknowns include the effects, whether acute or long-term, upon children, pregnant women and fetuses. Such studies are fairly complicated. On the basis of uncontrolled observations we made during our visits to several communities where "daime" is used ritually and noncontinuously, generally during ceremonies and on special dates, we did not discover any abnormalities.

35 -   <u>Actions taken by public authorities</u>. Over the years, the public authorities have taken uncoordinated action in countless cases involving Ayahuasca use in Brazil which, despite decades of involvement, never actually clarified or resolved the issue. Such action has been isolated, in the absence of any significant coordination between the various authorities, and has usually resulted from the startle of local authorities upon learning that groups of people were using an unfamiliar beverage with mind-altering effects. It would appear, however, that in every one of these instances the problems were satisfactorily clarified, and therefore resolved. Any further examination of the aforementioned cases would be beyond the scope of this report, and is better left to a historical survey.

36 -   However, there is a case of a coordinated action taken by the Brazilian federal authorities which is very important in terms of the present report, and which is recorded in two files of the Federal Police Department, Regional Superintendency of the State of Acre, with the following numbers: SRA/DPF/BSB-027129/81 and SRA/DPF/DSB-001372/82. These files constituted the records which, at present, are available at the CONFEN Secretariat. A careful examination of said records reveals a certain <u>fact</u>, i.e., not merely a conclusion "a" or " b", but, it bears repeating, a <u>fact</u>. And what is this

important fact? It involves the arrest of a young man named Eder Candido Silva, who was 22 years old at the time. The arrest occurred in Rio Branco, the capital of the State of Acre, on September 30, 1981. This young man, who "was carrying a green rucksack which caught the attention of both the driver and his fellow police officers" (cf. the terms of the "record of arrest for a crime detected in the act"), was detained by the police officers, who "decided to perform a search of the individual…" (cf. the above-cited "record of arrest"), upon whose person "marijuana" was found. The arrestee was residing in "Colônia Cinco Mil", where there was marijuana planted.

On the following day, i.e., October 1, 1981, the Federal Police went to "Colônia Cinco Mil", where they confiscated marijuana plants, seeds and leaves. It can therefore be affirmed that *Banisteriopsis* was subsequently put on the DIMED list of illicit substances on account of the "marijuana" which, at that time, was being used at "Colônia Cinco Mil", alone among the ten or so other communities whose members exclusively used ayahuasca, according to the deposition of Antonio Alves Leitão Neto (cf. item 33 above). The fact remains that the various investigations which targeted a number of groups of ayahuasca users, especially the community led by "Padrinho Sebastião", were set off by the arrest of Eder for possession of marijuana.

37 - The fact in question is of paramount importance, given that to date the Working Group has been unable to discover a single objectively verified record capable of demonstrating, unequivocally, any social harm actually caused by the use of ayahuasca. It should be reiterated that the subject of the Working Group's investigation is ayahuasca— not marijuana, cocaine or any other drug—and it is obvious that only problems which are specifically caused by the use of said beverage may be considered.

38 - The files referred to in item 36 above, from the Federal Police Department, Regional Superintendency of the State of Acre, as well as the various investigations in connection with them, resulted in Administrative Ruling No. 0534 of August 3, 1982, issued by the then Minister of Justice, Ibrahim Abi-Ackel, by way of which an interministerial working group was formed for the purpose of undertaking the "comprehensive review of the matter referred to in Proceeding No. MJ-7394/82, suggesting all necessary measures" (Attachment No. 14). The Public Prosecutor, Dr. Edmar de Azevedo Monteiro, was responsible for coordinating the Group, however there

www.bia...

is no record of any final rep...

IV

## CONCLUSION

39 -    It must first be understood that the change in membership of the Federal Council on Narcotics (CONFEN), which occurred during the beginning of this year, made it difficult to bring together all of the members of the Working Group so that they could jointly draft this final report—a task which would have required numerous meetings in light of the complexity and breadth of the work involved. Hence, the signatory of the present report maintained individual contacts with the various members of the Working Group, and present and past CONFEN board members, thereby gathering assorted material, opinions, information and contributions. These members will all be sent a copy of this report, along with a request that they issue their findings on it, which are to be sent to the CONFEN.

40 -    The period of two years following the July 30, 1985 publication of Resolution No. 4 has been essential in allowing a more equable and reliable assessment of the consequences of ayahuasca use. This period has allowed us, among a number of other activities, to observe users, to review reports about them, to visit various communities and, finally, to form an impartial, objective and just opinion on the matter at hand. A shorter period of time would have disallowed such degrees of experience.

       A first conclusion can easily be arrived at on the basis of what was stated in item 37 above. Given that, to date, there exists no objectively verified record containing an unequivocal demonstration of social harm caused by the use of ayahuasca, the status quo should not be altered. In other words, there is no reason, to date, for said beverage, in the way it is being prepared and used, to be included in the DIMED list of illicit substances.

41 -    There exist, however, unquestioned assumptions which are indeed questionable and which are further manifested as prejudices, given that, so often, they are simply the product of ideas which are received and accepted without ever having been subjected to critical analysis. The Working Group's concern with the "ayahuasca" issue over the past

two years it has led it to maintain innumerable contacts with users from all levels of society, from Rio de Janeiro, to Brasília, to the depths of the Amazon jungle. During this period, it has noted that many inquiries have involved preconceived opinions and condemnatory conclusions. Most often, said inquiries have revolved around two words: "hallucinogen" and "cultures", as in: "Is ayahuasca a hallucinogen?" and, if so, "Can city dwellers be allowed to use it, given the differences between urban and rural cultures?"

At the very least, such questions require all those who address the drug issue to engage in measured reflection in order to better answer them.

42 -    What can be affirmed is that the search for a particular form of perception, as undertaken by the users of ayahuasca during their "work", does not appear to be hallucination if this term is taken to mean derangement or insanity. Among all of the groups we visited, there was one common goal which they all strictly adhered to: the search for holiness and self-knowledge. It does not fall to the Working Group to determine whether the term hallucination, defined as illusion, daydreaming or fantasy, applies to their way of experiencing holiness or self-knowledge.

43 -    Obviously, it would not be tolerable if the perceptions in question led those who experience them to engage in anti-social behavior harmful to the rights of others. In this regard, it bears repeating what was stated in the first travel report from nearly two years ago, as quoted in item 11 above, i.e.:

> "Moral and ethical standards of behavior, similar in every respect to those which exist and are recommended in our society, are observed within the various sects, at times in an even stricter manner. Respect for the law always appeared to be emphasized."
> ...................................................................
> "The followers of the sects appear to be calm and happy people. Many of them attribute family reunification, regained interest in their jobs, finding themselves and God, etc., to the religion and the tea."
> ...................................................................
> "The ritual use of the tea does not appear to be disruptive or to have adverse effects upon the social interactions of the various sects' followers. On the contrary, it appears to orient them towards seeking social contentment in an orderly and productive manner."

44 -    It is well-known that man has always searched for ever-better ways of overcoming the limitations of his own ability to understand. Not just "hippies", but even Thomas Aquinas, in referring to the soul (which, it is important to note, has the meaning of [text cut off at page bottom]

alluded to the special circu............ ....... ...... .. .. .eave the body, to withdraw from the physical, and enable the emergence of [his? its?] inherent knowledge. With regard to these circumstances, Professor João Manoel de Albuquerque Lins of the Pontifícia Universidade Católica (Pontifical Catholic University) of Rio de Janeiro affirms that:

> "They are all occasions during which 'sensory occupations' cease to dominate our consciousness, thereby allowing us to distance ourselves from immediate contact with the outside world which surrounds us. Hence his reference, in *De Anima*, to the 'dorminetibus', i.e., to those who sleep and therefore to dreaming; and to their 'alienatis a sensibus', i.e., to those who are not using their senses, or who, for whatever reasons, are removed from the senses; in *Summa contra Gentiles*, we once again encounter 'dormientes', those who sleep; 'syncopizantibus', those who suffer from syncopes or fainting; and 'exstasim passis', those who experience ecstasies; and in Book IV of *Sententiarum*, he also refers to dreaming 'in dormiendo', i.e., while sleeping, and 'in excessu mentis', i.e., in a state of ecstasy, or, perhaps more specifically, while in a trance.
>    These are the same circumstances, therefore, that modern parapsychology recognizes as highly conducive to the manifestation of ESP or psi-gamma abilities."
> (Excerpt from the journal *Verbum*, Vol. XXIV, fascicle 2, June 1967, Universidade Católica, Rio de Janeiro, p. 221.)

The sole and exclusive reason for this reference to Thomas Aquinas is to propose reflection upon the states of perception to which man can be brought, and which do not appear to merit the definition of madness or insanity, and which, moreover, it would be presumptuous to classify as illusion, daydreaming or fantasy. Again, we must reflect upon and ponder the fact that, in the society in which live, we are quick to classify as crazy or insane those who, with or without ayahuasca, choose lifestyles different from our own or who seek processes of learning or personal realization which diverge from the established order.

Hence, the allusion to Thomas Aquinas does not purport to offer an argument as to whether ayahuasca should be used or not, but rather has the purpose of demonstrating that we often thoughtlessly classify as hallucination certain abilities "which we all possess, at least on a basic level" (Albuquerque Lins, op. cit., p. 211). Such "assumptions", which are undisputed, unchallenged and ingrained over the years, make it difficult to examine the issue, especially when such "assumptions" go hand-in-hand with what Henman identifies as:

> "the need for a 'total war on drugs' which, in turn, is based upon the prohibitionist hysteria promoted by the U.S. Drug Enforcement Administration through the local media" (op. cit., p. 221).

45 - As previously mentioned, the beverage in question is made with native species. This observation is important in that, in the case of synthetic forms [text cut off at page bottom]

(...) other treatment. Moreover, the typical reactions of vomiting and diarrhea (the latter being less frequent) leads us to suppose that ayahuasca does not lend itself to easy, indiscriminate or recreational use by the general public. Indeed, this can been verified by the fact that, despite receiving a good deal of coverage in major Brazilian newspapers, to date ayahuasca has not been fancied by hedonistic consumers.

46 - Finally, there is the question of "cultural differences". An honorary professor of the School of Philosophy of the Catholic University of Lyons noted that, in sociology, culture is "the combination of institutions and traditions, of customs and collective representations, of beliefs and value systems which characterize a given society" ("Vocabulary of Philosophy", *Agir*, 1975, p. 60).

But how can one imagine a clear barrier between the "cultures" present at the Céu do Mapiá rubber plantation, in Rio Branco, in Rio de Janeiro or in Visconde de Mauá when, throughout the year, pilgrims arrive from the four corners of Brazil to stay for a time in the Amazon jungle, at Céu do Mapiá? And how could such cultures be impermeable when one realizes that, in turn, Padrinho Sebastião and his entire family spent a long time in the Céu do Mar community in the São Conrado district of the city of Rio de Janeiro? With regard to the matter under consideration, the above report for the date of 7/15/1986, on pp. 15-16, which mentions pilgrimages to Céu do Mapiá, is also important.

47 - In addition, with regard to the oft-mentioned clash or incompatibility between "cultures", it is worthwhile to quote Professor Regina Abreu (Attachment No. 9, pp. 16-17), who states:

> There remain other considerations to be added to the issue which we addressed previously (p. 14 of this report), regarding the conversion to the Doctrine of certain members of urban or industrialized society, a fact which creates anxiety among religious groups, civil and military authorities, and elements of civil society. The adoption of the Santo Daime Doctrine in cities evidently has characteristics which are specific to the urban lifestyle, and are obviously devoid of activities which are specific to the rural environment, such as hunting and large-scale farming. Notwithstanding, those who convert to the Doctrine may be led to practice rituals and lifestyles which preserve the basic characteristics of the rural religious communities. In both cases, there is a similar project. In both cases, as stated by the above-quoted anthropologist, Louis Dumont, "the emphasis is placed upon the society as a whole, as a collective person,

www.bialabate.net

www.bialabate.net

the ideal being _____ by ____ _____ __ the society in view of its goals (rather than personal gain); what it amounts to, above all, is order and hierarchy; each specific individual must do his part to contribute to the overall order, and justice consists of providing social functions in relation to the whole" (cf. Dumont, Louis. 1966. *Homo Hirarchicus – Le Système des Castes et Ses Implications*, p. 23. Paris: Gallimard.). Hence, in cities, the community is also structured so as to fulfill its material and spiritual needs (by adopting the "doctrine", as practiced in the rural environment). Said material needs are fulfilled by way of the variety of occupations which exist in urban society (including professionals, public servants, private-sector employees, politicians, professors, intellectuals, etc.).

In any event, however exotic these country- or city-based "Santo Daime" communities may appear, their diversity can be enriching both for individuals and for society as a whole."

As a final conclusion on this theme, there is no text more fitting than the following one by Claude Lévi-Strauss:

"No culture is alone; it is always capable of connections with other cultures, and this is what allows it to build cumulative series. The probability of a longer series emerging from among the other series naturally depends upon the breadth, duration and variability of the system of connection."

..................................................................

"The only fatality, the only flaw which can afflict a human group and keep it from fully realizing its nature is to be alone." (*Raça e História*, pp. 262-263. *Raça e Ciência I*. 1970. São Paulo: Perspectiva.)

WHEREAS, in view of the legal authority of the Federal Council on Narcotics, which is legally responsible for the implementation of standard policies, general coordination, supervision, control and investigation of drug use; in view of the fact that the decisions of the CONFEN must be complied with by the federal administrative bodies making up the National System for the Prevention, Taxation and Repression of Narcotics Use; in view of the resulting fact that the CONFEN may, at any time, determine measures controlling and even prohibiting any substance which has specific characteristics making prohibition advisable; and in view of the fact that, to date,

www.bialabate.net

no circumstances have occurred which indicate, with regard to the use being made of "ayahuasca", that any change to the current DIMED lists is necessary; NOW, THEREFORE, the proposal being made, and which is subject to the sovereign ruling of the Federal Council on Narcotics, is to maintain the present policy adopted by the DIMED in its most recent administrative rulings, arrived at in collaboration with the CONFEN itself, which is to exclude from the aforementioned lists those plant species which are used in the preparation of "ayahuasca", most commonly referred to in Brazil as "daime" or "vegetal", among other previously mentioned names.

★ ★ ★ ★ ★
★ ★ ★
★

As a final conclusion to this report, I would like, in my capacity as chairman of the Working Group, to thank the distinguished Presidents of the CONFEN, Dr. Técio Lins e Silva, and Dr. Miguel Reale, Jr., for the confidence which they both placed in said Group, thereby allowing it, within the personal and material limitations acknowledged herein, to be of modest service to the higher public interest which is vested in the Federal Council on Narcotics.

[signature]

Domingos Bernardo Gialluisi da Silva Sá
Chairman of the Working Group

# MINISTRY OF JUSTICE
## FEDERAL COUNCIL ON NARCOTICS
## CONFEN

**Memorandum no. 423/CONFEN/MJ**

**Brasília, September 10, 1997**

**Attn:** **Advisor to the Minister of Justice**
**Re:** **Use of "ayahuasca"**

      With regard to your solicitation regarding the use of the tea known as "AYAHUASCA", I hereby inform you that:

1.    Having been directed by DIMED Administrative Ruling No. 2/85 to issue a finding on the inclusion of *Banisteriopsis caapi* among the drugs listed as prohibited substances, which includes references, in parentheses, to "cipó de chinchona" (cinchona liana), "chacrona" or "mariri", a Working Group was appointed by CONFEN Resolution No. 4 of July 30, 1985 with the purpose of examining the question of the production and consumption of substances derived from said plant species. The Working Group carried out various activities, with a view to learning about the aspects referred to in Resolution No. 4/85, "including sociological, anthropological, chemical, medical and general health aspects". A number of visits were made to sites where ayahuasca is used ritually. The Working Group concluded that the DIMED policy should be maintained pursuant to its most recent administrative rulings, which excluded from the aforementioned lists the plant species used in the preparation of ayahuasca, which in Brazil is more commonly referred to as "daime" or "vegetal", among other previously mentioned names.

2.   In 1988, an anonymous complaint was lodged which brought about the reexamination of the issue of ayahuasca use. Said complaint is attached to Police Inquiry No. ....9/89 – DRE/SR/DPF/RJ, ordered by the Honorable Judge of the 13th Federal District Court in the city of Rio de Janeiro. Council member Domingos Bernardo G. da Silva Sá submitted a finding, unanimously approved by the 5th Annual General Meeting of the Federal Council on Narcotics (CONFEN), held on June 2, 1992, which upheld the finding presented by the 1985 Final Report of the Working Group.

3.   In 1994, a new complaint filed by Ms. Alícia Castilho, who has a daughter in a Sect in Rio Branco which uses "AYAHUASCA", gave rise to Proceeding No. 136/94. Said proceeding consists of 291 pages to which are attached all of the existing CONFEN documents relating to the matter. During its analysis, there was participation by groups which use the tea, who had full access to the Council, with participation during regular meetings, including the showing of a documentary about the Sect. Council member José Costa Sobrinho submitted a finding, unanimously approved by the 3rd Annual General Meeting of the Federal Council on Narcotics of June 2, 1995. Among other conclusions, said finding recommended prohibiting the use of the tea by minors, given that their personalities are in a constructive developmental phase and that their ability to exercise judgment is therefore limited; and in view of the Statute on Children and Adolescents, with specific legislation guaranteeing their rights.

4.   In the meantime, Judge Mauro José do Nascimento Campello, of the Juvenile Court of Boa Vista in the State of Roraima, requested clarifications for a case in his district involving a request for minors over the age of 14 to use the "hoasca" tea. In view of other similar requests having come from a number of districts, a new proceeding was undertaken (Proceeding No. 08000.017948/96-21). The Reporter, Council member Arnaldo Madruga Fernandes, submitted a finding during the 3rd Annual General Meeting of the Federal Council on Narcotics (CONFEN), held on May 16, 1997, where once again the conclusion was reached to recommend that the tea known as AYAHUASCA not be used by minors under the age of 18 (eighteen), even in the company of their parents or guardians, and regardless of the dose or ceremony, thereby basically maintaining its previous decision.

www.bialabate.net

For the purposes of further clarification, I am attaching the findings handed down by the distinguished members of the Council, the respective minutes from their meetings, a copy of the Final Report of the Working Group established by Resolution No. 4/85, and the statement made by the President of the Federal Council on Narcotics to the Assistant Attorney General of the Republic.

Sincerely,

[signature]

**MÁRCIA MARIA DA SILVA**
**Executive Secretary of the CONFEN**

www.biala.bate.net

# OREGON BOARD OF PHARMACY
## LETTERS TO ROY HABER

### (THREE LETTERS)



# Oregon

John A. Kitzhaber, M.D., Governor

**Board of Pharmacy**
State Office Building, Suite 425
800 NE Oregon Street # 9
Portland, OR 97232
Phone: (503) 731-4032
Fax: (503) 731-4067
E-Mail: pharmacy.board@state.or.us
Web: www.pharmacy.state.or.us

November 8, 2000

Roy S. Haber
Attorney at Law
570 E 40th Street
Eugene, OR 97405

Dear Mr. Haber,

The Oregon Board of Pharmacy has received the information provided to supplement your appearance before the Board at its November 8, 2000 meeting in Portland.

After review and discussion of this material, and having heard your presentation on November 8, it seems apparent to the Board that the sacramental use of the Santo Daime tea in the context of a bona fide religious ceremony by practitioners of the Santo Daime religion as described does not constitute abuse of a controlled substance.

Sincerely,

Gary A. Schnabel, RPh, RN
Executive Director

**PLAINTIFF'S EXHIBIT**
3

- Exhibit "C"

www.bialabate.net



# Oregon

John A. Kitzhaber, M.D., Governor

Board of Pharmacy
State Office Building, Suite 425
800 NE Oregon Street # 9
Portland, OR 97232
Phone: (503) 731-4032
Fax: (503) 731-4067
E-Mail: pharmacy.board@state.or.us
Web: www.pharmacy.state.or.us

November 22, 2000

Roy S. Haber
Attorney at Law
570 E 40th Street
Eugene, OR 97405

Dear Mr. Haber,

This is in response to your letter of November 22, 2000 to the Oregon Board of Pharmacy indicating your clients' desire and willingness to register with the Board and to comply with any regulatory requirements to which they may be subject. While the Board does not possess authority to state whether any church can practice its religion in Oregon, the Board did state in its November 8, 2000 letter to you that it does not consider sacramental use of the Santo Daime Tea in the Churches religious ceremonies to constitute abuse of a controlled substance.

Board staff and counsel have discussed the issues raised in your letter regarding the registration of the Church and compliance with regulatory requirements. The Board is involved in the regulation of the sale and distribution of drugs in Oregon and the investigation of allegations of drug abuse. Since the Church is neither a drug outlet nor, as indicated by the opinion of the Board, involved in the abuse of a controlled substance, the Board has no authority to require registration or compliance with any Oregon pharmacy regulations.

In summary, I would say you can inform your clients that the Oregon Board of Pharmacy neither possesses nor plans to exercise regulatory authority with regard to the religious practices of the Santo Daime Church in Oregon.

Sincerely,

*Gary A Schnabel*

Gary A. Schnabel, RPh, RN
Executive Director

— Exhibit "D" —



# Oregon

Theodore R. Kulongoski, Governor

**Oregon Board Of Pharmacy**
800 NE Oregon Street, Suite 150
Portland, OR 97232
Phone: 971/673-0001
Fax: 971/673-0002
E-mail: pharmacy.board@state.or.us
Web: www.pharmacy.state.or.us

June 20, 2008
Mr. Roy Haber
Attorney at Law
540 E. 40th Street
Eugene, OR 97405

Dear Mr. Haber,

On November 8, 2000, after receiving the Santo Daime Memorandum of Law and expert reports, and after holding a hearing, the Oregon Board of Pharmacy concluded that the sacramental use of the Santo Daime tea in the context of a bona fide religious ceremony by practitioners of the Santo Daime religion as described does not constitute abuse of a controlled substance.

On November 22, 2000, after receiving a letter from you on behalf of your clients offering to register with the Board, we advised you that the Board is involved in regulation of the sale and distribution of drugs in Oregon and the investigation of allegations of drug abuse. Since the Church is neither a drug outlet nor, as indicated by the opinion of the Board, involved in abuse of a controlled substance, the Board has no authority to require registration or compliance with any Oregon pharmacy regulations.

The Board has considered the May 2, 2008, proposal of the Santo Daime Church to provide it with copies of documents that record the amount of sacramental tea that is brought into Oregon for Church services in Ashland and any distribution to other Santo Daime congregations in Oregon. Your current request to the Oregon Board of Pharmacy is for the Board to act as a quasi official repository of these documents. For the reasons cited above, the Board feels it must decline your offer to supply it with copies of your sacrament receipt records.

I want to thank you for being open and willing to provide these records on behalf of the Church's effort to demonstrate that it is taking all reasonable steps to prevent the tea from being diverted. As previously stated in its November 22, 2000 letter, the Board does not plan to exercise regulatory authority with regard to the religious practices of the Santo Daime Church in Oregon.

Very truly yours,

Gary Schnabel
Executive Director

– Exhibit "DD" –

PLAINTIFFS' EXHIBIT 5:


DEFENDANTS' RESPONSES TO
PLAINTIFFS' INTERROGATORIES
NOS. 16 AND 17


IN THE CASE OF

*O CENTRO ESPIRITA BENEFICIENTE
UNIAO DO VEGETAL, ET AL. V. JOHN
ASHCROFT, ET AL.*

www.bialabate.net

OCT-19-2001 23:37 CIVIL DIV/FED PRO BR 202 616 8202 P.02

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

O CENTRO ESPIRITA BENEFICIENTE
UNIAO DO VEGETAL, *et al.*,

   *Plaintiffs,*

vs.         No. CV 00-1647 JP/RLP

JOHN ASHCROFT, *et al.*,

   *Defendants.*

## DEFENDANTS' RESPONSES TO PLAINTIFFS' INTERROGATORIES No. 16 and 17

**INTERROGATORY NO. 16:** State what evidence you have that any hoasca has been diverted

from the O Centro Espirita Beneficiente Uniao do Vegetal to non-religious use, including in your

answer, without limitation, the witnesses and/or documents that support your answer.

**RESPONSE:** Defendants respond that they have no evidence that hoasca has been diverted

from the O Centro Espirita Beneficiente Uniao do Vegetal other than what may be reflected in

the grand jury documents. Defendants cannot access these documents without a court order.

**INTERROGATORY NO. 17:** State what evidence you have that any peyote has been diverted

by any member of the Native American Church to non-religious use, including in your answer

the witnesses and/or documents that support your answer.

**RESPONSE:** Defendants respond that, without having searched the files of the 94 U.S.

Attorneys Offices, Defendants have no evidence of any peyote having been diverted by any

member of the Native American Church to non-religious use.

-1-



PLAINTIFF'S
EXHIBIT
5

US 002612

Dated: October 19, 2001                    Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

NORMAN BAY
United States Attorney
for the District of New Mexico

VINCENT M. GARVEY
Deputy Branch Director

ELIZABETH GOITEIN
ADAM J. SZUBIN
United States Department of Justice
Civil Division
901 E Street, N.W., Room 1032
Washington, D.C.  20004
Telephone: (202)514-4470

Attorneys for Defendants

-2-

US 002613

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing AMENDED EXPERT WITNESS

STATEMENT OF GEORGE GERDING – EVALUATION OF HEALTH AND SAFETY

ISSUES CONCERNING SACRAMENTAL INGESTION OF THE SANTO DAIME HOLY

TEA on:

> Eric Joseph Beane / Brigham J. Bowen / Julie Straus / Lily Farel
> Civil Division, Federal Programs Branch
> U.S. Department of Justice
> P.O. Box 883, Room 7124
> Washington, DC  20044
>           Attorneys for Defendants

☐ by mailing a copy thereof in a sealed, first-class postage prepaid envelope,

addressed to each attorney's last-known address and depositing in the U.S. mail at Portland,

Oregon on the date set forth below;

☐ by causing a copy thereof to be hand-delivered to said attorneys at each

attorney's last-known office address on the date set forth below;

☐ by sending a copy thereof via overnight courier in a sealed, prepaid envelope,

addressed to each attorney's last-known address on the date set forth below;

☐ by faxing a copy thereof to each attorney's last-known facsimile number on

the date set forth below; or

☑ by filing electronically via the court's CM/ECF system.

DATED this 1st day of December, 2008.

TONKON TORP LLP

By _Don H. Marmaduke_

Don H. Marmaduke
OSB No. 530727
Direct Dial:        503.802.2003
Direct Fax:        503.972.2003
Email:              don.marmaduke@tonkon.com
Attorneys for Plaintiffs

097204\00001\1188593 V001

Page 1 -    CERTIFICATE OF SERVICE