**EXHIBIT A - NOTICE OF ERRATA**

Case No. 20-cv-02373-ROS

# Corrected Exhibits to AYA Motion for Preliminary Injunction

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 1

JOHN SULLIVAN (CSB#204648)
17532 Miranda Street
Encino, CA 91316
Tel:818-769-7236
Email:Sullivan.John84@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly, North American Association of Visionary Church, Clay Villanueva, and the Vine of Light Church

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Arizona Yagé Assembly, North American Association of Visionary Churches, Clay Villaneuva, and the Vine of Light Church,

Plaintiffs,

vs.

Merrick Garland, Attorney General of the United States, *et al.*,

Defendants.

**Case No.:20-CV-02373-ROS**

**DECLARATION OF WINFIELD SCOTT STANLEY III IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Winfield Scott Stanley III, hereby declares and affirms:

**1.** I am the founder of plaintiff Arizona Yage Assembly ("AYA"), and the Chair of the Board of Directors of plaintiff North American Association of Visionary Churches ("NAAVC"). I make this declaration in support of AYA's Motion for Preliminary Injunction. If called as a witness, I could and would so competently testify.

**2.** AYA is a religious nonprofit corporation whose religious exercise, and that of their member churches and congregants, is substantially burdened by laws prohibiting importation, distribution, and possession of Ayahuasca, an herbal tea that contains a

small amount of Dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act 21 U.S.C. § 801 et. seq. (the "CSA").

**3.** In 2009 I was introduced to Ayahuasca in the forests north of San Francisco from a traveling troupe of Ayahuasqueros from South America. From that point forward I began my ongoing introduction to the sacrament of Ayahuasca and the attendant plant medicines of the Amazon, eventually conducting my own small ceremonies. In June 2015, I incorporated our small church, the Arizona Yage Assembly ("AYA"). The founding of the church was a group effort expressing the clear intention of our growing congregation for healing. Our belief, born out of experience, is that a spiritual practice is a healing practice and a healing practice is a spiritual practice. To that I would add, that an organized spiritual practice is a religion. To that end, our church is engaged in a sacred religious practice.

**4.** Based on my practice of Ayahuasca communion, I have developed AYA Tenets and Precepts (Exhibit 3). I have learned that we can begin with the experience of love and forgiveness itself, and do not need to create or cling to dogmatic structures. A man takes the measure of religion using his own conscience. It must be so, and I am proud and thankful that as an American, it is my right to make conscience my guide in choosing my own path of Free Exercise, and my right to petition this Court to protect that right.

**5.** Our scripture and song are to be found within the sacrament itself. In organized spiritual practice we trust each individual's direct connection with the Divine. We do not seek to intervene in that connection. We trust the sanctity of each practitioner's conscience. With a clear conscience and an open heart comes peace of mind.

**6.** What could possibly be worth sacrificing one's peace of mind? This is both our query and our message.

**7.** A meaningful number of AYA's congregation come to ceremony seeking healing from wounds to their spirits suffered in a variety of traumatic environments.

Indeed, many people carry injuries to their body, mind, and spirit that express their need for healing in the course of ceremony. As I mentioned above, my belief, born of experience, is that a spiritual practice is a healing practice, and a healing practice is a spiritual practice. To that I would add, that an organized spiritual practice is a religion; accordingly, our church is engaged in a sacred religious practice.

**8.** In AYA, establishment of the proper ceremonial environment and inner mindset are essential. AYA's Ceremonial Instructions and Code of Ethics instruct facilitators in how to establish the ceremonial environment and embody the ceremonial mindset.

**9.** The proper ceremonial environment is established by dedicating the space, ideally a "maloka," a circular structure in a quiet rural area, by commencing the ceremony in a peaceful, harmonious spirit, by administering the sacrament with sensitivity and respect for the sacrament and the congregation, and by facilitating the communion experience of the practitioners.

**10.** The mindset of the practitioners must also be properly prepared. The congregants have been screened for contraindicated health conditions, and have undertaken some dietary restrictions in advance of ceremony. Additionally, they have been asked to refine and focus their wholesome intention for receiving the Ayahuasca sacrament. With this outer and inner preparation, ceremony becomes a sacred space where inner growth can occur, with the help of the Ayahuasca communion.

**11.** The experience of Ayahuasca communion mediates a connection to Divine Love, that has qualities of forgiveness, renewal, healing, joy, and peace. We experience Ayahuasca cleansing our spirits, strengthening our wholesome inspiration, and inspiring us to exert ourselves to do good in our lives.

**12.** AYA simply teaches love, acceptance, and forgiveness – we apply the same spiritual principles in ceremony that serve us best in daily life. (See, Exhibit 3 -- Tenets and Precepts; Exhibit 4 - Ceremonial Instructions; Exhibit 5 - Code of Ethics.) AYA

does not dictate dogma. Our scripture and song arise during communion from within the sacrament itself.

**13.** AYA practitioners perceive, and sometimes express, profound visions that reveal insights into ourselves, our world, and our fellow beings. This stream of visionary insights is unique to each individual, and yet leads to a unifying understanding of what it means to lead a meaningful, dignified life. In organized spiritual practice we trust each individual's direct connection with the Divine. We do not seek to intervene in that connection. We trust the sanctity of each practitioner's conscience. With a clear conscience and an open heart comes deep peace of mind, what all have acknowledged as life's most priceless attainment.

**14.** AYA practitioners can only enter into the stream of profound visionary understanding through Ayahuasca communion. Therefore, Ayahuasca communion is our visionary religious practice, and the AYA congregation is our church.

**15.** We have established through our own experience that Ayahuasca communion is safe when administered with the proper guidelines, utilizing pre-signup health-questionnaires to screen out all non-adults, and persons with physical or psychological vulnerabilities, dietary restrictions, or conflicting medication regimens. The testimony of Dr. Paulo Barbosa, attached as Exhibit 13, provides a summary of the peer-reviewed evidence establishing not only the physical and psychological safety of ceremonial Ayahuasca practice, but also the personal and pro-social benefits that accrue to a substantial number of practitioners.

**16.** Since we founded our church, I have led more than 300 ceremonies, participated in many more, and have been privileged to work and learn with the extraordinarily dedicated, focused, talented, and kind people in both our congregation and the people of Peru. We continue to bring small groups for teaching and healing to the Upper Amazon in Peru. I have deepened my experience of Ayahuasca communion through apprenticeship with Eladio Melendez Garcia, a third generation Ayahuasquero who lives and conducts Ayahuasca ceremonies in Jenaro Herrera, Peru, a small

community off the banks of the Ukayali River about 20 kilometers upriver from the confluence of the Ucayali, the Marañon, and Amazon rivers. After four or five years of personal practice, following my very first experience with Ayahuasca in 2009, I began to conduct small ceremonies sharing the sacrament with others. Eladio's letter of recognition and support is attached as "Eladio's Letter," Exhibit 15.

**17.** Although Visionary Churches have often eschew written scriptures and officially promulgated doctrine, its adherents share beliefs in Divine Love and spiritual powers. AYA members put Visionary Church beliefs at the center of their spiritual lives in much of the same way that members of the Catholic Fellowship put Catholic Church beliefs at the center of their spiritual lives.

**18.** AYA members attend all-night Ayahuasca ceremonies conducted pursuant to AYA's Ceremonial Instructions, attached as Exhibit 4. The Ayahuasca tea used by AYA is pharmacologically identical to that utilized by the UDV and Santo Daime churches, whose ceremonies have been held worthy of RFRA exemptions. Our ceremonies stand equal to the safety and religious sincerity of these two RFRA-exempt churches. The very activity of drinking Ayahuasca confirms and clarifies the Church member's religious intent, because it is a demanding visionary experience that can provoke deep re-evaluations of oneself, one's life, and one's relationship to the Divine. I have heard many participants in AYA ceremonies express their gratitude for the spiritual insights received in ceremony. It is clear from my perspective that Visionary Communion through Ayahuasca delivers rewards commensurate with sincerity.

**19.** The sacramental use of Ayahuasca is firmly grounded in the history of the Visionary Church and central to the principles and rituals of the religion. Taking Ayahuasca is the very cornerstone of a Visionary Church gathering and the use of Ayahuasca is the *sine qua non* of AYA and Visionary Churches everywhere.

**20.** Visionary Churches UDV and Santo Daime have already been granted religious exemptions to the Controlled Substances Act, which allow them to import and possess Sacramental Ayahuasca. AYA uses Sacramental Ayahuasca prepared from the

same two plant materials used by Visionary Churches UDV and Santo Daime. Specifically, AYA prepares their Sacramental teas using the plant materials *Banisteriopsis Caapi* (the yagé vine) and one of two alternative traditional dimethyltryptamine sources (*Psychotria Viridis* (Chacruna) or *Diplopterys Cabrerana* (Huambisa). The plants are gathered in Peru by people familiar with the needs of AYA, that requires that these sacred plants be gathered with respect for their extraordinary capacity to benefit those who receive the Sacrament.

**21.** As a RFRA claimant seeking religious exemptions from the proscriptions of general law, AYA alleges a *prima facie* case of sincere religious belief. AYA further alleges that specified statutes and regulations found in the CSA and 21 CFR 1300 et seq., and the DEA's Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act (the "Guidance") substantially burden AYA's religious exercise. AYA further alleges that the provisions of the CSA, 21 CFR 1300 et seq. and the Guidance, are not reasonably tailored to fit the needs of visionary churches, and impose a substantial burden on their rights of Free Exercise by way of visionary communion.

**22.** AYA is substantially burdened by laws prohibiting importation, distribution, and possession of Ayahuasca. Because DMT is listed as a Schedule I controlled substance under the Controlled Substances Act (the "CSA"), and because the DEA, DHS, CBP and DOJ interpret the law to enact a complete ban against the religious sacrament Ayahuasca, members are forced to choose between obedience to their religion and criminal sanction.

**23.** AYA undertook a years-long process to prepare to submit a Petition for Religious Exemption with the DEA pursuant to the Guidance. However, after seeing that the DEA never granted any claims of exemption under the Guidance, and after receiving advice of counsel concerning the Guidance process, and the outlines of the critique of the Guidance expressed in the complaint commencing this action, in April, 2019, I decided

that AYA should instead proceed with this Religious Freedom Restoration Act ("RFRA") lawsuit.

**24.** Currently, I and all other members of AYA practice visionary communion with an uncertain shield against prosecution. By way of the letter attached as Exhibit 18, AYA's counsel advised the Department of Justice ("DOJ") that AYA is relying on the DOJ's representations to Judge Orrick that AYA is not at imminent risk of federal prosecution, as represented in the federal agencies' successful opposition to AYA's first motion for preliminary injunction (Docket # 33). Neither does the DOJ's response to AYA's counsel's letter (Exhibit 19) instill confidence in the apparent promises of non-prosecution offered to Judge Orrick to convince him that AYA required no injunctive relief to protect it from federal agencies imposing substantial burdens on Free Exercise. While it has provided some slender comfort, this letter did nothing to alleviate concerns that AYA, members of the congregation, or I, as its minister, may be exposed to state court prosecutions incited, funded, directed, and participated in by the federal government, as was the case in the May 19, 2020 HIDTA armed raid on the home of co-plaintiff and fellow NAAVC director Clay Villanueva.

**25.** Beyond the risk of prosecution, the federal policy currently most injurious to AYA's Free Exercise, is the federal ban on importation of Ayahuasca. As stated in the DOJ's response to AYA's counsel's letter presenting AYA's request for an exemption from the Department of Homeland Security ("DHS") and Customs and Border Protection ("CBP"), these federal agencies identify, seize and destroy all Ayahuasca during the customs process. DHS and CBP claim the right to destroy all seized Ayahuasca without notice to AYA, or any means to seek release of the seized Ayahuasca, rejecting AYA's claim that importation of a necessary religious sacrament is exempt from federal constraints pursuant to RFRA, except as they may satisfy the least-restrictive means test.

**26.** My fear that seizures will prevent me from conducting AYA ceremonies is based on experience, because AYA's sacrament has been seized during importation more than once. As alleged at paragraph 138 of the Fourth Amended Complaint ("FAC"), on

April 22, 2020, AYA was notified that its property, a container of Ayahuasca ordered for the use of NAAVC and AYA, had been labeled contraband and seized by DHS during the customs process. DHS seized a second shipment of Ayahuasca on October 21, 2020, (Peruvian postal service "Serpost" # EE011369264PE, addressed to AYA and Scott Stanley). It was after the second interception of AYA's Sacramental Ayahusaca that AYA's counsel addressed the Exhibit 18 letter to the DOJ objecting to the seizure, and requesting release of this property as exempt from prohibitions on importation pursuant to RFRA. This the Government refused, stating that DHS had regulatory authority to seize, forfeit and destroy Sacramental Ayahuaca destined for AYA. (Exhibit 19.)

**27.** DHS and/or CBP seizures of AYA's Ayahuasca (both addressed to AYA and Scott Stanley) occurred again during importation in November 2020 (Serpost # EE011368873PE), and December 2020 (Serpost # EE011186439PE). Without access to the Ayahuasca seized by the Federal Defendants, AYA does not have a sacrament to share, I cannot conduct ceremonies, and AYA congregants are unable to practice their religion.

**28.** Based on these four past seizures, AYA is reasonably assured that future attempts to import Ayahuasca will result in interception. Each seizure imposes a financial loss on the congregation, and interrupts Free Exercise in much the same way as Catholic Mass would be desecrated by a ban on the distribution of communion hosts. The ceremony simply cannot be held, and visionary communion cannot be achieved, without the invocation and ingestion of the communion sacrament. When AYA is unable to hold ceremonies because its Ayahuasca was seized and destroyed by DHS and/or CBP, our Free Exercise is substantially burdened. Accordingly, we ask the Court to lift this burden.

**29.** Because Ayahuasca is virtually all produced in South America and other tropical lands, far from the continental United States, and DHS and CBP seizures block importation of Ayahuasca via international post and freight, AYA must import sacrament via the assistance of an international courier who must cross the border into the United

States through DHS and CBP security. The courier's imported items are subject to search, and a search could result in seizure of AYA's Ayahuasca. The courier could also be exposed to prosecution by federal or state authorities.

**30.** The case of Clay Villanueva, who was arrested on August 22, 2021 at LAX on an Arizona felony warrant, is an object lesson for how airports are hazardous to a sincere practitioner of visionary religion, even when he has previously sought the aid of this Court to practice his religion without fear of prosecution. Some of the details of Mr. Villanueva's travails in California and Arizona custody are set forth in his Application for Writ of Habeas Corpus (Docket # 125). As averred therein, Mr. Villanueva's was arrested at LAX on a Maricopa County Superior Court felony warrant based on the May 19, 2020 HIDTA raid that is the subject of the Section 1983 claim alleged in three successive iterations of the complaint, including the FAC.

**31.** The indictment and warrant against Mr. Villanueva issued in June 2021, the same month that Maricopa County's attorneys were urging the Court to disregard Mr. Villanueva's fears of prosecution as "conjectural." An event is rarely deemed "conjectural" when it has already occurred, and in this case, when Evan Hiller's brief was filed, his client, Maricopa County, and very likely Det. Matt Shay as well, knew without a doubt that there was a warrant for Mr. Villanueva's arrest sitting in a file in the Maricopa County Superior Court. Thus, Mr. Villanueva was affirmatively led into danger by the representations of the very defendants from whom he feared prosecution, who had dismissed those fears as fancy.

**32.** To protect himself from just such a surprise as occurred at LAX this August, Mr. Villanueva had also employed an attorney, Richard Gaxiola, to monitor felony filings charging Mr. Villanueva with a crime in Maricopa County, and Mr. Gaxiola had told him that he wanted to withdraw from representation because no case had been filed. (Gaxiola Dec., Docket # 129-1.) Thus, Mr. Villanueva acted with unusual care to protect himself from prosecution, and nevertheless, fell into one of the worst possible situations – detention by federal officials at the airport, prosecution by California

on a fugitive warrant, lodging in temporary housing in LA County awaiting extradition, and transfer to Maricopa County jail under apparently compromised circumstances.  As a result, the prosecuting Attorney General's office sought, and the court imposed, an unachievably high bail amount -- $150,000, all in cash, no property bond permissible.

**33.**    The high bail resulted in Mr. Villanueva's extended detention in Maricopa County custody.  Because Mr. Villanueva is suffering from Stage III lymphoma, the lack of wholesome food and warmth in jail provoked two hospitalizations for imminent organ failure due to malnutrition.  During this health crisis, Mr. Villanueva was taken to death's very door, before he was finally released after the County Commissioner, learning of the second hospitalization, amended the bail order to allow a $150,000 property bond.  Mr. Villanueva's family was able to post $15,000 secured bail amount, but not until a month of confinement in a panoply of harsh detention centers had wrecked his health.  Mr. Villanueva suffered from bloating in the legs induced by excessive hydration, and now must wear an ankle monitor that is not conducive to exercise, causes stress, and impedes his therapeutic cancer regimen.

**34.**    Little did we expect to see Mr. Villanueva in such difficult straits when we began this litigation, full of hope that our Free Exercise rights would be recognized in the judicial process.  In 2019, Clay Villanueva ("Villanueva") joined NAAVC as one of three founding Board members.  Villanueva also enrolled his own Visionary Church, the Vine of Light Church ("VOLC") as the first Visionary Church to join NAAVC.

**35.**    Villanueva responded to NAAVC's message that more needs to be done with the DEA and the courts before visionary churches can truly enjoy Free Exercise, free of the fear of unlawful searches, seizures, and arrests, all of which seem to be promised in the Supreme Court's seminal O Centro decision.

**36.**    Villanueva voted in favor of sending the DEA Letter (FAC ¶ 159), and in favor of commencing this litigation on behalf of NAAVC.  By initiating the NAAVC lawsuit, Villanueva and I placed ourselves under the jurisdiction of this court.

**37.**     Villanueva and I both sought to protect our own, personal religious Free Exercise, and that of our respective visionary church congregations, when, acting as Board members, we directed NAAVC's counsel to file this action.

**38.**     Neither Villanueva nor I expected that, by taking action as a member of NAAVC's Board, we would bring ourselves into a position of danger with respect to the DEA.

**39.**     The HIDTA raid and Villanueva's prosecution has chilled my Free Exercise, in my capacity as the minister of AYA.

**40.**     Like Villanueva, I too reside in the State of Arizona, and the federal law enforcement presence here is considerable.  Now that I know that the DEA funds and directs the activities of many local law enforcement agencies through the HIDTA program, in Arizona and in twenty-seven other HIDTA zones throughout the nation, I am concerned about the threat DEA poses to my Free Exercise rights.  DEA has used HIDTA once to harass a NAAVC Board member, and it may again pursue investigation, surveillance, search, and prosecution of myself and/or members the AYA congregation who are engaged in protected First Amendment activity.

**41.**     AYA members reasonably believe that DEA will investigate and/or arrest them for freely exercising their religion.  Notwithstanding the Government's assertions that Visionary Churches face no "imminent threat of prosecution," the threat of more police raids has forced AYA and other Visionary Churches and congregations into the shadows and underground.

**42.**     The DEA has suggested in filings herein that AYA might administer Ayahuasca to minors.  This is not the case.  The application process screens out minors at the outset.

**43.**     In its reply brief to the Motion to Dismiss the FAC, the DEA states that AYA "does not claim to use any screening process to evaluate the religious sincerity of its participants, as other religious groups do."  The contention is strange.  When people approach any other faith seeking spiritual fellowship, they are presumed to be sincere.

Why should a reverse presumption apply to those who express an interest in practicing Visionary Religion? Considering the DEA's claim on the merits, the DEA must know of, and be indifferent to the evidence AYA submitted in support of its first motion for preliminary injunction, establishing how it performs pre-ceremony screening of prospective congregants, using questionnaires, preparation materials addressing a prospective congregant's spiritual interests, commitment, and intention in seeking Ayahuasca communion. Of course, all of these matters speak to the religious sincerity of its prospective and current congregants.

**44.** AYA, in fact, has several layers of pre-ceremony screening and preparation for all participants in its ceremonies, including inquiries such as: "What are your spiritual interests in taking part in ceremony, including, for example your intentions for healing or personal growth," and "Briefly describe your current health and spiritual practice."

**45.** AYA has an open process of email, phone, and direct communication, engaging with the sincere spiritual interests of the members of its congregation.

**46.** AYA's Member Survey, summarized as Exhibit 8 submitted in support of AYA's Motion (Docket # 33-8), provides substantial evidence of the religious sincerity of our congregation.

**47.** AYA does not compare its path and method with the paths and methods of other religions. AYA does not claim religious sincerity to be objectively testable. The only arbiter of religious sincerity in this litigation is the Court. I respectfully submit that AYA and I are completely sincere in making this submission, and accordingly, we ask the Court to grant the injunctive relief requested in the proposed order submitted herewith.

I declare and affirm, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct, and that this declaration was signed on November 8, 2021, at Iquitos, Peru.

Winfield Scott Stanley III

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 2

JOHN SULLIVAN (CSB#204648)
17532 Miranda Street
Encino, CA 91316
Tel:818-769-7236
Email:Sullivan.John84@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly,
North American Association of Visionary Church,
Clay Villanueva, and the Vine of Light Church

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Arizona Yagé Assembly, North American Association of Visionary Churches, Clay Villaneuva, and the Vine of Light Church,

Plaintiffs,

**Case No.:20-CV-02373-ROS**

vs.

Merrick Garland, Attorney General of the United States, *et al.*,

Defendants.

---

**DECLARATION OF CHARLES CARREON IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Charles Carreon declares and affirms:

1. I am an attorney licensed to practice before all courts in the State of California since my admission to the California State Bar on January 17, 1987, and currently serve as Registered In-House Counsel, Arizona Bar # 030064, for plaintiff North American Association of Visionary Churches (“NAAVC”).

2. I make this declaration in support of the motion for preliminary injunction of plaintiff Arizona Yage Assembly (“AYA”) for an order enjoining the Drug Enforcement Administration (the “DEA”) and U.S. Customs and Border Protection (“CBP”) from enforcing the Controlled Substance Act (“CSA”) prohibitions on

possession of Ayahuasca tea against AYA.  If called as a witness, I could and would so competently testify.

   3.    The following chart sets forth the Exhibits relied upon as evidence on this motion.  Each exhibit is a true and correct copy of the original document that it is represented to be.

| | |
|---|---|
| Exhibit 1 | Declaration of Winfield Scott Stanley III |
| Exhibit 2 | Declaration of Charles Carreon |
| Exhibit 3 | AYA's Tenants and Principles |
| Exhibit 4 | Ceremonial Instructions |
| Exhibit 5 | Code of Ethics |
| Exhibit 6 | Questionnaire |
| Exhibit 7 | Confirmation Letter |
| Exhibit 8 | Summary of Survey Results |
| Exhibit 9 | District Court Complaint in *CHLQ v. Mukasey* |
| Exhibit 10 | Halpern Declaration from in *CHLQ v. Mukasey* |
| Exhibit 11 | Halpern scientific article from *CHLQ v. Mukasey* |
| Exhibit 12 | Gerding Declaration from *CHLQ v. Mukasey* |
| Exhibit 13 | Opinion Letter of Dr. Paulo Barbosa |
| Exhibit 14 | Oregon District Court's final injunction to DEA in *CHLQ v. Mukasey* |
| Exhibit 15 | Eladio Garcia Letter |
| Exhibit 16 | Villanueva Application for Writ of Habeas Corpus |
| Exhibit 17 | Webpages from dea.gov, MCSO.org, and AZHIDTA.org |
| Exhibit 18 | Carreon Letter to Kevin Hancock at DOJ |
| Exhibit 19 | Kevin Hancock's Reply to Carreon Letter |

| Exhibit 20 | June 9, 2021 Maricopa County Superior Court Warrant for Clay Anthony Villanueva (middle name is misnomer) |
|---|---|

4. Ayahuasca is AYA's sacramental communion substance, and it contains a small amount of Dimethyltryptaline ("DMT").

5. Ayahuasca is not listed as a drug of abuse in the latest DEA Resource Guide, *Drugs of Abuse*.[1] This is because Ayahuasca is almost exclusively consumed in religious ceremonies. Like peyote, Ayahuasca is not a drug of abuse, and courts have recognized that it is not a "recreational drug" and tends not to be diverted into the illicit market.

6. The law permitting the use of sacramental substances containing a controlled substance was carved out by two U.S. branches of South American visionary churches, the Uniao do Vegetal ("UDV") and the Santo Daime (the "Daime"), who sequentially prevailed in litigation against the DEA. The UDV won the seismically-disruptive *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 425 (2006) case. The Daime won its exemption in an opinion by the late Judge Owen Panner that was highly critical of the DEA's evident unwillingness to fairly evaluate evidence of the Daime's religious sincerity and Ayahuasca's physical and psychological safety in *Church of the Holy Light of the Queen v. Mukasey*, 615 Supp.2d 1210, 1215 (Oregon , 2006)(vacated on other grounds).

7. *O Centro* and *CHLQ v. Mukasey* are founded on the rights established by Congress when it enacted RFRA, providing exemptions from general laws that substantially burden First Amendment Religious Free Exercise and fail the strict scrutiny test. The strict scrutiny test requires the Government to show that the burden imposed by the law is the least restrictive means of advancing a compelling government interest. This requires a case-by-case analysis of each Free Exercise claim of burden, considering

[1] https://www.dea.gov/sites/default/files/2020-04/Drugs%20of%20Abuse%202020-Web%20Version-508%20compliant-4-24-20_0.pdf

whether, in the case *sub judice*, the Government can carry its burden. In both *O Centro* and the *CHLQ v. Mukasey* cases, the DEA could not carry that burden. Because the UDV and the Santo Daime churches have rather similar practices, and use the exact same Ayahuasca sacrament as many visionary churches, the principles applicable to the UDV and the Daime should apply to other visionary churches with similar cases.

8. Both the UDV and the Santo Daime were provoked to file suit by DEA searches and seizures of visionary church sacraments that the courts later held to be improper. Both the UDV and the Santo Daime were raided by the DEA during the same two-day period in May 1999, while both churches believed they were in negotiations with Janet Reno's DOJ. This statement is made in reliance upon the statement of the Daime's attorneys under Rule 11 requirements in the Daime's Complaint in *CHLQ v. Mukasey*, *supra*. (Exhibit 9, ¶ 26 and ¶45). To my knowledge, based on reading the case file extensively on PACER, this statement was not disputed by the Government.

9. In the UDV and Daime cases, the DEA obtained federal warrants and conducted its own seizures, while in the case *sub judice*, it enlisted the Maricopa County Sheriff's Office ("MCSO"), the Arizona Attorney General ("Arizona AG"), the State of Arizona, and Det. Matthew Shay ("Shay") (collectively, the "Arizona defendants") to search the Vine of Light Church sanctuary and Villanueva's home.

10. The exemptions granted to UDV and Santo Daime have not led to diversion into illegal markets, and AYA can be similarly compliant.

11. AYA uses sacramental Ayahuasca prepared from the same two plant materials that UDV and Santo Daime use to prepare their Sacramental teas.

12. On October 23, 2020, I sent the Exhibit 18 letter to Kevin Hancock, then-counsel of record for the Federal Defendants. The letter stated AYA's intent to rely on the representations and assurances that AYA did not face a threat of imminent prosecution. My letter also clarified AYA's position that Sacramental Ayahuasca intended for use as AYA's communion Sacrament is not lawfully subject to seizure because AYA's importation of the substance is entitled to an exemption as the least

restrictive means of accommodating the Government's interest in avoiding diversion of Ayahuasca into illegal markets.  Mr. Hancock's response on behalf of all federal agencies is attached as Exhibit 19.

13.     Plaintiff Clay Villanueva is a Minister of Visionary Religion, the founder of Plaintiff Vine of Light Church in Arizona, and a Board Member of Plaintiff NAAVC. Villanueva became a target of the DEA in 2019 when the NAAVC began publicly advocating for the religious rights of its members to use Ayahuasca.

14.     Pursuing an activist mission to engage the DEA on policy issues, NAAVC circulated an online petition on September 17, 2019 (see FAC at ¶ 193), to the DEA demanding that the agency alter its policies towards NAAVC and other Visionary Churches.

15.     NAAVC also sent a detailed, lengthy letter to the DEA in early January 2020 that requested changes in the DEA's policies.

16.     On May 5, 2020, Clay Villanueva – as a board member of NAAVC – authorized the filing of a Federal case in the Northern District of California styled *Arizona Yage Assembly et al. v. Barr*, Case No. 3:20-cv-03098-WHO (N.D. Cal.).

17.     Less than two weeks after NAAVC filed its complaint, at the behest of a DEA agent, Maricopa County Sherrif's Office retaliated against Petitioner by procuring a search warrant to search Petitioner's church-residence.  The warrant contained blatant falsehoods and material omissions, and was obtained through judicial deception.

18.     On May 19, 2020, Villanueva was the victim of an illegal search by a Federal HIDTA ("High Intensity Drug Trafficking Areas") Task Force that executed an armed raid on his church-residence, arrested him, and seized his religious sacrament.  The pretext for the raid was a fabricated "anonymous tip" to DEA that Petitioner was manufacturing DMT in a drug lab at his residence.  This fabricated tip was never corroborated by any physical evidence or witness statements, and investigators never even attempted to arrange a "controlled buy," which is the gold standard for drug investigations.

19. On August 22, 2021, Villanueva attempted to embark on a flight out of Los Angeles for Peru after he was assured by counsel (who reasonably relied on the statements of counsel of record in this case) that he was not facing a threat of imminent prosecution.

20. Despite suffering from Stage 3 lymphatic cancer, Villanueva was held in State custody for more than 30 days. Clay Villanueva's health cratered in jail, where he was twice hospitalized at the point of death and then released over the State's objection on a $150,000 property bond. The story of his suffering was recorded in his Emergency Ex Parte Application for Writ of Habeas Corpus (Exhibit 16; Docket # 125).

21. AYA is burdened by DEA and DOJ's enforcement of a complete ban on Ayahuasca use and importation due to the small amount of a Schedule I controlled substance contained therein. DHS' Customs Process cannot survive judicial scrutiny because it is not the least restrictive means of interdicting contraband. DHS provides no post-seizure procedure for recovery of seized Ayahuasca Sacrament.

22. Here, DHS has been put on notice – through multiple sworn statements – that AYA's sole and exclusive reason for importing Ayahuasca is to engage in Free Exercise. Although there can be no lawful reason for AYA's Ayahuasca to be seized, DHS continues to seize AYA's religious sacrament and cause irreparable harm to the Free Exercise rights of AYA. DHS will suffer no hardship from being enjoined, while AYA's Free Exercise rights will be denied, unless the request relief is granted.

I declare and affirm, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct, and that this declaration was signed on November 8, 2020, at Tucson, Arizona.

/s/Charles Carreon
Charles Carreon, Declarant

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 3

AYA TENETS AND PRECEPTS

Know and possess the intent to receive the Sacrament for the Proper Purpose – to reclaim your personal power and for healing through renewing your connection to Divine Love.

Resolve to be honest with yourself, and open your heart to receive all of the understanding that can be offered and received through the Sacrament.

Receive the Sacrament in reverence, and enter Communion from a place of freedom, as a wholly volitional act of personal agency.

Drink the Holy Sacrament in communion with others. Surrender. Enter into the temple in communion with Divine Love and direct awareness of this Divine Love, the Heart of Christ.

Clarify your intent. Seek inner silence. Bear witness. Surrender in Holy Communion.

Cross surrender's threshold into Divine Love. Heal in love. Clear room to grow.

Stay receptive. Bear witness. Listen.

Open to the equal nature of existence, and see others as equals.

Bring others to the Divine source, then withdraw. Remember that no one can be pushed across the threshold of surrender. Renew your individual connection with Divine Love.

Don't assume a priestly role, or try to act as a caretaker. The person you think you're helping is often your guide. Explore. Lend your awareness to what's right before your eyes.

Don't rob someone of an essential experience. Lend your awareness to others with a light touch.

Don't intercede between a person and their connection with the Divine.

If you feel yourself taking on the weight of others' pain, ground. Give it to the earth. Maintain healthy boundaries.

Awaken yourself to the source of your suffering. Feel it, accept it, and pass through it, into another layer of silence and Divine Love.

Lend your awareness in guiding others gently to the understanding that feeling and accepting their pain allows it to subside, and allows them to enter deeper Silence and Divine Love.

If you're arguing with someone in your head, return to your heart. Feel and express how you feel. Live from the heart.

Through Divine Love and acceptance, come to forgiveness and gratitude.

Live simply and share your energy and vitality in love. Simplicity grows from the Love of simplicity.

Release your disappointment at falling short of perfection. Receive the Divine Love available to you just as you are.

If your disappointment remains or intensifies, bear witness, and learn from it.

Give attention to your breath. Release thoughts by allowing the breath to move through your being. When you come to a blockage or heavy feeling, arising perhaps from self-importance or self-pity, feel its place within your breath. Breathe with it. Breathe it in. Gently exhale it out. Cleanse with the breath, allowing any block to open through acceptance.

Explore how it feels to adopt a light touch with yourself and others. Dust off your sense of humor, and take a break from habitual seriousness.

## AYA TENETS AND PRECEPTS

When anger arises, bear witness, and learn from it.

Release your fascination with drama. Conflicts cannot be avoided. They will arise. Reconcile them, learn what you can from them, and surrender any obsession with them.

If you feel remorse for past acts, allow yourself to receive the lesson, then allow yourself to move on.

Don't be anxious for peace. Protecting your peace from threats, puts you on guard, which inhibits freedom essential to the living experience of peace.

Don't avoid or indulge in negative states. An honest view is enough.

Free yourself from a chattering mind through acceptance, love, and forgiveness.

Instead of thinking about who you are, be yourself.

Infuse your entire body with awareness, and care for it as a temple.

Meditate daily and stay attuned to your body and spirit's vibratory state.

Protect your vitality and use sexual energy in wholesome ways.

Bring new life into this world with love and confidence. Teach love. Learn. Listen in love.

Seek freedom through the impeccability of personal action and responsibility.

Practice honesty. Sustain your awareness on your heart. Speak from the heart.

Speak openly and honestly without participating in partisan conflict.

Take a clear stand for the rights of man.

Be a living counter-measure to the advent of war. Don't fight wars. Seek to heal the wounds of war.

Do what you love. Choose a path with heart.

Respect the property and boundaries of others. Do not invest in businesses or schemes to rob others of their lives or livelihood. Avoid employment, occupations, and investments destructive to life.

Don't abdicate your personal power or personal agency. Uphold all of our essential rights as living beings on this earth.

Stand up for the underdog. Bring awareness to those enriching themselves on the backs of human suffering. Inspire those lapsing into complacency.

Speak to the demoralized. Share the gift of courage. Reaffirm your reason for getting up each morning. Help others to find theirs.

Uphold the freedom to engage in your spiritual practice as our collective birthright as human beings.

Accept your own failings, and those of others. Take an honest view. And in so doing, learn from yourself and others.

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 4

Arizona Yage Assembly
Ceremonial Instructions

The following are the instructions for the preparation, handling, and sharing of the Sacrament.

**1.** The Sacrament is a tea containing only two ingredients – *banisteriopsis caapi* (Ayahuasca vine) and *psychotria viridis (Chacruna)*, or alternatively, another traditional dimethyltryptamine source, *Diplopterys Cabrerana* (*Chaliponga*).

**2.** The plants must be gathered in the traditional fashion, by persons respectful of the plants and their sacred potential, who are aware of the intended use of the plants to prepare the Sacrament.

**3.** The Sacrament is brewed either by an experienced facilitator who has been trained in the process by the Minister of the Assembly, or by persons skilled in the art of brewing Ayahuasca in Peru, the country of origin. All quantities of the Sacrament, however small the amount, shall be kept in a secure location. When the Sacrament cannot be prepared at the ceremonial site, it is transported in sealed containers by trusted and experienced members of the congregation. The quantities of the Sacrament are measured by volume, and each member entrusted with a duty of transporting the Sacrament is responsible for delivering all of the Sacrament with which they are entrusted to the ceremonial location. Persons authorized to transport the Sacrament will deliver all the Sacrament directly to the lead facilitator promptly upon arrival at the ceremonial location.

**4.** The Sacrament is brewed by gently boiling the two plants together for several hours to create a reddish-brown tea, bitter in flavor.

**5.** Ceremonies are best conducted in the evening after dark, and conclude at dawn.

**6.** An experienced lead facilitator personally chosen by the Ministerof the Assembly will direct every ceremony.

**7.** It is an absolute prerequisite for participation in the ceremony that the practitioner have completed all of the required health and psychological disclosures, and been approved to participate by the Minister of the Assembly. There are to be no exceptions to this rule.

**8.** Each practitioner who joins the congregation in ceremony must make an explicit commitment to remain within the ceremonial environment until the conclusion of the ceremony. Facilitators will assure that practitioners keep this commitment.

**9.** The ceremony is preceded by the cleansing of the ceremonial land.

**10.** During the ceremony, Palo Santo incense and candles are lit, sacred objects are displayed to stimulate inspiration, and holy water is blessed and offered to the members of the circle. Purifying tobacco is offered for ritual sharing.

**11.** Because the experience of communion induces deep introspection and reverie, mats and pillows are provided so that practitioners can recline. Practitioners are encouraged to remain close to their chosen seat to keep order during the ceremony.

**12.** The ceremony begins with an invocation to the Spirit and a call for the cleansing of practitioners individual and collective intent for their participation in ceremony.

**13.** After the invocation of the Spirit, practitioners are invited by the lead facilitator to come forward one at a time to the altar to receive a single serving of the Sacrament. The lead facilitator controls the dispensing of the Sacrament so that practitioners receive a first serving of between 15 and 30 milliliters (between 0.5 and 1 fluid ounces).

**14.** After receiving their first serving of the Sacrament, practitioners return to their place in the circle to receive the blessings of communion.

**15.** An hour and a half after the first offering of the Sacrament, a facilitator will ring a singing bowl, and practitioners will be offered the opportunity to receive an additional serving of the Sacrament. Those who wish to may approach the altar and request a second cup from the lead facilitator, who will evaluate the practitioner's status and, dispense a second cup if it appears appropriate. The lead facilitator may recommend to the practitioner that they sit with the Sacrament a bit longer before drinking an additional cup, if in the facilitator's judgment, this is appropriate. Administration of the Sacrament in this measured fashion permits practitioners to gradually adjust to the unusual perceptions that sometimes accompany the receipt of communion.

**16.** Facilitators will attend to the physical needs of practitioners during the ceremony.

**17.** Nausea can be a symptom of drinking the Sacrment. Each practitioner will be provided with a purge receptable. Facilitators will promptly remove used purge buckets and replace them with clean receptacle.

**18.** Facilitators will monitor the psychic well-being of practitioners, and lend assistance to those who require it, guiding their awareness and ensuring their comfort and sense of security. Facilitators quietly visit each congregant over the course of the night with blessings for inner silence, Love, and well-being.

**19.** Facilitators may sing sacred songs (icaros) to assist the practitioners as a group or individually, as they are moved by the Spirit.

**20.** Facilitators will be responsive to the needs of practitioners to express feelings, to confess perceived misdeeds, to express or seek forgiveness. Facilitators encourage an atmosphere of acceptance and understanding, and listen to the expressions of practitioners without judging, encouraging them to speak freely.

**21.** Facilitators make an effort to balance the needs of individual practitioners with the needs of the group in order to maintain a peaceful atmosphere during the ceremony.

**22.** Practitioners who need to move about or express themselves loudly, or in a manner that might disturb others at communion, are lead gently to an area outside the main ceremony.

**23.** The ceremony is concluded with a closing prayer.

**24.** After the conclusion of the ceremony, practitioners are encouraged to get a few hours rest and then reflect on their experience in an attitude of contemplation and acceptance. Practitioners are given the space to share their experiences in quiet discussions. Facilitators support an atmosphere of openness so that all practitioners may express their feelings about the ceremony in a warm and supportive atmosphere before returning to their daily lives.

**25.** Practitioners are provided ample time to return to their baseline state of awareness, and facilitators monitor each one individually to be certain that each practitioner departs the ceremonial location in a state of clear awareness.

**26.** Facilitators determine whether any practitioners require assistance or transportation after the ceremony, and provide whatever additional care is required to assure the safety of the individual, the community, and the public.

**27.** Any portion of the Sacrament that remains unconsumed after a ceremony is returned to the lead facilitator of the Ceremony and accounted for. The lead facilitator shall return any unused Sacrament to the custody of the Minster of the Assembly.

**28.** The Minister of the Assembly monitors all activities involving the acquisition and dispensing of the Sacrament, and the disposal of any Sacrament that for any reason may become spoiled or unusable by disposing of it in a way that runs no risk of diversion to any illicit purpose.

**29.** The Minister of the Assembly may take disciplinary action towards any person found to have misused the Sacrament or conducted themselves improperly during the ceremony, including exclusion from future ceremonial activity or any other appropriate disciplinary sanction as necessary to protect the sacred nature of the Sacrament from profaning conduct.

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 5

## CODE OF ETHICS

### I. INTRODUCTION

The intent of the Arizona Yagé Assembly (AYA) is to engage in an ethically minded community consistent with the spirit of Divine love and forgiveness. This requires impeccability for those participating in our community. The tenets and precepts of the AYA call for honesty, humility, personal responsibility, and equitably resolving conflicts as they arise. Mutual respect among everyone participating within the sphere of our church is essential. We seek to maintain healthy boundaries and behavior among practitioners. Our code of ethics is born out of a living moral standard based on love and compassion. As Christ said, "Whoever does not love does not know God, because God is love." (John 4:8).

### II. INTENT

Our intention is to bring people to Divine love through the holy Sacrament. We hold to the right of humanity to engage in their chosen spiritual practice. We serve the Spirit by being impeccable in our word. We seek a fair exchange in our social contracts. We hold true to meeting the world as equals.

### III. RESOURCES & FINANCE

We consider ourselves stewards of the Earth, as part of God's creation. We respect the sacredness of our work in serving our communities,and refrain from placing financial benefit above the freedom of the human spirit. In engaging in societal work, we agree to respect the property and boundaries of others. We seek to be economical and discerning in our expenses. In the interest of maintaining a sustainable organization, we agree to balance the need for donations with the benefit of those who seek to join us in spiritual practice. Agreements are to be simple, clear, and well considered by all parties involved. We will not invest in organizations engaged in social or environmental exploitation. We agree to practice equitable dispute resolution.

### IV. HARASSMENT & DISCRIMINATION

We agree toa respectfulsocial environment that recognizes the rights and differences of all participants without prejudice or judgment based on their social role or category. We agree to a professional codeof ethics which prohibits sexual advances by facilitators and those participating in ceremony. Healthy boundaries are essential in respecting the personal agency of all practitioners. Conversations between facilitators and practitioners can be candid. Exploitation of the confessional nature of these conversations for personal gain betrays individual and group trust. The intuition and view of participants will be respected and honored. We agree to protect the rights and welfare of all participants. Some people come to ceremony with a personal history of sexual trauma. We do not condone perpetuating cycles of trauma or abuses of power.

### V. PARTICIPANT RIGHTS

We honor the dignity and independenceof each ceremonial participant. Practitioner participation is established with their informed and signed consent. AYA's disclosure includes presentation of

the ceremonial form, general guidelines, and religious practices,including potential physical or psychological challenges. Medication and dietary restrictions are to be presented to each participant. We do not make medical claims. Participation in ceremony is not intended to replacecrucial medical or psychological treatment. We engage in a religious practice, not a medical practice. Reasonable steps will be made to safeguard participant's health and wellbeing. Our spiritual practice is a healing practice for the purposes of spiritual healing. Our healing practice is a spiritual practice.

## VI. INTEGRITY

We agree to practice constructive and effective communication through honest and compassionate expression. In order to maintain a wholesome environment in Ceremony and daily life, practicioners eschew hostile, accusatory, discriminatory and deceptive speech. We understand that both misunderstandings and conflicts arise. We seek to expand our understanding in the study and practice of dispute resolution. Each practitioner will strive to accept and express personal responsibility for their response to their social climate. We agree to seek personal clarity in the face of both warranted and unwarranted criticism, even as we agree to personally disavow the use of such communication tactics as: guilt, shame, gossip, shunning, blaming, people pleasing, finger pointing, and dishonesty. We understand that these kinds of tactics undermine mutual trust. We seek to resolve conflicts as they arise. We agree to seek counsel to establish a remedy in the event of a breach of ethics, or when conflicts escalate or remain sustained.

## VII. COMPETENCE

We agree to seek our highest level of competence and ability through continuing education. We agree to seek learning from honored educators in all facets of plant-based medicines. The sharing of knowledge and feedback among peers is crucial for sustained community vibrancy and wellbeing. We seek to both understand and expand the current limits of our abilities. We seek to clear up our own issues as a means to serving others with grace, compassion, and appropriate action. We seek to dispel any semblance of mediocrity or complacency. As part of the need for personal integrity and responsibility, we recognize the need to learn from the studies and experience of others.

## VIII. TOLERANCE

Since all systems of belief are based in language, we accept simple love and forgiveness as the universal binding force of humanity. In order to establish harmony in Ceremony and in daily life, we engage in wholesome speech, and gentle respectful conduct towards all persons at all times, and most particularly during Ceremony. As such, we're willing to consider the views and beliefsof all peoples with heartfelt tolerance. We recognize the need to respect all people without standing in judgment of their beliefs. We do not practice judgment or intolerance in the proselytizing of our spiritual practice. We seek to bring those of all beliefs into direct contact with Divine love through the holy Sacrament. As such, we do not seek to sway people from their traditional religious beliefs. We don't stand in judgment ofothersor mold idols of doctrine or ideology.

## IX. SUBSTANCE USE

The use of alcohol or non-medicinal drugs in or around ceremony is forbidden.

## X. SUMMARY

Our statement of ethics can be summarized in *The Beatitudes* (Matthew 5:3-12):

Blessed are the poor in spirit, for theirs is the kingdom of heaven.
Blessed are those who mourn, for they will be comforted.
Blessed are the meek, for they will inherit the earth.
Blessed are those who hunger and thirst for righteousness, for they will be filled.
Blessed are the merciful, for they will be shown mercy.
Blessed are the pure in heart, for they will see God.
Blessed are the peacemakers, for they will be called children of God.
Blessed are those who are persecuted because of righteousness,
for theirs is the kingdom of heaven.
Blessed are you when people insult you, persecute you and falsely say all kinds of evil
against you because of me.
Rejoice and be glad, because great is your reward in heaven, for in the same way they
persecuted the prophets who were before you.

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 6

**Home Address**

Country*:

Address*:

Address *

City*

State*

Zip Code*

:

**Other Information**

Gender:

Birth Date:

Occupation *

Emergency Contact Name *

Emergency Contact Relationship to You *

Emergency Contact Phone Number *

Allergies -Include medicines, foods, animals, insect bites or stings, and environment (dust, pollen, etc.) *

Allergic Reaction Medication Required (if any)?

Please list all prescription, over-the-counter, and natural medications you are taking. *

Have you used Antidepressant medications? *

- [ ] Yes
- [ ] No

Have you had a recent illness? *

- [ ] Yes
- [ ] No

Have you had a recent accident? *

- [ ] Yes
- [ ] No

Have you had a recent operation? *

- [ ] Yes
- [ ] No

Have you recently been hospitalized? *

- [ ] Yes
- [ ] No

Do you have asthma? *

- [ ] Yes
- [ ] No

Do you have diabetes? *

- [ ] Yes
- [ ] No

What is your height? *

[ ]

What is your weight? *

[ ]

Do you have a history of high blood pressure? *

- [ ] Yes
- [ ] No

Have you used any antihypertensive medications? *

- [ ] Yes
- [ ] No

Do you have a history of cardiac failure or stroke? *

- [ ] Yes
- [ ] No

Do you have any bone, joint, or muscle problems? *

- [ ] Yes
- [ ] No

Have you ever had a seizure? *

- [ ] Yes
- [ ] No

Do you have any Psychosis / Schizophrenia condition or Multi Personality Disorder? *

- [ ] Yes
- [ ] No

Do you have any mental health condition not listed above? *

- [ ] Yes
- [ ] No

Have you had a Gastric Bypass Surgery? *

- [ ] Yes
- [ ] No

Are you pregnant, or think you could be? *

- [ ] Yes
- [ ] No

Do you have any other medical issues that might affect your participation in this ceremony? *

- [ ] Yes
- [ ] No

Do you have any physical or mental limitations and restrictions? *

- [ ] Yes
- [ ] No

*Required Fields

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 7

**Thank You!**

Thank you for securing your place for the evening's ceremony with the Arizona Yagé Assembly. As always, welcome to our small church. We're grateful for how these ceremonies have come together and the way our church has grown to support your spiritual practice. These ceremonies are possible because of your intent. Thank you.

Keep in mind that this confirmation is confidential. Do not share it with anyone outside of your circle for the evening's ceremony. Please read through to the bottom now. **You'll find important preparatory materials below that you'll absolutely need to participate in the best possible fashion.**

If you haven't already, please complete your ceremony questionnaire. This will complete your registration. The questionnaire is meant for you to strengthen your own intention and purpose for ceremony, as well as help us get to know you better. It also helps to show us how we can better support you during ceremony.

You will receive driving directions 5 days before your ceremony and **only after you send in your questionnaire and registration is complete.**

Go to this link to complete the personal questionnaire: **http://www.aya.guide/questionnaire** Take your time to reflect on your answers, but complete them **today**. You may type your answers into an email and send them to: ceremony@aya.guide.

## Ceremony Preparation

The main purpose of these ceremonies is to develop a deeper and more conscious relationship with the divine spirit, and to look for better and healthier ways to live and relate to self, family, and community. Therefore, it's essential that you bring your own purposeful intent.

**Preparation for ceremonies:** In seeking help, guidance, healing, and learning, establish a clear intention and purpose. It's important to be in the best possible disposition for the event. **Don't take any alcohol or drugs** (including marijuana), and also make an effort to stay away from disruptive influences and guilty pleasures (such as indulging in crappy food or media) before and after the ceremony. We recommend that you don't eat: **really salty, sugary, spicy or greasy food** 5 days before and at least two days after the ceremony. Abstain from **red meat** 5 days prior and **pork** the week prior. Also abstain from **dairy** at least one-day prior. Also abstain from **orgasms** 3 days before and 2 days after the ceremony. Do what you can. Here's a check list of do's and don'ts.

**Don'ts:**
Beginning 5 days before . . .
**No:**

- Meats (as stipulated above)
- Hard cheeses (they contain an amino acid that affects the clarity of the visions)
- Heavy greasy food
- Heavily salted foods

- Sugary foods
- Fermented foo d or drink
- Alcohol
- TV and TV News

**Also:**
- As noted in earlier materials, anti-depressants must be completely out of your system. (If you've taken them within the last 8 weeks, you can't take Ayahuasca.)
- Anti-hypertensive medications must also be completely out of your system.
- Other medications and stimulates should also be out of your system, please check this website if you have questions: http://ayahuascasafety.org/?page_id=13
- No cologne or perfumes at all the day of, or night prior to, ceremony.  This includes: no artificially scented shampoos, artificially scented soaps or artificially scented deodorants. (People's sense of smell will be especially heightened during ceremony.)

**Do's:**
You may drink pau d'arco tea http://paudarco.org/ (Buy it in bulk from your local health food store or food cooperative.  Bulk is recommended over pill form.  No tinctures.)
- Place 2 thick pinches in 1 quart of water.
- Bring to a full boil.  Let steep for 10 minutes.  Strain.  Drink hot or cold.
- Drink 3 cups per day with or without meals.

Drinking this tea is not mandatory but will help you have a better time, reducing potential reactions like nausea.   If you do take pau d'arco for the event, stop drinking one day prior to ceremony.  Feel free to start drinking the pau d'acro one to two weeks prior to the event.  Cat's Claw is another excellent preparatory tea that can simply be added to the pau d'arco.   (It's available at most health food stores that sell bulk herbs.) To prepare cat's claw and pau d'arco together, keep everything the same as with the pau d'arco tea recipe, just add a couple extra pinches of cat's claw to the pau d'arco mix.

**Stay hydrated the week prior.**  Drink plenty of water or non-caffeinated tea with lemon.  The pau d'arco is a diuretic.  Drink extra fluids to compensate.

**Meditate the week prior.**  Breath focused meditation is an excellent companion practice, in which you place your attention on your breath until you notice that your attention is not on your breath, then return your attention back to your breath.

**Sleep.** Catch some extra sleep the night prior or nap the day of.  You'll be up all n ight during ceremony.  You don't want to struggle with sleep.

**Gather your intent:**  Why are you attending?  What do you want to look into?  What questions do you have to address?

Try to give yourself time after the ceremony to integrate the guidance you receive to the rest of your life and relationships.

The Ceremony will last until first light, and after some rest we may share our experiences, questions and insights.

Also, your sacred instruments are welcome, but be aware that there will be only one altar to unite all and it will be the central altar.  You may use your feathers and other sacred instruments after the water prayer as long as they don't interfere with the ceremony.

Music may be shared by the participants after the Ceremonial work is finished in the morning.

As you will be laying down for much of the ceremony please bring everything you will need to be comfortable in ceremony including:  a sleeping mat, sleeping bag, a pillow, blankets, and if you like to sit, you may bring a low back-jack chair.   Sleeping mats should be the width of typical camping pads, unless you plan to have your mat accommodate two people.

**Also bring an extra change of clothes.**

**Starting time:**   Plan on arriving to the location between 7:00 and 8:00PM (and no later than 8:30PM).  Please try not to arrive before 6:30 PM.  You'll be emailed the event location with directions prior to the ceremony itself.   If you do not receive this email 5 days prior to the event please call us at 520-777-1348 or email us at ceremony @aya.guide.

**Registration:**  All guests must be registered and paid in advance.   Your payment is confirmed.  In doing so you've made a clear decision to prepare and attend.  Space is limited and your own clear intention to attend is essential.  Registration is non-refundable.

**More info:**  Try to give yourself time after the ceremony to integrate. Don't rush back to work, and if possible allow some solo time spent in nature to assist your re-entry.  Please be respectful with your space in the ceremony and leave it as you found it.  Absolutely no unregistered guests allowed.

In addition to this email confirmation, you'll be contacted by email **5 days** prior to the ceremony with follow-up materials that will include the location and driving directions to the event.
Go to this link to complete the personal questionnaire: **http://www.aya.guide/questionnaire**
Take your time to reflect on your answers, but complete them **today**. You may type your answers into an email and send them to: ceremony@aya.guide.
We're honored to share this sacred space with you.  Please email ceremony@aya.guide, if you have any questions, or call us at 520-777-1348.   Link here for more on our church's Tenets & Precepts and Statement of Ethics.

With affection,

Arizona Yagé Assembly

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 8

Summary
AYA June 2018 Survey of Congregants

## I. Methodology

**Survey Distribution Period**: May 21 - June 11, 2018

**Recipients**: Congregants of Arizona Yagé Assembly who attended ceremonies from June 2015 until the survey was distributed in May and June of 2018.[1]

**Number of questions: 80**

**Average time to complete: 20 minutes**

**Delivery Method**: Email link to online survey

**Total Number of Emails**: 1,430

**Responses**: 253 (17.7%)

The results of this survey offer a snapshot of the AYA congregation, the results of which are detailed in this report. The survey was conducted anonymously online to encourage both honesty in participant response as well as to address concerns raised by congregants of including their names in an application to the Drug Enforcement Administration.

## II. Demographics

Male: 58%

Female: 41%

Cross-gender: 1%

71% of AYA Congregants are over the age of 30, and 46% are over 40 years of age.

Ranges: 21-29: 20%; 30-39: 25%; 40-49: 31%; 50-59: 15%; 60-69: 8%; 70-72: 1%.

[1] The survey email list was drawn from the AYA attendee roster and cleared of duplicates.

Summary
AYA June 2018 Survey of Congregants

## III. Highlights

### A. AYA Congregants are Religious Practitioners

96% of respondents pray or meditate.

### B. Ayahuasca Is Central to the Spiritual Practice of AYA Congregants

97.6% consider the use of Ayahuasca essential to their ceremonial experience.

93.12% feel preventing them from drinking ayahuasca would deprive them of spiritual communion

### C. AYA Congregants Use Ayahuasca as a Sacrament

96.7% have only used Ayahuasca in ceremonial practice.

91.1% participate in AYA ceremonies as a religious or spiritual practice.

### D. AYA Ceremonies Are Sincere Religious Practices

97.8% consider AYA a bona-fide church.

98.8% consider participation in ceremony beneficial to their spiritual growth.

94.4% see themselves returning to AYA ceremonies.

98.4% felt AYA facilitators were capably performing their ceremonial duties.

98.4% felt physically safe inside ceremony.

98.4% felt emotionally safe inside ceremony

### E. Congregants Are Strongly Affiliated With AYA

90.3% believe AYA connects them with a community that views Ayahuasca use as sacred.

85.7% are interested in meeting with other congregants outside of ceremony.

71.25% are interested in volunteering with the AYA outside of ceremony.

64.1% connect with other church members between ceremonies.

48.7% have interest in becoming facilitators with the AYA

### F. Congregants Limit Their Speech About AYA

69.7% are hesitant to tell others of their experience because of questions surrounding the legality of Ayahuasca.

53.9% are hesitant to tell family or close friends or associates about ayahuasca because of questions surrounding its legality.

## IV. Personal Comments

The survey also addressed a range of personal issues with area for comment. Congregants' comments express strong positive feelings about the sacrament and the ceremony, including numerous accounts of improvements in life experience and social relations post-ceremony, including a sense of having reconciled accounts with God, deepening of empathy towards others, increased acceptance of self, relief from addictive compulsions, guilt, and self-judgment, and various other favorable changes in perception, attitude, and behavior. Following are some of the responses as to how the church members feel they benefit from ceremony and why people participate in Ayahuasca ceremonies with the AYA as a spiritual practice:

1. "I, like everybody, have searched for meaning, purpose, God, and guidance in my life. This sacred sacrament, and ritual practice, which is thousands of years old, has given my life meaning, clarity, and healing. There is no better way to get in touch with one's heart and spiritual life."

2. "Prior to my first ceremony, I had a very bleak outlook on life and death. These ceremonies have shown me my purpose and that death, as scary as it is, is just another chapter, not the finale."

3. "For me, the Aya experience is for healing and spiritual growth."

4. "I was in search of spiritual growth and didn't feel or find it with the Catholic Church."

5. "I am not a Christian but I believe in the Christ-like vibratory state that speaks to me through Ayahuasca: Love, Kindness, Compassion and Forgiveness."

6. "I feel that ayahuasca brings us closer to what other religions would consider to be "God". It is an extremely religious and spiritual experience for me."

7. "Because it connects you with divine love."

8. "Oneness with the creator."

9. "It has opened my eyes to the God of the universe and allowed me to connect."

10. "From the root to the fruit. It brings me clarity and roots me to living with intent. It makes me a more present person and fortifies my moral compass."

11. "I learned to accept and love parts of myself that I do not always like, because I was shown that God loves me despite my flaws. Though I was sad about certain ways I have conducted myself, I was able to sit within that sadness and learn from it."

12. "I was in a cycle of self-medication. The ceremony helped me to recognize this and the root causes for it. I now have accepted my shortcomings, recognized my weaknesses, and been able to move towards a more positive outlook on life."

13. "Aya teaches us to deal with our pain, learn from it and grow. Many personal insecurities and doubts were resolved due to sitting in ceremony."

14. "I can sit with my negative feelings, listen to the message contained in them, without the same degree of mental agony."

15. "I was shown that I am loved even when I do things wrong. I feel more okay experiencing negative feelings if it leads to greater acceptance and improvement of myself."

16. "I've recommitted myself to earning a degree. I now face every new day with a positive outlook, ready to face challenges because I know that this life, this experience is a small part of something much greater. I am truly thankful to have had a spiritual experience."

17. "As a mental health counselor I feel I experience my clients on a much deeper level."

18.“Ayahuasca has improved every dimension of my life. But mostly I'm no longer consumed with anxiety and so I function better at everything.”

19.“The experiences have exceeded any possible expectation I may have had before attending a ceremony.”

20.“Two years ago I wanted to die every day. I daydreamed about ways to do it 4-5 times a day. I am so grateful not to feel like that anymore. I never dreamed that life could be so amazing. The only thing that really changed was my perspective. I truly believe I would be dead without ayahuasca and AYA. I did all the work but they helped save my life. Literally.”

21.“There were parts of myself I was afraid of before the ceremony, particularly I was afraid God hated me for this. I learned through the ceremony that I could grow and improve but that God loves me as I am.”

22.“It was a beautiful, safe and structured experience. They did not stand between me and my experience; they created a safe environment for it.”

23.“Until I found AYA, my only option was to go to Peru (or somewhere else where it is legal). I researched the cost, and it was prohibitive. I had no options for ceremony, except to create it myself. I had several solo experiences, and then I found AYA. The ceremony environment allowed my soul to expand to a much higher level. I am so grateful to AYA.”

24.“Just like everything I have said before, aya has improved so much in my quality of life and has shown me how to live in love and made me feel sure of my place on this planet again. I don’t know that I would’ve been able to feel the way I do now without the help of aya.”

25.“I am beyond blessed to have come across this ceremony and special group of people. It has changed my life so profoundly. I look forward to learning more and deepening my aya experience.”

26.“Saved my life from an opiate addiction and continues to help me heal and grow.”

Summary
AYA June 2018 Survey of Congregants

27.“Beautiful people, beautiful place. Holy people, sacred space.”

28.“It changed my life. I’m a more patient loving person not only with my family, but with myself as well.”

29.“I believe this is a major movement for spiritual freedom all around the world. I believe this should be legal in the United States, for it is all organic and non-toxic. It is more of a gift from God, in my eyes, than just something that makes the brain ‘overactive’.”

30.“AYA is providing a safe space to participate in a spiritual sacrament despite the uncertain legal status of Ayahuasca and for this reason I am very grateful.”

31.“I just feel really lucky to have had the experience so early on in life.”

32.“The ceremony was safe and accessible. Information provided for preparing was complete and informative, facilitators and community was open and available. Communication was honest, experienced, educated and friendly.”

33.“It has changed my life.”

34.“Overwhelming gratitude for AYA and the facilitators that make it happen! They have shown me the light and the way to be the best person I can possibly be and I'm forever grateful for that!”

35.“It saved my life. I was using $300 worth of Heroin a day before the ceremony. I had a detox period after ceremony, but I did not go through the pain of kicking cold turkey. I have been successful in my recovery so far. Before the ceremony I tried methadone and suboxone and none of it addressed the core issues of my addiction. Today I feel relieved of my obsessive compulsive self destruction.”

36.“Connection with a deep and universal sense of caring that I have not felt in my life outside of ceremony.”

37.“I am truly at peace with myself and I had a blissful experience. So much love and laughter and light in my life to appreciate and embrace.”

38. "I've learned that life itself is a ceremony. There are going to be times that are great and times where you just want it to end. But even those times where you're not enjoying the experience, there is a lesson to learn from it."

39. "The Aya experience can be a profoundly emotional one. I experienced a level of awe that I had never experienced before."

40. "I learned acceptance of my most uncomfortable emotional states -- emotional states I'd built up entire edifices of habit and routine to defend against. When I simply accepted them, they let go of their hooks."

41. "I was astonished to discover emotional wounds that I thought either didn't exist or had been dealt with years ago, and learned to integrate, accept, and overcome them."

42. "I noticed parts of my body had darkness and other sides light. It corresponded to previous injury and emotional trauma. I also noticed that I could heal myself with my divine light."

43. "I was experiencing depression and anxiety in my everyday life before I participated in an AYA ceremony. While my experience with AYA has not completely solved my depression, it has shown me a way towards happiness and fulfillment in life."

44. "I value what I learned through ceremony in ways almost inconceivable to express. I've learned the deep importance of love, acceptance, and forgiveness -- lessons that continue to unfold in my daily life."

45. "Without legal access to plant medicines I cannot practice my religion. I have attended many types of religious gatherings. Though there is merit to such gatherings, they do not lead to the same kind of connection with God or personal transformation that plant medicines such as Yagé allow."

46. "AYA has helped me battle and defeat my alcohol addiction. Each ceremony give me more insight into who I truly am and helps heal all the damage I've done physically and psychologically to myself in the past."

47.“Aya is literally saving my life. I would not be here without its lessons and guidance.”

48.“Strengthens my mind, body, and spirit. Establishes a deep connection with other people. Inspires me creatively. Helps me understand who I am better. Brings me in touch with God and the divine.”

49.“I think it’s important for everyone to have access to ceremony, a safe environment with like-minded individuals. It’s a place to grow and heal. But I don't believe it's the only way to gain insights, we must do the work! Aya is just a powerful tool.”

50.“I feel that drinking Ayahuasca has made me a better person in my daily life. Reflecting on the divine in all experiences and all people, I have come to live my life with higher levels of respect for all beings.”

51.“I can think of no other way to get the level of insight and healing I have had since.”

52.“I continue to learn and grow through the process personally and I thoroughly enjoy connecting with others inside and outside of ceremony.”

53.“I feel it has opened my heart and helped me find meaning.”

54.“I feel a calling and it feels right.”

55.“These ceremonies help my body heal from a childhood trauma. They bring a sense of well-being that lasts beyond the experience.”

56.“The ceremony that I’ve had has been one of the most sublime and transformative single experiences of my life. It answered some of the questions I had about how I engage with my own humanity, but in the process opened up many more questions about what it means to engage that humanity in my relationships with other people.”.

57.“This is my spiritual practice, for now and the foreseeable future.”

58. "I'm able to focus on what I can do and not become paralyzed by all the things I can't affect."

59. "I feel more myself. I love more and I accept things better. I trust in myself."

60. "Before the ceremony I had put in notice at my job following being sexually assaulted. I returned from the ceremony with the understanding that I needed to stay at my job and forge through the pain to create a workplace of communication, understanding and healing. This is already starting to happen, because the medicine showed me that I needed to stay."

61. "My experience led to a breakthrough in honest communication, something I continue with presently. Speaking openly about things with family, even if they are things my family may not agree with or disapprove of such as engaging with ayahuasca for healing."

62. "I have doubled my income from last year, and I have infinitely more patience with my family."

63. "Aya has improved my life in every way. I'm a better coworker, student, friend, lover..."

64. "I find myself committed to spiritual growth. I try to take time out every day to meditate and reflect on my life."

65. "I quit an almost 10 year opiate addiction as well as bad habits and actions."

66. "I've been told that I seem more grounded, centered and balanced."

67. "I have less fear!"

68. "I quit my job; now I found my path, and I don't feel like it's work anymore because I love what I do so much. I learned to let go so the issue that haunted me doesn't haunt me anymore. I'm so positive that it helps others to be better. I'm sharing my light and my fire with everyone around me."

69. "I am patient, understanding, and so full of love. I respect myself and am happy."

70. "Aya gave me my own personal guidelines for how to live."

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 9

FILED 08 SEP 05 09:21 USDC-ORM

Roy S. Haber
OSB #80050
haberpc@cyber-dyne.com
Roy S. Haber P.C.,
570 East 40th Avenue
Eugene, Oregon 97403
Tel. (541) 485 6418

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

THE CHURCH OF THE HOLY LIGHT OF THE QUEEN, a/k/a The Santo Daime Church, an Oregon Religious Corporation, on its own behalf and on behalf of all of its members, JONATHAN GOLDMAN, individually and as Spiritual Leader of the "Santo Daime Church," JACQUELYN PRESTIDGE, MARY ROW, M.D., MIRIAM RAMSEY, ALEXANDRA BLISS YEAGER and SCOTT FERGUSON, members of the Santo Daime Church,
Plaintiffs,

vs.

MICHAEL B. MUKASEY, Attorney General of the United States; KARIN J. IMMERGUT, United States Attorney, District of Oregon; HENRY M. PAULSON, Secretary of the U.S. Department of the Treasury,
Defendants.

CIV NO. 08-3095-HL

COMPLAINT

TEMPORARY RESTRAINING ORDER REQUESTED

RELIGIOUS FREEDOM RESTORATION ACT {42 USC §§ 2000bb . 2000bb(4)}

Declaratory and Preliminary and Permanent Injunctive Relief Sought

**INTRODUCTION**

1. This is a suit brought by the CHURCH OF THE HOLY LIGHT OF THE QUEEN (a.k.a. "The Santo Daime Church" or "CHLQ"), a Christian religion based in Ashland, Oregon, its Spiritual Leader, Members of the Board of CHLQ, and members of

#1389

the Church on behalf of all of its members pursuant to 42 USC §§ 2000bb-2000bb(4), the Religious Freedom Restoration Act of 1993 ("RFRA"), to redress the deprivation of rights, privileges and immunities secured to plaintiffs by the First, Fifth, and Fourteenth Amendments to the Constitution of the United States. Specifically, plaintiffs seek a declaration that the defendants' threats to arrest and prosecute members of the Santo Daime religion who seek to bring their sacramental tea (the "Daime tea"), which contains trace amounts of a Schedule 1 chemical, into the United States to imbibe at their religious ceremonies is unconstitutional, unlawful and violates RFRA in that it burdens the central practice of the plaintiffs' religion, *i.e.* imbibing the Holy tea. Plaintiffs also seek a preliminary and then permanent injunction enjoining defendants from preventing the importation or use of tea in religious ceremonies and from threatening to arrest or prosecute Church members who seek to ingest their sacramental tea.

**JURISDICTION AND VENUE**

2. Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331 and 1343(3)-(4), because the case arises under the Constitution, laws and treaties of the United States and seeks to redress the deprivation of rights, privileges and immunities secured to plaintiff by the First, Fourth, and Fifth Amendments to the Constitution of the United States, and the Religious Freedom Restoration Act as well as to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

3. This court has authority pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706, to grant declaratory relief and to issue preliminary and permanent injunctions.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) in that all of the defendants are agents or officers of the United States and were, at all times relevant to

this case, acting in their official capacities, and at least one defendant resides in the State of Oregon. Plaintiffs reside in this district and the cause of action arose in this district.

**PARTIES**

PLAINTIFFS

5. Plaintiff **THE CHURCH OF THE HOLY LIGHT OF THE QUEEN** is a religious corporation formed under the laws of the State of Oregon whose principle office is located in Ashland, Oregon and is the local United States Branch of the Centro Eclético da Fluente Luz Universal Raimundo Irineu Serra, CEFLURIS (the "Santo Daime Church" of Brazil,) a fully recognized religion in Brazil. The Church is adversely affected and aggrieved by the defendants' actions as more fully described below. The Ashland Church administers to a small congregation in Bend, Oregon.

6. Plaintiff **JONATHAN GOLDMAN** is the religious leader ("Padrinho") of CHLQ and resides in Ashland, Oregon. He brings this action in his own capacity as a member of the Santo Daime Church, on behalf of members of the Church and as a representative and agent of CEFLURIS, in the United States.

6A. **ALEXANDRA BLISS YEAGER**, is the spiritual leader of the Céu da Divina Rosa (The church of the Divine Rose), a Santo Daime Curch located in Portland, Oregon.

7. Plaintiff **JACQUELYN PRESTIDGE** is Chairperson and Member of the Board of Directors of CHLQ. She resides in Bend, Oregon.

8. **SCOTT FERGUSON** is a member of CHLQ and resides in Bend, Oregon

9. PlaintifF **MARY ROW, M.D.**. is a member of CHLQ and resides in Oregon.

10. **MIRIAM RAMSEY** is a member of CHLQ, the salaried administrator of the Church and resides in Ashland, Oregon

DEFENDANTS

11. Defendant **MICHAEL B. MUKASEY** is the Attorney General of the United States and the Chief Law Enforcement Officer of the United States. MR. MUKASEY resides in Washington, D.C.

12. **KARIN J. IMMERGUT**, United States Attorney, District of Oregon and resides in Portlan, Oreogn.

13. Defendant **HENRY M. PAULSON**, Secretary of the Treasury of the United States, is responsible for administering and enforcing the customs laws, the Controlled Substances Import and Export Act and regulations promulgated thereunder. MR. PAULSON resides in Washington, D.C.

13.(a) At all times relevant to this litigation, all of the defendants acted in and are sued in their official capacities.

**FACTS**

14. For hundreds and, perhaps, thousand of years, a tea called ayahuasca has been brewed by indigenous tribes in the Brazilian and Peruvian Amazon region and has been used for sacramental and healing purposes. As noted in greater detail below, the ayahuasca tea contains trace amounts of N,N-5,5-dimethyltryptamine (DMT), a chemical listed on the Controlled Substances Act (CSA), and ensuing regulations. 21 U.S.C. §§ 801 et seq.

15. Beginning in the 1800's, Christian religious missionaroies made contact with many indigenous tribes in the Peruvian and Brazilian Amazon. These tribes then adopted Christian beliefs and practices and syncretic religions emerged. In the early twentieth century, a Brazilian rubber tapper, Mastre Raimundo Irineu Serra, had a direct revelation to found a new religion based upon the concept that Jesus Christ was the Savior and that the Ayahuasca tea was to become the central ritual and sacrament of the religion; and that the tea was to be renamed "Santo (Holy) Daime" which, in Portuguese, means "give me," interpreted to mean "give me light and give me love." The Santo Daime Church blends Christian theology with traditional indigenous religious beliefs. Church doctrine instructs that Daime tea is a sacrament and that the body of Christ is present in the tea. Church members ingest the tea during and only during church services.

16. The taking of the Daime sacrament is necessary for the Church to conduct its services. It is believed that only by taking the tea can a Church member have a direct experience with Jesus Christ, believed by members of the Church to be the savior. The Holy Daime tea is believed to be not only a vehicle for direct communion with God, but itself embodies the Divine Spirit; thus, it is prayed to directly as the manifestation of the Holy Spirit as contained in the Hymnals of the Church. According to Church doctrine, the presence of the Daime is the presence of Christ. Without the tea, there is essentially no religion because it is an essential element of the Church ritual in which the members have placed their faith. All Church members imbibe the holy tea as a form of communion.

17. The Santo Daime Church's doctrine is taught through the Hymnals received by its religious leaders over the past century. These are received during the ceremonies at which the Holy sacramental tea is taken.

18. From the making of the Holy Daime tea to the ingestion of the tea at ceremonies, the tea is accounted for in a structured distribution and accounting program under the direction of the elders of the Church, who have been trained to maintain high security surrounding the making, storage and transport of the tea. Each Church in the United States that receives the tea accounts for the amount received as well as the amount consumed at services.

19. The making of the Holy Daime tea is a highly ritualized sacred practice called the "feitio." The tea is made from cooking two plants, a vine named *Banisteriopsis Caapi,* and the leaves of *Psychotria viridis,* which grows in certain jungle areas of South America. The preparation of the tea requires the intensive labor of many Church members and is very time consuming. The vine and the leaves are boiled in water for many hours in a highly structured ceremony undertaken in prayer accompanied by the singing of Hymns. It is only when the tea is brewed under these very specific conditions that it is considered to be the Holy Daime sacrament. The Church considers the loss of any of the tea a sacrilege and takes great pains to protect it from diversion from its very limited and specific use.

20. *Banisteriopsis caapi* is a large, rugged vine containing three chemical alkaloids, harmaline, harmine, and 1,2,3,4-tetrahydroharmine, none of which are listed in any Schedule of the Controlled Substances Act of 1970.

21. *Psychotria viridis* is a small plant containing trace amounts of the Schedule 1 chemical N,N-5,5-dimethyltryptamine (DMT). Numerous other trees, shrubs, and plants found in the Western Hemisphere (including in the United States) also contain DMT. However, none of these plant species, including the *Psychotria viridis,*, are listed as Controlled Substances.

22. DMT is listed as a Schedule 1 controlled substance because in some chemical forms, particularly the synthetic forms, it may be viewed by some as a substance with abuse potential. One criterion for listing a chemical as a Schedule 1 Controlled Substance is that it has "a high potential for abuse." The CSA, however, does not list the *Psychotria viridis* plant as a controlled substance because the scientific evidence establishes that the DMT contained therein is not in a form with a "high potential for abuse."

23. In addition to not listing the *Psychotria viridis* plant as a controlled substance, and in spite of repeated requests to comment on the subject, the defendants have never communicated in any form that they consider the *Psychotria viridis* plant a controlled substance or that the plant is a substance with a "high potential for abuse."

24. Upon information and belief, DMT is only considered a substance of "high potential for abuse" when it is taken in its synthetic form intravenously, or by inhalation. The Holy Daime tea is a natural, organic non synthetic sacrament, that is ingested orally, and the processes that go on in the digestion of the DMT in this natural form ensure that the DMT is not and cannot become a substance with a "high potential for abuse."

25. On or about May 20, 1999, the defendants intercepted a shipment of the Holy Daime tea lawfully sent from the Santo Daime Church in Brazil to plaintiff Goldman, who is authorized by the Santo Daime Church in Brazil to receive, store, account for, and administer the tea which is used solely for sacramental purposes at services in the United States.

26. Upon information and belief, upon the instructions of defendants DEA, Treasury Department, and Department of Justice agents and employees and/or persons acting under their direction, DEA Special Agent Daniel Lakin obtained a search warrant to search the home of plaintiff Goldman. On or about May 20, 1999, the premises were searched by defendants' agents. Articles belonging to the plaintiffs and personal items of plaintiff Goldman and his family were confiscated by the agents. Some, but not all, of those items have since been returned.

27. The defendants' agents entered plaintiff Goldman's home with attack weapons, arrested plaintiff Goldman, and dragged him off to jail. Plaintiff Goldman spent 12 hours in jail before being released on bond.

28. The defendants seized the Holy Daime Tea from Mr. Goldman's home; and, upon information and belief, the Holy Daime tea may still be in defendants' possession.

29. While charges have never been filed against plaintiff Goldman and there is no continuing investigation into the facts surrounding the importation of the Holy Daime tea, the former Oregon United States Attorney advised plaintiffs by letter dated October 11, 2001 that "[T]he decision to prosecute your client for his conduct remains an open question pending the decision of the United States Department of Justice regarding your

request for a controlled substance exemption." Eight days later, on October 19, 2001, the United States Department of Justice advised that it "believes the prohibition on the importation, distribution and possession of ayahuasca tea is the least restrictive means of furthering a compelling government interest." Defendants did not advise plaintiffs what that compelling interest was. While no further action has been taken against plaintiff Goldman, all plaintiffs and members of the Church live under the constant threat of arrest, prosecution and imprisonment for quietly practicing their religion because the government refuses to respond to their requests that it abandon threats to arrest and prosecute Santo Daime Church members designated to transport the tea from Brazil to Ashland, Oregon for services. Thus the continuing threat of further arrest and prosecution looms heavy over plaintiffs and all Church members who attempt to practice the central tenet of this religion in the United States of America.

30. Plaintiffs petitioned the State of Oregon's Board of Pharmacy, which has concurrent jurisdiction with the defendants over distribution of controlled substances and abuse of controlled substances in the State of Oregon, to permit the Church to take its Holy Sacrament at Church services held in the State of Oregon. The Oregon Pharmacy Board held a hearing on November 8, 2000, at which time it carefully considered some of the same evidence that will be placed before this Court. The Board ruled that the State of Oregon "does not consider sacramental use of the Santo Daime tea in the Church's religious ceremonies to constitute abuse of a controlled substance." The Board then held that it "neither possesses nor plans to exercise regulatory authority with regard to the religious practices of the Santo Daime Church in Oregon."

31. Despite the ruling of the Oregon Pharmacy Board, which under principles of federalism has the primary responsibility to pass on matters of public health, the federal defendants threaten to override the findings of the Oregon Pharmacy Board by unilaterally declaring the tea unsafe and a threat to public health. The government has no evidence to support such a claim. Its attempts to avoid the Oregon findings are arbitrary and are not grounded in existing fact or jurisprudence.

32. The continuing threat of arrest and prosecution of Church members who attempt to bring the tea in from Brazil or hold services eviscerates Oregon's favorable ruling precluding it from having any practical effect in protecting plaintiffs' freedom to practice their religion, even in Oregon. Plaintiffs are still in great fear that defendants' agents and employees will arrest them and throw them in jail for practicing their religion, even in the State of Oregon.

33. In the late 1980's, the Brazilian Federal Narcotics Council ("CONFEN") embarked on an extensive two-jyear study of the religious practices of the Santo Daime Church, including the central practice of ingesting the tea at its ceremonies. The members of CONFEN traveled to many cities in Brazil and deep into the Amazon interior to the town of Mapia, which became the spiritual center of the Santo Daime religion, to investigate the religious practices and the community. After these extensive studies (which included participation by a wide variety of medical, social, psychological, historical, anthropological, law enforcement and drug policy experts), the Brazilian CONFEN ruled that the religious use of the Daime tea would be legally recognized and protected from government interference in Brazil.

Attempts to Settle and Obtain a Memorandum of Understanding with DOJ

34. On October 7, 2000, plaintiffs' counsel sent a Memorandum of Law and copies of the expert reports submitted with the instant Motion for Temporary Restraining Order to then Attorney General of the United States, Janet Reno, along with introductory letters from Congressman Peter DeFazio and a professional acquaintance of Ms. Reno (who is an expert for the plaintiffs), Mr. Allan F. Breed, urging that the matter be resolved without litigation through an Attorney General Memorandum of Understanding.

35. Ms. Reno appointed a task force composed of a dozen federal agencies concerned with drug use and abuse to meet with plaintiffs' representatives and attempt to resolve the matter.

36. At the request of plaintiffs' counsel, the offices of several Members of Congress conracted the Department of Justice voicing concerns over the treatment of the Santo Daime Church. On December 8, 2000, at the direction of Attorney General Reno, the Assistant Attorney General of the Criminal Division held a meeting with plaintiffs at Main Justice in Washington, D.C. Representatives from the U.S. Attorneys Office, Office of the Drug Czar, the Civil Rights Division, the Criminal Division, the Drug Enforcement Agency, and others were present. Padrinho Alex Polari de Alverga,[1] Executive Director of CEFLURIS Doctrinarian Board of the Santo Daime Church of Brazil, traveled from Brazil to the United States to attend this meeting, to convey the respect of the Spiritual Leader of the Santo Daime, Padrinho Alfredo Gregorio de Melo, and to be available to answer any questions that members of the Task Force might have about the Church and its practices. The DOJ provided a Portuguese interpreter to assist at

[1] "Padrinho" refers to an elder or leader of a Church. The literal term is "Godfather."

the meeting. On December 11, 2000, Associate Attorney General Michael Greenberger advised that an interagency task force had been formally established to "consider the important issues that you have raised."[2]

37. Plaintiffs advised the interagency members that the burden was on the United States to establish that it had a compelling reason to prevent the import of the sacramental tea into the United States. Though participants at that meeting were invited to present plaintiffs with any compelling government interest for prohibiting the importation of the sacred tea, none was provided.

38. On December 8, 2000, Congressman Peter DeFazio sent a letter to DOJ, asking, again, what compelling interest the government might have in preventing the Santo Daime from practicing their religion. Justice replied on December 12, 2000 it would be "premature to provide such a response." That response was curious at best as it illustrated that the government was claiming that it had "compelling interests" but could not quite figure out what they were, even though government agents had seized the tea and arrested Plaintiff Goldman based upon these not yet formulated "compelling interests." Thus, as of that date, the defendants had not identified even one colorable "compelling government interest" to justify their continuing effort essentially to ban the Church in the United States. This establishes that the defendants were and continue to be violating RFRA by substantially burdening religious exercise without compelling justification.

[2] Also present at the meeting were representatives from the DEA, Narcotics and Dangerous Drugs, the Office of the Solicitor General, Office of Legal Counsel, Office of Legislative Affairs, the Criminal Division, the Civil Division, the Civil Rights Division, Health and Human Services, the Office of National Drug Control Policy, United States Customs Service, and the Executive office of the United States Attorneys.

39. On December 21, 2000, Deputy Associate Attorney General Greenberger sent a letter stating that the defendants hoped to advise plaintiff by mid-January 2001, whether they would voluntarily agree to the cessation of the illegal activity complained of herein. On January 10, 2001, plaintiffs' counsel met again in Washington with members of the interagency task force. That meeting proved to be fruitless in either narrowing down issues or obtaining any temporary agreements with the defendants to permit the tea to be used in religious services.

40. Plaintiffs' counsel had suggested that the defendants agree to permit the tea to be imported temporarily under agreed upon DEA controls including an accounting system to ensure no diversion. Under a proposed Justice Department Memorandum of Understanding, submitted to the defendants, the government would study the religion more, attend and observe the services as did the Brazilian drug enforcement agencies, and undertake any studies that it might wish.

41. After the change in administrations in January 2001, Attorney General Reno was replaced by Attorney General Ashroft. On February 2, 2001, Deputy Assistant Attorney General Stuart E. Schiffer wrote plaintiffs inviting the Santo Daime to respond to the government's Opposition Brief in *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft, 282 F.Supp2d 1236 (D. N.M., 2002), aff'd, Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006)("UDV".) [3] Its brief was filed in January, 2001, stating, "We would be happy to consider any additional information that you may wish to provide in response to the position set out by the government in that filing . . ." On October 19, 2001, Assistant Attorney General McCullum advised

[3] Referring to *UDV v. Ashcroft* discussed at length below. The UDV is also a Brazilian religion using tea made form the same plants as the Daime tea.

plaintiffs that the Department of Justice would not voluntarily desist from continuing to threaten plaintiffs with arrest and prosecution for attempting to quietly practice their religion.

The O Centro Espírita Beneficente União do Vegetal (UDV) Decisions

42. Similar to the plaintiffs in this case, the O Centro Espírita Beneficente União do Vegetal (UDV)[4] is a religious organization formed under the laws of Brazil, with its headquarters in Brasilia, Brazil[5].

43. As in this case, where the Santo Daime sacred tea is the central ritual of the religion and is seen as the religion's sacrament, central and essential to the UDV Christian religion is the sacramental, ritual use of *Hoasca,* a tea made from the same two plants native to the Amazon River basin that comprise the sacred Daime tea. As in the case of the sacred Daime tea, the sacramental *Hoasca* tea contains a small amount of naturally-occurring dimethyltryptamine (DMT). And as in the case of the sacred Daime tea, the UDV *Hoasca* is tea imported from Brazil, after religious leaders (*Mestres*) of the UDV prepare *Hoasca* during a religious ritual held in Brazil for that purpose.[6]

44. As in the case of the Santo Daime sacred tea, it is a central and essential tenet of the UDV that its members receive communion by partaking of *Hoasca* as a sacrament during religious rites. When UDV adherents receive sacramental *Hoasca,* they

---

[4] *O Centro Espírita Beneficente União do Vegetal (UDV) v. Ashcroft,* CIV. No. 00-1647 JP/RLP (D. NM, 2000).

[5] The corporate plaintiff in the UDV case is the United States Branch of the UDV, O Centro Espírita Beneficente União do Vegetal (USA), Inc.

[6] O Centro v. Clement, CV 00-1647JP RLP (D. New Mexico, First Amended Complaint) (September 21, 2007).

receive the Divine Holy Spirit. For disciples of the UDV, the spirit of the *Hoasca*—a manifestation of God—is present within the tea.

45. On May 21, 1999, one day after plaintiff Goldman's home was searched, the sacred Daime tea was seized pursuant to a search warrant and he was arrested, the UDV-USA President's offices were then raided by federal officers who had intercepted a shipment of *Hoasca* sent by the UDV in Brazil to the UDV Church in Santa Fe, New Mexico. The federal agents seized records and documents from the President's office.

46. Upon information and belief, the UDV negotiated with the same task force that was formed by Attorney General Reno to negotiate with the plaintiff Santo Daime Church.

47. On November 21, 2000, the UDV filed suit in United States District Court, District of New Mexico seeking a preliminary and permanent injunction to prevent some of the same defendants as in this case from interfering with the importation, distribution and ingestion of the *Hoasca* tea.

48. Shortly after the filing of the UDV case, as noted above, on January 21, 2001, DOJ informed plaintiffs that anything they wanted to submit should be done so in the UDV litigation forum. The UDV plaintiffs alleged that the interference with the tea by the government violated their First Amendment Rights to freedom of religion and the Religious Freedom Restoration Act.[7] The district court granted a preliminary injunction based upon its findings that the government failed to establish that it had a compelling interest in totally prohibiting the importation, distribution and ingestion of the holy *Hoasca* tea and preliminarily enjoined Defendants from enforcing the CSA against the

[7] And other allegations not pertinent to this Complaint.

UDV Plaintiffs. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236 (D.N.M. 2002). Defendants appealed to a panel of the Court of Appeals which affirmed. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170 (10th Cir. 2003). On rehearing en banc, the Court of Appeals again affirmed. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) (en banc). On February 26, 2006, the Supreme Court of the United States unanimously affirmed the granting of the preliminary injunction and remanded the case to the district court for further proceedings. *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006).

49. The Solicitor General's Merits Brief to the Supreme Court asserted that the Santo Daime and UDV religions were very similar.

Thus the government defendants argued that:

> At a minimum, an equivalent exemption will be demanded by other religious groups that use ayahuasca, like the Santo Daime Church. While the Santo Daime Church has more broadly opened its hoasca ceremonies to others, courts may consider differences in evangelistic theology to be a tenuous basis for selectivity in governmental accommodations. Courts might also be concerned that a selective accommodation would effectively give the UDV a competitive advantage over the Santo Daime church in the religious "marketplace of ideas.
> In any event, the evangelistic differences between UDV and Santo Daime may not be that great.[8]

[8] Solicitor's Merits Brief, 21-22. The Solicitor's use of the phrase "will be demanded" was not entirely accurate. The Solicitor's brief was written in 2005. The Santo Daime began negotiations with the defendants under Attorney General Reno's explicit direction in 2000. Indeed, at the first meeting held at Attorney General Reno's direction in Washington, the Solicitor General's office had a representative present. Thus, at the time of the writing of the Solicitor's brief, he already knew that the Santo Daime had made demands that the government cease its illegal activity of interfering with transporting the same tea into the United States.

50. With regard to the factual and legal issues in this case, the plaintiffs are similarly situated to the UDV.

51. In the UDV case, at the preliminary injunction phase of the case, the Supreme Court upheld the district court's finding that the same federal defendants as in this case failed to establish that the government had a compelling interest to prevent the importation, distribution and ingestion of the *Hoasca* tea as the sacrament of the Church at religious ceremonies.

52. The government failed to establish that the tea was dangerous to the health of the members of the UDV or to the public, or that it was likely that the tea would be diverted to illicit consumption.

53. On remand to the district court, the defendants notified the district judge, "[t]hat they did not intend to present additional evidence concerning the government's compelling interest in banning Plaintiffs' use of *Hoasca*."[9]

54. The government defendants have thus abandoned their attempt to prevent the importation, distribution and ingestion of the *Hoasca* tea. Similarly, the government has no compelling interest to prohibit the importation of the Daime tea, which, as noted above, is considered by the defendants to be similarly situated to the *Hoasca* tea in terms of the government's professed "interests." However, the defendants continue to claim that they have "compelling interests" that justify criminalizing the Daime tea.

55. Regarding issues of safety and health, the government is precluded from relitigating those issues[10] in this case, as they were fully aired in the UDV case and the

---

[9] Motion to Dismiss UDV Amended Complaint, Civ 00-1647 (D. N.M), November 1, 2007, at page 10.

[10] "Collateral estoppel."

government stated in November 2007, only a few short months ago, that it has no more evidence to support its essentially abandoned "compelling interests" defense. And there is no additional evidence that the government intends to offer regarding diversion of the tea to illicit markets.

56. The continuing threats of prosecution and threats to seize the Holy sacramental tea in the United States has had the effect of chilling plaintiffs' rights as United States citizens to practice their religion in this country without fear of reprisals by federal agents acting outside the law.

57. There are Brazilian nationals in the United States as well as citizens who hold both Brazilian and American citizenship who can practice their religion in Brazil but are subject to arrest and prosecution in the United States by the defendants and their agents if they attempt to practice their religion in this country.

58. At all times relevant to this litigation, the defendants acted in their official capacities.

59. At all times relevant to this Complaint, defendants engaged in the illegal acts complained of herein to the injury of the plaintiffs and deprived plaintiffs of their rights, privileges and immunities secured to them under the First, Fourth, Fifth, Fourteenth Amendment, the Religious Freedom Restoration Act and the laws, regulations and decisions of the State of Oregon.

60. The actions of the defendants in arresting, threatening to arrest and threatening to prosecute plaintiffs serves no compelling government interest and are not the least restrictive means to protect any colorable government interests.

61. The actions committed by the defendants were calculated to and in fact, have punished plaintiffs for asserting their First Amendment rights and rights provided to them by Congress under RFRA.

62. The acts complained of were taken willfully and without the defendants undertaking a review of their legal responsibilities prior to engaging in the illegal acts set forth above.

63. Defendants continue to engage in the illegal acts set forth above after having been advised by the plaintiffs of their illegality.

64. The actions complained of were and are geared to intimidating and thereby preventing plaintiffs from practicing their deeply held religious beliefs and engaging in the sacrament of their Church.

65. The acts complained of were done by the defendants in excess of any authority conferred on them under the Constitution and the laws of the United States.

66. The United States Commission on International Religious Freedom established under the International Religious Freedom Act of 1998, in its "Year 2000" Report recognized and honored Brazil's tolerance for its syncretic religions of which the Santo Daime is one of the most recognized in Brazil both by the Brazilian government and by the Brazilian Catholic Church. 22 U.S.C. §§ 6401, et seq., Public Law 105-29 (105th Con. 1988), The actions of the defendants in arresting, threatening prosecution and confiscating the Holy Daime tea is a particularly egregious violation of the principle of comity in light of this country honoring Brazil's protection of the Daime tea in, while at the same time refusing to permit its sacramental use in the United States.

67. Plaintiffs have no adequate remedy at law and will continue to suffer irreparable injury and harm unless defendants are enjoined by this court from taking any further action against the plaintiffs.

**FIRST CLAIM FOR RELIEF**

(FIRST AMENDMENT FREE EXERCISE OF RELIGION)

68. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 67 as though more fully set forth herein.

69. The actions of the defendants in arresting plaintiff Goldman, confiscating the Holy sacramental tea, continuing to hold the threat of prosecution over his head and the continuing threats to confiscate the Holy sacrament, and to arrest, prosecute and imprison other members of the Santo Daime Church who in the future attempt to practice the central tenet of their religion, violate plaintiffs' rights to the free exercise of their religion under the Free Exercise Clause of the First Amendment to the United States Constitution.

70. Plaintiffs have no adequate remedy at law and will continue to suffer irreparable injury and harm unless defendants are enjoined by this court from taking any further action against the plaintiffs.

**SECOND CLAIM FOR RELIEF**

(RELIGIOUS FREEDOM RESTORATION ACT)

71. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67 as though more fully set forth herein.

72. The actions of the defendants in arresting plaintiff Goldman, confiscating the Holy sacramental tea and continuing to hold the threat of prosecution over his head, and the continuing threats to confiscate the Holy sacrament, and to arrest, prosecute, and imprison plaintiffs and other members of the Santo Daime Church who in the future attempt to practice the central tenet of their religion violate the Religious Freedom Restoration Act of 1993, 42 USC §§ 2000bb-2000bb(4).

## THIRD CLAIM FOR RELIEF

(FIFTH AMENDMENT DUE PROCESS)

73. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 67 as though more fully set forth herein. Plaintiffs have a property right in the ownership, possession, and use of the Holy sacramental Daime tea.

74. Defendants' seizure of the Holy Daime tea without prior notice and an opportunity to be heard deprived plaintiffs of their ownership, possession, and use of the tea in violation of plaintiffs' rights to both substantive and procedural due process pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution.

75. Plaintiffs have no adequate remedy at law and will continue to suffer irreparable injury and harm unless defendants are enjoined by this court from taking any further action against the plaintiffs.

## FOURTH CLAIM FOR RELIEF

(FOURTH AMENDMENT SEARCH AND SEIZURE)

76. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 67 as though more fully set forth herein.

77. The Holy Daime tea seized by the defendants and their agents did not constitute unlawful importation or distribution of a controlled substance under the CSA. The defendants did not have probable cause to seize the tea or to seek a search warrant to search plaintiff Goldman's home on or about May 20, 2000.

78. Defendant's obtaining a search warrant, searching plaintiff Goldman's home, and seizing the Daime tea and other property from Mr. Goldman's home constituted an unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution.

**FIFTH CLAIM FOR RELIEF**

(FIFTH AND FOURTEENTH AMENDMENT
EQUAL PROTECTION OF THE LAWS)

79. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67 as though more fully set forth herein.

80. Plaintiffs are similarly situated to UDV members in their sacramental use of the Holy Daime tea that Defendants consider a Schedule I controlled substance under the CSA, just as they have considered the Hoasca tea. Nevertheless, Defendants have accommodated the UDV and no longer seek to ban its importation, distribution, and ingestion while refusing to accommodate plaintiffs' sincere, sacramental use of the Holy Daime tea.

81. Defendants' decision to allow the members of the UDV to use Hoasca for religious purposes, while denying the same protection to plaintiffs, violates the equal

protection rights of plaintiffs guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

82. As a result of Defendants' violation of Plaintiffs' rights to equal protection, plaintiffs are entitled to appropriate injunctive and declaratory relief.

**SIXTH CLAIM FOR RELIEF**

(COMITY AND VIOLATION OF INTERNATIONAL LAW)

83. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67 as though more fully set forth herein.

84. The defendant's actions in arresting plaintiff Goldman, confiscating the Holy sacramental tea and continuing to hold the threat of prosecution over his head and the continuing threats to confiscate the Holy sacrament, and to arrest, prosecute, and imprison other members of the Santo Daime Church who in the future attempt to practice the central tenet of their religion are in violation of the policies of the United States under the doctrine of comity, as is defendants' refusal to recognize the acts, records and judicial proceedings of foreign sovereign nations that do not directly conflict with lawful policies of the Untied States.

85. Specifically, the actions of the defendants as set forth above, fail to give comity to the findings of the Brazilian Federal Narcotics Council ("CONFEN") which specifically ruled that the Santo Daime Church may lawfully utilize the Holy Daime tea for sacramental purposes.

86. The actions of defendants violate the United Nations International Covenant on Civil and Political Rights ("ICCPR") and Article 18 of its Universal

Declaration of Human Rights which declares that "Everyone has the right to freedom of thought, conscience, and religion. This right shall include freedom to have or to adopt a religion or belief of his choice, and freedom,. . . to manifest his religion or belief in worship, observance, practice, and teaching."

87. Plaintiffs have no adequate remedy at law.

88. The balance of the equities weighs in favor of an injunction preventing Defendants from further interfering with plaintiffs' religious conduct.

89. Injunctive relief is reasonably necessary to protect Plaintiffs' constitutional right to equal protection of the law.

90. Plaintiffs will suffer irreparable harm without injunctive relief.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs seeks declaratory and injunctive relief against the defendants as follows:

1. A Declaratory Judgment that the actions described in this Complaint violated plaintiffs' rights to freedom of religion under the First Amendment to the United States Constitution and a violation of the Religious Freedom Restoration Act.

2. A Declaratory Judgment that the defendants' actions described in this Complaint, including the obtaining of a search warrant, the interception of the Holy Daime tea, the search and seizure at plaintiff Goldman's house, the arrest of plaintiff Goldman, the continuing threat of prosecution of plaintiffs, and the threats of arrest and prosecution of all Santo Daime Church members in the United States who wish to engage in taking the sacrament, the Holy Daime tea, violate 42 USC §§ 2000bb-2000bb(4) the Religious Freedom Restoration Act ("RFRA") of 1993.

3.      A Declaratory Judgment that the defendants' actions described in this Complaint in confiscating the Holy Daime tea violated plaintiffs' rights to substantive and procedural due process of law under the Due Process Clause of the Fifth Amendment to the United States Constitution.

4.      A Declaratory Judgment that the defendants' actions in confiscating the Holy Daime tea, obtaining and executing a search warrant against plaintiff Goldman as described in this Complaint, violated plaintiff Goldman's rights to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

5.      A Declaratory Judgment that the actions of defendants in threatening to arrest and prosecute Santo Daime Church members for practicing their religion violate plaintiffs' rights to the equal protection of the laws.

6.      A preliminary and permanent injunction enjoining the defendants as follows:

     a.      From arresting, prosecuting, or threatening plaintiffs and members of the Santo Daime Church with arrest, prosecution and/or imprisonment for importing, distributing and ingesting the Daime tea solely at Santo Daime Church services.

     b.      Ordering that within 30 days after the date of issuance of declaratory relief, the parties present the Court with a plan to effectuate the importation, distribution, and accounting for the Holy Daime tea consistent with the rights of the Church members to use the Holy tea in ceremonies.

       c.      An Order awarding plaintiffs attorney's fees, costs and expenses

pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and The Civil Rights

Attorneys Fees Award Act of 1976, 42 U.S.C. § 1988.

       d.      Such other and further relief as the Court may deem just and

proper.

Dated:  August 12, 2008                Respectfully submitted,


                                     Roy S. Haber
                                     OSB 80050
                                     Roy S. Haber P.C.,
                                     570 East 40th Avenue
                                     Eugene, Oregon 97403
                                     Tel. (541) 485 6418
                                     Cell(541) 913 6397n
                                     Attorney for Plaintiffs

Of Counsel:

Gil Carrasco
Assistant Professor of Law
Willamette University College of Law
180 Church Street SE
P.O. Box 654
Salem, OR 97301

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 10

**Roy S. Haber**, OSB No. 800501
haberpc@cyber-dyne.com
**ROY S. HABER P.C.**
570 East 40th Avenue
Eugene, OR 97405
Telephone: 541.485.6418
FAX: 541.434.6360

**Don H. Marmaduke**, OSB No. 53072
don.marmaduke@tonkon.com
**TONKON TORP LLP**
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2099
Direct Dial: 503.802.2003
Direct FAX: 503.972.3703

**Gilbert Paul Carrasco**, California Bar No. 90838
*(Appearing pro hac vice)*
carrasco@willamette.edu
No. 451
245 Winter Street SE
Salem, OR 97301
Telephone: 503.370.6432
FAX: 503.370.6375

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(Medford Division)

**THE CHURCH OF THE HOLY LIGHT OF THE QUEEN**, a/k/a The Santo Daime Church, an Oregon religious corporation, on its own behalf and on behalf of all of its members, **JONATHAN GOLDMAN**, individually and as Spiritual Leader of the "Santo Daime Church," **JACQUELYN PRESTIDGE, MARY ROW, M.D., MIRIAM RAMSEY, ALEXANDRA BLISS YEAGER** and **SCOTT FERGUSON**, members of the Santo Daime Church,

Plaintiffs,

v.

Civil No. 08-cv-03095-PA

**AMENDED EXPERT WITNESS STATEMENT OF DR. JOHN HALPERN**

**MICHAEL B. MUKASEY**, Attorney General of the United States; **KARIN J. IMMERGUT**, United States Attorney, District of Oregon; **HENRY M. PAULSON**, Secretary of the U.S. Department of the Treasury,

Defendants.

My name is John H. Halpern, M.D.

I have been asked to provide my expert opinions regarding the sacramental use of the Daime Tea used by the Santo Daime Church. In preparation for this report, I have reviewed the statement of Dr. Glacus De Souza Brito, dated March 2, 2000; the declaration of Charles S. Grob, M.D., dated March 30, 2000; the declaration of Charles Schuster, Ph.D., dated June 20, 2000; the declaration of David E. Nichols, Ph.D., dated June 22, 2000; the declaration of Natalia P. Urtiew, dated January 23, 2001; the declaration of Gary T. Sheridan, dated January 24, 2001; the declaration of Robert E. Dalton, dated January 24, 2001; the second declaration of David E. Nichols, Ph.D., dated February 7, 2001; the second declaration of Charles S. Grob, M.D., dated February 8, 2001; and the declaration of Mark Albert Kleiman, Ph.D., dated February 9, 2001. In addition, I have referenced many scientific journals in my accompanying Journal Article. Plaintiffs' Exhibit "7." In addition I have attended a Santo Daime ceremony in Brazil and have spoken with plaintiff Jonathan Goldman about Church practices. At the request of the plaintiffs, I attended a ceremony in Oregon two years ago. I have also interviewed 32 members of the Oregon Santo Daime Church as part of my study. I served as a research assistant to Dr. Rick Strassman who did a study on the effects of DMT in a controlled setting. *See* citation in Footnote 5, page 5, below. I also conducted a study with NIDA funds (in a Mentored Patient-Oriented Research Career Development Award) regarding the mental health and neurocognitive effects of sacramental use of peyote by members of the Native American Church.

I have testified as an expert in trial or at deposition twice since 2000. A list of those occurrences can be found on page 14 of my curriculum vitae which is attached hereto as Exhibit A.

## THE MEDICAL AND PSYCHIATRIC SAFETY OF RELIGIOUS "AYAHUASCA" USE

### INTRODUCTION

"Ayahuasca" is a liquid brewed from the vine *Banisteriopsis caapi* along with usually the leaves of *Psychotria viridis*. These plants are native to the Amazon Basin of South America and are collected in the wild and by cultivation. Ayahuasca is used by many indigenous South American cultures whose customs have shifted over time due to Western/European influences. Ayahuasca has different functions for these people, including the preservation and continuity of their religious and medical traditions, much of which dates back a few thousand years. In the 20th Century, syncretic religions of Christian and indigenous beliefs were formed in Brazil, which identify ayahuasca as their holy religious sacrament. The two largest, the Santo Daime which evolved in the 1920's, and the União do Vegetal (UDV) which began in the 1960's, have been recognized since the 1980's by the Brazilian Government as having a legitimate right to ingest an ayahuasca sacrament and are therefore afforded the full measure of religious protection under the law in Brazil.[1] To avoid confusion, it should be noted that the brew does have many names depending on geographical location, religion, and people. In addition to "ayahuasca" then, other synonymous terms include "hoasca" or "oasca," "yajé" or "yage," "caapi" or "kahpi," "cipó," "natema" or "natem," "dapa," "mihi," "vegetal," "tea," and "Daime." For the purposes of this report, I will use the term "Daime," as it is the chosen name for the Santo Daime's ayahuasca sacrament.

---

1 Dr. Halpern, Dr. Juan Sanchez-Ramos, and Professor Jimmy Gurule submitted an Amicus Curiae Brief on September 5, 2005, supporting the position of the UDV in Gonzales v. O Centro Espirita, No.04-1084, On Writ of Certiorari to the Supreme Court. For purposes of this Declaration, I fully adopt the "Interest of the Amici Curiae" and "II. The Government Does Not Have A Compelling Interest in Prosecuting Sacramental Uses of the Hoasca." Pages 19-30. "Hoasca" is the term used by the UDV for their sacramental ayahuasca. Daime and Hoasca are both made from the same ingredients and all statements made in these sections of the Amicus Brief apply with equal force to the Santo Daime's ayahuasca sacrament, "Diame."

*Banisteriopsis caapi* is a large, rugged vine containing three chemical β-carboline alkaloids with mechanisms of action similar to certain FDA-approved anti-depressant, hypnotic/sedative, and anxiolytic medications. Psychoactivity commences within 1 hour of drinking a "sufficient amount" and continues for 1 to 2 hours, unless re-ingested. Yawning, emesis, and diarrhea often follows ingestion, but there are no known reports of chronic adverse reactions in the medical or anthropological literature. The three alkaloids are harmaline, harmine, and 1,2,3,4-tetrahydroharmine and are not listed in any Schedule of the Controlled Substances Act (CSA) of 1970 and successive Amendments.

*Psychotria viridis* is a small plant containing the Schedule I hallucinogen N,N-5,5-dimethyltryptamine (DMT). Numerous other trees, shrubs, and plants found in the Western Hemisphere (including the United States[2]) also contain DMT, a few of which are also used ceremonially, but not by the above-mentioned Brazilian religions. Neither of the plant species mentioned above are controlled substances. DMT is a very short-acting powerful hallucinogen when smoked, intranasally insufflated, or injected intravenously or intramuscularly. DMT is not orally absorbed (and therefore not psychoactive) unless a gut-lined enzyme, monoamine oxidase (MAO), is destroyed or temporarily inactivated. The three above-mentioned alkaloids of the *B. caapi* vine all posses reversible time-limited MAO inhibition, thereby permitting DMT absorption into the bloodstream and subsequent crossing of the blood-brain barrier. The two plants taken in combination, the typical Daime brew, steadily induces a psychoactive effect as increasing MAO inhibition enables more remaining DMT to be absorbed through the gastrointestinal tract. With the first ingestion, DMT intoxication occurs within the first hour and then gradually subsides over the next 1 to 2 hours. DMT likely will be absorbed more efficiently on re-ingestion while MAO inhibition continues from the earlier and additional consumption of *B. caapi*.

Pure DMT is not often used for illicit hallucinogen intoxication in America and there are no known reports of ayahuasca, in general, and Daime, in particular, being diverted to an illicit market anywhere. Human dose-response studies have been performed with synthetic DMT and some

---

2 Halpern JH. Hallucinogens and Dissociative Agents Naturally Growing in the United States. *Pharmacology & Therapeutics*, 102(2):131-138, 2004. Paper first presented at workshop: "Psychoactive Botanical Products." Office of Dietary Supplements & National Institute on Drug Abuse, Rockville, MD, 9/9/03.

neuropsychological, anthropological, and neuroendocrine studies have been conducted with members of the UDV. These early studies conclude that DMT can safely be administered in a research or specific religious setting and that ayahuasca drinkers appear healthy and neurocognitively intact.

Indeed, under my direction, 32 (of approximately 40) current American members of one branch of the Santo Daime Church were interviewed providing demographic information, physical exam, drug use timeline, data about childhood conduct disorder, and careful psychiatric semi-structured interview and questionnaires about anxiety, depression, and general mental health were completed. Subjects were asked about extent of Church participation, what is liked least and most about Daime, and what health benefits or harms they attribute to Daime. These members usually attend services weekly (lifetime 269±314.7 ceremonies; range 20-1300). Physical exam and test scores revealed healthy subjects. Members claimed psychological and physical benefits from Daime. 19 subjects met lifetime criteria for a psychiatric disorder, with 6 in partial remission, 13 in full remission, and 8 reporting induction of remission through Church participation. 24 subjects had drug or alcohol abuse or dependence histories with 22 in full remission, and all 5 with prior alcohol dependence describing Church participation as the turning point in their recovery. This data was presented at a Poster Session of the 70th Annual Scientific Meeting of the College on Problems of Drug Dependence (CPDD), held in San Juan, Puerto Rico, June 14-19, 2008. This study's abstract, as part of CPDD's proceedings, will be published in the peer-reviewed journal *Drug and Alcohol Dependence*; the full manuscript will be published in a peer-reviewed medical journal to be determined.[3] The research reveals that there are no apparent short or long term ill health affects associated with sacramental ingestion of Diame.

Turning to the research conducted thus far regarding the pharmacologic effects of DMT, as a chemical in the *P. viridis* plant, taken in combination with MAO inhibitors, as chemicals in the *B. caapi* plant, reveals that there is virtually no possibility of a human being consuming a sufficient quantity of the Daime to cause any immediate toxic or lethal effect.[4,5]

---

3 Halpern JH, Sherwood AR, Passie T, Blackwell KC, Ruttenber AJ (submitted for publication). Evidence of health and safety in American members of a religion that uses a hallucinogenic sacrament.

4 Callaway JC (1995). *Pharmahuasca* and contemporary ethnopharmacology. *Curare*; 18:395-398.

5 Strassman RJ (1996). Human psychopharmacology of N,N-dimethyltryptamine. *Behav.Brain Res*; 73:121-124.

PREPARATION OF DAIME

As mentioned above, Daime is made by harvesting the vine *B. caapi* and the leaves of *P. viridis*. Rituals and prayers are part of the collection and preparation process for the Santo Daime. Veneration of their holy sacrament includes pilgrimages for collecting the ingredients, and preparing the brew for a stated purpose such as for a specific prayer, religious holiday, or healing session. The traditional preparation of *B. caapi* is strenuous and time-consuming because the vine is a rugged, hard wood. Sections of the vine are cut and then beaten for hours in order to strip the bark and break apart the vine prior to boiling. This process maximizes the extraction of the β-carbolines. Santo Daime church members bond through this day-long ritual by sharing in the preparation of their holy sacrament and by offering hymn and prayer during this work. Typically, the preparation process is a happy time for church members and allows individuals to carefully reflect on their intentions for the coming use of their sacrament. Member's prayers over the brewing Daime may also extend to praying for the good health and emotional well-being of the extended church community that will eventually ingest this sacrament, even though they were unavailable for assisting in the preparation of Daime. The boiling of *B. caapi* takes many hours, with water carefully added such that there are several reductions of the brew. The leaves of *P. viridis* are typically added towards the end of the boiling of the *B. caapi* vine, as DMT quickly dissolves into the brew.

THE RELIGIOUS USE OF DAIME IS DISTINCT FROM ILLICIT DRUG USE

The Santo Daime religion reveals a clear and consistent religious doctrine striving to promote community and family values as well as a healthy work ethic. The use of Daime as a holy sacrament is the central facet in the expression of religious faith for members. This is a vital distinction to be appreciated, as the consumption of Daime as a sacrament is literally then the non-drug use of DMT.

It is scientifically inappropriate to refer to Daime as a hallucinogenic drug as compared to synthetic DMT. The Santo Daime's ingestion of their sacrament then has no relation to recreational drug use of synthetic DMT.

---

Recreational drug use of DMT remains illegal as set forth by this drug's listing in Schedule I of the CSA. Ingestion of Daime to "get high" is anathema to members and especially the leadership of Santo Daime, who consider the protection of Daime for only proper sacramental purposes as one of their highest responsibilities.

In fact, there is very clear precedent in the United States for permitting the sacramental ingestion of Daime, all the while acknowledging that it also contains a small amount of a chemical listed as a Schedule I substance in circumstances outside of an approved religious setting. Specifically, I refer to the protection of the sacramental use of the peyote cactus (*Laphophora williamsii*) by American citizens who belong to the Native American Church (NAC).

With reference to the neurocognitive risks from Daime use it might be helpful to consider similar evaluations of peyote. With grants from Harvard Medical School, the Heffter Research Institute, and especially the National Institute on Drug Abuse, I completed a study that focused on the neurocognitive effects from lifelong ingestion of peyote by members of the NAC. Final results concluded NAC members are just as neurocogntively healthy as non-peyote using controls.[6] It is also readily apparent that the religious and visionary experiences NAC members experience during the peyote ceremony should not be properly defined as a hallucinogenic intoxication. Nevertheless, the peyote cactus, and its principle psychoactive alkaloid, mescaline, are both listed in Schedule I of the CSA. In the late 1800's through early 1900's in America, the NAC, a syncretic Christian religion, emerged in which peyote is employed as a sacrament. The NAC is now well established in the United States, despite peyote being a "Schedule I drug." NAC members are deeply offended when people unfamiliar with their religion question the sincerity of their faith and their customs, which they know to be healthy, healing, and promoting the type of family values that dominant American culture actually reveres. Indeed, the use of the term "hallucinogen" is both misleading and inaccurate when describing sacramental peyote use as well as sacramental Daime use. The NAC has over 300,000 members in the United States, making it the largest religion among Native American peoples. Over 2 million peyote "buttons" are

---

6 Halpern JH, Sherwood AR, Hudson JI, Yurgelun-Todd D, Pope HG Jr. Psychological and cognitive effects of long-term peyote use among Native Americans. *Biological Psychiatry*, 58:624-631, 2005.

consumed annually in the United States through a regulated system designed in partnership between the DEA, the Texas Department of Public Safety, and the NAC. This quietly successful partnership offers positive proof that it is possible to safely regulate the wide distribution of an otherwise Schedule I hallucinogen in America when religious freedom hangs in the balance.

There are other important similarities between the religious use of Daime and peyote. Both have thousands of years of ritual use in the Western Hemisphere. Both may induce nausea and vomiting. They have only rarely been studied and described in peer-reviewed scientific journals. There are no published reports for either peyote or Daime indicating that their religious use causes Hallucinogen Persisting Perceptual Disorder. There are no published reports of either Daime or peyote causing any significant medical or psychological harm to members of these religions. Nor has peyote ever been reported to be a popular product of the illicit drug market in the United States. And Daime has never been reported to be associated in any way with illicit drug markets. It is doubtful that either peyote or Daime has ever been a minor drug trafficking problem in the United States. Moreover, both the leadership of the Santo Daime and the NAC consistently state that they would inform law enforcement should they learn of any such illicit drug trafficking of their respective sacraments. These similarities may provide another layer of reassurance at the public policy level that Daime, like peyote, appears safe for human consumption when taken in strict accordance with bona fide, traditionally accepted religious practices.

THE REAL AND POTENTIAL RISKS OF DAIME TO INDIVIDUALS AND TO THE GENERAL POPULATION

As a physician, I am concerned that proven allopathic medicine not be supplanted with untested, unproved faith healing. I am familiar with the Santo Daime religious tradition and am aware that the Church leaders do not preach that the ingestion of the sacramental Daime will "cure" a disease. What they do preach is that taking the sacrament and following the doctrine will promote psychological and physical health in a holistic manner for Church members. I have not found any evidence to question this expression of their faith but have found evidence in support (see Footnote 3 above).

The United States has an important tradition of providing religious freedom even when the resulting exemptions have caused concern amongst the traditional medical community of which I am a member. Thus, religious

exemptions have been granted from vaccination (several religions), treatment by faith-based healers outside allopathic medicine (Christian Scientists), denial of mental illness/opposition to the use of therapeutic psychopharmacological treatments by membership (Scientology), refusal of transfusion of blood products even if known to be lifesaving (Jehova's Witnesses), and opposition to pregnancy abortion when the mother's life is clearly at risk (several religions or specific factions). I note again that the exemption request in this case does not raise any of the real health concerns referred to in the aforementioned exemptions.

Serious medical consequences from ingestion are the rare exceptions with all hallucinogens and physical trauma is typically secondary to activities performed while under the influence of the drug.[7] Moreover, when a cardiovascular or other serious medical condition arises post hallucinogen ingestion, emergency medical teams generally correctly presume that the individual has taken a compound adulterated with a dangerous non-hallucinogenic substance.[8]

The psychoactive substances such as Daime and peyote are not known to induce physical dependence. Tolerance is quite rapid, precluding a theoretical scenario in which daily ingestion (which is not a feature of either religion) might lead to physiological dependence. In general, then, these substances have a very low dependence liability.[9] Generally, those who oppose the religious, medical, or psychotherapeutic use of hallucinogens have incorrectly labeled them as toxic to the CNS resulting in some sort of cognitive or emotional impairment. My review of the literature, which appeared in the CPDD sponsored journal *Drug and Alcohol Dependence*,[10] places these beliefs in serious question as evidence to date supports continued intact cognitive functioning. There are, of course, risks associated with the ingestion of virtually every chemical substance, including those available over the counter, particularly when they are not utilized according to directions.

---

7 Carvey PM (1998). *Drug Action in the Central Nervous System.* New York: Oxford University Press. 365.

8 Hurlburt KM (1991). Drug-induced psychoses. *Emergency Medicine Clinics of North America*, 9: 31-52.

9 Carvey PM (1998). *Drug Action in the Central Nervous System.* New York: Oxford University Press. 366.

10 Halpern JH, Pope HG Jr (1999). Do Hallucinogens Cause Residual Neuropsychological Toxicity? *Drug Alcohol Dependence*; 53:247-256.

Most traditional users and healers in South America do not screen for specific medical problems because they view the sacramental substance as a direct vehicle for religious and healing sessions, in general, and assisting in diagnosing the nature of the disease presenting before them, in particular. When a Santo Daime congregant wishes to become a Church leader "Padrinho," he/she undergoes extensive training, which includes evaluating each person who desires to become a new church member to determine whether there are any conditions or predisposition to any illness that might render ingestion of the Daime undesirable. For example, the Santo Daime Church has developed a form entitled "Confidential Medical Record" that it proposes to use prior to permitting any participation in Church activities where the Daime might be consumed. These forms are structured to carefully screen for a variety of medical and psychiatric conditions that can then be reviewed by a physician should there be any questions about risks to physical or mental health. The documents clearly indicate that should there be any question about health, a new physical and access to medical and psychiatric records could be requested by Church officials. For example, the form asks individuals if they have ever taken certain psychotropic medications and whether they ever required a psychiatric hospitalization, and this question does provide an indirect way of inquiring about remote major psychiatric illness and psychotropic medication use.

## CONCLUSIONS

I have recently reviewed the Brazilian Government 2006 CONAD report on the religious use of ayahuasca.[11] The CONAD report states:

> **For decades, the ritualistic use of *Ayahuasca* – a drink obtained from the decoction of the vine *Banisteriopsis caapi* (jagube, mariri, etc.) and the leaves of *Psychotria viridis* (chacrona, rainha etc.) – has been recognized by Brazilian society as a legitimate religious practice,[12] such that the conclusions of the reports and findings that resulted from the multidisciplinary studies determined by the former CONFEN in 1985 are more than current, when they**

11 CONAD is a drug policy arm of SISNAD, the National System of Public Policy on Drugs, and its decisions "must be complied with by organs and entities of the Brazilian Government" November 23, 2006. The Multidisciplinary Working Group, that wrote the CONAD report, was composed of six members. The Santo Daime and the UDV each provided two members. Another member was Dr. Edward John Baptista das Neves MacRae, who was advising the Multidisciplinary Working Group on issues relating to pharmacology and biochemistry. This member, Dr. MacRae, is now serving as an expert for the plaintiffs in this case.

12 For the Santo Daime and UDV religions.

**had verified that *"for many decades the use of Ayahuasca has been ocurring without leading to any known social damage."***

The empirical evidence to date fails to establish any threat to individual or long-term health issues but does point to relative safety and possible additional physical and mental health benefits. There is no trafficking in Daime in the United States. Daime is not a recreational drug by any definition and is not likely to ever be a concern to the goals of drug enforcement for which the DEA has been chartered. Absent direct evidence that the Daime is a serious health risk, and such evidence does not currently exist, there appears to be no scientific or medically valid reason to prohibit its ingestion as a bona fide religious sacrament. Finally, a Schedule I drug is, by definition, a drug with a high potential for abuse, which the Daime clearly is not. In this regard then, there are no public health concerns that would justify criminalizing the Santo Daime'suse of their ayahuasca sacrament, Daime.

To the extent that control over the Daime is an interest we all have, I am convinced that the leadership of the Church, no less so then the leaders of the peyote religion, control the distribution of the sacrament limiting its availability to direct use only at prayer services.

The DEA already has in place an elaborate scheme for registering, controlling and accounting for thousand of drugs that are made or imported into this country. Registering the importation of the Daime and requiring a strict accounting for its dissemination is expected to be a routine matter for the DEA without substantial burden on manpower and resources.

The members of the Santo Daime Church should be granted the right to ingest its sacrament Daime at religious services without threat of arrest or criminal prosecution in the United States.

Case 2:20-cv-02373-ROS Document 143-9 Filed 01/30/20 Page 92 of 192

In regard to this present legal matter, since 1999, I have been compensated at the rate of $150/hour for relevant research and preparation of my declaration. I have been paid approximately $2,000 to date.

My qualifications are set forth in my Curriculum Vitae, attached hereto as Exhibit A.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED this 5th day of November, 2008.

JOHN HALPERN

# EXHIBIT A
# (CURRICULUM VITAE)

# TO
# AMENDED EXPERT WITNESS STATEMENT OF JOHN HALPERN, M.D.

Case No. 08-cv-03095-PA

E-filed 12/1/08

**JOHN H. HALPERN, M.D.**

Home Address:
143 Hudson Road
Stow, MA 01775-1216
Phone: (617) 283-2133
FAX: (309) 276-6231
EMAIL: john_halpern@hms.harvard.edu

Office Address:
Alcohol & Drug Abuse Research Center
McLean Hospital
115 Mill Street
Belmont, MA 02478-9106
Phone: (617) 855-3703
FAX: (617) 855-3585

**Education**

| | | |
|---|---|---|
| 1986 | | Hackley School, Tarrytown, NY. |
| 1990 | B.A. | The University of Chicago, Chicago, IL. Biological Sciences with Honors. |
| 1994 | M.D. | The State University of New York Health Science Center at Brooklyn, College of Medicine. |

**Post Graduate Training**

| | |
|---|---|
| 7/94-12/94 | Medical Internship, Carney Hospital, Boston, MA. |
| 6/94-6/98 | Psychiatry Resident, Harvard Longwood Psychiatry Residency Training Program, Boston, MA.<br>Clinical Fellow in Psychiatry, Harvard Medical School, Boston, MA. |
| 7/97-6/03 | Research Fellow, Clinical Neuroendocrinology Laboratory, Alcohol and Drug Abuse Research Center, Harvard Medical School-McLean Hospital, Belmont, MA. |
| 7/97-6/03 | Research Fellow, Biological Psychiatry Laboratory, Alcohol and Drug Abuse Research Center, Harvard Medical School-McLean Hospital, Belmont, MA. |
| 7/98-6/99 | Ethel Dupont-Warren Fellow, Harvard Medical School, Boston, MA. |

**Past Academic Position**

| | |
|---|---|
| 7/98-3/06 | Instructor in Psychiatry, Harvard Medical School, Boston, MA. |

**Current Academic Position**

| | |
|---|---|
| 4/06- | Assistant Professor of Psychiatry, Harvard Medical School, Boston, MA. |

**Current Positions**

| | |
|---|---|
| 6/03- | Associate Director of Substance Abuse Research, Biological Psychiatry Laboratory, Alcohol and Drug Abuse Research Center, McLean Hospital, Belmont, MA. |
| 8/08- | Director, Laboratory for Integrative Psychiatry, Addictions Division, McLean Hospital, Belmont, MA. |

**Current Hospital Privileges**

| | |
|---|---|
| 4/06- | Associate Psychiatrist, McLean Hospital, Belmont, MA. |
| 7/98-3/06 | Assistant Psychiatrist. |

**Awards and Grants**

| | |
|---|---|
| 1997 | APA Young Investigator Award. The 150th Annual Meeting of the American Psychiatric Association, San Diego, CA. |
| 7/97-6/98; 8/99-6/00 | National Research Service Award, National Institute on Drug Abuse, Rockville, MD. T32-DA-7252. Support for Postdoctoral Fellowship in drug abuse research, Alcohol and Drug Abuse Research Program, Alcohol and Drug Abuse Research Center, Harvard Medical School-McLean Hospital, Belmont, MA. |
| 1998 | 1998 Laughlin Fellow of The American College of Psychiatrists. |
| 7/98-6/99 | Ethel Dupont-Warren Fellowship Award, Research Committee of the Consolidated Department of Psychiatry, Harvard Medical School, Boston, MA. Support for independent Postdoctoral Fellowship, Alcohol and Drug Abuse Research Program, Alcohol and Drug Abuse Research Center, Harvard Medical School-McLean Hospital, Belmont, MA. |
| 7/98-6/99 | Peter Livingston Fellowship Award, Research Committee of the Consolidated Department of Psychiatry, Harvard Medical School, Boston, MA. |
| 7/98-6/02 | Research Grant Award. The Heffter Research Institute, Santa Fe, NM. Support for protocol "Cognitive Effects of Substance Use in Native Americans." |
| 9/00-8/04 | Mentored Patient-Oriented Research Career Development Award (K23). National Institute on Drug Abuse, Rockville, MD. K23-DA00494. Support for career development, protocol "Cognitive Effects of Substance Use in Native Americans" (use of peyote or alcohol), and protocol "Neurocognitive Consequences of Long-Term Ecstasy Use." |

| | |
|---|---|
| 9/01-2/06 | Research Grant Award. The Multidisciplinary Association for Psychedelic Studies, Sarasota, FL. Support for protocols "Cognitive Effects of Substance Use in Native Americans," "Neurocognitive Consequences of Long-Term Ecstasy Use," and "Phase II Dose-Response Pilot Study of +/-3,4-methylenedioxymethamphetamine (MDMA)-assisted Psychotherapy in Subjects with Anxiety Associated with Advanced Stage Cancer." |
| 9/04- | Original Research Grant, National Institute on Drug Abuse, Rockville, MD, 1 R01 DA017953-01A1. NIH grant support for protocol "Neurocognitive Consequences of Long-Term Ecstasy Use." |
| 2005- | Listed in Marquis' *Who's Who in America*. |
| 5/06- | Major Donation. Mr. Peter Lewis. Support for protocol "Phase II Dose-Response Pilot Study of +/-3,4-methylenedioxymethamphetamine (MDMA)-assisted Psychotherapy in Subjects with Anxiety Associated with Advanced Stage Cancer." |

**Prior Research Experience**

| | |
|---|---|
| 1989 | The University of Chicago, Chicago, IL.<br>Research Assistant under Morris Goldman, M.D. Project in self-induced water intoxication and schizophrenia. Volunteer at Illinois State Psychiatric Institute. |
| 1989-1990 | Ben May Institute, The University of Chicago, Chicago, IL.<br>Research Assistant under Jeffrey Bluestone, M.D. Project in cloning and characterization of murine T-cell receptor genes. Participated in engineering DNA constructs for injection into transgenic mice. |
| 1994 | The University of New Mexico, Albuquerque, NM.<br>Fourth year medical student Psychiatry Research Elective under Rick Strassman, M.D. Assisted in the collection of data on the dose response of the hallucinogen dimethyltryptamine (DMT) in human volunteers. |
| 7/97-6/00 | Alcohol and Drug Abuse Research Program, Alcohol and Drug Abuse Research Center, Harvard Medical School, Harvard University, McLean Hospital, Belmont, MA.<br>Research Fellowship under Jack Mendelson, M.D. Participated in projects on potential pharmacotherapy of cocaine dependency and cocaine's acute neuroendocrine and immunologic effects in humans. Separate project ran concurrently under Harrison G. Pope, Jr., M.D. on the neurocognitive effects of chronic hallucinogen use or alcoholism in a Native American population; project continued under above-noted K23 Career Development Award. |

**Publications**

**Peer Reviewed Articles**

Halpern JH. The Use of Hallucinogens in the Treatment of Addiction. *Addiction Research*, **4**(2):177-189, 1996.

Halpern JH, Pope HG Jr. Do Hallucinogens Cause Residual Neuropsychological Toxicity? *Drug and Alcohol Dependence*, **53**:247-256, 1999.

Halpern JH, Pope HG Jr. Hallucinogens on the Internet: A Vast New Source of Underground Drug Information. *American Journal of Psychiatry*, **158**(3):481-483, 2001.

Mendelson JH, Mello NK, Sholar MB, Siegel AJ, Mutschler N, Halpern J. Temporal Concordance of Cocaine Effects on Mood States and Neuroendocrine Hormones. *Psychoneuroendocrinology*, **27**:71-82, 2002.

Halpern JH, Pope HG Jr. Hallucinogen Persisting Perception Disorder: What Do We Know After 50 Years? *Drug and Alcohol Dependence*, **69**(2):109-119, 2003.

Halpern JH, Sholar MB, Glowacki J, Mello NK, Mendelson JH, Siegel AJ. Diminished Interleukin-6 Response to Pro-Inflammatory Challenge in Men and Women After I.V. Cocaine Administration. *Journal of Clinical Endocrinology and Metabolism*, **88**:1188-1193, 2003.

Duckworth K, Halpern JH, Schutt RK, Gillespie C. Use of Schizophrenia as Metaphor in U.S. Newspapers. *Psychiatric Services,* **54**:1402-1404, 2003.

Halpern JH. Hallucinogens and Dissociative Agents Naturally Growing in the United States. *Pharmacology & Therapeutics*, **102**(2):131-138, 2004.

Halpern JH, Pope HG Jr, Sherwood AR, Barry S, Hudson JI, Yurgelun-Todd D. Residual Neuropsychological Effects of Illicit 3,4-Methylenedioxymethamphetamine (MDMA) in Individuals with Minimal Exposure to Other Drugs. *Drug and Alcohol Dependence*, **75**(2):135-147, 2004.

Halpern AL, Halpern JH, Freedman AM. Now is the Time for AAPL to Demonstrate Leadership by Advocating Positions of Social Importance. *Journal of the American Academy of Psychiatry and the Law*, **32**(2):180-183, 2004.

Halpern JH, Sherwood AR, Hudson JI, Yurgelun-Todd D, Pope HG Jr. Psychological and Cognitive Effects of Long-Term Peyote Use Among Native Americans. *Biological Psychiatry*, **58**:624-631, 2005.

Halpern JH, Sewell RA. Hallucinogenic Botanicals of America: A Growing Need for Focused Drug Education and Research. *Life Sciences*, **78**(5):519-526, 2005.

Sewell R, Halpern JH, Pope HG Jr. Response of Cluster Headache to Psilocybin and LSD. *Neurology*, **66**(12):1920-1922, 2006.

Boyer EW, Babu KM, Adkins JE, McCurdy CR, Halpern JH. Self-Treatment of Opioid Withdrawal Using Kratom. *Addiction*, **103**:1048-1050, 2008.

Halpern JH, Sherwood AR, Passie T, Blackwell KC, Ruttenber AJ. Evidence of Health and Safety in American Members of a Religion Who Use a Hallucinogenic Sacrament. *Medical Science Monitor*, **14**(8):SR15-22, 2008.

Passie T, Halpern JH, Stichtenoth DO, Emrich HM, Hintzen A. The Pharmacology of Lysergic Acid Diethylamide: A Review. *CNS Neuroscience & Therapeutics*, in press.

**Invited Articles/Book Chapters**

Halpern JH. Hallucinogens, Anesthetic Agents, and Amphetamines. *Pharmaceutical News*, 7(5):21-29, 2000.

Halpern JH. Counterpoint: Addiction is a Disease. *Psychiatric Times*, **XIX**(10), 2002. http://www.psychiatrictimes.com/p0210ctpt.html

El-Mallakh RS, Halpern JH, Abraham HD. Substance Abuse: Hallucinogen- and MDMA-Related Disorders (Chapter 57). In: Tasman A, Lieberman J, Kay J, editors. *Psychiatry*. 2nd edition. London: John Wiley & Sons, pp. 1046-1065, 2003.

Halpern JH. Hallucinogens: An Update. *Current Psychiatry Reports*, **5**(5):347-354, 2003.

Sewell RA, Halpern JH. Response of Cluster Headache to LSD and Psilocybin. In: Winkelman M, Roberts T, editors. *Psychedelic Medicine: Scientific Evidence for Hallucinogenic Substances as Treatments*, Volume 1. Westport, CT and London: Praeger Publishers, pp. 97-124, 2007.

Halpern JH. Hallucinogens in the Treatment of Alcoholism and Other Addictions. In: Winkelman M, Roberts T, editors. *Psychedelic Medicine: Scientific Evidence for Hallucinogenic Substances as Treatments*, Volume 2. Westport, CT and London: Praeger Publishers, pp. 1-14, 2007.

El-Mallakh RS, Halpern JH, Abraham HD. Substance Abuse: Hallucinogen- and MDMA-Related Disorders (Chapter 60). In: Tasman A, Maj M, First MB, Kay J, Lieberman JA, editors. *Psychiatry*. 3rd edition. London: John Wiley & Sons, pp. 1100-1126, 2008.

Suzuki J, Halpern JH, Passie T, Huertas PE. Hallucinogens and Dissociative Drugs (Chapter 20). In: Cohen LM, Collins FL, Young AM, McChargue DE, Leffingwell TR, editors. *The Pharmacology and Treatment of Substance Abuse: An Evidence Based Approach*. London: Taylor & Francis, *in press*, 2009.

Halpern JH, Huertas PE, Passie T. Hallucinogens. Johnson BA, editor. *Addiction Medicine: Science and Practice*, Heidelberg: Springer-Verlag, *in press*, 2009.

Halpern JH, Huertas PE, Passie T. Hallucinogen Abuse and Dependence. Stolerman I, editor-in-chief. *Encyclopedia of Psychopharmacology*, Heidelberg: Springer-Verlag, *in press*, 2009.

**Abstracts**

Halpern, JH, Halpern, AL. Addiction treatment in the 21st Century: New Therapeutic Approaches and Their Forensic Implications. *Proceedings of the American Academy of Forensic Sciences*, **III**:179-180, 1997.

Halpern, JH, Halpern, AL. The Violence-Prone Offender in the Criminal Justice System: Prospects for Prevention and Treatment in the 21st Century. *Proceedings of the World Congress on Violence*, 84, 1998.

Halpern JH, Mendelson JH, Glowacki J, Sholar MB, Lesieur-Brooks A, Siegel AJ, Pesok AL. Diminished Cytokine IL-6 Response in Men and Women After I.V. Cocaine Administration. *NIDA Research Monograph*, **179**:46, 1998.

Mendelson JH, Sholar MB, Mello NK, Siegel AJ, Halpern JH. Cocaine Pharmacokinetics in Men and in Women During Two Phases of the Menstrual Cycle. *NIDA Research Monograph*, **179**:149, 1998.

Sholar MB, Mendelson JH, Mello NK, Siegel AJ, Halpern JH. Gender Differences in ACTH and Cortisol Responses to I.V. Cocaine Administration. *NIDA Research Monograph*, **179**:150, 1998.

Sholar MB, Mendelson JH, Mello NK, Siegel AJ, Halpern JH. ACTH, DHEA, and Cortisol Increases After 0.2 mg/kg Cocaine I.V. Administration. *NIDA Research Monograph*, **180**:207, 1999.

Halpern JH, Pope HG Jr. Hallucinogens on the Internet: A Vast Underground Psychedelic Resource. *NIDA Research Monograph*, **180**:149, 1999.

Halpern JH, Pope HG Jr, Sherwood A, Hudson JI, Yurgelun-Todd D. Neuropsychological Effects of Long-Term Hallucinogen Use in Native Americans. *Drug and Alcohol Dependence*, **63**(S1):S62, 2001.

Halpern JH, Pope HG Jr, Sherwood A, Hudson JI, Yurgelun-Todd D. Neuropsychological Effects of Long-Term Hallucinogen Use Versus Alcoholism in Native Americans: Cultural Limitations of Tests. *Drug and Alcohol Dependence*, **66**(S1):S73-S74, 2002.

Halpern JH. Residual Neuropsychological Effects of Illicit 3,4-Methylenedioxymethamphetamine (MDMA) in Individuals with Minimal Exposure to Other Drugs: Pilot Data From "Pure" Users versus Controls. *International Journal of Neuropsychopharmacology*, 7(S1):S85, 2004.

**Letters to the Editor**

Halpern JH. Involvement of Physicians in Capital Punishment. *New York State Journal of Medicine*, **91**(6):271-272, 1991.

Halpern JH. H.M.O. Gag Rules. *The New York Times*, p.A24, January 11, 1996.

Halpern JH. It's Time to Wake Up to Drug War's Failure: California's Good Sense. *The New York Times*, p.A24, November 19, 1996.

Halpern JH. Native American Rites. *The New York Times*, p.A24, December 29, 1997.

Halpern JH. Treatment of Attention-Deficit/Hyperactivity Disorder. *The Journal of the American Medical Association*, **281**(16):1491, 1999.

Halpern JH. The Census and the Question About Race. *The New York Times*, p.A22, April 25, 2000.

Halpern JH, Pope HG Jr. Drugs on the Internet (In Reply). *American Journal of Psychiatry*, **158**(12):2095, 2001.

Halpern JH: Addiction: Choice or Disease (In Reply). *Psychiatric Times*, **XX**(2):13, 2003.

Halpern JH. Iraq's Reconstruction. *The New York Times*, p.A24, December 23, 2003.

Halpern JH, Pope HG, Sherwood AR, Barry S, Hudson JI, Yurgelun-Todd DA. Reply to Lyvers and Hasking (2004) (Commentary). *Drug and Alcohol Dependence*, **75**(2):153, 2004.

**Posters / Presentations**

Halpern JH. The Use of Hallucinogens in the Treatment of Addiction. Harvard Research Day. Consolidated Department of Psychiatry, Harvard Medical School, Boston, MA, 3/14/96.

Halpern JH. The Use of Hallucinogens in the Treatment of Addiction. NEDH Scientific Symposium. New England Deaconess Hospital, Boston, MA, 5/11/96.

Halpern JH. Group Psychotherapy in the Detox Setting (Grand Rounds). Detox Unit, Dimock Community Health Center, Roxbury, MA, 1/24/97.

Halpern JH, Halpern AL. Addiction Treatment in the 21st Century: New Therapeutic Approaches and its Forensic Implications. The 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, 2/22/97.

Halpern JH, Halpern AL. Anti-craving Chemotherapy: Anticipated Boon for Courts, Corrections, and the Addict Offender. The 6th International Conference of The International Association for Forensic Psychotherapy, London, England, 4/26/97.

Halpern JH, Pope HG. Neurocognitive Deficits in a Peyote Consuming Population. The Young Investigators' Research Colloquium of the 150th Annual Meeting of the American Psychiatric Association, San Diego, CA, 5/18/97.

Halpern JH, Mendelson J, Glowacki J, Sholar M, Lesieur-Brooks A, Pesok A. Diminished Cytokine IL-6 Response in Men and Women After I.V. Cocaine Administration. Harvard Research Day. Consolidated Department of Psychiatry, Harvard Medical School, Boston, MA, 4/22/98.

Halpern JH, Mendelson JH, Glowacki J, Sholar MB, Lesieur-Brooks A, Siegel AJ, Pesok AL. Diminished Cytokine IL-6 Response in Men and Women After I.V. Cocaine Administration (oral presentation). Sixtieth Annual Scientific Meeting of the College on Problems of Drug Dependence, Scottsdale, AZ, 6/14/98.

Mendelson JH, Sholar MB, Mello NK, Siegel AJ, Halpern JH. Cocaine Pharmacokinetics in Men and in Women During Two Phases of the Menstrual Cycle. Sixtieth Annual Scientific Meeting of the College on Problems of Drug Dependence, Scottsdale, AZ, 6/14/98.

Sholar MB, Mendelson JH, Mello NK, Siegel AJ, Halpern JH. Gender Differences in ACTH and Cortisol Responses to I.V. Cocaine Administration. Sixtieth Annual Scientific Meeting of the College on Problems of Drug Dependence, Scottsdale, AZ, 6/14/98.

Halpern JH. Neurocognitive Evaluation of a Peyote Consuming Population (Grand Rounds). The Massachusetts General Hospital, Boston, MA, 4/28/99.

Halpern JH, Pope HG Jr. Hallucinogens on the Internet: A Vast Underground Psychedelic Resource. Sixty-First Annual Scientific Meeting of the College on Problems of Drug Dependence, Acapulco, Mexico, 6/15/99.

Halpern JH. Neurocognitive Effects of Chronic Hallucinogen Use (Neuroscience Seminar Series). McLean Hospital, Belmont, MA, 9/20/99.

Halpern JH. Assessment of the Neurocognitive Functioning of Long-Term Hallucinogen Users: Implications for Clinical Hallucinogen Research. Third International Congress of the European College for the Study of Consciousness, Basel, Switzerland, 11/13/99.

Halpern JH. Hallucinogens: Illicit Use, Religious Use, and American Research (Psychopharmacology Grand Rounds). McLean Hospital, Belmont, MA, 10/19/00.

Halpern JH. Controversial Drugs in Health Care (Lecture sponsored by the MCPHS Faculty Development Committee). Massachusetts College of Pharmacy and Health Sciences, Boston, MA, 11/16/00.

Halpern JH. Legal Invasion of Privacy: Psychiatrists Beware! Presented at Workshop on "The Individual versus the State: Patients' Privacy and Abuses of Psychiatry," 154th Annual Meeting of the American Psychiatric Association, New Orleans, LA, 5/8/01.

Halpern JH. Hallucinogens: Religious Use, Illicit Use, and Current Psychiatric Research. Presented at (and Co-Chair of) Workshop on "Hallucinogens: Religious Use, Illicit Use, and Current Psychiatric Research," 154th Annual Meeting of the American Psychiatric Association, New Orleans, LA, 5/10/01.

Halpern JH, Pope HG Jr. Neuropsychological Effects of Long-Term Hallucinogen Use in Native Americans (oral presentation). Sixty-Third Annual Scientific Meeting of the College on Problems of Drug Dependence, Scottsdale, AZ, 6/18/01.

Halpern JH (Co-chair). Debate: The Use of Psychedelics in Therapy. Addictions 2001 Meeting of the International Society of Addiction Medicine, Tel Aviv, Israel, 9/9/01.

Halpern JH. Neurocognitive Consequences of MDMA and Marijuana. Addictions 2001 Meeting of the International Society of Addiction Medicine, Tel Aviv, Israel, 9/10/01.

Halpern JH. Mescaline: Clinical Neurocognitive Toxicity and Treatment Profile for Severe Alcoholism. Addictions 2001 Meeting of the International Society of Addiction Medicine, Tel Aviv, Israel, 9/10/01.

Halpern JH. Ethnopharmacology of Psychedelics: From Ancient Rites to Modern Therapies. Regional Meeting of the American Chemistry Society, Cambridge, MA, 5/16/02.

Halpern JH. Lecture and Discussant. Workshop: "Youth, the Internet, and Drug Use." National Institute on Drug Abuse, Rockville, MD, 6/6/02.

Halpern JH, Pope HG Jr, Sherwood A, Hudson JI, Yurgelun-Todd D. Neuropsychological Effects of Long-Term Hallucinogen Use Versus Alcoholism in Native Americans: Cultural Limitations of Tests. Sixty-Forth Annual Scientific Meeting of the College on Problems of Drug Dependence, Quebec, Canada, 6/18/02.

Halpern JH. Lecture and Discussant. Workshop: "Psychoactive Botanical Products." Office of Dietary Supplements & National Institute on Drug Abuse, Rockville, MD, 9/9/03.

Halpern JH. Lecture and Discussant. Residual Neuropsychological Effects of Illicit 3,4-Methylenedioxymethamphetamine (MDMA) in Individuals with Minimal Exposure to Other Drugs: Pilot Data from "Pure" Users versus Controls. For symposium, "MDMA Neurotoxicity in Humans: Current Status and Future Prospects." Collegium Internationale Neuro-Psychopharmacologicum, XXIV Congress, Paris, 6/24/04.

Halpern JH. Lecture and Discussant. Workshop: "Naturceuticals (Natural Products), Nutraceuticals, Herbal Botanicals, and Psychoactives: Drug Discovery and Drug-Drug Interactions." National Institute on Drug Abuse, Baltimore, MD, 11/05/04.

Sewell RA, Halpern JH, Pope HG Jr. "The Treatment of Cluster Headaches with Indole-Ring Hallucinogens." Harvard Department of Psychiatry Research Day, Boston, MA, 3/30/05.

Halpern JH. Lecture. Hallucinogens: Neurocognitive Sequelae From Long-Term Use and the Importance of Re-Investigating Their Medico-Therapeutic Potentials. Behavioral Pharmacology Research Unit, Department of Psychiatry, Johns Hopkins School of Medicine, Johns Hopkins University, Baltimore, MD, 5/3/05.

Halpern, JH. Lecture and Panelist. Cognitive Effects of Substance Abuse in Native Americans. For the session "Advances in Clinical Neuroscience, Development, and Behavioral Treatment Research" of the conference "Bridging Science and Culture to Improve Drug Abuse Research in Minority Communities." National Institute on Drug Abuse, Atlanta, GA, 10/24/05.

Halpern JH. The Research of MDMA-Assisted Psychotherapy as a Treatment for the Clinical Anxiety of the Dying (Grand Rounds). McLean Hospital, Belmont, MA, 11/03/05.

Sewell RA, Halpern JH. Response of Cluster Headache to LSD and Psilocybin. 17th Annual Meeting of the American Neuropsychiatric Association, 2/21/06.

Halpern JH. Hallucinogens: Harms, Potentials, and Religious Users. 4th Annual Symposium, "Current Trends in Drug Abuse Research." The Center for Drug Discovery, Northeastern University, Boston, MA 4/12/06.

Sewell RA, Halpern JH. Response of Cluster Headache to LSD and Psilocybin. 114th Annual Meeting of the American Psychiatric Association, 5/21/06.

Halpern JH. Advances in the Treatment of Alcohol and Drug Addiction. American Conference on Psychiatric Disorders, New York, NY, 6/24/06.

Halpern JH. Ecstatic States in Psychotherapy and Their Relevance for Mental Health. International Congress on Ecstatic States: Phenomenon, Experience, Healing. Hannover Medical School, Hannover, Germany, 5/24/2008.

Halpern JH. Update on Therapeutic Research of Hallucinogens (Invited Lecture). Department for Psychiatry, Social Psychiatry and Psychotherapy, Hannover Medical School, Hannover, Germany, 5/28/2008.

Halpern JH, Sherwood A, Passie T, Ruttenber J. Use of a Hallucinogenic Sacrament by American Members of the Santo Daime Church: Evidence of Safety (Poster). Seventy-First Annual Scientific Meeting of the College on Problems of Drug Dependence, San Juan, PR, 6/17/08.

**Peer Review Services**

| | |
|---|---|
| 1999 | *The Oxford Handbook of Clinical Medicine: American Edition*. Oxford University Press, Inc., 1999 (ISBN: 019512572X). |
| 2002 | *American Journal of Psychiatry* |
| 2003 | *Archives of General Psychiatry*<br>*Drug and Alcohol Dependence*<br>*Journal of Clinical Psychiatry*<br>*Social Science & Medicine* |
| 2004 | *American Journal of Psychiatry*<br>*Drug and Alcohol Dependence*<br>*Journal of Clinical Psychiatry*<br>*Primary Psychiatry* |
| 2005 | *American Journal of Psychiatry*<br>*Cognitive and Behavioral Neurology*<br>*Drug and Alcohol Dependence*<br>*Experimental & Clinical Psychopharmacology*<br>*Forensic Science International*<br>*Journal of Clinical Psychiatry* |
| 2006 | *Archives of General Psychiatry*<br>*Drug and Alcohol Dependence*<br>*Evidence Based Complementary and Alternative Medicine*<br>*Experimental & Clinical Psychopharmacology*<br>*Journal of Clinical Psychiatry*<br>*Substance Abuse Treatment, Prevention, and Policy* |
| 2007 | *Drug and Alcohol Dependence*<br>*Experimental & Clinical Psychopharmacology*<br>*Forensic Science International*<br><br>*Journal of Clinical Psychiatry*<br>*Journal of Psychopharmacology* |

| | |
|---|---|
| | *Journal of Psychosomatic Research* |
| | *Pharmacological Research* |
| | *Philosophy, Ethics, and Humanities in Medicine* |
| 2008 | *Biological Psychiatry* |
| | *Journal of Psychopharmacology* |
| | *Journal of Psychosomatic Research* |

**Dissertation Committee**

| | |
|---|---|
| 2006 | "Metamemory, Memory and Executive Function in Recreational Ecstasy-Polydrug Users." Gill Inder Bedi, Ph.D. Candidate, Monash University, Melbourne, Australia. |

**NIH Review Services**

| | |
|---|---|
| 11/04/05 | Member, Center for Scientific Review Special Emphasis Panel, ZRG1 BBBP-D (03): Drug Effects on Biobehavioral Regulation. |
| 6/04/07 | Reviewer, NIDA Small Business Innovative Research (SBIR) project, "Discovery and Study of Psychoactive Components of Botanicals." |
| 10/20-21/08 | Member, Center for Scientific Review Special Emphasis Panel, 2009/01 ZRG1 DIG-A (50)R: Native American Research Centers for Health. |

**Editorial Board**

| | |
|---|---|
| 2005- | *American Psychiatry News* (formerly *CNS News*) |
| 2008- | *ISL-Psychiatry Research*, Editor-in-Chief. (1st |

**Organizations**

| | |
|---|---|
| 1990-2006 | Member, American Medical Association. |
| 1990- | Member, *Sigma Xi*. |
| 1990-1995 | Member, Medical Society of The State of New York. |
| 1992-1995 | Member, Drug Abuse Committee. |
| 1995- | Member, American Psychiatric Association. |
| 2006-2009 | Member, Committee on Training and Education in Addiction Psychiatry |
| 1995- | Member, Massachusetts Psychiatric Society. |
| 1995-2001 | Special Consultant, Heffter Research Institute. |
| 1996- | Member, Massachusetts Medical Society. |
| 1997-2001 | Fellow, Boston Medical Library. |
| 1997- | Member, American Academy of Forensic Sciences. |
| 2003- | Member, Psychiatry & Behavioral Science Section Task Force on Addiction. |
| 2001- | Member, American Academy of Psychiatry and the Law. |
| 2004- | Member, American College of Psychiatrists. |
| 2007- | Regular Member, College on Problems of Drug Dependence |
| 2008- | Member, Underrepresented Populations Committee |

**Licensure**

| | |
|---|---|
| 1995 | Diplomate, National Board of Medical Examiners (USMLE). |
| 1996- | Medical License, Board of Registration in Medicine, Commonwealth of Massachusetts (#150283). |
| 1997- | DEA II-V Registration (#BH4926878) |
| 1999- | Diplomate, American Board of Psychiatry and Neurology (Board Certification # 46440) |
| 2004- | DEA Buprenorphine Registration (#XH4926878) |

**Expert Witness Testimony**

| | |
|---|---|
| 2000 | State of Florida v. Valessa Robinson. Case No. 98-11873. Murder case involving hallucinogen intoxication. |
| 2002 | State of Michigan, in the Circuit Court for the County of Newaygo, Family Division. Case No. 98-000744-DM; In the Matter of Fowler v. Fowler. Family Court hearing involving Native American parental rights to include a child in peyote prayer services of the Native American Church. |

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing AMENDED EXPERT WITNESS STATEMENT OF DR. JOHN HALPERN on:

Eric Joseph Beane / Brigham J. Bowen / Julie Straus / Lily Farel
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883, Room 7124
Washington, DC 20044
Attorneys for Defendants

☐ by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to each attorney's last-known address and depositing in the U.S. mail at Portland, Oregon on the date set forth below;

☐ by causing a copy thereof to be hand-delivered to said attorneys at each attorney's last-known office address on the date set forth below;

☐ by sending a copy thereof via overnight courier in a sealed, prepaid envelope, addressed to each attorney's last-known address on the date set forth below;

☐ by faxing a copy thereof to each attorney's last-known facsimile number on the date set forth below; or

☑ by filing electronically via the court's CM/ECF system.

DATED this 1st day of ~~November~~ December, 2008.

ROY S. HABER, P.C.

By ______________________
Roy S. Haber
OSB No. 800501
Direct Dial: 541.485.6418
Direct Fax: 541.434.6360
Email: haberpc@cyber-dyne.com

TONKON TORP LLP

By [signature]
Don H. Marmaduke
OSB No. 530727
Direct Dial: 503.802.2003
Direct Fax: 503.972.2003
Email: don.marmaduke@tonkon.com
Attorneys for Plaintiffs

034557\00001\1263581 V001

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 11



Check for updates

*Original Paper*

*Journal of Psychopharmacology*
2020, Vol. 34(9) 1008–1020
© The Author(s) 2020

Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/0269881120916143
journals.sagepub.com/home/jop

# Survey of entity encounter experiences occasioned by inhaled *N,N*-dimethyltryptamine: Phenomenology, interpretation, and enduring effects

**Alan K Davis[1,2], John M Clifton[1,3], Eric G Weaver[1], Ethan S Hurwitz[4], Matthew W Johnson[1] and Roland R Griffiths[1,5]**

**Abstract**

**Background:** Experiences of having an encounter with seemingly autonomous entities are sometimes reported after inhaling *N,N*-dimethyltryptamine.

**Aim:** The study characterized the subjective phenomena, interpretation, and persisting changes that people attribute to *N,N*-dimethyltryptamine-occasioned entity encounter experiences.

**Methods:** Two thousand, five hundred and sixty-one individuals (mean age 32 years; 77% male) completed an online survey about their single most memorable entity encounter after taking *N,N*-dimethyltryptamine.

**Results:** Respondents reported the primary senses involved in the encounter were visual and extrasensory (e.g. telepathic). The most common descriptive labels for the entity were being, guide, spirit, alien, and helper. Although 41% of respondents reported fear during the encounter, the most prominent emotions both in the respondent and attributed to the entity were love, kindness, and joy. Most respondents endorsed that the entity had the attributes of being conscious, intelligent, and benevolent, existed in some real but different dimension of reality, and continued to exist after the encounter. Respondents endorsed receiving a message (69%) or a prediction about the future (19%) from the experience. More than half of those who identified as atheist before the experience no longer identified as atheist afterwards. The experiences were rated as among the most meaningful, spiritual, and psychologically insightful lifetime experiences, with persisting positive changes in life satisfaction, purpose, and meaning attributed to the experiences.

**Conclusion:** *N,N*-dimethyltryptamine-occasioned entity encounter experiences have many similarities to non-drug entity encounter experiences such as those described in religious, alien abduction, and near-death contexts. Aspects of the experience and its interpretation produced profound and enduring ontological changes in worldview.

**Keywords**

Psychedelic, *N,N*-dimethyltryptamine, survey, entity encounter, subjective effects

## Introduction

*N,N*-dimethyltryptamine (DMT), which occurs naturally in a variety of animal and plant species (Halpern, 2004) can produce intense subjective effects, including vivid mental imagery, perceptual and time distortions, changes in thought patterns, and heightened emotional states (Carbonaro and Gatch, 2016; Szára, 1957). When administered via intravenous injection or inhalation, DMT has a very rapid onset and short duration of action, with peak effects occurring within 5 min and resolving within 30 min due to its rapid metabolism (Acosta-Urquidi, 2015; Carbonaro and Gatch, 2016; Strassman et al., 1994; Strassman, 1996; Timmermann et al., 2019). When taken orally with a monoamine oxidase inhibitor, as prepared in the plant admixture ayahuasca, the onset of effects is delayed and the duration may be several hours (Domínguez-Clavé et al., 2016; Riba et al., 2003). Similar to other classic psychedelics, DMT is a Schedule I compound in the US Controlled Substance Act of 1970 with no accepted medical use (Drug Enforcement Administration, 1970).

The neuropharmacological mechanisms of action mediating the effects of DMT are varied and complex, with a primary role for serotonin 2A receptors. However, DMT also has effects elsewhere, including other serotonergic and glutaminergic receptors, trace-amine associated receptors, sigma-1 receptors, with additional

[1]Department of Psychiatry and Behavioral Sciences, Johns Hopkins School of Medicine, Baltimore, USA
[2]College of Social Work, The Ohio State University, Columbus, USA
[3]University of Maryland School of Medicine, Baltimore, USA
[4]Department of Psychology, University of California San Diego, La Jolla, USA
[5]Department of Neuroscience, Johns Hopkins School of Medicine, Baltimore, USA

**Corresponding author:**
Roland Griffiths, Department of Psychiatry, Center for Psychedelic and Consciousness Research, Johns Hopkins School of Medicine, 5510 Nathan Shock Drive, Baltimore, MD 21224, USA.
Email: rgriff@jhmi.edu

interactions with dopamine and acetylcholine functioning (Barker, 2018; Carbonaro and Gatch, 2016; Ray, 2010). A recent placebo-controlled trial examining administration of intravenous DMT (Timmermann et al., 2019) on electroencephalogram (EEG) in humans showed that substantial decreases in total spectral power in alpha and beta bands co-occurring with substantial increases in spontaneous signal diversity and the emergence of delta and theta oscillations during peak effects. Interestingly, these changes in brain activity covaried with the subjective experiences reported by participants, as was observed in an uncontrolled observation of inhaled DMT effects on EEG (Acosta-Urquidi, 2015).

It has been speculated that due to the endogenous presence of DMT in the mammalian brain, including humans (Christian et al., 1977; Dean et al., 2019), DMT may play a role in a variety of non-ordinary states of consciousness such as dreaming, psychosis, spiritual experiences, encounters with non-human intelligence (e.g. alien and unidentified flying object (UFO) encounters), extrasensory perception, out-of-body experiences, and near-death experiences (Gallimore 2013; Grammenos and Barker, 2015; Luke, 2008, 2011, 2012; St. John, 2016, 2018; Strassman, 2001, 2008; Timmermann et al., 2018). However, it is not clear that DMT occurs endogenously in sufficient concentrations to produce pharmacological effects (Barker, 2018; Nichols, 2018).

Although there are numerous anecdotal reports of vaporized or smoked DMT use (e.g. dmt-nexus.me; erowid.org; Luke and Spowers, 2018), empirical research detailing prevalence, patterns of use, and other characteristics of such DMT use is scarce. Drug use data from a US nationally representative survey in 2013/2014 (Palamar and Le, 2018) indicated that DMT, 5-Methoxy-N,N-diisopropyltryptamine (5-MeO-DIPT), and/or alpha-methyl-tryptamine use are rare (0.7%). Other survey data indicate that the desirable features of smoked DMT include meaningful, insightful or spiritual experiences, the short duration of action, and pleasurable feelings (Cakic et al., 2010; Winstock et al., 2014). A structured qualitative thematic analysis of DMT effects in 19 self-selected users revealed nine themes of the DMT experience including: hallucinations, lucidity, affective distortions, ineffability, extreme intensity, spirituality, distortion in sense of space-time and self, a sense of familiarity, and reports of entering other realities that were sometimes inhabited by other sentient beings (Cott and Rock, 2008). One recent study provided detailed descriptions of experiences of 606 individuals who reported experiences of an encounter with God, ultimate reality, higher power, or an emissary of God after using smoked or vaporized DMT (Griffiths et al., 2019).

Among the most vivid, intriguing, memorable, and sometimes disconcerting experiences that people report after taking a high dose of inhaled or intravenous DMT are those of encountering seemingly autonomous entities or beings (Luke, 2011; Luke and Spowers, 2018; Meyer, 2006; Strassman 2001, 2008). Although description of the nature of the entities, details of the experiences, and meaning attributed to the experiences vary widely, such experiences are apparently not infrequent. Strassman (2008) estimated that at least half of the participants in his studies of high doses of intravenous DMT reported experiences of journeys to invisible or alternative worlds, and that contact with alien beings or entities were a variant of this category.

The present study was undertaken to advance our understanding of DMT-occasioned experiences that are interpreted as an encounter with a seemingly autonomous being or entity. This study was an Internet survey of a large international sample of individuals who reported having had such an experience after having taken a "breakthrough" dose of vaporized or smoked DMT. Detailed questions were asked to characterize participant demographics and the subjective phenomena, interpretation, and persisting changes that people attributed to their single most memorable experience.

## Method

### Procedure

This study was an anonymous Internet-based survey of individuals who reported having had an experience of having an encounter with a seemingly autonomous being or entity after taking DMT. Respondents were recruited by postings on several websites (e.g. motherboard.com, facebook.com, reddit.com, dmt-nexus.me, bluelight.org, drugs-forum.com), and by sending email announcements. Each advertisement included a hyperlink that directed potential respondents to a secure Web-based survey (hosted by Qualtrics; the full survey is available in the online Supplemental Material). Each person who clicked a study link was presented with a consent document that provided details about the inclusion criteria. Eligible study participants had to endorse being at least 18 years old, being able to read, write and speak fluent English, having taken a "breakthrough" dose of DMT ("that is, one that produced very strong psychoactive effects"), and that they had an experience of encountering a seemingly autonomous being or entity after consuming DMT. Eligible respondents were presented with the survey. The study was approved by the Institutional Review Board at Johns Hopkins University School of Medicine.

### Study recruitment flow

Respondents were recruited from February to December 2018. A total of 20,340 people clicked an advertisement link to read more details about the study. Of those, 10,308 consented to participate. Of those who consented, 1129 were excluded because they: reported that they had previously completed the questionnaire (150 individuals), were younger than 18 years old (50), were not fluent in English (103), had no prior breakthrough experience with DMT (342), or had not encountered a seemingly autonomous being or entity (484). Of the remaining 9179 who were eligible for the study, 4610 completed the survey and reported at the end of the survey that they believed their responses were accurate. Of these, 1839 were excluded from analysis because: they reported that they: had a prior diagnosis of a psychotic disorder (103), had consumed other substances which may have affected their DMT experience (1279), or had administered DMT via a route other than smoking or vaporizing (e.g. oral, intranasal, intravenous; 457).

The remaining 2771 respondents were included in the process of assessing data quality, which included a review of IP addresses, a qualitative review of open-ended responses, and examining completion times. Duplicate internet protocol (IP) addresses were identified in 34 surveys, which were excluded. Of the remaining 2737, a qualitative review process identified an additional 176 respondents to be excluded from analyses (63 who revealed they had used multiple substances but did not report this when asked via other questions in the survey), or had used a psychoactive substance other than DMT (e.g. alcohol, cannabis), 36 who reported using changa (i.e. a smokable admixture of plants containing

DMT and a monoamine oxidase inhibitor; St. John, 2017), 37 who appeared to be a poor responder (e.g. responses suggested that they were not attending to question content), and 40 with some combination of these various indicators. We also examined completion time to rule out fast responding. Mean completion time was 39 min. No respondents were removed for fast responding. The final sample consisted of 2561 respondents.

### Entity survey

The questionnaire (Supplemental Material) was modified from that used to assess God encounter experiences in non-drug and psychedelic drug users (Griffiths et al., 2019). After completion of demographic information, respondents were asked to bring to mind their experience of encountering a seemingly autonomous being or entity after taking DMT. They were instructed that if they had multiple such experiences, they should answer the questionnaire only with respect to their single most memorable experience. The respondents provided a brief written description of the experience and then answered a series of questions about various aspects of the experience and their interpretation of the experience. Details of questionnaire items are provided in the Results section. Briefly, respondents answered questions about descriptive details of the encounter experience (e.g. senses involved, type of communication, best descriptive labels to describe the entity, respondent and entity emotions during the encounter). Other questions probed details of the interpretation of the experience having metaphysical implications (e.g. did the entity exist in some real but different dimension; did the experience alter their fundamental conception of reality; was the entity intelligent, conscious, or sacred; did identification as atheist or agnostic change after the experience). Questions also asked respondents to compare the experience on several dimensions (e.g. personal meaning, psychological insight) to other lifetime experiences and to rate various persisting changes attributed to the experience (e.g. well-being, life's purpose). Respondents were asked to provide open-ended written responses to questions about whether they received a message, task, or prediction about the future from their entity encounter experience.

### Data analyses

*Analytic plan.* Quantitative analyses included frequency counts and descriptive calculations for all questionnaire responses. For religious orientation data, comparison of changes in religious orientation before and after the encounter experience, $z$-tests of dependent proportions were used. Bonferroni corrections were used to control for Type I error rate. Results were considered significant when the adjusted $p<0.05$. Analyses were conducted in SPSS v25 (IBM Corp., 2018). A qualitative analysis was also conducted for the open-ended text box responses to questions about entity encounter experiences: (a) messages, tasks, missions, purposes, or insights, and (b) predictions about the future that were ascertained during the entity encounter. This qualitative approach included a content analysis (Casterlé et al., 2012; Miles and Huberman, 1994), in which each respondent's written text was reviewed to create a list of themes. This process began with the preparation for coding process described by Casterlé et al. (2012), which included reading all open-ended responses, generating a list of potential themes, and refining themes in an iterative process when they were not initially supported by further review of responses. The next stage was the actual coding process, in which a list of themes was used for each open-ended question and each theme was assigned a numerical code (e.g. 1, 2, 3, 4, 5, etc.) so that links could be made between a respondent comment and the associated theme. The number of responses that were coded into each theme within each open-ended question were then calculated as a proportion of responses out of the total sample. After this process was completed, a random selection of 20% of responses from each open-ended item were then coded independently by an author previously not involved in coding to assess interrater reliability. Rates of agreement were high (95% for prediction themes, and 94% overall for message, task, mission, purpose, or insight themes). All qualitative analyses were conducted by the first three study authors (AKD, JMC, and EGW).

## Results

### Respondent characteristics

As Table 1 shows, most of the sample ($n$=2561) reported they were male (77%), Caucasian/white (85%), never married (52%), earned US$35,000 or more in income (52%), and lived in the USA (64%). Average age in the sample was 31.9 (standard deviation (SD)=9.1). Respondents had used DMT an average of 14.5 times (SD=22.9) in their lifetime (Table 2). For most participants (67%) the most memorable entity encounter, which was described in the survey, was their first entity encounter experience with DMT. However, 56% reported having had other such DMT-associated entity encounters either before or after the experience they described in the survey. Of those who had such experiences in the past, this had occurred a median of three ($n$=849) times before and three ($n$=1105) times after the reported most memorable experience.

### Details of the most memorable entity encounter

As shown in Table 3, 21% of respondents went into the experience with the intention of having an encounter experience, with most (69%) reporting that the entity initiated the encounter. The primary senses involved in the encounter were visual (92%), extrasensory (e.g. telepathic; 85%), auditory (54%), and touch (34%), with less than 10% reporting taste or smell. Most respondents indicated that some form of communication occurred in the encounter, with 49% reporting the communication was one-way (from entity to respondent) and 40% two-way. Very few (2%) respondents reported one-way (respondent to entity) communication.

Table 3 also shows that respondents selected a variety of descriptive labels for the entity. The most commonly endorsed were "being," (60%) "guide," (43%) "spirit," (39%) "alien," (39%) or "helper" (34%). Other labels selected by small proportions of respondents (range 10–16%), included the terms "angel," "elf," "religious personage," or "plant spirit," and very few (range 1–5%) reporting the terms "gnome," "monster," or a "deceased" person. Most respondents reported having had an emotional response to the experience (99%). Respondents reported experiencing joy (65%), trust (63%), surprise (61%), love (59%), kindness (56%), friendship (48%), and fear (41%) during the encounter

**Table 1.** Demographic characteristics of the sample (*n*=2561).[a]

| | |
|---|---|
| **Current age in years** (mean, SD) | 31.9 (9.1) |
| **Age at time of experience** (mean, SD) | 27.3 (7.9) |
| **Male sex** (%) | 77% |
| **Race** (%) | |
| Caucasian/White | 85% |
| Mixed race | 10% |
| Asian | 2% |
| Black/African American | 1% |
| Native American | 1% |
| Native Hawaiian or Pacific Islander | 1% |
| **Hispanic** (%) | 10% |
| **Marital/partner status** (%) | |
| Never married | 52% |
| Married and living with spouse | 15% |
| Living with partner | 25% |
| Divorced/separated | 7% |
| Widowed | 1% |
| **USA resident** (%) | 64% |
| **Education** (%) | |
| High school/GED or below | 17% |
| Some college, no degree | 30% |
| Trade school/associates degree | 17% |
| Bachelor's degree | 26% |
| Advanced professional/graduate degree | 11% |
| **Income** (%) | |
| Under US$25,000 | 29% |
| US$25,000-US$34,999 | 18% |
| US$35,000-US$49,999 | 15% |
| US$50,000-US$74,999 | 15% |
| US$75,000-US$99,999 | 8% |
| More than US$100,000 | 14% |

SD: standard deviation.
[a]Dichotomous data are the percentage of the total sample (*n*=2561). Continuous data are means and standard deviations.

**Table 2.** History of *N,N*-dimethyltryptamine (DMT) use and entity encounter experiences (*n*=2561).

| | |
|---|---|
| **Lifetime uses of DMT** (median, *n*=2561)[a] | 6 |
| **DMT entity encounter BEFORE the current experience**[b] | 33% |
| If yes, number of times encountered entities after consuming DMT before the current experience? (median, *n*=849)[c] | 3 |
| **DMT entity encounter AFTER the current experience**[b] | 46% |
| If yes, number of times encountering entities after this experience? (median, *n*=1105)[c] | 3 |
| **DMT entity encounter either before or after the current experience**[b] | 56% |

[a]Lifetime DMT use is median; response options were on a scale from 0–101+.
[b]Percentage of the total sample (*n*=2561).
[c]Number of DMT entity encounter experiences before and after the current experience are medians.

experience, with smaller proportions reporting emotions such as sadness (13%), distrust (10%), disgust (4%), or anger (3%). In another question, respondents reported that love (21%) was the single most prominent emotion experienced during the encounter.

**Table 3.** Descriptions of the entity encounter experiences (*n*=2561).[a]

| | |
|---|---|
| **Respondent had the intention to encounter entity** | 21% |
| **Who initiated the encounter** | |
| Entity initiated the encounter | 69% |
| Participant initiated the encounter | 7% |
| **Senses involved in interaction** (could select all that apply) | |
| Vision | 92% |
| Hearing | 54% |
| Touch | 34% |
| Taste | 6% |
| Smell | 9% |
| Extrasensory (e.g. telepathically) | 85% |
| **There was communication with the entity (1 -way or 2-way)** | 84% |
| **Type of communication (2-way vs 1-way)**[b] | |
| Communication was a 2-way exchange | 40% |
| Communication was a 1-way exchange (from it to you) | 49% |
| Communication was a 1-way exchange (from you to it) | 2% |
| **Mode of communication with the entity** (could select all that apply) | |
| Communication was verbally (spoken language) | 26% |
| Communication was visually (gestures) | 40% |
| Communication was by touch (somatic/kinesthetic) | 17% |
| Communication was extrasensory (telepathy) | 74% |
| Communication was via some other mode | 9% |
| **Descriptive labels for entity** (could select all that apply) | |
| Being | 60% |
| Guide | 43% |
| Spirit | 39% |
| Alien | 39% |
| Helper | 34% |
| Angel | 16% |
| Elf | 14% |
| Religious personage | 11% |
| Plant spirit | 10% |
| Fairy | 8% |
| Chemical spirit | 8% |
| Animal spirit | 7% |
| Clown | 6% |
| Demon | 6% |
| Gnome | 5% |
| Monster | 3% |
| Deceased family member | 2% |
| Devil | 2% |
| Unknown deceased person | 2% |
| Deceased friend | 1% |
| Other | 29% |
| **Respondent had emotional response during encounter** | 99% |
| **Respondent emotions during encounter** (could select all that apply) | |
| Joy | 65% |
| Trust | 63% |
| Surprise | 61% |
| Love | 59% |
| Kindness | 56% |
| Friendship | 48% |
| Fear | 41% |
| Sadness | 13% |

*(Continued)*

**Table 3.** (Continued)

| | |
|---|---|
| Distrust | 10% |
| Unreactive | 5% |
| Disgust | 4% |
| Anger | 3% |
| **Respondent emotions during encounter (most prominent)** | |
| Love | 21% |
| Surprise | 16% |
| Trust | 12% |
| Joy | 9% |
| Fear | 7% |
| Kindness | 4% |
| Friendship | 3% |
| Unreactive | 1% |
| Sadness | 1% |
| Distrust | 1% |
| Anger | <1% |
| Disgust | <1% |
| **Entity seemed to have an emotional response during encounter** | 58% |
| **Entity emotions during encounter (most prominent emotion)** | |
| Love | 17% |
| Kindness | 11% |
| Joy | 10% |
| Friendship | 8% |
| Unreactive | 7% |
| Surprise | 6% |
| Trust | 6% |
| Anger | 2% |
| Fear | 1% |
| Distrust | 1% |
| Disgust | 1% |
| Sadness | <1% |

[a]Dichotomous data are the percentage of the total sample ($n$=2561).
[b]This survey question was separate from the preceding question. Differences in the total percentage of the total sample endorsing the response options reflect actual survey data.

Over one-half (58%) reported that the entity also had an emotional reaction to the encounter. The single most prominent emotion that the entity appeared to have was love (17%), kindness (11%), or joy (10%), with low rates (⩽2%) of emotions with a negative valence (e.g. anger, fear, distrust, disgust, sadness).

### *Additional details of the most memorable encounter experience and its interpretation having metaphysical implications*

Additional details about the interpretation of the encounter experience are shown in Table 4. The low mean respondent rating of familiarity of the experience (1.2) indicates that the average experience was quite unfamiliar (0="None; Not at all"; 1="So slight I cannot decide"; 2="Slight"). Yet, the mean rating of clarity of memories of the experience (59.9) indicated that these memories were between "clear" and "very clear." Respondent ratings also indicated that the entity encounter seemed more real than normal reality during (81%) and after (65%) the encounter. From their current perspective, three-quarters of respondents reported that the entity existed in some real but different dimension or reality (49%) or in a combination of some real but different dimension or reality *and* in normal everyday physical reality (26%). A minority of respondents (9%) reported that the entity existed "completely within myself," or that the entity existed *only* in normal reality (1%). Most respondents (72%) endorsed believing that the entity continued to exist after their encounter, and that the experience altered the respondent's fundamental conception of reality (80%). Sixty percent of the whole sample indicated that the experience produced a desirable alteration in their conception of reality whereas only 1% indicated an undesirable alteration in their conception of reality.

When asked about the attributes of the entity, a majority of the sample reported that the entity was conscious (96%), intelligent (96%), benevolent (78%), sacred (70%), had agency in the world (54%), and was positively judgmental (52%). Fewer reported that the entity was petitionable (23%), negatively judgmental (16%), or malicious (11%).

Approximately one-quarter of the sample reported that they were atheist (28%) and one-quarter reported they were agnostic (27%) before the entity encounter, but significantly smaller proportions reported they were atheist (10%) or agnostic (16%) after the encounter (pre-post change $p$ values $<0.001$). Additionally, approximately one-third (36%) of respondents reported that before the encounter their belief system included a belief in ultimate reality, higher power, God, or universal divinity, but a significantly larger percentage (58%) of respondents reported this belief system after the encounter ($p<0.001$).

### *Comparison to other lifetime experiences and persisting changes attributed to the experience*

Over one-half (range 54–65%) of the sample reported that the entity encounter was one of the top five or single most personally meaningful, spiritually significant, or psychologically insightful experiences of their lives (Table 5). Approximately one-third (32%) reported that the encounter was one of the top five or single most psychologically challenging lifetime experiences. Table 5 also shows that most respondents reported persisting positive and desirable changes that they attributed to the encounter experience, including well-being and life satisfaction (89%), life's purpose (82%), life's meaning (81%), social relationships (70%), attitudes about life (88%) and self (84%), mood (67%), and behavior (71%). In contrast, only 1–5% of the sample reported any negative and undesirable changes in the above domains of functioning.

### *Ascertaining a message and predictions about the future*

Sixty-nine percent of respondents ($n$=1773/2561) endorsed that they ascertained a message, task, mission, purpose, or insight as part of their most memorable entity encounter experience. As Table 6 shows, themes in order of descending prevalence (out of the total sample) included "Idiosyncratic information" (27%), "Personal insight" (22%), "Love" (16%), "Task" (11%), "Safety/reassurance" (10%), "Interconnectedness" (7%), "Death" (7%), "Knowledge"

**Table 4.** Additional details of the encounter experience and its interpretation having metaphysical implications ($n$=2561).[a]

| | |
|---|---|
| **Clarity of memories of the experience** (mean, (SD), rated from 0–100)[b] | 59.9 (31.6) |
| **Familiarity of the experience** (mean, (SD), rated from 0–4)[c] | 1.2 (1.4) |
| **How real was the experience compared to normal everyday waking consciousness?** (rated from 0–100)[d] | |
| How real at time of encounter (mean, (SD)) | 77.3 (29.7) |
| How real after the encounter (mean, (SD)) | 63.2 (34.4) |
| **The experience was more real than everyday waking consciousness (as it felt DURING the experience)** | 81% |
| **The experience was more real than everyday waking consciousness (as it feels now, AFTER the experience)** | 65% |
| **From your current perspective, where did the entity exist?** | |
| In normal everyday physical reality | 1% |
| In some real but different dimension or reality | 49% |
| Both 1 and 2 above | 26% |
| Completely within myself | 9% |
| Other | 15% |
| **The entity continued to exist after the encounter** (%) | 72% |
| **The experience has altered your fundamental conception of reality** (%) | 80% |
| **The experience has produced a desirable alteration in your fundamental conception of reality** (%) | 60% |
| **The experience has produced an undesirable alteration in your fundamental conception of reality** (%) | 1% |
| **The experience has produced neither a desirable nor undesirable alteration in your fundamental conception of reality** (%) | 19% |
| **Attributes to that which was encountered**[e] | |
| Conscious (i.e. self-aware) | 96% |
| Intelligent | 96% |
| Benevolent | 78% |
| Sacred | 70% |
| Had agency in the world (e.g. it could affect outcomes, events or material objects in this reality | 54% |
| Positively judgmental | 52% |
| Eternal | 42% |
| All-knowing | 38% |
| Petition-able (e.g. in response to prayer or petition, it might change events or circumstances) | 23% |
| Negatively judgmental | 16% |
| Malicious | 11% |
| **Religious identification before and after the encounter**[e] | |
| *Identification as atheist* | |
| Before the encounter | 28% |
| After the encounter | 10%[f] |
| *Identification as agnostic* | |
| Before the encounter | 27% |
| After the encounter | 16%[f] |
| *Identification as belief in ultimate reality, higher power, God, or universal divinity* | |
| Before the encounter | 36% |
| After the encounter | 58%[f] |
| *Identification as "Other"* | |
| Before the encounter | 9% |
| After the encounter | 16%[f] |

SD: standard deviation.
[a]Dichotomous data are the percentage of the total sample ($n$=2561). Continuous data are means and SDs.
[b]Response options were on a scale from 0="not very clear" to 100="completely clear".
[c]Ratings were on five-point scale and include response options 0="not at all familiar", 1="so slight I cannot decide" to 4="completely familiar".
[d]Scale anchors: 0=superficial dreamlike; 50=reality similar to everyday normal consciousness; 100=more real than everyday normal reality.
[e]Percentage of the total sample that rated the attribute descriptor as moderately or moderate, very or a lot, completely or complete.
[f]"After the encounter" values are significantly different ($p<0.001$) from the "before the encounter" values using a $z$-test for dependent proportions with a Bonferroni-corrected alpha.

(6%), "Greeting, valediction, or reprimand" (4%), "Prediction" (4%), "Divinity" (3%), and "Veridicality of DMT space" (2%).

In a second open-ended question, 19% of respondents ($n$=484/2561) reported that they received a prediction about the future during their most memorable entity encounter experience. As Table 7 shows, themes in order of descending prevalence (out of the total sample) included "Personal life event" (6%), "Transpersonal, interdimensional, or extraterrestrial event" (2%),

**Table 5.** Comparison of encounter experience to other lifetime experiences and persisting changes attributed to the encounter experience (*n*=2561).[a]

| | |
|---|---|
| **Comparison to other lifetime experiences** | |
| *Rating relative to other lifetime experiences (ratings from 1–8, mean, (SD))*[b] | |
| Personally meaningful | 6.3 (1.4) |
| Spiritually significant | 6.5 (1.7) |
| Psychologically insightful | 6.0 (1.9) |
| Psychologically challenging | 4.6 (2.5) |
| *Percentage rating the item as among the top 5 or single most of lifetime* | |
| Personally meaningful | 55% |
| Spiritually significant | 65% |
| Psychologically insightful | 54% |
| Psychologically challenging | 32% |
| *Percentage rating the item single most of lifetime* | |
| Personally meaningful | 16% |
| Spiritually significant | 31% |
| Psychologically insightful | 20% |
| Psychologically challenging | 11% |
| **Persisting changes attributed to the encounter experience** | |
| *Ratings of change from −3 to +3, mean, (SD)*[c] | |
| Personal sense of well-being or life-satisfaction | 2.0 (1.1) |
| Your life's purpose | 1.8 (1.2) |
| Your life's meaning | 1.8 (1.2) |
| Your social relationships | 1.4 (1.3) |
| Your attitudes about life | 2.0 (1.1) |
| Your attitudes about self | 1.9 (1.2) |
| Your mood | 1.4 (1.3) |
| Your behavior | 1.4 (1.2) |
| How spiritual you are | 1.8 (1.2) |
| Your attitudes about death | 1.8 (1.3) |
| *Percentage rating positive desirable change*[d] | |
| Personal sense of well-being or life-satisfaction | 89% |
| Your life's purpose | 82% |
| Your life's meaning | 81% |
| Your social relationships | 70% |
| Your attitudes about life | 88% |
| Your attitudes about self | 84% |
| Your mood | 67% |
| Your behavior | 71% |
| How spiritual you are | 80% |
| Your attitudes about death | 76% |

SD: standard deviation.
[a]Dichotomous data are the percentage of the total sample (*n*=2561). Continuous data are means and SDs.
[b]Rating options ranged from 1=no more than routine, everyday experiences to 7=among the five most (meaningful, spiritually significant, psychologically insightful, or difficulty/psychologically challenging) of my life, and 8=the single most (meaningful, spiritually significant, psychologically insightful, or difficulty/psychologically challenging) of my life.
[c]Response options were on a scale from −3="strong negative change that I consider undesirable" to 0="no change," +1="slight positive change that I consider desirable," +2="moderate positive change that I consider desirable," and +3="strong positive change that I consider desirable."
[d]Percentage of total sample that rated item +1, +2, or +3.

"Negative state of the world" (2%), "Idiosyncratic prediction" (2%), "Afterlife" (2%), "Positive state of the world" (1%), "Safety/reassurance" (1%), "Dying/timing of death" (1%), and "Meeting again" (1%).

## Discussion

The primary aim of this Internet survey study was to characterize the subjective phenomena, interpretation, and persisting changes that people attributed to experiences they reported of an encounter with a seemingly autonomous being or entity after taking a vaporized or smoked dose of DMT. A large number of survey respondents (*n*=2561) completed the survey with a median number of six lifetime uses of DMT and 67% of respondents answering the survey based on their first DMT-occasioned entity encounter experience.

### *Similarities of DMT entity encounter experiences to DMT God/ultimate reality encounter experiences*

The results of the current survey of DMT-occasioned entity encounter experiences are markedly similar to a survey of DMT-occasioned encounter experiences most frequently interpreted as an encounter with "God", "ultimate reality", or "higher power" (Griffiths et al., 2019). The demographics of respondents to both surveys are very similar being predominately male (~80%), White (~85%), residing in the USA (64%), and having a bachelor's college degree or higher (~35%). These demographics are also consistent with other studies of people who use DMT (Cakic et al., 2010; Palamar and Le, 2018; Winstock et al., 2014). There were numerous other similarities between the DMT God/ultimate reality encounter survey and the present entity encounter survey, including that a minority of respondents had the intention to have an encounter experience, most reported that the encounter was initiated by the entity, the large majority (⩾89%) of respondents reported an emotional response to the experience, the predominant senses involved in the interaction were extrasensory and visual (>80%), about 80% reported communication (a two-way exchange of information) with that which was encountered, most (⩾65%) rated the experience as more real than everyday normal consciousness, most (⩾75%) rated the qualities attributed to that which was encountered (e.g. conscious, intelligent, benevolent), and the high rate of attribution of positive effects of the experience including persisting increases in well-being and life satisfaction. Finally, in both surveys, the percentage of the group that identified as being atheist before the encounter (about 25%) dropped significantly after the encounter (to ~10%).

Although it is beyond the scope of this analysis to statistically compare all identically worded questions across the two surveys, it is notable that ratings of the personal meaning, spiritual significance, and positive enduring effects attributed to the DMT encounter experience (well-being, life purpose and meaning, social relationships, attitudes about life and self, mood, and behavior) were significantly higher in the God/ultimate reality encounter survey than the entity encounter survey (*t*-tests, $p<0.001$). Perhaps it is not surprising that greater positive effects are attributed to an experience often interpreted as an encounter with ultimate reality or higher power than one interpreted as an encounter with a seemingly autonomous entity.

A limitation in interpreting differences between the present study and the God/ultimate reality encounter survey is that the descriptors "God", "ultimate reality", and "higher power" were not included as terms to describe the autonomous entity or being in current study because the authors assumed, based on previous reports of DMT entity experiences, that such endorsements would be

**Table 6.** Open-ended written responses to the question regarding the message, task, mission, purpose, or insight received from the encounter with the being or entity.[a]

| Theme and description | Exemplar quote | Number of respondents (percentage of total sample, *n*=2561) |
|---|---|---|
| **Idiosyncratic information**<br>Idiosyncratic messages or insights not otherwise captured in themes; vague, non-specific communications or insights | *"He was teaching me the rules/regulations of the NFL."*<br>*"She said 'you've finally found me'."* | 703 (27%) |
| **Personal insight**<br>Insight into personal behaviors, emotions, relationships, or life purpose; specific instruction or task pertaining to the aforementioned | *"I learned that when I resist uncomfortable emotions, I am selling myself short of the possibility to learn and grow."*<br>*"It was on a personal level as I had been struggling with addiction of opiates at the time. She basically told me that I really needed to cut it out of my life because all it will bring is pain. I had not previously thought negatively about my use of opiates before this encounter."* | 571 (22%) |
| **Love**<br>Message, insight, or task related to love, kindness, compassion, or benevolence | *"Love is the answer to everything."*<br>*"The message and insight is that our purpose is to love each other."* | 409 (16%) |
| **Task**<br>Task, instruction, or command not related to other themes; may be within or outside of the DMT experience; often idiosyncratic in nature | *"Worship me."*<br>*"Telepathically: 'Do not tell anyone about this'."* | 280 (11%) |
| **Safety/reassurance**<br>Message about being safe or protected | *"It told me that everything was okay."*<br>*"I was being reassured that I was safe."* | 259 (10%) |
| **Interconnectedness**<br>Message about the interconnectedness of the universe and/or all beings; sense of oneness or connection to the entity; realization that separateness, self, or ego are illusory | *"This experience was them showing me that we are all connected, all one."*<br>*"The insight I received was that everyone and everything is connected."* | 180 (7%) |
| **Death**<br>Message or insight about death, afterlife, pre-birth state, or reincarnation | *"That this space was the after-death state."*<br>*"There was insight that death is not the end."* | 168 (7%) |
| **Knowledge**<br>Message about general knowledge or information; receiving general knowledge; task to spread, share, or pursue knowledge | *"The entity was showing me knowledge."*<br>*"Learn and educate myself."* | 161 (6%) |
| **Greeting, valediction, or reprimand**<br>Being welcomed or invited; being told farewell; being told to leave, or that one is not ready for the experience | *"The message I received was, welcome."*<br>*"The message was to go back to my planet as it was not my time to be in that amazing golden white sea of consciousness."* | 104 (4%) |
| **Prediction**<br>Prediction about the future, not related to other themes | *"I thought about a missing zippo lighter for some reason and they flashed to me where it was and after I came back, I went to that spot deep inside a couch and grabbed it perfectly, it was unreal."*<br>*"The being communicated to me that future DMT experiences would more or less be the same as the one I was experiencing."* | 99 (4%) |
| **Divinity**<br>Message or insight about God(s) or deities | *"I was essentially told that I was God."*<br>*"It telepathically gave me information that said this being was in service of God."* | 66 (3%) |
| **Veridicality of DMT space**<br>Message or insight that the DMT space is more real than everyday reality; everyday reality is an illusion, simulation, or dream | *"That the reality I perceive is more like a hallucination and that the true reality is better represented from the encounter with these beings. That the DMT reality is more real than the perceived world I inhabit."*<br>*"There was an indescribably powerful notion that this dimension in which the entity and I convened was infinitely more 'real' than the consensus reality I usually inhabit. It felt truer than anything else I'd ever experienced."* | 52 (2%) |

DMT: *N,N*-dimethyltryptamine.
[a]Responses were provided by 69% of respondents (*n*=1773).

**Table 7.** Open-ended written responses to the question regarding the prediction about the future received through the encounter with the being or entity.[a]

| Theme and description | Exemplar quote | Number of respondents (percentage of total sample, *n*=2561) |
|---|---|---|
| **Personal life event** Predictions about relationships, personal behaviors, or one's life path or purpose | *"I was shown how my life will be without my addiction and how my loved ones will suffer less. I was shown past mistakes and how to rectify them." "I was shown the way my life was heading into further depression and potential suicide and how it would impact my family and I was going to be alone unless I made some changes."* | 156 (6%) |
| **Transpersonal, interdimensional, or extraterrestrial (ET) event** Predictions about transpersonal, interdimensional, or extraterrestrial occurrences; predictions about advancements in consciousness or technology | *"There is going to be a clear distinct divide and a restructuring of society with the assistance of ET consciousness. The lower vibrational humans are going to be phased out and replaced." "We'll break strings apart and discover yet another universe within them, and so forth. And we shall continue to look outwardly and find multiple universes, the multi-multi-trans-dimensional-matrix of a multi-universal multi-verse which is a never-ending fractal of infinite complexity."* | 64 (3%) |
| **Negative state of the world** Predictions or warnings about a negative future state of humanity, the world, or the universe; predictions about natural disasters, wars, or destruction | *"That humanity would destroy our world and other worlds." "The earth will be slowly consumed and destroyed by the human race due to greed."* | 63 (2%) |
| **Idiosyncratic prediction** Predictions that did not meet criteria for any other theme; vague predictions, not otherwise specified | *"There will be a storm before the calm." "I saw my future self through its eyes."* | 62 (2%) |
| **Afterlife** Predictions about the afterlife | *"That death is just the beginning of another greater universe." "The main future prediction was concerning my consciousness. That it will continue on after I die."* | 54 (2%) |
| **Positive state of the world** Predictions about an improving state of humanity, the world, or the universe; achieving world peace or harmony | *"That the future of humanity was that we would exist in perfect symbiosis with one another." "They told me that true peace would be achieved in a matter of decades, once this was achieved, they would reveal themselves to the world."* | 33 (1%) |
| **Safety/reassurance** General predictions that "everything will be okay," "all will be well," or "there will be nothing to worry about"; predictions that there is nothing to fear in the future | *"All will be well." "It's all going to be okay."* | 32 (1%) |
| **Dying/timing of death** Predictions about when an individual will die; predictions about death that do not refer to the afterlife | *"I will die in my 60s from something I can prevent." "I was told the day I am going to die. June 27th, 2067."* | 26 (1%) |
| **Meeting again** Predictions that an individual will meet the entity again or return to the DMT space | *"That I will return there." "If I learn to wait, I will see him again."* | 19 (1%) |

DMT: *N,N*-dimethyltryptamine.
[a]Responses were provided by 19% of respondents (*n*=484).

unlikely. Given the similarity of results across the two surveys, the exclusion of those descriptors in the present study is unfortunate.

## *Similarities of DMT entity encounter experiences to descriptions of nondrug entity encounter experiences*

Entity encounter experiences in the absence of DMT or other psychedelics have been described in various contexts including those reported as God encounter experiences (Griffiths et al., 2019), religious prophecy (Strassman, 2014), alien abduction experiences (Jacobs, 2000; Mack, 1994, 2000), near-death experiences (Ring, 1992), UFO experiences which include non-human entity encounters (Hernandez et al., 2018), and a range of other historical and cultural contexts (Hancock, 2007; McKenna, 2018; Winkelman, 2018). In the present survey and consistent with prior descriptions of DMT-associated entity encounters (dmt-nexus.me; erowid.org; Hanna, 2012; Strassman, 2001), respondents commonly endorsed non-specific terms to describe these entities (e.g.

"being," "guide," "spirit," "alien," or "helper") with a wide variety of more specific terms (e.g. "animal spirit," "clown," "demon," "gnome," "monster," "deceased person," "devil") being endorsed at low rates (i.e. $<$10%). These descriptions are somewhat similar to those in the non-drug alien encounter and abduction literature which most commonly describe humanoid entities, but also insectoid, reptilian, spirit/ghost, and animal-type entities (Hernandez et al., 2018; Mack, 1994, 2000). Other similarities between the present survey and surveys of non-drug alien encounter experiences include that communication was most often telepathic or visual and most respondents considered the experience to be positive, reporting increases in appreciation for life, self-worth, compassion for others, and a decreased fear of death (Hernandez et al., 2018; Mack, 2000; Ring, 1992). Differences between the DMT entity encounter survey and non-drug alien encounter experiences include that the latter entities are most commonly described as "greys" (e.g. short humanoid beings having characteristic features such as large bald heads, large oval pupil-less eyes, with spindly legs and arms), that the experiencer is often taken into some kind of alien space craft, and is subjected to medical experiments (Hernandez et al., 2018; Mack, 2000).

### *Positive and negative emotional responses during the encounter*

Almost all respondents (99%) reported having had an emotional response during the encounter, and most (58%) reported that the entity also had an emotional response, with the predominant emotions reported by the respondent for both the entity and themselves being positive (i.e. love, kindness, joy, friendship). Noteworthy, however, is that 41% and 19% of respondents, respectively, also endorsed feeling fear or distrust sometime during the encounter, although these were almost never rated to be the most prominent emotions. The presence of such negative emotions during the experience is consistent with the finding that 32% of respondents rated the experience to be among the five most psychologically challenging experiences of their lifetime. This observation may be consistent with descriptions of alien abduction experiences which are often initially accompanied by an experience of confusion and great fear but later, or with subsequent experiences, may become valued as experiences of transformation or spiritual growth (Mack, 2000).

### *Entity encounter experiences frequently result in ontological changes in worldview including the belief in the reality of such entities*

Previous descriptions of entity encounter experiences occasioned by DMT (Strassman, 2001, 2008), as well as nondrug alien encounter and abduction experiences, near-death experiences (Hernandez et al., 2018; Jacobs, 2000; Mack, 2000; Ring, 1992; Winkelman, 2018), religious prophecy experiences (Strassman, 2014), and naturally occurring God encounter experiences (Griffiths et al., 2019), suggest that such experiences often result in changes in world view including the belief in the reality of such entities. The current survey provides strong evidence of such changes. More specifically, even after the experience, 65% of respondents rated the experience as more real than everyday waking consciousness, 96% believed the entity was conscious and intelligent, 75% thought that from their current perspective the entity existed, at least in part, in a different dimension or realty, 72% endorsed that they believed the entity continued to exist after the experience, and 80% indicated that the experience altered their fundamental conception of reality. Less than 10% endorsed that the experience occurred completely within themselves. The percentage of the group that identified as being atheist or agnostic before the encounter (55%) dropped significantly (to 26%) after the encounter, whereas identification of belief in ultimate reality, higher power, God, or universal divinity increased significantly from 36% to 58%. Significant decreases in identification as atheist have also been reported for both non-drug and psychedelic (psilocybin, lysergic acid diethylamide (LSD), and ayahuasca) associated God encounter experiences (Griffiths et al., 2019).

### *Attributions of positive enduring effects*

Similar to a previous survey of both psychedelic-occasioned and naturally occurring God encounter experiences (Griffiths et al., 2019), over one-half of the current sample reported that the encounter was one of the top five or single most personally meaningful, spiritually significant, and psychologically insightful experiences of their entire lives. Furthermore, in both studies, respondents attributed to the experience persisting positive changes in subjective well-being and life satisfaction, life purpose and meaning, social relationships, attitudes about life and self, mood, behavior, spirituality, and attitudes about death. Positive changes in appreciation for life, self-acceptance, meaning, and spirituality have also been noted in surveys of individuals who reported having broadly defined UFO encounter experiences, including forcible alien abduction as well as more benign encounters with non-human intelligence (Hernandez et al., 2018; Mack, 2000; Ring, 1992) as well as in discussions of religious prophecy experiences (Strassman, 2014) and of the impact of non-ordinary experiences more generally (Kripal, 2019).

Recent research suggests that psychedelic-occasioned increases in psychological flexibility are associated with decreases in symptoms of depression and anxiety (Davis et al., 2020), and that the psychological flexibility model may be a mechanism for therapeutic changes in mental health in clinical trials with psychedelics (Watts and Luoma, 2020). Although psychological flexibility was not directly assessed in the current study, it is plausible that the previously discussed abrupt ontological shift (i.e. "ontological shock") associated with DMT-occasioned entity encounter experiences also increase psychological flexibility which, in turn, mediate high rates of attribution of enduring positive desirable changes in attitudes, moods and behavior.

### *Ascertaining messages or predictions about the future*

More than two-thirds (69%) of respondents in the present study reported that they ascertained a message, task, mission, purpose, or insight from the entity encounter experience. This is similar to survey findings of naturally occurring and psychedelic-occasioned God encounter experiences (Griffiths et al., 2019). Unique to this study, a qualitative analysis was used to examine the content of these "communications," which revealed that 22% of these responses involved a personal insight into one's behaviors,

emotions, relationships, or life's path. Recent research (Belser et al., 2017; Davis et al. 2020; Gasser et al., 2015) suggests that psychological insight is associated with the therapeutic effect of psychedelic experiences; the frequent reporting of psychological insights occasioned by these entity encounters suggests that such experiences may have therapeutic potential. Given that some of these reports involved positively valanced messages or insights about love and safety/reassurance, it is also plausible that these experiences affected the ratings of enduring positive effects of the DMT experience (e.g. desirable changes in mood, behavior, attitudes, and beliefs).

Predictions about the future (Table 7) occurred in about 20% of the respondents in this study, which is similar to survey findings of naturally occurring and psychedelic-occasioned God encounter experiences (Griffiths et al., 2019). Again, these results were extended by examining the content of these predictions using a qualitative analysis. These predictions were most frequently related to personal life events, such as future relationships, patterns of behavior, and glimpses of one's life trajectory; and less frequently related to transpersonal (e.g. expanding consciousness, ego dissolution, etc.), interdimensional (e.g. moving between dimensions or realities), or extraterrestrial (e.g. alien interventions, cosmic occurrences, etc.) events, the negative state of the world, about afterlife or post-death states of consciousness, and to various other topics (i.e. positive state of world, safety/reassurance, timing of death, meeting again). Such predictions are unverifiable using the current study methodology in anonymous respondents.

### Potential harms

Although only a very small percentage (1–5%) of the sample in this study reported enduring negative attributions to their entity encounter experiences, it is important to acknowledge potential harms of such experiences that were not examined in this survey. For example, it is plausible that the survey methodology underestimated the rates of harmful attributions of DMT experiences because individuals who may have had negatively life-disrupting experiences may have been less likely to respond to our recruitment advertisements or to participate in Internet-based research. Similarly, instances of harm may have not been detected because participants were instructed to report on their most memorable experience (which may or may not have included potentially harmful experiences). Additionally, our findings revealed significant decreases in identification as atheist and agnostic and significant increases in belief in ultimate reality, higher power, God, or universal divinity, which may be viewed as positive outcomes by some, but as negative outcomes by others. Likewise, profound changes in ontological worldview, including the belief in a previously unbelieved different dimensions of reality or a belief in the veracity of messages or predictions about the future, might be regarded as important insights by some but could be alarming to others because they may lead to overt physical or psychological harm or because they may be viewed as resulting in the epistemic harm of taking the individual further away from the truth about reality. Although the current study provided no evidence of such harmful outcomes, it will be important for future research to assess the extent to which DMT-occasioned beliefs in previously unbelieved dimensions of reality or in the veracity of messages or predictions about the future might predispose individuals to engage in self-destructive or other harmful behavior, or might indicate the onset of significant psychiatric illness such as a psychotic disorder.

### Study limitations

Limitations to this study are similar to those of any retrospective Internet-based survey and include retrospective recall and social desirability biases, the use of a cross-sectional assessment which makes causal interpretations impossible and lacks the ability to determine whether the sample is representative of the entire population of people who ingest DMT. Although evidence suggests that the demographic composition of the population of DMT users is comprised primarily of young adult, White men (Cakic et al., 2010; Palamar and Le, 2018; Winstock et al., 2014), it is possible that there are people who identify with other backgrounds who also have had entity encounters after ingesting DMT but were not willing or able to participate in this study. Also, because respondents were excluded who reported using more than one substance before the entity encounter, using changa, or administering DMT via methods other than vaporizing or smoking, the findings may not represent the entire population of people who have such encounters after taking DMT. Additionally, participants were instructed to report on their most memorable DMT entity encounter experience. Thus, for participants who had more than one experience, the survey results may not be representative of the entire range of such experiences. Finally, it will be important for future studies to determine both the prevalence of DMT-occasioned entity encounter experiences among DMT users and the reliability of having such experiences among those who have taken DMT on multiple occasions.

## Conclusion

The present survey study is the largest to date to provide detailed information about the subjective phenomena, interpretation, and persisting changes attributed to experiences people report about having an encounter with a seemingly autonomous entity after inhaling DMT. Aspects of the experience and its interpretation had metaphysical implications for most (80%) of the respondents about their fundamental understanding of the nature of reality. For example, most respondents indicated that the entity had the attributes of being conscious, intelligent, and benevolent, existed in some real but different dimension of reality, and continued to exist after the encounter. These experiences were also rated as among the most meaningful, spiritual, and psychologically insightful lifetime experiences, with persisting positive changes in life satisfaction, purpose and meaning attributed to the experiences. More than half of those who identified as atheist before the experience no longer identified as atheist afterwards. Although further research is needed to provide more information about causality and mechanisms (Winkelman, 2018), it is possible that the "ontological shock" occasioned by these vivid unusual experiences may play an important role in the enduring positive life changes in attitudes, moods, and behavior attributed to these experiences. As such, it is possible that, under appropriate supportive set and setting conditions, DMT could show promise as an adjunct to therapy for people with mood and behavioral problems (e.g. depression and addiction). However, regardless of whether or not DMT will be shown to have therapeutic efficacy, future double-blind human laboratory studies investigating dose-effects and correlated brain activity may provide a unique window into the psychological and biological nature of such anomalous subjective experiences of encounters with nonhuman entities that date back to the beginnings of recorded human history.

Case 2:20-cv-02373-ROS Document 140-1 Filed 11/30/21 Page 121 of 192

## Acknowledgements

The authors acknowledge helpful discussions with David Luke, PhD and discussions and comments on the manuscript with Christopher Letheby, PhD and Jeffrey Kripal, PhD.

## Declaration of conflicting interests

The authors declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The authors disclosed receipt of the following financial support for the research, authorship, and/or publication of this article: AK Davis was supported by a National Institute on Drug Abuse postdoctoral training grant (#DA007209). MW Johnson was partially supported by a grant from the Heffter Research Institute. Study conduct and manuscript development were supported by the Center for Psychedelic and Consciousness Research, which is funded by the Steven and Alexandra Cohen Foundation, Tim Ferriss, Matt Mullenweg, Craig Nerenberg, and Blake Mycoskie. The funding sources had no role in the design/execution of this study or the interpretation or communication of findings.

## ORCID iD

Alan K Davis https://orcid.org/0000-0003-4770-8893

## References

Acosta-Urquidi J (2015) QEEG studies of the acute effects of the visionary tryptamine DMT. *Cosmos History: J Natl Soc Philos* 11: 115–129.

Barker SA (2018) N,N-Dimethyltryptamine (DMT), an endogenous hallucinogen: Past, present, and future research to determine its role and function. *Front Neurosci* 12: 1–17.

Belser AB, Agin-Liebes G, Swift TC, et al. (2017) Patient experiences of psilocybin-assisted psychotherapy: An interpretative phenomenological analysis. *J Human Psychol* 57: 354–388.

Cakic V, Potkonyak J and Marshall A (2010) Dimethyltryptamine (DMT): Subjective effects and patterns of use among Australian recreational users. *Drug Alcohol Depend* 111: 30–37.

Carbonaro TM and Gatch MB (2016) Neuropharmacology of N,N-dimethyltryptamine. *Brain Res Bull* 126: 74–88.

Casterlé B, Gastmans C, Bryon E, et al. (2012) QUAGOL: A guide for qualitative data analysis. *Int J Nurs Stud* 49: 360–371.

Christian ST, Harrison R, Quayle E, et al. (1977) The *in vitro* identification of dimethyltryptamine (DMT) in mammalian brain and its characterization as a possible endogenous neuroregulatory agent. *Biochem Med* 18: 164–183.

Cott C and Rock A (2008) Phenomenology of N,N-dimethyltryptamine use: A thematic analysis. *J Sci Explor* 22: 359–370.

Davis AK, Barrett F and Griffiths RR (2020) Psychological flexibility mediates the relations between acute psychedelic effects and subjective decreases in depression and anxiety. *J Context Behav Sci* 15: 39–45.

Dean J, Liu T, Huff S, et al. (2019) Biosynthesis and extracellular concentrations of N,N-dimethyltryptamine (DMT) in Mammalian Brain. *Sci Report* 9: 9333.

Domínguez-Clavé E, Soler J, Elices M, et al. (2016) Ayahuasca: Pharmacology, neuroscience and therapeutic potential. *Brain Res Bull* 126: 89–101.

Drug Enforcement Administration (1970) Subchapter 1: Control and enforcement. In: *Title 21 United States Code (USC) Controlled Substances Act*. U.S. Department of Justice. Available at: https://www.deadiversion.usdoj.gov/21cfr/21usc/812.htm (accessed 22 April 2020).

Gallimore A (2013) Building alien worlds: The neuropsychological and evolutionary implications of the astonishing psychoactive effects of N,N-dimethyltryptamine (DMT). *J Sci Explor* 27: 455–503.

Gasser P, Kirchner K and Passie T (2015) LSD-assisted psychotherapy for anxiety associated with a life-threatening disease: A qualitative study of acute and sustained subjective effects. *J Psychopharmacol* 29: 57–68.

Grammenos D and Barker SA (2015) On the transmethylation hypothesis: Stress, N,N-dimethyltryptamine, and positive symptoms of psychosis. *J Neural Transm* 122: 733–739.

Griffiths RR, Hurwitz ES, Davis AK, et al. (2019) Survey of subjective "God encounter experiences": Comparisons among naturally occurring experiences and those occasioned by the classic psychedelics psilocybin, LSD, ayahuasca, or DMT. *PLoS One* 14: e0214377.

Halpern J (2004) Hallucinogens and dissociative agents naturally growing in the United States. *Pharmacol Ther* 102: 131–138.

Hancock G (2007) *Supernatural: Meetings with the Ancient Teachers of Mankind*. San Francisco: Disinformation Company.

Hanna J (2012) Aliens, Insectoids, and Elves! Oh, My! In: *Erowid Extracts*. Available at: Erowid.org/chemicals/dmt/dmt_article3.shtml (accessed 17 November 2019).

Hernandez R, Klimo J and Schild R (2018) A report on phase I and II of FREE's experiencer research study: The results of a quantitative study. In: Hernandez R, Klimo J and Schild R (eds) *Beyond UFOs: The Science of Consciousness and Contact with Non-Human Intelligence*. Dr. Edgar Mitchell Foundation for Research into Extraterrestrial and Extraordinary Experiences, FREE, Inc., United States, pp. 1–121.

IBM Corp (2018) *IBM SPSS Statistics for Windows, Version 25.0*. Armonk: IBM Corp.

Jacobs DM (2000) *UFOs and Abductions: Challenging the Borders of Knowledge*. Lawrence: University Press of Kansas.

Kripal JJ (2019) *The Flip: Epiphanies of Mind and the Future of Knowledge*. New York: Bellevue Literary Press.

Luke D (2011) Discarnate entities and dimethyltryptamine (DMT): Psychopharmacology, phenomenology and ontology. *JSPR* 75: 26–42.

Luke D (2012) Psychoactive substances and paranormal phenomena: A comprehensive review. *Int J Transp Stud* 31: 97–156.

Luke D and Spowers R (2018) *DMT Dialogues: Encounters with the Spirit Molecule*. Rochester: Park Street Press.

Luke DP (2008) Psychedelic substances and paranormal phenomena: A review of the research. *J Parapsych* 72: 77–107.

Mack JE (1994) *Abduction: Human Encounters with Aliens*. New York: Ballantine Books.

Mack JE (2000) How the alien abduction phenomenon challenges the boundaries of our reality. In: Jacobs DM (ed.) *UFOs and Abductions: Challenging the Borders of Knowledge*. Lawrence: University Press of Kansas, pp. 241–261.

McKenna D (2018) Is DMT a chemical messager from an extraterrestrial civilization? In: Luke D and Spowers R (eds) *DMT Dialogues: Encounters with the Spirit Molecule*. Rochester: Park Street Press.

Meyer P (2006) Reports which attest to contact with apparently independently-existing intelligent entities within what seems to be an alternate reality. In: *340 DMT Trip Reports*. Available at: www.serendipity.li/dmt/340_dmt_trip_reports.htm (accessed 10 November 2019).

Miles M and Huberman A (1994) *Qualitative Data Analysis: An Expanded Sourcebook*. 2nd edn. Thousand Oaks: SAGE.

Nichols DE (2018) N,N-dimethyltryptamine and the pineal gland: Separating fact from myth. *J Psychopharmacol* 32: 30–36.

Palamar JJ and Le A (2018) Trends in DMT and other tryptamine use among young adults in the United States. *Am J Addict* 27: 578–585.

Ray TS (2010) Psychedelics and the human recepterome. *PLoS One* 5: e9019.

Riba J, Valle M, Ubrano G, et al. (2003) Human pharmacology of ayahuasca: Subjective and cardiovascular effects, monoamine metabolite excretion, and pharmacokinetics. *J Pharmacol Exp Ther* 306: 73–83.

Ring K (1992) *The Omega Project: Near Death Experiences, UFO Encounters, and Mind at Large*. New York: William Morrow.

St. John G (2016) The DMT gland: The pineal, the spirit molecule, and popular culture. *Int J Stud New Religions* 7: 153–174.

St. John G (2017) Aussiewaska: A cultural history of changa and ayahuasca analogues in Australia. In: Labate BC, Cavnar C and Gearin AK (eds) *The World Ayahuasca Diaspora: Reinventions and Controversies*. Abington: Routledge, pp. 143–164.

St. John G (2018) The breakthrough experience: DMT hyperspace and its liminal aesthetics. *Anthropol Conscious* 29: 57–76.

Strassman R (2001) *DMT: The Spirit Molecule*. Rochester: Park Street Press.

Strassman R (2008) The varieties of the DMT experience. In: Strassman R, Wojtowicz S, Luna LE, et al. (eds) *Inner Paths to Outer Space: Journeys to Alien Worlds Through Psychedelics and Other Spiritual Technologies*. Rochester: Park Street Press, pp. 51–80.

Strassman R (2014) *DMT and the Soul of Prophecy: A New Science of Spiritual Revelation in the Hebrew Bible*. Rochester: Park Street Press.

Strassman RJ (1996) Human psychopharmacology of N,N-dimethyltryptamine. *Behav Brain Res* 7: 121–124.

Strassman RJ, Qualls CR, Uhlenhuth EH, et al. (1994) Dose response study of N,N-dimethyltryptamine in humans: II. Subjective effects and preliminary results of a new rating scale. *Arch Gen Psychiatry* 51: 98–108.

Szára S (1957) The comparison of the psychotic effect of tryptamine derivative with the effects of mescaline and LSD-25 in self-experiments. In: Garattini S and Ghetti V (eds) *Psychotic Drugs*. Amsterdam: Elsevier, pp. 460–467.

Timmermann C, Roseman L, Schartner M, et al. (2019) Neural correlates of the DMT experience assessed with multivariate EEG. *Sci Report* 9: 16324.

Timmermann C, Roseman L, Williams L, et al. (2018) DMT models the near-death experience. *Front Psychol* 9: 1424.

Watts L and Luoma J (2020) The use of the psychological flexibility model to support psychedelic assisted therapy. *J Context Beh Sci* 15: 92–102.

Winkelman MJ (2018) An ontology of psychedelic entity experiences in evolutionary psychology and neurophenomenology. *J Psychedelic Stud* 2: 1–19.

Winstock AR, Kaar S and Borschmann R (2014) Dimethyltryptamine (DMT): Prevalence, user characteristics and abuse liability in a large global sample. *J Psychopharmacol* 28: 49–54.

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 12

**Roy S. Haber**, OSB No. 800501
haberpc@cyber-dyne.com
**ROY S. HABER P.C.**
570 East 40th Avenue
Eugene, OR 97405
Telephone: 541.485.6418
FAX: 541.434.6360

**Don H. Marmaduke**, OSB No. 53072
don.marmaduke@tonkon.com
**TONKON TORP LLP**
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2099
Direct Dial: 503.802.2003
Direct FAX: 503.972.3703

**Gilbert Paul Carrasco**, California Bar No. 90838
*(Appearing pro hac vice)*
carrasco@willamette.edu
No. 451
245 Winter Street SE
Salem, OR 97301
Telephone: 503.370.6432
FAX: 503.370.6375

**Jack Silver**, California Bar No. 160575
warrioreco@yahoo.com
*(Appearing pro hac vice)*
PO Box 5469
Santa Rosa, CA 95402-5469
Telephone: 707.528.8175
FAX: 707.528.8675

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(Medford Division)

www.bialabate.net

**THE CHURCH OF THE HOLY LIGHT OF THE QUEEN**, a/k/a The Santo Daime Church, an Oregon religious corporation, on its own behalf and on behalf of all of its members, **JONATHAN GOLDMAN**, individually and as Spiritual Leader of the "Santo Daime Church," **JACQUELYN PRESTIDGE, MARY ROW, M.D., MIRIAM RAMSEY, ALEXANDRA BLISS YEAGER** and **SCOTT FERGUSON**, members of the Santo Daime Church,

Plaintiffs,

v.

**MICHAEL B. MUKASEY**, Attorney General of the United States; **KARIN J. IMMERGUT**, United States Attorney, District of Oregon; **HENRY M. PAULSON**, Secretary of the U.S. Department of the Treasury,

Defendants.

Civil No. 08-cv-03095-PA

**AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.Ph. – EVALUATION OF HEALTH AND SAFETY ISSUES CONCERNING SACRAMENTAL INGESTION OF THE SANTO DAIME HOLY TEA**

I, George Gerding, state under penalty of perjury as follows:

1. My name is George Gerding. I live in Portland, Oregon. I am married and am the father of five children. I am a licensed pharmacist. I received a BS degree in pharmacy from Drake University, and have done post-graduate work at Oregon State University, Memphis State University, University of Utah and various professional centers. My practical experience has been varied, and includes specialization in geriatrics and research coordination. I have had teaching experience at Oregon State University and Portland State University, as well as at the Community Colleges in the Portland metropolitan area. I served nine years on the Oregon Board of Pharmacy, including twice as its elected president. My professional publications and presentations are listed in my CV, which is annexed.

2. My Amended Expert Witness Statement was prepared at the request of counsel for the Santo Daime Church. I have been asked to comment on specific law enforcement, health and safety concerns regarding use of a tea called Daime which is imbibed by Santo Daime Church members as the central practice of their religion and as its sacrament. The

Daime tea (called ayahuasca by people who do not use the tea as the sacrament of the Santo Daime Church) is made from brewing a vine, *Banisteriopsis caapi* together with the leaves of *Psychotria viridis*, which contain trace amounts of a short-acting psychoactive agent N,N-dimethyltryptamine (DMT), which is currently listed as a Schedule 1 Drug under the Controlled Substances Act.

3. I was asked to comment upon a number of public policy considerations that are generally evaluated by state and federal officials when deciding whether or not to permit use of a particular "substance" prohibited from importation and distribution under the Controlled Substance Act.

4. Society expects pharmacists to assure that when anything that affects living cells is taken, that it is appropriate. The benefit must clearly outweigh any risk. Thus, issues such as toxicity, side effects and safety are very important. Agents having pharmacological activity but not used medicinally are also judged on their risk of abuse. Increasingly, especially with natural substances, considerations of cultural and psycho social concerns come into the deliberation.

5. Obviously petitioning for any form of exemption from application of the Controlled Substance Act requires serious consideration. When the Native American Church came before the Oregon Board of Pharmacy in 1989, and then the Oregon Legislature, seeking an exemption for the sacramental use of peyote, the Board considered questions similar to the ones I discuss in this report. Since I was serving as the President of the Board at the time, I offered testimony for our position, some of which is referred to below.

6. As noted above, the substance under consideration today is Daime, a tea brewed from two plants indigenous to the Amazon jungle. There are small trace amounts of DMT in the *Psychotria viridis*; DMT is a psychoactive agent listed as a controlled substance by the U.S. Drug Enforcement Agency ("DEA"), as well as other international agencies.

7. As one might expect in the case of naturally derived substances, there is a rich history of anecdotal information and not so much scientific data on Daime. Fortunately, there has been some credible analysis of ayahuasca, as well as a thorough investigation by the Brazilian equivalent of our DEA. Additionally, the sacramental use of Daime spans several continents, so there are well-documented, practical accounts of its effects upon those who ingest it. As used in this report "ayahuasca" refers to a liquid having only the same components as "Daime" tea, the substance that is in issue in this case, *i.e.,* only the vine *Banisteriopsis caapi* and the leaves of *Psychotria viridis* brewed in water.

8. In my discussion, I will minimize the minutia of things such as analysis of samples and detail of religious ceremonies, some of which is covered in other expert reports and are available upon request.

9. In preparing for this report, I was asked to review a number of articles and other written material. They generally include:

a. My previous testimony before the Oregon Legislature.

b. Plaintiffs' Ex. 1: The Report of the Brazilian Federal Council on Narcotics (CONFEN) regarding his issue, annexed to this report.

c. Several articles regarding the pharmacology of Daime and peyote.

d. Several articles that discuss the historical use of Daime. (It is also called "ayahuasca" by persons other then the followers of the Santo Daime Church) for religious purposes and healing by indigenous tribes in the Amazonian region of South America.

e. Articles regarding contemporary medical research regarding the properties and effects of the Daime.

f. Testimony provided to Congress by certain officials of the United States Department of Justice when Congress was considering

www.bialabate.net

amending the Indian Religious Freedom Act to protect persons who wished to use peyote as the sacrament of the Native American Church from threat of criminal prosecution.

g. The expert Declarations of Dr. Cozzi, Dr. Halpern, and Dr. Winkelman.

h. Plaintiffs' Ex. 3: Letters from the Oregon Board of Pharmacy to Roy Haber in November 2000 and June 2008, annexed hereto.

i. Plaintiffs' Ex. 5: Interrogatory Responses 16 and 17 of Defendants' Responses to Plaintiffs' Interrogatories in *O Centro v. Ashcroft*, also annexed hereto.

10. I have been asked to review this information and provide an opinion as to whether or not there is sufficient evidence that would justify a decision by federal (and state) drug enforcement agencies to refuse to exempt from application of the drug laws the sacramental use of Daime in religious ceremonies.

11. The most important issues that I considered when having to decide whether to advise the Oregon Legislature to grant an exemption for the non-drug use of peyote in the Native American Church services were:

a. The pharmacology of the "substance"[1]

b. The short and long term effects, both physiological and psychological

c. The extent to which it is part of illicit drug trafficking in the United States[2]

[1]The Controlled Substances Act uses the term "substances" and "drug" often interchangeably. I will discuss below, why it is not appropriate to refer to Daime tea as a "drug."

[2] "(a) The Congress finds that—

(1) Drug and alcohol abuse are problems of grave concern and consequence in American society;

(2) Over 500,000 individuals are known heroin addicts; 5 million individuals use cocaine; and at least 7 million individuals regularly use prescription

      www.bialabate.net

d. The context in which it is administered

e. Whether there is evidence of significant abuse of the substance, including addiction

## I. PHARMACOLOGY OF THE SUBSTANCE

12. There are two major active ingredients in ayahuasca, or the tea called Daime, Dimethyltrytamine (DMT) and Harmine. The DMT is in the leafy plant *Psychotria virdis* and is a short acting hallucinogen.

13. The Harmine is in the bark and stems of a vine, *Banisteriopsis caapi* and while not a controlled substance, may have some pharmacological activity. Its purpose here is to activate the DMT in the mix. When DMT is ingested, it is quickly inactivated by the mono amine oxidase in the stomach. The Harmine inhibits this action, thus making the DMT active.

14. In order to ingest the quantity of DMT for toxicity or overdose, one would have to drink 3 to 4 liters of the tea. Ceremonial use involves only small quantities, 50-100 milligrams or so, barely above the threshold dose. The vomiting quickly limits the amount in the stomach, and the pharmacological effects last only between two to four hours. Because of the vomiting effect, it is simply not possible to consume much more then 100 milligrams.

---

drugs, mostly addictive ones, without medical supervision;

(3) Ten million adults and 3 million children and adolescents abuse alcohol, and an additional 30 to 40 million people are adversely affected because of close family ties to alcoholics;

(4) the total cost of drug abuse to the Nation in 1983 was over $60,000,000,000; and

(5) the vast majority of health benefits plans provide only limited coverage for treatment of drug and alcohol addiction, which is a fact that can discourage the abuser from seeking treatment or, if the abuser does seek treatment, can cause the abuser to face significant out of pocket expenses for the treatment. 21 U.S.C.S. @ 801 at 10."

My understanding is that there only about 50 Santo Daime Church members in Oregon who are using the tea in a "non-drug" environment.

## II. PHYSIOLOGICAL AND PSYCHOLOGICAL EFFECTS

15. I found the comparison of DMT and mescaline (the active ingredient of peyote) useful in my review. Here are the DEA internet definitions for each.

### a. Peyote & Mescaline

16. Peyote is a small, spineless cactus, *Lophophora williamsii*, whose principal active ingredient is the hallucinogen mescaline. From earliest recorded time, peyote has been used by natives in Northern Mexico and the Southwestern United States as a part of traditional religious rites. The hallucinogenic dose for mescaline is about 0.3 to 0.5 grams (330-500 mg) (equivalent to about 5 grams of dried peyote) and lasts about 12 hours. While peyote produced rich visual hallucinations which were important to the native peyote cults, the full spectrum of effects served as a chemically induced model of mental illness. Mescaline can be extracted from peyote or produced synthetically.

### b. Dimethyltryptamine (DMT)

17. Dimethyltryptamine (DMT) has a long history of use worldwide as it is found in a variety of plants and seeds, and can also be produced synthetically. The effective hallucinogenic dose in humans is about 50 to 100 milligrams and lasts for about 45 to 60 minutes. Because the effects last only about an hour, the experience was called a "businessman's trip."

18. The DEA discussion does not discuss the fact that DMT, in its natural state in the *Psychotria viridis* leaf, is not orally active, being metabolized by the enzyme MAO in the stomach.

19. The initial common effects of the ingestion of this tea can include psychoactivity in various stages, nausea, vomiting, dizziness, palpitations, anxiety and discomfort. The second phase of action has been reported to include feelings of comfort, well-being and euphoria accompanied by deep insights inspired by the altered state, and visions interpreted to have a spiritual quality to them.

20. My evaluation of the actual effects of the Daime, include, as did our evaluation of peyote, the historic context in which the plants were used. In 1857, in the Ecuadorian Andes, Botanist Spruce encountered the Záparo Indians using a drink called ayahuasca which he considered to be the identical species found in the Vaupés of Brazil (SPRUCE 1873). The tea has been used for hundreds and perhaps thousands of years by indigenous tribes in the Amazon basin.

## III. NO EVIDENCE OF TOXICITY OR HARMFUL EFFECTS FROM AYAHUASCA USE REPORTED

21. In the context of this discussion, I refer to toxic as a serious unwanted reaction to ingestion of a substance that the medical community would generally see as involving a threat to the current or future health of the person. In that regard, vomiting after ingestion of peyote or ayahuasca has more of a tonic side effect than causing toxicity, and is considered cleansing by religious users.

22. When I provided testimony to the Oregon legislature, I noted then that:

> [O]ne of the problems with things like peyote is there are very few scientific studies done on it. It isn't a drug that we use every day. . . and as such it makes it very difficult to go to a textbook and open it up and say oh yeah, that has a risk rating of such-and-such in pregnancy. With medicines, any of them, they all have a level of toxicity and it's dose related. So the toxicity pretty much depends on the way it's given, and there is not much you can do about that. I'm sure somebody could get into serious trouble taking peyote. I'm sure it could be toxic. But from what we are seeing here and the experience that I read about, it seems to be safe enough for that use."

Gerding, April 24, 1990.

23. In the case of Daime, I could find no reports of overdose or toxicity related to the Harmines contained in the Daime Tea. Similarly, there are no reported cases of toxicity due to the ingestion of DMT as an ingredient in the Daime tea. The DEA reports the threshold hallucinogenic dose of DMT is 50 to 100 milligrams. In my readings about quantities of the tea used in ceremonies, I find from the articles referred to below and my oral interviews

with Santo Daime Church leaders establish that the normal dose ranges from 40-150 milligrams of Daime depending on the particular type of ceremony being conducted, the amount taken generally to be between 15 to 60 milligrams. It would take a dose of several liters to be toxic. Because of the vomiting effect, a person cannot possibly take and retain a dose of Daime that is much more then just a fraction of a liter (a shot glass or two).

24. The common purgative effects are, as noted above, considered to be tonic, and also limit the amount of absorption of the ingredients. The relatively short action of DMT is an additional limiting factor in consideration of any risk of toxicity.

## IV. THE SACRAMENTAL USE OF THE DAIME

### a. Brief Review of the Santo Daime Religion

25. I understand that the Santo Daime religion was founded back in the 1920s by an indigenous rubber-tapper Raimundo Irineu Serra, who was living in the state of Acre, deep in the Amazon. After participating in a traditional ayahuasca ceremony, Irineu was visited in a vision by a woman whom he identified with the Virgin Mary and whom he further identified as both "Our Lady of Conception" and the "Forest Queen."

26. She instructed him to found a new spiritual path or doctrine in which the drinking of ayahuasca would be central to the ritualistic worship. The Forest Queen also gave the tea the new name "Daime." The name in Portuguese means "give me," which has been interpreted to mean both a gift and a prayer to "give me love, give me light, and give me strength." I understand that the religion is what is called a "syncretic" religion, combining many elements of traditional Christian beliefs and practices with ancient indigenous religious and healing practices.

27. I note that the above description of the Santo Daime is similar to the description of the founding of the Native American Church that we made at the Board of Pharmacy regarding peyote. There we found that it was well-documented that even before the establishment of the Native American Church in the early 1900s, peyote had been used for

centuries as a religious sacrament and for healing purposes by Native Americans.

28. In my April 24, 1991 testimony regarding ingestion of peyote, I stated:

> It seems to be well documented that people are not hurt by that, they seem to keep very tight control on both the quality of the sacrament and the use of it, and it seemed basically the right thing to do to make an exemption on that ground.

29. The "set and setting" influences are the extra pharmacological factors derived from expectations and situational circumstances that are important to determine how the individual reacts to biologically induced experiences. Set refers to the individuals' purpose and expectations about the experience, while setting refers to the environment within which the experiences take place.

30. The classic example of the importance of set and setting is illustrated in the recognition by the U.S. DEA which lists peyote whose active substance is mescaline as a Schedule 1 controlled "drug." However, in granting an exemption from the prohibition of taking peyote, the DEA has acknowledged the importance of set and setting by permitting the "non-drug use of peyote" in Native American Church services. Thus, the DEA does not consider peyote a Schedule I drug when it is used in the religious ceremony. Likewise, DMT cannot be considered a drug when used in the Santo Daime religious services for the reasons set forth herein.

31. The Santo Daime ceremony wherein the tea is consumed is a highly structured church service. I have viewed videos of several Brazilian services wherein the Daime tea is served. The following description by the Brazilian drug enforcement that studied the religious ceremonies stated:

> The men were wearing white three-piece suits. The women wore white dresses with green belts, and a head decoration resembling a small garland. They give these clothes the name of "uniform," and they are only provided to those who have chosen the "doctrine." . . . The ambiance was quite similar to that found in the places of worship of other religions: candles, crosses, rosaries, effigies of the Virgin Mary, Jesus Christ and St. John the Baptist.

www.bialabate.net

> They (services) exalt the virtues of mankind, and encourage love, humility and repentance for one's faults. They proclaim the joy and the power of those who have faith in divine power and do good deeds.
>
> The actual ceremonies include reading of hymns, singing and rhythmic movement. Hymns are chanted throughout the ceremonies, accompanied by instruments such as a guitar or accordion, sometimes to the rhythm of maracas. Each time the Daime sacrament is served, each participant makes the "Sign of the Cross" and returns to his or her place, which is reminiscent of a Catholic service.

32. From the evidence that I have gathered from reading the cited articles, I am persuaded that the use of Daime in strict religious services of the Santo Daime Church promote positive cultural, social, physical, and psychological health. Similar to the healing value of peyote, Daime is often used to promote the process of physical and mental well-being of Church members.

33. Testimonials in the literature refer to the revealing power of the tea, of promoting positive personal values and self-discipline when combined with the religious ritual. As mentioned earlier, the induction of vomiting is considered a cleansing action by many of the church members.

**b. Extent of illicit drug trafficking in the United States**

34. With respect to the substance at issue here, Daime, it cannot be said that there is any illicit trafficking or that there has been any problem reported. It is virtually unknown in the U.S., and I could find no evidence of illicit use or marketing. It is clear from Ex. 5 that as of October 19, 2001, when the government answered Interrogatories 16 and 17 in the O Centro case, the government had no evidence that ayahuasca tea had been diverted from the Church's sacramental use of the tea, nor any evidence that any peyote has ever been diverted from any member of the Native American Church for non-religious use. Similarly, I know of no evidence that any Daime tea has ever been diverted by any member of the Santo Daime Church for non-religious use.

35. Daime is not grown or produced in this country. Even in Brazil, it is difficult to gather the vines and leaves that grow deep in the jungle. Traditionally, harvesting was mostly done by tribes and the Santo Daime communities. There is now some cultivation of the plants in Brazil. There is no known illicit drug market in Brazil for DMT manufactured from the *Psychotria viridis* leaf.

36. Because, as DEA notes, DMT can be produced synthetically, it would stand to reason that any illicit market in DMT would more likely result from the synthetic forms rather then as a result of any diversion of Daime tea. I understand that the process of extracting the very minute quantities of DMT from the Daime tea would be technically difficult and would require a great deal of tea to obtain an amount that would be sufficient for purposes of even entering the illicit drug market.

37. In preparation for writing this report, I reviewed the testimony of Gene Haislip, Deputy Assistant Administrator, Office of Diversion Control before the House of Representatives, wherein the DEA argued in favor of granting an exception for the non-drug use of peyote. He stated:

> Peyote simply is not a popular drug; its distribution for use in religious rituals has nothing to do with the vast and violent traffic in illegal narcotics that plagues this country.

38. Haislip did note that "On occasion, peyote has been found in the illicit traffic. It has not been reported by the DEA, state or local enforcement agencies to be anything other than a sporadic problem." With regard to the substance at issue here, Daime, it cannot be said that there is any illicit trafficking or that there has been any "problem" with state or local enforcement agencies. It is virtually an unknown substance in the United States, and to my knowledge plays no discernible role in the illicit drug market. And while it is possible that some Daime could get into the illicit market, given that it is only administered by a church leader during the actual service, that it is foul-tasting, that it is both self-limiting and not a recreational

drug or drug for pleasure that is taken to get "high," the unlikely prospect of any diversion is clearly not a compelling reason to deny this religion the right to practice its sacrament.

39. Finally, as we noted above, it would appear from the evidence to date that only those persons who are committed to following the spiritual path for which the Daime is intended will even be inclined to ingest it. The findings of the CONFEN regarding this issue are accurate:

> Moreover, the typical reactions of vomiting and diarrhea (the latter being less frequent) leads us to suppose that ayahuasca does not lend itself to easy, indiscriminate or recreational use by the general public. Indeed, this can be verified by the fact that, despite receiving a good deal of coverage in major Brazilian newspapers, to date ayahuasca has not been fancied by hedonistic consumers.

## V. USING THE DAIME (AYAHUASCA) IN THE CONTEXT OF THE SANTO DAIME RELIGIOUS SERVICE CAUSES NO HARM TO THE PUBLIC WELFARE

40. My investigation revealed no instances of any aggressive, violent or any antisocial behavior in any persons who have taken the Daime. There is no evidence that the Daime is a cause of any problems to society at large. In this regard, it would appear that the following description by the CONFEN is accurate:

> What can be affirmed is that the search for a particular form of perception, as undertaken by the users of ayahuasca during their "work," does not appear to be hallucination if this term is taken to mean derangement or insanity. Among all of the groups we visited, there was one common goal which they all strictly adhered to: the search for holiness and self-knowledge. It does not fall to the Working Group to determine whether the term hallucination, defined as illusion, daydreaming or fantasy, applies to their way of experiencing holiness or self-knowledge.

41. Obviously, it would not be tolerable if the perceptions in question led those who experience them to engage in antisocial behavior harmful to the rights of others. In this regard, it bears repeating what was stated in the first travel report from nearly two years ago, as quoted in item 11 above, *i.e.*:

> Moral and ethical standards of behavior, similar in every respect to

> those which exist and are recommended in our society, are observed within the various sects, at times in an even stricter manner. Respect for the law always appeared to be emphasized. The followers of the sects appear to be calm and happy people. Many of them attribute family reunification, regained interest in their jobs, finding themselves and God, etc., to the religion and the tea.
>
> The ritual use of the tea does not appear to be disruptive or to have adverse effects upon the social interactions of the various sects' followers. On the contrary, it appears to orient them towards seeking social contentment in an orderly and productive manner.

(CONFEN Report at 33.)

## VI. NO EVIDENCE OF ABUSE OF THE SUBSTANCE

42. In our society, substance abuse usually refers to the use of an agent recreationally and it often goes hand-in-hand with illicit trafficking. Psychoactive chemicals certainly have fallen into that category in recent decades. Despite the fact that this class of agents may not carry the risk of dependence, withdrawal or even addiction, the hazards of bodily harm to self and others is enough to control their distribution.

43. In the case of the religious use of Daime, like peyote, the psychoactive ingredients are used as a sacrament and rigidly administered and monitored. The doses are very low and the side effects limit any risk of overdose. I could find no record of Daime abuse in the international literature. Indeed, most often there is reference to both healing physical and psychological ills in relation to the ritual use of Daime.

44. There seems to be no evidence of tolerance (need to increase the dose over time), or dependence (withdrawal symptoms following abstinence). Similarly, I found no writings indicating addictive behavior among those taking sacramental Daime.

## VII. SUMMARY AND CONCLUSION

45. Medicine today encompasses a much broader scope then even a decade ago. Clearly, the holistic approach with a global appreciation of therapies is blending with

western high-tech medicine. For example, in Fundamentals of Nursing, Chapter 1, Health-Illness Continuum, at pp. 3-6, the importance of spiritual health is stressed as a central tenet of holistic health which seeks to "maintain a state of physical, emotional, intellectual, social, developmental and spiritual well-being."

46. In a dynamic, transitional period such as this there is frequently a disconnection between the rules and regulations based upon traditional experience and science and the need to expand the boundaries to accommodate new options. Regulators have the formidable task of protecting the public while striking a balance.

47. In conclusion, from the perspective of the underlying drug policy considerations that exist to protect public health and safety, it is my opinion that there is no compelling reason in this case to prohibit the members of the Santo Daime Church from taking their sacrament. The sacramental ingestion of the Daime tea as part of the Santo Daime religious doctrine and teachings, facilitates the internal and external environments that promote positive spiritual, physical, and emotional health which are goals that are central to the religious doctrine. Such a socially desirable non-dangerous tradition must be recognized and respected. There is no pharmacological evidence of ill-health effects or danger of toxicity, virtually no danger of illicit drug use or diversion for recreational use, and no issue of addiction that would justify infringing on this sacred religious practice.

48. Furthermore, to the extent that one might argue there is a compelling reason to regulate the Daime, total prohibition is not the least restrictive way in which the government can protect whatever interests are asserted. Whenever controlled substances are manufactured, imported, distributed and/or used, a regulatory scheme similar to that which is used to track the transport and delivery of peyote which is ingested by over 250,000 NAC members would suffice to ensure that the products do not enter the illicit market. The registration and accounting procedures routinely used provide the government with the necessary

controls to ensure the protection of its legitimate interests.

49. In the year 2000, after receiving evidence from the Santo Daime Church similar to what I have stated herein, the Pharmacy Board found that the sacramental use of the tea was a "non-drug use," and advised the Church that it did not intend to regulate its religious practice. See Ex. 3, the Board's official notification of its decision to the Church. The Board's action is consistent with my findings that there is no evidence of ill-health effects from the tea.

50. And while the Pharmacy Board does not intend to regulate the tea, the Santo Daime Church requested that the Board act as an unofficial repository of copies of all Sacrament Receipt Forms which record each batch of tea being imported from Brazil to Oregon. See Ex. 3. This would add a layer of protection from diversion, and more importantly it establishes the intent of the Church to satisfy all concerned that the tea will not be diverted from its intended sacramental use.

51. However, as evidenced by the most recent letter from the Board dated June 20, 2008 (See Ex. 3), because the Pharmacy Board concluded after investigation and hearing that the Santo Daime Church's importation and use of its sacramental tea in bona fide religious ceremonies does not constitute abuse of a controlled substance and is consequently not an activity that the Board has authority to regulate, the Board declined the Church's request.

52. Because the Oregon Pharmacy Board found that the importation, distribution and ingestion of the tea does not implicate any danger to public health or safety in Oregon, it impinges on Oregon's sovereignty when the United States Attorney General threatens to arrest and prosecute Church members for religious activities that occur in Oregon.

53. In 2006 or 2007 I was asked to offer my expert opinion in a case involving a disputed fine that the Oregon Department of Human Services had levied on a nursing home. Since medications were involved in the violation, I was asked to give expert testimony regarding the efficacy of certain medications. I do not recall anything else about my involvement in that

www.bialabate.net
017

matter.

54. I have received $1,250 in compensation for my time in preparing this report. I coauthored a study published in *The Consultant Pharmacist* in 2005. My CV is annexed.

Pursuant to 28 USC §1746, I declare under penalty of perjury that the facts set forth above are true and correct.

DATED: December 1, 2008.

George Gerding, R.Ph.

034557\00001\1298078 V001

Page 17 - AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING, R.PH.

www.bialabate.net

# GEORGE ROBERT GERDING

# CV

# GEORGE ROBERT GERDING

**Licensed Pharmacist-Senior Care Specialist**

**1429 SE 55th Ave.**
**Portland, OR 97215**

**(503) 232-2566**
**mggerding@msn.com**

## Background:

Born and raised in Chicago, IL. Educated in the public school system. Served in the U.S. Army, honorable discharge. Married (Mary Elizabeth), five children.

## Education:

BS Pharmacy, Drake University, Des Moines, IA

## Pharmacy Practice:

Feb 2004-present Private consulting practice

Jan 2003-Feb 2004 Assisted Living Specialist, Omnicare National Marketing Team

Jan 2002-2003 National Senior Care Specialist, NCS HealthCare

1999-2001-National Research Coordinator, NCS HealthCare

2000-2001 Projects include INNOVATE Study, AVALON Study, Medication Use in ALFs, Treatment of Resistant Gram-positive Infections in LTC Facilities

1998-1999- Investigational pharmacist, research team, NCS HealthCare, Portland
Investigator: Overactive Bladder Study, 1999
Sub-investigator: Trovan Study 1998,99
Sub-investigator: Influenza Prophylaxis Study 1999
Others: Gain Registry (1000 patients nationwide)
Metrifonate Investigational study
Levofloxacin study

1993-1999- Consultant pharmacist, director of consulting services, NCS HealthCare, formerly IPAC Pharmacy Services

1977-1993- Manager/partner, Professional Plaza 102 Pharmacy (community practice, specializing in long term care and compounding)

Prior to 1976- Staff pharmacist- Colonial Drug, Collins Pharmacy, Seaton Pharmacy

www.bialabate.net

**Teaching Experience:**

- Instructor, Oregon State University College of Pharmacy
- Active in externship, clerkship programs
- Recipient, Preceptor of the Year
- Presenter, Partners in Pharmacy, IPAC-NCS Pharmacy
- Instructor, Pharmacology for Long Term Care Nurses, Clackamas Community College
- Instructor, Pharmacology for Respiratory Therapists, Mt. Hood Community College
- Co-instructor, Drugs and Society, Continuing Education Division, Portland State University
- Instructor, OTC Medications Review for Chiropractors, Portland Community College
- Guest Speaker, Nursing Program, Portland Community College
- Health Classes, Mt. Hood Community College
- Video Production-Management of Respiratory Disease,
- Rhone-Poulenc Rorer
- Guest trainer, Pain Management in Long Term Care, Hastings Institute
- Presenter, Gastrointestinal Disease Training, Pharmacists' Service Group, Salem, OR
- Reviewer, Drug Regimen Review, Pharmacists' Service Group
- Speaker, Kos Pharmaceutical
- Speaker, Wyeth Laboratories

**Professional Publication:**

Co-author (J. Carlson, M. Estoup, G. Gerding)
Evaluation of Demographics and Medication Use in Patients with Dementia in Assisted Living and Skilled Nursing Facilities, *The Consultant Pharmacist, July 2005*

**Professional Presentations:**

When Bad Drugs are Given to Good People. Oregon State Pharmacists Association

Medicare Part D–Historical and Hysterical, Oregon Society of Consultant Pharmacists

Through a Glass Darkly, OSEC Summer institute 2005

Drugs and the Free-Range Elderly, Oregon State Phamacists Association

When Good Drugs go Bad, Oregon Alliance of Senior and Health Services

Medication Management for Community-based Care, Oregon Dept. of Human Services, various sites

Understanding Older Adults, Oregon State Pharmacist's Assn. Meeting, Tualatin, OR

From Greyhound to Hertz, Oregon Health Care Assn. Meeting, Bend, OR

New Strategies for Alzheimer's Dementia, Washington Health Care Association Meeting, Yakima, WA

The Silent Epidemic- Medication Errors in Assisted Living, Oregon Medical Directors Meeting, Sun River, OR

The Paradox of Modern Drug Therapy, Regional Meeting, Prestige Care, Portland, OR,

Making Medications Work Better, Oregon Health Care Association Meeting, Portland, OR

Creating a Pain Management Team, American Society of Consultant Pharmacists Meeting, Nashville, TN.

Consultant Practice, Challenges and Opportunities, Oregon State Pharmacists' Association Meeting, Portland, OR

Sjogren's Syndrome, American College of Apothecaries Meeting, Philadelphia, PA

Ten Ways to Make Your Board Work For You, American College of Apothecaries Dallas, TX

Professional organization presentations for Nurses, Caregivers, Social Workers, Physical Therapists, Denturists, Ward Clerks

Various community organization presentations

**Postgraduate Professional Training:**

Alzheimer's/Dementia Traineeship, American Society of Consultant Pharmacists, Dearborn, MI, Dec. 1998

Certified Geriatric Pharmacy Practitioner, June 1998

Assessment of the Geriatric Patient, Oregon State University, College of Pharmacy, Portland

www.bialabate.net

Specialty Training in Diabetes Care, American College of Apothecaries, Memphis State University, Memphis, TN.

Specialty Training in Respiratory Diseases, American College of Apothecaries, Memphis State University, Memphis, Tn.

Specialty training in Compounding, Professional Compounding Centers of America, Houston, TX.

Pain Management Training, University of Utah, Bal Harbour, FL

Research Training, Pharmatech, Portland, OR

Speaker's Education Network, Rhone-Poulenc Rorer

- 

**Poster Presentations:**

- Evaluation of Functional Status and Treatment Outcome in Patients with Alzheimer's Disease in NF and ALF settings.
  American Society of Consultant Pharmacists, Anaheim, CA Nov. 2002

- Cost of Treating MRSA Infections in Lon-Term Care Facilities
  American Society of Consultant Pharmacists, Chicago, IL Nov. 2001

- Treatment of Osteoarthritis and Rheumatoid Arthritis in Long Term Care
  American Society of Consultant Pharmacists, Boston, MA Nov 2000

**Professional Membership:**

- Full Fellow, Past President, American College of Apothecaries
- Full Fellow, American College of Consultant Pharmacists
- Oregon State Pharmacists' Association, past secretary, delegate
- Oregon Society of Consultant Pharmacists, past president
- Professional Society of Pharmacists, past president
- Joint Commission of Pharmacy Practitioners
- American Pharmaceutical Association
- Appointed to Oregon Board of Nursing Home Administrators, 2003
- Appointed by two Oregon Governors to the State Board of Pharmacy (serving nine years), elected president twice.
- Appointed to the Oregon Council on Alcohol and Drug Problems

www.bialabate.net

**Awards and Honors:**

- Bowl of Hygeia Award, Philadelphia, PA, Sept. 2002
- 50 Years of Dedicated Service, OR Soc. Cons. Pharmacists, Dec 2005
- Life Member, ACA Research and Development Foundation
- Leadership Award, Region XI Director, ACA
- Outstanding Achievement in the Practice of Pharmacy
- Pharmacy Innovative Practice Award
- Community Service Award
- Pharmacist of the Year, Portland Retail Druggists' Association
- Special Service Award, Professional Society of Pharmacists
- Honorary Alumnus, Oregon State University, College of Pharmacy
- APHA Foundation member

**Specialized Training:**

- A.A., Television Production

**Published Articles:**

- Timing is everything, OHCA Quarterly
- Dangers of Acetaminophen, ODS Quarterly
- Medications and Falls, ODS Quarterly
- Crazy Dirt, (short story), Northwest Writers Quarterly
- The Technician Issue, Oregon Board of Pharmacy Quarterly

**Visual Arts:**

- Feeling Different, 8mm sound film
- The Trustee Series, Multi-image training presentations for hospital trustees, Brim and Associates
- Fairlawn, A Love Story, Multi-image presentation

**Community Service:**

- Board Member, Oregon State Pharmacists Association
- Board Member, Geriatric Dental Group
- Board Member, Oregon Drug Utilization Review
- Pharmacy Advisory Committee, Oregon State University
- Board Member, Benedictine Foundation
- Ruling Elder, Mt. Tabor Presbyterian Church
- Toastmasters International
- Dale Carnegie Training
- Eastside Professional Group

www.bialabate.net

# PLAINTIFFS' EXHIBIT 1:

# THE REPORT OF THE BRAZILIAN FEDERAL COUNCIL ON NARCOTICS (CONFEN)

www.bialabate.net

**WORKING GROUP**

**FINAL REPORT**

**"Examination of the issue of the production and consumption of substances derived from plant* species" – Recommendations.**

PLAINTIFF'S
EXHIBIT
1

* Translator's Note: The term "plant" (Portuguese: "*vegetal*"), as used herein, refers specifically to the psychotropic plants discussed in this report.

the activities carried out by the Working Group appointed by CONFEN Resolution No. 4 of July 30, 1985, the makeup of which was modified by CONFEN Resolution No. 7 of July 9, 1986, with the purpose of "examining the issue of the production and consumption of substances derived from plant species" – Recommendations.

I

PROLOGUE

1 - The Federal Council on Narcotics ("Conselho Federal de Entorpecentes," or CONFEN), was directed by Administrative Ruling 02/85 of the DIMED (Division of Medications of the Ministry of Health) to issue a declaration regarding the inclusion of *Banisteriopsis caapi* among the drugs listed as illicit substances, which includes references, in parentheses, to "cipó de chinchona" (cinchona liana), "chacrona" or "mariri." The solicitation was formalized by a petition addressed to the then President of the CONFEN, Dr. Técio Lins e Silva, registered under no. 019547, on July 23, 1985, with the Communications Division of the Ministry of Justice. The request was signed by attorney Luís Felipe Belmonte dos Santos, and was accompanied by the power of attorney granted to him by the "Centro Espírita Beneficente União do Vegetal" ("União do Vegetal Beneficent Spiritual Center") (Attachment No. 1).

2 - The President of the CONFEN at that time dispatched the petition determining the establishment of a proceeding by way of which the matter would be subsequently examined by Commission, to be appointed pursuant to a resolution which was to come into effect as Resolution No. 4 of July 30, 1985, published in the *Diário Oficial da União* (*D.O.U.*, the Official Gazette of Brazil) on August 8, 1985. Hence, the Working Group was appointed by Resolution No. 4/85 and consisted of the following members: Antonio Carlos de Moraes, vice-president of the CONFEN and representative of the Ministry of Public Finances; Suely Rozenfeld, representative of the National Division of Sanitary Surveillance (of the DIMED); Isac Germano Karniol, representative of the Brazilian Medical Association; Sérgio Dario Seibel, representative of the Ministry of Social Security and Welfare; and Paulo Gustavo Magalhães Pinto, representative of the Narcotics Repression Division of the Federal Police Department.

Dr. António Carlos de Morais (sic?) was appointed chairman of the Working Group (Attachment No. 2)

www.bialabate.net

3 - Two members of th[illegible] Germano Karniol and Dr. Sérgio Dario Seibel—traveled to Rio Branco, capital of the State of Acre, in order to gather further information so as to better support the group's work, given that various communities which use the beverage under investigation were, and indeed still are, located in said State. Their visit resulted in the report submitted to the final plenary session of the CONFEN of 1985, on December 19, during which it was unanimously decided to postpone its decision upon the matter until the following session, to be held in January 1986. In addition, during said session of December 1985, the honorable advisor Antonio Carlos de Moraes requested to be relieved of the chairmanship of the Working Group on account of insufficient time to dedicate himself to his duties to the extent he had intended. Consequently, Dr. Domingos Bernardo Gialluisi da Silva Sá was appointed both as a member of the Working Group and as its chairman.

4 - The Working Group subsequently met in the city of Rio de Janeiro, and its members unanimously approved the terms of the opinion submitted to the plenary session of the CONFEN, held on January 31, 1986, which it also approved unanimously (Attachment No. 3). Said opinion, which follows, is transcribed in its entirety, taking into account the overriding importance, for this final report, of the presuppositions upon which it is based, and the fact that it was approved unanimously by the members of the Working Group and of the Federal Council on Narcotics (CONFEN) itself:

> "The Working Group directed by Resolution No. 04/85 to examine the matter relating to the production and consumption of substances derived from plant species;
>
> CONSIDERING the investigation and corresponding report organized and prepared by Dr. Isac Germano Karniol and Dr. Sérgio Dario Seibel with regard to the plants popularly known as "mariri" and "chacrona," the scientific names of which are *Banisteriopsis caapi* and *Psychotria viridis*;
>
> CONSIDERING that the aforementioned investigation was carried out in Rio Branco, capital of the State of Acre, among religious communities which make ritual use of the substance derived from a decoction of "mariri" and "chacrona," said product corresponding to the tea commonly referred to as "daime";
>
> CONSIDERING that the aforementioned ritual use of "daime" has existed for many decades without resulting in any known social harm;
>
> CONSIDERING that, according to the above-mentioned report, "moral and ethical standards of behavior, similar in every respect to those which exist and are recommended in our

www.bialabate.net

society, are of ... sects, at times in an even stricter manner";

CONSIDERING that Resolution No. 04/85 addresses the various aspects involved in the ritual use of substances derived from plant species, by religious or indigenous communities, including sociological, anthropological, chemical, medical and general health aspects, it requires the examination of ALL of these aspects, which must therefore be taken into account when deciding upon issues relating to the use of said plant species;

CONSIDERING that, by way of Administrative Ruling 02/85, issued by the DIMED, ***Banisteriopsis caapi*** was included among the drugs on the list of illicit substances without observing the provisions of Art. 3, § 1 of Decree No. 85110 of 9/2/1980, which requires a prior hearing of the CONFEN, which is responsible for orienting policy and for the technical supervision of the activities regulated by the National System for the Prevention, Taxation and Repression of Narcotics Use;

CONSIDERING, in conclusion, the need to carry out various other studies referred to in Resolution No. 04/85, in addition to those carried out by Dr. Isac Germano Karniol and Dr. Sérgio Dario Seibel, the Working Group suggests to the distinguished Plenary Session of the Federal Council on Narcotics that it reexamine the process of including ***Banisteriopsis caapi*** in the aforementioned DIMED list so as to temporarily suspend said inclusion until the study of every aspect referred to in Resolution No. 04/85 has been completed, while strictly maintaining the status quo prior to above-mentioned DIMED Administrative Ruling 02/85, and officially notifying the sects which use "daime" or the beverage known by any other name which results from the decoction of the aforementioned species. Notwithstanding, the CONFEN may at any time reverse the temporary suspension decision suggested herein in the event that facts are verified which in any way indicate the misuse of said tea, including a corresponding rise in the number of users.

Such is our opinion. – Submitted with all proper reserves"

5 - The approval of the above-quoted opinion resulted in Resolution No. 6 of February 4, 1986, published in the *D.O.U.* on the 5th of the same month, by way of which the inclusion of *Banisteriopsis caapi* in DIMED Admin. Ruling 02/85 was suspended until the conclusion of the studies of the Working Group, with a deadline of six months (Attachment No. 4).

6 - The CONFEN met on June 26 and 27, 1986, at which time the Working Group

www.bialabate.net

officially notified the Pres[illegible] way in which it organized its activities, in addition to reporting on the phases already completed. The Working Group also reported that professionals from various fields, referred to in item VI of the official notice, had been invited to advise it.

In conclusion, by way of the same official notice, an extension of the period provided for in CONFEN Resolution No. 06/86 was requested, based on the following reasons:

> "Hence, taking into account the great significance to the CONFEN of gathering all necessary information which may provide knowledge which is indispensable to reaching a final and unbiased decision regarding the issue of the religious and/or cultural use of psychoactive plant species; and in accordance, moreover, with the recommendations made to the governments of the Americas during the 9th Congress of the Inter-American Indian Institute (Resolution 10), the W.G. hereby submits the present request to the Plenary Session for an extension of the period determined by Resolution No. 6/86, which would thereby extend the deadline from August 5 of this year to June 30, 1987.
>
> The request made herein needs to be considered since the W.G. can directly affirm, based on the observations it has already made, that to date it has not encountered any verifiable individual or social harm resulting from the use of the tea ("Holy Daime") obtained by decocting the plant species scientifically known as *Banisteriopsis caapi* and *Psychotria viridis* in their natural state, i.e., not having undergone any type of chemical processing, and which are used for ritual or religious purposes.
>
> Moreover, to date the W.G. has observed that the users of said tea comply with the rules of social behavior both within and without their respective communities, and demonstrate full compliance with the standards of conduct adopted by society in general.
>
> Wherefore, the W.G. proposes the continued authorization of exclusively ritual or religious use, without prejudice to whatever decision the CONFEN reaches under the terms of the final opinion to be submitted by this W.G."

7 - Two further resolutions resulted from the report submitted by the Working Group, on June 26, 1986. The first, Resolution No. 7 of July 9, 1986, published in the *D.O.U.* on the 10th of the same month, formalized the replacement of Dr. Antonio Carlos de Moraes as president of the Working Group by Dr. Domingos Bernardo Gialluisi da Silva Sá, and incorporated the following group of advisors into the Working Group's coordination activities: Dr. Francisco Cartaxo Rolin, Associate Professor of Sociology of the Universidade Federal Fluminense (Federal University of the State of Rio de Janeiro); Dr. João Manoel de Albuquerque Lins, Professor of Philosophy of the Pontifícia

www.bialabate.net

Universidade Católica (Pon ... f Rio de Janeiro with doctorates in Philosophy and Theology from the Gregorian University of Rome; Dr. João Romildo Bueno, Professor of the Department of Psychiatry of the School of Medicine of the Federal University of Rio de Janeiro; Gilberto Alves Velho, Professor and Anthropologist of the National Museum, member of the board of the Sociedade Brasileira para o Progresso da Ciência (SBPC, Brazilian Society for Scientific Progress), board member and former President of the Associação Brasileira de Antropologia (Brazilian Anthropology Association), and board member of the Conselho do Patrimônio Histórico e Artistíco Nacional (National Historical and Artistic Heritage Council); Regina Maria do Rego Monteiro de Abreu, Professor and Anthropologist; and Dr. Clara Lúcia de Oliveira Inem, Clinical Psychologist, member of the Sociedade de Psicanálise de Grupo (SPAG, the Group Psychoanalysis Society) and Technical Advisor of the Fundação Nacional do Bem-Estar do Menor (FUNABEM, the National Foundation for the Well-Being of Minors) (Attachment No. 5).

The second resolution, Number 9 of August 8, 1986, published in the *D.O.U.* on the 12th of the same month, extended the deadline for submitting the final report of the Working Group to June 30, 1987 (Attachment No. 6).

8 - Lastly, His Excellency the current President of the CONFEN, Dr. Miguel Reale Junior, on account of changes to the makeup of the CONFEN's board of directors, whereby various members of the Working Group ceased to belong to said board, made the following statement in official notice No. 310/CONFEN/SG/87 of May 14, 1987, addressed to the president of said Group:

> "I refer to CONFEN Resolutions 04/85 and 07/86 referring to the creation and reformulation of the Working Group in order to examine the issue of the production and consumption of the substances derived from plant species, of which you are the President, in order to request that the final report of the Group be examined by the plenary session of the CONFEN during its upcoming July meeting period.
> Therefore, I would greatly appreciate it if the report were sent to the Executive Secretary of the Council as soon as it is completed, so that it can be distributed to its members beforehand.
> In addition, I am instructing the Secretary to keep you informed of the agenda of said meetings so that the proper measures are taken to allow you to attend them."
> (Attachment No. 7)

## II

## OBJECTIVES

9 - Notwithstanding the generic references made by Resolution No. 4/85 to the

examination of issues p[illegible] spects of the production and consumption of substances derived from plant species, the Working Group restricted itself to the study of the production and consumption of the beverage which the communities it visited commonly refer to as "daime" or "vegetal," and which the media generally refer to as "ayahuasca." Regardless of the names given to the beverage (there are several others), what is important to remember for the purposes of the Working Group's investigation is that said beverage is always a product of the decoction of the vine stem and of the leaf of the species scientifically known as *Banisteriopsis caapi* and *Psychotria viridis*, respectively. In addition, various names are given to these two ingredients. The liana is sometimes also called "jagube," "mariri," or simply "cipó" ("liana"), and other names given to the leaf include "rainha" ("queen") and "chacrona."

It is listed in the dictionary by Aurélio Buarque de Holanda Ferreira as "caapi," a plant discovered and classified by Richard Spruce, an English botanist and explorer of the 19th century (cf. p. 180 of *O Índio e as Plantas Alucinógenas* [The Indian and Hallucinogenic Plants] by Sangirardi, Jr., Alhambra, 1983).

Having initially defined the plant species of concern to the Working Group, the activities performed by the Group need to be reported, along with the results of the studies it carried out.

## III

## ACTIVITIES CARRIED OUT

10 - The Working Group carried out various activities with the purpose of understanding the aspects referred to in Resolution No. 4/85, "including sociological, anthropological, chemical, medical and general health aspects". The main activities carried out are described below.

11 - A number of visits were made to locations where Ayahuasca is used ritually.

Visit No. 1, from October 23 to 26, 1985, was made by Dr. Isac German Karniol and Dr. Sérgio Dario Seibel to three places where Ayahuasca users meet ritually, all of which are located in Rio Branco, capital of the State of Acre. The three groups in question are known by the names of "União do Vegetal," "Colônia 5000," and "Alto Santo." A report on this visit was prepared, and is an invaluable aid in the examination of the issue. It is therefore considered to be an integral and complementary part of this final report. (Attachment No. 8)



www.bialabate.net

A few of the topic [illegible] highlighted, in view of their importance to the study presented herein.

> "4) moral and ethical standards of behavior, similar in every respect to those which exist and are recommended in our society, are observed within the various sects, at times in an even stricter manner. Respect for the law always appeared to be emphasized.
>
> ..........................................................................
>
> 5) The effect observed is probably due not only to the tea but also to the entire ambience, the music and accompanying dances, etc.
>
> ..........................................................................
>
> 9) Once the ceremonies have ended, apparently all in a normal and orderly fashion, they return to their homes.
>
> The followers of the sects appear to be calm and happy people. Many of them attribute family reunification, regained interest in their jobs, finding themselves and God, etc., to the religion and the tea.
>
> ..........................................................................
>
> 12) Among the sects only one seems to have used a drug other than the tea (i.e., cannabis) during its religious pursuits. This practice was abandoned under the Cavalheiros agreement made with the military and police authorities of the time, and is apparently still being respected.
>
> ..........................................................................
>
> 13) Historically, cipó and chacrona were only found in the virgin forest. Some sects have attempted to cultivate these plants, with relative success. It should be emphasized, however, that the preparation of the tea is fairly difficult and time-consuming, and involves a whole "technology" (sic) dating back to time immemorial which is used during a given ritual. In view of how it is prepared, it would appear difficult for an amount much greater than that needed by the sects to be feasibly prepared. In other words, it would appear difficult to prepare the tea in amounts which could be abused in a non-ritual way in society at large.
>
> ..........................................................................
>
> 17) We encountered isolated cases of young adults from large cities in other Brazilian States who, in search of a life path, appear to have discovered these religions. They appear nonetheless to be well-adjusted in personal and occupational terms."

Other integral aspects of the "travel report" which resulted from this first visit will be addressed later.

www.bialabate.net

11 (sic*) - Visit No. 2, made [illegible] Domingos Bernardo Gialluisi da Silva Sá and Dr. Sérgio Dario Seibel to the religious community called "Céu do Mar," located at Estrada das Canoas 3036 in the Zona Sul (southern zone) of the city of Rio de Janeiro. This visit was preliminary in nature. Its objective was to prepare for another visit which would be made during the performance of what the followers of the sect call "work." The "work" is actually the religious practice of the community during which they drink the beverage, sing hymns, dance and recite prayers, some of which are from the Christian tradition, such as the "Lord's Prayer," the "Hail Mary," the "Hail, Holy Queen" and the "Glory Be to the Father."

We were greeted by the spiritual leader of the community, the psychologist Paulo Roberto Silva e Souza, who took us to the place where the "work" is performed, which is called the "church." There we met with six other followers of the "doctrine," the name given to all of the principles contained in the hymns which are chanted during the ceremonies.

12 - The anthropologist Regina Abreu, who is a researcher from the National Historical Museum and a professor of anthropology at the University of the State of Rio de Janeiro, reflected upon the basic characteristics, both in terms of doctrine and ritual, found within the community of "Padrinho (Godfather) Sebastião" (currently in the "Céu do Mapiá" Rubber Plantation, deep in the Amazon jungle), the supreme leader of the "doctrine." However, said basic characteristics are also found right in the Zona Sul area of Rio de Janeiro.

"Padrinho Sebastião" and his wife, "Madrinha (Godmother) Rita" are respected by all and recognized as the Father and Mother of the community, as well as the earthly representatives of the spiritual Father and Mother. In general terms, what appears to matter are the group, the whole, the community, more than individuals or isolated family units. In this sense the Santo (Holy) Daime Community resembles the societal model which the French anthropologist Louis Dumont described as "holistic."

From an astral or spiritual standpoint, "the basic principle is Daime," says the eldest son of the Padrinho, designated by him to be future leader and who is already taking on the administration of the community, "because Daime is the Mestre (Mentor). [In our healing work] the sick person only has to come speak to the chief, the Mestre already knows what's going to happen."

The Mestre is Juramidan, commander of all of the movement in the universe, a spiritual entity identified with Jesus Christ and the Eternal Father (God the Father of Christianity). "In spirituality, Daime takes the name of Juramidan," he continued. "Daime is the drink, but the drink contains the divine being which comes from the forest (...) The presence of Daime is the presence of Christ." (Cf. the work of Professor

---

* This should have been number 12 and subsequent sections should have been adjusted accordingly.

The supreme importance of "Padrinho Sebastião" in the "Holy Daime doctrine" is demonstrated by the fact that no "church" has the legitimacy to function in Brazil or even abroad unless the interested party goes personally to the "Céu do Mapiá" Rubber Plantation in the Amazon jungle and there obtains the direct authorization of the "Padrinho."

It is interesting to note that Dr. Paulo Roberto Silva e Souza went to Cape Code, Boston (sic) in the United States, where he performed "work" four times at the invitation and expense of a group of American psychotherapists who, reportedly, intend to found a "Church" in Boston. In addition, according to Dr. Paulo Roberto, he has received invitations to perform "work" in Madrid; on the island of Maui in Hawaii; in London; in Brisbane, Australia; and in Oslo, Norway.

It should be made clear that the data contained here in item 12 were not all collected on the same day during visit no. 2, although they were all reported on the basis of various interviews held with Dr. Paulo Roberto over the course of approximately one year. However, the undersigned author of this report felt that organizing this first batch of information would make the present study easier to understand.

It was agreed that we would be in attendance during the "work" which was to be performed the following day.

13 - Visit No. 3, made on April 25, 1986. The "church" was lit up and there was a great deal of movement among the followers of the "doctrine" who were preparing and decorating the premises, considered sacred, where the ceremonies were to take place. The men were wearing white three-piece suits with a blue fringe on their pants, and ties of the same color. On their lapels some of them were wearing a circle containing a star and, inside of it, a moon, all in gold. The women wore white dresses with green belts, and a head decoration resembling a small garland. They give these clothes the name of "uniform," and they are only provided to those who have chosen the "doctrine." They were tuning instruments which were to be played during the "work" (an accordion and guitars) and were teaching chants. The ambience was quite similar to that found in the places of worship of other religions: candles, crosses, rosaries, effigies of the Virgin Mary, Jesus Christ and St. John the Baptist. At the rear of the temple there was an isolated chamber in which the "Daime" was kept, and it was interesting to observe that the connection with the assembly room, in which the ceremony was to be held, was through two tabernacle-like openings.

www.bialabate.net

Before initiating the "work," the spiritual head, Paulo Roberto, called us aside and cautioned us that, in the event we wanted to take "Daime," we should know about the fundamentals of said practice. He then said: "We take Daime under the power of our Lord Jesus Christ, the protection of the Virgin Mary, of St. John the Baptist and of the Patriarch St. Joseph. Daime requires courage and strength in order to directly face what people are. If such is not the case it's better not to take Daime. We believe in the power of love, that men are brothers and that pride is what separates people."

14 -     The "work" lasted around six hours and began with the recital of Christian prayers, specifically the "Lord's Prayer," the three "Hail Marys" and the "Hail, Holy Queen," in addition to ejaculatory prayers. Next, the men and the women—in two separate groups with a table between them covered with candles, crosses, water, rock crystals and rosaries—formed two lines and moved towards the "tabernacles" (one for the women and the other for the men). In each one some "Holy Daime," in an amount equivalent to 100 ml or 150 ml, is served to each participant who, before receiving his or her serving, contritely makes the "Sign of the Cross" and returns to his or her place. Hymns are chanted throughout the "work," accompanied by instruments such as the guitar and the accordion, to the rhythm of maracas. The two groups of men and women dance, with lateral, repetitive, uniform and alternating movements. Occurrences such as vomiting and diarrhea are viewed as natural. (The latter appear to be less frequent.) Such events are considered to be a form of purification of the ills of the spirit and the body. Participants who are in such conditions are always looked after by members of the community who, during all of the "work," are charged with supporting those who are expiating their ills. The "church" is located in a place which, by necessity, anticipates the indispensable conditions which allow this genuine "rite of expiation" (through vomiting or diarrhea or both combined). It can be said, however, that the performance of "work" does not fail to anticipate the "rite of expiation," with spaces and places which allow the purging (vomiting and diarrhea) of any suffering participants. The hymns evoke the forces of nature, the power of God, of the Virgin Mary and of all of the saints. They exalt the virtues of mankind, and encourage love, humility and repentance for one's faults. They proclaim the joy and the power of those who have faith in divine power and do good deeds. There are brief intervals between the hymns, during which ejaculatory prayers are recited in a lively manner to the "Divine Eternal Father," to the authors of the hymnals, and to the visitors, among others. The beverage was served two more times, following the

www.bialabate.net

same ritual (separate line ... fferent "tabernacles," respectful ingestion), in a manner similar to the lines for receiving communion among Catholics. The last time, the "work" participants took a smaller amount of "daime," for the purpose of concluding the contemplative experiences and thereby returning to the ordinary rhythm of life. The "work" is formally concluded with the recitation of prayers and with thanks to God. After the conclusion, the participants disperse. We sat down with some of them, including Dr. Paulo Roberto, and had coffee or tea, and biscuits and cake—in short, a little snack—after which each of us took leave of each other cordially and calmly and returned home.

15 - The two of us who visited both participated in the "work," during which we drank the beverage three times (in a smaller amount the last time). The liquid is brownish, with an extremely acrid, repulsive and nauseating taste which, in both our cases, provoked serious nausea and vomiting. In my case (that of the author of this report), it also caused serious diarrhea. With our eyes closed or half-open, in a state of varying torpor, as if half asleep, we experienced perceptions which apparently were unexplainable by external objects. It was possible to observe these characteristics—eyes closed or half-closed with slight fluttering—among the participants when they were having visions.

16 - <u>OTHER INFORMATION ON THE VISITED COMMUNITY</u>. The legal name of the sect is "Centro Eclético de Fluente Luz Universal Sebastião Mota Melo" ("Sebastião Mota Melo Eclectic Center of Universal Flowing Light") or "CEFLUSMME," which owns the building which serves as its headquarters. Although it is located right in the city of Rio de Janeiro, the occupied area is covered with dense vegetation in a 200,000 $m^2$ (≅ 50 acre) forest reserve of the Brazilian Forest Development Institute (IBDF), 20,000 $m^2$ (≅ 5 acres) of which are buildable. The congregation includes about 200 followers, approximately 30 of whom already live at the location, as a community. The latter (including some physicians, university professors, journalists and even a state assemblyman) have outside activities and share housekeeping expenses. The other "uniformed" followers contribute to the "church" in keeping with their means, in accordance with their testimony. It should be remembered that the "uniformed" are those who have definitively chosen the "doctrine." The organization has received a certificate of public interest from the State and its date of establishment is 11/01/1982.

17 - <u>Visit No. 4</u>, from June 13 to 15, 1986, was made by Dr. Domingos Bernardo Gialluisi da Silva Sá, Dr. Isac Germano Karniol and Dr. Sérgio Dario Seibel to the community known as the Centro Eclético de Fluente Luz Universal Rita Gregório ("CEFLURG"), based at the Fazenda Nova Redenção (New Redemption Ranch) in Visconde de Mauá-Resende, State of Rio de Janeiro, postal code CEP 27500. The

www.bialabate.net

director of the center is journalist and writer. The basic characteristics of the CEFLURG in terms of doctrine and ritual are similar in every way to those encountered at the CEFLUSMME in the city of Rio de Janeiro, which are described in items 11 to 14 above and which therefore do not need repeating. Naturally, since the CEFLURG is a rural community, there are differences which result from this particular fact. Such differences in social organization are best stated by the declaration of Sonia Maria Palhares, professor and vice-president of the CEFLURG, in a document sent to the undersigned author of this report. The following words are her own: (Attachment No. 10)

> "The CEFLURG is a non-profit organization, duly registered with the Registry of the 1st Registrar's Office of Deeds and Documents, and which has as its activity the organization of a Community and its spiritual practices.
>
> The Community has an administrative framework consisting of several commissions managed by people who oversee daily tasks and divide them among their members. The Commissions (Agriculture, Works, Teaching, Nutrition, Janitorial, Ritual, Secretarial, Archive and Documentation, Healing, etc.) meet monthly. All of the members of the community meet daily at Dawn (7 a.m.) to plan the day's work. Depending upon the needs of the Community, work may be assigned by gathering the majority in one area or by having individuals stay within their own specific area and operating several areas at the same time.
>
> Due to the Microsystemic nature of a Community, all of those who arrive find a field in which to develop their skills, and the tendency is towards choosing to spend all of their work time within the Community.
>
> Family support is provided for all those who work full time, and we have a collective dining hall and a general supply plan.
>
> There are, however, persons who maintain other employment ties. They generally work in the town of Mauá or provide services to private parties.
>
> There are also the members of the Center who attend the Spiritual Work, wear the "uniform of the Doctrine," and live in urban centers (Rio and São Paulo).
>
> Our source of revenue at this time, aside from private donations, is "Flor das Águas – Producer of Natural Foods" and the cheese dairy.
>
> Workers:
>
> 1) In the Community only:
>
> 1 Civil Engineer – in the Works Commission, with two years of Doctrine.
>
> 1 Architect – in the Works Commission, with four years of Doctrine.
>
> 1 Draftsman – in the Works Commission, with two years of Doctrine

www.bialabate.net

2 Teachers – in the Teaching Commission, who teach at the Community Preschool in the morning: one of them has four years of Doctrine and the other has two years of Doctrine.

2) In the town of Mauá:

1 Teacher of the Visconde de Mauá State School (a State employee) who has five years of Doctrine.

1 Doctor with an office in Visconde de Mauá who serves the local population, with three years of Doctrine.

1 Forest Engineer – providing consecutive services to landholders and individuals in the region. He has one year of Doctrine.

3) In Rio, São Paulo and other urban centers:

1 Psychologist who is currently working in the United States and returns in October. He has one year of Doctrine.

1 Doctor with the Services Support Institute of the State of Rio de Janeiro (IASERJ). She has three years of Doctrine.

1 Attorney with a private office. He has three years of Doctrine.

1 Freelance Journalist, with six months of Doctrine.

1 Publisher, with two years of Doctrine.

Conclusion:

The people listed herein have some academic training, however the members of the Community work in many capacities which are specific to the rural environment, with the result that new fields of study and research are opening up. For example: the cheese dairy, poultry farming, herbal healing, farming and the Works Commission (research has been carried out on cement and adobe floors by studying books, texts from the Banco Nacional da Habitação (BNH, the National Housing Bank), and correspondence with architects in other countries). All of the members of the Community are registered, and these records are available to you.

Mauá, May 20, 1987

Sonia Maria Palhares
Vice-President of the CEFLURG

18 - One piece of information which is indicative of the unity of the "doctrine" followed by the two centers—the one in Rio de Janeiro and the other in Visconde de Mauá, is that their respective names include the name of the "Padrinho" Sebastião Mota Melo (the Rio de Janeiro center) and the name of the "Madrinha" Rita Gregório (the Visconde de Mauá center), who are the earthly representatives of the spiritual Father and Mother.

As visitors we all participated in the "work" performed, which merits the same

www.bialabate.net

description as that given in items 13 and 14 above, with minor differences of no real importance, akin to the differences one would notice between two Catholic masses celebrated in two different parishes.

As occurred in Rio de Janeiro, we all took part in the "work," and ingested the beverage which, once again, provoked nausea and vomiting. It should be noted, however, that we visitors concluded that the strong emetic effects of the drink are attenuated by participating in the dancing and the chants.

Special mention should also be given to the special "work" performed on Sunday mornings, the so-called "Children's Daime," when the drink is served to the children in much smaller doses (the youngest, some of them still nursing, take "daime" from a teaspoon). There were pregnant women who had participated in the "work" both on Sunday and the day before. Some of them told of their experiences, which they considered highly positive, of using "daime" during childbirth.

One of the women, to give an example, described the perception which can be experienced during childbirth, which led her to a full understanding of that moment and her profound loving relationship with her son being born. She then added that her subsequent relationship with this son was more intense and positive than that experienced with her older son.

This Community, just as the one in Rio de Janeiro had done, provided all requested information and gave full support to the visitors, treating them with hospitality and giving them full access to all of the outbuildings and areas of the Ranch.

19 -  Visit No. 5, from July 14 to 20, 1986, was made by Dr. Domingos Bernardo Gialluisi da Silva Sá, Dr. Sérgio Dario Seibel, Dr. Sérgio Sakon and Dr. Clara Lúcia de Oliveira Inem, and included three destinations: Rio Branco, capital of the State of Acre; the locality known as Boca do Acre, in the State of Amazonas; and the Céu do Mapiá Rubber Plantation, in the Amazon jungle.

Preliminary clarifications: Although Dr. Sérgio Sakon is not a member of the Working Group under the terms of Resolutions no. 04/85 and no. 07/86, it should be noted that he is a member of the CONFEN board, a representative of the Federal Police, and is the substitute, within the CONFEN, of the representative from the Federal Police Department, Dr. Paulo Gustavo Magalhães Pinto. He was therefore invited to join the team making the journey in question. This invitation was made because, at the time, board member Paulo Gustavo Magalhães Pinto was unable to make said trip due to his professional obligations with the Federal Police Department. Dr. Clara Inem participated

We were also joined by Dr. Paulo Roberto Silva e Souza, from the previously mentioned "Céu do Mar" community, located in the city of Rio de Janeiro, who met us at Rio de Janeiro International Airport and accompanied us until our arrival at the Céu do Mapiá Rubber Plantation. We were informed by him in detail about the various phases of the upcoming journey, in view of the complexities involved (various means of transportation; food and potable water supplies during the river passage; medications, including anti-malarial treatment, smallpox vaccinations, etc.). Dr. Paulo Roberto was perfectly acquainted with the route, having periodically met with "Padrinho Sebastião" and his community at the "Céu do Mapiá" Rubber Plantation.

20 - Date: 07/14/86 – We arrived at Rio Branco and, on the same day, we continued in a single-engine airplane to Boca do Acre, about a 30-minute flight. The locality known as Boca do Acre is located on the banks of the Purus river and its population, overall, appeared fairly poor. Located there is what the followers of the "Santo Daime doctrine" call a "first-aid clinic." This is emergency treatment, administered by followers of the sect authorized by "Padrinho Sebastião," to persons requiring help for their physical or spiritual suffering. We obtained this and other information from the various members of the "doctrine," some of whom reside there, and from others who had come from elsewhere in Brazil.

It is interesting to note that the community living in the Amazon jungle, known as "Céu do Mapiá," was running a commercial business like a restaurant or snack bar in Boca do Acre. This activity is managed by one of its members—the same who had provided us with these clarifications. In any event, this location is an important part of the structure of the jungle-based community, since, as we later observed, it serves as a small consumer market for the products produced in "Céu do Mapiá," such as the latex they extract in the rubber plantation, refined sugar, and agricultural products, including those consumed at the above-mentioned business. At the same time, Boca do Acre serves as a supplier of necessities for the inhabitants of the rubber plantation, including goods such as clothing, medicine, tools, household utensils, etc.

[21 -] Date: 07/15/1986. In the morning we left Boca do Acre aboard the "Tucuxi," a vessel from the INCRA (Instituto Nacional de Colonização e Reforma Agrária, the National Institute for Agrarian Settlement and Reform), and followed the Purus river up to the mouth of the Mapiá narrows [text cut off at page bottom]

www.bialabate.net

[...] can be made by canc[...] under protective netting, in an unoccupied hut on the banks of the narrows. Indeed, to continue the journey during the night would have been extremely hazardous, on account of reduced visibility and the highly sinuous nature of the narrows, along with the numerous trunks and branches which need to be avoided all along the way. Moreover, we were warned many times that we would need to take great care in walking on the riverbed through the narrows on account of the ferocious sting of the freshwater rays there. This brief narration is important in that it conveys the difficulties and adverse conditions which travelers must face in order to reach the community of "Padrinho Sebastião" and "Madrinha Rita" at the "Céu do Mapiá Rubber Plantation." Indeed, we encountered people from a number of regions of Brazil (including Brasília, Bahia, Rio de Janeiro and Visconde de Mauá) during our journey. The impression of the author of this study was that many of these people had the characteristics of genuine pilgrims making their way to the center of the "Santo Daime doctrine," in search of sacred contact with the elderly man with an apostle's beard: "Padrinho Sebastião," thus justifying the many inconveniences and difficulties confronted. All of this, together with the attempt to live in harmony with nature, appears to be very rich material for later analysis by sociologists. In addition, witnessing the interaction among members of groups from different regions and cultures of Brazil is essential in order to accurately assess the topic and final considerations of this report.

[22 -] Date: 07/16/1986. Arrival at the "Céu do Mapiá Rubber Plantation," where we stayed until our departure on the 19th of the same month. The village is small, with around 250 inhabitants, as reported to us by members of this community, which was founded and nurtured in the heart of the Amazon jungle. There are a number of huts of the type shown in the photos attached hereto (Attachment No. 10, photos I to XII, all of which are reproduced with the permission of the historian Vera Fróes, author of the book *História do Povo Juramidan -A Cultura do Santo Daime*, i.e.: *History of the Juramidan People - The Santo Daime Culture*, which received the Suframa Prize for History in 1983).

As stated previously, there were people from various parts of Brazil, and even outside the country. Currently, since the time of our visit, there are people who are moving there permanently; such is the case of the clinical psychiatrist who is pictured alone in photo no. II, in the center of photo no. VIII, and beside "Padrinho Sebastião" in photo no. IV. This psychiatrist, a married man with children, was met by the author of this study during Visit No. 4, at Visconde de Mauá. His move was reported to us by the historian Vera Fróes.

www.bialabate.net

23 - Date: 07/17/1986. A vening of the following day, all of the most important moments of our visit were recorded on video. In addition to this documentary, a number of interviews were recorded with members of the community, both male and female, and of various ages. All of this material is available for the CONFEN to examine.

The first place we visited was where the leaves ("rainha" or "chacrona") were stored for use in the "feitio" ("craft"), the term given to the entire "Daime" preparation process. These leaves, we were told, came from Rio Branco. The leaf plantation is much smaller than the liana plantation, with the latter numbering some 5,000 plants. We went to see the so-called *jagube* grove (a plantation of the *cipó* or *jagube* liana) where it was explained to us that the ideal harvest time is after five years, and that it is possible to use the vine after three years, although at that point it is still slender.

The new "craft house" was being completed. It contained a hearth for preparing the beverage in large aluminum pots, with a capacity of up to 120 liters (≅ 30 gallons), and tree stumps arranged in two rows of seven, one in front of the other, with small benches where the followers of the "doctrine" sit during the "pounding" (*bateção*). The "pounding" is the process of macerating the liana. This was done, with rhythmic strokes, using mallets fashioned by the community members themselves.

We also visited sites planned for the milling of sugar cane, and for the production and storage of refined sugar. The community also farms the land for its own sustenance, and reportedly the only thing it needs to obtain from the outside (in Boca do Acre) is salt. It should also be noted that the harvesting and sale of latex sap play a significant role in the economy of the community.

Photograph no. II shows the "Healing House" (*Casa de Cura*), which, as its name suggests, is intended for the rituals which aim to ease or eliminate the physical or spiritual suffering of those who seek succor from the "doctrine."

At nighttime, all of the visitors took part in a "work" ritual. Once again, we remarked upon the similarity of the ritual to what we had witnessed in Rio de Janeiro and in Visconde de Mauá, to such an extent that it is entirely possible to rely once again upon the description given previously in items 13 and 14 for a fairly accurate picture of how the "work" on the night of 4/17/1986 was performed. The visitors participated fully in the ingestion of the beverage, in the chants and in the dance.

There were also occurrences of nausea and forceful vomiting. It is noteworthy that the greater the amount of the beverage ingested [text cut off at page bottom]

[...] -ly, diarrhea.

24 - Date: 07/18/1986. The "craft house" was completed during the day. The women selected, cleaned and arranged the leaves, while the men vigorously scrubbed the *cipó* liana in order to prepare it for steeping.

Fresh *Psychotria* leaves and macerated *Banisteriopsis* are arranged in alternating layers inside of the big boiling pots. This preparation is handled by "specialists," since appearance, flavor and immediate effect are important factors in verifying whether the preparation is suitable. The same liquid is generally used to boil three successive batches of fresh material from said plants. The end result is a thick brownish liquid which is filtered in order to remove fibrous matter. Depending upon its phase of boiling, "daime" is designated as either first, second or third degree. The first degree is the strongest, since it results from boiling with a third batch. However, the final beverage may be more or less active as a result of using more or less material (plants) or, reportedly, depending on the use of the branch (the mildest part), the main stalk of the liana, or its roots (the strongest part).

Stored adequately, some samples may remain fully active for several years. This contradicts the notion that ayahuasca preparations are only active for a short period.

This beverage is usually prepared during special ceremonies with great symbolic and religious significance.

25 - We all took part in the "craft" ceremony, which culminated with the drinking of the fresh "daime." This was unlike other "work." The beverage was drunk in the "craft house" itself, which is situated in an open clearing in the middle of the jungle, at a distance from the other huts. The new beverage seemed to taste less acrid and repulsive, however, once again, a number of participants vomited. It is interesting to observe that, during the "mirações" (moments of ecstasy, of clairvoyant contemplation or of visionary experience), people's eyes are generally closed or half shut, and their eyelids appear to flutter lightly.

From then on we all remained seated as chants were sung. It is important to note that the setting, the contact with the Amazon forest at nighttime under a full moon, the hymns and their words evoking the force of the elements and the divine power, and the reciprocal will to encounter the other and the sacred, have a significant influence [text cut off at page bottom]

www.bialabate.net

[...] participants.

This special "work" was led by Alfredo, son of "Padrinho Sebastião," whom we were only able to converse with briefly on account of his ongoing illness.

A few brief accounts concerning "Padrinho Sebastião" and the "Céu do Mapiá Rubber Plantation" are therefore included below. These accounts have been extracted from the aforementioned *História do Povo Juramidam*, by Vera Fróes:

> **"Sebastião Mota de Melo was born in Eirunepé in the State of Amazonas on October 7, 1920. As early as 1975 the members of his rural "Santo Daime" community began calling him "padrinho" ("godfather"), a word which expresses respect for and recognition of his abilities as a spiritual mentor, while at the same time making whoever so addresses him his "godchild" and protégé under his spiritual guidance.**
>
> **Padrinho Sebastião reports that he lived with health problems as soon as he was born, and that, as a child, he heard voices from the spirit world and had visions and dreams which revealed events which had yet to occur. At the age of eight, he had a dream which he interprets a sign of the mission he was to accomplish years later, with Santo Daime:**
>
> > **"I was alone in the middle of the jungle, wearing a felt hat on my head and dark clothes, when suddenly a fire arose and that terrifying roar was coming and I saw the little tongue of fire engulf everything, it burned everything, nothing was left, only the place where I was... I was going to see the vision of my life fifteen years forward, there in Amazonas: of the water, of the jungle and of the astral plane. But I didn't understand any of that and everything was like a dream... I willfully ignored it, but it was happening and then I was seeing the result. It kept up and I began to fly. As I flew and saw what the astral plane is like, I entered the forest and the waters and as I did so I saw the visions. With time I began to work with a spiritualism (sic) which appeared and a voice began to call me: 'Bastião!', and I answered 'Hey there!' Then the light went out and the voice stopped. But time went by and I caught an astral airplane and I arrived in Acre. I didn't delay, I came, I was coming materially."**
>
> **For the Padrinho there is a difference between dreams, hallucinations and visions, and it is very important for a healer to know how to differentiate between these phenomena:**
>
> > **"Don't go thinking that a miração is a dream or that a vision is a miração. The miração leaves you doubtful, you saw it but you didn't see it, and when it's a vision, it's still like you're having a dream, but it's not, it's the truth, you're seeing everything, you're hearing and seeing. Dreams are more muddled, you wander aimlessly, get on a narrow path and head down it, but when you wake up you're not conscious of it. During a vision you are fully conscious, more than ever..."**
>
> **Just as in the case of Mestre (Mentor) Irineu, the initiation of Padrinho Sebastião was guided by a shaman, Mestre Osvaldo, a São Paulo-born black man also known as "Cumpade (God-Daddy) Osvaldo" on account of his being the godfather of Sebastião's son, Pedro Mota.**
>
> **During a year spent in the jungle near the [illegible] river,**

www.bialabate.net

Padrinho Sebasti... to perform work with a spiritual group, a communion altar and activities, and hosted the medium and surgeon Dr. Bezerra de Menezes. Depending upon the condition of the ill who came to see Osvaldo, he would send for Padrinho Sebastião to perform the healing." (Op. cit., pp. 41-42)

"Céu do Mapiá" is now the headquarters of the Centro Eclético de Fluente Luz Universal Raimundo Irineu Serra (CEFLURIS), which was previously based in "Colônia Cinco Mil" ("Settlement 5000"), at kilometer 9 of the Porto Acre highway. It was given the name "5000" because, "once the rubber plantation ceased operations, the land was divided into settlements which were each sold for five thousand old cruzeiros." (Vera Fróes, op. cit., p. 43-44.)

Padrinho Sebastião and "his people," namely the community which has him as its spiritual leader, moved to the "Rio do Ouro Rubber Plantation" in the region of the Endimari river, on the banks of the Igarapé Trena narrows. Vera Fróes narrates:

> "To the surprise of all, the Padrinho announced in 1981 that this was not the location determined by the astral plane where the New Jerusalem was to be built. At the same time, persons interested in the land cultivated by the community had begun to exert pressure on account of the discovery of a land deed—dating back to the early 1900s and containing numerous irregularities—which stated that the area was the property of a southern rancher.
>
> Despite the fact that the community had been authorized to settle at the Rio do Ouro rubber plantation by the regional agency of the National Institute for Agrarian Settlement and Reform (INCRA), this organization informed the community of the existence of another area, in Federal custody and with no owners, where they could move. Said area, located in the Municipality of Pauini (Amazonas State) along the narrows of the Mapiá river, a tributary of the Purus river, was 150 kilometers (≅ 95 miles) from the Rio do Ouro rubber plantation.
>
> The community, confronting innumerable difficulties yet again, undertook the move to the Mapiá river narrows with the aim of establishing a new rubber plantation called Céu do Mapiá. They did so even though this also meant leaving behind a rubber plantation without receiving any compensation from the alleged landowners, notwithstanding the fully-realized agricultural and rubber-production capacity of said plantation or the many enhancements built for it by the community.
>
> The rural community's move from Colônia 5000 to the heart of the Amazon forest is meaningful from both a material and spiritual standpoint: Daime shall protect his children, the Midam, who await the call to return to the origins, to the groves of rubber trees where many were born and raised. It is also a return to the time when Mestre Irineu worked in the jungle tapping rubber, and came to know Daime." (op. cit., pp. 120-121)

www.bialabate.net

26 - Date: 07/19/1986. Departure, [illegible] for Boca do Acre, where night had fallen by the time we arrived. Along the return route we came across a canoe of "pilgrims" (about six people) hailing from Brasília, Bahia and Rio de Janeiro in search of the sacredness which the Céu do Mapiá Plantation signifies for them.

27 - Date: 07/20/1986. Arrival, in the morning, in Rio Branco, whence we visited "Colônia Cinco Mil." There remains little to add to what has already been stated about it. Compared to our preceding visits, this one was much quicker. At present, this community does not appear to be as well organized as the others mentioned herein. We visited the "craft house," the church and a few lodgings. It should be recalled, however, that "Colônia Cinco Mil" was visited by Dr. Isac Germano Karniol and Dr. Sérgio Dario Seibel in October of 1985, as reported previously.

28 - Visit No. 6, on September 12 and 13, 1986, was made by Dr. Domingos Bernardo Gialluisi da Silva Sá, Dr. Isac Germano Karniol, Dr. Sérgio Dario Seibel and Dr. Clara Lucia de Oliveira Inem, who went to the Centro Espírita Beneficente União do Vegetal, which has its Rio de Janeiro headquarters at Estrada do Carretão S/N, with its entryway at Estrada de Boca do Mato, after no. 695 – Vargem Pequena, Jacarepaguá.

The União do Vegetal, also known simply as the UDV, has characteristics which differ in many respects from those of the communities referred to up to this point, although, with regard to the essential purpose of this study, it is basically identical to them. It is a spiritual center which uses the same beverage which we are concerned with: ayahuasca. The UDV, however, has another Mestre (mentor), i.e., other than Raimundo Irineu Serra ("General Juramidan" to the followers of the "Santo Daime Doctrine," which he created). The União do Vegetal defers to José Gabriel da Costa, its spiritual mentor, who founded it on July 22, 1961 (cf. the statements contained in the letter issued by the legal representatives of the UDV, in Attachment No. 11).

In an article appearing in *América Indígena* (volume XLVI, January-March 1986), a quarterly publication of the Inter-American Indian Institute, Anthony Richard Henman (University of London), accurately addresses

www.bialabate.net

the use of ayahuasca by the [illegible] le is entitled "Ayahuasca Use in an Authoritarian Context. The Case of the União do Vegetal in Brazil".

Henman states that the UDV was founded in Porto Velho in 1962. The article in question presents a fairly faithful depiction of this other branch of "ayahuasqueiros," including, in Brazil, the adepts of Mestre Raimundo Irineu Serra, founder of the Santo Daime Doctrine, who form the people of Jurimadan; and the adepts of Mestre José Gabriel da Costa, founder of the União do Vegetal (UDV), which is analyzed in detail in the aforementioned article by Henman. The issue of *América Indígena* which featured the article in question was devoted entirely to ayahuasca, and has therefore been incorporated herein as an integral part of this report (Attachment No. 12). It is worthwhile reading, particularly the aforementioned article by A. R. Henman, and the article by Professor Richard Evan Schultes on "The Historical Development of Identifying *Malpighiaceae* Employed as Hallucinogens," both of which are essential in order to understand this report.

29 - The UDV took the initiative (cf. Prologue, item 1) of requesting that the CONFEN review the inclusion of *Banisteriopsis caapi* among the drugs listed as illicit substances. This request and its supporting documents brought about the proceeding registered under no. 019547, available at the Secretariat of the CONFEN. The perusal of these records reveals the numerous depositions which were given by professionals, with titles including: doctor, public official, lawyer, serviceman, business manager, psychologist, state attorney general, university professor, architect, engineer, radio announcer, economist, publicist, writer, banker, cocoa grower, state tax inspector, chief collections officer of the Federal Revenue Service, and student—all of them members of the UDV, which has around two dozen centers, with locations in Bahia, Ceará, Espírito Santo, Rio de Janeiro, Amazonas, São Paulo and Rondônia. Attachment No. 13 lists all of the UDV's officials in Brazil, together with their respective addresses. Attachment No. 13-A is the UDV's own report on its history and myths.

30 - Moreover, both our visits to the UDV and our relationships with its followers, over the course of nearly two years, have allowed us to confirm Henman's assertion that said followers are middle-class members of urban society.

www.bialabate.net

31 - The "work" [of the ... does not include hymns or dances. However, they do play records or tape recordings of familiar works and artists. Those of us visiting all took part in the ceremony. We witnessed the same "purification" process, as did Henman, who remarks: "(...) the act of vomiting is considered to be the expulsion of harmful material, an act of purification" (cf. the above-cited *América Indígena*, p. 232). The rituals we had the opportunity to observe are so faithfully described in Henman's article that to recapitulate them here would be pointless. Moreover, said article provides additional insights, especially with regard to social organization, creation myths and other information referred to previously.

32 - The UDV in Rio de Janeiro owns the site of its headquarters, a wooded property of nearly one and half acres. It has about 117 members in Rio de Janeiro and around 2000 members throughout Brazil. Those members who have the means to do so contribute 10% of their earnings to the organization, while those who are poor or unable to pay do not make a contribution. There are also members who make higher contributions, as they fit.

A *cipó* vine, brought back from the Amazon rainforest, is used for the *preparo*, i.e., "preparation." (The Daimista term for this, *feitio*, i.e., "craft," is not employed by the UDV). I was told that the leaf can be found at a place called Pedra Branca, in Rio de Janeiro.

I was also informed that, for "special" gatherings, the men wear a uniform consisting of white pants and a green shirt, and the women wear golden-yellow pants or skirts and a green blouse. The officiating mestre is the only one to wear a blue shirt.

This was the final visit made to an ayahuasca-using community.

33 - Interview with Antonio Alves Leitão Neto, a journalist working for the newspaper *O Rio Branco*. The interviewee was the designated "secretary and spokesman" of the "Alto Santo" religious community. I will only be reporting the most relevant points from the two-hour recorded interview, taking into account that "Alto Santo" constitutes another branch of the Santo Daime Doctrine. Thus, although "Alto Santo" recognizes the same founder—Mestre Raimundo Irineu Serra—its spiritual leader is not "Padrinho Sebastião."

www.bialabate.net

The spiritual teachi[illegible] ministered by the High Council, which, according to the interviewee, was founded by "Mestre Irineu" himself. Said Council has offices-in-perpetuity, which are: a) The Mestre Imperador (Emperor-Mentor) and Chief of Doctrine: Mestre Raimundo Irineu Serra; b) The President Leôncio Gomes da Silva (deceased), also called Mestre Imediato, whom Mestre Irineu, while still alive, chose to head the community; c) The Councilor José das Neves, who is quite advanced in age, and practically never participates in the work. These three offices are held in perpetuity and are non-transferable. Underneath the High Council there is the Community Council, which directs the community in accordance with "orders emanating from above." It provides for the material needs of the organization. (The Council comprises positions and duties which include: president, monitors, secretary, Daime preparation, custodianship of the community's patrimony, etc.)

At present, the leadership of the center is held incontestably by the "Dignitary," a title which Mestre Irineu gave to his wife, Mistress Peregrina Gomes Serra, while he was still alive.

For Alto Santo, the only padrinho was Mestre Irineu, who has no successors. It is at variance with the community which follows the "Padrinho" for two main reasons. First, because Mestre Irineu set the maximum number of hymns that one can receive in one's lifetime at 132. Beyond this number, Mestre Irineu would no longer be responsible because they would no longer be inspired by him. Also, the interviewee affirms that said number has been surpassed by a number of Padrinho Sebastião's followers. The second reason was the use of "Saint Mary's Wort" (i.e., cannabis) in Colônia 5000 which, in '81-'82 caused the Federal Police crackdown, casting troubles and stigma upon the ten other centers in Rio Branco, where only "daime" was used, but whose followers were nonetheless persecuted by the police, summoned for depositions, and harassed at school and at work, just because they used "daime," on account of which they were automatically called "potheads."

Notwithstanding, the interviewee expresses the willingness to seek common ground, with the main exception being marijuana use.

Currently, there are perhaps some 200 members who live on small properties registered with the INCRA, most of them originally from farmers. Nowadays the community is more spiritual, since everyone produces their own products and sells them

directly in the city, which is nearby.

Normally they assemble twice per month, during sessions which are attended by families, children of all ages and pregnant women, in order to partake of Daime, a long-standing tradition. They seek physical, mental and spiritual health. Daime promotes deep meditation and spiritual fitness.

34 - Effects upon the human body as a whole – On this subject, Professor Isac Germano Karniol points out that psychotropic drugs—drugs which act upon the central nervous system—are classified in different ways by different sources. The chemical structures of these substances are a potential approximation. Pharmacological effect is the more widely accepted distinguishing factor. Hence, hallucinogenic drugs are ones which, on the whole, provoke changes in sensory perception, most often hallucinations, i.e., perceptions in the absence of an external object. Visual hallucinations are characteristically caused by such substances, and this is what distinguishes them from the altered states which are typical of certain mental disorders, such as schizophrenia, involving the manifestation of auditory hallucinations.

Certain hallucinogenic drugs, such as LSD, are taken as pure substances. More commonly, however, a plant is used or, in rare instances, a mixture of plants, as in the case of ayahuasca.

The most important work on the hallucinogenic compounds of ayahuasca is by Rivier and Lindgren (1972). As it happens, betacarbolines such as harmine, harmaline and tetrahydroharmine, as well as N-dimethyltryptamine, are found in the admixture of *Banisteriopsis caapi* and *Psychotria viridis*. Dimethyltryptamine is much more active than the other compounds. Notwithstanding, when it is taken on its own, through oral ingestion, its effect appears to be limited, since it is metabolized quickly in the peripheral tissues by enzymes known as monoamine oxidase. The betacarbolines inhibit these enzymes, thereby prolonging the effect of the N-dimethyltryptamine. This mechanism was the subject of recent study by McKenna et al.

The chemical makeup of its compound or compounds notwithstanding, the indisputable result is that ayahuasca, as a unified whole, has a hallucinogenic effect.

As this preparation acts within the body, it produces the intense hallucinatory effects for which it is known, in addition to other possible peripheral effects, such as vomiting, diarrhea, etc. To date, no data is available which would allow an adequate assessment of the chronic mental and clinical effects of its long-term use. Other unknowns include the effects, whether acute or long-term, upon children, pregnant women and fetuses. Such studies are fairly complicated. On the basis of uncontrolled observations we made during our visits to several communities where "daime" is used ritually and noncontinuously, generally during ceremonies and on special dates, we did not discover any abnormalities.

35 - Actions taken by public authorities. Over the years, the public authorities have taken uncoordinated action in countless cases involving Ayahuasca use in Brazil which, despite decades of involvement, never actually clarified or resolved the issue. Such action has been isolated, in the absence of any significant coordination between the various authorities, and has usually resulted from the startle of local authorities upon learning that groups of people were using an unfamiliar beverage with mind-altering effects. It would appear, however, that in every one of these instances the problems were satisfactorily clarified, and therefore resolved. Any further examination of the aforementioned cases would be beyond the scope of this report, and is better left to a historical survey.

36 - However, there is a case of a coordinated action taken by the Brazilian federal authorities which is very important in terms of the present report, and which is recorded in two files of the Federal Police Department, Regional Superintendency of the State of Acre, with the following numbers: SRA/DPF/BSB-027129/81 and SRA/DPF/DSB-001372/82. These files constituted the records which, at present, are available at the CONFEN Secretariat. A careful examination of said records reveals a certain fact, i.e., not merely a conclusion "a" or " b", but, it bears repeating, a fact. And what is this

important fact? It involves the arrest of a young man named Eder Candido Silva, who was 22 years old at the time. The arrest occurred in Rio Branco, the capital of the State of Acre, on September 30, 1981. This young man, who "was carrying a green rucksack which caught the attention of both the driver and his fellow police officers" (cf. the terms of the "record of arrest for a crime detected in the act"), was detained by the police officers, who "decided to perform a search of the individual..." (cf. the above-cited "record of arrest"), upon whose person "marijuana" was found. The arrestee was residing in "Colônia Cinco Mil", where there was marijuana planted.

On the following day, i.e., October 1, 1981, the Federal Police went to "Colônia Cinco Mil", where they confiscated marijuana plants, seeds and leaves. It can therefore be affirmed that *Banisteriopsis* was subsequently put on the DIMED list of illicit substances on account of the "marijuana" which, at that time, was being used at "Colônia Cinco Mil", alone among the ten or so other communities whose members exclusively used ayahuasca, according to the deposition of Antonio Alves Leitão Neto (cf. item 33 above). The fact remains that the various investigations which targeted a number of groups of ayahuasca users, especially the community led by "Padrinho Sebastião", were set off by the arrest of Eder for possession of marijuana.

37 - The fact in question is of paramount importance, given that to date the Working Group has been unable to discover a single objectively verified record capable of demonstrating, unequivocally, any social harm actually caused by the use of ayahuasca. It should be reiterated that the subject of the Working Group's investigation is ayahuasca—not marijuana, cocaine or any other drug—and it is obvious that only problems which are specifically caused by the use of said beverage may be considered.

38 - The files referred to in item 36 above, from the Federal Police Department, Regional Superintendency of the State of Acre, as well as the various investigations in connection with them, resulted in Administrative Ruling No. 0534 of August 3, 1982, issued by the then Minister of Justice, Ibrahim Abi-Ackel, by way of which an interministerial working group was formed for the purpose of undertaking the "comprehensive review of the matter referred to in Proceeding No. MJ-7394/82, suggesting all necessary measures" (Attachment No. 14). The Public Prosecutor, Dr. Edmar de Azevedo Monteiro, was responsible for coordinating the Group, however there

www.bialabate.net

is no record of any final rep ... e.

IV

CONCLUSION

39 - It must first be understood that the change in membership of the Federal Council on Narcotics (CONFEN), which occurred during the beginning of this year, made it difficult to bring together all of the members of the Working Group so that they could jointly draft this final report—a task which would have required numerous meetings in light of the complexity and breadth of the work involved. Hence, the signatory of the present report maintained individual contacts with the various members of the Working Group, and present and past CONFEN board members, thereby gathering assorted material, opinions, information and contributions. These members will all be sent a copy of this report, along with a request that they issue their findings on it, which are to be sent to the CONFEN.

40 - The period of two years following the July 30, 1985 publication of Resolution No. 4 has been essential in allowing a more equable and reliable assessment of the consequences of ayahuasca use. This period has allowed us, among a number of other activities, to observe users, to review reports about them, to visit various communities and, finally, to form an impartial, objective and just opinion on the matter at hand. A shorter period of time would have disallowed such degrees of experience.

A first conclusion can easily be arrived at on the basis of what was stated in item 37 above. Given that, to date, there exists no objectively verified record containing an unequivocal demonstration of social harm caused by the use of ayahuasca, the status quo should not be altered. In other words, there is no reason, to date, for said beverage, in the way it is being prepared and used, to be included in the DIMED list of illicit substances.

41 - There exist, however, unquestioned assumptions which are indeed questionable and which are further manifested as prejudices, given that, so often, they are simply the product of ideas which are received and accepted without ever having been subjected to critical analysis. The Working Group's concern with the "ayahuasca" issue over the past

www.bialabate.net

two years has led it to n[illegible]ts with users from all levels of society, from Rio de Janeiro, to Brasília, to the depths of the Amazon jungle. During this period, it has noted that many inquiries have involved preconceived opinions and condemnatory conclusions. Most often, said inquiries have revolved around two words: "hallucinogen" and "cultures", as in: "Is ayahuasca a hallucinogen?" and, if so, "Can city dwellers be allowed to use it, given the differences between urban and rural cultures?"

At the very least, such questions require all those who address the drug issue to engage in measured reflection in order to better answer them.

42 - What can be affirmed is that the search for a particular form of perception, as undertaken by the users of ayahuasca during their "work", does not appear to be hallucination if this term is taken to mean derangement or insanity. Among all of the groups we visited, there was one common goal which they all strictly adhered to: the search for holiness and self-knowledge. It does not fall to the Working Group to determine whether the term hallucination, defined as illusion, daydreaming or fantasy, applies to their way of experiencing holiness or self-knowledge.

43 - Obviously, it would not be tolerable if the perceptions in question led those who experience them to engage in anti-social behavior harmful to the rights of others. In this regard, it bears repeating what was stated in the first travel report from nearly two years ago, as quoted in item 11 above, i.e.:

> "Moral and ethical standards of behavior, similar in every respect to those which exist and are recommended in our society, are observed within the various sects, at times in an even stricter manner. Respect for the law always appeared to be emphasized."
>
> ..........................................................................
>
> "The followers of the sects appear to be calm and happy people. Many of them attribute family reunification, regained interest in their jobs, finding themselves and God, etc., to the religion and the tea."
>
> ..........................................................................
>
> "The ritual use of the tea does not appear to be disruptive or to have adverse effects upon the social interactions of the various sects' followers. On the contrary, it appears to orient them towards seeking social contentment in an orderly and productive manner."

44 - It is well-known that man has always searched for ever-better ways of overcoming the limitations of his own ability to understand. Not just "hippies", but even Thomas Aquinas, in referring to the soul (which, it is important to note, has the meaning of [text cut off at page bottom]

www.bialabate.net

alluded to the special circ... which allow it to leave the body, to withdraw from the physical, and enable the emergence of [his? its?] inherent knowledge. With regard to these circumstances, Professor João Manoel de Albuquerque Lins of the Pontifícia Universidade Católica (Pontifical Catholic University) of Rio de Janeiro affirms that:

> "They are all occasions during which 'sensory occupations' cease to dominate our consciousness, thereby allowing us to distance ourselves from immediate contact with the outside world which surrounds us. Hence his reference, in *De Anima*, to the '*dorminetibus*', i.e., to those who sleep and therefore to dreaming; and to the '*alienatis a sensibus*', i.e., to those who are not using their senses, or who, for whatever reasons, are removed from the senses; in *Summa contra Gentiles*, we once again encounter '*dormientes*', those who sleep; '*syncopizantibus*', those who suffer from syncopes or fainting; and '*exstasim passis*', those who experience ecstasies; and in Book IV of *Sententiarum*, he also refers to dreaming '*in dormiendo*', i.e., while sleeping, and '*in excessu mentis*', i.e., in a state of ecstasy, or, perhaps more specifically, while in a trance.
> These are the same circumstances, therefore, that modern parapsychology recognizes as highly conducive to the manifestation of ESP or psi-gamma abilities."
> (Excerpt from the journal *Verbum*, Vol. XXIV, fascicle 2, June 1967, Universidade Católica, Rio de Janeiro, p. 221.)

The sole and exclusive reason for this reference to Thomas Aquinas is to propose reflection upon the states of perception to which man can be brought, and which do not appear to merit the definition of madness or insanity, and which, moreover, it would be presumptuous to classify as illusion, daydreaming or fantasy. Again, we must reflect upon and ponder the fact that, in the society in which live, we are quick to classify as crazy or insane those who, with or without ayahuasca, choose lifestyles different from our own or who seek processes of learning or personal realization which diverge from the established order.

Hence, the allusion to Thomas Aquinas does not purport to offer an argument as to whether ayahuasca should be used or not, but rather has the purpose of demonstrating that we often thoughtlessly classify as hallucination certain abilities "which we all possess, at least on a basic level" (Albuquerque Lins, op. cit., p. 211). Such "assumptions", which are undisputed, unchallenged and ingrained over the years, make it difficult to examine the issue, especially when such "assumptions" go hand-in-hand with what Henman identifies as:

> "the need for a 'total war on drugs' which, in turn, is based upon the prohibitionist hysteria promoted by the U.S. Drug Enforcement Administration through the local media" (op. cit., p. 221).

45 - As previously mentioned, the beverage in question is made with native species. This observation is important in that, in the case of synthetic forms [text cut off at page bottom]

(....) other treatment. Moreover, the typical reactions of vomiting and diarrhea (the latter being less frequent) leads us to suppose that ayahuasca does not lend itself to easy, indiscriminate or recreational use by the general public. Indeed, this can been verified by the fact that, despite receiving a good deal of coverage in major Brazilian newspapers, to date ayahuasca has not been fancied by hedonistic consumers.

46 - Finally, there is the question of "cultural differences". An honorary professor of the School of Philosophy of the Catholic University of Lyons noted that, in sociology, culture is "the combination of institutions and traditions, of customs and collective representations, of beliefs and value systems which characterize a given society" ("Vocabulary of Philosophy", *Agir*, 1975, p. 60).

But how can one imagine a clear barrier between the "cultures" present at the Céu do Mapiá rubber plantation, in Rio Branco, in Rio de Janeiro or in Visconde de Mauá when, throughout the year, pilgrims arrive from the four corners of Brazil to stay for a time in the Amazon jungle, at Céu do Mapiá? And how could such cultures be impermeable when one realizes that, in turn, Padrinho Sebastião and his entire family spent a long time in the Céu do Mar community in the São Conrado district of the city of Rio de Janeiro? With regard to the matter under consideration, the above report for the date of 7/15/1986, on pp. 15-16, which mentions pilgrimages to Céu do Mapiá, is also important.

47 - In addition, with regard to the oft-mentioned clash or incompatibility between "cultures", it is worthwhile to quote Professor Regina Abreu (Attachment No. 9, pp. 16-17), who states:

> There remain other considerations to be added to the issue which we addressed previously (p. 14 of this report), regarding the conversion to the Doctrine of certain members of urban or industrialized society, a fact which creates anxiety among religious groups, civil and military authorities, and elements of civil society. The adoption of the Santo Daime Doctrine in cities evidently has characteristics which are specific to the urban lifestyle, and are obviously devoid of activities which are specific to the rural environment, such as hunting and large-scale farming. Notwithstanding, those who convert to the Doctrine may be led to practice rituals and lifestyles which preserve the basic characteristics of the rural religious communities. In both cases, there is a similar project. In both cases, as stated by the above-quoted anthropologist, Louis Dumont, "the emphasis is placed upon the society as a whole, as a collective person,

www.bialabate.net

the ideal being [illegible] the society in view of its goals (rather than personal gain); what it amounts to, above all, is order and hierarchy; each specific individual must do his part to contribute to the overall order, and justice consists of providing social functions in relation to the whole" (cf. Dumont, Louis. 1966. *Homo Hirarchicus – Le Système des Castes et Ses Implications*, p. 23. Paris: Gallimard.). Hence, in cities, the community is also structured so as to fulfill its material and spiritual needs (by adopting the "doctrine", as practiced in the rural environment). Said material needs are fulfilled by way of the variety of occupations which exist in urban society (including professionals, public servants, private-sector employees, politicians, professors, intellectuals, etc.).

In any event, however exotic these country- or city-based "Santo Daime" communities may appear, their diversity can be enriching both for individuals and for society as a whole."

As a final conclusion on this theme, there is no text more fitting than the following one by Claude Lévi-Strauss:

> "No culture is alone; it is always capable of connections with other cultures, and this is what allows it to build cumulative series. The probability of a longer series emerging from among the other series naturally depends upon the breadth, duration and variability of the system of connection."
>
> ..........................................................................
>
> "The only fatality, the only flaw which can afflict a human group and keep it from fully realizing its nature is to be alone." (*Raça e História*, pp. 262-263. *Raça e Ciência I.* 1970. São Paulo: Perspectiva.)

WHEREAS, in view of the legal authority of the Federal Council on Narcotics, which is legally responsible for the implementation of standard policies, general coordination, supervision, control and investigation of drug use; in view of the fact that the decisions of the CONFEN must be complied with by the federal administrative bodies making up the National System for the Prevention, Taxation and Repression of Narcotics Use; in view of the resulting fact that the CONFEN may, at any time, determine measures controlling and even prohibiting any substance which has specific characteristics making prohibition advisable; and in view of the fact that, to date,

www.bialabate.net

no circumstances have occurred which indicate, with regard to the use being made of "ayahuasca", that any change to the current DIMED lists is necessary; NOW, THEREFORE, the proposal being made, and which is subject to the sovereign ruling of the Federal Council on Narcotics, is to maintain the present policy adopted by the DIMED in its most recent administrative rulings, arrived at in collaboration with the CONFEN itself, which is to exclude from the aforementioned lists those plant species which are used in the preparation of "ayahuasca", most commonly referred to in Brazil as "daime" or "vegetal", among other previously mentioned names.

★★★★★
★★★
★

As a final conclusion to this report, I would like, in my capacity as chairman of the Working Group, to thank the distinguished Presidents of the CONFEN, Dr. Técio Lins e Silva, and Dr. Miguel Reale, Jr., for the confidence which they both placed in said Group, thereby allowing it, within the personal and material limitations acknowledged herein, to be of modest service to the higher public interest which is vested in the Federal Council on Narcotics.

[signature]

Domingos Bernardo Gialluisi da Silva Sá
Chairman of the Working Group

www.bialabate.net

# MINISTRY OF JUSTICE
## FEDERAL COUNCIL ON NARCOTICS
## CONFEN

**Memorandum no. 423/CONFEN/MJ**

**Brasília, September 10, 1997**

**Attn: Advisor to the Minister of Justice**
**Re: Use of "ayahuasca"**

With regard to your solicitation regarding the use of the tea known as "AYAHUASCA", I hereby inform you that:

1. Having been directed by DIMED Administrative Ruling No. 2/85 to issue a finding on the inclusion of *Banisteriopsis caapi* among the drugs listed as prohibited substances, which includes references, in parentheses, to "cipó de chinchona" (cinchona liana), "chacrona" or "mariri", a Working Group was appointed by CONFEN Resolution No. 4 of July 30, 1985 with the purpose of examining the question of the production and consumption of substances derived from said plant species. The Working Group carried out various activities, with a view to learning about the aspects referred to in Resolution No. 4/85, "including sociological, anthropological, chemical, medical and general health aspects". A number of visits were made to sites where ayahuasca is used ritually. The Working Group concluded that the DIMED policy should be maintained pursuant to its most recent administrative rulings, which excluded from the aforementioned lists the plant species used in the preparation of ayahuasca, which in Brazil is more commonly referred to as "daime" or "vegetal", among other previously mentioned names.

2. In 1988, an anonymous complaint was lodged which brought about the reexamination of the issue of ayahuasca use. Said complaint is attached to Police Inquiry No. ....9/89 – DRE/SR/DPF/RJ, ordered by the Honorable Judge of the 13th Federal District Court in the city of Rio de Janeiro. Council member Domingos Bernardo G. da Silva Sá submitted a finding, unanimously approved by the 5th Annual General Meeting of the Federal Council on Narcotics (CONFEN), held on June 2, 1992, which upheld the finding presented by the 1985 Final Report of the Working Group.

3. In 1994, a new complaint filed by Ms. Alícia Castilho, who has a daughter in a Sect in Rio Branco which uses "AYAHUASCA", gave rise to Proceeding No. 136/94. Said proceeding consists of 291 pages to which are attached all of the existing CONFEN documents relating to the matter. During its analysis, there was participation by groups which use the tea, who had full access to the Council, with participation during regular meetings, including the showing of a documentary about the Sect. Council member José Costa Sobrinho submitted a finding, unanimously approved by the 3rd Annual General Meeting of the Federal Council on Narcotics of June 2, 1995. Among other conclusions, said finding recommended prohibiting the use of the tea by minors, given that their personalities are in a constructive developmental phase and that their ability to exercise judgment is therefore limited; and in view of the Statute on Children and Adolescents, with specific legislation guaranteeing their rights.

4. In the meantime, Judge Mauro José do Nascimento Campello, of the Juvenile Court of Boa Vista in the State of Roraima, requested clarifications for a case in his district involving a request for minors over the age of 14 to use the "hoasca" tea. In view of other similar requests having come from a number of districts, a new proceeding was undertaken (Proceeding No. 08000.017948/96-21). The Reporter, Council member Arnaldo Madruga Fernandes, submitted a finding during the 3rd Annual General Meeting of the Federal Council on Narcotics (CONFEN), held on May 16, 1997, where once again the conclusion was reached to recommend that the tea known as AYAHUASCA not be used by minors under the age of 18 (eighteen), even in the company of their parents or guardians, and regardless of the dose or ceremony, thereby basically maintaining its previous decision.

www.bialabate.net

For the purposes of further clarification, I am attaching the findings handed down by the distinguished members of the Council, the respective minutes from their meetings, a copy of the Final Report of the Working Group established by Resolution No. 4/85, and the statement made by the President of the Federal Council on Narcotics to the Assistant Attorney General of the Republic.

Sincerely,

[signature]

**MÁRCIA MARIA DA SILVA**
**Executive Secretary of the CONFEN**

www.bialabate.net

# OREGON BOARD OF PHARMACY LETTERS TO ROY HABER

# (THREE LETTERS)

www.bialabate.net

Oregon
John A. Kitzhaber, M.D., Governor

Board of Pharmacy
State Office Building, Suite 425
800 NE Oregon Street # 9
Portland, OR 97232
Phone: (503) 731-4032
Fax: (503) 731-4067
E-Mail: pharmacy.board@state.or.us
Web: www.pharmacy.state.or.us

November 8, 2000

Roy S. Haber
Attorney at Law
570 E 40th Street
Eugene, OR 97405

Dear Mr. Haber,

The Oregon Board of Pharmacy has received the information provided to supplement your appearance before the Board at its November 8, 2000 meeting in Portland.

After review and discussion of this material, and having heard your presentation on November 8, it seems apparent to the Board that the sacramental use of the Santo Daime tea in the context of a bona fide religious ceremony by practitioners of the Santo Daime religion as described does not constitute abuse of a controlled substance.

Sincerely,

Gary A. Schnabel

Gary A. Schnabel, RPh, RN
Executive Director

PLAINTIFF'S EXHIBIT 3

- Exhibit "C" -

www.bialabate.net

Board of Pharmacy
State Office Building, Suite 425
800 NE Oregon Street # 9
Portland, OR 97232
Phone: (503) 731-4032
Fax: (503) 731-4067
E-Mail: pharmacy.board@state.or.us
Web: www.pharmacy.state.or.us

November 22, 2000

Roy S. Haber
Attorney at Law
570 E 40th Street
Eugene, OR 97405

Dear Mr. Haber,

This is in response to your letter of November 22, 2000 to the Oregon Board of Pharmacy indicating your clients' desire and willingness to register with the Board and to comply with any regulatory requirements to which they may be subject. While the Board does not possess authority to state whether any church can practice its religion in Oregon, the Board did state in its November 8, 2000 letter to you that it does not consider sacramental use of the Santo Daime Tea in the Churches religious ceremonies to constitute abuse of a controlled substance.

Board staff and counsel have discussed the issues raised in your letter regarding the registration of the Church and compliance with regulatory requirements. The Board is involved in the regulation of the sale and distribution of drugs in Oregon and the investigation of allegations of drug abuse. Since the Church is neither a drug outlet nor, as indicated by the opinion of the Board, involved in the abuse of a controlled substance, the Board has no authority to require registration or compliance with any Oregon pharmacy regulations.

In summary, I would say you can inform your clients that the Oregon Board of Pharmacy neither possesses nor plans to exercise regulatory authority with regard to the religious practices of the Santo Daime Church in Oregon.

Sincerely,

Gary A Schnabel

Gary A. Schnabel, RPh, RN
Executive Director

- Exhibit "D" -

www.bialabate.net

Oregon Board Of Pharmacy
800 NE Oregon Street, Suite 150
Portland, OR 97232
Phone: 971/673-0001
Fax: 971/673-0002
E-mail: pharmacy.board@state.or.us
Web: www.pharmacy.state.or.us

June 20, 2008
Mr. Roy Haber
Attorney at Law
540 E. 40th Street
Eugene, OR 97405

Dear Mr. Haber,

On November 8, 2000, after receiving the Santo Daime Memorandum of Law and expert reports, and after holding a hearing, the Oregon Board of Pharmacy concluded that the sacramental use of the Santo Daime tea in the context of a bona fide religious ceremony by practitioners of the Santo Daime religion as described does not constitute abuse of a controlled substance.

On November 22, 2000, after receiving a letter from you on behalf of your clients offering to register with the Board, we advised you that the Board is involved in regulation of the sale and distribution of drugs in Oregon and the investigation of allegations of drug abuse. Since the Church is neither a drug outlet nor, as indicated by the opinion of the Board, involved in abuse of a controlled substance, the Board has no authority to require registration or compliance with any Oregon pharmacy regulations.

The Board has considered the May 2, 2008, proposal of the Santo Daime Church to provide it with copies of documents that record the amount of sacramental tea that is brought into Oregon for Church services in Ashland and any distribution to other Santo Daime congregations in Oregon. Your current request to the Oregon Board of Pharmacy is for the Board to act as a quasi official repository of these documents. For the reasons cited above, the Board feels it must decline your offer to supply it with copies of your sacrament receipt records.

I want to thank you for being open and willing to provide these records on behalf of the Church's effort to demonstrate that it is taking all reasonable steps to prevent the tea from being diverted. As previously stated in its November 22, 2000 letter, the Board does not plan to exercise regulatory authority with regard to the religious practices of the Santo Daime Church in Oregon.

Very truly yours,

Gary Schnabel

Gary Schnabel
Executive Director

- Exhibit "DD" -

www.bialabate.net

# PLAINTIFFS' EXHIBIT 5:

# DEFENDANTS' RESPONSES TO PLAINTIFFS' INTERROGATORIES NOS. 16 AND 17

# IN THE CASE OF

# O *CENTRO ESPIRITA BENEFICIENTE UNIAO DO VEGETAL, ET AL. V. JOHN ASHCROFT, ET AL.*

www.bialabate.net

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

O CENTRO ESPIRITA BENEFICIENTE UNIAO DO VEGETAL, *et al.*,

*Plaintiffs*,

vs. No. CV 00-1647 JP/RLP

JOHN ASHCROFT, *et al.*,

*Defendants*.

**DEFENDANTS' RESPONSES TO PLAINTIFFS' INTERROGATORIES No. 16 and 17**

**INTERROGATORY NO. 16:** State what evidence you have that any hoasca has been diverted from the O Centro Espirita Beneficiente Uniao do Vegetal to non-religious use, including in your answer, without limitation, the witnesses and/or documents that support your answer.

**RESPONSE:** Defendants respond that they have no evidence that hoasca has been diverted from the O Centro Espirita Beneficiente Uniao do Vegetal other than what may be reflected in the grand jury documents. Defendants cannot access these documents without a court order.

**INTERROGATORY NO. 17:** State what evidence you have that any peyote has been diverted by any member of the Native American Church to non-religious use, including in your answer the witnesses and/or documents that support your answer.

**RESPONSE:** Defendants respond that, without having searched the files of the 94 U.S. Attorneys Offices, Defendants have no evidence of any peyote having been diverted by any member of the Native American Church to non-religious use.

PLAINTIFF'S
EXHIBIT
5

www.bialabate.net

Dated: October 19, 2001

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

NORMAN BAY
United States Attorney
for the District of New Mexico

VINCENT M. GARVEY
Deputy Branch Director

[signature]
ELIZABETH GOITEIN
ADAM J. SZUBIN
United States Department of Justice
Civil Division
901 E Street, N.W., Room 1032
Washington, D.C. 20004
Telephone: (202)514-4470

Attorneys for Defendants

www.bialabate.net

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing AMENDED EXPERT WITNESS STATEMENT OF GEORGE GERDING – EVALUATION OF HEALTH AND SAFETY ISSUES CONCERNING SACRAMENTAL INGESTION OF THE SANTO DAIME HOLY TEA on:

Eric Joseph Beane / Brigham J. Bowen / Julie Straus / Lily Farel
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883, Room 7124
Washington, DC 20044
Attorneys for Defendants

☐ by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to each attorney's last-known address and depositing in the U.S. mail at Portland, Oregon on the date set forth below;

☐ by causing a copy thereof to be hand-delivered to said attorneys at each attorney's last-known office address on the date set forth below;

☐ by sending a copy thereof via overnight courier in a sealed, prepaid envelope, addressed to each attorney's last-known address on the date set forth below;

☐ by faxing a copy thereof to each attorney's last-known facsimile number on the date set forth below; or

☑ by filing electronically via the court's CM/ECF system.

DATED this 1st day of December, 2008.

TONKON TORP LLP

By [signature: Don H. Marmaduke]

Don H. Marmaduke
OSB No. 530727
Direct Dial: 503.802.2003
Direct Fax: 503.972.2003
Email: don.marmaduke@tonkon.com
Attorneys for Plaintiffs

097204\00001\1188593 V001