**EXHIBIT A - NOTICE OF ERRATA**

Case No. 20-cv-02373-ROS

# Corrected Exhibits to AYA Motion for Preliminary Injunction

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 13

CHARLES CARREON (CSB # 127139)
3241 E. Blacklidge Drive
Tucson, Arizona 85716
Tel:  628-227-4059
Email: chascarreon@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly,
North American Association of Visionary Churches, and
Clay Villanueva

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIZONA YAGÉ ASSEMBLY, NORTH AMERICAN ASSOCIATION OF VISIONARY CHURCHES, and CLAY VILLANUEVA, | Case No.: 3:20-CV-03098-WHO |
| Plaintiffs, | DECLARATION OF PAULO CESAR RIBEIRO BARBOSA |
| vs. | Date:  September 9, 2020 Time:  2:00 P.M. Courtroom:  2 (17th floor) |
| WILLIAM BARR, Attorney General of the United States; UTTAM DHILLON, Acting Administrator of the U.S. Drug Enforcement Administration; CHAD F. WOLF, Acting Secretary of the Dept. of Homeland Security; MARK A. MORGAN, Acting Commissioner of U.S. Customs and Border Protection; THOMAS PREVOZNIK, Deputy Assistant Administrator of the DEA Dept. of Diversion Control, in his personal capacity; the UNITED STATES OF AMERICA; the STATE OF ARIZONA; MARK BRNOVICH, Arizona Attorney General; MARICOPA COUNTY, a political subdivision of the State of Arizona; and, MATTHEW SHAY, | |
| Defendants. | |

Paulo Cesar Rebeiro Barbosa declares and affirms:

**1.**    I am an Adjunct Professor in the Department of Philosophy and Human Sciences working in the field of Scientific Methodology at the State University of Santa Cruz in Ilheus, Brazil.

**2.**    The CV attached as Appendix II  is a true and correct statement of my qualifications to provide the opinions expressed in the Opinion Letter attached hereto as Exhibit 1.

**3.**    During early 2018, I was retained by the Arizona Yagé Assembly ("AYA") to provide the summary of scientific evidence and expert opinions presented in the attached Opinion Letter.  These opinions and the scientific evidence supporting those opinions are current as of this date, thanks in substantial part to the assistance of my co-professor Eduardo Ary Villela Marinho, who provided vital updates regarding research completed since April 2018.  Because of the strength of his contributions, that brought my prior research and analysis up to date with the most recent research in this field, I have attached a copy of Prof. Marinho's CV as Appendix III.  The additional research, easily identifiable in the Opinion Letter as citations to studies completed in 2018 – 2020, to which we of course had no access prior to publication.  The additional research adds weight to the conclusions expressed in the Opinion Letter, particularly in the section analyzing whether Ayahuasca serves as, or stimulates consumption of, drugs of abuse.

**4.**    The Opinion Letter addresses the questions that were presented to me for analysis and response, based on the scientific evidence summarized in the Opinion Letter remains as accurate today as it was when I signed it, and I currently hold all of the same opinions on the topics addressed in the Opinion Letter.  During the two years that have passed since I signed the Opinion Letter, some additional information has come to my attention that warrants providing a brief update, however.

/ / /

/ / /

/ / /

**5.** I may be contacted through AYA's attorney, and upon reasonable advance notice, will be available to answer questions via teleconference from here in Brazil.

I declare and affirm, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct, and that this declaration was signed on August ⎯5⎯, 2020, at Ilheus, Bahia, Brazil.

Paulo Cesar Ribeiro Barbosa



August 4, 2020

Dr. Paulo Cesar Ribeiro Barbosa
Prof. Adjunto do Departamento de Filosofia e Ciencias Humanas
Departamento de Filosofia e Ciências Humanas
Area de Metodologia Cientifica
Universidade Estadual de Santa Cruz - Ilhéus – BA
Campus Soane Nazaré de Andrade
CEP 45662-900. Ilhéus-Bahia

To:     United States District Court for the Northern District of California

Re:     Application for Religious Freedom Exemption of Arizona Yagé Assembly

I have been retained by the Arizona Yagé Assembly ("AYA") to answer a series of questions regarding the traditional Amazonian brew known variously as ayahuasca, yage, and hoasca[1] to aid the United States Drug Enforcement Administration (the "Agency") in deciding whether to grant an exemption to AYA to practice religious ceremonies in which AYA members drink ayahuasca.
I have provided answers to these questions in the form of concise professional opinions in italics followed by an explanation of my opinion, supported by a summary of relevant studies.  Appendix I summarizes some of the results of the studies discussed below in chart format.

My opinions are based on my professional education, my study of the available scientific research in the field, knowledge acquired through collaboration with other experts in the field, and my own research.  Appendix II hereto is my curriculum vitae, stating my qualifications to render the opinions expressed herein.

I also adopt the conclusions of my co-researcher, Eduardo Ary Villela Marinho, who provided vital updates to a prior analysis I prepared approximately two years ago, that strengthens the conclusions expressed in this Opinion Letter, particularly in the section analyzing the evidence about whether Ayahuasca serves as, or stimulates abuse of, drugs of abuse.  Because of the strength of his contributions, that brought my prior research and analysis up to date with the most recent research in this field, I have attached a copy of Prof. Marinho's CV as Appendix III.

---

[1] Recipes for the brew can encompass a wide range of herbs, however, the most commonly used formulation for religious use is extracted from a combination of *Banisteriopsis Caapi* (harmaline, harmine, tetrahydroharmine, and other beta-carbolines) and a second herb containing Dimethyltryptamine, generally *Psychotria Viridis* or *Diplopterys Cabrerana*.  Opinions expressed in this letter are expressed regarding this traditional "two-ingredient" brew, which is used by the UDV, the Santo Daime, and AYA.

**Do ayahuasca and dimethyltryptamine have substantially different effects?**

*Yes. DMT is a psychedelic and, in humans, is usually administered intravenously, felt nearly instantaneously, and exhausts its powerful effects within under a half hour. Regarding intensity of effect, the effects of DMT are estimated to be twice as intense compared to equivalent dosages of ayahuasca. By comparison, ayahuasca is consumed orally, and its effects are slow and progressive, leading to a 4 - 6 hour experience that is more controllable than DMT.*

DMT and ayahuasca are very different in their effects, with DMT being more intense and less subject to control than ayahuasca. Grob's seminal paper evaluated the "maximum intensity of the effects of DMT" as approximately twice that of ayahuasca at "equivalent doses." (Grob et al., 1996). The acute effects of DMT are very intense, appear nearly instantaneously after intravenous administration, and are over in under an hour (Strassman & Qualls, 1994; Strassman et al., 1994.) During the last few decades, clinical trials have been carried out on humans where both DMT (in purified form, administered intravenously) and ayahuasca (administered orally) have been administered in a laboratory context, and their acute effects have been characterized both at the psychological and somatic levels. Ayahuasca affects users slowly and progressively. Effects are felt 45 to 60 minutes after administration, reach their maximum effects 2 hours later, decline thereafter, and cease after 4 to 6 hours (Riba, 2003; dos Santos, 2011). Thus, the effects of ayahuasca are much more controllable than those of pure DMT.

**Does ayahuasca adversely affect the physical health of religious ayahuasca users?**

*No. Ayahuasca is a non-toxic psychedelic tea whose main adverse physical effects are nausea and vomiting. It causes slight impact on the cardiovascular system. Religious ayahuasca use does not have adverse effects on physical health, and is associated with reduced physical pain and decreased impairment of life activities due to physical infirmities. Studies relevant to this topic are summarized in Chart A, Appendix I.*

Toxicity is considered the capacity of a substance to cause harm to an organism by means of its chemical properties (Baños & Farré, 2002). From a toxicological viewpoint, the minimum psychoactive dose of a substance being administered to induce a psychoactive effect should be less than the toxic dose. This is certainly the case with ayahuasca, that has no toxic effects at all at dosage levels sufficient to induce a powerful psychoactive effect. It is thus a physically non-toxic psychedelic. This statement is subject to the caveat that persons taking MAO inhibitors should not take ayahuasca, and that pre-ceremonial dietary restrictions to avoid tyramine-containing substances should be observed.

The main adverse effects produced by ayahuasca are nausea and vomiting (Callaway, et al., 1999; Riba et al., 2001; Riba, 2003; Riba & Barbanoj, 2005; dos Santos, 2011; dos Santos et al., 2012). The emetic action of ayahuasca is

related first to the organoleptic properties of the decoction, and second to its serotonergic action (Callaway et al., 1999). The impact of ayahuasca on the cardiovascular system is minimal, producing only slight increases in blood pressure and heart rate that have no clinical implications (Riba et al., 2001, 2003; dos Santos et al., 2012). Studies to determine the acute effects of ayahuasca in the laboratory (Riba, 2003; dos Santos, 2011) and in natural contexts (McKenna, 2004), show that ayahuasca is physiologically safe.

Long-term Santo Daime users of religious ayahuasca showed significantly better scores than the control group on ASI-assessed Medical Status (Fabregas et al. 2010). Additionally, the UDV subjects showed improvement in the Bodily Pain subscale of SF-36 at six-month follow-up (Barbosa et al. 2009). Finally, UDV subjects scored better than the control group on a scale used to measure how much quality of life suffered from physical health restrictions -- the Medical Outcomes Study Short Form-36 (SF-36) Barbosa et al. (2016).

**Does ayahuasca in the religious context serve as a drug of abuse or stimulate abuse of other drugs?**

*No. In my professional opinion, the scientific evidence does not support any hypothesis that religious use of ayahuasca constitutes or leads to drug abuse. Indeed, the reverse appears to be the effect. For many users, religious ayahuasca use diminishes or eliminates abuse of alcohol and other substances. I cite and briefly discuss the relevant results from five studies in support of this opinion.*

Pre-clinical studies have found that in different mouse models of addiction-related behaviors, ayahuasca administered in doses between 100 and 300 mg/kg promotes important anti-addictive effects against the use of ethanol (Cata-Preta et al., 2018; Oliveira -Lima et al., 2015) and psychostimulants (methylphenidate, Reis et al., 2020). In addition, Reis et al., 2020 also demonstrated that, when administered after treatment with ethanol, ayahuasca reversed the changes in neuronal activity induced by methylphenidate in brain regions related to addiction, an effect that was maintained even after re-exposure to methylphenidate, suggesting an important role for ayahuasca in preventing drug-induced relapse. Cata-Preta et al. 2018 further demonstrated that when administered separately, extracts of the two main plant constituents of ayahuasca, *Banisteriopsis caapi* (which contains MAO-inhibiting Beta carbolines) and *Psychotria viridis* (which contains DMT), also showed anti-relapse effects in a model of ethanol reward.

Among the earliest studies to provide evidence of a lack of association between religious use of ayahuasca and behavior associated with drugs of abuse was Grob's seminal human assessment of religious users of ayahuasca. Grob's study reported zero (0) UDV members with current drug/alcohol-related problems, compared to one person with alcohol use disorder (AUD) in the non-ayahuasca-using control group (Grob et al., 1996). Grob's study was conducted in Brazil. Researchers administered the Composite International Diagnostic Interview (CIDI) to 15 adult long-term UDV members and 15 non-ayahuasca-user controls. Five (5) UDV members who suffered from AUD before becoming UDV members no longer had active AUD diagnoses. By comparison, only one control subject showed past and no longer active AUD diagnosis.

4

A larger study was completed in Brazil in 2010, and compared 127 ayahuasca drinkers with 115 control subjects, assessing them using the biopsychosocial criteria of the Addiction Severity Index 5th Edition (ASI-5, the standard drug-dependence assessment).  The positive results were twofold: (1) no evidence of drug dependence among the ayahuasca drinkers, and (2) no association between continuous ritual use of ayahuasca and harmful biopsychosocial consequences related to drugs of abuse.  As in the studies cited above, the ayahuasca group consumed less alcohol and other drugs than the control group.  These scores on the biopsychosocial criteria for drug dependence were replicated a year later (Fábregas et al., 2010).

A study conducted at the University of New Mexico compared the substance-abusing behavior of members of the UDV church with that of church-going Christians.  The two groups were comprised of 30 UDV ayahuasca users and 27 non-ayahuasca-using devout Catholics and Protestants (Barbosa et al., 2016).   The UDV members drank ayahuasca in their twice-monthly church meetings.  The Catholic and Protestant subjects attended masses and services more frequently than the UDV subjects.  Relative to the control group, the UDV group demonstrated greater past intoxication-driven alcohol use and past use of cannabis, but less recent use of alcohol.  Put simply, the UDV group started out with more marijuana and alcohol users, and ended up with fewer alcohol users.  The control group numbers did not diminish for either category.

Doering-Silveira et al. (2005) administered a questionnaire based on the World Health Organization criteria for substance use and found lower past month and past year alcohol use in 41 Brazilian adolescent UDV ayahuasca users, compared to 43 matched control adolescents with no previous ayahuasca exposure.

The tendency of ayahuasca users to abandon alcohol and other drugs of abuse was again observed in a 2008 study of 32 Oregon Santo Daime members who were examined using the Structured Clinical Interview for DSM-IV psychiatric disorders (SCID).  This group of ayahuasca users showed marked reduction in addictive behavior: Twenty-two (22) participants with a previous history of drug/alcohol-related problems were in full remission, one marijuana-dependent person was in partial remission, and one continued to abuse marijuana. (Halpern et al. 2008).

A large-scale survey was conducted with 1,947 members of UDV from all geographic areas of Brazil (Barbosa et al. 2018). The Substance Abuse and Mental Health Services (SAMHSA) questionnaire was administered to compare the lifetime use and current prevalence of alcohol and tobacco use disorders between the UDV and a national normative sample (n=7,939). The authors found that lifetime use of alcohol and tobacco was higher in UDV sample compared to the Brazilian norms for age ranges of 25–34and over 34 years old, but not for the age range of 18–24 years old. However, current prevalence for alcohol and tobacco use disorders were lower in the UDV sample than the Brazilian norms for all age ranges. This study also found that the more the participants attended ayahuasca rituals during their lifetime and during the previous 12 months, the less they used alcohol and tobacco during the previous year and month, and the less they had current alcohol and tobacco use disorders. The salient results of the cited studies are summarized as Chart B in Appendix I.

**Does ayahuasca adversely affect the mental health of ceremonial ayahuasca users?**

*No. In my professional opinion, the scientific evidence does not support the hypothesis that ritual use of ayahuasca adversely affects mental health.*

Concern for the health of the ayahuasca-using community has fueled considerable research into this topic, and the weight of the scientific evidence today indicates that religious ayahuasca users demonstrate less psychiatric morbidity, *i.e.,* mental illness, than either non-ayahuasca using control groups, or the general population.  Using the CIDI to assess the mental health of ayahuasca users and compare it with that of non-users, Grob's seminal study identified no one in the UDV group with a current psychiatric diagnosis; whereas the control group included one person with hypochondriasis (Grob *et al.* 1996). Subsequent studies suggested that the rate of psychotic episodes that occured in ayahuasca ceremonial settings did not differ from the rate of general population (Lima and Tofoli 2011; Gable 2007). Moreover, the causal relationship of these episodes with ayahuasca intake were difficult to ascertain, because other risk factors, such as concurrent use of other substances and past history of psychosis, were present in most of the cases (Dos Santos et al. 2017).

These evaluations of the mental health effects ayahuasca intake within religious contexts are reinforced by a recent double-blind randomized placebo-controlled study (Palhano-Fontes et al. 2019). The authors found out that ayahuasca administration elicited rapid antidepressant effects, as assessed by the Montgomery-Åsberg Depression Rating scale (MADRS) and the Hamilton Depression Rating scale (HAM-D), in treatment-resistant depression patients.

Further, several studies show improved measures of mental health contemporaneously with continued religious ayahuasca use.  The salient results of the cited studies are summarized in Chart C in Appendix I.

### The Fabregas Study

Fabregas *et al.* (2010) found better scores on the psychiatric status subscale of the ASI-V among the Santo Daime group relative to non ayahuasca-using control groups.

### The Doering-Silveira Study

Doering-Silveira *et al.* (2005) reported less anxiety symptoms using the State-Trait Anxiety Inventory (STAI), less body dysmorphism symptoms as assessed by Body Shape Questionnaire (BSQ), and less Attention Deficit Disorder using Conner's Adolescent Self-Rating scale than the control group.

### The Halpern Study

Halpern *et al.* (2008) found that the Santo Daime group had fewer, less intense complaints, and lower levels of overall severity of symptoms than the normative group for the Symptom Check List Revised 90 (SCLR90).[2]

---

[2] The SCLR90 assesses three categories of symptoms:  Positive Symptom Total (overall complaints), Positive Symptom Distress Index (intensity of complaints), and Global Severity Index (overall severity of complaints).

Ayahuasca users were found to be free of clinically significant anxiety as measured by the Hamilton Anxiety Rating Scale (0/32 on the HAM-A)

Ayahuasca users demonstrated a low rate of depression as measured by Hamilton Depression Rating Scale (1/32 on the HAM-D). This was particularly significant, because five of the ayahuasca users had suffered at least one major depressive disorder before joining Santo Daime, as revealed by administration of the Structured Clinical Interview for DSM-IV Disorder (SCID).

The SCID also identified one individual with a current bipolar I disorder, one with a current panic disorder, six with recurrent major depressive disorders, with four in remission and two in partial remission, and two with simple phobia disorder in partial remission, four with simple phobia (two in remission and two in partial remission), three with bulimia nervosa in remission, six with posttraumatic stress disorder or panic disorder in remission. Eight subjects reported remission occurring after their involvement in ayahuasca religious use.

## The Barbosa Study

Barbosa *et al.* (2009) prospectively assessed psychiatric morbidity in new ayahuasca users using the Clinical Interview Schedule – revised edition (CIS-R), which was administered to each subject three times: shortly before, a week after, and six months after the subjects' first religious ayahuasca experience. Nineteen (19) of the subjects were members of the Santo Daime, and nine (9) were from the UDV.

The Santo Daime group nearly met criteria for the CIS-R defined psychiatric disorder (scores of at least 12) before drinking ayahuasca. Their scores significantly improved at one week and six-month follow-up (11.6 before ayahuasca, 5.1 a week later and six-months later).

The UDV group scored below the cut off value for CIS-R defined psychiatric disorder before beginning participation and showed no significant changes at either one-week or six-month follow-up.

In Barbosa et al's 2016 study at the University of New Mexico, the UDV group scored lower than the active religious control group for depression and confusion as assessed by the Profile of Mood States (POMS).

## Does religious use of Ayahuasca have adverse effects on cognitive function?

*No. In my professional opinion, the scientific evidence discussed below and summarized in Chart D indicates that religious use of ayahuasca does not negatively affect human cognitive function.*

Grob et al. (1996) used the WHO-UCLA Auditory Verbal Learning Test (WHO UCLA-AVLT) to compare the memory functions of long-term UDV members with those of a matched control group. The WHO UCLA-AVLT test assesses mild degrees of cognitive dysfunction and consists of several trials of recalling words read from lists of common items such as household objects. The authors detected better performance in ayahuasca users in the recall of words for the fifth learning trial.

Two more recent studies administered a comprehensive battery of neuropsychological tests to compare the attention, psychomotor speed, verbal

and visual abilities, memory, and mental flexibility of non-ayahuasca using control groups with those of UDV adolescents (Doering-Silveira et al. 2005), and UDV and Santo Daime adults (Bouso et al. 2012; Barbosa et al. 2016). Bouso et al. (2012) found better results on cognitive performance of Santo Daime group relative to the control group.  No difference in cognitive functions were found in UDV adolescents and adults relative to their control group (Doering-Silveira et al. 2005; Barbosa et al. 2016).

**Conclusion**

Ayahuasca and dimethyltryptamine are two very different psychoactive substances, and of the two, ayahuasca is far more amenable to conscious control.  Ayahuasca is essentially an herbal tea that often induces nausea and vomiting due to its organoleptic and serotonergic characteristics.  Other physical effects include mild rises in blood pressure and heart rate.  The psychoactive effects begin slowly after a 45-minute period of onset, and end within approximately six hours.  Ayahuasca consumed in a religious context is not being used as a drug of abuse, nor does the religious use of ayahuasca lead to the abuse of other drugs; instead, religious ayahuasca users generally abandon abuse of alcohol after they become members of an ayahuasca church. These data are backed up by pre-clinical evidence indicating that ayahuasca blocks many abuse-related behavioral effects of drugs of abuse.  Ayahuasca does not adversely affect mental health. Many religious ayahuasca users start out with greater psychological morbidity than the control groups, and show a marked improvement with years of ayahuasca use, reporting greater mental health after participating in religious ayahuasca use compared to control groups. Ayahuasca has not been observed to impair cognitive function, and on some testing scales, is associated with improved functioning.


Very truly yours,

Paulo Cesar Ribeiro Barbosa

# APPENDIX I

APPENDIX I

| CHART A | | |
|---|---|---|
| **Study** | **Scale** | **Result** |
| Riba<br>dos Santos | Physiological measures of acute effects | Minimal impact on the cardiovascular system<br>Slight increases in blood pressure and heart rate that have no clinical implications |
| Fabregas | ASI-5 medical status | Santo Daime had better results than the control group |
| Barbosa | SF-36 | Improved Bodily Pain six months after the first ayahuasca experience in UDV |
| Barbosa | SF-36 | UDV had better score on domain role limitations due to physical health than the control group |

| CHART B | | |
|---|---|---|
| **Study** | **Scale** | **Result** |
| Grob | CIDI | UDV have less current substance use disorder than control group<br>Past diagnostic criteria for alcohol use disorders (AUD) for 5 UDV members who no longer met the criteria after becoming UDV members. |
| Fabregas | ASI-5 | No evidence of drug dependence in Santo Daime group, nor evidence that the continuous ritual use of ayahuasca was associated with harmful biopsychosocial consequences related to drugs of abuse.<br>Moreover, the Santo Daime ayahuasca group consumed less alcohol and other drugs compared to the control group |
| Doering-Silveira | World Health Org. criteria | UDV adolescent members had less past year and month use of alcohol relative to the control group |
| Halpern | SCID - DSM-IV | Participants of Santo Daime with a previous history of drug/alcohol-related problems were in full remission |
| Barbosa | ASI-5 | UDV Had More Prior intoxication-driven alcohol use Use than control group<br>UDV Had Less Recent Use of alcohol than control group |

| CHART C | | |
|---|---|---|
| **Study** | **Scale** | **Result** |
| Grob | CIDI | UDV have less current psychiatric diagnoses than controls |
| Fabregas | ASI-V | Santo Daime had better scores on the psychiatric status than controls |
| Doering-Silveira | STAI | UDV adolescent group had less anxiety symptoms than the control group |
| Doering-Silveira | BSQ | UDV adolescent group had less body dysmorphism symptoms than the control group |

APPENDIX I

| | | |
|---|---|---|
| Doering-Silveira | Conner's Adolescent Self-Rating | UDV adolescent group had less attention deficit disorder than the control group |
| Halpern | SCLR-90 | Santo Daime group had better scores than the normative group for Positive Symptom Total, Positive Symptom Distress Index and Global Severity Index |
| Halpern | HAM-A | Santo Daime group was free of clinically significant anxiety (0/32) |
| Halpern | HAM-D | Santo Daime group demonstrated a low rate of depression (1/32) |
| Halpern | SCID | Eight Santo Daime subjects reported remission of psychiatric disorder occurring after their involvement in ayahuasca religious use. |
| Barbosa | CIS-R | New Santo Daime parcicipants reported improved scores on minor psychiatric symptoms six months after drinking ayahuasca<br>No difference in the scores of minor psychiatric symptoms in new ayahuasca users within UDV |
| Barbosa | POMS | UDV had less depression than the active religious control group<br>UDV had less  confusion than the active religious control group |

| CHART D | | |
|---|---|---|
| **Study** | **Scale** | **Result** |
| Grob | WHO-UCLA AVLT | UDV had better performance the recall of words for the fifth learning trial |
| Doering-Silveira | Comprehensive battery of neuropsychological function | No difference between UDV adolescents and control group |
| Barbosa | Comprehensive battery of neuropsychological function | No difference between UDV adults and control group |
| Bouso | Comprehensive battery of neuropsychological function | Santo Daime had better results on cognitive function than the control group |

# APPENDIX II

## Biography

Dr. Paulo Cesar Ribeiro Barbosa obtained his Ph.D. in Medical Sciences at Universidade Estadual de Campinas (UNICAMP) in 2008 working on a follow-up evaluation of religious ayahuasca users. He obtained his degree in Social Sciences at Universidade de São Paulo (USP) in 1992 and a degree in Psychology at Faculdade de Ilhéus (CESUPI) IN 2019. Since 2001 he has worked on a variety of projects involving psychiatric, psychological, neurocognitive, social and cultural assessments of ayahuasca users within Brazilian and North-American urban contexts. Dr Barbosa was appointed Professor of Scientific Methods in 2002 in the Departamento de Filosofia e Ciências Humanas at Universidade Estadual de Santa Cruz (Brazil). He worked as Adjunct Assistant Professor at the Psychiatry Department of University of New Mexico. Dr. Barbosa's main research activities concern the relationships among psychiatric, psychological and anthropological methods of evaluating the effects of ayahuasca in Brazilian and North-American urban settings.

## Research Strategy and Context

Ayahuasca is a hallucinogenic beverage produced from Amazonian plant components that contain harmine, harmaline, tetrahydroharmine and N,N-dimethyltryptamine (DMT). The ritually sanctioned use of the brew is widespread among Amerindian and Mestizo groups of the western Amazonian basin. Ethnological data suggest that the ritual and ideological framework accompanying the use of ayahuasca in these societies can minimize social and psychological problems associated with the use of psychoactive substances in western societies.

During the last three decades modern urban Brazilian ayahuasca religions, such as *União do Vegetal* and *Santo Daime* who use ayahuasca as a key element in their doctrines and ceremonial meetings have spread from the Amazon to major cities in Brazil, as well as to Europe and North America. Hallucinogens are often associated by mainstream psychiatry with psychopathology and abuse potential and the fact that their use is restricted legally the expanded use of the beverage has brought these religious groups under scrutiny by law enforcement officials. On the other hand, ayahuasca religions claim that the brew can show therapeutic properties for the treatment of several psychological, psychiatric and general health problems.

Many ethnographic studies have been conducted in the attempt to describe the social and ideological structures involved in these religious groups concerning the purported therapeutic use of ayahuasca. However, rigorous scientific evaluations about its actual effects on health are still lacking.

This research programme addresses the need for rigorous scientific investigations when evaluating the effects of ayahuasca on mental health and the inter-relationships between ritual and social network involved in religious ayahuasca groups in determining the health status of urban ayahuasca users. The aims of the research strategy are:

- To evaluate the socioeconomic profile of people who seek ayahuasca experiences and to elicit their therapeutic and religious itineraries;

- To elicit how people evaluate and interpret their ayahuasca experience;

- To evaluate the effects of ayahuasca use on psychiatric symptoms;

- To evaluate the effects of ayahuasca use on personality traits;

- To evaluate the effects of ayahuasca use on neurocognitive functions;

- To evaluate the effects of ayahuasca use on health-related quality of life;

- To evaluate the effects of ayahuasca use on licit and illicit drug use and abuse;

- To evaluate the interaction of ayahuasca use with selective serotonin reuptake inhibitors.

## Ongoing research protocols

### 1) Quality of life and drug use in UDV adepts

This project proposes to evaluate the quality of life and use and abuse of licit (such as alcohol and tobacco) and illicit (e.g., cocaine, marihuana) drugs in adepts of the União do Vegetal. It will also evaluate the potential adverse interaction between ayahuasca and serotonergic antidepressant drugs. In order to achieve these goals, we will conduct a national survey using a standardized instrument of WHO on the quality of life (WHOQOLBref), and two standardized instruments based on the WHO and the Substance Abuse and Mental Health Services (SAMHSA), to assess drug use and addiction. The independent variables will be the frequency pattern of ayahuasca use and the years and months of joining the religion. We investigate whether subjects who attend ayahuasca rituals regularly show improved quality of life and drug use in comparison with those who attend these rituals intermittently. Length of time of regular attendance to these rituals will also be correlated with the corresponding measures. It is also aimed to investigate whether the use of medications and the frequency pattern of ritual attendance is associated with adverse reactions during the acute effects of ayahuasca. Additionally, there will be a qualitative research on health and welfare of members of the UDV, in which respondents of the questionnaires will also be invited to take part in a qualitative follow-up study in order to assess the impact of religion on health.

Funded by National Counsel for Scientific Development (Federal Administration – Brazil)
Started: April 2009
Scheduled conclusion: March 2011
Coordinator:  Paulo Cesar Ribeiro Barbosa
Researchers: Michael Winkelman, Alberto Groisman, Luis Fernando Tofoli

### 2) Personality traits, cognitive functions and drug abuse-related problems associated with regular ayahuasca use

It was aimed to evaluate potential drug abuse-related problems, personality traits and cognitive functions associated with regular ayahuasca use. Standardized instruments were used in order to assess a number of personality traits, cognitive functions and medical and psychosocial consequences of drug misuse in the following groups: a) a group of jungle-based ayahuasca users (n = 56) vs. non-ayahuasca-using rural group (n

= 56); and b) a group of urban-based ayahuasca users (n = 71) vs. a group of urban non-users (n = 59).

Funded by: Instituto de Etnopsicología Amazónica Aplicada (IDEAA).
Coordinator:  Jose Carlos Bouso
Researchers: Josep Maria Fábregas, Débora González, Sabela Fondevila, Marta Cutxet, Xavier Fernández, Paulo César Ribeiro Barbosa, Miguel Ángel Alcázar-Córcoles, Jordi Riba

### 3) A psychological and neuropsychological evaluation of Hoasca users within Uniao do Vegetal in the USA

Hoasca is a hallucinogenic brew originally used for magico-religious purposes by Amerindian populations of the western Amazon Basin. Throughout the last four decades, Brazilian syncretic churches, such as Santo Daime and Uniao do Vegetal (UDV) have helped spread the ritual use of hoasca abroad. This trend has raised concerns that regular use of this N,N-dimethyltryptamine-containing tea may lead to the mental and physical health problems associated with drug abuse. Lawsuits involving tensions between drug control laws and principles of religious freedom had occurred in Europe and in the USA. In 2006 the U.S. Supreme Court ruled for the UDV, allowing its local branch in the state of New Mexico to import, store and use hoasca. In 2009 the District Court of the State of Oregon ruled a similar decision in favor of a local branch of the Santo Daime Church. These decisions point to a significant increase in the use of hoasca in the U.S. and to the definitive establishment of this practice in American religious diversity. The few rigorous studies that have been completed on the psychological and medical effects of hoasca suggest mostly positive effects of religious hoasca use, but concerns about the potential for harmful effects remain. To further elucidate the effects of religious use of hoasca we propose a case-control study in which 35 North American users of hoasca within UDV will be compared to 35 matched control subjects with no history of hoasca use. The assessment will include instruments on quality of life, personality, spirituality and religiosity, mood, neuropsychological function and altered states of consciousness.

## List of Publications

### Full Articles

REIS, H. S.; RODRIGUES, I. R. S.; ANJOS-SANTOS, A.; LIBARINO-SANTOS, M.; SERRA, Y. A.; CATA-PRETA, E. G.; OLIVEIRA-CAMPOS, D.; KISAKI, N. D.; BARROS-SANTOS, T.; YOKOYAMA, T. S.; CRUZ, F. C.; OLIVEIRA-LIMA, A. J.; **BARBOSA, P. C. R.**; BERRO, L. F.; MARINHO, E. A. V. **Ayahuasca blocks the reinstatement of methylphenidate-induced conditioned place preference in mice: behavioral and brain Fos expression evaluations.** Psychopharmacology (Berl). 2020 Jul 16. DOI: 10.1007/s00213-020-05609-6. (Online ahead of print.)

**BARBOSA, P. C. R.**; TOFOLI, L. F.; BOGENSCHUTZ, M. P.; HOY, R.; BERRO, L. E. M.; ARECO, K.; WINKELMAN, M. **Assessment of alcohol and tobacco use disorders among religious users of ayahuasca.** Frontiers in Psychiatry, v. 9, p. 136, 2018.

CATA-PRETA, E. G.; SERRA, Y. A.; MOREIRA-JUNIOR, E. D. C.; REIS, H. S.; KISAKI, N. D.; LIBARINO-SANTOS, M.; SILVA, R. R. R.; BARROS-SANTOS, T.; SANTOS, L. C.; **BARBOSA, P. C. R.**; COSTA, J. L.; OLIVEIRA-LIMA, A. J.; BERRO, L. F.; MARINHO, E. A. V. **Ayahuasca and Its DMT- and β-carbolines - Containing Ingredients Block the Expression of Ethanol-Induced Conditioned Place Preference in Mice: Role of the Treatment Environment.** Frontiers in Pharmacology, v. 9, p. 561, 2018.

**BARBOSA, P. C. R.**; STRASSMAN, R.; SILVEIRA, D. X.; ARECO, K.; HOY, R.; POMMY, J.; THOMA, R.; BOGENSCHUTZ, M. P. **Psychological and neuropsychological assessment of regular hoasca users.** Comprehensive Psychiatry (Print), v. 71, p. 95-105, 2016.

BOGENSCHUTZ, M. P.; FORCEHIMES, A.; POMMY, J.; WILCOX, C.; **BARBOSA, P. C. R.**; STRASSMAN, R. **Psilocybin-assisted treatment for alcohol dependence: A proof-of-concept study.** Journal of Psychopharmacology (Oxford), v. 29, p. 1-11, 2015.

OLIVEIRA-LIMA, A.; SANTOS, R.; HOLLAIS, A.; GERARDI-JUNIOR, C.; BALDAIA, M.; WUO-SILVA, R.; YOKOYAMA, T. S.; COSTA, J.; MALPEZZI-MARINHO, E.; **BARBOSA, P. C. R.**; BERRO, L.; FRUSSA-FILHO, R. **Effects of ayahuasca on the development of ethanol-induced behavioral sensitization and on a post-sensitization treatment in mice.** Physiology & Behavior, p. 28, 2015.

**BARBOSA, P. C. R.**; MIZUMOTO, S.; BOGENSCHUTZ, M. P.; STRASSMAN, R. **Health status of ayahuasca users.** Drug Testing and Analysis, v. 4, p. 1, 2012.
#
BOUSO, J. C.; GONZALEZ, D.; FONDEVILA, S.; CUTCHET M.; FERNÁNDEZ, X.; **BARBOSA, P. C. R.**; ALCÁZAR-CÓRCOLES, M. Á.; ARAUJO, W. S.; BARBANOJ, M. J.; FÁBREGAS J. M.; RIBA, J. **Personality, psychopathology, life attitudes and neuropsychological performance among ritual users of ayahuasca.**

Plos One, v. 7, p. 1-13, 2012.

ANDERSON, B.; LABATE, B. C.; MEYER, M.; TUPPER, K.; **BARBOSA, P. C. R.**; GROB, C.; DAWSON, A.; MCKENNA, D. **Statment on ayahuasca.** International Journal on Drug Policy, v. 23, p. 173-175, 2012.

MIZUMOTO, S.; SILVEIRA, D. X.; **BARBOSA, P. C. R.**; STRASSMAN, R. **HRS - Hallucinogen Rating Scale - Versão Brasileira: Tradução e adaptação transcultural.** Revista de Psiquiatria Clínica (USP. Impresso), v. 38, p. 231-237, 2011.

FÁBREGAS J. M.; GONZALEZ, D.; FONDEVILA, S.; CUTCHET M.; FERNÁNDEZ, X.; **BARBOSA, P. C. R.**; ALCÁZAR-CÓRCOLES, M. Á.; BARBANOJ, M. J.; RIBA, J.; BOUSO, J. C. **Assessment of addiction severity among ritual users of ayahuasca.** Drug and Alcohol Dependence, v. 1, p. 257-261, 2010.

**BARBOSA, P. C. R.**; CAZORLA, I. M.; GIGLIO, J. S.; STRASSMAN, R. **A six-month prospective evaluation of personality traits, psychiatric symptoms and quality of life in ayahuasca-naïve subjects.** Journal of Psychoactive Drugs 41 (3): 205-212, 2009.

**BARBOSA, P. C. R.**; DALGALARRONDO, P.; GIGLIO, J. S. **Altered States of Consciousness and Short-term Psychological After-effects Induced by the First Time Ritual Use of Ayahuasca in Urban Context in Brazil.** Journal of Psychoactive Drugs 37 ( 2): 193-201, 2005.

**BARBOSA, P. C. R. O uso ritual de um alucinógeno no contexto urbano: estados alterados de consciência e efeitos em curto prazo induzidos pela primeira experiência com a ayahuasca.** Jornal Brasileiro de Psiquiatria 52 (3): 181-190, 2003.


**Book Chapter**

LABATE, B. C.; SANTOS, R. G.; ANDERSON, B.; MERCANTE, M.; **BARBOSA, P. C. R.** The Treatment and Handling of Substance Dependence with Ayahuasca: Reflections on Current and Future Research. In: LABATE, B. C.; MACRAE, E. (org.). **Ayahuasca, Ritual and Religion in Brazil. Ayahuasca, Ritual and Religion in Brazil.** Londres: Equinox, 2010, v. , p. 205-227.

**BARBOSA, P. C. R.**; DA SILVA DOS SANTOS, S. F. Aspectos culturais e sociais da saúde mental. In: SILVA, C. P. B. V.; SOARES, E. F. S.; DOS SANTOS, J. E. (org.). **I Encontro de Saúde Mental: rede de experiências.** 1ª ed. Salvador: EDUNEB v. I, p. 51-59, 2007.

# APPENDIX III

#

#

#

**Professional Biography of Dr. Eduardo Ary Villela Marinho**

Dr. Eduardo Ary Villela Marinho obtained his bachelor's degree in Biological Sciences in the Pontifícia Universidade Católica de Campinas (1992) and his master's degree in Biological Sciences (Physiology) at at Universidade Estadual de Campinas  (1997). He also holds PhD in Pharmacology at Universidade Federal de São Paulo (2011). Dr. Marinho was appointed Professor of Pharmacology at Universidade Estadual de Santa Cruz (Brazil). Dr. Marinho's main research activities concern Pharmacology and Physiology, Behavioral Pharmacology, Preference Conditioned by Place, Substance Abuse, Ayahuasca and other native medicinal plants.

**Research Strategy and Context**

1- Experimental therapeutic evaluation with Ibogaine in drug-induced chemical dependence in mice.
2- The role of 5HT2A receptors in the anti-addictive effect of Ayahusca in animal models of ethanol dependence.

**List of Publications**

1. REIS, HENRIQUE S.; RODRIGUES, ISA R. S.; ANJOS-SANTOS, ALEXIA; LIBARINO-SANTOS, MATHEUS; SERRA, YASMIM A.; CATA-PRETA, ELISÂNGELA G.; OLIVEIRA-CAMPOS, DANIELLA; KISAKI, NATALI D.; BARROS-SANTOS, THAÍSA; YOKOYAMA, THAIS S.; CRUZ, FABIO C.; OLIVEIRA-LIMA, ALEXANDRE J.; BARBOSA, PAULO C. R.; BERRO, LAIS F.; MARINHO, EDUARDO A. V.

Ayahuasca blocks the reinstatement of methylphenidate-induced conditioned place preference in mice: behavioral and brain Fos expression evaluations. PSYCHOPHARMACOLOGY. Fator de Impacto(2018 JCR): 3,4240, v.1, p.1 - , 2020.

2. BARROS-SANTOS, THAÍSA; SILVA, KALLYANE SANTOS OLIVEIRA; LIBARINO-SANTOS, MATHEUS; REIS, HENRIQUE SOUSA; Tamura, Eduardo Koji; DE OLIVEIRA-LIMA, ALEXANDRE JUSTO; BERRO, LAÍS FERNANDA; UETANABARO, ANA PAULA TROVATTI; MARINHO, EDUARDO ARY VILLELA

Effects of chronic treatment with new strains of Lactobacillus plantarum on cognitive, anxiety- and depressive-like behaviors in male mice. PLoS One. Fator de Impacto (2018 JCR): 2,7760, v.15, p.e0234037 - , 2020.

3. LIBARINO-SANTOS, MATHEUS; DE SANTANA SANTOS, ANA CATHERINE GOMES; CATA-PRETA, ELISANGELA G.; BARROS-SANTOS,

THAÍSA; NUNES BRANDÃO, NINA ROSA; BORGES, AUREA LORENA NUNES; SANTOS-BALDAIA, RENAN; HOLLAIS, ANDRÉ W.; BALDAIA, MARILIA A.; BERRO, LAÍS F.; Marinho, Eduardo A.V.; Frussa-Filho, Roberto; OLIVEIRA-LIMA, ALEXANDRE J.

Role of the treatment environment in the effects of aripiprazole on ethanol-induced behavioral sensitization and conditioned place preference in female mice. DRUG AND ALCOHOL DEPENDENCE. Fator de Impacto(2018 JCR): 3,4660, v.208, p.107856 - , 2020.

4. BRANDÃO, N.R.N.; LIBARINO-SANTOS, M.; MARINHO, E.A.V.; OLIVEIRA, T.S.; BORGES, A.L.N.; OLIVEIRA, A.P.; OLIVEIRA-CAMPOS, D.; AZEVEDO-SOUZA, N.; SANTOS, V.F.L.; BERRO, L.F.; OLIVEIRA-LIMA, A.J.

Treatment with zolpidem after ethanol administration potentiates the expression of ethanol-induced behavioral sensitization in mice. Brazilian Journal of Medical and Biological Research (on line). Fator de Impacto(2018 JCR): 1,8500, v.53, p.1 - 6, 2020.

5. MALPEZZI-MARINHO, ELENA L. A.; MOLSKA, GRAZIELA R.; FREIRE, LYVIA I. G. P.; SILVA, CRISTIANE I.; TAMURA, EDUARDO K.; BERRO, LAÍS F.; PARADA, CARLOS A.; MARINHO, EDUARDO ARY VILLELA

Effects of hydroalcoholic extract of Solidago chilensis Meyen on nociception and hypernociception in rodents. BMC Complementary and Alternative Medicine. Fator de Impacto(2018 JCR): 2,4790, v.19, p.72 - , 2019.

6. WUO-SILVA, RAPHAEL; FUKUSHIRO-LOPES, DANIELA F.; FIALHO, BRUNO P.; HOLLAIS, ANDRÉ W.; SANTOS-BALDAIA, RENAN; MARINHO, EDUARDO A. V.; MÁRI-KAWAMOTO, ELISA; YOKOYAMA, THAÍS S.; LOPES-SILVA, LEONARDO B.; BERRO, LAÍS F.; FRUSSA-FILHO, ROBERTO; LONGO, BEATRIZ M.

Participation of Dopamine D1 and D2 Receptors in the Rapid-Onset Behavioral Sensitization to Modafinil. Frontiers in Pharmacology. Fator de Impacto (2018 JCR): 3,8450, v.10, p.1 - 9, 2019.

7. BARBOSA, PAULO CESAR RIBEIRO; TÓFOLI, LUÍS F.; BOGENSCHUTZ, MICHAEL P.; HOY, ROBERT; BERRO, LAIS F.; MARINHO, EDUARDO A. V.; ARECO, KELSY N.; WINKELMAN, MICHAEL J.

Assessment of Alcohol and Tobacco Use Disorders Among Religious Users of Ayahuasca. Frontiers in Psychiatry. Fator de Impacto(2018 JCR): 3,1610, v.9, p.1 - 12, 2018.

8. CATA-PRETA, ELISANGELA G.; SERRA, YASMIM A.; MOREIRA-JUNIOR, ELISEU DA C.; REIS, HENRIQUE S.; KISAKI, NATALI D.; LIBARINO-

SANTOS, MATHEUS; SILVA, RAIANY R. R.; BARROS-SANTOS, THAÍSA; SANTOS, LUCAS C.; BARBOSA, PAULO C. R.; COSTA, JOSÉ L.; OLIVEIRA-LIMA, ALEXANDRE J.; BERRO, LAIS F.; MARINHO, EDUARDO A. V.

Ayahuasca and Its DMT- and β-carbolines - Containing Ingredients Block the Expression of Ethanol-Induced Conditioned Place Preference in Mice: Role of the Treatment Environment. Frontiers in Pharmacology. Fator de Impacto(2018 JCR): 3,8450, v.9, p.1 - 14, 2018.

9. SILVA, ALINE A.F.; SOUZA, EVELYN B.; CARVALHO, CASSIO C.; SILVA, RAIANY R.R.; BRITO, ANA CAROLINA L.; PRETA, ELISANGELA G.C.; OLIVEIRA, THAYNARA S.; BERRO, LAIS F.; OLIVEIRA-LIMA, ALEXANDRE J.; MARINHO, EDUARDO A.V.

Context-dependent effects of rimonabant on ethanol-induced conditioned place preference in female mice. DRUG AND ALCOHOL DEPENDENCE. Fator de Impacto(2018 JCR): 3,4660, v.179, p.317 - 324, 2017.

10. OLIVEIRA-LIMA, A.J.; MARINHO, E. A. V.; SANTOS-BALDAIA, R.; HOLLAIS, A. W.; BALDAIA, M. A.; TALHATI, F.; Ribeiro, Luciana T.C.; WUO-SILVA, R.; BERRO, L. F.; Frussa Filho, R.

Context-dependent efficacy of a counter-conditioning strategy with atypical neuroleptic drugs in mice previously sensitized to cocaine. PROGRESS IN NEURO-PSYCHOPHARMACOLOGY & BIOLOGICAL PSYCHIATRY. Fator de Impacto(2018 JCR): 4,3150, v.73, p.49 - 55, 2017.

11. MARINHO, Eduardo A.V.; OLIVEIRA LIMA, ALEXANDRE J.; YOKOYAMA, THAIS S.; SANTOS-BALDAIA, RENAN; Ribeiro, Luciana T.C.; BALDAIA, MARILIA A.; DA SILVA, RAPHAEL WUO; HOLLAIS, ANDRE WILLIAN; TALHATI, FERNANDA; LONGO, BEATRIZ MONTEIRO; BERRO, LAIS FERNANDA; FRUSSA-FILHO, ROBERTO

Post-sensitization treatment with rimonabant blocks the expression of cocaine-induced behavioral sensitization and c-Fos protein in mice. PHARMACOLOGY BIOCHEMISTRY AND BEHAVIOR. Fator de Impacto(2018 JCR): 2,7730, v.156, p.16 - 23, 2017.

12. OLIVEIRA-LIMA, A.J.; SANTOS, R.; HOLLAIS, A. W.; GERARDI-JUNIOR, C. A.; BALDAIA, M. A.; WUO-SILVA, R.; YOKOYAMA, T.S.; COSTA, J. L.; MALPEZZI-MARINHO, E. L. A.; RIBEIRO-BARBOSA, P. C.; BERRO, L.F.; FRUSSA-FILHO, R.; MARINHO, E. A. V.

Effects of ayahuasca on the development of ethanol-induced behavioral sensitization and on a post-sensitization treatment in mice. PHYSIOLOGY & BEHAVIOR. Fator de Impacto(2018 JCR): 2,6350, v.142, p.28 - 36, 2015.

13. MARINHO, Eduardo A.V.; OLIVEIRA-LIMA, ALEXANDRE J.; SANTOS, RENAN; HOLLAIS, ANDRÉ W.; BALDAIA, MARILIA A.; Wuo-Silva, Raphael; YOKOYAMA, THAIS S.; TAKATSU-COLEMAN, ANDRÉ L.; PATTI, CAMILLA L.; LONGO, BEATRIZ M.; BERRO, LAÍS F.; Frussa-Filho, Roberto

Effects of rimonabant on the development of single dose-induced behavioral sensitization to ethanol, morphine and cocaine in mice. PROGRESS IN NEURO-PSYCHOPHARMACOLOGY & BIOLOGICAL PSYCHIATRY. Fator de Impacto(2018 JCR): 4,3150, v.58, p.22 - 31, 2015.

14. PAULA FREIRE, L. I. G.; MALPEZZI-MARINHO, E. L. A.; MOLSKA, G. R.; Kohn, D.O.; CORREA, L.; MARINHO, E. A. V.

Evaluation of the Acute Toxicity of the Hydroalcoholic Extract of Solidago chilensis Meyen (Arnica Do Campo) in Mice. American Journal of Phytomedicine and Clinical Therapeutics. , v.2, p.217 - 228, 2014.

15. MARINHO, EDUARDO A. V.; OLIVEIRA-LIMA, ALEXANDRE J.; Wuo-Silva, Raphael; SANTOS, RENAN; BALDAIA, MARILIA A.; HOLLAIS, ANDRÉ W.; LONGO, BEATRIZ M.; BERRO, LAÍS F.; Frussa-Filho, Roberto

Selective action of an atypical neuroleptic on the mechanisms related to the development of cocaine addiction: a pre-clinical behavioural study. INTERNATIONAL JOURNAL OF NEUROPSYCHOPHARMACOLOGY. Fator de Impacto(2018 JCR): 4,2070, v.17, p.613 - 623, 2014.

16. PROCÓPIO-SOUZA, ROBERTA; FUKUSHIRO, DANIELA F.; TROMBIN, THAÍS F.; SILVA, R. W.; ZANLORENCI, LINEANE H.F.; LIMA, ALEXANDRE J.O.; RIBEIRO, LUCIANA T.C.; CORRÊA, JUSSARA M.R.M.; MARINHO, E. A. V.; KAMEDA, SONIA R.; ANDERSEN, MONICA L.; TUFIK, SERGIO; FRUSSA-FILHO, ROBERTO

Effects of group exposure on single injection-induced behavioral sensitization to drugs of abuse in mice. Drug and Alcohol Dependence. Fator de Impacto(2018 JCR): 3,4660, v.118, p.349 - 359, 2011.

17. TAMURA, EDUARDO KOJI; JIMENEZ, RENATA SPADA; WAISMAM, KALINE; GOBBO-NETO, LEONARDO; LOPES, NORBERTO PEPORINE; MALPEZZI-MARINHO, ELENA A.L.; MARINHO, EDUARDO A.V.; FARSKY, SANDRA H.P.

Inhibitory effects of Solidago chilensis Meyen hydroalcoholic extract on acute inflammation. JOURNAL OF ETHNOPHARMACOLOGY. Fator de Impacto(2018 JCR): 3,4140, v.122, p.478 - 485, 2009.

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

CHURCH OF THE HOLY LIGHT OF
THE QUEEN, et al.,

                    No. 1:08-cv-03095-PA

        Plaintiffs,

    v.                  **SECOND AMENDED**
                                **JUDGMENT**

ERIC HOLDER, et al.,

        Defendants.

    Defendants are enjoined from prohibiting plaintiffs'
importation, storage, distribution, and use of Daime tea for
plaintiffs' religious ceremonies.

    IT IS SO ORDERED.

    DATED this _____6_____ day of January, 2012.

                          OWEN M. PANNER
                          U.S. DISTRICT JUDGE

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 15

To Those Concerned,

My name is Eladio Melendez Garcia. I live in the Peruvian Jungle four hours upriver from Iquitos, Peru, a city itself unreachable by road. I am Quechua. My father was a curandero, an ayahuasquero, a shaman – as was my grandfather, as am I. I am also a Christian. I am neither Protestant nor Catholic. In Peru, I am free to practice my religion. At the heart of my spiritual practice is the use of ayahuasca.

I have been teaching Scott Stanley what I know: the spirit of the plants, the spirit of the icaros, the spirit of the jungle, the spirit of healing, and the door to the divine. Mr. Stanley has stepped through this door. He has returned to tell the people of the United States what he has learned, what he has witnessed, how to heal the spirit with the help of the ayahuasca. I hope that one day he will be able to adhere to his religious convictions in his home country without fear of persecution.

I am sad to hear that in a country as powerful and free as the United States, that this man is not yet truly free to abide by the word of his God without fear of arrest. In Peru I am free to practice the tenets of my faith. My prayer is that one day all people will be so free.

Eladio Melendez Garcia
November 11, 2017

---

To Those Concerned,

Mi nombre es Eladio Melendez Garcia. Vivo en la selva peruana a cuatro horas río arriba de Iquitos, Perú, una ciudad inalcanzable por carretera. Yo soy Quechua. Mi padre era curandero, ayahuasquero, chamán, como mi abuelo, como yo. También soy ristiano. No soy protestante ni católico. En Perú, soy libre de practicar mi religión. En el corazón de mi práctica espiritual está el uso de ayahuasca.

Le he estado enseñando a Scott Stanley lo que sé: el espíritu de las plantas, el espíritu de los icaros, el espíritu de la jungla, el espíritu de sanación y la puerta a lo divino. Señor Stanley ha atravesado esta puerta. Ha regresado para contarle a la gente de los Estados Unidos lo que ha aprendido, lo que ha visto, cómo sanar el espíritu con la ayuda de la ayahuasca. Espero que algún día pueda adherirse a sus convicciones religiosas en su país de origen sin temor a la persecución.

Me entristece escuchar que en un país tan poderoso y libre como los Estados Unidos, este hombre aún no es verdaderamente libre de cumplir con la palabra de su Dios sin temor a ser arrestado. En Perú soy libre de practicar los principios de mi fe. Mi oración es que algún día todas las personas sean tan libres.

Eladio Melendez Garcia
11 de Noviembre de 2017

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 16

1  JOHN SULLIVAN (CSB#204648) Pro Hac Vice
   17532 Miranda Street
2  Encino, California 91316
   Tel:818-769-7236 Fax:818-301-2175
3  Email: Sullivan.John84@gmail.com

4  Attorney for Plaintiffs Arizona Yagé Assembly,
   North American Association of Visionary Churches,
5  Clay Villanueva, and Vine of Light Church

6              **UNITED STATES DISTRICT COURT**

7               **DISTRICT OF ARIZONA**

8

9  Arizona Yagé Assembly, North American
   Association of Visionary Churches, Clay
10 Villanueva, and Vine of Light Church

11          Plaintiffs,

12     vs.                            Case No.:20-CV-02373-ROS

13 Merrick B. Garland, Attorney General of   **PLAINTIFF CLAY VILLANUEVA'S**
   the United States; D. Christopher Evans,   ***EMERGENCY EX PARTE***
14 Acting Administrator of the U.S. Drug      **APPLICATION FOR WRIT OF**
   Enforcement Administration; Alejandro      **HABEAS CORPUS**
15 N. Mayorkas, Secretary of the Dept. of
   Homeland Security; Troy Miller, Senior
16 Official Performing the Duties of
   Commissioner of U.S. Customs and
17 Border Protection; the United States of
   America; Maricopa County, Matthew
18 Shay, and Marco Paddy
19

20          Defendants.

21

22 **I.     SUMMARY OF THE GROUNDS FOR EMERGENCY RELIEF**

23         Because the applicant, plaintiff Clay Lindell Villanueva, is currently suffering the

24 risk of death while unjustly incarcerated in the Maricopa County jail, this application is

25 made *ex parte* on an emergency basis pursuant to the habeas corpus proceeding

26 authorized at 28 U.S.C. § 2241 *et seq.*  Section 2243 of the habeas procedural scheme

27 imposes a statutory deadline that the proposed Order submitted herewith incorporates.

28

Notice of the intended filing of an ex parte application to procure applicant's relief was provided to all defendants herein on Monday, August 30, 2021, via email.

On August 23, 2021, plaintiff Clay Villanueva ("Villanueva") was arrested at LAX prior to boarding a plane to Peru to participate in religious ceremonies.   The arrest was made pursuant to a hitherto unknown arrest warrant that all defendants in this case disavowed knowledge of, on grounds of being a "fugitive" from a proceeding that had been concealed from Villanueva, his attorneys, and even the attorneys for Maricopa County in this action.   Defendants -- who made multiple representations to this Court that Plaintiffs were in no imminent risk of criminal prosecution, were gravely wrong. Villanueva has been arrested and now faces prosecution in Maricopa County over the exact same matters that he put at issue in this litigation over a year ago. Such matters are serious enough, but Villanueva faces something even more drastic than prosecution. Villanueva is suffering Stage 3 Lymphatic Cancer and requires immediate release from custody from Maricopa County Sheriff's confinement.  When Villanueva's counsel (who has verified this petition) tracked him down in detention in Los Angeles, he feared Villanueva would die in custody from malnutrition and hypothermia. Matters have not improved since his extradition to Maricopa County jail two days ago.  His bond is excessive, and apparently, due to a forfeiture lien placed on his home by Maricopa County (also the subject of litigation in this Court), he cannot secure his release with the aid of a property bond.  Villanueva therefore requests the emergency relief requested in the proposed Order submitted herewith, to ensure that Clay returns to his normal treatment for illness during continued confinement.

Defendants have repeatedly represented that Plaintiffs do not face an "imminent threat of prosecution." *See* Dkt. Nos. 39, 41, 85, 86, 116, 117.   Yet on August 22, 2021, Plaintiff Clay Villanueva was arrested at the Los Angeles International Airport ("LAX"). Initially, Defendant Department of Homeland Security ("DHS") detained Villanueva minutes before trying to board an international flight to Peru.  Next, Defendant Maricopa County, acting through employee Monica Schaffner, informed the Los Angeles Police

department that a valid warrant had been issued for Villanueva's arrest and they would extradite. Finally, Defendant Maricopa County, acting through the Maricopa County Sherriff's Office ("MCSO"), arrested Villanueva and booked him on September 1, 2021. Despite numerous representations to this Court that Villanueva was not facing an imminent threat of prosecution, he has been detained, arrested and is currently incarcerated in an Arizona jail.

Villanueva was arrested because he was a so-called "fugitive" of justice. Records obtained by counsel over the last week show that the Arizona Attorney General convened a grand jury and sought an indictment for the very activities that are at issue in the instant case – namely, Villanueva's legal and protected right to religious Free Exercise that Defendants have characterized as criminal activity. To be absolutely clear, Villanueva's recent arrest stems solely from the illegal search of his residence in May 2020 (discussed at length in the Second, Third and Fourth Amended Complaints) and not any other action Villanueva has taken in the 15 months since the government's retaliatory search.

Villanueva could not have been a fugitive because the Arizona Attorney General and the defense attorneys in this case **intentionally** **withheld** notice of his indictment. Villanueva's criminal case was never calendared in any court, no process was ever initiated to serve him, he was never summoned, and no officer ever attempted to execute his arrest warrant. To the contrary, Villanueva was informed on numerous occasions by Defendants that he was not facing an imminent threat of prosecution. Because he had no knowledge of the "stealth warrant" and no way of learning about it, Villanueva was not a fugitive and his arrest was illegal.

Emergency relief is necessary because Clay Villanueva is dying of cancer. He was diagnosed with Stage 3 lymphatic cancer in 2020, and he has lost nearly 15 percent of his body weight since his diagnosis. Villanueva has pursued an alternative treatment course based on a vegetarian diet, vitamin and mineral supplements, herbal and botanical therapies, mediation, and spiritual prayer. For the last year, Villanueva has been able to maintain his vitality and maximize his life span by following this carefully prescribed

holistic treatment regimen, primarily based around eating fresh fruits, vegetables, and a small amount of fish for protein. All other food gives him side effects that include vomiting and severe indigestion. Without proper nutrition or access to homeopathic remedies, Mr. Villanueva is rapidly losing his battle with cancer and is facing the real prospect that he will die in an Arizona jail.

Villanueva was targeted by Defendants because he had the nerve to practice Visionary Religion and advocate for his Free Exercise rights. He was falsely arrested on a fabricated warrant, prosecuted in secret, and lied to by the attorneys for the government. He is a 60-year-old religious man with no prior criminal history who lacks sufficient equity in his house to post a $150,000 real property bond. He is incarcerated, unable to receive prescribed cancer care and his required cancer therapy diet, losing weight due to malnutrition, losing his battle with cancer, and at risk of dying in jail while awaiting trial. Due to these extraordinary circumstances, Plaintiff Villanueva respectfully requests that this Court grant this emergency writ of Habeas Corpus and order Defendant Maricopa County to immediately release Villanueva on his own recognizance.

## II.     BACKGROUND FACTS

### A. Clay Villanueva is a Military Veteran, IT Professional, and Spiritual Leader With No Prior Criminal Record

Clay Lindell Villanueva is a 60-year-old man who spent seven years serving his country in the Navy as a communications technology specialist, and later became a respected IT professional for over two decades. Villanueva is also a Minister of Visionary Religion, the founder of the Vine of Light Church in Arizona, and a Board Member of the North American Association of Visionary Churches ("NAAVC"). Vine of Light Church members use Ayahuasca, an herbal tea that contains a small amount of Dimethyltryptamine ("DMT"), as their religious sacrament. In communion ceremonies, congregants pray to receive the transmission of wisdom and Divine Love that comes through sacramental use of Ayahuasca.

### B. Villanueva Became a Target of Retaliation by DEA, and then a Plaintiff in this Case

As alleged in the pending Fourth Amended Complaint (Docket #109), Villanueva became a target of the Drug Enforcement Agency ("DEA") in 2019 when the NAAVC began publicly advocating for the religious rights of its members to use Ayahuasca. NAAVC began pursuing an activist mission to engage the DEA on policy issues, and to that end, circulated an online petition to the DEA demanding that the agency alter its policies towards NAAVC and other Visionary Churches. NAAVC also sent a detailed, lengthy letter to the DEA in early January 2020 that requested changes in the DEA's policies toward NAAVC member churches, such as Villanueva's Vine of Light Church.

On May 5, 2020, Clay Villanueva – as a board member of NAAVC – authorized the filing the instant case in the Northern District of California. Less than two weeks after NAAVC filed the original Complaint in this case, at the behest of a DEA agent, Maricopa County Sherrif's Office ("MCSO") Detective Matthew Shay retaliated against Villanueva by procuring a search warrant to search Villanueva's church-residence. The search warrant was based on fabricated evidence that Villanueva had an illegal drug lab and was manufacturing DMT. The warrant contained blatant falsehoods and material omissions, and was only obtained through judicial deception.

On May 19, 2020, Villanueva was the victim of an illegal search by a Federal/State task force that executed an armed raid on his church-residence, arrested him, and seized his religious sacrament. Because there was never any drug lab or manufacturing of DMT by Villanueva, the HIDTA task force found no evidence of such activity. As a result of the illegal and unconstitutional search, Villanueva joined this suit as a named Plaintiff, alleging a 42 U.S.C. § 1983 claim against the Federal and State defendants.

**C. When Opposing A Motion for Preliminary Injunction, the Federal Government and Maricopa County Deceived Judge Orrick by Promising No Prosecution**

Plaintiffs sought a preliminary injunction to prevent the Defendants from taking any further prosecutorial steps until his rights under the Religious Freedom Restoration Act and 42 U.S.C. § 1983 were resolved. The Defendants in this case opposed the preliminary injunction on the grounds that Villanueva did not face an "imminent threat of prosecution." Defendants informed the Honorable Judge Orrick that there was no need for an injunction because there was no risk Villanueva would be prosecuted. Judge Orrick relied on the representations by the defendants to deny the motion: "[P]laintiffs have not shown, as they must to obtain a pre-enforcement injunction, that there has been any realistic, imminent threat of prosecution or enforcement action by the federal government." *See* Dkt. 57 at 23:20-23.

**D. The Federal Government and County Deceived the Arizona District Court and the Plaintiffs by Promising No Prosecution**

The false assurances provided to Judge Orrick in the Northern District of California were repeated to this Court. In a filing dated June 15, 2021, Department of Justice attorney Lisa Newman made the following representations to the Court on behalf of DHS:

- "The alleged May 19, 2020 search of Villanueva's home, Compl. ¶¶ 159-204, does not support Plaintiffs' claims of future harm *by Defendants*." Dkt. 112 at page 17 (emphasis in original).
- "Finally, neither AYA nor NAAVC allege any concrete plan to import ayahuasca in the future, much less that they will be prosecuted." Dkt. 112 at page 17.
- "Where, as here, the allegedly feared future harm is prosecution, there must be a 'genuine threat of imminent prosecution,' and 'neither the mere existence of a proscriptive statute nor a generalized threat' is sufficient." Dkt. 112 at page 15.

Also dated June 15, 2021, attorneys for Defendants Maricopa County and MCSO Detective Matthew Shay made the following representations to the Court:

- "The instant Motion to Dismiss further addresses Plaintiffs' claims for injunctive relief, which are not justified by real and immediate threat of irreparable injury." Dkt. 110 at page 2.
- "The criminal investigation of Villanueva (and the search of his property, and the seizure of his contraband) has already occurred; there is no plausible basis to conclude that an injunction against Shay himself would be necessary (or, for that matter, effective) to address the highly speculative 'threat' alleged by Plaintiffs." Dkt. 110 at page 8).
- "First, Plaintiffs have failed to plausibly allege that future injuries are 'real and immediate' rather than 'conjectural or hypothetical.'" Dkt. 110 at page 15.

The representations made to this Court on June 15 were all false. Just **six days** before these statements were made – on June 9, 2021 – a grand jury indictment appears to have issued out of the Superior Court for Maricopa County. Thus, at the same time counsel for DOJ and Maricopa County were making these misrepresentations to this Court, employees of the Maricopa County were testifying in a grand jury proceeding against Clay Villanueva brought by the Arizona Attorney General.

In light of the fact that Defendant Matthew Shay (an MSCO Detective) and other Maricopa County officials participated in the grand jury proceedings, these misrepresentations to this Court are inexcusable and clearly violative of Villanueva's civil and constitutional rights.

## E. The Secret Indictment and Planned Deprivation of Due Process

The putative warrant from Maricopa County was assigned Case No. 2021-001611-001 (the "Warrant Case"), and bears a "Court Ordered Date" of June 9, 2021.[1] Villanueva was never provided any notice of any indictment or warrant for his arrest. The putative warrant is completely concealed from public view, and as of the date of this filing, cannot be found in the physical or digital files of the Warrant Case. Nor does any indictment appear in the files of the Warrant Case.

No hearing was scheduled in the Warrant Case for June 9, 2021. On the comprehensive list of criminal defendant court hearings in Maricopa County Superior Court on June 9, 2021, the name Villanueva does not once appear. Villanueva clearly has never failed to appear at any criminal court hearing, and therefore did not "Fail to Appear" at a hearing, and was never a "fugitive," because flight requires knowledge of what one is fleeing. Villanueva had been lulled into the belief that he had no criminal charges against him by the above-quoted reassurances of the defendants in the RFRA Case, and their attorneys, that he faced "no imminent risk of prosecution."

The existence of the Warrant Case was deliberately concealed from Villanueva so that he would be arrested without warning, most likely while driving or travelling, and be hauled before the court under compromising circumstances that would impede his efforts to obtain his freedom and prove his innocence, expose him to inconvenience and hardship, and expose him to additional "fugitive" charges in any foreign state outside Arizona where he might be arrested.

Indeed, to this very day, a search for "Clay Villanueva" in Maricopa County's "Public Access to Criminal Court Information" website does not identify any cases in

---

[1] The judge's signature on the putative warrant is illegible, and there is no printed name under the illegible signature. There is also no printed name of the Deputy Clerk who allegedly signed the order and that signature is also illegible. The inability to identify any of the signatories on this document is inherently suspect and makes its authenticity and validity impossible to determine from the face of the document.

which he is a criminal defendant.[2] Both the putative warrant and the indictment remain accessible only to the defendants, who have concealed their existence and affirmatively deceived Villanueva by telling him, through the agency of their attorneys, that he stands no risk of imminent prosecution. Unfortunately, there was not one thing Villanueva could have done to avoid his current situation, because all of the diligence in the world would not have revealed the existence of the minefield of secret warrants, one of which was bound to explode and destroy his life whenever he had any investigative contact with a police officer or other official with access to the NCIC. Thus, the NCIC database itself was taken over and turned to a corrupt purpose.

### F. Villanueva Triggers the Secret Warrant Planted for Him at the Airport and Disappears into the Los Angeles County Detention System

On August 22, 2021, having been assured that international flight would not expose him to risk, Mr. Villanueva attempted to embark on a flight out of Los Angeles for Peru. In addition to travelling to Peru to augment his holistic treatment regimen for cancer, Villanueva was also traveling to lead Ayahuasca ceremonies for the congregants of his Vine of Light Church. Villanueva's plan was to travel along with 10 other congregants, who were all visiting Peru as part of a religious pilgrimage. For that reason, he was carrying travel itineraries and a supply of cash to cover the lodging food and other expenses of the entire group, an amount totaling approximately $10,000.

DHS detained Villanueva at the gate, and then called the Los Angeles County police. DHS advised the police officers that they ran a warrants check on Villanueva and detailed him at the gate. Villanueva was then handed over to the Los Angeles County police. A Los Angeles police officer then contacted Maricopa County employee Monica Scheffner. Ms. Scheffner "confirmed" that the warrant on Villanueva was valid and that MCSO would extradite Villanueva. After receiving confirmation from Maricopa County, Villanueva was booked for 1551.1 PC Fugitive Warrant.

---

[2] https://www.superiorcourt.maricopa.gov/docket/CriminalCourtCases/

Mr. Villanueva was only able to report to his family that he was being arrested, as he was separated from his luggage, his possession, medical records, special food and medications, and other things necessary to treat his cancer. Arrested while leaving the country in possession of a large amount of cash, none of which was illegal, Villanueva – who knew of nothing that might prompt a person to flee – nevertheless looked to the authorities like a fugitive from justice. Thus, he was completely deprived of his right under the Fourteenth Amendment to due process and an opportunity to be heard on the issue, and was charged with a Felony Complaint by the People of the State of California in Case No. BA497967. Villanueva was thus "framed" as a fugitive by Maricopa County and the Arizona Attorney General, and jailed without any opportunity to bail.

**G. This Arrest is Just the Latest Effort to Harass, Intimidate and Overwhelm Villanueva**

Since Villanueva started advocating for his Free Exercise rights, the three defendants in this action have generated four new cases against him in a blatant effort to harass, intimidate, and overwhelm him. The first case for retaliatory purpose against Villanueva was filed by Maricopa County filed on May 17, 2020, to procure a search warrant for Villanueva's home and church, in Superior Court Case No. SW 2020-006651 (the "Search Warrant Lawsuit"). The Search Warrant Lawsuit was founded upon judicial deception, including (a) initiation of the investigation by the use of a "planted tip" to conceal the hand of the initiating DEA agent, and (b) the assertion of no less than nine false statements by the detective who swore out the warrant affidavit. All of this is alleged in detail in the Fourth Amended Complaint (Docket # 109).

The second retaliatory case was a "racketeering" forfeiture lawsuit to seize Villanueva's home and money, filed by the Arizona Attorney General, Maricopa County Superior Court Case No. CV2021-007240, filed both *in personam* against Villanueva, and *in rem* against his real and personal property (the "Forfeiture Lawsuit".) The Forfeiture Lawsuit was filed in order to harass and multiply litigation against Villanueva, and was "verified" by a false verification (the "False Verification") that asserted entirely

false claims, *inter alia*, falsely swore that Villanueva had possessed FOUR MILLION DOLLARS worth of controlled substances. The False Verification was signed by Maricopa County Det. Almanza, who has previously been found to engage in perjurious verification of charges in Maricopa County. Finally, a lien placed on Villanueva's home by Maricopa County in the Forfeiture Lawsuit is believed to be currently deterring bondsmen from issuance a property bond for a reasonable, payable fee to secure Villanueva's release on bond.

The third retaliatory case is Maricopa County Case No. CR2021-001611-001, entitled *State of Arizona v. Clay Anthony Villanueva* (the "AZ Warrant Lawsuit"). This case number appears on the invalid criminal warrant dated June 9, 2021 on which Villanueva was detained at LAX (the "Arizona Arrest Warrant"). The AZ Warrant Lawsuit is completely secret, cannot be found by searching Villanueva's demographics, and when the file was physically inspected by an attorney for plaintiff on August 31, 2021, the file contained no indictment, no warrant, no materials whatsoever, except for the record of a grand jury hearing. Before an Arizona arrest warrant may issue, Arizona law requires that a prosecutor make a showing, and the court make a finding, that the defendant in a criminal matter is unlikely to appear if given notice. The paper and digital files of this secret action record no such showing being made by any prosecutor, and no such finding being made by any Maricopa County judge. Accordingly, all evidence shows the Arizona Arrest Warrant to be a deliberate vehicle for secretly end-running this first-filed litigation and initiating the arrest without notice for the retaliatory purpose alleged hereinbelow.

The fourth retaliatory case is the action filed (under the wrong name) by the Los Angeles County District Attorney, *People of the State of California v. Clay Anthony Villanueva*, Los Angeles Superior Court Case NO. BA47967, alleging violation of Cal. Penal Code § 1551, "Fugitive From Justice." Los Angeles County then procured a warrant in violation of the terms of Section 1551, that allows such a warrant to issue only when the defendant is "charged by a verified complaint," or "an affidavit … that a crime

has been committed in such another State."  No such verified complaint or affidavit were received by Los Angeles County, that merely claims to have "verified the warrant" by calling a Maricopa County employee.  However, neither the putative Arizona Arrest Warrant, nor the teletype "confirmation" are affidavits, or verified statements.  Thus, the fourth redundant lawsuit arising out of the May 19, 2020 Raid is merely another piece of vexatious, harassing criminal litigation intended to cause injury to plaintiff for no purpose other than retaliation against him for asserting his right to petition for redress of grievances by filing the RFRA Case and engaging in other Visionary Religion activism protected by the First Amendment.

All of the above actions are active at this time, and are based on claims the defendants allege arise out of the illegal search of Villanueva's residence on May 19, 2020.  The defendants have engaged in filing a multiplicity of actions, proceeding piecemeal against Villanueva in bad faith, in order to frustrate the entry of meaningful relief for Villanueva in this case.

## III.    DISCUSSION

### A. An Emergency Application for Habeas Corpus is Proper

Villanueva brings this emergency application for habeas corpus pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 1651(a).  Because Villanueva is a pretrial detainee, he is not being held pursuant to judgment of state court and therefore his claim does not fall under 28 U.S.C. § 2254.  *See White v. Lambert*, 370 F.3d 1002, 1005-06, 1009 (9th Cir. 2004) ("the general grant of habeas authority in § 2241 is available for challenges by a state prisoner who is not in custody pursuant to a state court judgment - for example, a defendant in pre-trial detention or awaiting extradition"), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010).

The All Writs Act, 28 U.S.C. § 1651(a) provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  The

"purpose and function" of the All Writs Act is "to supply the courts with the instruments needed to perform their duty, as prescribed by the Congress and the Constitution." *Harris v. Nelson*, 394 U.S. 286 (1969).  The Act recognizes an Article III court's inherent authority to "fashion appropriate modes of procedure" necessary to the exercise of its judicial function. *Id.* at 299.

### B. Inability Comply with 28 U.S.C. § 2249

Plaintiff is unable to attach a copy of any Arizona indictment in compliance with 28 U.S.C. § 2249, because it has been concealed from the filers of this writ application, and while Villanueva may have seen it in jail, no copy has been provided to his counsel in this action.  Plaintiff's counsel and designees were unable to obtain a copy either over the Internet, or by physically obtaining the file in Maricopa County Court Clerk's office, which was attempted by counsel on August 31, 2021.  Accordingly, plaintiff prays that the Court order respondent to "promptly file with the court certified copies of the indictment" with this Court pursuant to 28 U.S.C. § 2249.

### C. Plaintiff Villanueva's Detention is in Violation of his Constitutional Rights and he Should be Immediately Released on his Own Recognizance

"Federal habeas corpus relief for most state prisoners was established as a statutory remedy in 1867, enabling federal courts to grant a writ of habeas corpus in cases where a person is restrained in violation of the Constitution or federal law." *Holley v. Yarborough*, 568 F.3d 1091, 1097 (9th Cir. 2009).  Since that time, the power to grant the writ has been adjusted by various congressional acts, although the general requirements for relief have remained the same. *See id.* (*citing Williams v. Taylor*, 529 U.S. 362, 375, (2000).  "The underlying principle is that, while not all constitutional errors are sufficient to entitle the petitioner to a remedy, 'errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ.'" *Id.*

According to the Supreme Court, a writ of habeas corpus can reach behind prison walls and iron bars, but it is not static, narrow, formalistic remedy, its scope also including protection of individuals against erosion of their right to be free from wrongful

restraints upon their liberty. *See Jones v. Cunningham*, 371 U.S. 236, 242 (1963). "The writ of habeas corpus is a procedural device for subjecting executive, judicial, or private restraints on liberty to judicial scrutiny. Where it is available, it assures among other things that a prisoner may require his jailer to justify the detention under the law." *Peyton v. Rowe*, 391 U.S. 54, 58 (1968)

Here, Villanueva's continued incarceration in an Arizona jail is contrary to law, contrary to decency, and violates Villanueva's Constitutional rights under the Fourth, Fifth, Eighth and Fourteenth Amendments. As discussed above, Villanueva was detained on an invalid Arizona Arrest Warrant. The Arizona Arrest Warrant arises out of a secret proceeding of which plaintiff had no knowledge. Indeed, Maricopa County (in collusion with the Arizona Attorney General) created the invalid Arrest Warrant without establishing to the court, as required by Arizona law, that plaintiff was not likely to answer charges if provided notice of the indictment.

Maricopa County intentionally concealed whatever indictment underlies the Arizona Arrest Warrant, and the warrant itself, to surprise plaintiff with an arrest that was deprive plaintiff of notice and an opportunity to be heard, and to seek release on his own recognizance or bond.

Because Defendants hid his indictment and arrest warrant in order to gain leverage in the litigation, Villanueva had no way of knowing that he was facing prosecution. Plaintiff had retained counsel to respond to any charges that might be filed, and none were filed for over a year after the May 19, 2020 search of his home. No amount of diligent inquiry by plaintiff or his attorneys would have been sufficient to discover the concealed warrant and indictment.

Villanueva's constitutional rights have been violated in the following ways:

- All Defendants violated Villanueva's constitutional rights under the Fourth, Fifth Amendment and Fourteenth Amendments by failing to provide Villanueva with any notice of any indictment pending against him or any warrant that had been issued for his arrest.

- Defendant Maricopa County, by and through employee Monica Schaffner, deprived Villanueva of his right to due process of law under the Fifth and Fourteenth Amendments by falsely and erroneously confirming the validity of any warrant that was allegedly issued for Villanueva's arrest.

- Defendant Matthew Shay, while acting under color of law, deprived Villanueva of his right to due process of law under the Fifth and Fourteenth Amendments, by participating in a Grand Jury proceeding against Villanueva **at the same** that his attorneys represented to the Court that Villanueva faced no imminent threat of prosecution.

- All Defendants have acted with a conscious disregard of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution, by virtue of ensuring that Villanueva was arrested, subject to improper police investigation, and incarcerated pending extradition.

- Plaintiff is suffering from cruel and unusual punishment in violation of the Eight Amendment by being deprived of necessary food and warmth, exposing him to immediate severe and continuous suffering due to hunger and cold, and great emotional distress due to exacerbation of the chronic decline of his health due to cancer, and the painful knowledge that as his health slips away, his pretrial detention could turn into a death sentence.

Plaintiff's incarceration is not only unlawful, it is imperiling his health by exposing him to malnutrition, hypothermia, and continuous stress that undermines his health and may lead to his death in custody.  Maricopa County, having injured plaintiff and placed him in peril of his life due to their own unconstitutional, retaliatory acts, are required to act with alacrity to protect plaintiff from the enhanced risk of death his is now

exposed to in Arizona jail, due to their own tortious acts. Yet, the callous indifference demonstrated by the Defendants in this case shocks the conscience. Accordingly, the Court is respectfully respected to issue the relief prayed in the proposed Order submitted herewith.

Dated:  September 3, 2021    /s/John Sullivan
    JOHN SULLIVAN (CSB#204648) Pro Hac Vice
    17532 Miranda Street
    Encino, California 91316
    Tel:818-769-7236 Fax:818-301-2175
    Email:Sullivan.John84@gmail.com

**VERIFICATION**

The matters stated in the foregoing petition upon personal knowledge are true and correct. Those matters alleged based on knowledge, information, and belief, are true to the best of my knowledge, information, and belief.

I declare and affirm, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct, and that this declaration was signed on September 3, 2021, at Tucson, Arizona.

Charles Carreon

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Arizona Yagé Assembly, North American
Association of Visionary Churches, Clay
Villanueva, and Vine of Light Church

      Plaintiffs,

      vs.

Merrick B. Garland, Attorney General of
the United States; D. Christopher Evans,
Acting Administrator of the U.S. Drug
Enforcement Administration; Alejandro
N. Mayorkas, Secretary of the Dept. of
Homeland Security; Troy Miller, Senior
Official Performing the Duties of
Commissioner of U.S. Customs and
Border Protection; the United States of
America; Maricopa County, Matthew
Shay, and Marco Paddy

      Defendants.

Case No.:20-CV-02373-ROS

[PROPOSED] **ORDER
GRANTING PLAINTIFF CLAY
VILLANUEVA'S *EMERGENCY*
APPLICATION FOR WRIT OF
HABEAS CORPUS**

     For good cause shown, pursuant to 28 U.S.C. § 2241 *et seq.*, and 28 U.S.C. §

1651(a), the Court hereby Orders the following:

    a. All Defendants are directed to show cause on or before September 7, 2021

        why the writ should not be granted;

    b. Defendant Maricopa County is required to make a return certifying the true

        cause of Clay Villanueva's detention on or before September 7, 2021;

c. Defendant Maricopa County is directed to immediately release Clay Lindell Villanueva, or to produce the body of plaintiff Clay Lindell Villanueva at a hearing before this Court on September 7, 2021.

Dated: _____, 2021

_____
UNITED STATES DISTRICT COURT JUDGE
ROSLYN O. SILVER

Respectfully submitted,
August 3, 2021

/s/John Sullivan
JOHN SULLIVAN (CSB#204648) Pro Hac Vice
17532 Miranda Street
Encino, California 91316
Tel:818-769-7236 Fax:818-301-2175
Email: Sullivan.John84@gmail.com

PROPOSED ORDER GRANTING WRIT OF HABEAS CORPUS

2

**Other Documents**
2:20-cv-02373-ROS Arizona Yage Assembly et al v. Barr et al

STD,TRANSFER-IN

# U.S. District Court

# DISTRICT OF ARIZONA

## Notice of Electronic Filing

The following transaction was entered by Sullivan, John on 9/3/2021 at 11:33
AM MST and filed on 9/3/2021
**Case Name:**         Arizona Yage Assembly et al v. Barr et al
**Case Number:**       2:20-cv-02373-ROS
**Filer:**             Clay Villanueva
**Document Number:** 125

**Docket Text:**
**APPLICATION for Writ of EMERGENCY EX PARTE APPLICATION
FOR WRIT OF HABEAS CORPUS by Clay Villanueva. (Attachments:
# (1) Proposed Order Granting Order to Show Cause Why Writ of
Habeas Corpus Should Not Issue)(Sullivan, John)**

## 2:20-cv-02373-ROS Notice has been electronically mailed to:

Drew Curtis Ensign       drew.ensign@azag.gov, ACL@azag.gov,
terry.olsen@azag.gov

Evan Franklin Hiller     evan.hiller@sackstierney.com,
michelle.curtsinger@sackstierney.com

Jeffrey S Leonard     jeffrey.leonard@sackstierney.com,
michelle.curtsinger@sackstierney.com

John William Sullivan      johnw.sullivan@yahoo.com, naavclaw@gmail.com,
sullivan.john84@gmail.com

Kwan Piensook      kwan.piensook@usdoj.gov, CaseView.ECF@usdoj.gov,
mary.finlon@usdoj.gov

Lisa Newman      lisa.n.newman@usdoj.gov

**2:20-cv-02373-ROS Notice will be sent by other means to those listed below
if they are affected by this filing:**

Charles H Carreon
Charles Carreon Attorney at Law
3241 E Blacklidge Dr.
Tucson, AZ 85716

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096393563 [Date=9/3/2021]
[FileNumber=22376047-0
]
[0fbe35e4d2c6c1958d38f9feb49494ccad84c7104eb667341cace8ca6c02b378954
65957925778ba29e5684e543a7b8efbdb33b6a3d241d1655a995a601caaf9]]
**Document description:**Proposed Order Granting Order to Show Cause Why
Writ of Habeas Corpus Should Not Issue
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096393563 [Date=9/3/2021]
[FileNumber=22376047-1
]
[99ec33c654493e8d18e93ce1da4474df2bb47a1dad473aacb2cc094d00a35465f71
f72c559bd527a4d2736cea51d6ec75a9ef47a7499eeb1177690f8f1c6bb6e]]

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 17

An official website of the United States government
Here’s how you know

</>

FULL MENU

# HIDTA

High Intensity Drug Trafficking Areas (HIDTA) program, created by Congress with the Anti-Drug Abuse Act of 1988, provides assistance to Federal, state, local, and tribal law enforcement agencies operating in areas determined to be critical drug-trafficking regions of the United States. This grant program is administered by the Office of National Drug Control Policy <https://www.whitehouse.gov/ondcp/>(ONDCP). There are currently 33 HIDTAs, and HIDTA-designated counties are located in 50 states, as well as in Puerto Rico, the U.S. Virgin Islands, and the District of Columbia. The DEA plays a very active role and has more than 1,500 authorized special agent positions dedicated to the program. At the local level, the HIDTAs

are directed and guided by Executive Boards composed of an equal number of regional Federal and non-Federal (state, local, and tribal) law enforcement leaders. The 2021 HIDTA annual budget is $290 million.

To qualify for consideration as a HIDTA, an area must meet the following criteria:

- The area is a significant center of illegal drug production, manufacturing, importation, or distribution;

- State, local, and tribal law enforcement agencies have committed resources to respond to the drug trafficking problem in the area, thereby indicating a determination to respond aggressively to the problem;

- Drug-related activities in the area are having a significant harmful impact in the area and in other areas of the country; and

- A significant increase in allocation of Federal resources is necessary to respond adequately to drug related activities in the area.

---

  

**SAMHSA Behavioral Health Treatment Locator**

Address, city, state or zip code

**Go**

**Who We Are**

</who-we-are>

About
<https://www.dea.gov/who-we-are/about>

Domestic Divisions
<https://www.dea.gov/divisions>

**What We Do**

</what-we-do>

Drug Prevention
<https://www.dea.gov/what-we-do/education-and-prevention>

Law Enforcement
</law-enforcement>

**Careers** </careers>

Overview
</careers>

Special Agent
</careers/special-agent>

Diversion Investigator
</careers/diversion-investigator>

**Resources**

</resources>

Drug Information
</drug-information>

Employee Assistance Program
</resources/eap>

**Doing Business with the DEA**

</resources/doing-business-dea>

Overview
</resources/doing-business-dea>

**Foreign Offices**

<https://www.dea.gov/foreign-offices>

**Contact Us** <who-we-are/contact-us>

**DEA Museum**

<https://museum.dea.gov/>

**Diversion Control Division**

<https://www.deadiversion.usdoj.gov/>

**News** </news>

<investigator>

**Forensic Sciences**

</careers/forensic-sciences>

**Intelligence Research Specialist**

</careers/intelligence-research-specialist>

**Publications**

**Media Galleries** </resources/media-galleries>

**VWAP**

<https://www.dea.gov/resources/vwap>

**Equal Opportunity Employer** </how-to-apply/equal-opportunity-employer>

**FOIA**

<https://www.dea.gov/foia>

**Current Vendors**

**Prospective Vendors** </doing-business-dea/current-vendors>

<https://www.dea.gov/doing-business-dea/prospective-vendors>

**Security Clauses** </doing-business/security-clauses>

**Security Forms** </doing-business-dea/security-forms>

**Small Business Program** </doing-business-dea/small-business>

**Policies** <>

**Accessibility, Plug-ins & Policy**

</resources/accessibility-plug-ins-policy>

**Legal Policies & Disclaimers**

<https://www.justice.gov/legalpolicies#disclaimer>

**No FEAR Act**

<https://www.justice.gov/jmd/eeo-program-status-report>

**Privacy Policy**

<https://www.justice.gov/doj/privacy-policy>

**U.S. Department of Justice EEO Policy**

<https://www.justice.gov/jmd/file/790081/download>

USA.gov

<https://www.usa.gov/>

Whistleblower Protection

<https://www.justice.gov/pardon/whistleblower-

protection-enhancement-act>



# United States Drug Enforcement Administration

DEA.gov is an official site of the U.S. Department of Justice <https://www.justice.gov/>

<https:/ <https:/ <https:/ <https:/
/www.f /www.t /www.li /www.i
aceboo witter.c nkedin. nstagra
k.com/ om/dea com/co m.com/
deahq/ hq> mpany/ deahq>
> drug-

DEA Contact Center

(202) 307-1000 info@dea.gov

Contact the Webmaster </contact-us>

enforce
ment-
admini
stratio
n>



HOME   ABOUT HIDTA   ISC   PREVENTION   TRAINING
CONTACT US

Se

**eResources**

**In The News**

**Arizona High Intensity Drug Trafficking Areas** (HIDTA) was established in 1990.  Its mission is to facilitate, support, and enhance collaborative drug control efforts among law enforcement agencies and community-based organizations with a common voice and unified strategy and thereby significantly reduce the impact of illegal trafficking and use of drugs throughout Arizona.

By focusing on this mission, the Arizona HIDTA has evolved into a trusted counter-drug grant program that Arizona law enforcement agencies have come to rely upon to assess regional drug threats, facilitate the creation of cooperative strategies to address the threat, and to provide

Arizona HIDTA designated counties include Cochise, La Paz, Maricopa, Mohave, Navajo, Pima, Pinal, Santa Cruz, and Yuma.



National HIDTA Map

them with the necessary resources to enhance their effectiveness and efficiency as they implement the strategies.

The Arizona HIDTA coordinates and supports the efforts of 633 full-time and 185 part-time participants from 75 Federal, state, local, and tribal agencies.

© Arizona HIDTA 2021



HOME  ABOUT HIDTA  ISC  PREVENTION  TRAINING
CONTACT US

# PARTICIPATING AGENCIES

HIDTA helps improve the effectiveness and efficiency of drug control efforts by facilitating cooperation between drug control organizations through resource and information sharing, co-locating, and implementing joint Initiatives. HIDTA funds help Federal, state, local, and tribal law enforcement organizations invest in infrastructure and joint Initiatives to confront drug trafficking organizations. Funds are also used for demand reduction and drug treatment Initiatives.

### FEDERAL

Bureau of Alcohol, Tobacco, Firearms and Explosives
Bureau of Indian Affairs
Bureau of Land Management
Drug Enforcement Administration
Federal Bureau of Investigation
Internal Revenue Service
United States Attorney's Office

### LOCAL

Apache Junction Police Department
Buckeye Police Department
Bullhead City Police Department
Casa Grande Police Department
Chandler Police Department
Cochise County Attorney's Office
Cochise County Sheriff's Office
Coolidge Police Department

United States Border Patrol

United States Customs and Border Protection

United States Department of Homeland Security

United States Fish and Wildlife Service

United States Forest Service

United States Immigration and Customs Enforcement - Homeland Security Investigations

United States Marshals Service

United States National Park Service

## STATE

Arizona Attorney General's Office

Arizona Department of Corrections

Arizona Department of Public Safety

Arizona National Guard

Northern Arizona University Police Department

University of Arizona Police Department

## TRIBAL

Colorado River Indian Tribes Police Department

Salt River Tribal Police Department

Tohono O'odham Nation Police Department

Douglas Police Department

El Mirage Police Department

Eloy Police Department

Flagstaff Police Department

Florence Police Department

Gilbert Police Department

Glendale Police Department

Kingman Police Department

La Paz County Attorney's Office

La Paz County Sheriff's Office

Lake Havasu City Police Department

Marana Police Department

Maricopa County Attorney's Office

Maricopa County Probation Office

Maricopa County Sheriff's Office

Mesa Police Department

Mohave County Adult Probation

Mohave County Attorney's Office

Mohave County Sheriff's Office

Navajo County Sheriff's Office

Nogales Police Department

Oro Valley Police Department

Peoria Police Department

Phoenix Police Department

Pima County Attorney's Office

Pima County Probation Office

Pima County Sheriff's Department

Pinal County Attorney's Office

Pinal County Sheriff's Office

Quartzsite Police Department

Santa Cruz County Attorney's Office

Santa Cruz County Sheriff's Office

Show Low Police Department

Sierra Vista Police Department

Snowflake-Taylor Police Department

Surprise Police Department

Tempe Police Department

Tucson Police Department

Winslow Police Department

Yuma County Adult Probation

Yuma County Attorney's Office

Yuma County Sheriff's Office

Yuma Police Department

© Arizona HIDTA 2021

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 18

# CHARLES CARREON

LAW FOR THE DIGITAL AGE

October 23, 2020

Kevin.p.hancock@usdoj.gov
United States Department of Justice
Federal Programs Branch, Civil Division

### Re: *AYA v. Barr, et al., NDCAL Case #3:20-cv-03098-WHO*

Dear Mr. Hancock:

The Department of Justice, Drug Enforcement Administration, Dept. of Homeland Security, and Customs and Border Protection (the "Government") are respectfully notified that plaintiff Arizona Yagé Assembly and minister Winfield Scott Stanley III (jointly "AYA") will rely upon the Government's statement in opposition to AYA's Motion for Preliminary Injunction (Docket # 33, the "Motion"), wherein the Government represented that AYA faces no imminent risk of prosecution from the Government due to importing, dispensing, or possessing Sacramental Ayahuasca. The Government assured the Court there was no prosecution of AYA on the horizon:

> [A]ttempts by the federal government to seize substances containing DMT … occurred before the Supreme Court's ruling in *O Centro*, which required the DEA to abandon its previous practice of categorically not considering exemptions to the CSA's ban on Schedule I substances. (Docket # 49, 13:16-20.)

> DEA's lack of history of past prosecution or enforcement of the CSA against ayahuasca use also indicates that Plaintiff faces no genuine threat of imminent prosecution. Plaintiffs do not point to a single federal criminal prosecution relating to ayahuasca. (Docket # 49; 12:21-24.)

> Arizona Yagé … failed to demonstrate that it faces any genuine threat of imminent prosecution by federal authorities. (Docket # 49, 1:1-2.)

And as you yourself said at the hearing, summing up the Government's reassurances to the Court that AYA runs no risk of prosecution from its activities:

> As to the allegations of fears of prosecution, again, plaintiffs are only able to submit generalized fears. The test is there has to be a specific threat of prosecution. Plaintiffs are still not able to articulate any such threat, because there has been none. (Docket # 60, 22:20-23.)

The Court relied on the representations, and denied the Motion:

> [P]laintiffs have not shown, as they must to obtain a pre-enforcement injunction, that there has been any realistic, imminent threat of prosecution or enforcement action by the federal government. They, therefore, have likely not demonstrated that they can succeed on the merits or would suffer irreparable injury absent an injunction. (Docket # 57, 23:20-24.)

Accordingly, the Government is judicially estopped[1] from taking or enforcing any position contrary to the assurance made in Court, that federal authorities have no plans to interfere with AYA's openly declared acts of Free Exercise, and are barred from doing so by *O Centro*.

---

[1] *Russell v. Rolfs*, 893 F.2d 1033 (9th Cir. 1990).

Based on affirmative representations made to the Court, the Government has an affirmative obligation to bring all of the agencies that the DOJ represents in this action into conformity with the Government's representations to the Court. Currently, the Department of Homeland Security and Customs and Border Protection are not on the same page with the Government's representations, because one or both of those agencies are interfering with AYA's Free Exercise by holding a small shipment of Ayahuasca addressed to Scott Stanley and AYA in the Los Angeles Customs office. (Exhibit 1.)

Sacramental Ayahuasca intended for use as AYA's communion Sacrament is not lawfully subject to seizure because AYA's importation of the substance is entitled to an exemption as the least restrictive means of accommodating the Government's interest in avoiding diversion of Ayahuasca into illegal markets. Since the Government now has in its possession multiple sworn statements establishing that AYA's sole and exclusive reason for importing Ayahuasca is to engage in Free Exercise, and has represented that it has no intent to prosecute AYA or Mr. Stanley based on those declarations, there can be no lawful reason for AYA's Ayahuasca to be seized.

Accordingly, I request that, no later than 6 p.m. Mountain Time on October 27, 2020, you provide me, on behalf of all Government agencies, including DEA, DHS, and CBP, assurance that AYA's Ayahuasca will be released for delivery to AYA in the usual course of international parcel delivery. I would further request that AYA receive actual delivery of the Sacramental Ayahuasca no later than November 2, 2020.

Thank you for your attention to these requests.

Very truly yours,

Charles Carreon

cc:     AYA
        NAAVC
        CV

Remove ✕

## Tracking Number:
EE011369264PE

Your item is being processed by United States Customs.

## In-Transit
Inbound Into Customs

## Text & Email Updates  ⌃

**Select what types of updates you'd like to receive and how. Send me a notification for:**

**Text   Email**

☐   ☐   All Below Updates

☐   ☐   Expected Delivery Updates ⓘ

☐   ☐   Day of Delivery Updates ⓘ

☐   ☐   Package Delivered ⓘ

☐   ☐   Available for Pickup ⓘ

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 19



**U.S. Department of Justice**

Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530

---

**Kevin P. Hancock**
Trial Attorney

Tel:      (202) 514-3183
Fax:      (202) 616-8470
Email:   Kevin.P.Hancock@usdoj.gov

November 18, 2020

**By Email**

Charles Carreon, Esq.
3241 E. Blacklidge Dr.
Tuscon, Arizona 85716
Email: chascarreon@gmail.com

Re: *Arizona Yagé Assembly, et al. v. Barr, et al.*, 3:20-cv-3098 (N.D. Cal.)

Dear Mr. Carreon:

I am writing in response to your letters dated October 23, 2020 ("Oct. 23 Letter") and November 13, 2020 ("Nov. 13 Letter"), relating to the above-captioned matter (which, since your letter, has been ordered transferred to the U.S. District Court for the District of Arizona). This letter follows my October 27, 2020 email to you and our Wednesday, November 6, 2020 phone conversation regarding the issues raised in your October 23 Letter.

Your letters claim that two international mail packages containing ayahuasca and addressed to Plaintiff Arizona Yagé Assembly ("AYA") were recently seized upon arrival in the United States in Los Angeles. As a preliminary matter, U.S. Customs and Border Protection ("CBP") is not legally obligated to confirm or provide any information regarding packages containing Schedule I controlled substances that allegedly have been inspected or seized at the border. *See* 19 C.F.R. § 162.45a. Nevertheless, as a courtesy given the ongoing litigation between the parties, I can confirm that CBP is processing one or more packages associated with the U.S. Postal Service tracking numbers provided with your letters, and that CBP's processing is not yet complete.

Assuming *arguendo* that the package(s) being processed were addressed to AYA and in fact contain ayahuasca, as you claim, your letter identifies no valid reason why CBP could not lawfully inspect and seize such package(s), and thus there is no legal basis for your demand that CBP release them.

First, CBP has broad statutory and regulatory authority to inspect all packages and mail entering the United States at its border. *See* 19 U.S.C. § 482; 19 C.F.R. §§ 145.2, 162.6. As the U.S. Supreme Court and the Ninth Circuit have explained, "customs officials may conduct searches at the international border to identify the illegal transportation of contraband or undeclared articles across the border," and "[b]ecause searches at the international border of both inbound and

outbound persons or property are conducted 'pursuant to the long-standing right of the sovereign to protect itself,' they generally require neither a warrant nor individualized suspicion." *United States v. Seljan*, 547 F.3d 993, 999 (9th Cir. 2008) (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)).  Because CBP has the authority to search packages at the border without individualized suspicion, it is immaterial whether you are correct or incorrect in assuming that CBP's decision to inspect this particular package was based on its contents or the identity of the package's intended recipient.

Second, and in any event, CBP may lawfully inspect and seize packages to enforce the Controlled Substances Act ("CSA"), including by preventing the illegal importation of ayahuasca containing dimethyltryptamine ("DMT"), despite your letters' incorrect claims to the contrary, *see* Oct. 23 Letter at 2; Nov. 13 Letter at 1.  As you know, DMT is a Schedule I controlled substance under the CSA, and, accordingly, the importation of ayahuasca containing DMT violates federal law.  *See* 21 U.S.C. § 952(a).  Pursuant to the CSA, any Schedule I controlled substances seized at the border are summarily forfeited to the United States and subject to potential destruction, unless an applicable "permit for lawful importation has been issued."  19 C.F.R. § 162.45a (citing 21 U.S.C. § 881(f)).

Your letter does not claim that AYA has any such permit for the lawful importation of ayahuasca containing DMT.  While your letters do make clear that AYA subjectively believes it is "entitled to an exemption" from the CSA under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b), *see* Oct. 23 Letter at 2; Nov. 13 Letter at 1, AYA has yet to actually demonstrate such entitlement.  To obtain a RFRA exemption from the CSA's prohibitions, a party must demonstrate to the U.S. Drug Enforcement Administration ("DEA") that the CSA imposes a substantial burden on its sincere exercise of religion, and that substantial burden must not be the least restrictive means of advancing a compelling government interest.  *See, e.g.*, *Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1145 (N.D. Cal. 2007), *aff'd*, 365 F. App'x 817 (9th Cir. 2010).

Not only has AYA never made this showing, it has never even sought a RFRA exemption from the DEA, which has the authority under the CSA to register the legitimate importation and use of a Schedule I controlled substance, including for religious purposes.  *See* 21 U.S.C. § 822; *see* Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act, https://www.deadiversion.usdoj.gov/ pubs/rfra_exempt_022618.pdf.  AYA has conceded that it is aware of the DEA's exemption process.  (*See, e.g.*, ECF No. 33-1, ¶¶ 23-32.)  Defendants reiterated in their August 2020 preliminary injunction opposition that AYA must petition the DEA for an exemption.  (ECF No. 49 at 13-15.)  And yet AYA still has yet to seek an exemption from the DEA.

Third, nothing Defendants have said in this litigation is inconsistent with CBP exercising its wide authority to inspect packages at the border for contraband.  Far from arguing that AYA "runs no risk of prosecution from its activities," as your letter misrepresents, Oct. 23 Letter at 1; *see also* Nov. 13 Letter at 1, Defendants' preliminary injunction opposition argued that AYA "ha[d] failed to demonstrate a genuine risk of prosecution sufficient to establish an imminent injury" for standing purposes.  (ECF No. 49 at 11.)  As that brief pointed out, "Plaintiffs d[id] not allege that federal authorities ha[d] communicated a specific warning or threat to initiate

proceedings against it or its members.  *See Rossides v. Gonzales*, 210 F. App'x 711, 712 (9th Cir. 2006) (finding no standing where "[n]o prosecuting authorities have ever communicated a specific threat or warning to initiate proceedings against [plaintiff]")."  (ECF No. 49 at 12.)  As a result, the Court concluded in its September 21, 2020 order that Plaintiffs had failed to demonstrate that their RFRA claim was constitutionally ripe.  (ECF No. 57 at 23.)  The Court's conclusion remains true today:  neither your October 23 Letter nor your November 13 Letter claims that any federal prosecuting authorities have communicated a specific threat or warning to initiate proceedings against any Plaintiff or AYA's members.

Finally, if AYA is in fact concerned that Defendants' routine enforcement of the CSA, in the absence of a RFRA exemption, is imposing a substantial burden upon its sincere religious exercise, we again invite Plaintiff to file a petition with the DEA demonstrating its entitlement to a RFRA exemption.  As you are aware, the DEA's public "Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act" can be found on its website at https://www.deadiversion.usdoj.gov/pubs/rfra_exempt_022618.pdf.

Best regards,

Kevin P. Hancock

3

Case No.:20-CV-02373-ROS
Arizona Yagé Assembly's Motion for Preliminary Injunction

# Exhibit 20

Case 2:20-cv-02373-ROS  Document 140-2  Filed 11/30/21  Page 73 of 73
Case 2:20-cv-02373-ROS  Document 129-4  Filed 09/07/21  Page 18 of 39

EXHIBIT 1, PAGE 18

**GRAND JURY**

THIS IS NOT A DETAINER
CONTACT 602 876 1034

| SUPERIOR COURT MARICOPA COUNTY, ARIZONA | |
|---|---|
| STATE OF ARIZONA | ARREST WARRANT |
| vs | CASE NO. |
| CLAY ANTHONY VILLANUEVA (001), | SGJ No. 88 SGJ 162 |
| Defendant (First, MI, Last) | CR 2021 - 0 0 1 6 1 1 001 |

TO: ANY AUTHORIZED LAW ENFORCEMENT OFFICER,

YOU ARE COMMANDED to arrest and bring the defendant before this court. If this court is unavailable or if the arrest is made in another country, you shall take the defendant before the nearest or most accessible Magistrate.

The defendant is accused of an offense or violation based on the following:

### INDICTMENT

The offense(s) or violation(s) are briefly described as follows:

**CHARGES:**

COUNT 1: CONSPIRACY, a Class 2 Felony, in violation of A.R.S. § 13-1003, was committed on or about May 19, 2020.

COUNT 2: ILLEGALLY CONDUCTING AN ENTERPRISE, a Class 3 Felony, in violation of A.R.S. § 13-2312(B), was committed on or about May 19, 2020.

COUNTS 3: POSSESSION OF A DANGEROUS DRUG FOR SALE, a Class 2 Felony, in violation of A.R.S. § 13-3407 (A)(2), was committed on or about May 19, 2020.

COUNT 4: POSSESSION OF A DANGEROUS DRUG FOR SALE, a Class 2 Felony, in violation of A.R.S. § 13-3407 (A)(2), was committed on or about May 19, 2020.

COUNT 5: POSSESSION OF MARIJUANA FOR SALE IN AN AMOUNT OVER THE STATUTORY THRESHOLD, a Class 2 Felony, in violation of A.R.S. § 13-3405 (A)(2), was committed on or about May 19, 2020.

COUNT 6: POSSESSION OF A NARCOTIC DRUG (CANNABIS) FOR SALE IN AN AMOUNT OVER THE STATUTORY THRESHOLD, a Class 2 Felony, in violation of A.R.S. § 13-3408(A)(2), was committed on or about May 19, 2020.

COUNT 7: PRODUCTION OF MARIJUANA IN AN AMOUNT OVER THE STATUTORY THRESHOLD, a Class 3 Felony, in violation of A.R.S. § 13-3405 (A)(3), was committed on or about May 19, 2020.

COUNT 8: MONEY LAUNDERING, a Class 3 Felony, in violation of A.R.S. §§ 13-2317 (B)(1), was committed on or about May 19, 2020.

The defendant may be released if a $150,000.00 CASH bond is posted by or on behalf of the accused, OR

☐ The defendant is not eligible for release on bond.

☐ Yes  ☐ No  ☐ Unknown   The offense is, or is materially related to, a Victims' Rights applicable offense.

BY ORDER OF: _____

6.9.2021
Court Ordered Date

Deputy Clerk