BRIAN M. BOYNTON
Acting Assistant Attorney General
BRIGHAM J. BOWEN
Assistant Branch Director
LISA NEWMAN
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 514-5578
Fax: (202) 616-8470
E-mail: lisa.n.newman@usdoj.gov

*Attorneys for the Federal Agency Defendants*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Yagé Assembly; North American Association of Visionary Churches; Clay Villanueva; and the Vine of Light Church, <br><br> Plaintiffs, <br><br> v. <br><br> Merrick B. Garland, Attorney General of the United States, *et al.*, <br><br> Defendants. | No. 2:20-cv-2373-PHX-ROS |

**FEDERAL AGENCY DEFENDANTS' OPPOSITION TO ARIZONA YAGE ASSEMBLY'S MOTION FOR PRELIMINARY INJUNCTION [DOC. 137].**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND.......................................................................................................... 1

LEGAL STANDARD .................................................................................................. 3

ARGUMENT .............................................................................................................. 3

    I.    AYA's RFRA Claim Should be Dismissed for Lack of Jurisdiction................................. 3

    II.   AYA is Unlikely to Succeed on the Merits of its RFRA Claim. ...................................... 4

        A.    AYA has not demonstrated a *prima facie* case under RFRA........................................ 5

           1.    AYA has not demonstrated the sincerity of its members' religious beliefs. ........ 6

           2.    Even if sincere, AYA's religious exercise is not substantially burdened. ............ 8

        B.    The DEA's tailored exemption process furthers compelling governmental interests through the least restrictive means............................................................................. 10

           1.    Protecting public health and safety ........................................................... 11

           2.    Preventing diversion of ayahuasca to non-adherents ................................... 12

        C.    DEA's exemption process is the least restrictive alternative to the CSA's closed regulatory system.................................................................................................. 14

    III.  AYA Has Not Demonstrated Irreparable Harm. ........................................................ 16

    IV.  The Balance of Equities Favors Defendants. ............................................................. 17

CONCLUSION .......................................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) ........................................................................................... 3

*Church of the Holy Light of the Queen v. Mukasey,*
  615 F. Supp. 2d 1210 (D. Or. 2009) ........................................................................ 6, 7, 11

*Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.,*
  774 F.2d 1371 (9th Cir. 1985) ......................................................................................... 16

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006) ................................................................................................ *passim*

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ........................................................................................................... 7

*Little Sisters of the Poor v. Pennsylvania,*
  140 S. Ct. 2367 (2020) .................................................................................................... 10

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ........................................................................................................... 3

*Navajo Nation v. U.S. Forest Serv.,*
  535 F.3d 1058 (9th Cir. 2008) ........................................................................................... 9

*Nken v. Holder,*
  556 U.S. 418 (2009) ......................................................................................................... 17

*Oklevueha Native Am. Church of Hawaii, Inc. v. Holder,*
  Case No. 09-cv-336-SOM, 2013 WL 6892914 .................................................... *passim*

*Oklevueha Native Am. Church Of Hawaii, Inc. v. Lynch,*
  828 F.3d 1012 (9th Cir. 2016) ..................................................................................... 5, 10

*Tandon v. Newsom,*
  141 S. Ct. 1294 (2021) .................................................................................................... 10

*U.S. v. Friday,*
  525 F.3d 938 (10th Cir. 2008) ........................................................................................... 9

ii

*U.S. v. Quaintance,*
  608 F.3d (10th Cir. 2010) ................................................................................... 8

*U.S. v. Tawahongva,*
  456 F. Supp. 2d 1120 (D. Ariz. 2006) ................................................................ 9

*United States v. Anderson,*
  854 F.3d 1033 (8th Cir. 2017) ...................................................................... 7, 13

*United States v. Christie,*
  Case No. 10-CR-384-01-LEK, 2013 WL 6860822 (D. Haw. Dec. 30, 2013) ............... 13, 15

*United States v. Christie,*
  825 F.3d 1048 (9th Cir. 2016) ................................................................... *passim*

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................................... 3

**<u>Statutes</u>**

21 U.S.C. § 812 ..................................................................................................... 1

21 U.S.C. § 823 ................................................................................................. 1, 2

21 U.S.C. § 880 ..................................................................................................... 2

21 U.S.C. § 954 ..................................................................................................... 1

21 U.S.C. § 958 ..................................................................................................... 2

28 U.S.C. § 877 ..................................................................................................... 4

42 U.S.C. § 2000 .................................................................................................. 5

**<u>Regulations</u>**

21 C.F.R. § 1301.34 .............................................................................................. 3

21 C.F.R. § 1312.15 .............................................................................................. 3

21 C.F.R. §§ 1301.01-1301.52 ............................................................................. 1

21 C.F.R. §§ 1301.71-1301.76 ............................................................................. 2

21 C.F.R. §§ 1301.90-1301.93 ................................................................................................ 2

21 C.F.R. §§ 1304.21-1304.22 ................................................................................................ 2

21 C.F.R. §§ 1312.11-1312.14 ................................................................................................ 2

21 C.F.R. §§ 1316.01-1316.13 ................................................................................................ 2

**Other Authorities**

Ariel Levy, "The Drug of Choice for the Age of Kale,"
The New Yorker (Sept. 5, 2016),
   https://perma.cc/YT4Y-AJYC ............................................................................................ 12

Beatriz Caiuby Labate, *The World Ayahuasca Diaspora: Reinventions and Controversies*
   (Routledge, Ltd. 2017) ..................................................................................................... 12

Debra Kamin, "The Rise of Psychedelic Retreats,"
The New York Times (Nov. 25, 2021),
   https://perma.cc/2D6M-RXXA ........................................................................................ 12

Mark Hay, "The Colonization of the Ayahuasca Experience,"
JSTOR Daily (Nov. 4, 2020),
   https://perma.cc/VVZ3-7GAS ......................................................................................... 12

Rachel Harris, *Listening to Ayahuasca:  New Hope for Depression, Addiction,
PTSD, and Anxiety*
   (New World Library 2017) ............................................................................................... 12

# INTRODUCTION

For the third time, Plaintiff Arizona Yage Assembly (AYA) moves for a preliminary injunction, this time seeking a blanket order under the Religious Freedom Restoration Act (RFRA) that would enjoin the federal government from prosecuting AYA or its members for "importing or ingesting" ayahuasca, and prevent Customs and Border Patrol (CBP) from "confiscating" illegally imported ayahuasca. Mot. at 1. A process exists by which the Drug Enforcement Administration (DEA) can consider a registration petition for religious claimants for an exemption from the Controlled Substances Act (CSA) for religious ayahuasca use. But AYA refuses to seek an exemption, which would allow DEA, an agency with deep expertise in drug diversion prevention, to consider its RFRA claim while ensuring that ayahuasca is imported and distributed safely and without risking diversion.

AYA instead elected to proceed on an expedited basis, asking this Court—and DEA—to take its word on the sincerity and safety of its practices, without demonstrating that a sincere belief has actually been burdened or that it will be irreparably harmed. AYA also fails to provide information that would allow this Court or DEA to conclude that AYA can import and distribute ayahuasca safely and without risking diversion. This Court should deny AYA's request for a preliminary injunction.

# BACKGROUND

Plaintiff AYA describes itself as a visionary church, which practices visionary communion by ingesting ayahuasca, a tea brewed from plants containing the Schedule I controlled substance dimethyltryptamine (DMT). Mot. at 1. The importation and use of Schedule I substances—including DMT, and substances containing it—are strictly controlled due to the high risk of abuse and lack of accepted medical use. 21 U.S.C. § 812(b)(1).

Through the CSA, Congress created a closed regulatory system to strictly control and monitor the flow of controlled substances in the United States. Under this system, all parties—including health care professionals, pharmacists, medical researchers, or religious adherents—wishing to handle controlled substances must register with DEA. 21 U.S.C. § 823, 954; 21 C.F.R. §§ 1301.01-1301.52; Redd Decl. ¶ 6; Via Decl. ¶ 5; Hinkle ¶ 9. The purpose of this

registration system is to ensure that controlled substances are safely handled and properly safeguarded to prevent loss, theft, and diversion to illicit use. 21 U.S.C. §§ 823, 958; Redd Decl. ¶ 6. Following the Supreme Court's decision in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006), DEA has considered registration petitions from religious claimants which, if granted, may exempt such claimants from the application of specific provisions of the CSA and its implementing regulations, including allowing the importation or use of a controlled substance for religious reasons on a case-by-case basis. DEA will grant such a petition and issue the requester a registration—when, under the rubric of RFRA, (1) the requester demonstrates that the inability to import or distribute a controlled substance substantially burdens a sincere religious exercise of the requester; and (2) DEA is unable to establish that denying the registration is the least restrictive means of protecting a compelling government interest. *See also* Dkt. 49 at 5-7 (describing DEA's RFRA exemption process).

Under the CSA, DEA may only register an applicant to handle a Schedule I substance when doing so is consistent with the public interest. DEA considers several factors in evaluating registration applications, including whether it can be assured that the registrant would maintain effective controls against diversion.[1] When a party applies for a registration, a DEA diversion investigator conducts an investigation. Redd Decl. ¶ 7-9 (discussing factors considered by DEA and purpose of investigation). DEA confirms through interviews and on-site visits that the applicant is familiar with, and likely to abide by, its responsibilities to prevent diversion, such as on-site security measures, and understands record-keeping, auditing, and inspection requirements. Redd Decl. ¶ 9. When a registration application is approved, DEA issues a Certificate of Registration. Via Decl. ¶ 5; Redd Decl. ¶ 11.

A DEA registrant wishing to import controlled substances must apply for an import permit each time it wishes to import controlled substances, and the approved permit must accompany the shipment into the United States. 21 C.F.R. §§ 1312.11-1312.14, 1301.34; Redd

---

[1] DEA regulations require, *inter alia*, security, storage, and theft/loss avoidance measures, 21 C.F.R. §§ 1301.71-1301.76, record-keeping and inventory regarding importation, receipt, distribution, and disposal of controlled substances, *id.* §§ 1304.21-1304.22, DEA access for inspections and audits, 21 U.S.C. § 880; 21 C.F.R. §§ 1316.01-1316.13, and employee screening procedures, 21 C.F.R. §§ 1301.90-1301.93.

Decl. ¶ 12; Via Decl. ¶ 5. This permitting process allows CBP to track controlled substances entering the United States. Hinkle Decl. ¶ 10. CBP is charged with advancing our nation's compelling interest in protecting its borders, including by preventing the unlawful importation of harmful controlled substances. Hinkle Decl. ¶ 9 (discussing CBP's role in the closed regulatory system). CBP relies on DEA's importation permitting system, and the information DEA shares with CBP as part of that system, to ensure only lawfully imported controlled substances enter the country. *Id.*; Redd Decl. ¶ 13 (describing tracking information). When a DEA-authorized shipment arrives at a port of entry, CBP verifies that that the importer is registered, that the permit is valid and accurate, and that the shipment is not greater than that authorized by DEA. Hinkle Decl. ¶ 7. CBP also inputs the entry into a customs database, memorializing the amount received, country of origin, and other information. Via Decl. ¶ 9. CBP is authorized to deny release of a shipment if, for example, the shipment exceeds the import permit's limits or contains additional substances not authorized by the permit. Redd Decl. ¶ 12; Hinkle Decl. ¶ 8. If CBP intercepts a non-permitted Schedule I controlled substance CBP will seize the shipment and it will be forfeited. 21 C.F.R. § 1312.15; Hinkle Decl. ¶ 8.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*) (citation omitted). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). A possibility of irreparable harm is insufficient; irreparable harm must be likely absent an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## ARGUMENT

### I.  AYA's RFRA Claim Should be Dismissed for Lack of Jurisdiction.

Plaintiff AYA asks the Court to enter a broad injunction prohibiting the government from

prosecuting it or its members for "importing or ingesting sacramental ayahuasca," and preventing CBP from "confiscating sacramental Ayahuasca that was shipped to AYA." Mot. at 1. AYA claims it is entitled to this relief because it fears prosecution. *Id.* at 7-9. But several fatal jurisdictional flaws render AYA unlikely to succeed on the merits of its RFRA claim. As Defendants have argued in moving to dismiss, Dkt. 121: (1) under 28 U.S.C. § 877, this Court lacks jurisdiction over Plaintiffs' claims, including AYA's RFRA claim, Dkt. 112 at 3-8; (2) AYA has not demonstrated a genuine threat of imminent prosecution or enforcement by the federal government, or that such prosecution would be traceable to the federal government, *id.* at 8-11; and (3) AYA does not allege any concrete plan to import ayahuasca in the future, *id.* at 10, and its claim for injunctive relief cannot succeed against CBP.**²**

Prior to transfer, Judge Orrick observed that "plaintiffs have not shown [for their RFRA claim], as they must to obtain a pre-enforcement injunction, that there has been any realistic, imminent threat of prosecution or enforcement action by the federal government." Dkt. 57 at 23. The latest request for an injunction fails for the same reason. AYA's motion does not identify any enforcement action brought *by the federal government* since briefing on the motion to dismiss was completed. AYA relies on the actions of and prosecution by Maricopa County to show a threat of future enforcement, Mot. at 7, but AYA does not allege that the federal defendants participated in the indictment secured by Maricopa County, *id.* at 6. Prosecution by state and local officials cannot support a finding of imminent prosecution by *federal* officials. And AYA does not—and cannot—point to a single federal criminal prosecution relating to ayahuasca use by AYA or any other person or organization. This failure is fatal to AYA's standing to seek a broad, categorically applicable pre-enforcement injunction to prevent criminal prosecution of any of its purported members.

**II. AYA is Unlikely to Succeed on the Merits of its RFRA Claim.**

Under the CSA's closed regulatory system, any party (secular or religious) who wishes to

---

² Defendants refer the Court to the background and arguments made in their motion to dismiss and reply, Dkt. 121, as well as the background in their opposition to Plaintiffs' previous motion for preliminary injunction, Dkt. 49 at 3-10, and incorporate them by reference here.

import or distribute a controlled substance must petition for and obtain a DEA registration. *See supra* at 1-3. AYA is unlikely to succeed on the merits of its claim that the "application of" DEA's registration (or RFRA exemption) process that effectuates the CSA's closed regulatory system substantially burdens its sincere religious beliefs. 42 U.S.C. § 2000bb–1(b)). And that is what RFRA demands: by its terms, RFRA requires the Court to analyze the alleged burden imposed by a governmental action "'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 430-31 (quoting *id.*). To show likelihood of success on its RFRA claim, AYA "cannot simply point to other groups who have won accommodations for the sacramental use of . . . hoasca and say 'we'll have what they're having,'" particularly when there are "material differences between those particular groups and their sacramental practices" and AYA's practices. *United States v. Christie*, 825 F.3d 1048, 1061 (9th Cir. 2016). But this piggybacking is what AYA attempts. RFRA requires a showing that AYA and its members are entitled to relief; AYA has not made such a showing.

Instead of going through DEA's exemption process, pursuant to which DEA can determine whether and how a RFRA applicant's handling of a controlled substance may be accommodated within the CSA's closed regulatory system, AYA asks this court to grant it a blanket exemption from the CSA's registration and permitting requirements without providing any information that would ensure that its importation and distribution of ayahuasca does not undermine the government's compelling interests. *See* Dkts. 49 at 5-7 & Dkt. 121 at 4-5 (explaining DEA's process). Because AYA has not established that federal defendants have substantially burdened a sincere religious exercise and because the DEA's registration process that effectuates the CSA's closed regulatory system is the least restrictive means to carry out its compelling interests, AYA is not likely to succeed on the merits of its claim.

## A. AYA has not demonstrated a *prima facie* case under RFRA.

RFRA requires a threshold showing that "application of the Controlled Substances Act would (1) substantially burden (2) a sincere (3) religious exercise." *O Centro*, 546 U.S. at 428. In meeting this burden, AYA "must present evidence sufficient to allow a trier of fact rationally to find the existence" of a substantial burden on a sincere religious exercise. *Oklevueha*

1   *Native Am. Church Of Hawaii, Inc. v. Lynch*, 828 F.3d 1012, 1015 (9th Cir. 2016).

2       AYA has not made this threshold showing because its motion lacks sufficient supporting

3   evidence for the Court to conclude that AYA's or its members' use of ayahuasca is categori-

4   cally a sincere exercise of religion, rather than a secular activity. Moreover, AYA has not al-

5   leged, much less demonstrated, that *seeking a religious exemption from DEA* substantially burdens

6   its or its members' religious exercise. AYA therefore cannot prove a likelihood of success on

7   the merits "on the bare record before the court"; to hold otherwise on such a thin record

8   would have the effect of allowing "any individual [to] use any drug by simply asserting that he

9   or she was part of a religion that used that drug as a sacrament." *Oklevueha Native Am. Church*

10  *of Hawaii, Inc. v. Holder*, No. 09-cv-336-SOM, 2013 WL 6892914, at *1.

11      **1.   AYA has not demonstrated the sincerity of its members' religious beliefs.**

12      AYA seeks to use RFRA to obtain a broad injunction prohibiting the government from

13  prosecuting it or its members for "importing or ingesting sacramental ayahuasca," and pre-

14  venting CBP from "confiscating sacramental Ayahuasca that was shipped to AYA." Mot at 1.

15  However, sincerity must be satisfied by each person seeking relief. *See* 42 U.S.C. § 2000bb-

16  1(b). As the Supreme Court explained in *O Centro*, a religious exemption granted under RFRA

17  applies only to those persons whose particular religious practices are substantially burdened;

18  it does not apply categorically to all those who a plaintiff claims are similarly situated. 546 U.S.

19  at 431. Instead, when evaluating whether an organization has demonstrated that distributing a

20  controlled substance fulfills a sincere religious belief, courts consider a variety of factors, in-

21  cluding information about an organization's membership and screening requirements, its ten-

22  ets and practices, and the religious nature of the substance at issue. *See, e.g.*, *Oklevueha*, 2013

23  WL 6892914, at *1-2, 10; *CHLQ*, 615 F. Supp. 2d at 1212, 126-17. AYA cannot establish that

24  its religious beliefs are sincere simply because the plaintiffs in *O Centro* were able to do so in

25  regards to their religious use of ayahuasca. And there is little, if any, evidentiary basis for this

26  Court to conclude that AYA is organized to facilitate the sincere beliefs of its participants in

27  AYA's religious tenets or that participants are using ayahuasca as a sacrament. Accordingly,

28

AYA cannot secure the broad relief it seeks in its motion, which requests that federal defend-ants be enjoined from taking any future enforcement action against all "members" of AYA.[3]

First, AYA's filings contain very few details about basic membership requirements. With-out this information, AYA has not demonstrated that "membership" in AYA actually repre-sents an expression of a sincerely held religious belief in ayahuasca as a sacrament. *Cf. Okle-vueha*, 2013 WL 6892914, at *1-2, 10 (discussing dearth of evidence about "who qualifies to be a Church member"). For example, AYA does not discuss how an individual becomes a mem-ber; whether members must evince a commitment to AYA and its religious tenets to become a member; whether all individuals who pay for ayahuasca retreats publicized on its website become *de facto* members upon payment; whether and how often retreat participants return to services; or how many of them sincerely view ayahuasca as a religious sacrament. As in *Okle-vueha*, AYA introduced no declarations from congregants other than that of its founder attest-ing to the religious nature of ayahuasca. 2013 WL 6892914 at *10; Dkt. 137-1. Although AYA indicates that it makes inquiries about the "spiritual interests" of those who seek to participate in their ayahuasca ceremonies, it does not represent that applicants are screened out on that basis or denied entry if they do not sincerely believe that ayahuasca is a religious sacrament, much less that applicants subscribe to the tenets of AYA itself. Stanley Decl. ¶ 44. *Contrast Church of the Holy Light of the Queen* ("*CHLQ*") *v. Mukasey*, 615 F. Supp. 2d 1210, 1212, 126-17 (D. Or. 2009) (plaintiff had about 120 members and a "screening process" in which it "at-tempts to select only those who are serious about the Santo Daime religion" by requiring "a serious commitment of time and energy from members") with *United States v. Anderson*, 854 F.3d 1033, 1036 (8th Cir. 2017) (affirming that claimant was not entitled to a RFRA exemption for his heroin distribution, in part, because he did not "allege that the recipients of his heroin used it for their own religious purposes") and *Christie*, 825 F.3d at 1052-53 ("signing up [for

---

[3] AYA claims to be a "person" with "corporate standing" to assert a RFRA claim in its own right. Compl. ¶ 30. There are reasons to doubt AYA's own sincerity given the scant evidence about its practices. *Cf. Oklevueha*, 2013 WL 6892914, at *1-2, 10. But as to associational standing on behalf of AYA's alleged members, Compl. ¶ 56, AYA must demonstrate, among other things, that "its members would otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  AYA does not do so.

membership] was not difficult"); *U.S. v. Quaintance*, 608 F.3d at 717, 722 (10th Cir. 2010) (church "never had him read the pledge or asked if he shared their beliefs").

It is accordingly impossible for this Court to conclude on this evidentiary record either that AYA is organized to further the sincere religious beliefs of its participants or that participants are using ayahuasca for a sincere religious reason as opposed to another reason. *Oklevueha*, 2013 WL 6892914, at *8 (finding that there was "not enough evidence in the record to separate Plaintiffs' use of cannabis from any other entity or individual's nonreligious use," where Plaintiff lacked "declarations from other members of [the] Church"). Indeed, even in AYA's own polling, only 16% of the 1,430 people surveyed responded that using ayahuasca was "religious or spiritual." Dkt. 33-8 at 3. Such evidence cannot support the broad emergency injunctive relief—on behalf of an unknown and unidentified number of "members"—that AYA seeks to obtain. Accordingly, AYA has not satisfied its threshold burden under RFRA.

### 2.   Even if sincere, AYA's religious exercise is not substantially burdened.

AYA also fails to demonstrate that it is likely to succeed in showing that the DEA's registration process that effectuates the CSA's closed regulatory system substantially burdens its associational exercise of religion. At the outset, AYA mischaracterizes the alleged burden on its practice as being a "total prohibition on AYA's use of Ayahuasca." Mot. at 13. As previously briefed, the CSA and its implementing regulations create a closed regulatory system under which substances are strictly controlled, a system that is effectuated by the DEA's registration process. But religious claimants may petition the DEA for registration and receive exemptions from specific provisions of the CSA and its implementing regulations. This process allows the government to do what RFRA requires: consider the specific request at issue and weigh it against the government's interests. To cast the "burden" as a "total prohibition" is therefore incorrect. The CSA's prohibition on the general, unregistered handling of dangerous Schedule I substances functions as a prophylactic measure that remains in place until an applicant is able to demonstrate both entitlement under RFRA and that it can comply with the CSA's regulatory requirements for registrants. As a result, the question here is not whether a "total prohibition" on AYA's ayahuasca use constitutes a substantial burden; the question is whether AYA can

show that petitioning the DEA for a RFRA exemption from the CSA through the registration process imposes a substantial burden.

AYA is unlikely to make this showing.  Under RFRA, AYA must demonstrate a substantial burden by presenting evidence that it was "coerced to act contrary to their religious beliefs." *Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058, 1069-70 (9th Cir. 2008) (en banc). AYA failed to demonstrate that the religious practices of AYA or its individual members are substantially burdened by DEA's RFRA exemption process.

First, AYA does not argue in its motion—much less demonstrate with specificity—that the DEA's exemption process substantially burdens its sincere beliefs. AYA states that it "decided against providing inculpatory information to an accusatory agency." Mot. at 5.[4] Stanley's declaration likewise does not attest to how or why the exemption process substantially burdens either AYA or its members' religious beliefs. *See, e.g.*, *U.S. v. Tawahongva*, 456 F. Supp. 2d 1120, 1132 (D. Ariz. 2006) (RFRA plaintiff not substantially burdened "by the requirement that he acquire a permit"); *U.S. v. Friday*, 525 F.3d 938, 947-48 (10th Cir. 2008) ("We are skeptical that the bare requirement of obtaining a permit can be regarded as a 'substantial burden' under RFRA[.]"). As previously argued, Dkt. 121 at 7, the exemption process does not threaten civil or criminal sanctions or otherwise force AYA to act contrary to its religious beliefs. AYA's failure to bear its litigation burden to present evidence about any substantial burden from the exemption process is grounds alone to deny a preliminary injunction.

But even if the Court were to construe the "burden" for purposes of the RFRA analysis as the CSA's prohibition on handling DMT, AYA's admissions that it has held ayahuasca ceremonies for years and continues to do so makes clear that it has in fact not been "coerced to act contrary to [its] religious beliefs," *Navajo Nation*, 535 F.3d at 1069-70; *see* Stanley Decl. ¶ 16 (claiming he has "led more than 300 ceremonies"). Stanley admitted that he and AYA members are actively "practic[ing] visionary communion," *id.* ¶ 24, an admission supported by the previously scheduled and upcoming ayahuasca retreats in January and February publicized on

---

[4] Instead, AYA's only repeats its argument that DEA lacks the authority to conduct such a process, Mot. at 5, which the government previously rebutted, Dkt. No. 121 at 4-5.

AYA's website. *See* https://perma.cc/P4WJ-8YKU (advertising ceremonies in Tucson in for $325-$775). These facts belie AYA's assertion that it is unable to consume and share aya-huasca, and cannot support AYA's assertion that it is being forced to act contrary to its beliefs or that any of its members have in fact stopped their practice. *Cf. Oklevueha*, 828 F.3d at 1017.

AYA also argues that it is injured by the so-called ayahuasca "ban" because "DHS and CBP claim the right to destroy all seized Ayahuasca without notice to AYA, or any means to seek release of the seized Ayahuasca." Stanley Decl. ¶ 25. But CBP is simply acting pursuant to the closed regulatory system under which no controlled substances may be imported by any party without an importation permit. And AYA does not allege that obtaining an importation permit substantially burdens its religious beliefs, nor has AYA sought and been denied such a permit. If AYA obtained a registration through the RFRA exemption process, it could obtain importation permits. But, as noted, AYA has not availed itself of that avenue for relief.

Because AYA failed to demonstrate that DEA's RFRA exemption process substantially burdens a sincere religious exercise, it is not entitled to a RFRA exemption in this emergency posture. Accordingly, the Court need not address whether the exemption process furthers a compelling government interest. *Oklevueha*, 2013 WL 6892914, at *12.

## B. The DEA's tailored exemption process furthers compelling governmental interests through the least restrictive means.

Under RFRA "a law that substantially burdens the exercise of religion must serve 'a compelling governmental interest' and be 'the least restrictive means of furthering that compelling governmental interest.'" *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2376 (2020). Compelling interest is analyzed "through application of the challenged law" to "the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 430-31. In addition, courts must scrutinize the "asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431.[5]

Here, too, AYA is unlikely to succeed on the merits of its RFRA claim. The CSA's closed

---

[5] AYA additionally relies on *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). But *Tandon*, a case involving a Free Exercise Clause claim against a state government, has no bearing on AYA's RFRA claim (the only claim at issue in its motion).

regulatory system, effectuated by DEA's registration process, including the RFRA exemption process, is the least restrictive means of furthering at least two compelling governmental interests: (1) ensuring the safety of sincere religious adherents who use ayahuasca; (2) and preventing diversion of ayahuasca to non-adherents amidst a precipitous rise in secular ayahuasca use. Instead of pursuing the RFRA exemption process, AYA asks this Court to grant it a blanket exemption from the CSA without any evidence that AYA could handle ayahuasca safely and without risking diversion. *See* Redd Decl. ¶ 19 (describing harm to closed system).

### 1. Protecting public health and safety

The government has a compelling interest in protecting the health and safety of AYA participants and the public more generally from the risks associated with the consumption of ayahuasca. The Supreme Court has recognized that "Schedule I substances such as DMT are exceptionally dangerous." *O Centro*, 546 U.S. at 432; *see also id.* at 438 ("We do not doubt the validity of . . . the general interest in promoting public health and safety by enforcing the Controlled Substances Act[.]"); *CHLQ*, 615 F. Supp. 2d at 1214 ("There is no question that Daime tea could be dangerous if used improperly.").

Despite AYA's assertion that ayahuasca is "not a drug of abuse," Mot. at 2, AYA does not dispute that ayahuasca contains DMT, or that DMT is a Schedule I controlled substance. "DEA found that clinical effects" of ingesting ayahuasca has been shown to result in "hallucinations, agitation, tachycardia, confusion, heightened blood pressure, and vomiting," and, in rare instances, "seizures, respiratory arrest, and cardiac arrest." Redd Decl. ¶ 17. Given the potential of severe or life-threatening side effects "to the health of the religious practitioners" from ingesting ayahuasca, *Christie*, 825 F.3d at 1057, it is of the utmost importance that the wholly unregulated importation and use of ayahuasca not occur. Redd Decl. ¶ 17.

DEA's RFRA exemption process furthers the government's interest in ensuring the safety of sincere religious adherents who wish to use a substance with known severe health side effects.[6] AYA has not provided sufficient evidence that would allow either DEA or this Court

---

[6] In a previous request for a religious exemption for ayahuasca use, DEA examined a range of safety

to appraise the sufficiency of AYA's safety protocols. Instead, AYA utilizes a "trust-us" approach about the safety of their methods, stating that "[w]e have established through our own experience that Ayahuasca communion is safe when administered with the proper guidelines." Stanley Decl. ¶ 15. This statement, devoid of important details about their safety practices, is a wholly insufficient basis for this Court to assess the adequacy of AYA's safety protocols.

### 2. Preventing diversion of ayahuasca to non-adherents

The DEA also has a compelling interest in "reducing the incidence of illicit, recreational" use of ayahuasca, including by preventing its diversion to "people whose use is disconnected from any sincere religious practice." *Christie*, 825 F.3d at 1057.

First, there is a significant and growing illicit market in ayahuasca that did not exist when the Supreme Court decided *O Centro*. In the last decade, interest in and consumption of ayahuasca for secular purposes has increased markedly in the United States.[7] Redd Decl. ¶ 17. In fact, the rise of "international ayahuasca tourism" has prompted concern over the commodification and cultural appropriation of indigenous cultural practices by profit-minded westerners.[8] In light of this burgeoning secular ayahuasca market, the risk of ayahuasca diversion justifies a close inquiry into AYA's particular importation, distribution, and storage practices.

In assessing diversion risk, courts consider whether a claimant's "distribution methods

---

concerns with a claimant's procedures, including health monitoring during and after ayahuasca ceremonies, and sourcing of ayahuasca that was not labeled for human consumption. *Soul Quest Church of Mother Earth, Inc. v. Garland*, 6:20-cv-701-WWB-DCI, Dkt. 38-1 at 5-7 (M.D. Fla. May 11, 2021).

[7] *See, e.g.*, Ariel Levy, "The Drug of Choice for the Age of Kale," The New Yorker (Sept. 5, 2016), https://perma.cc/YT4Y-AJYC; Debra Kamin, "The Rise of Psychedelic Retreats," The New York Times (Nov. 25, 2021), https://perma.cc/2D6M-RXXA. And increasing numbers of vendors offer ayahuasca experiences on the internet to those seeking to self-medicate for conditions ranging from PTSD to cancer. *See* Rachel Harris, *Listening to Ayahuasca: New Hope for Depression, Addiction, PTSD, and Anxiety* (New World Library 2017).

[8] *See, e.g.*, Kenneth W. Tupper, "The Economics of Ayahuasca: Money, Markets, and the Value of the Vine," in Beatriz Caiuby Labate*, et al.*, eds., *The World Ayahuasca Diaspora: Reinventions and Controversies* (Routledge, Ltd. 2017). This commodification has, in some cases, dramatically increased the cost of ayahuasca to indigenous cultures and had the effect of limiting indigenous access to their own healing and faith traditions. *See* Mark Hay, "The Colonization of the Ayahuasca Experience," JSTOR Daily (Nov. 4, 2020), https://perma.cc/VVZ3-7GAS.

create[] a realistic probability that [the substance] intended for members" would be "distributed instead to outsiders who were merely feigning membership . . . and adherence to [the group's] religious tenets." *Christie*, 825 F.3d at 1057. There, the court concluded that an unacceptable risk of diversion exists where "[t]here is no evidence of how [an alleged church] determined whether persons at the . . . services were sincere, nor is there evidence of how [the alleged church] dealt with an attendee . . . found to be insincere." *United States v. Christie*, No. 10-CR-384-01-LEK, 2013 WL 6860822, at *8 (D. Haw. Dec. 30, 2013). The alleged church had a "barebones membership requirement" that was "not enforced as a meaningful check on who could receive" the controlled substance. *Christie*, 825 F.3d at 1063. Rather, it "simply gave [the substance] to those who showed up, took their money, and sent them on their way." *Id.*

On this score, AYA "present[s] the court with a factual record that is extremely thin." *Oklevueha,* 2013 WL 6892914, at *8. What little AYA has averred about its practices presents a "realistic probability" that ayahuasca will be diverted to non-adherents. *Christie*, 825 F.3d at 1057. AYA has not shown that its rules serve a meaningful religious screening function or represent "more than parchment barriers" to minimize the risk of diversion to non-adherents. *Id.* In *Anderson*, the alleged church "did not advise the recipients that the cannabis was for religious purposes" or confirm that it could only be used as such. 854 F.3d at 1036 (affirming denial of RFRA claim, in part, because "Anderson does not even allege that the recipients of his heroin used it for their own religious purposes"). AYA submitted evidence neither about its membership requirements, nor about its members' belief in "AYA's Tenets and Precepts," Stanley Decl. ¶ 4, nor that AYA limits ayahuasca offerings at its ceremonies to those who sincerely believe ayahuasca is a religious sacrament. *Cf. Christie*, 2013 WL 6860822, at *8 (noting failure to tell "customers that the sacrament was only for religious purposes," that consumption occur on-site, or "that 'members' were prohibited from distributing the sacrament to non-members").

Similarly, neither the DEA nor this Court can appraise the sufficiency of AYA's importation and security measures because AYA provides no evidence about its existing importation and storage practices that would satisfy the government's significant diversion concerns and

attendant regulatory requirements. Nor has AYA provided information about the quantity of DMT-containing plants that it imports or the entities from which it imports them. As a result, DEA cannot determine how much DMT is being imported, how often packages are sent and received, whether any portion of the imported shipments are diverted to persons or entities other than AYA, and whether there are security measures to prevent ayahuasca from finding its way into illicit channels after it arrives at AYA. Redd. Decl. ¶ 19.

**C. DEA's exemption process is the least restrictive alternative to the CSA's closed regulatory system.**

The government additionally has a compelling interest in ensuring that persons granted exemptions from the otherwise generally applicable provisions of the CSA prohibiting the use of dangerous substances receive such exemptions only after careful review pursuant to applicable statutory requirements, regulations, and an administrative-investigative process. DEA's religious exemption process is best equipped to conduct the intensive, fact-specific inquiry necessary for evaluating individual requests for exemption from the CSA and its implementing regulations. That process provides the least restrictive means for collecting and evaluating a sufficiently detailed and complete body of information as is necessary to ensure the compelling governmental interests in safety and diversion are tailored to a party's specific religious accommodation. When pursued, it also develops an individualized assessment of the entity's practices—which RFRA contemplates—that can properly be subject to judicial review.

AYA represents that its request is identical to those at issue in *O Centro* and *CHLQ*, and therefore asserts that it is entitled to the same relief afforded to those plaintiffs. Mot. at 5. Far from it. First, prior to *O Centro*, no process existed for an individual who wished to use ayahuasca for religious purposes. That is no longer the case. In the wake of *O Centro,* DEA created a religious-exemption process open to anyone who wishes to handle ayahuasca (or another controlled substance) for religious purposes while ensuring that DEA can continue to safely regulate the movement of that controlled substance.[9]

---

[9] For this reason, this case is not simply a repeat of *O Centro* and *CHLQ,* as Plaintiff suggests. *See, e.g.,*

14

Second, AYA has not demonstrated that it is similarly situated to the churches in *O Centro* and *CHLQ*. In contrast to AYA, the churches in *O Centro* and *CHLQ* entered into agreements with DEA under which imported ayahuasca is tracked from its entry into the United States until its ultimate consumption or disposal, thus preventing diversion and ensuring that the churches could engage in "circumscribed, sacramental use of hoasca." *Christie*, 2013 WL 6860822, at *4; *see* Via Decl. ¶ 11-12 (discussing DEA's registration of and ongoing interactions with those churches). DEA "worked closely" with these churches "on a case-by-case basis to develop a means by which that party could access the ayahuasca it claims to need *within* the closed regulatory system established by the CSA," including "complying with applicable DEA regulations." Redd Decl. ¶ 22. This is consistent with both RFRA's requirement to make individualized assessments and the manner in which DEA generally treats controlled substances, and it enables DEA to accommodate the churches' religious needs within the closed regulatory system to minimize the risk of diversion. Given this fact-specific engagement between DEA and these churches, it is irrelevant and too simplistic for AYA to claim entitlement to the same exemption simply because it too seeks to use ayahuasca. *See* Mot. at 5.[10] Similarly, Plaintiff's requested order against CBP, if granted, would effectively require CBP to "pre-clear" or "pre-admit" parcels that Plaintiff claims contain DMT, a Schedule I controlled substance, based solely on the Plaintiff's word that the parcel contains *only* ayahuasca (and only a certain type and amount of ayahuasca), as well as Plaintiff's claim that such ayahuasca would be used exclusively in the exercise of a sincerely held religious belief. Hinkle Decl. ¶ 9-11 (discussing an injunction's disruption to CBP's mission).

AYA's motion illustrates the compelling nature of the government's interest, and confirms that emergency litigation is a poor substitute for a regulatory process in which the individual seeking an exemption can engage with the expert agency. AYA has not provided sufficient

---

Mot. at 4-5. The holding in both of those cases—that the dangerousness of Schedule I substances does not *categorically* preclude any consideration of individualized exemptions to the CSA's ban on such substances—is not disputed or at issue here. *See also* Dkt. 49 at 4-5 (discussing *O Centro* and *CHLQ*).

[10] Stanley additionally asserts that AYA's practices are similar to UDV and Santo Daime, Stanley Decl. ¶ 20, but Stanley provides no basis on which he has personal knowledge of these practices.

1    information to the Court to determine whether it should be granted an exemption and how

2    such an exemption would take the government's interests into account. Instead, AYA seeks

3    to "have what they're having" without meeting the safeguards or registration requirements.

4        DEA's religious-exemption process is, by its nature, a less-restrictive alternative than an

5    absolute ban that effectuates the CSA's closed regulatory system. This process advances the

6    government's compelling interests while protecting against diversion. Other potentially less

7    restrictive means—such as permitting sincere believers to use ayahuasca under exacting health

8    monitoring procedures—cannot be credibly considered by the Court, given the paucity of

9    information about AYA's existing importation and use practices. Because the regulatory ex-

10   emption process is the least restrictive means of advancing the government's compelling in-

11   terests, AYA is not likely to prevail.

12   **III.    AYA Has Not Demonstrated Irreparable Harm.**

13       "An essential prerequisite" before granting a preliminary injunction is showing that irrep-

14   arable injury is likely absent an injunction. *Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*,

15   774 F.2d 1371, 1375 (9th Cir. 1985). AYA's voluntary decision to delay seeking a preliminary

16   injunction for several years undermines its claim of irreparable harm. AYA claims that it began

17   a "years-long process" preparing materials for a religious exemption prior to April 2019, Stan-

18   ley ¶ 23, but instead decided to file a lawsuit in May 2020. *See* Dkt. 49 at 7-10 (detailing back-

19   ground and Plaintiffs' initial claims). After Judge Orrick denied Plaintiffs' first two motions

20   for preliminary injunctions, they proceeded to file several amended complaints—including the

21   operative Complaint in May 2021—but did not renew their preliminary injunction motion.

22   During that time, AYA has continued to import, distribute, and use ayahuasca. But the federal

23   government has taken no criminal enforcement action against AYA, and any urgency spurred

24   by the recent *state court* prosecution of Mr. Villanueva has no bearing on irreparability here.

25       But even if AYA could defend its delay, it would still fail to show irreparable harm because,

26   as explained above, there is no genuine threat of imminent prosecution and the CBP's last

27   seizure of AYA's ayahuasca took place more than a year ago. *See supra* at I. Moreover, AYA's

28   generalized assertions that it is being "chill[ed]," Mot. at 11, "terroriz[ed]," *id.* at 20, and

"forced . . . into the shadows and underground," *id.* at 9, are conclusory and belied by AYA's admissions that Stanley and AYA members are actively "practic[ing] visionary communion," Stanley Decl. ¶ 24. Indeed, AYA does not claim that it or any of its members have in fact stopped their practice. Rather, AYA's own public website advertises numerous upcoming aya-huasca ceremonies, including one scheduled for January 14-16 and another two for February 2022. *See* https://perma.cc/P4WJ-8YKU. Given the absence of irreparable harm, there is no basis for the entry of an injunction here.

**IV. The Balance of Equities Favors Defendants.**

Where the government is a party, the balance-of-the-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the balance of equities tips sharply against the injunction AYA seeks. Prohibiting DEA and CBP from enforcing the closed regulatory scheme pertaining to "importing [and] distributing" a Schedule I controlled substance is not in the public interest. *See* Redd Decl. ¶ 19; Hinkle Decl. ¶ 10. AYA's total refusal to engage with DEA through its religious-exemption process creates significant diversion and safety risks. The public is best served by maintaining the integrity of the closed regulatory scheme unless an entity can demonstrate that it is entitled to a religious exemption and can handle the controlled substance safely and without risking diversion. AYA has fallen well short of such a showing, and granting the injunction would therefore undermine, rather than further, the important interests of RFRA. In light of the damage such an injunction would cause to DEA, CBP, and the public, and the lack of any imminent irreparable harm likely to be suffered by AYA in the absence of an injunction, granting AYA's motion would not be in the public interest.

## CONCLUSION

For the reasons above, the Court should deny AYA's motion for a preliminary injunction.

Dated: January 6, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Lisa Newman*
LISA NEWMAN
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 514-5578
Fax: (202) 616-8470
E-mail: lisa.n.newman@usdoj.gov

*Attorneys for the Federal Agency Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2021, I electronically transmitted the foregoing Federal Agency Defendants' Opposition to Arizona Yage Assembly's Motion for Preliminary Injunction [Doc. 137] to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants for this matter.

*/s/ Lisa Newman*
LISA NEWMAN