JOHN SULLIVAN (CSB#204648)
17532 Miranda Street
Encino, CA 91316
Tel:818-769-7236
Email:Sullivan.John84@gmail.com

CHARLES CARREON (CSB #127139)
305 Cuprite Street
Tyrone, New Mexico 88065
Tel: 928-975-2191
Email: chascarreon@gmail.com

Attorneys for Plaintiffs Arizona Yagé Assembly
and Winfield Scott Stanley III

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Arizona Yagé Assembly, Winfield Scott Stanley III, in his capacity as Founder and Director of Arizona Yagé Assembly,<br><br>Plaintiffs,<br><br>vs.<br><br>Merrick Garland, Attorney General of the United States; Anne Milgram, Administrator of the U.S. Drug Enforcement Administration; Alejandro Mayorkas,, Secretary of the Dept. of Homeland Security; and Chris Magnus, Commissioner of U.S. Customs and Border Protection.<br><br>Defendants. | Case No.:20-CV-02373-PHX-ROS<br><br>DECLARATION OF CHARLES CARREON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS FIFTH AMENDED COMPLAINT |

DECLARATION OF CHARLES CARREON

Charles Carreon declares and affirms:

1. I am an attorney licensed to practice before all courts in the State of California, and admitted *pro hac vice* by this Court as plaintiffs' counsel of record herein. In their Fifth Amended Complaint, Docket # 159 (the "FAC"), Plaitiffs Arizona Yagé Assembly

1. ("AYA") and Winfield Scott Stanley III ("Mr. Stanley") have pled a viable claim under the Religious Freedom Restoration Act ("RFRA"). Accordingly, I make this declaration in support of the Plaintiffs' opposition to the motions to dismiss of Federal Defendants (Docket # 175). If called as a witness, I could and would so competently testify.

2. In February of 2021, I was the Arizona State Bar Registered In-House General Counsel for AYA, and have knowledge of the true facts regarding the events inaccurately related in the declaration of DHS Agent Alexander Smyrnos ("Agent Smyrnos") in his declaration (Docket #175-1). As this declaration establishes, the Federal Defendants' efforts to dispute the facts alleged in the FAC regarding Agent Smyrnos' conduct raises a dispute that goes to the merits of the RFRA claim alleged in the FAC. Thus, to the extent Agent Smyrnos' declaration attempts to dispute "jurisdictional facts," the determination of those facts is inextricably intertwined with the merits of Plaintiffs' RFRA claim.

3. As the FAC alleges, DHS has repeatedly seized and destroyed AYA's Ayahuasca Sacrament in importation. As this declaration avers, through the actions of agents like Agent Smyrnos, DHS is also substantially burdening AYA's Free Exercise by conducting harassing investigations of its members based on their purchases of innocuous, lawful products from South American online vendors. Further, because Agent Smyrnos and his investigative partner from local law enforcement threatened an AYA member with prosecution if she failed to spy and inform on her co-religionists, his conduct rises to the level of the new RFRA tort for damages under *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) (RFRA claims for damages allowed against FBI agents who attempted to coerce Islamic believers into spying on their Islamic congregations). Finally, when Agent Smyrnos used information extracted from one AYA member to initiate investigatory contact with another AYA member, he left no doubt of his intent to exercise coercive force upon an AYA member to cause injury to AYA. Agent Smyrnos' conscious indifference to AYA's right to practice Visionary Religion free of hostile government surveillance imposes a substantial burden upon AYA's Free Exercise.

4.  This declaration controverts a number of Agent Smyrnos' assertions, and establishes the existence of a substantial factual dispute going to the merits of AYA's RFRA claim regarding whether Agent Smyrnos' actual conduct – as distinct from his own self-serving statements -- imposes a substantial burden on AYA and its congregation.

5.  My own background in the analysis of controlled substances comes from my years of practice as a member of the CJA Panel for the Oregon Federal Public Defender, under the direction of Steve Wax, from 1995 – 2000, during which time I represented over fifty indigent defendants, approximately half of those cases being prosecutions for violations of the Controlled Substances Act. I attended CLE classes about drug forensics to better represent my clients in sentencing, learning basic chemical principles to better understand the evidence presented by forensic experts. During that same time period, I also had a private practice, in which I represented many persons accused of controlled substance violations of federal and state law, so I became reasonably conversant with the language of pharmacology. During the past six years, I have focused more closely on current research in the history and use of psychoactive substances as part of my practice and general professional development. Accordingly, I am competent to make a comparison of Mescaline and San Pedro cactus, scientifically named *Echinopsis Pachanoi*, for purposes of establishing that Agent Smyrnos' conflation of the two into a single substance is a gross misstatement that leads to many inaccurate inferences. A chart summarizing all of the facts cited in my comparison of Mescaline and *Echinopsis Pachanoi,* as well as a comparison of Peyote (*Lophophora Williamsii*) with *Echinopsis Pachanoi,* is attached as Exhibit 2.

6.  Agent Smyrnos' investigations of AYA members for "mescaline" purchases are founded upon a form of weaponized ignorance that conflates an innocuous plant that is widely sold in U.S. retail outlets with a Schedule I Hallucinogen.

7.  There is no reasonable basis for Agent Smyrnos to not know the difference between Mescaline and dried cactus dust. Mescaline is a chemical that can be identified by: (1) its

known molecular weight (2122.26), (2) its Chemical Abstracts Services Registry "CAS" Number (832-92-8), (3) its PubChem Compound Identifier number (4076), (4) and its European Community "EC-Number" (212-626-3).   Mescaline has a known active adult dose: 200 mg.  By contrast, *Echinopsis Pachanoi* is a plant that has no molecular weight, CAS number, PubChem Compound Identifier Number, or EC-Number.  Rather, *Echinopsis Pachanoi* has a Taxonomy ID (1001097), and a bioassay of its constituents reveals that it is composed of a vast array of chemicals.  The amount of Mescaline in *Echinopsis Pachanoi* varies widely, from as little as 0% to as much as % 4.7 percent, with an average of .82%.  By equating a chemical with a plant, Agent Smyrnos has either ventured into the realm of "alternative facts," or actually shown himself unable to correctly answer the child's question: "Animal, mineral, or vegetable?"

8.   Although Agent Smyrnos' declaration carries on the ruse that dried *Echinopsis Pachanoi* is Mescaline, his email, written at the time and therefore more veridical, makes it clear he was investigating importation of "…plants containing mescaline, such as the peyote, San Pedro, and torch cactus [that] are controlled substances under federal law."

9.   I replied in my email that "San Pedro (*Ephinopsis Pachanoi*) and Peruvian Torch (*Echinopsis Peruviana*) are not on either Schedules I, II, III, IV or V."   Agent Smyrnos did not contradict me and say that the substance at issue was actually Mescaline.

10.  I pressed the matter further in my email, citing the case law[1] for the principle that the only way to convict someone for possession of an un-scheduled substance is under the provisions of the Analogue Act, 21 U.S.C. § 802(32) and § 813, that criminalizes "designer drugs," synthetic chemicals, which *Echinopsis Pachanoi* is not.  Finally, I advised him that "a global search in all federal and state Lexis case law produces not a single response to a search for either of the two [*Echinopsis*] cacti;" accordingly, I asked

---

[1] *United States v. Jones*, No. 18CR-01280CVE, 2018 U.S. Dist. LEXIS 179637, at *9 (N.D. Okal. Oct. 19, 2018).

him to support his contentions by providing information about "any prosecutions or civil penalty actions resulting from possession of any mescaline-containing cacti other than *Lophophora Williamsii*."

11.  Agent Smyrnos responded to my questions with silence.  His acquiescence in my definition of the issue at hand constitutes a tacit admission that he was investigating the entirely legal importation of dried *Echinopsis Pachanoi* cactus dust, Taxonomy ID # 1001097, not Mescaline, CAS Number 832-92-8.  There was no justification for this investigation, that appears to have been motivated by the misguided belief that turning visionary religion practitioners into informants would result in the interdiction of controlled substances by DHS.

12.  *Echinopsis Pachanoi*  is a perfectly legal plant that contains very small amounts of Mescaline, if any at all, hidden under prickly spines and a thick cuticle, in green cactus flesh often described as extremely bad-tasting, slime-infused cellulose that causes people who try to eat it to choke and vomit.  Even after it has been reduced to a dried dust, in order to ingest it in any substantial quantity, it must be mixed with liquid, whereupon it immediately reconstitutes into a nauseous green slime.  Chemical extractions require complex lab equipment and chemicals that are basically unobtainable.  Apparently, many people find that using San Pedro as the Andean natives do, in small quantities as a mild tonic, is pleasant and healthful, but that effect is not necessarily attributable to its usually insignificant Mescaline content.  And vast numbers of people buy the cacti just to grow them as very beautiful legal ornamentals, which is why a Google search for "san pedro plants for sale" generates many, many pages of results.  (Exhibit 3.)

13.  A scientific assay of twenty-nine different samples of *Echinopsis Pachanoi* showed that many samples contained 0 - .20 % Mescaline by weight, and the average Mescaline content was .82%.  So even if, through forensic lab chemistry, one was improbably able to extract and refine all of the Mescaline from 3 kilos of *Echinopsis Pachanoi* cactus

dust, it would be a very modest amount, since .82% of three thousand grams is a mere 24.6 grams, the weight of 4 quarters and a nickel.

14. Agent Smyrnos has sworn to this Court that he was on the trail of three kilos (6.6 pounds), or three thousand grams of Mescaline, when he subjected an AYA member to custodial interrogation, believing her to be an intended recipient of this so-called Mescaline shipment. If true, Agent Smyrnos would have been onto something reasonably big. Since an active dose of Mescaline is around 200 milligrams, there are five doses per gram, and therefore fifteen-thousand (15,000) doses of Mescaline in three kilos. Street psychedelics sell for between $5 to $20 per dose, and thus, the street value of three kilos of Mescaline would be somewhere between $75,000 and $300,000.

15. By comparison, packages of 1,750 grams of *Echinopsis Pachanoi* were fairly recently available on the Internet from ComprasPeru.com for $395. (Exhibit 4.) Thus, 3,500 grams of cactus dust have a retail value of less than $790. Refining the Mescaline out of that volume of cactus dust, assuming that it could actually be done at all, would be a complex and laborious task taking approximately a week, and requiring the use of toxic chemicals. That labor would on average produce 123 doses, having a street value of between $615 and $2,460.

16. Because of the miniscule Mescaline content in *Echinopsis Pachanoi* cactus dust, most persons who attempt it discover that San Pedro cactus dust is almost impossible to consume in amounts sufficient to trigger a noticeable pharmacological effect distinguishable from a placebo. Much of the belief to the contrary is simply due to indiscriminate marketing claims that routinely announce exagerated results from herbal remedies – Acai berries, Green Tea, etc.

17. Agent Smyrnos is not the only DHS agent who is taking advantage of the public chatter about the psychedelic potency of *Echinopsis Pachanoi* to initiate investigations that are actually focused on persecuting Visionary Religion practitioners. For example, a

man named Adam DeArmon, living in Yavapai County, was arrested last year after a search of his home that was preceded by DHS seizure of several shipments of *Echinopsis Pachanoi* cactus dust.  Mr. DeArmon is a minister of the Oklevueha Church, and was growing Peyote (*Lophophora Williamsii*) in abundance.  The search and seizure and arrest were conducted by Yavapai County Sheriff's Office Deputies, at the instigation of DHS agents.  Seizures of dried *Echinopsis* cacti were reported to the press as "8.9 pounds of mescaline" in the local newspapers, and that false accusation against Mr. DeArmon remains on the Internet today.[2]  I am in personal contact with the Yavapai County evidence custodian with respect to the release of all Mr. DeArmon's seized property.  I have reviewed all seized property receipts.  In fact, no Mescaline was seized, at all.  The Yavapai County District Attorney concluded Mr. DeArmon's peyote was legally in his possession for religious use, and in the final plea agreement, dismissed all charges for possession of controlled substances. (Exhibit 5.)

18.  Agent Smyrnos used the ruse of investigating Mescaline importation to enter into the home of an AYA member and subject her to custodial interrogation while numerous law enforcement SUV's idled outside her home.  Along with a local law enforcement officer, after learning that the interrogation subject was an AYA member, he pressured her to disclose information about AYA members, in precisely the manner the Supreme Court held unlawful in *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020), by threatening her with arrest and prosecution if she learned of "unlawful conduct" by her co-religionists, and failed to report it to him.  Agent Smyrnos left his card with the AYA member to report her discoveries as a newly-recruited informant.  She gave the card to me, and I then called Agent Smyrnos after he reached out to try and "turn" a second AYA member from a loyal AYA church member to a government informant.

---

[2] https://journalaz.com/2021/03/12/ycso-pant-arrest-camp-verde-couple-for-mescaline-peyote-lsd-psilocybin/

19. After being first approached by Federal Defendants to step into settlement talks, I represented AYA and Mr. Stanley in what I hoped would be settlement negotiations with the DOJ and all Federal Defendants.

20. Plaintiffs' stated goal in settlement negotiations was to negotiate a Least Restrictive Means Agreement ("LERMA"), whereby AYA could submit an application for registration, set up site inspections, and arrange importation, storage, and distribution activities within the DEA's "closed system," like the Santo Daime and UDV churches that currently import Ayahuasca under LERMAs of their own. I read the UDV LERMA carefully to get a grasp of its procedural architecture, and I felt confident that, if the DEA was receptive, it would see that AYA is substantially capable of entering into a LERMA with the DEA.

21. Procedurally, there were two points Plaintiffs needed assurances for at the outset: (1) Ayahuasca ceremonies would be permitted during the pendency of negotiations, and (2) the Fifth Amendment rights of Mr. Stanley and AYA members would be protected. A good number of other "guardrails" were proposed by AYA, but we didn't discuss them at great length, because the DEA could not give us either of these assurances.

22. The DEA's proposed framework was simply to restate the Agency *status quo*:

> In agreeing to this framework, DEA will not grant authority or immunity to use controlled substances in violation of federal law. Nothing in this framework shall prohibit any agency within the Department of Justice, any State or local entity, or any law enforcement, administrative, or regulatory agency of the United States or any State thereof from initiating, or continuing with, administrative, legal, civil, or criminal proceedings with respect to any conduct in violation of laws of the United States, and DEA shall, as obligated in fulfilling its statutory duties, assist and cooperate with any law enforcement agency that initiates any investigation, action, or proceeding involving any unlawful conduct discovered in the course of DEA fulfilling its obligations under this framework or otherwise.

23. While providing no protection whatsoever for the persons affected by the disclosures, as the above language made clear, the DEA would have required AYA's

DECLARATION OF CHARLES CARREON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
FEDERAL DEFENDANTS' MOTION TO DISMISS FIFTH AMENDED COMPLAINT

8

disclosure of "a complete list of individuals (petitioner, church leader(s), or head of the organization; hereinafter, "principals") who hold a position of authority within AYA" and of those "who will be primarily responsible for the storage, preparation, security, distribution, dispensing, obtaining, importing, exporting, destroying/disposing, or otherwise handling the Ayahuasca for use in a religious ceremony." The DEA also wanted to "inspect and be provided access to any and all locations related to the use of controlled substances."

24. As a former Federal Public Defender, and as former in-house counsel for a number of small corporations, I saw no possible way to provide the DEA with the disclosures it wanted plaintiffs to provide. The DEA would provide no assurances that it would restrain its investigative scope, or its free use of all information obtained from the disclosures it would have required of plaintiffs in order to proceed with the "exemption investigation." Plaintiffs' exposure to criminal peril, under those circumstances was open and obvious. I have negotiated and obtained grants on testimonial immunity on several occasions in the past, and studied this situation particularly closely. Thus, I know that an implicit waiver of Fifth Amendment protections would be the result of making the requested disclosures. If, after having learned the identities of top AYA church members and the location of its sacrament, the DEA were to turn its investigative file over to another law enforcement agency, I would be professionally responsible for any enforcement activity that might result from the disclosures. The DEA was simply asking my clients to abandon their effort to secure their First and Fifth Amendment rights of free exercise and freedom from compelled self-incrimination by judicial decree. Since this was what originally motivated my clients to file this action, we knew we had reached an impasse. Since it was clear the DEA wasn't open to accommodating the Free Exercise

/ / /

and Fifth Amendment rights of plaintiffs during the pendency of negotiations, so that those negotiations could proceed in an atmosphere of confidence and trust, rather than at the DEA's sufferance, we discontinued negotiations and asked the Court to end the stay.

      I declare and affirm, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct, and that this declaration was signed on October 17, 2022, at Tyrone, New Mexico.

_____
Charles Carreon, Declarant