# Exhibit B

CHARLES CARREON (CSB #127139)
7 N. Ridge Crest Drive
Silver City, New Mexico 88061
Tel: 928-975-2191
Email: chascarreon@gmail.com

JOHN SULLIVAN (CSB#204648) Pro Hac Vice
17532 Miranda Street
Encino, California 91316-1249
Tel:818-769-7236 Fax:818-301-2175
Email:Sullivan.John84@gmail.com

Attorneys for Plaintiffs Arizona Yagé Assembly and
Winfield Scott Stanley III

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ArizonaYagé Assembly,  and Winfield Scott Stanley III, in his capacity as Founder and Director of Arizona Yagé Assembly, <br> , <br><br> Plaintiffs, <br><br> vs. <br><br> Merrick Garland Attorney General of the United States; et al. <br><br> Defendants. | Case No.:20-CV-02373-ROS <br><br> PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES FROM DEFENDANTS <br><br> F.R.Civ.P. 33 |

PROPOUNDING          All Defendants

PARTIES:

RESPONDING PARTY:    Plaintiffs Arizona Yagé Assembly and Winfield Scott

                     Stanley III

SET NUMBER:          ONE

# INTERROGATORIES, OBJECTIONS & RESPONSES

## Prefatory Statement

Plaintiffs' responses take as the relevant time period that commencing April 22, 2020, when Defendants gave Plaintiffs notice of the seizure of Ayahuasca destined for AYA's receipt and sacramental use.

1.  Please identify each and every actual or intended activity Plaintiffs believe is or was an exercise of religion that is substantially burdened by Defendants' conduct.

Objection:  The term "each and every actual or intended activity" sweeps in a vast range of conduct that extends indefinitely in all directions and times, without limitation, and accordingly, is incapable of accurate application.

Plaintiffs are substantially burdened in their conduct of virtually all aspects of AYA activity, including obtaining the sacrament, preparing the facilities and persons involved in the conduct of ceremony, conducting the ceremony, and developing networks of fellowship and mutual assistance in the continuous growth of the church and the congregation that it serves.

For each activity, please:

a. Describe its religious significance.

Plaintiffs define the term "religious" in a manner that comports with Supreme Court jurisprudence.  "***The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition. This construction avoids imputing to Congress an intent to classify different religious beliefs, exempting some and excluding others, and is in accord with the well-established congressional policy of equal treatment for those whose opposition to service is grounded in their religious tenets.*"*  *United States v. Seeger,* 380 U.S. 163, 176, 85 S. Ct. 850, 859 (1965).

Plaintiffs' central religious practice is the practice of visionary communion through the ceremonial drinking of Ayahuasca, in the company of a sincere congregation, under the direction of at least one facilitator, oriented toward the realization of the Divine with each ceremonial participant and the entire web of life and consciousness.

b. Describe the burden on the activity that Plaintiffs believe has been caused by Defendants' conduct.

As alleged specifically in the FAC, substantial burdens result from: Seizures of sacrament by DHS burden Free Exercise, that cause financial loss, and threaten the risk of criminal prosecution, investigations, controlled deliveries, and interrogations of AYA congregation members by DHS and local law enforcement; the shadow of illegality that impairs AYA's commercial relationships and imposes financial detriment; the inability to obtain a letter from the IRS to confirm AYA's tax-exempt status; and, the risks of exposure, incrimination, loss of employment, relationships, and reputational status that result from engaging in AYA practice, all of which deters some persons from engaging in AYA practice at all, causes others to be uncertain of the wisdom of continuing the practice.

> c. State whether a member or participant at an AYA ceremony must always use or consume ayahuasca in connection with that activity, or, if not, state all conditions under which participant may have no obligation to use or consume ayahuasca in connection with the activity or may be exempt or excused from any such obligation.

Plaintiffs object that the question seeks non-relevant information in seeking to determine whether Ayahuasca drinking is a "compelled" practice. The Court in this matter has specifically rejected the "compulsion" test in an RLUIPA case, which applies the same standard for measuring religious sincerity as the Court must apply in this RFRA action, summarizing its analysis in the holding: "The RLUIPA's legislative history indicates that Congress did not intend courts to measure substantial burden on religious exercise by reference to centrality or compulsion." *Coronel v. Paul*, 316 F. Supp. 2d 868, 880 n.12 (D. Ariz. 2004), *citing Seeger, supra* at 1484-1495 for the Supreme Court's "survey" of its own case law and the conclusion that the Supreme Court "has never required centrality or compulsion."

The test the Court will apply is as follows:
"The religious motivation test -- which defined substantial burden as state action that prevented religious adherents from engaging in conduct both important to them and motivated by sincere religious belief -- avoided many of the pitfalls of the centrality and compulsion tests. *** Although the text of the RLUIPA does not specifically mention the religious motivation test, given the statute's explicit rejection of the centrality and compulsion tests, ***the Court finds that*** the motivation test accurately reflects the meaning of substantial burden under the Act -- ***state action substantially burdens the exercise of religion*** within the meaning of the RLUIPA ***when it prevents a religious adherent from engaging in conduct both important to the adherent and motivated by sincere religious belief***. *Coronel v. Paul*, 316 F. Supp. 2d 868, 880 (D. Ariz. 2004) (emphasis added).

Accordingly, Plaintiffs respond that when an individual drinks Ayahuasca in an AYA ceremony, it is important to them, and motivated by a sincere religious belief.

    d. Identify and describe all instances in which the activity has occurred by providing the dates, times, and locations of the activity, as well as the names of all AYA officers, leaders, or personnel present at the activity.

Objection: To answer the Interrogatory subpart would require Plaintiffs to prepare a compilation from records that constitute the papers, files, and records of AYA correspondents who possess, and whose representative asserts, a Constitutional right to privacy under the Fourth Amendment, contending that such disclosures without probable cause would violate the warrant requirement; accordingly, Plaintiffs cannot expose the contents of such records to view upon demand by the Defendants.

Without waiver of the objection, since April 22, 2020, AYA has conducted approximately 250 ceremonies, one every two weeks in the District of Arizona.  Ninety-seven percent of all ceremonies are conducted by Mr. Stanley.  For further information concerning Mr. Stanley's ceremonial activities in the State of California and elsewhere prior to the filing of the action, please see the first Stanley Declaration (Dkt # 33-1.)

    e. Identify whether any other substances listed on a Schedule pursuant to the Controlled Substances Act, including any "medicinal drugs, were present at the location at which the activity took place, whether or not they were consumed.

None, to the knowledge of Plaintiffs, who exercise all appropriate care to maintain a pure ceremonial environment, and to advise the congregation concerning the medical issues that must be considered when administering Ayahuasca in the ceremonial setting.

2.  Describe the process by which an individual becomes a member or congregant of AYA, or a non-member participant of AYA ceremonies. This includes but is not limited to:

New congregation members discover AYA via referrals from other congregation members, recommendations from a wide variety of third persons involved in the visionary religion movement, including confidential recommendations from trauma and addiction therapists, and confidential recommendations from organizations that provide mental health support for veterans and first responders.  AYA's Facebook page provides a home on the Internet for the AYA congregation, where congregation members share communications under protection from law enforcement surveillance via the Stored Communications Act.

a. How AYA recruits members and advertises for its ceremonies, including any facebook and other social media advertisements;

AYA does not engage in "recruitment," defined as "the process of actively seeking out, finding and hiring candidates for a specific position or job."

Demonstrating the Plaintiffs' religious sincerity in a manner endorsed by the Supreme Court as evidence of even a for-profit corporation's religious character, AYA has spread the good word that ceremonies are being offered bimonthly in the District of Arizona at the AYA Maloka via the advertising module in Facebook. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 703, 134 S. Ct. 2751, 2766 (2014) (religious corporations "buy hundreds of full-page newspaper ads inviting people to 'know Jesus as Lord and Savior.'").

b. What requirements, if any, AYA imposes on individuals to become AYA members;

Plaintiffs believe in the good faith of those who apply to attend an AYA ceremony. This belief turns out to be well-grounded in fact, based on the statistical evidence gathered in the survey of the congregation that showed that virtually all person who attended ceremony did so from what is properly defined as a religious motivation. Doctrinal tests and belief-requirements are not imposed pre-ceremony; however, after ceremony, a certain commonality of beliefs in the validity of ceremonial practice and the reality of the visionary communion experience can be discerned among those in attendance.

Because Ayahuasca is pharmacologically active, each person who wishes to participate in a ceremony must complete an online questionnaire like the one filed as Docket #33-6. After eliciting contact information and an emergency contact phone number, the questionnaire requires each prospective communicant to list allergies, medications, and to answer the "yes" or "no" question: "Have you used Antidepressant medications?" A "yes" answer to this question will end the online questionnaire process and notify the submitter that they are, unfortunately, not able to receive communion at an AYA ceremony. Thus, no one who is taking anti-depressant medications partakes of the communion Sacrament in AYA ceremonies. The health questionnaire also requires disclosure of recent hospitalizations, surgeries, cardiac problems, high blood pressure, use of hypertensive medications, pregnancy, seizures, psychoses, or other mental or physical health conditions or restrictions that might be adversely affected by participating in the ceremony. If such conditions are disclosed, further inquiries are made of the prospective practitioners, and participation may be denied or conditioned participation upon the approval of the individual's physician.

c. The responsibilities or obligations of membership;

These are set forth in the Code of Ethics, Dkt. # 33-5.

d. The ways in which an individual participates as a member of AYA;

Thanks to its individual members, AYA continually provides access to the sacrament every two weeks, despite being forced to conduct ceremony under the shadow of the DEA's disapproval.  Every person who attends ceremony must summon a reserve of faith and confidence in the ceremonial practice to attend.  The Maloka was costly and difficult to construct, accomplished thanks to the participation of AYA members, who labored to build their own religious sanctuary, and now are able to practice together regularly.  AYA teaches that the congregation grows in reach and goodness when each member of the congregation expresses kindness and support towards every other members of the congregation.  The practical activity of presenting the ceremony every two weeks requires participation of AYA members who support the attendance of others in a variety of ways, assisting with lodging, travel, food, and fellowship for members who come from out of the area to attend ceremony.

e. The duration of such membership;

A person who has sits in ceremony with the AYA congregation is considered a member; however, it would be presumptuous for Plaintiffs to say how long that relationship will last.  We hope it will last a long time, and produce good for the member and the congregation.

f. Whether any monetary transfers are made in connection with such membership, including required, requested, recommended, suggested, or customary fees, dues, donations, or contributions;

One becomes a member of AYA by drinking Ayahuasca in ceremony with Plaintiff Stanley or a designated facilitator.  Most people pay a ceremonial fee to attend one or more ceremonies.  Currently, the ceremonial fees are between $250 and $350 per night. Veterans and other persons with special needs may receive fee waivers.  Fees for ceremonial services are traditional and do not diminish the sacred nature of the ceremonial service; *eg.*, Catholic priests receive "service fees" for performing "Masses, baptisms, weddings, confessions, penance services, funeral services, retreats, talks, or other ministerial activities." *See*, *Archdiocese of Los Angeles Administrative Handbook*, § 5.13.7.3, "Service Fees." [1]

---

[1] https://handbook.la-archdiocese.org/chapter-5/section-5-13/topic-5-13-7

g. Any reasons why membership would be granted, denied, or terminated; including any policies or criteria that aid in making such a determination;

Membership in a religious body such as the AYA congregation is not granted by any individual – it is bestowed by the Spirit.  Permission to attend an AYA ceremony is not based on any concept that "members may attend but non-members may not."  The goal of AYA is to make Ayahuasca ceremony available to sincere people, without setting itself up as a gatekeeper.  The admonition of Christ not to judge others but rather to discipline oneself seems applicable here.  AYA has never had a problem with "insincere applicants," and no need to create a system to address a nonexistent problem.  And, although a small number of people have been told that their future participation in AYA ceremonies would not be welcomed, the reasons for their exclusion are varied, do not fall into a single category, would be confidential in every case.

h. Whether non-members are allowed to participate in AYA ceremonies, and if so, how that differs from member recruitment and screening, and;

"Membership" is not a pre-requisite to attending an AYA ceremony; rather, it is attendance at an AYA ceremony that makes one a member, much as playing in the game makes an individual a member of an athletic team.  Religious is an action sport, you might say, in which the goals are to establish positive conditions for human beings to thrive in an environment of community support, built on a base of personal integration.

i. Each and every person involved in making membership determinations.

As noted above, AYA does not gatekeep access to ceremony; rather, it makes ceremony accessible to sincere applicants.  The determination of who is in and who is out of the AYA congregation is not the duty of anyone, except on that rare occasion when a decision must be made to exclude someone from attendance, and in that case, the final authority is always Plaintiff Stanley.

3. Identify each and every instance in which a facilitator determined that a participant requested or required "assistance or transportation after the ceremony," or "additional care" after the ceremony. (Referencing AYA Ceremonial Instructions, Dkt. No. 33-4 at 4.)  For each instance identified, please identify the person who made the decision, the reason or reasons for that decision, any training that person had to make such a determination, and any policies or criteria in place to aid in making such a determination.

On one occasion in Spring 2023, an individual with a pre-existing health condition suffered a flare-up, and she was transported by paramedics to a local hospital, where

she recovered from the flare-up.  Specific medical information about her condition would of course be confidential.

4. Please describe all information and identify all documents that AYA conveys to potential and actual participants of ayahuasca ceremonies about the "risks and hazards connected with" an ayahuasca ceremony and "physical and physiological infirmity [that] would place [an individual] at risk to participate in any way with the ceremony activities."[8]

This interrogatory seeks a compilation of information available from plaintiff's documents produced as AYA0001 – AYA 0039.  Rule 33(d)(1).

5. Describe all individuals, protocols, procedures, guidelines, or other criteria in place during an ayahuasca ceremony to ensure the medical, psychological, emotional, and sexual safety of participants during and after the ceremony.

An AYA Ayahuasca ceremony does not expose the congregation to medical, psychological, emotional and sexual risks, because medical screening is thorough and effective, and best practices for caring for the ceremonial participants are adhered to by Plaintiff Stanley and AYA.  The 2018 Survey results show that 98.4% of ceremonial attendees felt physically safe in ceremony.  (Dkt. # 33-8, page 3.)  Certainly some people who attend Ayahuasca ceremonies experience transient physical and psychological distress associated with purging the gastrointestinal tract, a symptom that medical professionals may define as an "adverse health effect."  See, Defendants' document, "Adverse effects of ayahuasca: Results from the Global Ayahuasca Survey." (defs.000000057.pdf – defs.00000080.pdf.)  The scholarly article supplied by Defendants concludes:  "As expected, in this study using a large online survey sample, it was found that **adverse ayahuasca effects are frequent, but generally mild and transient**. The most prevalent adverse physical effect was vomiting/nausea, and the most prevalent adverse mental health effect was reported in the domain of altered perception. *** Furthermore, both adverse physical and mental effects were significantly associated with non-supervised and non-traditional supervised contexts, while **consumption in a religious context was associated with fewer adverse effects than other contexts**.  *** Finally, **adverse physical effects were more frequently associated with a non-supervised context** of ayahuasca use."  (Page, defs.00000072 – 000000073.pdf, emphasis added.)

With respect to "sexual risks," the Code of Ethics clearly proscribes conduct that would be construed as sexually offensive or harassing.  On one occasion, an individual grabbed another person through their clothing, and they were placed on the list of individuals who cannot attend future AYA ceremonies.  Other than that, no AYA ceremony has ever been the setting for an act of sexual abuse or misconduct, to the knowledge of Plaintiffs.

This includes but is not limited to:

a. Whether AYA personnel meet with individuals participating in the ceremony prior to or after the ceremony;

Yes.

b. Whether there are trained medical professionals present during the ceremony;

Sometimes doctors, EMTs, and first responders with medical training attend ceremony.

c. Whether there are medical professionals monitoring for adverse health effects;

As quoted above, the Defendants' own documents establish that the transient "adverse health effects" some people suffer from drinking Ayahuasca are minimized in the supervised, religious context.  That is the context provided by an AYA ceremony, and the transient adverse health effects that do occur present no foreseeable likelihood of a medical crisis that would require "medical professionals" to be monitoring the vital signs of the congregation.  Anyone whose health condition would foreseeably place them at risk of a serious health emergency requiring the attendance of medical professionals would be excluded from attendance at AYA ceremony.

d. Whether there is a plan for medical or psychiatric emergencies;

There is a plan for handling any emergencies that may occur at the AYA Maloka.

e. Whether there is medical equipment on site;

As noted above, the Defendants' own documents establish that the transient "adverse health effects" some people suffer from drinking Ayahuasca are minimized in the supervised, religious context of an AYA ceremony, and those adverse effects do not present the likelihood of a medical crisis that would require "medical equipment."

f. Whether AYA facilitators are prohibited from engaging in sexual contact with those who participate in ceremonies during or any time after ceremonies; and

They are so instructed. See Code of Ethics, as well.

g. Whether AYA has a practice of following up with individuals regarding adverse health effects or other negative side effects, including psychiatric, emotional, or sexual, after the ceremony.

It is unclear what "negative side effects" the Defendants are alluding to, because the scientific evidence uniformly shows that Ayahuasca ceremonial practice rarely prompts psychological pathology, has powerful anti-addictive effects, and in regular ceremonial participants, is associated with a reduction in psychological morbidity. (See Declaration of Paulo Cesar Rebeiro Barbosa, Dkt. # 33-11.)

From the perspective of Mr. Stanley, much of the internal struggle post-ceremony results from ethical and emotional adjustments that people are moved to make by their ceremonial experience. For example, some people give up addictive drugs like alcohol and heroin, which requires letting go of bad relationships, and can be difficult. Other people look at the work they are doing to earn a living, and discover that, after ceremony, their ethical beliefs have become stronger, and they want to change employment. It can be difficult to fully let go of destructive behavior without support. Therefore, Plaintiff Stanley and other members work with other congregation members to build positively on their ceremonial practice and encourage courageous, ethical conduct that builds personal virtue and expands the congregation's positive influence.

The AYA Survey conducted in 2018 showed that 90.3% of the congregation believe AYA connects them with a community that views Ayahuasca use as sacred. AYA members are blessed with many individual healing and teaching skills that inspire the congregation, and 96% of the AYA Survey respondents pray or meditate. (See Dkt. # 33-8, page 3.) Prayer and meditation are traditional paths to integrating mystical experience with daily life that most AYA members apply to their own path. Music, song, breathwork and bodywork, yoga and mindfulness are also pathways that various members of the congregation are using and sharing with each other to maximize the beneficial effects of ceremonial practice. The experience of visionary communion often has a powerful somatic component that can prompt changes in a person's physical appearance, dietary habits, and other features of their character. Statistically, thanks to the response to the congregation Survey, we know that 64.1% connect with other church members between ceremonies, and 71.25% are interested in volunteering with AYA outside of ceremony.

6. Describe your plans for importing, manufacturing, storing, transporting, and distributing ayahuasca, including:

Plaintiffs' Short Term Plans: Plaintiffs will import Ayahuasca manufactured in Peru by secret means, and store it in a secret location in the District of Arizona under the sole

control of Plaintiff Stanley, who shall be responsible for the storage, transportation and distribution of Ayahuasca exclusively in AYA ceremonies.  "Plaintiffs' secrecy does not show a lack of sincerity. Instead, it shows that plaintiffs remained committed to practicing their religion despite the threat of criminal prosecution and loss of professional status." *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1219 (D. Or. 2009).

Plaintiffs' Long Term Plans:  Plaintiffs plan to get a DEA number(s) and disclose all of their importation information in detail on the required DEA forms.

a. The importers and recipients of the shipments;

Scott Stanley.

b. Where the ayahuasca will be shipped to;

A secret location in the District of Arizona.

c. The quantity and form of imported ayahuasca;

The quantity is undetermined, but AYA will try to get enough to continue ceremonies every two weeks.  If ceremonial Ayahuasca is unavailable, members of the congregation will gather to pray for the restoration of their access to their sacrament.  The form of Ayahuasca will be the standard two-ingredient combination of *Banisteropsis Caapi* and either *Diplopterys Cabrerana* or *Psychotria Viridis*.

d. Where and who will manufacture the ayahuasca;

Artisanal harvesters and manufacturers situated in Iquitos, Peru.

e. Where and how the ayahuasca will be transported once it has been received in the United States (including all in and out-of-state locations to which AYA will transport such ayahuasca);

Plaintiffs have no plans to transport Ayahuasca anywhere except to the Arizona Maloka, or to one of the announced locations where ceremonies are held out of state.

f. The amount of ayahuasca that will be consumed at each ceremony;

Per capita consumption averages 1.0 – 1.5 ounces per ceremony.

g. All physical locations for which you will be seeking a DEA registration, and;

Unknown at present.

h. Procedures for recordkeeping.

Like the Oregon Santo Daime, AYA protects its sacrament from diversion, using it exclusively for AYA ceremony, and has not maintained written records; however, AYA is ready, willing and able to adopt and utilize the recordkeeping system that the Santo Daime have developed to track their DEA-regulated importations of Ayahuasca. "The government has not presented evidence that there is a significant market for Daime tea. The government also has not presented evidence that plaintiffs have allowed the diversion of a single drop of Daime tea. This is an issue best addressed through reasonable guidelines for storing and inventorying plaintiffs' supply of Daime tea." *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1220 (D. Or. 2009).

7. Please identify the person or persons who do not consume ayahuasca (or are otherwise not under the influence of a controlled or mind-altering substance) immediately prior to or during the ayahuasca ceremony such that they can attend to any medical emergency or other issues that arise during or immediately after the ceremony. For any such persons, identify their respective roles and their medical training or expertise.

Plaintiff Stanley is present during 97% of all ceremonies, and his ability to respond to ordinary situations is not diminished by taking the sacrament in ceremony. Facilitators who conduct ceremony for AYA must possess a similar level of clarity in order to conduct the ceremony properly. The performance of ordinary activities, such as using telecommunications devices, communicating with authorities, and dealing with challenging circumstances, is not impeded for the adept ceremonial practitioner.

8. Please identify any AYA members who have been arrested or charged by federal law enforcement authorities for ayahuasca importation, use, manufacture, or distribution.

Plaintiffs have no knowledge of any such persons, aside from deceased former co-plaintiff Clay Villanueva, who was the victim of a federally-instigated State Court prosecution by the State of Arizona.

9. Beyond answers to Interrogatory No. 8, please identify any and all specific instances of "congregants" relaying to Stanley that they "understand [they] live under [an] open threat by law enforcement."

Such occurrences are so common it would be difficult to keep track of them, and Mr. Stanley made no records of this commonly-discussed topic.   The only reliable written record of information known to Plaintiffs at present for that information is the fact that 69.7% of the Survey respondents were hesitant to tell others of their experience because of questions surrounding the legality of Ayahuasca, and 53.9% feel the same constraints even when speaking with "family, close friends or associates."

10. Please explain how "Kambo ceremony[ies]" and "the Divine Kambo Sacrament" relate to AYA's sincere religious beliefs.

Plaintiffs object that Interrogatory # 10 seeks information irrelevant to any matter at issue in this litigation and is not proportionate to the needs of the case.  Plaintiffs will stand on the said objections.

11. Please identify any and all instances of AYA hosting Kambo ceremonies. For each instance of a Kambo ceremony, please identify:

Objections: Irrelevant to the determination of any claim or defense, overbroad and disproportionate to the needs of the case.  Plaintiffs will stand on the said objections.

a. The date and location of each and every instance in which you held a ceremony;

Objections:  Irrelevant to the determination of any claim or defense, overbroad and disproportionate to the needs of the case.  Plaintiffs will stand on the said objections.

b. How kambo was brewed, distributed, consumed, destroyed/disposed of, or otherwise present;

Objections:  Irrelevant to the determination of any claim or defense, overbroad and disproportionate to the needs of the case. Plaintiffs will stand on the said objections.

c. How AYA acquired kambo, including any potential supplier or importer;

Objections:  Irrelevant to the determination of any claim or defense, overbroad and disproportionate to the needs of the case. Plaintiffs will stand on the said objections.

d. Any other substance consumed by any person or offered for consumption, including whether ayahuasca was taken in conjunction with kambo;

Objections: Irrelevant to the determination of any claim or defense, overbroad and disproportionate to the needs of the case.

e. Who was present at the ceremony;

Objections: Irrelevant to the determination of any claim or defense, overbroad and disproportionate to the needs of the case. Requires a compilation of information that can be provided only by revealing the contents of papers as to which AYA's correspondents have a reasonable expectation of privacy, that are protected from disclosure by the warrant requirement of the Fourth Amendment, and that Plaintiffs have no authority to consent to disclose.  Invades the First Amendment free speech rights of AYA's correspondents, encroaching on promises of confidentiality AYA has made to AYA's correspondents.  Invades the confidentiality of medical records (ARS § 12-2292). Violates AYA's right under the Establishment Clause to be free of government process probing internal church activities.  *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1264 (10th Cir. 2008)(state regulatory scheme demanding disclosure of church's expenditures unconstitutional), *quoting Surinach v. Pesquera De Busquets*, 604 F.2d 73, 78 (1st Cir. 1979).  Plaintiffs will stand on the said objections.

f. Who was responsible for handling any substances consumed by any person or offered for consumption; and

Objections: Irrelevant to the determination of any claim or defense, overbroad and disproportionate to the needs of the case. Requires a compilation of information that can be provided only by revealing the contents of papers as to which AYA's correspondents have a reasonable expectation of privacy, that are protected from disclosure by the warrant requirement of the Fourth Amendment, and that Plaintiffs have no authority to consent to disclose.  Invades the First Amendment free speech rights of AYA's correspondents, encroaching on promises of confidentiality AYA has made to AYA's correspondents.  Invades the confidentiality of medical records (ARS § 12-2292). Violates AYA's right under the Establishment Clause to be free of government process probing internal church activities.  *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1264 (10th Cir. 2008)(state regulatory scheme demanding disclosure of church's expenditures unconstitutional), *quoting Surinach v. Pesquera De Busquets*, 604 F.2d 73, 78 (1st Cir. 1979).  Plaintiffs will stand on the said objections.

g. Who served in a leadership role and/or position of authority at the ceremony (e.g., Minister of the Assembly, "lead facilitator," other facilitator).

Objections: Irrelevant to the determination of any claim or defense, overbroad and disproportionate to the needs of the case. Requires a compilation of information that can be provided only by revealing the contents of papers as to which AYA's correspondents have a reasonable expectation of privacy, that are protected from disclosure by the warrant requirement of the Fourth Amendment, and that Plaintiffs have no authority to consent to disclose.  Invades the First Amendment free speech rights of AYA's correspondents, encroaching on promises of confidentiality AYA has made to AYA's correspondents.  Invades the confidentiality of medical records (ARS § 12-2292). Violates AYA's right under the Establishment Clause to be free of government process probing internal church activities.  *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1264 (10th Cir. 2008)(state regulatory scheme demanding disclosure of church's

expenditures unconstitutional), *quoting Surinach v. Pesquera De Busquets*, 604 F.2d 73, 78 (1st Cir. 1979).  Plaintiffs will stand on the said objections.

12. Please describe AYA's corporate structure including each and every state in which AYA is incorporated, its corporate status, any officers, and any other related entities. Please identify any and all incorporation documents and state corporate filings.

AYA was incorporated in:
- Arizona (Entity ID # 20126067)
- California (Registry # 4231879)
- Oregon (Registry # 1298470-91)

The remainder of the interrogatory seeks a compilation of publicly available information; accordingly, Plaintiffs respectfully direct the Defendants pursuant to Rule 33(d)(1) to the Arizona Corporation Commission website, the California Secretary of State website, and the Oregon Secretary of State website, where all documents from which the information may be compiled are available to the public.

13. Identify all churches, congregations, religions, denominations, religious organizations, sects, or spiritual organizations with which Mr. Stanley is or has been affiliated or involved in any way (including but not limited to employment, direction, management, advising, consulting, volunteering, membership, or participation in activities). Parent organizations, subsidiary organizations, and branches of a single organization are to be considered separate organizations for purposes of this interrogatory.

Plaintiffs object to this question as not proportional, and directed at obtaining information that would be of no evidentiary value to the Court in deciding any matter in dispute based upon the allegations of the Fifth Amended Complaint and the defendants' Answer (the "Pleadings").

Aside from Mr. Stanley's being the Founder of AYA, Plaintiffs have no further information to provide.

For each group that you identify: a. Identify the group and describe the nature of Mr. Stanley's involvement, including providing the title(s) of any positions that he has held and describing the duties of each position.

Mr. Stanley is the Founder and Sole Director of the AYA Board.  He has authority over all of the activities of AYA.

Plaintiffs object to providing any further response to this question because it is directed at obtaining information that would be of no evidentiary value to the Court in deciding any matter in dispute based upon the allegations of the Pleadings.

b. Identify the time periods of Mr. Stanley's affiliation or involvement with the group.

Mr. Stanley formed AYA as an Arizona corporation on June 15, 2015, and has been the Founder and Director since that date.  Plaintiffs object to providing any further response to this question because it is directed at obtaining information that would be of no evidentiary value to the Court in deciding any matter in dispute based upon the allegations of the Pleadings.

c. State Mr. Stanley's beginning and ending (or current) salaries or compensation, if he received a salary or compensation.

Plaintiffs object on the grounds that the Defendants seek information protected from disclosure by the First Amendment.  "[I]n the sensitive area of First Amendment religious freedoms, the burden is upon the state to show that implementation of a regulatory scheme will not ultimately infringe upon and entangle it in the affairs of a religion to an extent which the Constitution will not countenance." *Bangor Baptist Church v. Me., Dep't of Educ. & Cultural Servs.*, 549 F. Supp. 1208, 1221 (D. Me. 1982). *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1264 (10th Cir. 2008)(state regulatory scheme demanding disclosure of church's expenditures unconstitutional), *quoting Surinach v. Pesquera De Busquets*, 604 F.2d 73, 78 (1st Cir. 1979). Plaintiffs further that this question because it is directed at obtaining information that would be of no evidentiary value to the Court in deciding any matter in dispute based upon the allegations of the Pleadings.

Without waiver of the above objections, Plaintiffs respond that  Plaintiff Stanley does not receive a set salary from AYA.

Dated: February 6, 2024                CHARLES CARREON
                                        /s/Charles Carreon
                                        CHARLES CARREON (127139)
                                        Attorney for Plaintiffs
                                        Arizona Yagé Assembly,
                                        Winfield Scott Stanley III

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

The matters and facts set forth in the above and foregoing Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

_____
Winfield Scott Stanley III