## EXHIBIT LIST

| EXHIBIT | Document Title | Docket # |
|---------|----------------|----------|
| 1 | Order (the "Disclosure Order") | 220 |
| 2 | Declaration of Winfield Scott Stanley III | 222-5 |
| 3 | Discovery Disputes order (the "Discovery Rule") | n/a |
| 4 | Fifth Amended Complaint | 159 |
| 5 | Order denying motion to dismiss Fifth Amended Complaint | 183 |
| 6 | Declaration of Dr. Paulo Barbosa | 33-1 |
| 7 | Defendants' First Set of Interrogatories | 222-2 |
| 8 | Defendants' First Set of Requests for Production ("RFPs") | 222-3 |
| 9 | Joint Statement re Discovery Dispute | 219 |
| 10 | Notice of Appeal from the Disclosure Order | 221 |
| 11 | Letter to Defendants' Counsel requesting stipulation to stay of Disclosure Order | Not filed |
| 12 | Email response from Defendants' Counsel | Not filed |
| 13 | Ex Parte Motion for Stay Pending Appeal | 222 |
| 14 | Defendants' Response to Motion for Stay | 223 |
| 15 | Order re Motion for Stay (denying immediate stay, setting for hearing on shortened schedule) | 224 |
| 16 | Protective Order | 217 |

EXHIBIT 1

1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9     Arizona Yage Assembly, et al.,                No. CV-20-02373-PHX-ROS

10                    Plaintiffs,                    **ORDER**

11    v.

12    William Barr, et al.,

13                    Defendants.

14

15          Parties have filed a Joint Statement on a dispute over Plaintiffs' responses to

16   Defendants' First Sets of Interrogatories and Requests for Production (Doc. 219) ("Joint

17   Statement").

18          Plaintiffs have the initial burden to establish a prima facie case under the RFRA. 42

19   U.S.C. § 2000bb-1(b).   Defendants must then make an individualized showing that

20   application of the Controlled Substances Act and its implementing regulations to Plaintiffs'

21   organization is the least restrictive means of furthering a compelling government interest.

22   *Id.*  The discovery Defendants seek in these disputed requests is critical to this inquiry.

23          It is clear both from this dispute and those already adjudicated by the Court, *see,*

24   *e.g.,* (Docs. 210, 216, and 218), Plaintiffs have not taken their discovery obligations

25   seriously.  In the present dispute, Plaintiffs have failed to adequately respond to nearly 40

26   of Defendants' discovery requests.  Plaintiffs have provided incomplete, insufficient, or

27   unresponsive answers to many of the requests and in some instances have refused to

28   respond at all.  Defendants state they "still know very little about Plaintiffs' organization,

EXHIBIT 1

1   the safety of its practices, those who lead or attend its ceremonies, and how it imports,

2   handles, stores, or transports ayahuasca." Joint Statement at 5. The Court is in the same

3   boat. Plaintiffs' responses and productions are totally insufficient and Plaintiffs' refusal to

4   sufficiently respond to Defendants' discovery requests based on inapplicable privileges and

5   objections is wrong and in some cases ridiculous.

6        Plaintiffs shall provide full and complete responses and productions to Defendants'

7   requests. Where Plaintiffs claim they have already produced documents or that no

8   responsive documents exist, Plaintiffs must verify their answers under penalty of perjury.

9   **PLAINTIFFS' ASSERTED PRIVILEGES AND OBJECTIONS**

10       As Defendants point out, federal law governs the applicable privileges in this

11   Religious Freedom Restoration Act case. *See, e.g.*, Joint Statement at 32; Fed. R. Evid.

12   501; *Lewis v. United States*, 517 F.2d 236, 237 (9th Cir. 1975) ("In determining the federal

13   law of privilege in a federal question case, absent a controlling statute, a federal court may

14   consider state privilege law. But the rule ultimately adopted, whatever its substance, is not

15   state law but federal common law." (internal citation omitted)). Even if the Court were to

16   consider Plaintiffs' asserted privileges, they are either unrecognized or inapplicable.

17       First, confidentiality promises made to third parties are not grounds for objection,

18   particularly where, as here, a protective order is in place. *See Walt Disney Co. v. DeFabiis*,

19   168 F.R.D. 281, 283 (C.D. Cal. 1996) ("[O]nly privilege, not confidentiality, is a valid

20   objection under Fed. R. Civ. P. 26(b)); *In re Application of O'keeffe*, 2016 WL 2771697,

21   at *4 (D. Nev. Apr. 4, 2016) ("Confidentiality agreements do not bar discovery."); *Nat'l*

22   *Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP*, 256 F.R.D. 678, 681 (C.D.

23   Cal. 2009) ("Although there is no absolute privilege for highly confidential information,

24   such information, even if not privileged, may be protected under Rule 26(c)(1)(G)."

25   (internal citations omitted)).

26       Second, the Arizona statute protecting disclosure of medical records is inapplicable

27   in this federal question case. Even if state privilege law governed, this statute would not

28   apply since Plaintiffs are not licensed health care providers as defined by the statute, *see*

## EXHIBIT 1

1  A.R.S. § 12-2291(5), and Defendants' requests do not seek medical records "maintained

2  for purposes of patient diagnosis or treatment," *id.* § 12-2291(6).

3        Third, the First Amendment Free Exercise and Establishment Clauses do not

4  establish any privilege applicable to the civil discovery sought by Defendants. *See*

5  *Byzantine Cath. Eparchy of Phoenix v. Burri L. PA*, 2022 WL 3597106, at *3 (D. Ariz.

6  June 17, 2022) (explaining the "First Amendment's Free Exercise Clause and

7  Establishment Clause offer religious organizations wide latitude to structure and govern

8  their organizations in accordance with their own sincerely held beliefs, but the religion

9  clauses do not offer an immunity against civil discovery."); *see also Cason v. Federated*

10  *Life Ins. Co.*, 510 F. App'x. 663, 665 (9th Cir. 2013).

11        Fourth, Arizona's priest-penitent privilege does not apply here. As discussed above,

12  federal privilege law governs. *See* Fed. R. Evid. 501; *Lewis*, 517 F.2d at 237. Even if the

13  Arizona statute did govern here, Plaintiffs have not shown it would apply. Plaintiffs assert

14  the privilege as a blanket exclusion and do not identify any "confession" or allege any such

15  confession was confidential and not made in the presence of third parties. *See State v.*

16  *Archibeque*, 221 P.3d 1045, 1048, 1050 (Ariz. Ct. App. 2009). Plaintiffs may not rely on

17  Arizona's priest-penitent privilege to avoid responding to Defendants' discovery requests.

18        Finally, Plaintiffs object to discovery under the Fourth Amendment warrant

19  requirement throughout the Joint Statement. This is a frivolous objection and Plaintiffs

20  cite no authority to support it. The Fourth Amendment has no bearing on this case, where

21  Plaintiffs object to discovery in a civil lawsuit Plaintiffs initiated against Defendants. *See,*

22  *e.g., United States v. Int'l Bus. Machines Corp.*, 83 F.R.D. 97, 102 (S.D.N.Y. 1979) ("It

23  strains common sense and constitutional analysis to conclude that the fourth amendment

24  was meant to protect against unreasonable discovery demands made by [the government

25  acting as] a private litigant in the course of civil litigation."); *Bey v. Antoine*, No. 19-CV-

26  1877, 2023 WL 3204576, at *1 (E.D.N.Y. May 2, 2023) ("Where a plaintiff brings claims

27  [against the government,] the protections of the Fourth Amendment do not provide a shield

28  against civil discovery going to those issues."); *O'keeffe*, 2016 WL 2771697, at *5 (finding

EXHIBIT 1

1  a party may not invoke privacy "to prevent discovery regarding matters that a party places

2  in controversy").

3  In short, none of Plaintiffs' proffered objections justify their refusal to respond to

4  Defendants' discovery requests.  The Court will address each disputed request in the order

5  presented in the Joint Statement.

6  **DISPUTED REQUESTS**

7  **Interrogatory No. 2:**

8  This interrogatory seeks the identity of persons asked to serve or have requested to

9  serve in leadership roles or positions of authority in AYA or its ceremonies, which roles

10  they served in or requested to serve in, and when.  This information is crucial, and

11  Plaintiffs' response is clearly incomplete.  The names Plaintiff provided without further

12  information are insufficient, and withholding additional responsive information on the

13  basis of deposition limits is wrong.  Plaintiffs shall provide a complete response to this

14  interrogatory.

15  **Interrogatory No. 3:**[1]

16  This interrogatory seeks information about the *training* of persons in positions of

17  leadership or authority.  As Defendants argue, AYA's training procedures are relevant to

18  the analysis of potential health, safety, or diversion risks.  *See* Joint Statement at 10, 21.

19  Plaintiffs' response is unresponsive by failing to identify any individuals who provided

20  training and do not deny training has been provided.  Plaintiffs may not amend or

21  supplement their responses in the Joint Statement.  Plaintiffs shall provide a complete and

22  responsive response to this interrogatory.

23  **Interrogatory No. 5:**[2]

24  This interrogatory asks for information about individuals being denied participation

25  in Plaintiffs' ceremonies, why they were not approved to participate in one of AYA's

26
27  [1] This interrogatory appears twice in the Joint Statement under two different categories of issues presented by the Parties.  *See* Joint Statement at 10, 21.  The Court will address all arguments related to this interrogatory here.
28  [2] This interrogatory appears twice in the Joint Statement under two different categories of issues presented by the Parties.  *See* Joint Statement at 12, 24.  The Court will address all arguments related to this interrogatory here.

## EXHIBIT 1

1    ceremonies, who made the decisions, and how the decisions were communicated to the

2    individuals. Instead of responding to the request, Plaintiffs offer to "provide a selection of

3    anonymized documents showing one or more instances of the sort sought by this

4    interrogatory, with personal and location identifiers of non-parties redacted." Joint

5    Statement at 24. As Defendants argue, this is clearly insufficient. Plaintiffs do not identify

6    a single incident resulting in denial of participation in future ceremonies. Plaintiffs

7    acknowledge a "list of people who will not be allowed to participate in ceremonies" exists

8    but refuse to produce it. *Id.* If this information was conveyed in writing, Defendants are

9    entitled to production of all documents. Defendants' request for this information is not an

10   "improper effort by the Defendants to judge the religious beliefs of the Plaintiffs," and the

11   information sought is relevant to Defendants' defenses. Since there is a protective order in

12   place, the information provided pursuant to this request must be unredacted and non-

13   anonymized. The priest-penitent privilege does not apply. Plaintiffs shall provide a

14   complete response to this interrogatory.

15         **Interrogatory No. 16:**

16         This interrogatory seeks the identity of all "honored educators" and "peers" from

17   which Plaintiffs seek and with whom Plaintiffs share "knowledge and feedback," including

18   the "knowledge and feedback" sought from or shared by them. In the Joint Statement,

19   Plaintiffs assert "[f]urther information is not available" and Defendants "project[ing] the

20   existence of other inspirators for the Plaintiffs does not create discoverable information."

21   While it is true Defendants' projections would not "create discovery information,"

22   Defendants' objections to Plaintiffs' response are based on Plaintiffs' acknowledging

23   "significant peer support within the anonymity of our church membership" but asserting it

24   would be a "betrayal of trust to see the release of these names and the tenor of these

25   conversations to public agencies." Joint Statement at 14. Further, Defendants argue this

26   response is inconsistent with a prior declaration identifying at least one other individual

27   responsive to this request. This information is relevant to for identifying potential

28   witnesses and evaluating the safety and sincerity of Plaintiff's practices. While Plaintiffs

## EXHIBIT 1

need not "create discoverable information," they shall provide all existing information as part of a full, detailed, and complete response to this interrogatory.

**RFP No. 21:**

This request seeks documents related to "knowledge and feedback" sought or shared by Plaintiffs with anyone from whom they "seek guidance or consultation." Joint Statement at 16. Defendants argue Plaintiffs have produced only one (altered) email. Plaintiffs offer to produce additional documents with redactions in response but cite *Hobby Lobby* to assert Defendants "have no license to scrutinize the rationality of AYA's beliefs." *Id.* While the *rationality* of Plaintiffs' beliefs may not be relevant, Defendants are correct that *Hobby Lobby* is inapplicable since "both the genuineness of the Plaintiffs' beliefs and the nature and character of those beliefs is at issue." *Id.* Plaintiffs shall produce all additional responsive documents referred to in their response, and redactions are not allowed because a protective order is in place.

**RFP No. 22:**

Plaintiff have apparently misconceived this request, which seeks documents related to training of individuals holding leadership or authoritative roles in Plaintiffs' organization. As Defendants argue, these documents are related to whether AYA's practices pose health, safety, or diversion risks to participants or the broader public. Joint Statement at 18. Plaintiffs indicate they plan to produce a large set of relevant material in the form of the AYA Newsletter for the past two years of publication. This may be helpful, but as Defendants point out, they cannot know whether it will constitute a sufficient response to the request until the materials are promptly produced. If Plaintiffs have further responsive materials, they shall produce them.

**Interrogatory No. 4:**

This interrogatory seeks information related to who and how many people have attended Plaintiffs' ceremonies and consume or request to consume ayahuasca. Plaintiffs refused to respond to this request in its entirety. This information is particularly relevant to the sincerity of participants and whether individuals can joint under false pretenses. As

## EXHIBIT 1

1    discussed above, Plaintiffs' objections in the Joint Statement to producing communications

2    on confidentiality grounds are inapplicable.  Confidentiality promises made to third parties

3    are not grounds to object to civil discovery, particularly where, as here, a protective order

4    is in place.  *See, e.g.*, *Walt Disney Co. v. DeFabiis*, 168 F.R.D. 281, 283 (C.D. Cal. 1996)

5    ("[O]nly privilege, not confidentiality, is a valid objection under Fed. R. Civ. P. 26(b)).

6    The information Defendants seek is relevant to determining health, safety, and diversion

7    risks and the genuineness of Plaintiffs' beliefs.  Plaintiffs shall provide a complete response

8    to this interrogatory.

9         **Interrogatory No. 7:**

10        This interrogatory seeks information about individuals being denied "an additional

11   serving" of ayahuasca during Plaintiffs' ceremonies.  This information is relevant to

12   potential health or safety risks posed by Plaintiffs' practices.  Plaintiffs may not amend or

13   supplement their responses in the Joint Statement.  Plaintiffs do not identify a single

14   incident where an individual was denied "an additional serving" of ayahuasca.  Although,

15   as Plaintiffs argue, Defendants' objections to Plaintiffs' response "doesn't create

16   discoverable facts," to the extent such facts exist, they shall be included in a full and

17   complete response to this interrogatory.

18        **Interrogatory No. 8:**

19        This interrogatory seeks information about when responses to an AYA

20   questionnaire would result in ineligibility to participate in Plaintiffs' ceremonies.  This

21   information is relevant to potential health or safety risks posed by Plaintiffs' practices.

22   Plaintiffs do not identify any specific response that would result in denying participation

23   and apparently contradict both prior statements and their explanation in the Joint Statement

24   by responding a "yes" response to the medical intake questionnaire would "prompt further

25   inquiry" rather than an automatic denial of participation.  *See* Joint Statement at 28-29.  If

26   Plaintiffs have denied participation or made "further inquiry" in deciding whether to deny

27   participation, a complete response to the interrogatory must identify the questionnaire

28   response that prompted this action.  Further, Plaintiffs' response must clarify whether a

EXHIBIT 1

1  "yes" response to the medical questionnaire renders an individual ineligible for

2  participation or simply prompts further inquiry.  Plaintiffs may not amend or supplement

3  their responses in the Joint Statement.

4      **Interrogatory No. 9:**

5      This interrogatory seeks information related to medical or other trained

6  professionals involved in the drafting of a document regarding proper preparation of

7  ayahuasca and the medical or other basis for including statements in the document.  This

8  information is relevant to evaluating potential health or safety risks posed by Plaintiffs'

9  practices and identifying potential witnesses.  Defendants are correct that "Plaintiffs neither

10  confirm or deny whether any medical or trained professionals were involved in drafting the

11  referenced document" and fail to identify which "scientific and medical protocols have

12  been incorporated" despite asserting they have incorporated such information.  Plaintiffs'

13  response is incomplete.  If no medical or other professionals were involved in drafting this

14  document, Plaintiffs must clearly identify this.  Further, Plaintiffs must provide a complete

15  response identifying the "medical or other basis for including each of the statements" in

16  the document.  Simply stating the protocols "derive from ancient unwritten practices" is

17  insufficient, particularly where Plaintiffs acknowledge "[s]cientific and medical protocols

18  have been incorporated."  Plaintiffs list two such protocols in their response, but if any

19  further responsive information exists, Plaintiffs shall provide it in a complete response to

20  this interrogatory.

21      **Interrogatory No. 14:**

22      This interrogatory seeks information related to aid and support offered or provided

23  to participants before, during, or after a ceremony.  Plaintiffs' response asserts "the

24  particulars of any individual non-party's ceremonial experience are not relevant."  This is

25  incorrect.  The information sought by this interrogatory is relevant to evaluating potential

26  health or safety risks posed by Plaintiffs' practices and identifying potential witnesses.

27  Plaintiffs further offer a "medical records" objection, but (as discussed at length above),

28  this does not apply here.  Finally, Plaintiffs attempt to supplement their response to argue

- 8 -

### EXHIBIT 1

1    its response to a separate interrogatory satisfies its burden for this interrogatory.   Plaintiffs

2    may not amend or supplement their responses in the Joint Statement and, as Defendants

3    point out, the other interrogatory Plaintiffs reference only asks about assistance or care

4    provided *after* a ceremony and is insufficient anyway.   Plaintiffs shall provide a full and

5    complete response to this interrogatory, identifying all instances of aid or assistance

6    provided before, during, or after a ceremony including when and where the instance

7    occurred.

8        **Interrogatory No. 17:**

9        This interrogatory seeks information related to the setting of Plaintiffs' ayahuasca

10   ceremonies.   Defendants assert Plaintiffs' lengthy response is incomplete since it does not

11   identify the number and title of healthcare professionals or the titles of the three to eight

12   facilitators present at the ceremonies.   Joint Statement at 35-36.   This information is

13   relevant to evaluating potential health, safety, or diversion risks posed by Plaintiffs'

14   practices and identifying potential witnesses.   Plaintiffs' position in the Joint Statement

15   does not address these issues, instead focusing on adding context to Defendants' citation

16   to *O Centro* regarding DMT's status as an "exceptionally dangerous" substance.   This is

17   not responsive to Defendants' position in the Joint Statement.   Plaintiffs shall provide a

18   full and complete response to this interrogatory.

19       **RFP No. 3:**

20       This request seeks "any and all communications regarding ayahuasca use with any

21   person identified" in Plaintiff's initial disclosures.   This information is relevant to

22   evaluating health, safety, and diversion risks and the sincerity of Plaintiff's beliefs.

23   Defendants argue Plaintiffs have not produced *any* communications pursuant to this request

24   and instead simply indicated responsive documents have been produced pursuant to other

25   requests and reasserted its general objections.   *See* Joint Statement at 37.   In the Joint

26   Statement, Plaintiffs ambiguously and wrongly assert that they have "responded

27   proportionately" but do not indicate anything about their response or identify any

28   documents produced.   *Id.*   And as discussed above, Plaintiffs' proffered objections do not

## EXHIBIT 1

1    apply.  Plaintiffs must produce all documents and communications responsive to this

2    request, including not only communications between Plaintiffs and the individuals

3    identified in their initial disclosures, but all communications those individuals have had

4    related to ayahuasca, including with participants.

5        **RFP No. 11:**

6        This request seeks documents containing communications with individuals who

7    have participated in or facilitated one of Plaintiffs' ceremonies.  Plaintiffs' response shows

8    responsive documents exist but are being withheld based on Plaintiffs' general objections.

9    As discussed at length above, Plaintiffs' asserted objections and privileges do not apply

10   and will not serve as a basis for objecting to civil discovery.  Specifically, the Fourth

11   Amendment warrant requirement no bearing on this case, where Plaintiffs object to

12   discovery in a civil lawsuit Plaintiffs initiated against Defendants.  *See, e.g., United States*

13   *v. Int'l Bus. Machines Corp.*, 83 F.R.D. 97, 102 (S.D.N.Y. 1979) ("It strains common sense

14   and constitutional analysis to conclude that the fourth amendment was meant to protect

15   against unreasonable discovery demands made by a private litigant in the course of civil

16   litigation.").  The First Amendment Free Exercise and Establishment Clauses do not

17   establish any privilege applicable to the civil discovery sought by Defendants.  *See*

18   *Byzantine Cath. Eparchy of Phoenix v. Burri L. PA*, 2022 WL 3597106, at *3 (D. Ariz.

19   June 17, 2022) (explaining the "First Amendment's Free Exercise Clause and

20   Establishment Clause offer religious organizations wide latitude to structure and govern

21   their organizations in accordance with their own sincerely held beliefs, but the religion

22   clauses do not offer an immunity against civil discovery.").  And further, the priest-penitent

23   privilege does not apply.  Plaintiffs have not demonstrated a justification for refusing to

24   produce responsive documents.  Plaintiffs shall make a full and complete production of all

25   responsive documents pursuant to this request.

26       **RFP No. 12:**

27       This request seeks documents related to Plaintiffs' ceremonies involving ayahuasca,

28   such as when it is brewed, distributed, consumed, destroyed or disposed of, or otherwise

# EXHIBIT 1

1   present.  This information is relevant to evaluating health, safety, and diversion risks

2   potentially posed by Plaintiffs' practices.  Plaintiffs' response indicates responsive

3   documents exist but are being withheld based on Plaintiffs' general objections.  *See* Joint

4   Statement at 41. This is contradicted by Plaintiffs' position in the Joint Statement, in which

5   Plaintiffs assert they "have responded abundantly to this response." *Id.* This contradiction

6   is later clarified as Plaintiffs acknowledge their response should have referred to

7   "additional" responsive documents.  *Id.* at 42. But Plaintiff's asserted objections do not

8   apply here.  Plaintiffs shall make a full and complete production of all responsive

9   documents pursuant to this request.

10      **RFP No. 13:**

11      This request seeks documents related to receipt of anything of value, e.g. payment

12   or donations, from ceremony participants.  This information is relevant to evaluating

13   Plaintiffs' true purpose and sincerity, and finances "consistent with a religious organization

14   as opposed to a commercial enterprise that engages in the purchase and sale of ayahuasca

15   for profit." Joint Statement at 43.  Plaintiffs refuse to produce any documents pursuant to

16   this request, despite acknowledging responsive documents exist.  As detailed above,

17   Plaintiffs' proffered objections and privileges do not apply here and will not serve as

18   justification for Plaintiffs' refusal to produce responsive documents.  Plaintiffs shall make

19   a full and complete production of all responsive documents pursuant to this request.

20      **RFP No. 14:**

21      This request seeks documents related to ethical and safety protocols used in

22   connection with Plaintiffs' ceremonies.  Plaintiffs' response asserts they have "produced

23   all responsive documents, to the extent of their ability to identify them, given the overbroad

24   formulation of this request." Joint Statement at 45.  Plaintiffs' position in the Joint

25   Statement explains Plaintiffs have not withheld any "documents known to be responsive"

26   based on the overbreadth exception.  *Id.* But Plaintiffs do not state the construction they

27   applied in answering this request to allow Plaintiff to determine whether the response was

28   adequate, and Plaintiffs do not explain what search they undertook to identify responsive

## EXHIBIT 1

1  documents.  Plaintiffs shall clarify these points in a full and complete response and shall

2  produce all additional responsive documents should any exist.

3  **RFP No. 15:**

4  This request seeks documents shared with participants before, during, and after

5  Plaintiffs' ceremonies.  Plaintiffs' response states "[i]nterpreting this request as non-

6  redundant of other requests, Plaintiffs have produced all responsive documents."  Joint

7  Statement at 46.  Plaintiffs do not state the limiting construction they applied to this request

8  as required by RFP Instruction No. 7.  *Id.*  Plaintiffs shall state with particularity their

9  interpretation of the request "as non-redundant of other requests" to allow Defendants to

10  determine whether Plaintiffs' response is adequate.

11  **RFP No. 16:**

12  This request seeks documents related to instances where "aid, support, or

13  assistance" was offered or administered to any person before, during, or after Plaintiffs'

14  ceremonies.  Joint Statement at 47.  This information is relevant to evaluating potential

15  health and safety risks posed by Plaintiffs' practices.  Plaintiffs' response indicates

16  "[r]esponsive documents exist, and a reasonably proportionate sample of such, with

17  personally identifying information redacted, will be produced."  *Id.*  This is an inadequate

18  response.  Plaintiffs do not offer any specific objections to the construction of this request

19  and are not entitled to pick and choose a sample of documents as they see fit.  Further, the

20  information provided pursuant to this request must be unredacted and non-anonymized

21  since a protective order is in place.  Plaintiffs shall promptly produce all responsive

22  documents without redactions.

23  **RFP No. 17:**

24  This request seeks documents related to every specific instance or allegation of

25  misconduct in connection with Plaintiffs' ceremonies.  This information is relevant to

26  evaluating Plaintiffs' sincerity and potential risks to health and safety posed by Plaintiffs'

27  practices.  Since there is a protective order in place, information provided pursuant to this

28  request must be unredacted and non-anonymized.  The Fourth Amendment warrant

- 12 -

EXHIBIT 1

1    requirement no bearing on this case, where Plaintiffs object to discovery in a civil lawsuit

2    Plaintiffs initiated against Defendants.  *See, e.g., United States v. Int'l Bus. Machines*

3    *Corp.*, 83 F.R.D. 97, 102 (S.D.N.Y. 1979) ("It strains common sense and constitutional

4    analysis to conclude that the fourth amendment was meant to protect against unreasonable

5    discovery demands made by a private litigant in the course of civil litigation.").  Plaintiffs

6    shall promptly produce the list of individuals who are disqualified from membership in

7    Plaintiffs' organization without redactions and shall produce any additional documents

8    responsive to this request.

9        **RFP No. 23:**

10       This straightforward request seeks documents "that identify, describe, refer to, or

11   contain materials used in the training of ceremony participants."  Joint Statement at 50.

12   Plaintiffs' response states "[r]esponsive documents exist, and have been produced

13   previously."  *Id.*  Plaintiffs' position in the Joint Statements asserts this request is redundant

14   of RFP 15.  *Id.*  But Plaintiffs have misconstrued this request, which asks for materials used

15   in the training of participants, as redundant of RFP 15, which asks for documents shown to

16   participants before, during, or after ceremonies.  There may be substantial overlap between

17   the categories of documents sought by these requests, and it may be true that no additional

18   documents exist.  If that is the case, Plaintiffs shall particularly clarify this fact.  If

19   additional documents do exist, Plaintiffs shall promptly produce them.

20       **Interrogatory No. 10:**

21       This interrogatory seeks the date and location of every ceremony Plaintiffs have

22   held, what substances were involved, who was present, and who handled substances or

23   served in a leadership role during each ceremony.  This information is relevant to potential

24   diversion risks posed by Plaintiffs' practices.  Plaintiffs' response asserts prior-filed

25   documents "have provided sufficient information concerning this topic that any additional

26   information would be duplicative, redundant and unnecessarily burdensome."  Joint

27   Statement at 53.  Plaintiffs do not provide specific information for even a single ceremony

28   as the interrogatory requires.  Plaintiffs shall provide a full and complete response to this

# EXHIBIT 1

1  interrogatory.

2  **Interrogatory No. 11:**

3      This interrogatory seeks information related to Plaintiffs' handling of ayahuasca

4  including when any handling activity occurred, all persons involved, and required steps for

5  persons to be granted permission to handle ayahuasca.  Information about sourcing,

6  storage, transportation, and security of ayahuasca is relevant to potential diversion and

7  safety risks posed by Plaintiffs' practices.  Plaintiffs' response again asserts prior-filed

8  documents "have provided sufficient information concerning this topic that any additional

9  information would be duplicative, redundant and unnecessarily burdensome" and provides

10  a short explanation that Plaintiffs "adhere to a protocol of sourcing Ayahuasca from ethical

11  providers," which is "acquired by Stanley, stored on the premises under his exclusive

12  control, and utilized exclusively in AYA ceremonies."  Joint Statement at 55.  Plaintiffs'

13  position in the Joint Statement asserts this information is not "relevant to the issue of

14  religious intent" but ignores the diversion and safety risk analysis.  *Id.*  This information is

15  plainly relevant, and Plaintiffs shall provide it in a full and complete response to this

16  interrogatory.

17  **Interrogatory No. 12:**

18      This interrogatory seeks information about security measures related to Plaintiffs'

19  handling of ayahuasca, including specific information about any physical devices or other

20  security measures identified.  This information is relevant to potential diversion and safety

21  risks posed by Plaintiffs' practices.  Plaintiffs' response states Plaintiff Stanley is the sole

22  person having custody of ayahuasca and it is secured either "locked in a vehicle, locked in

23  a temporary storage facility, or inside premises under his control."  Joint Statement at 57.

24  This response is insufficient.  The response does not identify when these security measures

25  were implemented, what devices are used to "lock" the ayahuasca, or how these measures

26  ensure safe handling of ayahuasca.  Plaintiffs shall provide this specific information as part

27  of a full and complete response to this interrogatory.

28

EXHIBIT 1

**RFP No. 18:**

This request seeks documents related to the storage, security, preparation, distribution, procurement, and other handling of ayahuasca. This information is clearly relevant to potential diversion and safety risks posed by Plaintiffs' practices. But Plaintiffs' response simply states "[n]o responsive documents exist," and does not give any indication of the extent of Plaintiffs' search for responsive documents or whether any search was even conducted. Joint Statement at 59. The Court agrees with Defendants' argument that "it is highly improbable that no other responsive documents—whether in the form of emails, text messages, Facebook messages, or invoices, etc.—exist," particularly where Plaintiffs indicated responsive documents exist in response to a similar request (RFP No. 20) and would be required to keep detailed records of this sort if they obtain a DEA registration they seek as relief in this case. *Id.* Plaintiffs' response is wholly unsatisfactory. Plaintiffs shall conduct a reasonable search and promptly produce all responsive documents.

**RFP No. 20:**

This request seeks communications to or from any individuals who have been involved in handling ayahuasca. Plaintiffs' response indicates responsive documents exist but are withheld based on Plaintiffs' previous objections. As discussed at length above, Plaintiffs' asserted privileges and objections are inapplicable here. Neither the First nor Fourth Amendments establish any privilege applicable to the civil discovery sought by Defendants. *See Byzantine Cath. Eparchy of Phoenix v. Burri L. PA*, 2022 WL 3597106, at *3 (D. Ariz. June 17, 2022) (explaining the "First Amendment's Free Exercise Clause and Establishment Clause offer religious organizations wide latitude to structure and govern their organizations in accordance with their own sincerely held beliefs, but the religion clauses do not offer an immunity against civil discovery."); *United States v. Int'l Bus. Machines Corp.*, 83 F.R.D. 97, 102 (S.D.N.Y. 1979) ("It strains common sense and constitutional analysis to conclude that the fourth amendment was meant to protect against unreasonable discovery demands made by a private litigant in the course of civil litigation."). Further, this request does not create a substantial burden to Plaintiffs under

EXHIBIT 1

1    the RFRA because the documents sought are plainly relevant to potential diversion and

2    safety risks posed by Plaintiffs' practices and Defendants' compelling interest inquiry.

3    Since there is a protective order in place, the information provided pursuant to this request

4    must be unredacted and non-anonymized. Plaintiffs shall promptly produce all documents

5    responsive to this request.

6        **Interrogatory No. 18:**

7        This interrogatory seeks the identity of every person involved in drafting five

8    documents attached to Plaintiffs' preliminary injunction motion. Plaintiffs' response states

9    Plaintiff Stanley is the author and "lead editor" for two of the five documents but does not

10   identify anyone else involved in the drafting process for any of the documents. Joint

11   Statement at 64. Since Plaintiffs rely on these documents to establish their prima facie

12   case, they are relevant to Defendants' defenses, the sincerity of Plaintiffs' religious beliefs,

13   and identifying potential witnesses. Plaintiffs' response is insufficient. Plaintiffs shall

14   provide a full and complete response to this interrogatory.

15       **Interrogatory No. 21:**

16       This interrogatory seeks the identify of every person involved in the drafting process

17   of any document used at Plaintiffs' ceremonies or trainings or that Plaintiffs "otherwise

18   intend to rely upon to demonstrate" their sincerely held religious beliefs and practices.

19   Joint Statement at 66. This information is relevant to Defendants' defenses, identifying

20   witnesses, and the sincerity of Plaintiffs' beliefs. Plaintiffs' response simply states Plaintiff

21   "Stanley wrote all of the documents that he and AYA will present as evidence of sincerely

22   held religious beliefs and practices." *Id.* This response is incomplete and insufficient.

23   Plaintiffs do not identify any other person who (or claim that no other person) "edited,

24   reviewed, commented on, or otherwise received" these documents as the request calls for.

25   Further, the response addresses only documents Plaintiffs intend to rely on to demonstrate

26   sincerity and ignores that the request seeks this information about documents used at

27   Plaintiffs ceremonies as well. Plaintiffs shall provide a full and complete response to this

28   interrogatory.

## EXHIBIT 1

**Interrogatory No. 23:**

This interrogatory seeks the identity of every organization of which any of the Plaintiffs is a member or has requested to be a member, including when the membership request was made, the duration of membership, any dues or other value paid to the organization, and individuals at these organizations Plaintiffs have communicated with. This information is relevant to the sincerity of Plaintiffs' beliefs, potential risk of diversion, and identifying potential witnesses. Plaintiffs' response simply indicates "AYA has been a member of the North American Association of Visionary Churches since it was formed in June of 2019, and pays yearly organizational dues of $200." Joint Statement at 68. This response is incomplete. Plaintiffs do not provide any information about Plaintiff Stanley's membership in any organization, any organizations any Plaintiff requested to be in but did not join, or any individuals Plaintiffs have communicated with in connection with any actual or requested membership. Plaintiffs shall provide this information as part of a full and complete response to this interrogatory.

**RFP No. 4:**

This request seeks all documents Plaintiffs "have written, revised, used at [their] ceremonies, or otherwise intended to rely upon to demonstrate" Plaintiffs' sincere religious beliefs. Joint Statement at 70. Plaintiffs' response states they have "produced responsive documents" and "have supplemented that production." *Id.* Defendants argue Plaintiffs have "not produced any documents in a 'revised' format, only final-form documents" and "do not indicate whether they have or intend to produce documents 'used' at ceremonies." *Id.* Plaintiffs' position in the Joint Statement asserts "Plaintiffs have produced many documents they intend to rely upon . . . and will produce more in a timely fashion, supplementing production if and when new documents are discovered." *Id.* Plaintiffs shall promptly produce any additional responsive documents, including draft or revised versions and documents used at ceremonies.

**RFP No. 5:**

This request seeks all documents related to "the process by which" Plaintiffs "ensure

- 17 -

EXHIBIT 1

that [they] 'offer Visionary communication only to sincere religious persons with a reverent mindset.'" Joint Statement at 71. This information is relevant to evaluating the sincerity of Plaintiffs' beliefs and potential diversion risks. Plaintiffs' response states "[r]easonably construed, the interrogatory seeks information found in responsive documents that have been produced." *Id.* Plaintiffs do not explain how they "reasonably construed" the request as required. Plaintiffs may not amend or supplement their responses in the Joint Statement. Plaintiffs shall provide a complete and sufficient response and shall promptly produce all responsive documents pursuant to this request.

**RFP No. 6:**

This request seeks all documents, whether draft or final, related to the documents attached to Plaintiffs' motion for preliminary injunction. This information is relevant to evaluating the sincerity of Plaintiffs' beliefs, practices, and core documents. Plaintiffs' response states they "decline to produce responsive documents based on the stated objections." Joint Statement at 73. Plaintiffs' position in the Joint Statement misconstrues the request by stating Plaintiffs have provided "the responsive documents identified." *Id.* But this request not only asks for draft versions of responsive documents, but also all drafts and documents "relating to or referred to" in the referenced documents. Plaintiffs' response is incomplete and insufficient. Plaintiff shall promptly produce all additional responsive documents.

**RFP No. 7:**

This request seeks all documents containing communications with any members of Plaintiffs' organization related to membership, ceremonies, and their tenets and beliefs. This information is relevant to evaluating the sincerity of Plaintiffs' beliefs and potential diversion risks. Plaintiffs' response states some "[r]esponsive documents have been produced" and "[s]ome responsive documents are withheld," but "Plaintiffs may produce additional documents pursuant to an appropriate confidentiality stipulation." Joint Statement at 74. As discussed at length above, Plaintiffs' proffered objections are inapplicable here and will not serve as justification for refusing to produce or respond to

EXHIBIT 1

1    discovery requests.  Plaintiffs wrongly argue Defendants must articulate an occasion when

2    Plaintiffs have encouraged illicit, recreational use of ayahuasca or diversion to have their

3    discovery requests adequately responded to.   Instead, Defendants are entitled to this

4    discovery to determine whether Plaintiffs' practice pose a diversion risk.  This information

5    is relevant and not "grossly disproportionate to the needs of the case." *Id.* Plaintiffs shall

6    promptly produce all documents responsive to this request.

7        **RFP No. 8:**

8        This request seeks "all copies of the 'AYA attendee roster.'" Joint Statement at 76.

9    Plaintiffs' response acknowledges a "responsive document exists," but "Plaintiffs decline

10   to produce the same, based on the above objections." *Id.*  This information is relevant to

11   identifying potential witnesses and evaluating Plaintiffs' sincerity and whether individuals

12   are joining Plaintiffs' organization under false pretenses.   Again, Plaintiffs' proffered

13   objections are inapplicable here.  Confidentiality promises made to third parties are not

14   grounds to object to civil discovery, particularly where, as here, a protective order is in

15   place.  *See, e.g.*, *Walt Disney Co. v. DeFabiis*, 168 F.R.D. 281, 283 (C.D. Cal. 1996)

16   ("[O]nly privilege, not confidentiality, is a valid objection under Fed. R. Civ. P. 26(b)).

17   Neither the First nor Fourth Amendments establish any privilege applicable to the civil

18   discovery sought by Defendants. *See Byzantine Cath. Eparchy of Phoenix v. Burri L. PA*,

19   2022 WL 3597106, at *3 (D. Ariz. June 17, 2022) (explaining the "First Amendment's

20   Free Exercise Clause and Establishment Clause offer religious organizations wide latitude

21   to structure and govern their organizations in accordance with their own sincerely held

22   beliefs, but the religion clauses do not offer an immunity against civil discovery."); *United*

23   *States v. Int'l Bus. Machines Corp.*, 83 F.R.D. 97, 102 (S.D.N.Y. 1979) ("It strains common

24   sense and constitutional analysis to conclude that the fourth amendment was meant to

25   protect against unreasonable discovery demands made by a private litigant in the course of

26   civil litigation."). And the priest-penitent privilege does not apply to protect disclosure of

27   the attendee roster.  Plaintiffs shall promptly produce all documents responsive to this

28   request.

- 19 -

EXHIBIT 1

1     **RFP No. 10:**

2     This request seeks all "drafts of the survey that was delivered via email" and the

3 email that "delivered the survey to the AYA roster to generate the 'Summary – AYA June

4 2018 Survey of Congregants' document." Joint Statement at 78. This information is

5 relevant to evaluating the sincerity of Plaintiffs' beliefs and identifying potential witnesses.

6 Plaintiffs' response states "[d]rafts of the survey do not exist," but notes "the email, with

7 the email addresses of recipients redacted, will be produced." *Id.* Plaintiffs have not yet

8 produced that email but claim they will do so "immediately upon discovery." *Id.* Since

9 there is a protective order in place, the information provided pursuant to this request must

10 be unredacted and non-anonymized. Plaintiffs shall search for and promptly produce the

11 referenced email by the deadline set forth at the end of this Order.

12                            *     *     *

13     This dispute is another of Plaintiffs' attempts to delay or disrupt discovery.

14 Plaintiffs are on notice that the Court will impose sanctions—including liability for

15 excessive costs and fees, prohibiting Plaintiffs from supporting or opposing designated

16 claims or defenses, and dismissal of the action—for any further obstruction or failure to

17 meet discovery obligations. *See* Fed. R. Civ. P. 11, 26, 37; 28 U.S.C. § 1927.

18     Accordingly,

19     **IT IS ORDERED** Plaintiffs shall provide full and complete responses to

20 Defendants' First Sets of Interrogatories and Requests for Production as outlined in this

21 Order no later than **March 8, 2024**.

22     Dated this 22nd day of February, 2024.

23

24

25                                    Honorable Roslyn O. Silver

26                                    Senior United States District Judge

27

28

# EXHIBIT 2

CHARLES CARREON (CSB #127139)
7 N. Ridge Crest Circle
Silver City, New Mexico 88061
Tel: 928-975-2191
Email: chascarreon@gmail.com

JOHN SULLIVAN (CSB#204648)
17532 Miranda Street
Encino, CA 91316
Tel:818-769-7236
Email:Sullivan.John84@gmail.com

Attorneys for Plaintiffs Arizona Yagé Assembly
and Winfield Scott Stanley III

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Yagé Assembly, Winfield Scott Stanley III, in his capacity as Founder and Director of Arizona Yagé Assembly,<br><br>        Plaintiffs,<br><br>vs.<br>Merrick Garland Attorney General of the United States; et al.<br><br>        Defendants. | Case No.:20-CV-02373-PHX-ROS<br><br>DECLARATION OF WINFIELD SCOTT STANLEY III IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY PENDING APPEAL |

## DECLARATION OF WINFIELD SCOTT STANLEY III

Winfield Scott Stanley III, hereby declares and affirms:

    1.    I am the founder of plaintiff Arizona Yage Assembly ("AYA"), and a plaintiff in my own right in this litigation.  I make this declaration in support of AYA's Motion for Stay Pending Appeal, jointly referring to AYA and myself as "Plaintiffs."

## EXHIBIT 2

2.      As explained in Plaintiffs' motion in support of the request for stay, because of the Court's Discovery Rule[1] forbidding the filing of motions, I was unable to file a declaration to explain to the Court how Plaintiffs would be prejudiced if compelled to disclose, as we are now required by the Disclosure Order (Dkt. # 220):

      a.  the identities of AYA's members, donors, and correspondents;

      b.  their emails and other correspondence with Plaintiffs;

      c.  which ceremonies they attended;

      d.  how often they attended; and,

      e.  whether they donated to AYA, and in what amount.

3.      Producing all of this information, with no time period limitation, would compel Plaintiffs to disclose:

      a.  The identities of no less than 5,239 people who communicated with Plaintiffs for religious reasons, *i.e.*, to attend ceremony, request and receive advice, and other private matters;[2]

      b.  Tens of thousands of emails discussing religious matters;

      c.  Thousands of pieces of reputationally damaging information;

      d.  Records of private, personal activity; and

      e.  Records of donations and ceremonial contributions made with the understanding that donors and contributors would remain secret.

4.      If Plaintiffs were to disclose such information and documents, we would be breaching the trust and confidence our congregation has placed in us.  As a result of that breach, irreparable injuries would occur immediately, including:

      a.  Severe reputational damage to AYA and myself;

      b.  Injury to the mood and tenor of reverential practice;

      c.  Membership withdrawal;

---

[1] https://www.azd.uscourts.gov/sites/azd/files/judge-orders/ROS_Discovery_Dispute_Instructions_On_Line.pdf

[2] There are 5,239 email recipients in AYA's current email address list.

## EXHIBIT 2

     d.  Discouragement of new members from joining or participating in ceremony;

     e.  Injury to the congregational mindset, undermining the ability to communicate freely with AYA staff, both in and out of ceremony;

     f.  Injury to the congregational mindset for communicating with other members;

     g.  Discontinuance of donations; and,

     h.  Decline in attendance at ceremonies.

5.     If I had been permitted to file a declaration in opposition to the Defendants' request for the Disclosure Order, I would have explained why these injuries are certain to occur from compliance with the Disclosure Order.

6.     Due to the pending discovery demands attached hereto as Exhibits 1, 2, and 3, and my efforts to respond to the deep disclosures they demand, I have been managing a crisis within our church staff, as a result of them feeling threatened by the impending release of their names to Federal authorities.  While I am seeking to obtain the cooperation of church staff to make disclosure of their identities and roles, I am not guaranteed of a unanimous decision in my efforts to bring my facilitator staff on board with releasing their individual names.  Their aim in their religious practice is to practice in peace, privacy, and safety for themselves and others.  It's hard for me to convey in words the depth of their private and personal conflicts in seeing their right to freely practice threatened in the interest of obtaining the judicial exemption sought by way of this action.

7.     Plaintiffs were also disadvantaged by the Court's elimination of the discovery motion system because the Defendants were not required to make any assertions under oath, or with any degree of specificity at all, concerning the compelling governmental purpose justifying their requests to disclose the identities of, *inter alia*, AYA's members, donors, correspondents, their email addresses and correspondence with Plaintiffs, their ceremonial attendance, whether they donated to AYA, and in what amounts.  Nor were the Defendants required to meet the heightened relevance standards for discovery that

## EXHIBIT 2

must apply when First Amendment religious or political groups establish a *prima facie* case of First Amendment infringement, as discussed in the motion filed herewith. Finally, Plaintiffs are currently disadvantaged by the Court's Discovery Rule, as Defendants continue to press for more Constitutionally-protected information in current discussions with Plaintiffs' counsel, on constricted time schedules, with no opportunity for submitting extended argument and facts supported by affidavit.

8.      I do not mean any disrespect to this Court, and wish to proceed in the litigation, under rules that are in accordance with those the higher courts have decreed should apply when a church's records are demanded in civil discovery.  How can I, in good conscience, comply with those requirements of the Disclosure Order (Dkt. # 220) that would require me to betray my religious commitment to the AYA congregation and reveal private intra-church communications in an effort to avoid punishment by the Court?  Finally, Plaintiffs can not participate in a civil discovery procedure that deprives them of rights provided under the Federal Rules of Procedure to protect the fairness of discovery adjudications, and that have previously resulted in an order requiring what, as explained above, would be extremely injurious disclosures. (Dkt. # 220).

9.      Accordingly, while we seek the opinion of the appellate court, I respectfully request the Court to stay enforcement of the Disclosure Order (Dkt. # 220), and to refrain from adjudicating any discovery disputes under the Court's Discovery Rule that forbids the filing of motions supported and opposed by legal memoranda and sworn declarations in accordance with the applicable Federal Rules of Civil Procedure Rules 26 - 37.

I declare and affirm, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct, and that this declaration was signed on March 6, 2024 at Tucson, Arizona.



Winfield Scott Stanley III

EXHIBIT 3

# DISCOVERY DISPUTES

Pursuant to Local Rule 7.2(j) and the Court's Rule 16 Scheduling Order, counsel and any pro se parties must personally meet and confer and make all reasonable efforts to resolve a discovery dispute prior to contacting the Court. GENERALLY, NO MOTIONS CONCERNING THE DISPUTE ARE PERMITTED TO BE FILED.

1. If unable to resolve a discovery dispute, do not file a motion unless directed by the Court.

2. Each party is required to provide the Court with written certification that there has been compliance with Rule 7.2(j) and the Rule 16 Scheduling Order.

3. File and e-mail to chambers (Silver_Chambers@azd.uscourts.gov) a joint statement of the dispute. This joint statement is not to exceed 14 lines per issue for each party unless an enlargement has been approved by the Court.

4. The filed/faxed document will be reviewed, and either an order will issue or a hearing will be set with the parties receiving notice via the Court's electronic filing system.

# EXHIBIT 4

JOHN SULLIVAN (CSB#204648)
17532 Miranda Street
Encino, CA 91316
Tel:818-769-7236
Email:Sullivan.John84@gmail.com
Attorney for Plaintiffs Arizona Yagé Assembly
and Winfield Scott Stanley III

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Yagé Assembly, Winfield Scott Stanley III, in his capacity as Founder and Director of Arizona Yagé Assembly,<br><br>Plaintiffs,<br><br>vs.<br><br>Merrick Garland, Attorney General of the United States; Anne Milgram, Administrator of the U.S. Drug Enforcement Administration; Alejandro Mayorkas, Secretary of the Dept. of Homeland Security; and Chris Magnus, Commissioner of U.S. Customs and Border Protection.<br><br>Defendants. | Case No.:20-CV-02373-PHX-ROS<br><br>FIFTH AMENDED COMPLAINT<br><br>1. RELIGIOUS FREEDOM RESTORATION ACT<br>[42 U.S.C. § 2000bb-1(c)]<br><br>2. DECLARATORY RELIEF<br>[28 U.S.C. § 2201 – 2202]<br><br>JURY DEMAND |

## EXHIBIT 4

**TABLE OF CONTENTS**

I.     JURISDICTION ....................................................................................... 3

II.    PARTIES .................................................................................................. 3

III.   NATURE OF THE CASE.......................................................................... 4

IV.   AYAHUASCA, AYA AND VISIONARY RELIGION............................ 5

V.    THE AGENCY DEFENDANTS' ENFORCEMENT ACTIONS HAVE
       BURDENED AYA'S RELIGIOUS FREE EXERCISE........................ 12

VI.   AYA HAS A CONCRETE PLAN TO CONTINUE POSSESSING AND
       IMPORTING AYAHUASCA FOR USE IN RELIGIOUS CEREMONIES ........ 20

FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS ..................................... 20

SECOND CLAIM FOR DECLARATORY RELIEF AGAINST ALL DEFENDANTS 25

PRAYER FOR RELIEF ............................................................................. 30

## EXHIBIT 4

For their complaint against defendants, plaintiffs allege:

## I.   JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 28 USC §§ 1331, because it is an action arising under the Constitution and federal statutes.

2.     This Court has authority pursuant to 28 U.S.C. §§ 2201-2202, to grant declaratory relief and to issue preliminary and permanent injunctions. The Court further has authority under 5 U.S.C. § 702 to compel agency action unlawfully withheld or unreasonably delayed, and to set aside an agency's acts or failures to act that are: contrary to constitutional right, privilege or immunity; in excess of statutory jurisdiction, authority or limitations; or, carried on without the procedure required by law.

3.     Venue is proper under 28 USC § 1391(e)(1)(c) against the defendants, all officers of agencies of the United States acting in their official capacities, because Plaintiff is an Arizona nonprofit corporation and because a substantial part of the events or omissions giving rise to the claim occurred in Arizona.

## II.   PARTIES

4.     The defendants identified in this paragraph are "the Agency Defendants." Defendant Merrick Garland, Attorney General of the United States, is named in his capacity as Chief Law Enforcement Officer of the United States, head of the Department of Justice ("DOJ"), and the ultimate head of the Drug Enforcement Agency ("DEA"). Defendant Anne Milgram is named in her official capacity as Administrator of the DEA. Defendant Alejandro Mayorkas is named in his official capacity as the Acting Secretary of the Department of Homeland Security ("DHS").  Defendant Chris Magnus is named in his official capacity as Acting Commissioner of Customs and Border Protection ("CBP"). Each of these agencies (separately and collectively, "the Agency Defendants"), enforces the CSA's proscriptions in various aspects of their operations, exerting legal authority over all movements of controlled substances, that thus affect the Free Exercise of plaintiffs.

## EXHIBIT 4

5.      Plaintiff Arizona Yagé Assembly ("AYA") is a church congregation organized as an Arizona nonprofit corporation alleging RFRA standing as a religious person.

6.      Plaintiff Winfield Scott Stanley III ("Stanley") is AYA's Founder and Director.

### III.     **NATURE OF THE CASE**

7.      This action is brought under 42 U.S.C. § 2000bb-1(c), the Religious Freedom Restoration Act ("RFRA") and the Declaratory Judgment Act 28 U.S.C. § 2201-2202.

8.      AYA is a religious institution and Visionary Church that seeks to provide its members with spiritual fellowship, healing practices, and communion ceremonies. During AYA's communion ceremonies, church members use Ayahuasca (also known as yagé), an herbal tea that contains a small amount of Dimethyltryptamine ("DMT"), as their religious sacrament.

9.      Drinking sacramental Ayahuasca is the central communion ceremony of AYA where congregants receive the transmission of wisdom and Divine Love that comes through sacramental use of Ayahuasca. Without Ayahuasca, AYA does not have a religious practice to share, and AYA congregants are unable to practice their religion.

10.     AYA and its members are substantially burdened by laws prohibiting importation, distribution, and possession of Ayahuasca. Because DMT is listed as a Schedule I controlled substance under the Controlled Substances Act (the "CSA"), and because the DEA and DHS interpret the law to enact a complete ban against the religious sacrament Ayahuasca, members are forced to choose between obedience to their religion and criminal sanction.

11.     Plaintiffs' injury arises from application of the CSA and the designation of DMT as a Schedule I substance.

EXHIBIT 4

12.     Plaintiffs seek a declaratory judgment that AYA's use, possession, or transportation of Ayahuasca for *bona fide* traditional ceremony purposes in connection with the practice of Visionary Religion is lawful.

13.     Plaintiffs seek a declaratory judgment that DEA and DHS's interpretation of the law to enact a complete ban against AYA's possession and transportation of their religious sacrament violates RFRA.

14.     Plaintiffs seek an Order under RFRA instructing the Agency Defendants to grant AYA a religious exemption under the Controlled Substances Act ("CSA") and requiring the Agency Defendants to engage with AYA and design reasonable restrictions to prevent diversion of Ayahuasca into illegal markets.

15.     AYA is not the first Visionary Church to seek and obtain the relief that AYA now requests in this Court.  Following the Supreme Court's decision in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 425 (2006), a Visionary Church called Uniao do Vegetal ("UDV") was granted a religious exemption under the CSA and is currently allowed to import Ayahuasca and practice its religion without the fear of criminal sanction.  Similarly, following a decision by the United States District Court for the District of Oregon, *Church of the Holy Light of the Queen [CHLQ] v. Mukasey*, 615 Supp.2d 1210, 1215 (D. Ore., 2006), a Visionary Church called Santo Daime was granted a religious exemption under the CSA and is currently allowed to import Ayahuasca and practice its religion without the fear of criminal sanction.

16.     AYA has filed this suit to protect the same Free Exercise rights that were recognized and protected in *O Centro* and *CHLQ*.  AYA seeks nothing more than the same reasonable accommodations from the Agency Defendants that are currently being granted to UDV and Santo Daime.

**IV.     AYAHUASCA, AYA AND VISIONARY RELIGION**

17.     AYA is a church that offers its congregation the experience of Visionary Communion in ceremonies where Mr. Stanley and trained AYA facilitators administer

## EXHIBIT 4

Ayahuasca, a pharmacologically-active communion sacrament, in a ceremonial setting, to a congregation that comes prepared with a religious mindset.

18.     The purpose of Visionary Communion is to bring the individual members of the congregation into communication with the Divine to receive healing and instruction.  The legitimacy of Ayahuasca as a religious sacrament when ceremonially administered in a religious setting, was established as the law of the land in *O Centro, supra*, 546 U.S. 418 (referring to Ayahuasca by the UDV term, "Hoasca,").

19.     Mr. Stanley organized AYA as a visionary church in 2015, after first being introduced to Ayahuasca in 2009. He studies the way of Visionary Communion under the tutelage of Eladio Melendez Garcia, a Peruvian Ayahuasquero who lives along a tributary of the Amazon and teaches a traditional shamanic practice of Visionary Communion.  In Peru, Mr. Garcia is able to practice his religion without fear of prosecution.  Mr. Stanley has led several trips into the Peruvian jungle for AYA facilitators and congregation members to practice Visionary Communion in the native environment.  In Peru, Ayahuasca is not legally restricted in any way, and practice can proceed without any fear of law enforcement interference.  AYA and Mr. Stanley have operated in the United States in good faith as church and minister in reliance upon the Supreme Court's seminal decision under RFRA in *O Centro, supra*, 546 U.S. 418, that affirmed the injunction issued by the District Court of the District of New Mexico, in favor of the *Unia do Vegetal* (the "UDV") visionary church.  The UDV injunction compelled the DEA to release a fifty-gallon drum of seized Ayahuasca to the UDV, to cease all threats of criminal enforcement against the church, and to establish the first successful system of lawfully-sanctioned Ayahuasca importation for religious use.  Implicit in these holdings is that the UDV's possession of Sacramental Ayahuasca was at no time a violation of the CSA, and at all times was lawful.  The implicit holding that sacramental use of Ayahuasca is not unlawful also appears in *CHLQ v. Mukasey, supra,* where the late Judge Owen Panner expressly held that the plaintiffs' continued importation and use of Ayahuasca in secrecy was evidence of religious sincerity, not criminality.  It is under the

EXHIBIT 4

shelter of these legal opinions, and with a sincere belief in the legitimacy of the claims asserted herein, that Plaintiffs share their religion in the broad light of day, declare their actions in this litigation, and thereby open themselves to the appropriate level of inquiry necessary for the Court to rule upon the sincerity of their religious faith on the path of Visionary Communion.

20.     As the minister and lead facilitator of AYA, Mr. Stanley devotes himself full time to assisting the AYA congregation to practice Visionary Communion, training AYA facilitators, and managing and funding projects, such as the recent erection of AYA's first permanent ceremonial maloka in the District of Arizona in addition to the creation of a nature conservancy in Peru for the preservation of Amazonian rainforest. Such ministerial duties are similar to those of many religious leaders, but Mr. Stanley has additional duties that most ministers do not.

21.     AYA and Mr. Stanley are agreed that it is the church's pastoral duty to prosecute this action against the Agency Defendants to defend the Free Exercise rights of AYA members for at least three reasons: (1) to obtain unimpeded access to Sacramental Ayahuasca for the congregation, (2) to free AYA members of the risk of investigation and the threat of prosecution, and (3) to protect AYA members from exposure to the threatening, coercive interrogation tactics of investigators employed by the Agency Defendants who have targeted AYA members after identifying them as practitioners of Visionary Communion, as alleged hereinbelow.

22.     The experience of Visionary Communion through Ayahuasca is the receipt of Divine Love and wisdom by the congregation, and thus involves the deepest level of free religious expression and understanding.  Mr. Stanley teaches the AYA congregation that the essential religious teaching "comes from the vine and the leaf," because Ayahuasca offered in ceremony is not merely a physical drink, but rather, the Sacrament that opens the heart to visions illuminated by inner light, that inspires one to understand and sing healing songs, and can in fact heal the whole human being, body, spirit, and

EXHIBIT 4

mind.  The individual members of the congregation are then able to expand this healing to our entire world.

23.     Physically, Ayahuasca is an herbal tea made of two herbs drunk as a ceremonial sacrament in religious ceremonies that arose among Amazonian tribes in Brazil, Peru, Ecuador, and other Latin American countries.  The controlling body of scientific evidence establishes that sacramental Ayahuasca is physically safe for persons who do not consume contraindicated foods or medications prior to ceremony.  An abundance of peer reviewed studies establish regular ceremonial Ayahuasca use reduces and often entirely eliminates substance addictions to alcohol, opiates, and cocaine. This feature of the Ayahuasca religion was one of the features that persuaded the government of Brazil to reverse its scheduling of Ayahuasca as a controlled substance, and has contributed to the religion's popularity in that country.  Ayahuasca is not habit-forming or addictive, and is not listed as a drug of abuse in the DEA Resource Guide, *Drugs of Abuse*.

24.     However, Ayahuasca contains a small amount of DMT, so the DEA and DHS absolutely prohibit its importation, manufacturing, and possession imposed by the CSA and related CFRs.  While the DEA has an undoubted bias towards issuing no exemptions via administrative process, when judicial exemptions have been issued, the DEA has implemented less restrictive options twice pursuant to post-injunction negotiations, first with the UDV after the *O Centro* decision, and second with the Santo Daime, after the *CHLQ v. Mukasey* decision.  These systems have well worked for years, with the churches importing known amounts under governmental authorization, and recording amounts consumed for later comparison, to eliminate the risk of diversion into an illicit market.  Neither church has reported any difficulties, nor has the DEA. Likewise, AYA is ready, willing and able to import and dispense under a reasonable exemption regime.

25.     AYA obtains Sacramental Ayahuasca from Peru from trusted sources that harvest the yage vine and DMT-containing herbs in a respectful, traditional manner,

EXHIBIT 4

brewing the tea with awareness that it will be used in Visionary Communion. Those who prepare the sacramental Ayahuasca used by AYA have not industrialized the process in an effort to maximize production.  Such an attitude would be antithetical to the very reason for brewing Ayahuasca, which is to bring healing and wisdom to those who imbibe the sacred tea.  Ayahuasca is traditionally prepared in an atmosphere of sacramental respect for the spirits that animate the plants and transmit blessings to those who drink the tea.  Ayahuasca Sacrament does degrade over time, and occasionally, must be discarded, as it will have no efficacy.  In that event, practitioners of Visionary Communion dispose of the liquid in a respectful manner, by pouring it into the earth from which it came, with consciousness that the substance is not simply garbage or refuse.

26.     Describing the practices of a Brazilian church that sued the Government under RFRA in the District of Oregon, the late Judge Owen Panner wrote: "The Santo Daime church brews Daime tea in Brazil during an elaborate religious ritual. Men gather the woody B. caapi vine and pound it for hours with mallets, while women collect and clean the P. viridis leaves. The shredded vine is boiled for many hours, constantly tended. P. viridis leaves are not added until boiling is nearly complete because the DMT dissolves rapidly." *Church of the Holy Light of the Queen v. Mukasey*, 615 F.Supp.2d 1210, 1215 (2006) (vacated on other grounds).

27.     Ayahuasca, referred to as "Hoasca" in *O Centro*, was purposely created by Amazonian natives for spiritual purposes. The two herbs that are boiled together to create Ayahuasca have a joint effect on the human metabolism that neither herb alone will produce.  DMT, the controlled substance that subjects Ayahuasca to the prohibitory sanctions of the CSA, ordinarily produces no effect when consumed by mouth.  DMT as a drug of abuse is smoked to create a sudden, overpowering hallucinogenic experience that fades in minutes.  The Ayahuasca recipe, however, makes DMT orally active by brewing leaves from DMT-containing plants jointly with slices of *Banisteropsis Caapi*, the "yagé" vine.  Yagé is rich in beta-carbolenes, chemicals that are not controlled substances and possess therapeutic qualities and sensitize the human metabolism so that a

## EXHIBIT 4

small amount of DMT, taken in a sacramental environment with persons of positive

intent, becomes activated, and along with the yagé vine, that has its own divine character,

generates a spiritually uplifting experience of approximately four hours.

28.    The similarities between Ayahuasca and peyote are significant, and indicate

that a like manner of relaxed regulation would be indicated under RFRA's least-

restrictive means test.  Like peyote, Ayahuasca has a long history of sacramental use by

native peoples, and like those who eat peyote, virtually all persons who drink Ayahuasca

drink it at a religious ceremony.  Like peyote, Ayahuasca has an unpleasant taste and

emetic qualities that render ingestion physically uncomfortable, and discourages

recreational users.  Like peyote, Ayahuasca's emetic effects are concurrent with purging

forces that obscure the sacramental communion experience.  Like peyote, Ayahuasca

induces introspective states of awareness that facilitate reflection and contemplation,

rather than inducing the stimulation and euphoria sought by social and recreational drug

users.  Just as peyote lies at the "theological heart" of the Native American Church,

Ayahuasca lies at the theological heart of the Visionary Church.  Thus, like peyote,

Ayahuasca is not a drug of abuse, and the courts have recognized that it tends not to be

diverted into the illicit market.  "As courts have repeatedly emphasized, cannabis differs

critically from peyote and hoasca precisely because there is a thriving market for diverted

cannabis, whereas there is no comparable demand for recreational peyote and hoasca."

*United States v. Christie*, 825 F.3d 1048, 1060-1061 (2016), *citing O Centro Espirita*

*Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1020 (10th Cir. 2004) (en

banc) (McConnell, J., concurring).

29.    Ayahuasca is almost exclusively consumed in religious ceremonies;

accordingly, visionary churches whose sacrament is Ayahuasca are using a sacrament

that in itself affirms their claim of religious sincerity.  The very activity of drinking

Ayahuasca confirms their religious intent, because it is a demanding visionary experience

that delivers rewards commensurate with sincerity.  Further, visionary churches

emphasize the importance of preparation as part of sincere intention in approaching the

## EXHIBIT 4

use of the sacrament, since an initially casual mindset often leads to hard lessons that appear necessary to ripen the practitioner's sincerity.   Thus, the very use of Ayahuasca in a sacramental setting provides a warrant of sincerity; accordingly, the sincerity of the faith of visionary churches should be taken at face value, and in the absence of evidence that their faith is feigned, they should be able to obtain an exemption from general law for the Free Exercise purpose of dispensing Ayahuasca as the communion sacrament in visionary churches, without being subject to a searching inquiry by any administrative agency or judicial officer.

30.     The demographics and religious attitudes of AYA's congregation are indicative of the sincerity of its membership.  Seventy-one percent are over 30, and forty-six percent are over the age of 40.  Ninety-six percent pray or meditate, and the same percentage state that their only use of Ayahuasca has been as a religious or spiritual practice.  Ninety-eight percent consider participation in AYA ceremonies as beneficial to their spiritual growth.  Sixty-four percent connect with other church members between ceremonies.  Ninety-four percent see themselves returning to future ceremonies.  These statistics are drawn from a statistically significant sampling of responses to a questionnaire sent to all AYA members by AYA in 2018.

31.     AYA ceremonies are conducted by trained facilitators who apply AYA's Ceremonial Instructions, following best practices for conducting Visionary Communion ceremonies.  Ninety-eight percent of AYA members reported that ceremony facilitators capably perform their ceremonial duties, and the same percentage said they felt physically and emotionally safe throughout the ceremony.

32.     AYA ceremonies are traditionally conducted after nightfall, and continue until dawn, in a "maloka," a circular structure that, in the Amazonian jungle, is built of natural wood and palm leaf roofing.  AYA's maloka in the Arizona desert is built of more conventional materials better suited to the Sonoran desert, while preserving the tradition circular space for the ceremonial setting.

EXHIBIT 4

33.     The congregation prepares for the experience with set dietary restrictions the week before the ceremony.  Ceremonies begin in the evening, and all members of the congregation commit to remain for the entire ceremony.  All are provided comfortable places to sit and recline in the maloka, where their needs will be cared for by facilitators trained in helping others during the experience of Visionary Communion.

34.     After the members have gathered quietly and focused their attention, the lead facilitator performs an invocation and rings a ceremonial bell.  Then he or she offers each person a first cup of Ayahuasca.  After this first offering of Ayahuasca, at intervals, the lead facilitator may make additional offerings of Sacramental Ayahuasca, sensitively monitoring what is offered to each congregant, so that they drink only so much of the sacrament as is necessary for them to receive a meaningful experience of communion.

35.     During ceremonies, many members experience deep religious sentiments directly connected with their own life experience, reviewing incidents from their past, recognizing their errors and those of others, purging their own guilt and forgiving others their wrongs, receiving mercy and forgiveness from the divine source, and experiencing the restful peace of Divine Love.  The ceremony concludes slowly, as the visionary experience subsides over the course of the night.  Facilitators attend to the condition of each congregant, and appropriate action is taken for their physical and psychological well-being.

36.     The experience of visionary communion is profound and uniquely personal. For many AYA members, communion through Ayahuasca has proven pivotal to their spiritual growth and ethical development, helping them reconnect with their innate religious feeling, and learn how to express it in positive action.

## V.     THE AGENCY DEFENDANTS' ENFORCEMENT ACTIONS HAVE BURDENED AYA'S RELIGIOUS FREE EXERCISE

37.     Plaintiffs face the classic Catch-22 dilemma that RFRA was meant to remediate: exercise their religion or face the threat of civil or criminal sanction.

# EXHIBIT 4

38.     Some who wish to join AYA in ceremony will not do so because of the threat of arrest.  This group includes many whose positions require licensed credentials, security background checks, and other scrutiny of their background that make the revelation of AYA ceremony attendance an embarrassment, or a potential target for law enforcement.  But it also includes people who have a strong sense of avoiding any ambiguity in their legal conduct, and simply will not enter into situations where their legal safety is not assured.

39.     Plaintiffs are burdened by the Government's failure to provide a RFRA exemption under the CSA's implementing regulations to allow for Free Exercise.

40.     The CSA has been enforced against AYA and Mr. Stanley on several occasions by the seizure of Sacramental Ayahuasca during importation.  These seizures continued despite specific request from AYA to the DOJ to cease the seizures and return all seized Sacramental Ayahuasca.

41.     On April 22, 2020, AYA was notified that its property, a container of Ayahuasca ordered for the use of AYA, had been seized by DHS during the customs process.  DHS notified AYA's designated addressee of the seizure of AYA's property by sending a notice in the empty box from which the Ayahuasca had been removed.  DHS sent the empty box to AYA's designated agent at their mailing address in the State of California, in lieu of an international parcel, stating:

<u>NOTICE</u>

NARCOTICS AND/OR OTHER CONTRABAND PROHIBITED FROM ENTRY INTO THE UNITED STATES HAVE BEEN SEIZED AND REMOVED FOR APPROPRIATE ACTION UNDER 19CFR145.59. YOU WILL BE RECEIVING CORRESPONDENCE FROM OUR FINES, PENALTIES AND FORFEITURES BRANCH IN THE NEAR FUTURE.

42.     On October 21, 2020, a shipment of Sacramental Ayahuasca from Peru, Serpost tracking number EE011369264PE, addressed to AYA and Scott Stanley, was intercepted in transit by the Department of Homeland Security in Los Angeles, and has never been received.  After this interception of AYA's Sacramental Ayahusaca, plaintiffs

# EXHIBIT 4

notified counsel for the Agency Defendants in this action that they objected to the interception, and requested release of this property, which the Agency Defendants refused, stating that DHS had regulatory authority to seize, forfeit and destroy Sacramental Ayahuasca destined for AYA.

43.      In a letter addressed to DOJ Attorney Kevin Hancock dated October 23, 2020, an AYA representative provided U.S. Postal Service tracking numbers identifying packages of religious sacrament ordered by AYA and asked that the packages be returned to AYA.  In a reply dated November 18, 2020, DOJ attorney Kevin Hancock replied: "I can confirm that CBP is processing one or more packages associated with the U.S. Postal Service tracking numbers provided with your letters, and that CBP's processing is not yet complete.  Assuming *arguendo* that the package(s) being processed were addressed to AYA and in fact contain Ayahuasca, as you claim, your letter identifies no valid reason why CBP could not lawfully inspect and seize such package(s), and thus there is no legal basis for your demand that CBP release them."  Mr. Hancock's response noted that all Ayahuasca is subject to seizure and destruction, and there is no pre or post-deprivation hearing available to prevent all AYA imported Ayahuasca being seized and destroyed, which was the intention of DHS, as alleged hereinbelow.

44.      Mr. Hancock's promise has been honored by DHS, that has continued to seize AYA's Sacramental Ayahuasca shipments.

45.      During November, 2020, a third shipment of Sacramental Ayahuasca from Peru, Serpost tracking number EE011368873PE, addressed to AYA and Scott Stanley, was seized by DHS.

46.      On December 31, 2020, a fourth shipment of Sacramental Ayahuasca from Peru, Serpost tracking number EE011186439PE, addressed to AYA and Scott Stanley, was seized by DHS.

47.      These seizures prevent AYA from engaging in Free Exercise, and from sharing the Ayahuasca Sacrament with its congregation.  Without access to the

## EXHIBIT 4

Ayahuasca seized by the Defendants, AYA does not have a sacrament to share, and AYA congregants are unable to practice their religion.

48.    Because the DHS seizures of AYA's Sacramental Ayahuasca are certain to continue, continued importation efforts will result only in financial loss and the disrespectful profanation of AYA's religious sacrament by DHS agents who risk no liability for their acts of destruction, and will continue to act in a disrespectful, unlawful manner by seizing and destroying Ayahuasca Sacrament that they discover in the course of performing their customs duties.  During the pendency of this litigation, DHS has intensified its surveillance of packages from Peru, from whence all AYA sacrament is shipped, and uses advanced technology to obtain instantaneous sampling of suspected liquid contraband; accordingly, successfully evading this importation obstacle is not effectively impossible.  Wherefore, AYA and Mr. Stanley have no remedy at law for the destruction of their religious property, the financial damages caused thereby, and the substantial burden on Free Exercise resulting DHS seizures, for which they have no remedy at law, and pray for injunctive relief to prevent the continuation of these injuries.

49.    Plaintiffs also seek injunctive relief for the DEA's failure to provide AYA and Mr. Stanley, and all visionary churches with an exemption under 21 CFR 1312.11, such as is granted to police officers, pharmaceutical manufacturers, and the employees of physicians, which would allow AYA and Mr. Stanely to import Sacramental Ayahuasca.  Without an exemption under 21 CFR 1312.11, RFRA Plaintiffs will suffer repeated seizure of its sacrament by the DHS, administrative sanctions, and referral of the matter to the DEA for prosecution for violation of 21 U.S.C. § 952(a).  The failure to provide an exemption for visionary churches violates equal protection under the Fourteenth Amendment, and is actionable under RFRA.  For the refusal to provide such an exemption, Plaintiffs have no remedy at law, and accordingly pray for injunctive relief to compel the DEA to issue AYA and Mr. Stanley the needed exemptions to allow them to import Sacramental Ayahuasca.

## EXHIBIT 4

50.     DHS provides no post-seizure procedure for recovery of seized Ayahuasca Sacrament. AYA has requested that seized Ayahuasca Sacrament be released to its custody, as the Agency Defendants have full knowledge via AYA's Motion for Preliminary Injunction that AYA's Ayahuasca use is entirely sacramental in character, and DHS is a subordinate agency of the Agency Defendants whose conduct should conform to a single, lawful standard in compliance with RFRA.

51.     Each seizure imposes a financial loss on AYA's congregation, and interrupts Free Exercise in much the same way as Catholic Mass would be interrupted by a ban on the distribution of communion hosts, or the seizure of Passover wine would interrupt the Seder.  Beyond the financial loss, DHS deals a severe insult to Plaintiffs by refusing to recognize the sacred nature of their Ayahuasca Sacrament, and profaning it by seizing it without respect for its symbolic meaning to Plaintiffs, and destroying it like poisonous refuse.

52.     When AYA is unable to hold ceremonies because its Ayahuasca was seized and destroyed by DHS and/or CBP, AYA's Free Exercise is substantially burdened.

53.     AYA members cannot freely practice their religion without a clear and present danger that: (1) AYA and its members may be arrested for violations of the CSA, (2) warrants could be issued for the arrest of AYA members, and (3) warrants may be issued allowing the search of AYA properties or that of their members.

54.     Under the current regulatory scheme, Plaintiffs are forced to practice their religion in the shadows and "underground," which deters many religious persons desirous of practicing Visionary Communion from joining AYA and Mr. Stanley in ceremony, thus imposing a substantial burden on Plaintiffs' Free Exercise and Freedom of Assembly by labeling and stigmatizing their religious beliefs and practices, falsely characterizing their religious gatherings as mere occasions for the distribution of a controlled substances.

55.     AYA has been severely burdened by the heavily armed police raid and subsequent prosecution and incarceration of a Visionary Church practitioner named Clay

EXHIBIT 4

Villanueva. Based on Mr. Villanueva's experience, AYA members reasonably believe that DEA will investigate and/or arrest them for freely exercising their religion.

56.     The case of Clay Villanueva, who was arrested in August 2021 at LAX on an Arizona felony warrant, has served as a lesson for AYA about how law enforcement can ruin the life of a sincere practitioner of visionary religion.

57.     The joint federal/state task force raid on Mr. Villanueva's home and his subsequent prosecution has chilled AYA's Free Exercise, and chilled the Free Exercise of Mr. Stanley in his capacity as the minister of AYA.

58.     As a result of law enforcement actions against Mr. Villanueva, the Vine of Light Church was forced to close down and cease all religious events because the DEA arrested its leader and seized all of its religious sacrament. The closure of the Vine of Light Church highlighted the risk to AYA and its members and has chilled the Free Exercise of Mr. Stanley and AYA.

59.     Making the life of visionary church members even more difficult, in addition to seizing all the Ayahuasca it can find, DHS has begun seizing innocuous plants and substances during importation, and launching investigations of individuals based on their mistaken conflation of visionary religion with drug use. This stigmatization of visionary religion practitioners based on their claimed online purchasing habits is injurious to AYA because it associates its Free Exercise activity with dangerous consequences and unnecessary and perilous interactions with federal law enforcement.

60.     One AYA member was subjected to custodial interrogation by a joint state-federal task force after DHS Agent Smyrnos showed up at her home with a local law enforcement phalanx of large SUVs that flooded the neighborhood, idling menacingly while Agent Smyrnos and his state law partner administered Miranda rights warnings, and interrogated her in her own living room for an hour and half. All this was done under the observant eyes of the AYA member's young daughter, who occasionally commented on aspects of the coercive atmosphere. During this custodial interrogation under duress, the AYA member was coerced to disclose the identity of another AYA member. When

## EXHIBIT 4

Agent Smyrnos and his state law partner were done interrogating, they jointly told the AYA member that it was her duty to inform on others whom "she knew were doing illegal things." She was then specifically told that she herself could be prosecuted if she did not inform on her co-religionists. To do this informing, Agent Smyrnos left the AYA member with his card. By his above-alleged conduct, DHS Agent Smyrnos attempted to corrupt the honesty of an AYA member with false statements about the purported unlawfulness of her conduct. Since this interaction, the AYA member interrogated by Agent Smyrnos has ceased attending ceremonies, apparently deterred by the hair-raising interaction, that created a stir in the neighborhood, in addition to the invasion of her own life. AYA has and asserts associational standing to seek a remedy for the constitutional injuries suffered by the said AYA member, so that other AYA members will not be similarly imperiled in their privacy and personal security. AYA further alleges that the revelation of this individual's identity in this litigation by DHS or Agent Smyrnos or any of the Agency Defendants would impose a substantial burden upon her rights of Free Exercise, and would injure AYA and Mr. Stanley by deterring other AYA members faced with similar investigative tactics aimed at substantially burdening Free Exercise from reporting their encounters to AYA and this Court.

61.     After disrupting the first AYA member's life, Agent Smyrnos began placing calls to the AYA member he had identified in the interrogation of the first member. He left the second AYA member a voicemail requesting a return call.

62.     AYA's counsel returned the call on behalf of the second AYA member, sent a notice of representation via email explaining the AYA member's church affiliation, and offered to answer whatever questions Agent Smyrnos might have to ask of the second AYA member. Instead of asking questions, however, Agent Smyrnos asked AYA counsel to tell the AYA members that their importation of a particular plant was a crime under the CSA for which they could face prosecution. Accordingly, AYA counsel's researched into the scheduling status of the plant, and provided Agent Smyrnos with all three scheduling lists to show that the plant was not a controlled substance in any class.

## EXHIBIT 4

AYA's counsel then asked Agent Smyrnos via email on what authority he was making the erroneous assertion about risks of federal prosecution from importing this perfectly legal plant. To this email, Agent Smyrnos did not respond. Thus, Agent Smyrnos falsely threatened an AYA member with felony drug prosecution to intimidate her into acting as an informant against other AYA members. Further, since Agent Smyrnos has never admitted that he was making a false threat of prosecution, he and DHS continue to seize plants and substances that are in no way contraband, merely because they are associated with the practice of visionary religion.

63. Due to encounters such as these, and the fear of having them, many AYA members censor their own speech about their religious beliefs and practices when speaking with some or all of their friends, family, employers, and coworkers. Sixty-nine percent of AYA members are hesitant to tell others about their positive experiences because of questions surrounding the legality of this form of Free Exercise. Fifty-three point nine percent are hesitant to tell family, close friends or associates about Ayahuasca for the same reason.

64. Plaintiffs' ability to share Ayahuasca with AYA members is substantially burdened by the prohibitions on importing, manufacturing, or dispensing a controlled substance in § 841(a) (2), by the prohibition on importation in § 952(a) of the CSA, and by 21 CFR 1312.11.

65. Plaintiffs' freedom of assembly is substantially burdened by the DEA's mistaken contention that their ceremonial gatherings to practice Visionary Communion are not genuine, and is merely the profane distribution of a controlled substance.

66. Many more persons would join AYA and participate in the Visionary Communion ceremony, and will do so when AYA obtains a judicial certificate of exemption that confirms that AYA's practice of Visionary Religion is Free Exercise, and not crime.

67. The DEA purports to provide an avenue for religious groups like AYA to apply for exemptions from the CSA.

EXHIBIT 4

68.     DEA has published a document called "*Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act.*"  *Id.*  The Guidance imposes substantial burdens on Plaintiffs, such as requiring applicants to disclose inculpatory information and incur significant financial costs before filing a petition.  Despite imposing these substantial burdens, the Guidance is a sham.  DEA has never granted an exemption under the Guidance.

**VI.     AYA HAS A CONCRETE PLAN TO CONTINUE POSSESSING AND IMPORTING AYAHUASCA FOR USE IN RELIGIOUS CEREMONIES**

69.     AYA recently completed construction on its own ceremonial maloka which is located in Arizona.  On January 14, 2022, AYA held its first ceremony at its new ceremonial maloka.

70.     AYA currently holds bi-monthly Ayahuasca ceremonies in the District of Arizona at its maloka.

71.     AYA plans to continue to hold bi-monthly meetings at its maloka in the District of Arizona for the foreseeable future.

72.     AYA plans to serve Ayahuasca to its congregation who are gathering in religious Visionary Communion in its maloka.

73.     AYA plans to continue importing sacramental Ayahuasca from Peru through common carriers for use in AYA's religious ceremonies to be held at its maloka in Arizona on a bi-monthly basis.

**FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**

**Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(c)**

74.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

75.     As practiced by Mr. Stanley and AYA, Visionary Communion is the central ceremony of AYA, during which members can receive the transmission of wisdom and Divine Love that comes through sacramental use of Ayahuasca.  Ayahuasca is a non-addictive substance that has been shown to have beneficial effects on those who use it in

EXHIBIT 4

religious ceremonies.  AYA and Mr. Stanley require Ayahuasca to perform the ceremony of Visionary Communion; otherwise, AYA members cannot practice Visionary Communion.

76.     The Plaintiffs' belief that Ayahuasca Communion gives access to direct communication with Divine Love is a legitimate doctrine that addresses central issues of human ethical and philosophical concern at the deepest level, and is thus a religious faith entitled to equal treatment before the law.

77.     Plaintiffs' belief that Ayahuasca Communion gives access to direct communication with Divine Love is sincere.  That sincerity is reflected in the loving care provided to the congregation during ceremony, that reflects the extensive preparation, training, and experience that allows AYA to conduct Visionary Communion ceremonies year after year with results most satisfactory to the congregation, as has been alleged hereinabove.

78.     Plaintiffs offer Visionary Communion only to sincere religious persons with a reverent mindset, who have been screened for contraindicated medical conditions and perform all other requirements, including from specific foods and all psychoactive substances.

79.     The setting of AYA ceremonies evokes religious sentiment in a traditional Amazonian style, during which all gather in a circular space, prayers are made to bless the place and all participants, Ayahuasca is respectfully shared by the lead facilitator, sacred tobacco (mapacho) is offered, sacred songs (icaros) are sung, and the congregation is assisted individually and as a group to see, hear, receive and understand the message of Divine Love.

80.     Plaintiffs are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA, that impose criminal penalties for violations.

81.     The effect of the said provisions of the CSA is to coerce AYA and Mr. Stanley to act contrary to their religious beliefs by the threat of criminal sanctions.  The

## EXHIBIT 4

potential for prosecution under the CSA places substantial pressure on AYA, its Founder, and the congregation to modify their behavior and violate their beliefs, forcing them to choose between either abandoning religious principle or risking criminal prosecution.

82.     Plaintiffs' Free Exercise is substantially burdened by the DEA and DHS application of the CSA and related enforcement statutes and regulations as an absolute bar upon the importation of Ayahuasca by AYA and Mr. Stanley, justifying its seizure and destruction without prior notice to Plaintiffs as importers of Ayahuasca for sacramental use, and without any means of pre- or post-seizure due process to prevent the seizure and destruction of Sacraments that are necessary to Visionary Religion Free Exercise.

83.     Plaintiffs' Free Exercise is substantially burdened by DHS seizure of Sacramental Ayahuasca, first because it interrupts Free Exercise in the same manner as the seizure of their Communion Host would interrupt Free Exercise of a Catholic congregation that practices the Mass, in which the receipt of Communion is transmuted into the Body of Christ.  The Ayahuasca Sacrament is likewise transformed from a simple plant substance to a communion sacrament that AYA and Mr. Stanley sincerely believe brings them into the very presence of the Divine.

84.     Plaintiffs' Free Exercise is substantially burdened by the seizure of the Ayahuasca Sacrament imported by AYA and Mr. Stanley.

85.     Plaintiffs' Free Exercise is burdened when they are placed under investigation by law enforcement because of their religious activity.

86.     By prohibiting their central act of Free Exercise, the CSA's criminal prohibitions impose a severe and substantial burden upon AYA's Free Exercise of religion, and that of its members.  AYA's commercial relationships and ability to contract freely are impaired by the shadow of illegality that falls over the church.  Members of AYA's congregation find themselves at a disadvantage when their credibility and law-abidingness is scrutinized, *i.e.*, when job-seeking, when testifying, as party to a lawsuit, when applying for a passport or visa, license, permit, or in countless other situations.

Case 2:20-cv-02373-ROS   Document 159   Filed 05/15/22   Page 23 of 32

# EXHIBIT 4

87.     RFRA Plaintiffs and their members are aggrieved by this situation, that forces them to procure, share and celebrate their communion sacrament secretly, and to risk the loss of liberty and bear an unmerited stain of criminality, in order to engage in the Free Exercise of religion protected by the First Amendment.

88.     Agency Defendants are required to utilize the least restrictive means to accomplish its legitimate interests by granting RFRA Plaintiffs appropriate exemptions from the criminal prohibitions of the CSA on importation, distribution and dispensing of Ayahuasca.  Importation of Ayahuasca requires an Importation Permit issued under 21 CFR 1312.12, a regulatory service available only to DEA registrants who have been assigned a DEA number for use in submitting applications for permits.  Each of the RFRA Plaintiffs needs to be assigned a DEA number to obtain regulatory services necessary to supply sacramental Ayahuasca to its congregation.

89.     Application of § 841(a)(2) and §952(a) of the CSA and related federal regulations to RFRA Plaintiffs is not the least restrictive means for the Agency Defendants to accomplish its interests in preventing the illicit distribution of controlled substances.

90.     RFRA Plaintiffs are entitled to a decree establishing its right to exemptions from the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA.  RFRA Plaintiffs are further entitled to register with the DEA as exempt persons under 21 CFR 1312.11, and to receive all further administrative clearances necessary to eliminate substantial burdens on RFRA Plaintiffs' Free Exercise rights.

91.     If defendants are not enjoined, plaintiffs will suffer irreparable harm for which they have no remedy at law.  The requested injunction will serve the public interest in protecting Free Exercise from prior restraint and *post-hoc* detention, prosecution, and punishment.

92.     Plaintiffs have been damaged by the unconstitutional Policy that has presented the Guidance as a genuine path to regulatory services from the DEA, when in

23

## EXHIBIT 4

truth it is merely a blind alley intended to induce visionary churches to misdirect their efforts.

93.     RFRA Plaintiffs, and their congregations and member churches, are substantially burdened by the DEA's use of the Guidance to issue *de facto* demands for disclosure of information that is protected from compelled disclosure by the Fifth Amendment privilege against self-incrimination, and by the First Amendment Establishment Clause prohibition on the Agency Defendants regulatory entanglement in a religion's internal affairs.

94.     There exists a clear and present danger: (1) that AYA and its members may be unlawfully arrested for acts of Free Exercise misconstrued by the Agency Defendants, and DEA in particular, as violations of the CSA, (2) that warrants could be issued for the arrest of Mr. Stanley and AYA members without probable cause, solely for engaging in Free Exercise that is not a crime, and the performance of which cannot give rise to probable cause to believe a crime has been committed, (3) that warrants may be issued allowing the search of Mr. Stanley's property and AYA property without probable cause, , to search for Ayahuasca Sacrament, which it is not a crime to possess for religious purposes, and (4) that AYA's sacramental Ayahuasca will be seized during the importation, manufacturing, or dispensing process, even though it is not a CSA violation for AYA to import Ayahuasca as an act of Free Exercise, and (5) that AYA members may be placed under investigation for criminal activity without reasonable suspicion, due to the refusal of the Agency Defendants to admit that AYA is engaged in Free Exercise when it imports and offers Sacramental Ayahuasca in ceremony with religious purpose.

95.     AYA and its members are aggrieved by this situation, that forces them to procure, share and celebrate their communion sacrament secretly, and to risk the loss of liberty and the personal anguish and humiliation of bearing an unmerited stain of criminality, in order to engage in the Free Exercise of religion protected by the First Amendment.

EXHIBIT 4

96.     The Agency Defendants have no compelling interest in prohibiting AYA from using Ayahuasca as a religious sacrament.

97.     Agency Defendants are required to utilize the least restrictive means to accomplish its legitimate interests by granting AYA an exemption from the criminal prohibitions of the CSA on importation, distribution and dispensing of Ayahuasca. Importation of Ayahuasca requires an Importation Permit issued under 21 CFR 1312.12, a regulatory service available only to DEA registrants who have been assigned a DEA number for use in submitting applications for permits.  AYA and Mr. Stanley need to be assigned DEA numbers to obtain regulatory services necessary to supply sacramental Ayahuasca to its congregation.

98.     Application of § 841(a)(2) and §952(a) of the CSA and related federal regulations to AYA is not the least restrictive means for the Agency Defendants to accomplish its interests in preventing the illicit distribution of controlled substances.

99.     AYA is entitled to a decree establishing its right to exemptions from the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA.  AYA is further entitled to register with the DEA as an exempt person under 21 CFR 1312.11, and to receive all further administrative clearances necessary to eliminate substantial burdens on AYA's Free Exercise rights.

## SECOND CLAIM FOR DECLARATORY RELIEF AGAINST ALL DEFENDANTS

### Declaratory Relief, 28 U.S.C. §§ 2201 – 2202

100.    An actual controversy exists between the plaintiffs and the Agency Defendants.  AYA and Mr. Stanley are interested parties to this controversy, and seek a declaration of their respective rights and relations with the Agency Defendants, as further alleged herein below.

# EXHIBIT 4

101.    Plaintiffs seek a declaration that DEA and DHS's enforcement of the CSA against AYA in a manner that chills their bona fide religious practice violates their constitutional rights to free exercise.  Plaintiffs contend that:

a.    AYA is a religious institution and Visionary Church that seeks to provide its members with spiritual fellowship, healing practices, and communion ceremonies.

b.    Mr. Stanley is a religious person within the meaning of RFRA;

c.    AYA is a religious person within the meaning of RFRA, endowed with the right of self-determination sincerely professing a doctrine of visionary religion whose central practice is communion with Divine Love through drinking sacramental Ayahuasca in sacred ceremony;

d.    Mr. Stanley is the founder of AYA, its minister and chief facilitator in the conduct of AYA religious ceremonies, that are described as "Visionary Communion;"

e.    Plaintiffs' religious sincere belief in the religious character of Visionary Communion has been established by Mr. Stanley's credible and corroborated statements that establish his sincere religious intent and the conduct of his AYA ministry consistent therewith;

f.    During AYA's Visionary Communion ceremonies, church members use Ayahuasca (also known as yagé), an herbal tea, as their religious sacrament;

g.    The CSA has been enforced against AYA and Mr. Stanley on several occasions by the seizure of Sacramental Ayahuasca during importation that continued despite specific request from AYA to the DOJ to cease the seizures and return all seized Sacramental Ayahuasca;

h.    Ayahuasca was designed for religious purposes, is not addictive, nor is it a drug of abuse;

i.    Ayahuasca is not subject to the risks of diversion applicable to other substances regulated by the CSA;

### EXHIBIT 4

j.      Ayahuasca contains a small amount of DMT, a Schedule I controlled substance under the CSA;

k.      Plaintiffs sincerely believe that the experience of Visionary Communion is the receipt of Divine Love and wisdom by the congregation;

l.      The validity of Plaintiffs' religious belief in Visionary Communion is not subject to scrutiny by the Agency Defendants or this Court;

m.      DEA and DHS have interpreted the CSA to enact a complete ban against the religious sacrament Ayahuasca;

n.      The DEA and DHS apply that complete ban to AYA and Mr. Stanley;

o.      The DEA denies that Plaintiffs' Visionary Communion ceremonies are lawful Free Exercise, and contends their conduct violates the CSA;

p.      Plaintiffs' injury arises from application of the CSA and the designation of DMT as a Schedule I substance;

q.      The Ayahuasca seized by DHS as alleged hereinabove was the lawful property of AYA, imported as an act of Free Exercise, which was not subject to seizure;

r.      Plaintiffs have suffered pecuniary injury due to the DHS four seizures, for which there is no remedy at law, because Sacramental Ayahuasca is costly to import, no claim for damages will lie against DHS or individual DHS agents, and DHS provides no post-deprivation remedy for the seizures;

s.      DHS seizures of Sacramental Ayahuasca are a prelude to further investigation;

t.      It would be futile and an invitation to investigation and prosecution by DHS and the DEA for Plaintiffs to repeat their efforts at importing Sacramental Ayahuasca;

u.      DHS Agent Smyrnos investigated at least two AYA members for importing controlled substances, and sought to turn one of those members into a DHS informant against other AYA members;

v.      Some persons for whom professional licensure and exposure to security background checks make attendance at AYA ceremony attendance dangerous to their

## EXHIBIT 4

employment, do not attend ceremony despite their desire to engage in this religious practice;

w.      The Agency Defendants have a compelling interest in respecting and protecting the religious freedom of all people within their jurisdiction;

x.      The Agency Defendants' current manner of application of the CSA to Plaintiffs imposes substantial burdens upon Plaintiffs' Free Exercise;

y.      To practice their religion, Plaintiffs are forced to choose between obedience to their religion and exposing themselves to the risk of criminal sanction;

z.      Plaintiffs' importation, possession and sharing of Ayahuasca in Visionary Communion is lawful *ab initio*;

aa.     Plaintiffs' importation, possession and sharing of Ayahuasca in Visionary Communion are not criminal acts, but rather, protected Free Exercise;

bb.     The disclosure of the identity of those two AYA members that were investigated by Agent Smyrnos would impose a substantial burden upon the Free Exercise of AYA and Mr. Stanley;

cc.     The destruction of AYA's Sacramental Ayahuasca injures AYA's rights of Free Exercise by: (a) knowingly profaning their sacrament by disrespectfully destroying it, and (b) forcing AYA and Mr. Stanley to remain silent while their communion sacrament is treated like poisonous refuse;

dd.     AYA's rights of religious Free Exercise, and those of Mr. Stanley, are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), by the prohibition on importation in § 952(a) of the CSA, and by the Agency Defendants' application of those absolute prohibitions to the Plaintiffs;

ee.     The CSA's absolute prohibition on Mr. Stanley's and AYA's importation and offering of Ayahuasca to its congregation in ceremony is not the least restrictive means of preventing diversion of Ayahuasca to the illicit market.

## EXHIBIT 4

ff.   The disclosure of the identity of those two AYA members that were investigated by Agent Smyrnos would impose a substantial burden upon the Free Exercise of AYA and Mr. Stanley;

gg.   DHS seizures of Plaintiffs' Sacramental Ayahuasca are substantially certain to continue in the future, if Plaintiffs continue to attempt to import it;

hh.   It would be a futile effort for Plaintiffs to continue trying to import Sacramental Ayahuasca via the postal service;

ii.   Plaintiffs are not required to perform futile acts to establish their entitlement to relief;

jj.   AYA and Mr. Stanley are entitled to exemptions from the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.AYA and Mr. Stanley are entitled to receive DEA Numbers as exempt religious persons under RFRA, in the same manner as all of the persons 21 CFR 1312.11;

kk.   The DEA, the Agency Defendants' administrative agency, had and has a policy of denying regulatory services to persons seeking exemption from the CSA for purposes of Free Exercise, except where compelled by court order (the "Policy");

ll.   The Policy violates the rights of Mr. Stanley and AYA to receive the equal protection of the laws, because the Policy favors secular exemptions and disfavors religious exemptions from the CSA;

mm.   Due to the DEA's adherence to the Policy, Plaintiffs cannot obtain an exemption from the prohibitions of the CSA and related CFRs;

nn.   In the absence of an injunction to prevent the Agency Defendants from seizing Plaintiffs' Sacramental Ayahuasca, Plaintiffs' Free Exercise will continue to be substantially burdened by the conduct of DHS, DEA, and the other Agency Defendants;

## EXHIBIT 4

oo.     The fact that the DEA, DHS and DOJ have not initiated a District Court criminal prosecution of the Plaintiffs does not eliminate the danger that such a prosecution could occur;

pp.     The continued risk of prosecution substantially burdens Plaintiffs' Free Exercise;

qq.     Plaintiffs are entitled to injunctive relief and a express judicial exemption from the prohibitions of the CSA and the DEA's erroneous application of it to Plaintiffs;

rr.     The requested injunction will serve the public interest.

102.    Defendants dispute the Plaintiffs' contentions.

103.    Wherefore, there is an actual dispute between the parties that this Court is authorized to adjudicate, and to resolve by issuing a declaration stating the rights and relations of the parties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request entry of judgment in its favor and against defendant by the issuance of a decree and an injunction providing that:

1.  Plaintiffs' importation use, possession, or transportation of Ayahuasca for *bona fide* religious use in Visionary Communion is lawful *ab initio*, and not a violation of the CSA or the related CFRs.

2.  The Agency Defendants' interpretation of the law as a complete ban against AYA's importation and sharing of Ayahuasca in Visionary Communion violates RFRA by substantially burdening Plaintiff's Free Exercise.

3.  The Agency Defendants' application of a complete ban on the importation and use of Ayahuasca to Plaintiffs is not the least restrictive means of achieving any compelling interest that the Agency Defendants have asserted.

4.  Plaintiffs have established their entitlement to an injunction under RFRA:

    a)  Compelling the Agency Defendants to grant AYA a religious exemption from the absolute prohibitions on importation, sharing and using Ayahuasca;

## EXHIBIT 4

b) Barring the Agency Defendants, most particularly DHS, DEA and DOJ, from initiating any criminal investigation or prosecution against Plaintiffs for the Free Exercise activity of Visionary Communion;

c) Barring the Agency Defendants, and in particular DHS and CBP, from seizing any of Plaintiffs' Sacramental Ayahuasca during the importation process; and,

d) Requiring the Agency Defendants to engage with AYA to establish a system for importing Sacramental Ayahuasca in amounts sufficient to supply the AYA congregation with all of the Sacramental Ayahuasca necessary to conduct ceremonies of Visionary Communion without interference of burden.

PLAINTIFFS FURTHER PRAY:

1. That plaintiffs be awarded their attorney's fees pursuant to 42 U.S.C. § 1988(b).

2. That Plaintiffs be awarded such other and further relief as the Court deems just.

Dated: May 15, 2022

JOHN SULLIVAN
/s/John Sullivan
JOHN SULLIVAN
Attorney for Plaintiffs
Arizona Yagé Assembly and Winfield Scott Stanley III

## EXHIBIT 4

1

### **JURY DEMAND**

2

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial.

3

4

Dated:  May 15, 2022             JOHN SULLIVAN
5                                /s/John Sullivan _____
6                                JOHN SULLIVAN
                                 Attorney for Plaintiffs
7                                Arizona Yagé Assembly and Winfield Scott Stanley III

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 5

1    **WO**

2

3

4

5

6                        **IN THE UNITED STATES DISTRICT COURT**

7                           **FOR THE DISTRICT OF ARIZONA**

8

| | |
|---|---|
| 9   Arizona Yage Assembly, et al., | No. CV-20-02373-PHX-ROS |
| 10          Plaintiffs, | **ORDER** |
| 11   v. | |
| 12   Merrick B. Garland, et al., | |
| 13          Defendants. | |

14

15        Plaintiffs Arizona Yage Assembly ("AYA") and Winfield Scott Stanley III

16   ("Stanley"), AYA's Founder and Director, have filed a Fifth Amended Complaint alleging

17   claims against Merrick Garland, the United States Attorney General, Anne Milgram, the

18   Administrator of the Drug Enforcement Agency ("DEA"), Alejandro Mayorkas, the

19   Secretary of the Department of Homeland Security ("DHS"), and Chris Magnus, the

20   Commissioner for U.S. Customs and Border Protection ("CBP") (collectively, "the Agency

21   Defendants") in their official capacities. That complaint alleges sufficient facts to establish

22   standing as well as sufficient facts establishing a burden on Plaintiffs' religious practices.

23   Therefore, the motion to dismiss will denied.

24                           **FACTUAL BACKGROUND**

25        AYA describes itself as a "Visionary Church"; church members allegedly use and

26   share ayahuasca as part of their religious ceremonies. (Doc. 159 at ¶ 8). Ayahuasca is a tea

27   brewed from plants containing a hallucinogenic compound, dimethyltryptamine ("DMT").

28   (*Id.*) DMT is listed as a Schedule I controlled substance under the Controlled Substances

EXHIBIT 5

1   Act ("CSA").

2         Plaintiffs allege four shipments of ayahuasca from Peru to AYA have been seized

3   by the federal government between April and December 2020. (Doc. 159 at ¶¶ 41, 42, 45,

4   and 46). Plaintiffs additionally allege that AYA currently holds bi-monthly ayahuasca

5   ceremonies within the District of Arizona, that it plans to continue to hold bi-monthly

6   meetings for the foreseeable future, and that it will continue importing ayahuasca for that

7   purpose. (Doc. 159 at ¶¶ 70-73).

8         Although a DEA guidance document ("the Guidance") first promulgated in 2009

9   established a procedure for seeking religious exemptions from the CSA, *see* U.S. Dep't of

10  Just., Guidance Regarding Petitions for Religious Exemption from the Controlled

11  Substances Act Pursuant to the Religious Freedom Restoration Act, Plaintiffs have not

12  sought an exemption. (*See* Doc. 159 at ¶ 68). Plaintiffs allege they declined to seek an

13  exemption because the "Guidance imposes substantial burdens on Plaintiffs, such as

14  requiring applicants to disclose inculpatory information and incur significant financial

15  costs before filing a petition." (*Id.*) Plaintiffs additionally allege the Guidance is a "sham"

16  because the "DEA has never granted an exemption under the Guidance." (*Id.*)

17                      **PROCEDURAL BACKGROUND**

18        This case has shifted form over the course of five amended complaints, and the

19  parties are familiar with the case history. (*See* Doc. 153 at 1-3). Initially, Plaintiffs Clay

20  Villanueva,[1] Arizona Yage Assembly, North American Association of Visionary

21  Churches, and the Vine of Light Church brought this action against a variety of state and

22  federal government officials and entities seeking monetary, injunctive, and declaratory

23  relief. (Doc. 109 at 87-94). Plaintiffs brought claims against the Agency Defendants (the

24  Attorney General, DEA, DHS, and CBP) in their official capacities under the Religious

25  Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, et seq.; claims against the United

26  States and DEA under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, et seq.;

27  claims against a DEA agent under 42 U.S.C. § 1983; and claims against state entities and

28   

---

[1] Plaintiff Clay Villanueva was voluntarily dismissed on June 2, 2022. (Doc. 161). Plaintiff Wilfred Scott Stanley III joined the Fifth Amended Complaint. (Doc. 159).

EXHIBIT 5

1   personnel under § 1983 and state laws. (Doc. 109 at 43-87).

2          On March 30, 2022, the Court dismissed Plaintiffs' Fourth Amended Complaint.

3   (Doc. 153). The Court granted Plaintiffs leave to amend only their RFRA and § 1983

4   claims against the Agency Defendants. (Doc. 153 at 23). A Fifth Amended Complaint,

5   brought only by AYA and Winfield Scott Stanley III, was filed on May 15, 2022, asserting

6   a RFRA claim and a claim for declaratory judgment against the Agency Defendants. (Doc.

7   159). Plaintiffs seek a declaration and injunction providing that their "importation[,] use,

8   possession, or transportation of Ayahuasca for bona fide religious use in Visionary

9   Communion is lawful ab initio, and not a violation of the CSA," that the Agency

10  Defendants' interpretation of the law as a complete ban against AYA's importation and

11  sharing of Ayahuasca in Visionary Communion violates RFRA," compelling the Agency

12  Defendants to grant AYA a religious exemption from the absolute prohibitions on

13  importing, sharing, and using Ayahuasca, and barring them from initiating any criminal

14  investigation. (Doc. 159 at p. 30-31).

15         The Agency Defendants filed a Motion to Dismiss the Fifth Amended Complaint

16  (Doc 175), arguing Plaintiffs do not have standing to bring their RFRA claim, and that they

17  have failed to state a RFRA claim. See Fed. R. Civ. P. 12(b)(6).

18                              **ANALYSIS**

19  **I.      Motions to Dismiss**

20         A pleading must contain a "short and plain statement of the claim showing that the

21  pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a

22  complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief

23  that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell

24  Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted)). "[W]here

25  the well-pleaded facts do not permit the court to infer more than the mere possibility of

26  misconduct, the complaint" has not adequately shown the pleader is entitled to relief. *Id.*

27  at 679. Although federal courts ruling on a motion to dismiss "must take all of the factual

28  allegations in the complaint as true, [they] 'are not bound to accept as true a legal

- 3 -

## EXHIBIT 5

1   conclusion couched as a factual allegation.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at

2   555).

3   **II.   Standing**

4         The Agency Defendants first argue Plaintiffs' RFRA claim should be dismissed for

5   lack of standing. (Doc. 175 at 12). For the reasons below, Defendants' motion to dismiss

6   for lack of standing is denied.

7         Under Article III of the Constitution, a plaintiff only has standing if he can show (1)

8   an "injury in fact" that is "concrete and particularized" and "actual or imminent;" (2) that

9   the injury is "fairly traceable to the challenged action of the defendant;" and (3) that it is

10  "likely, as opposed to merely speculative, that the injury will be redressable by a favorable

11  decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations

12  and citations omitted). In cases seeking prospective injunctive relief, "past wrongs do not

13  in themselves amount to that real and immediate threat of injury necessary to make out a

14  case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Rather, a

15  plaintiff's "standing to seek the injunction requested depend[s] on whether he [is] likely to

16  suffer future injury." *Id.* at 105.

17        To have standing to bring a pre-enforcement RFRA claim like Plaintiffs have

18  alleged here, the Ninth Circuit requires plaintiffs to allege a "genuine threat of imminent

19  prosecution." *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 835

20  (9th Cir. 2012) (*Oklevueha I*) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220

21  F.3d 1134, 1139 (9th Cir. 2000) (en banc)). This requires considering: "(1) whether the

22  plaintiffs have articulated a 'concrete plan' to violate the law in question; (2) whether the

23  government has communicated a specific warning or threat to initiate proceedings; and (3)

24  the history of past prosecution or enforcement under the statute." *Id.*

25        The Agency Defendants argue Plaintiffs have failed to allege any genuine threat of

26  imminent prosecution, because they rely on claims of past harm, they have failed to allege

27  a particular or specific threat by Defendants to initiate proceedings, and they have failed to

28  allege any past federal prosecutions for ayahuasca use. Plaintiffs oppose each of those

- 4 -

EXHIBIT 5

1    arguments.

2         **A. Concrete Plan**

3         Defendants argue "neither the mere existence of a proscriptive statute nor a

4    generalized threat of prosecution" is sufficient to establish standing. *Thomas*, 220 F.3d at

5    1139. However, Plaintiffs may satisfy the "concrete plan" requirement where the plaintiff

6    "actually did violate [the law at issue] on a number of occasions," and where they plan to

7    continue doing so. *Oklevueha I*, 676 F.3d at 836 (quoting *Sacks v. Off. of Foreign Assets

8    Control*, 466 F.3d 764, 773 (9th Cir. 2006)) (finding concrete plan existed where

9    "[p]laintiffs are currently violating and plan to continue to violate the CSA by purchasing

10   and consuming marijuana"). While the Court previously dismissed Plaintiffs' RFRA

11   claims because of a failure to allege a concrete plan, the Fifth Amended Complaint

12   specifically alleges AYA "currently holds bi-monthly Ayahuasca ceremonies" and that it

13   "plans to continue to hold bi-monthly meetings . . . for the foreseeable future." (Doc. 159

14   at ¶¶ 70-73) That is sufficient, taken as true, to allege a concrete plan to violate the CSA.

15        **B. Future and Past Prosecutions**

16        Defendants next argue that Plaintiffs have not alleged any specific warning or threat

17   by Defendants to initiate proceedings against Plaintiffs, nor have they alleged any past

18   federal prosecutions for violations of the CSA based on ayahuasca use. However, in

19   *Oklevueha I*, the Ninth Circuit held a plaintiff "need not allege a threat of future prosecution

20   because the statute has already been enforced against them." 676 F.3d at 836. For the same

21   reasons, in that case there was no need to inquire into "the history of enforcement of the

22   statute," under the third prong, because "the CSA has already been enforced against

23   Plaintiffs through the seizure of their [controlled substance]." *Id.* at 837.

24        Defendants argue the facts here differ from those in *Oklevueha I*. Defendants mainly

25   argue there was, in fact, no past enforcement of the CSA against Plaintiffs. Defendants

26   argue "CBP's alleged border seizures cannot form the basis for a broad pre-enforcement

27   injunction against DEA and the CSA *in toto* because DEA has not 'enforced' these

28   provisions against Plaintiffs." (Doc. 179 at 5). However, the CSA operates through

## EXHIBIT 5

1   multiple agencies; as the Agency Defendants have argued, the DEA may grant permits for

2   importation of controlled substances, without which the CBP and/or DHS will seize

3   packages as a matter of course. (*See* Doc. 149 at 4). The Agency Defendants' actions and

4   responsibilities are thus intertwined; the Defendant agencies cannot avoid accountability

5   for enforcing the CSA by claiming they enforce only one piece of it.

6        Moreover, just because DEA has not commenced a federal criminal prosecution

7   does not mean the CSA has not been enforced against Plaintiffs. Just as in *Oklevueha I*,

8   "[w]hen the government seized Plaintiffs' [drugs] pursuant to the CSA, a definite and

9   concrete dispute regarding the lawfulness of that seizure came into existence." 676 F.3d at

10  836. And here, Plaintiffs allege four separate seizures of ayahuasca shipments by DHS

11  between April and December 2020. (Doc. 159 at ¶¶ 41, 42, 45, and 46). Plaintiffs also

12  allege AUSA Kevin Hancock sent a letter in November 2020, in response to AYA's

13  demand for release of their packages containing ayahuasca, stating that any future imports

14  of Schedule I controlled substances like ayahuasca will be seized and forfeited unless an

15  applicable permit for lawful importation has been issued.[2] (*See* Doc. 177 at 12; Doc. 179

16  at 2). Those allegations are enough to establish that the CSA has already been enforced

17  against him and will continue to be enforced.[3]

18        Accordingly, Plaintiffs have alleged facts sufficient to demonstrate standing for

19  their RFRA claim.

20  **C. DEA Exemption Process**

21        The bulk of Defendants' arguments stem from the fact that Plaintiffs have not sought

---

22  [2] While Defendants argue this case is more like the facts in *Thomas*, 220 F.3d 1134, the
23  Court disagrees. In *Thomas*, the plaintiffs were landlords and devout Christians who
    believed an unmarried man should not cohabitate with an unmarried woman; they brought
24  a pre-enforcement action to block applicability of a statute that made it unlawful to refuse
    to rent a property to a person because of marital status. The Ninth Circuit held the plaintiffs
25  did not have standing, because "[t]he asserted threat [of prosecution] is wholly contingent
    upon the occurrence of unforeseeable events," like an unmarried couple seeking to rent
26  their property in the first place, so there was no realistic danger of injury as a result of the
    statute. *Id.* at 1141. Here, by contrast, Plaintiffs have already had multiple shipments of
27  ayahuasca seized pursuant to the CSA. The harm is nowhere near as speculative as it was
    in *Thomas*.
28  [3] The allegations made about Agent Smyrnos threatening a member of AYA with felony
    drug prosecution after seizing packages containing mescaline, another controlled
    substance, do not necessarily impact this analysis.

- 6 -

### EXHIBIT 5

1    an exemption from the applicability of the CSA. The DEA promulgated the "Guidance" in

2    2009 in response to the Supreme Court's ruling in *Gonzales v. O Centro Espirita*

3    *Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). However, in 2012 the Ninth Circuit

4    addressed a similar argument as Defendants make here, and the court refused "to read an

5    exhaustion requirement into RFRA where the statute contains no such condition."

6    *Oklevueha I*, 676 F.3d at 838 (stating that "the Supreme Court has reviewed a RFRA-based

7    challenge to the CSA without requiring that the plaintiffs first seek a religious use

8    exemption from the DEA") (citing *O Centro*, 546 U.S. 418). Both the Supreme Court and

9    the Ninth Circuit have recognized that RFRA "plainly contemplates that *courts* would

10   recognize exceptions [to the CSA]—that is how the law works." *Id.* (quoting *O Centro*,

11   546 U.S. at 434).

12           The Court will not depart from that clear precedent. Accordingly, the Defendants'

13   alternative request that the Court stay the case to allow Plaintiffs to apply for an exemption

14   is denied.

15           **D. Associational Standing**

16           Lastly, Defendants argue AYA has no associational standing to bring claims on

17   behalf of AYA's members.

18           A plaintiff organization may bring suit on its members' behalf when: "(a) its

19   members would otherwise have standing to sue in their own right; (b) the interests it seeks

20   to protect are germane to the organization's purpose;[4] and (c) neither the claim asserted nor

21   the relief requested requires the participation of individual members in the lawsuit." *Hunt*

22   *v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

23           Defendants first argue Plaintiffs have failed to allege any AYA member has suffered

24   an injury sufficient to establish they would have standing to sue in their own right.

25   However, Plaintiffs have alleged ayahuasca is a central component of AYA members'

26   religion (*see* Doc. 159 at ¶¶ 34-36), and that if ayahuasca shipments continue to be seized,

27   their members will be unable to practice their religion (*see* Doc. 159 at ¶ 47). Defendants

28   _____

[4] Defendants do not dispute this prong, so the Court will assume AYA has met the
requirement.

## EXHIBIT 5

1   also argue that individual members must participate in the litigation, destroying AYA's

2   associational standing. However, the Ninth Circuit in *Oklevueha* answered this question on

3   closely related facts, and held that "it can reasonably be supposed that the [AYA's

4   prospective relief], if granted, will inure to the benefit of those members of the association

5   actually injured." 676 F.3d at 839 (quoting *Warth v. Sedlin*, 422 U.S. 490, 515 (1975)).

6   There is no need for the kind of individualized inquiry Defendants suggest.

7        Accordingly, Plaintiffs have alleged facts sufficient to support standing.

8   Defendants' motion to dismiss for lack of standing is denied.[5]

9   **III.    Failure to State a Claim (FRCP 12(b)(6))**

10       RFRA provides that the government "shall not substantially burden a person's

11   exercise of religion" unless the government "demonstrates that application of the burden

12   to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the

13   least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§

14   2000bb-1(a)-(b). To state a claim under RFRA, a plaintiff must allege facts sufficient to

15   show that "application of the [CSA] would (1) substantially burden (2) a sincere (3)

16   religious exercise." *O Centro*, 546 U.S. at 428.

17       Defendants only obliquely challenge Plaintiffs' assertion that ayahuasca use is a

18   sincere religious exercise for its members. (Reply at 8-9). Defendants claim Plaintiffs are

19   trying to rely on a categorial allegation that ayahuasca is always religious, instead of

20   individualized allegations about personal religious beliefs. (*Id.*) But Plaintiffs have alleged

21   "[d]rinking sacramental Ayahuasca is the central communion ceremony of AYA where

22   congregants receive the transmission of wisdom and Divine Love that comes through

23   sacramental use of Ayahuasca. Without Ayahuasca, AYA does not have a religious

24   practice to share, and AYA congregants are unable to practice their religion." (Doc. 159 at

25   ¶ 9). Plaintiffs have alleged particular facts about the ayahuasca religious ceremonies

26   AYA's members attend. (Doc. 159 at ¶¶ 31-36). And Plaintiffs have also alleged that it

27   plans to serve ayahuasca to its members in religious ceremonies despite the possibility that

28   ─────────────────

[5] Defendants' footnoted argument that Plaintiffs similarly lack standing for their declaratory relief claim is denied for the same reasons. (*See* Doc. 175 at 12, n.7).

EXHIBIT 5

1  Defendants may enforce the CSA against them. (Doc. 159 at ¶¶ 70-73). Construed most

2  favorably to Plaintiffs, the Fifth Amended Complaint sufficiently alleges the sincerity of

3  Plaintiffs' religious beliefs.

4      Plaintiffs have also alleged that they are "substantially burdened by the prohibitions

5  on manufacturing, distributing, or dispensing a controlled substance in [the CSA], and by

6  the prohibition on importation in [the CSA], that impose criminal penalties for violations."

7  (Doc. 159 at ¶ 80). "A statute burdens the free exercise of religion if it puts substantial

8  pressure on an adherent to modify his behavior and to violate his beliefs, including when,

9  if enforced, it results in the choice to the individual of either abandoning his religious

10  principle or facing criminal prosecution." *Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th

11  Cir. 2002). Plaintiffs allege they are forced to choose between "either abandoning religious

12  principle or risking criminal prosecution." (Doc. 159 at ¶¶ 81, 86). That is sufficient to state

13  a RFRA claim. *See Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.3d 1012,

14  1016 (9th Cir. 2016) (*Oklevueha II*) (reiterating "a substantial burden under RFRA exists

15  . . . only when individuals are . . . coerced to act contrary to their religious beliefs by the

16  threat of civil or criminal sanctions") (citation omitted); *Church of the Holy Light of the*

17  *Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1219 (D. Or. 2009), vacated on other grounds,

18  *Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011) (finding that

19  prohibiting plaintiffs' use of ayahuasca would substantially burden their exercise of

20  religion where the tea was the "sole means by which [they] are able to experience their

21  religion") (citation omitted).

22      While Defendants try to re-cast Plaintiffs' alleged "burden" as one imposed by the

23  DEA's exemption process, that was not how Plaintiffs made their allegations in the Fifth

24  Amended Complaint.[6] (*See* Doc. 175 at 19). Plaintiffs argue they are burdened by the

25  CSA's complete ban on ayahuasca use and importation (Doc. 159 at ¶¶ 82-87), not by the

26  exemption process outlined by DEA's Guidance. They have alleged multiple seizures of

27

28  _____
[6] Indeed, the Court previously dismissed Plaintiffs' claim under the Administrative Procedures Act that sought to challenge the DEA's guidance for lack of standing. (Doc. 153 at 9).

### EXHIBIT 5

1    ayahuasca shipments, which interrupts their free exercise of religion because they cannot

2    use the ayahuasca that has been seized. (Doc. 159 at ¶¶ 41-46, 51, 83). That is sufficient to

3    state a claim under RFRA.

4        Accordingly, Defendants' Motion to Dismiss the RFRA claim for failure to state a

5    claim is denied.

6        **IT IS ORDERED** Defendants' Motion to Dismiss (Doc. 175) is **DENIED**.

7        Dated this 4th day of May, 2023.

8

9

10                            Honorable Roslyn O. Silver

11                            Senior United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 10 -

# EXHIBIT 6

CHARLES CARREON (CSB # 127139)
3241 E. Blacklidge Drive
Tucson, Arizona 85716
Tel: 628-227-4059
Email: chascarreon@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly,
North American Association of Visionary Churches, and
Clay Villanueva

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIZONA YAGÉ ASSEMBLY, NORTH AMERICAN ASSOCIATION OF VISIONARY CHURCHES, and CLAY VILLANUEVA,<br><br>               Plaintiffs,<br><br>    vs.<br><br>WILLIAM BARR, Attorney General of the United States; UTTAM DHILLON, Acting Administrator of the U.S. Drug Enforcement Administration; CHAD F. WOLF, Acting Secretary of the Dept. of Homeland Security; MARK A. MORGAN, Acting Commissioner of U.S. Customs and Border Protection; THOMAS PREVOZNIK, Deputy Assistant Administrator of the DEA Dept. of Diversion Control, in his personal capacity; the UNITED STATES OF AMERICA; the STATE OF ARIZONA; MARK BRNOVICH, Arizona Attorney General; MARICOPA COUNTY, a political subdivision of the State of Arizona; and, MATTHEW SHAY,<br><br>          Defendants. | Case No.: 3:20-CV-03098-WHO<br><br>DECLARATION OF PAULO CESAR RIBEIRO BARBOSA<br><br>Date: September 9, 2020<br>Time: 2:00 P.M.<br>Courtroom: 2 (17th floor) |

# EXHIBIT 6

Paulo Cesar Rebeiro Barbosa declares and affirms:

**1.**   I am an Adjunct Professor in the Department of Philosophy and Human Sciences working in the field of Scientific Methodology at the State University of Santa Cruz in Ilheus, Brazil.

**2.**   The CV attached as Appendix II is a true and correct statement of my qualifications to provide the opinions expressed in the Opinion Letter attached hereto as Exhibit 1.

**3.**   During early 2018, I was retained by the Arizona Yagé Assembly ("AYA") to provide the summary of scientific evidence and expert opinions presented in the attached Opinion Letter. These opinions and the scientific evidence supporting those opinions are current as of this date, thanks in substantial part to the assistance of my co-professor Eduardo Ary Villela Marinho, who provided vital updates regarding research completed since April 2018. Because of the strength of his contributions, that brought my prior research and analysis up to date with the most recent research in this field, I have attached a copy of Prof. Marinho's CV as Appendix III. The additional research, easily identifiable in the Opinion Letter as citations to studies completed in 2018 – 2020, to which we of course had no access prior to publication. The additional research adds weight to the conclusions expressed in the Opinion Letter, particularly in the section analyzing whether Ayahuasca serves as, or stimulates consumption of, drugs of abuse.

**4.**   The Opinion Letter addresses the questions that were presented to me for analysis and response, based on the scientific evidence summarized in the Opinion Letter remains as accurate today as it was when I signed it, and I currently hold all of the same opinions on the topics addressed in the Opinion Letter. During the two years that have passed since I signed the Opinion Letter, some additional information has come to my attention that warrants providing a brief update, however.

/ / /

/ / /

/ / /

# EXHIBIT 6

1   **5.**   I may be contacted through AYA's attorney, and upon reasonable advance notice,

2   will be available to answer questions via teleconference from here in Brazil.

3   I declare and affirm, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true

4   and correct, and that this declaration was signed on August ⟨5⟩, 2020, at Ilheus, Bahia,

5   Brazil.

6

7   Paulo Cesar Ribeiro Barbosa

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 2:20-cv-02373-ROS   Document 133-14   Filed 03/05/21   Page 4 of 25

EXHIBIT 6



August 4, 2020

Dr. Paulo Cesar Ribeiro Barbosa
Prof. Adjunto do Departamento de Filosofia e Ciencias Humanas
Departamento de Filosofia e Ciências Humanas
Area de Metodologia Cientifica
Universidade Estadual de Santa Cruz - Ilhéus – BA
Campus Soane Nazaré de Andrade
CEP 45662-900. Ilhéus-Bahia

To:     United States District Court for the Northern District of California

Re:     Application for Religious Freedom Exemption of Arizona Yagé Assembly

I have been retained by the Arizona Yagé Assembly ("AYA") to answer a series
of questions regarding the traditional Amazonian brew known variously as
ayahuasca, yage, and hoasca[1] to aid the United States Drug Enforcement
Administration (the "Agency") in deciding whether to grant an exemption to AYA
to practice religious ceremonies in which AYA members drink ayahuasca.
I have provided answers to these questions in the form of concise professional
opinions in italics followed by an explanation of my opinion, supported by a
summary of relevant studies.  Appendix I summarizes some of the results of the
studies discussed below in chart format.

My opinions are based on my professional education, my study of the available
scientific research in the field, knowledge acquired through collaboration with
other experts in the field, and my own research.  Appendix II hereto is my
curriculum vitae, stating my qualifications to render the opinions expressed
herein.

I also adopt the conclusions of my co-researcher, Eduardo Ary Villela Marinho,
who provided vital updates to a prior analysis I prepared approximately two
years ago, that strengthens the conclusions expressed in this Opinion Letter,
particularly in the section analyzing the evidence about whether Ayahuasca
serves as, or stimulates abuse of, drugs of abuse.  Because of the strength of
his contributions, that brought my prior research and analysis up to date with
the most recent research in this field, I have attached a copy of Prof. Marinho's
CV as Appendix III.

---

[1] Recipes for the brew can encompass a wide range of herbs, however, the most commonly
used formulation for religious use is extracted from a combination of *Banisteriopsis Caapi*
(harmaline, harmine, tetrahydroharmine, and other beta-carbolines) and a second herb
containing Dimethyltryptamine, generally *Psychotria Viridis* or *Diplopterys Cabrerana*.  Opinions
expressed in this letter are expressed regarding this traditional "two-ingredient" brew, which is
used by the UDV, the Santo Daime, and AYA.

# EXHIBIT 6

**Do ayahuasca and dimethyltryptamine have substantially different effects?**

*Yes.  DMT is a psychedelic and, in humans, is usually administered intravenously, felt nearly instantaneously, and exhausts its powerful effects within under a half hour.  Regarding intensity of effect, the effects of DMT are estimated to be twice as intense compared to equivalent dosages of ayahuasca.  By comparison, ayahuasca is consumed orally, and its effects are slow and progressive, leading to a 4 - 6 hour experience that is more controllable than DMT.*

DMT and ayahuasca are very different in their effects, with DMT being more intense and less subject to control than ayahuasca.  Grob's seminal paper evaluated the "maximum intensity of the effects of DMT" as approximately twice that of ayahuasca at "equivalent doses." (Grob et al., 1996).  The acute effects of DMT are very intense, appear nearly instantaneously after intravenous administration, and are over in under an hour (Strassman & Qualls, 1994; Strassman et al., 1994.)  During the last few decades, clinical trials have been carried out on humans where both DMT (in purified form, administered intravenously) and ayahuasca (administered orally) have been administered in a laboratory context, and their acute effects have been characterized both at the psychological and somatic levels.  Ayahuasca affects users slowly and progressively.  Effects are felt 45 to 60 minutes after administration, reach their maximum effects 2 hours later, decline thereafter, and cease after 4 to 6 hours (Riba, 2003; dos Santos, 2011).  Thus, the effects of ayahuasca are much more controllable than those of pure DMT.

**Does ayahuasca adversely affect the physical health of religious ayahuasca users?**

*No.  Ayahuasca is a non-toxic psychedelic tea whose main adverse physical effects are nausea and vomiting.  It causes slight impact on the cardiovascular system.  Religious ayahuasca use does not have adverse effects on physical health, and is associated with reduced physical pain and decreased impairment of life activities due to physical infirmities.  Studies relevant to this topic are summarized in Chart A, Appendix I.*

Toxicity is considered the capacity of a substance to cause harm to an organism by means of its chemical properties (Baños & Farré, 2002).  From a toxicological viewpoint, the minimum psychoactive dose of a substance being administered to induce a psychoactive effect should be less than the toxic dose.  This is certainly the case with ayahuasca, that has no toxic effects at all at dosage levels sufficient to induce a powerful psychoactive effect.  It is thus a physically non-toxic psychedelic.  This statement is subject to the caveat that persons taking MAO inhibitors should not take ayahuasca, and that pre-ceremonial dietary restrictions to avoid tyramine-containing substances should be observed.

The main adverse effects produced by ayahuasca are nausea and vomiting (Callaway, et al., 1999; Riba et al., 2001; Riba, 2003; Riba & Barbanoj, 2005; dos Santos, 2011; dos Santos et al., 2012). The emetic action of ayahuasca is

EXHIBIT 6

related first to the organoleptic properties of the decoction, and second to its serotonergic action (Callaway et al., 1999). The impact of ayahuasca on the cardiovascular system is minimal, producing only slight increases in blood pressure and heart rate that have no clinical implications (Riba et al., 2001, 2003; dos Santos et al., 2012). Studies to determine the acute effects of ayahuasca in the laboratory (Riba, 2003; dos Santos, 2011) and in natural contexts (McKenna, 2004), show that ayahuasca is physiologically safe.

Long-term Santo Daime users of religious ayahuasca showed significantly better scores than the control group on ASI-assessed Medical Status (Fabregas et al. 2010). Additionally, the UDV subjects showed improvement in the Bodily Pain subscale of SF-36 at six-month follow-up (Barbosa et al. 2009). Finally, UDV subjects scored better than the control group on a scale used to measure how much quality of life suffered from physical health restrictions -- the Medical Outcomes Study Short Form-36 (SF-36) Barbosa et al. (2016).

**Does ayahuasca in the religious context serve as a drug of abuse or stimulate abuse of other drugs?**

*No. In my professional opinion, the scientific evidence does not support any hypothesis that religious use of ayahuasca constitutes or leads to drug abuse. Indeed, the reverse appears to be the effect. For many users, religious ayahuasca use diminishes or eliminates abuse of alcohol and other substances. I cite and briefly discuss the relevant results from five studies in support of this opinion.*

Pre-clinical studies have found that in different mouse models of addiction-related behaviors, ayahuasca administered in doses between 100 and 300 mg/kg promotes important anti-addictive effects against the use of ethanol (Cata-Preta et al., 2018; Oliveira -Lima et al., 2015) and psychostimulants (methylphenidate, Reis et al., 2020). In addition, Reis et al., 2020 also demonstrated that, when administered after treatment with ethanol, ayahuasca reversed the changes in neuronal activity induced by methylphenidate in brain regions related to addiction, an effect that was maintained even after re-exposure to methylphenidate, suggesting an important role for ayahuasca in preventing drug-induced relapse. Cata-Preta et al. 2018 further demonstrated that when administered separately, extracts of the two main plant constituents of ayahuasca, *Banisteriopsis caapi* (which contains MAO-inhibiting Beta carbolines) and *Psychotria viridis* (which contains DMT), also showed anti-relapse effects in a model of ethanol reward.

Among the earliest studies to provide evidence of a lack of association between religious use of ayahuasca and behavior associated with drugs of abuse was Grob's seminal human assessment of religious users of ayahuasca. Grob's study reported zero (0) UDV members with current drug/alcohol-related problems, compared to one person with alcohol use disorder (AUD) in the non-ayahuasca-using control group (Grob et al., 1996). Grob's study was conducted in Brazil. Researchers administered the Composite International Diagnostic Interview (CIDI) to 15 adult long-term UDV members and 15 non-ayahuasca-user controls. Five (5) UDV members who suffered from AUD before becoming UDV members no longer had active AUD diagnoses. By comparison, only one control subject showed past and no longer active AUD diagnosis.

## EXHIBIT 6

A larger study was completed in Brazil in 2010, and compared 127 ayahuasca drinkers with 115 control subjects, assessing them using the biopsychosocial criteria of the Addiction Severity Index 5th Edition (ASI-5, the standard drug-dependence assessment).  The positive results were twofold: (1) no evidence of drug dependence among the ayahuasca drinkers, and (2) no association between continuous ritual use of ayahuasca and harmful biopsychosocial consequences related to drugs of abuse.  As in the studies cited above, the ayahuasca group consumed less alcohol and other drugs than the control group.  These scores on the biopsychosocial criteria for drug dependence were replicated a year later (Fábregas et al., 2010).

A study conducted at the University of New Mexico compared the substance-abusing behavior of members of the UDV church with that of church-going Christians.  The two groups were comprised of 30 UDV ayahuasca users and 27 non-ayahuasca-using devout Catholics and Protestants (Barbosa et al., 2016).    The UDV members drank ayahuasca in their twice-monthly church meetings.  The Catholic and Protestant subjects attended masses and services more frequently than the UDV subjects.  Relative to the control group, the UDV group demonstrated greater past intoxication-driven alcohol use and past use of cannabis, but less recent use of alcohol.  Put simply, the UDV group started out with more marijuana and alcohol users, and ended up with fewer alcohol users. The control group numbers did not diminish for either category.

Doering-Silveira et al. (2005) administered a questionnaire based on the World Health Organization criteria for substance use and found lower past month and past year alcohol use in 41 Brazilian adolescent UDV ayahuasca users, compared to 43 matched control adolescents with no previous ayahuasca exposure.

The tendency of ayahuasca users to abandon alcohol and other drugs of abuse was again observed in a 2008 study of 32 Oregon Santo Daime members who were examined using the Structured Clinical Interview for DSM-IV psychiatric disorders (SCID).  This group of ayahuasca users showed marked reduction in addictive behavior: Twenty-two (22) participants with a previous history of drug/alcohol-related problems were in full remission, one marijuana-dependent person was in partial remission, and one continued to abuse marijuana. (Halpern et al. 2008).

A large-scale survey was conducted with 1,947 members of UDV from all geographic areas of Brazil (Barbosa et al. 2018). The Substance Abuse and Mental Health Services (SAMHSA) questionnaire was administered to compare the lifetime use and current prevalence of alcohol and tobacco use disorders between the UDV and a national normative sample (n=7,939). The authors found that lifetime use of alcohol and tobacco was higher in UDV sample compared to the Brazilian norms for age ranges of 25–34and over 34 years old, but not for the age range of 18–24 years old. However, current prevalence for alcohol and tobacco use disorders were lower in the UDV sample than the Brazilian norms for all age ranges. This study also found that the more the participants attended ayahuasca rituals during their lifetime and during the previous 12 months, the less they used alcohol and tobacco during the previous year and month, and the less they had current alcohol and tobacco use disorders. The salient results of the cited studies are summarized as Chart B in Appendix I.

EXHIBIT 6

**Does ayahuasca adversely affect the mental health of ceremonial ayahuasca users?**

*No. In my professional opinion, the scientific evidence does not support the hypothesis that ritual use of ayahuasca adversely affects mental health.*

Concern for the health of the ayahuasca-using community has fueled considerable research into this topic, and the weight of the scientific evidence today indicates that religious ayahuasca users demonstrate less psychiatric morbidity, *i.e.*, mental illness, than either non-ayahuasca using control groups, or the general population.  Using the CIDI to assess the mental health of ayahuasca users and compare it with that of non-users, Grob's seminal study identified no one in the UDV group with a current psychiatric diagnosis; whereas the control group included one person with hypochondriasis (Grob *et al.* 1996). Subsequent studies suggested that the rate of psychotic episodes that occured in ayahuasca ceremonial settings did not differ from the rate of general population (Lima and Tofoli 2011; Gable 2007). Moreover, the causal relationship of these episodes with ayahuasca intake were difficult to ascertain, because other risk factors, such as concurrent use of other substances and past history of psychosis, were present in most of the cases (Dos Santos et al. 2017).

These evaluations of the mental health effects ayahuasca intake within religious contexts are reinforced by a recent double-blind randomized placebo-controlled study (Palhano-Fontes et al. 2019). The authors found out that ayahuasca administration elicited rapid antidepressant effects, as assessed by the Montgomery-Åsberg Depression Rating scale (MADRS) and the Hamilton Depression Rating scale (HAM-D), in treatment-resistant depression patients.

Further, several studies show improved measures of mental health contemporaneously with continued religious ayahuasca use.  The salient results of the cited studies are summarized in Chart C in Appendix I.

The Fabregas Study

Fabregas *et al.* (2010) found better scores on the psychiatric status subscale of the ASI-V among the Santo Daime group relative to non ayahuasca-using control groups.

The Doering-Silveira Study

Doering-Silveira *et al.* (2005) reported less anxiety symptoms using the State-Trait Anxiety Inventory (STAI), less body dysmorphism symptoms as assessed by Body Shape Questionnaire (BSQ), and less Attention Deficit Disorder using Conner's Adolescent Self-Rating scale than the control group.

The Halpern Study

Halpern *et al.* (2008) found that the Santo Daime group had fewer, less intense complaints, and lower levels of overall severity of symptoms than the normative group for the Symptom Check List Revised 90 (SCLR90).[2]

---

[2] The SCLR90 assesses three categories of symptoms:  Positive Symptom Total (overall complaints), Positive Symptom Distress Index (intensity of complaints), and Global Severity Index (overall severity of complaints).

## EXHIBIT 6

Ayahuasca users were found to be free of clinically significant anxiety as measured by the Hamilton Anxiety Rating Scale (0/32 on the HAM-A)

Ayahuasca users demonstrated a low rate of depression as measured by Hamilton Depression Rating Scale (1/32 on the HAM-D). This was particularly significant, because five of the ayahuasca users had suffered at least one major depressive disorder before joining Santo Daime, as revealed by administration of the Structured Clinical Interview for DSM-IV Disorder (SCID).

The SCID also identified one individual with a current bipolar I disorder, one with a current panic disorder, six with recurrent major depressive disorders, with four in remission and two in partial remission, and two with simple phobia disorder in partial remission, four with simple phobia (two in remission and two in partial remission), three with bulimia nervosa in remission, six with posttraumatic stress disorder or panic disorder in remission. Eight subjects reported remission occurring after their involvement in ayahuasca religious use.

### The Barbosa Study

Barbosa *et al.* (2009) prospectively assessed psychiatric morbidity in new ayahuasca users using the Clinical Interview Schedule – revised edition (CIS-R), which was administered to each subject three times: shortly before, a week after, and six months after the subjects' first religious ayahuasca experience. Nineteen (19) of the subjects were members of the Santo Daime, and nine (9) were from the UDV.

The Santo Daime group nearly met criteria for the CIS-R defined psychiatric disorder (scores of at least 12) before drinking ayahuasca. Their scores significantly improved at one week and six-month follow-up (11.6 before ayahuasca, 5.1 a week later and six-months later).

The UDV group scored below the cut off value for CIS-R defined psychiatric disorder before beginning participation and showed no significant changes at either one-week or six-month follow-up.

In Barbosa et al's 2016 study at the University of New Mexico, the UDV group scored lower than the active religious control group for depression and confusion as assessed by the Profile of Mood States (POMS).

### Does religious use of Ayahuasca have adverse effects on cognitive function?

*No. In my professional opinion, the scientific evidence discussed below and summarized in Chart D indicates that religious use of ayahuasca does not negatively affect human cognitive function.*

Grob et al. (1996) used the WHO-UCLA Auditory Verbal Learning Test (WHO UCLA-AVLT) to compare the memory functions of long-term UDV members with those of a matched control group. The WHO UCLA-AVLT test assesses mild degrees of cognitive dysfunction and consists of several trials of recalling words read from lists of common items such as household objects. The authors detected better performance in ayahuasca users in the recall of words for the fifth learning trial.

Two more recent studies administered a comprehensive battery of neuropsychological tests to compare the attention, psychomotor speed, verbal

EXHIBIT 6

and visual abilities, memory, and mental flexibility of non-ayahuasca using control groups with those of UDV adolescents (Doering-Silveira et al. 2005), and UDV and Santo Daime adults (Bouso et al. 2012; Barbosa et al. 2016). Bouso et al. (2012) found better results on cognitive performance of Santo Daime group relative to the control group. No difference in cognitive functions were found in UDV adolescents and adults relative to their control group (Doering-Silveira et al. 2005; Barbosa et al. 2016).

**Conclusion**

Ayahuasca and dimethyltryptamine are two very different psychoactive substances, and of the two, ayahuasca is far more amenable to conscious control. Ayahuasca is essentially an herbal tea that often induces nausea and vomiting due to its organoleptic and serotonergic characteristics. Other physical effects include mild rises in blood pressure and heart rate. The psychoactive effects begin slowly after a 45-minute period of onset, and end within approximately six hours. Ayahuasca consumed in a religious context is not being used as a drug of abuse, nor does the religious use of ayahuasca lead to the abuse of other drugs; instead, religious ayahuasca users generally abandon abuse of alcohol after they become members of an ayahuasca church. These data are backed up by pre-clinical evidence indicating that ayahuasca blocks many abuse-related behavioral effects of drugs of abuse. Ayahuasca does not adversely affect mental health. Many religious ayahuasca users start out with greater psychological morbidity than the control groups, and show a marked improvement with years of ayahuasca use, reporting greater mental health after participating in religious ayahuasca use compared to control groups. Ayahuasca has not been observed to impair cognitive function, and on some testing scales, is associated with improved functioning.

Very truly yours,

Paulo Cesar Ribeiro Barbosa

EXHIBIT 6

# APPENDIX I

\#                          \#

| d | | |
|---|---|---|
| Riba dos Santos | Physiological measures of acute effects | Minimal impact on the cardiovascular system<br>Slight increases in blood pressure and heart rate that have no clinical implications |
| Fabregas | ASI-5 medical status | Santo Daime had better results than the control group |
| Barbosa | SF-36 | Improved Bodily Pain six months after the first ayahuasca experience in UD |
| Barbosa | SF-36 | UD  had better score on domain role limitations due to physical health than the control group |

| d | | |
|---|---|---|
| Grob | CIDI | UD  have less current substance use disorder than control group<br>Past diagnostic criteria for alcohol use disorders (AUD) for 5 UD  members who no longer met the criteria after becoming UD  members. |
| Fabregas | ASI-5 | o evidence of drug dependence in Santo Daime group, nor evidence that the continuous ritual use of ayahuasca was associated with harmful biopsychosocial consequences related to drugs of abuse.<br>Moreover, the Santo Daime ayahuasca group consumed less alcohol and other drugs compared to the control group |
| Doering-Silveira | World Health Org. criteria | UD  adolescent members had less past year and month use of alcohol relative to the control group |
| Halpern | SCID - DSM-I | Participants of Santo Daime with a previous history of drug  alcohol-related problems were in full remission |
| Barbosa | ASI-5 | UD  Had More Prior intoxication-driven alcohol use Use than control group<br>UD  Had Less Recent Use of alcohol than control group |

| d | | |
|---|---|---|
| Grob | CIDI | UD  have less current psychiatric diagnoses than controls |
| Fabregas | ASI- | Santo Daime had better scores on the psychiatric status than controls |
| Doering-Silveira | STAI | UD  adolescent group had less anxiety symptoms than the control group |
| Doering-Silveira | BS | UD  adolescent group had less body dysmorphism symptoms than the control group |

| Doering-Silveira | Conner's Adolescent Self-Rating | UD adolescent group had less attention deficit disorder than the control group |
|---|---|---|
| Halpern | SCLR-90 | Santo Daime group had better scores than the normative group for Positive Symptom Total, Positive Symptom Distress Index and Global Severity Index |
| Halpern | HAM-A | Santo Daime group was free of clinically significant anxiety (0 32) |
| Halpern | HAM-D | Santo Daime group demonstrated a low rate of depression (1 32) |
| Halpern | SCID | Eight Santo Daime subjects reported remission of psychiatric disorder occurring after their involvement in ayahuasca religious use. |
| Barbosa | CIS-R | ew Santo Daime parcicipants reported improved scores on minor psychiatric symptoms six months after drinking ayahuasca<br> o difference in the scores of minor psychiatric symptoms in new ayahuasca users within UD |
| Barbosa | POMS | UD had less depression than the active religious control group<br>UD had less confusion than the active religious control group |

| d | | |
|---|---|---|
| Grob | WHO-UCLA A LT | UD had better performance the recall of words for the fifth learning trial |
| Doering-Silveira | Comprehensive battery of neuropsychological function | o difference between UD adolescents and control group |
| Barbosa | Comprehensive battery of neuropsychological function | o difference between UD adults and control group |
| Bouso | Comprehensive battery of neuropsychological function | Santo Daime had better results on cognitive function than the control group |

EXHIBIT 6

# APPENDIX II

# EXHIBIT 6

## Biography

Dr. Paulo Cesar Ribeiro Barbosa obtained his Ph.D. in Medical Sciences at Universidade Estadual de Campinas (UNICAMP) in 2008 working on a follow-up evaluation of religious ayahuasca users. He obtained his degree in Social Sciences at Universidade de São Paulo (USP) in 1992 and a degree in Psychology at Faculdade de Ilhéus (CESUPI) IN 2019. Since 2001 he has worked on a variety of projects involving psychiatric, psychological, neurocognitive, social and cultural assessments of ayahuasca users within Brazilian and North-American urban contexts. Dr Barbosa was appointed Professor of Scientific Methods in 2002 in the Departamento de Filosofia e Ciências Humanas at Universidade Estadual de Santa Cruz (Brazil). He worked as Adjunct Assistant Professor at the Psychiatry Department of University of New Mexico. Dr. Barbosa's main research activities concern the relationships among psychiatric, psychological and anthropological methods of evaluating the effects of ayahuasca in Brazilian and North-American urban settings.

## Research Strategy and Context

Ayahuasca is a hallucinogenic beverage produced from Amazonian plant components that contain harmine, harmaline, tetrahydroharmine and N,N-dimethyltryptamine (DMT). The ritually sanctioned use of the brew is widespread among Amerindian and Mestizo groups of the western Amazonian basin. Ethnological data suggest that the ritual and ideological framework accompanying the use of ayahuasca in these societies can minimize social and psychological problems associated with the use of psychoactive substances in western societies.

During the last three decades modern urban Brazilian ayahuasca religions, such as *União do Vegetal* and *Santo Daime* who use ayahuasca as a key element in their doctrines and ceremonial meetings have spread from the Amazon to major cities in Brazil, as well as to Europe and North America. Hallucinogens are often associated by mainstream psychiatry with psychopathology and abuse potential and the fact that their use is restricted legally the expanded use of the beverage has brought these religious groups under scrutiny by law enforcement officials. On the other hand, ayahuasca religions claim that the brew can show therapeutic properties for the treatment of several psychological, psychiatric and general health problems.

Many ethnographic studies have been conducted in the attempt to describe the social and ideological structures involved in these religious groups concerning the purported therapeutic use of ayahuasca. However, rigorous scientific evaluations about its actual effects on health are still lacking.

This research programme addresses the need for rigorous scientific investigations when evaluating the effects of ayahuasca on mental health and the inter-relationships between ritual and social network involved in religious ayahuasca groups in determining the health status of urban ayahuasca users. The aims of the research strategy are:

- To evaluate the socioeconomic profile of people who seek ayahuasca experiences and to elicit their therapeutic and religious itineraries;

- To elicit how people evaluate and interpret their ayahuasca experience;

- To evaluate the effects of ayahuasca use on psychiatric symptoms;

# EXHIBIT 6

- To evaluate the effects of ayahuasca use on personality traits;

- To evaluate the effects of ayahuasca use on neurocognitive functions;

- To evaluate the effects of ayahuasca use on health-related quality of life;

- To evaluate the effects of ayahuasca use on licit and illicit drug use and abuse;

- To evaluate the interaction of ayahuasca use with selective serotonin reuptake inhibitors.

**Ongoing research protocols**

*1) Quality of life and drug use in UDV adepts*

This project proposes to evaluate the quality of life and use and abuse of licit (such as alcohol and tobacco) and illicit (e.g., cocaine, marihuana) drugs in adepts of the União do Vegetal. It will also evaluate the potential adverse interaction between ayahuasca and serotonergic antidepressant drugs. In order to achieve these goals, we will conduct a national survey using a standardized instrument of WHO on the quality of life (WHOQOLBref), and two standardized instruments based on the WHO and the Substance Abuse and Mental Health Services (SAMHSA), to assess drug use and addiction. The independent variables will be the frequency pattern of ayahuasca use and the years and months of joining the religion. We investigate whether subjects who attend ayahuasca rituals regularly show improved quality of life and drug use in comparison with those who attend these rituals intermittently. Length of time of regular attendance to these rituals will also be correlated with the corresponding measures. It is also aimed to investigate whether the use of medications and the frequency pattern of ritual attendance is associated with adverse reactions during the acute effects of ayahuasca. Additionally, there will be a qualitative research on health and welfare of members of the UDV, in which respondents of the questionnaires will also be invited to take part in a qualitative follow-up study in order to assess the impact of religion on health.

Funded by National Counsel for Scientific Development (Federal Administration – Brazil)
Started: April 2009
Scheduled conclusion: March 2011
Coordinator: Paulo Cesar Ribeiro Barbosa
Researchers: Michael Winkelman, Alberto Groisman, Luis Fernando Tofoli

*2) Personality traits, cognitive functions and drug abuse-related problems associated with regular ayahuasca use*

It was aimed to evaluate potential drug abuse-related problems, personality traits and cognitive functions associated with regular ayahuasca use. Standardized instruments were used in order to assess a number of personality traits, cognitive functions and medical and psychosocial consequences of drug misuse in the following groups: a) a group of jungle-based ayahuasca users (n = 56) vs. non-ayahuasca-using rural group (n

# EXHIBIT 6

= 56); and b) a group of urban-based ayahuasca users (n = 71) vs. a group of urban non-users (n = 59).

Funded by: Instituto de Etnopsicología Amazónica Aplicada (IDEAA).
Coordinator: Jose Carlos Bouso
Researchers: Josep Maria Fábregas, Débora González, Sabela Fondevila, Marta Cutxet, Xavier Fernández, Paulo César Ribeiro Barbosa, Miguel Ángel Alcázar-Córcoles, Jordi Riba

### 3) A psychological and neuropsychological evaluation of Hoasca users within Uniao do Vegetal in the USA

Hoasca is a hallucinogenic brew originally used for magico-religious purposes by Amerindian populations of the western Amazon Basin. Throughout the last four decades, Brazilian syncretic churches, such as Santo Daime and Uniao do Vegetal (UDV) have helped spread the ritual use of hoasca abroad. This trend has raised concerns that regular use of this N,N-dimethyltryptamine-containing tea may lead to the mental and physical health problems associated with drug abuse. Lawsuits involving tensions between drug control laws and principles of religious freedom had occurred in Europe and in the USA. In 2006 the U.S. Supreme Court ruled for the UDV, allowing its local branch in the state of New Mexico to import, store and use hoasca. In 2009 the District Court of the State of Oregon ruled a similar decision in favor of a local branch of the Santo Daime Church. These decisions point to a significant increase in the use of hoasca in the U.S. and to the definitive establishment of this practice in American religious diversity. The few rigorous studies that have been completed on the psychological and medical effects of hoasca suggest mostly positive effects of religious hoasca use, but concerns about the potential for harmful effects remain. To further elucidate the effects of religious use of hoasca we propose a case-control study in which 35 North American users of hoasca within UDV will be compared to 35 matched control subjects with no history of hoasca use. The assessment will include instruments on quality of life, personality, spirituality and religiosity, mood, neuropsychological function and altered states of consciousness.

# EXHIBIT 6

**List of Publications**

**Full Articles**

REIS, H. S.; RODRIGUES, I. R. S.; ANJOS-SANTOS, A.; LIBARINO-SANTOS, M.; SERRA, Y. A.; CATA-PRETA, E. G.; OLIVEIRA-CAMPOS, D.; KISAKI, N. D.; BARROS-SANTOS, T.; YOKOYAMA, T. S.; CRUZ, F. C.; OLIVEIRA-LIMA, A. J.; **BARBOSA, P. C. R.**; BERRO, L. F.; MARINHO, E. A. V. **Ayahuasca blocks the reinstatement of methylphenidate-induced conditioned place preference in mice: behavioral and brain Fos expression evaluations.** Psychopharmacology (Berl). 2020 Jul 16. DOI: 10.1007/s00213-020-05609-6. (Online ahead of print.)

**BARBOSA, P. C. R.**; TOFOLI, L. F.; BOGENSCHUTZ, M. P.; HOY, R.; BERRO, L. E. M.; ARECO, K.; WINKELMAN, M. **Assessment of alcohol and tobacco use disorders among religious users of ayahuasca.** Frontiers in Psychiatry, v. 9, p. 136, 2018.

CATA-PRETA, E. G.; SERRA, Y. A.; MOREIRA-JUNIOR, E. D. C.; REIS, H. S.; KISAKI, N. D.; LIBARINO-SANTOS, M.; SILVA, R. R. R.; BARROS-SANTOS, T.; SANTOS, L. C.; **BARBOSA, P. C. R.**; COSTA, J. L.; OLIVEIRA-LIMA, A. J.; BERRO, L. F.; MARINHO, E. A. V. **Ayahuasca and Its DMT- and β-carbolines - Containing Ingredients Block the Expression of Ethanol-Induced Conditioned Place Preference in Mice: Role of the Treatment Environment.** Frontiers in Pharmacology, v. 9, p. 561, 2018.

**BARBOSA, P. C. R.**; STRASSMAN, R.; SILVEIRA, D. X.; ARECO, K.; HOY, R.; POMMY, J.; THOMA, R.; BOGENSCHUTZ, M. P. **Psychological and neuropsychological assessment of regular hoasca users.** Comprehensive Psychiatry (Print), v. 71, p. 95-105, 2016.

BOGENSCHUTZ, M. P.; FORCEHIMES, A.; POMMY, J.; WILCOX, C.; **BARBOSA, P. C. R.**; STRASSMAN, R. **Psilocybin-assisted treatment for alcohol dependence: A proof-of-concept study.** Journal of Psychopharmacology (Oxford), v. 29, p. 1-11, 2015.

OLIVEIRA-LIMA, A.; SANTOS, R.; HOLLAIS, A.; GERARDI-JUNIOR, C.; BALDAIA, M.; WUO-SILVA, R.; YOKOYAMA, T. S.; COSTA, J.; MALPEZZI-MARINHO, E.; **BARBOSA, P. C. R.**; BERRO, L.; FRUSSA-FILHO, R. **Effects of ayahuasca on the development of ethanol-induced behavioral sensitization and on a post-sensitization treatment in mice.** Physiology & Behavior, p. 28, 2015.

**BARBOSA, P. C. R.**; MIZUMOTO, S.; BOGENSCHUTZ, M. P.; STRASSMAN, R. **Health status of ayahuasca users.** Drug Testing and Analysis, v. 4, p. 1, 2012.
#
BOUSO, J. C.; GONZALEZ, D.; FONDEVILA, S.; CUTCHET M.; FERNÁNDEZ, X.; **BARBOSA, P. C. R.**; ALCÁZAR-CÓRCOLES, M. Á.; ARAUJO, W. S.; BARBANOJ, M. J.; FÁBREGAS J. M.; RIBA, J. **Personality, psychopathology, life attitudes and neuropsychological performance among ritual users of ayahuasca.**

# EXHIBIT 6

Plos One, v. 7, p. 1-13, 2012.

ANDERSON, B.; LABATE, B. C.; MEYER, M.; TUPPER, K.; **BARBOSA, P. C. R.**; GROB, C.; DAWSON, A.; MCKENNA, D. **Statment on ayahuasca.** International Journal on Drug Policy, v. 23, p. 173-175, 2012.

MIZUMOTO, S.; SILVEIRA, D. X.; **BARBOSA, P. C. R.**; STRASSMAN, R. **HRS - Hallucinogen Rating Scale - Versão Brasileira: Tradução e adaptação transcultural.** Revista de Psiquiatria Clínica (USP. Impresso), v. 38, p. 231-237, 2011.

FÁBREGAS J. M.; GONZALEZ, D.; FONDEVILA, S.; CUTCHET M.; FERNÁNDEZ, X.; **BARBOSA, P. C. R.**; ALCÁZAR-CÓRCOLES, M. Á.; BARBANOJ, M. J.; RIBA, J.; BOUSO, J. C. **Assessment of addiction severity among ritual users of ayahuasca.** Drug and Alcohol Dependence, v. 1, p. 257-261, 2010.

**BARBOSA, P. C. R.**; CAZORLA, I. M.; GIGLIO, J. S.; STRASSMAN, R. **A six-month prospective evaluation of personality traits, psychiatric symptoms and quality of life in ayahuasca-naïve subjects.** Journal of Psychoactive Drugs 41 (3): 205-212, 2009.

**BARBOSA, P. C. R.**; DALGALARRONDO, P.; GIGLIO, J. S. **Altered States of Consciousness and Short-term Psychological After-effects Induced by the First Time Ritual Use of Ayahuasca in Urban Context in Brazil.** Journal of Psychoactive Drugs 37 ( 2): 193-201, 2005.

**BARBOSA, P. C. R. O uso ritual de um alucinógeno no contexto urbano: estados alterados de consciência e efeitos em curto prazo induzidos pela primeira experiência com a ayahuasca.** Jornal Brasileiro de Psiquiatria 52 (3): 181-190, 2003.

**Book Chapter**

LABATE, B. C.; SANTOS, R. G.; ANDERSON, B.; MERCANTE, M.; **BARBOSA, P. C. R.** The Treatment and Handling of Substance Dependence with Ayahuasca: Reflections on Current and Future Research. In: LABATE, B. C.; MACRAE, E. (org.). **Ayahuasca, Ritual and Religion in Brazil. Ayahuasca, Ritual and Religion in Brazil.** Londres: Equinox, 2010, v. , p. 205-227.

**BARBOSA, P. C. R.**; DA SILVA DOS SANTOS, S. F. Aspectos culturais e sociais da saúde mental. In: SILVA, C. P. B. V.; SOARES, E. F. S.; DOS SANTOS, J. E. (org.). **I Encontro de Saúde Mental: rede de experiências.** 1ª ed. Salvador: EDUNEB v. I, p. 51-59, 2007.

EXHIBIT 6

# APPENDIX III

#

#

#

# EXHIBIT 6

**Professional Biography of Dr. Eduardo Ary Villela Marinho**

Dr. Eduardo Ary Villela Marinho obtained his bachelor's degree in Biological Sciences in the Pontifícia Universidade Católica de Campinas (1992) and his master's degree in Biological Sciences (Physiology) at at Universidade Estadual de Campinas  (1997). He also holds PhD in Pharmacology at Universidade Federal de São Paulo (2011). Dr. Marinho was appointed Professor of Pharmacology at Universidade Estadual de Santa Cruz (Brazil). Dr. Marinho's main research activities concern Pharmacology and Physiology, Behavioral Pharmacology, Preference Conditioned by Place, Substance Abuse, Ayahuasca and other native medicinal plants.

**Research Strategy and Context**

1- Experimental therapeutic evaluation with Ibogaine in drug-induced chemical dependence in mice.
2- The role of 5HT2A receptors in the anti-addictive effect of Ayahusca in animal models of ethanol dependence.

**List of Publications**

1. REIS, HENRIQUE S.; RODRIGUES, ISA R. S.; ANJOS-SANTOS, ALEXIA; LIBARINO-SANTOS, MATHEUS; SERRA, YASMIM A.; CATA-PRETA, ELISÂNGELA G.; OLIVEIRA-CAMPOS, DANIELLA; KISAKI, NATALI D.; BARROS-SANTOS, THAÍSA; YOKOYAMA, THAIS S.; CRUZ, FABIO C.; OLIVEIRA-LIMA, ALEXANDRE J.; BARBOSA, PAULO C. R.; BERRO, LAIS F.; MARINHO, EDUARDO A. V.

Ayahuasca blocks the reinstatement of methylphenidate-induced conditioned place preference in mice: behavioral and brain Fos expression evaluations. PSYCHOPHARMACOLOGY. Fator de Impacto(2018 JCR): 3,4240, v.1, p.1 - , 2020.

2. BARROS-SANTOS, THAÍSA; SILVA, KALLYANE SANTOS OLIVEIRA; LIBARINO-SANTOS, MATHEUS; REIS, HENRIQUE SOUSA; Tamura, Eduardo Koji; DE OLIVEIRA-LIMA, ALEXANDRE JUSTO; BERRO, LAÍS FERNANDA; UETANABARO, ANA PAULA TROVATTI; MARINHO, EDUARDO ARY VILLELA

Effects of chronic treatment with new strains of Lactobacillus plantarum on cognitive, anxiety- and depressive-like behaviors in male mice. PLoS One. Fator de Impacto (2018 JCR): 2,7760, v.15, p.e0234037 - , 2020.

3. LIBARINO-SANTOS, MATHEUS; DE SANTANA SANTOS, ANA CATHERINE GOMES; CATA-PRETA, ELISANGELA G.; BARROS-SANTOS,

## EXHIBIT 6

THAÍSA; NUNES BRANDÃO, NINA ROSA; BORGES, AUREA LORENA NUNES; SANTOS-BALDAIA, RENAN; HOLLAIS, ANDRÉ W.; BALDAIA, MARILIA A.; BERRO, LAÍS F.; Marinho, Eduardo A.V.; Frussa-Filho, Roberto; OLIVEIRA-LIMA, ALEXANDRE J.

Role of the treatment environment in the effects of aripiprazole on ethanol-induced behavioral sensitization and conditioned place preference in female mice. DRUG AND ALCOHOL DEPENDENCE. Fator de Impacto(2018 JCR): 3,4660, v.208, p.107856 - , 2020.

4. BRANDÃO, N.R.N.; LIBARINO-SANTOS, M.; MARINHO, E.A.V.; OLIVEIRA, T.S.; BORGES, A.L.N.; OLIVEIRA, A.P.; OLIVEIRA-CAMPOS, D.; AZEVEDO-SOUZA, N.; SANTOS, V.F.L.; BERRO, L.F.; OLIVEIRA-LIMA, A.J.

Treatment with zolpidem after ethanol administration potentiates the expression of ethanol-induced behavioral sensitization in mice. Brazilian Journal of Medical and Biological Research (on line). Fator de Impacto(2018 JCR): 1,8500, v.53, p.1 - 6, 2020.

5. MALPEZZI-MARINHO, ELENA L. A.; MOLSKA, GRAZIELA R.; FREIRE, LYVIA I. G. P.; SILVA, CRISTIANE I.; TAMURA, EDUARDO K.; BERRO, LAÍS F.; PARADA, CARLOS A.; MARINHO, EDUARDO ARY VILLELA

Effects of hydroalcoholic extract of Solidago chilensis Meyen on nociception and hypernociception in rodents. BMC Complementary and Alternative Medicine. Fator de Impacto(2018 JCR): 2,4790, v.19, p.72 - , 2019.

6. WUO-SILVA, RAPHAEL; FUKUSHIRO-LOPES, DANIELA F.; FIALHO, BRUNO P.; HOLLAIS, ANDRÉ W.; SANTOS-BALDAIA, RENAN; MARINHO, EDUARDO A. V.; MÁRI-KAWAMOTO, ELISA; YOKOYAMA, THAÍS S.; LOPES-SILVA, LEONARDO B.; BERRO, LAÍS F.; FRUSSA-FILHO, ROBERTO; LONGO, BEATRIZ M.

Participation of Dopamine D1 and D2 Receptors in the Rapid-Onset Behavioral Sensitization to Modafinil. Frontiers in Pharmacology. Fator de Impacto (2018 JCR): 3,8450, v.10, p.1 - 9, 2019.

7. BARBOSA, PAULO CESAR RIBEIRO; TÓFOLI, LUÍS F.; BOGENSCHUTZ, MICHAEL P.; HOY, ROBERT; BERRO, LAIS F.; MARINHO, EDUARDO A. V.; ARECO, KELSY N.; WINKELMAN, MICHAEL J.

Assessment of Alcohol and Tobacco Use Disorders Among Religious Users of Ayahuasca. Frontiers in Psychiatry. Fator de Impacto(2018 JCR): 3,1610, v.9, p.1 - 12, 2018.

8. CATA-PRETA, ELISANGELA G.; SERRA, YASMIM A.; MOREIRA-JUNIOR, ELISEU DA C.; REIS, HENRIQUE S.; KISAKI, NATALI D.; LIBARINO-

# EXHIBIT 6

SANTOS, MATHEUS; SILVA, RAIANY R. R.; BARROS-SANTOS, THAÍSA; SANTOS, LUCAS C.; BARBOSA, PAULO C. R.; COSTA, JOSÉ L.; OLIVEIRA-LIMA, ALEXANDRE J.; BERRO, LAIS F.; MARINHO, EDUARDO A. V.

Ayahuasca and Its DMT- and β-carbolines - Containing Ingredients Block the Expression of Ethanol-Induced Conditioned Place Preference in Mice: Role of the Treatment Environment. Frontiers in Pharmacology. Fator de Impacto(2018 JCR): 3,8450, v.9, p.1 - 14, 2018.

9. SILVA, ALINE A.F.; SOUZA, EVELYN B.; CARVALHO, CASSIO C.; SILVA, RAIANY R.R.; BRITO, ANA CAROLINA L.; PRETA, ELISANGELA G.C.; OLIVEIRA, THAYNARA S.; BERRO, LAIS F.; OLIVEIRA-LIMA, ALEXANDRE J.; MARINHO, EDUARDO A.V.

Context-dependent effects of rimonabant on ethanol-induced conditioned place preference in female mice. DRUG AND ALCOHOL DEPENDENCE. Fator de Impacto(2018 JCR): 3,4660, v.179, p.317 - 324, 2017.

10. OLIVEIRA-LIMA, A.J.; MARINHO, E. A. V.; SANTOS-BALDAIA, R.; HOLLAIS, A. W.; BALDAIA, M. A.; TALHATI, F.; Ribeiro, Luciana T.C.; WUO-SILVA, R.; BERRO, L. F.; Frussa Filho, R.

Context-dependent efficacy of a counter-conditioning strategy with atypical neuroleptic drugs in mice previously sensitized to cocaine. PROGRESS IN NEURO-PSYCHOPHARMACOLOGY & BIOLOGICAL PSYCHIATRY. Fator de Impacto(2018 JCR): 4,3150, v.73, p.49 - 55, 2017.

·11. MARINHO, Eduardo A.V.; OLIVEIRA LIMA, ALEXANDRE J.; YOKOYAMA, THAIS S.; SANTOS-BALDAIA, RENAN; Ribeiro, Luciana T.C.; BALDAIA, MARILIA A.; DA SILVA, RAPHAEL WUO; HOLLAIS, ANDRE WILLIAN; TALHATI, FERNANDA; LONGO, BEATRIZ MONTEIRO; BERRO, LAIS FERNANDA; FRUSSA-FILHO, ROBERTO

Post-sensitization treatment with rimonabant blocks the expression of cocaine-induced behavioral sensitization and c-Fos protein in mice. PHARMACOLOGY BIOCHEMISTRY AND BEHAVIOR. Fator de Impacto(2018 JCR): 2,7730, v.156, p.16 - 23, 2017.

12. OLIVEIRA-LIMA, A.J.; SANTOS, R.; HOLLAIS, A. W.; GERARDI-JUNIOR, C. A.; BALDAIA, M. A.; WUO-SILVA, R.; YOKOYAMA, T.S.; COSTA, J. L.; MALPEZZI-MARINHO, E. L. A.; RIBEIRO-BARBOSA, P. C.; BERRO, L.F.; FRUSSA-FILHO, R.; MARINHO, E. A. V.

Effects of ayahuasca on the development of ethanol-induced behavioral sensitization and on a post-sensitization treatment in mice. PHYSIOLOGY & BEHAVIOR. Fator de Impacto(2018 JCR): 2,6350, v.142, p.28 - 36, 2015.

## EXHIBIT 6

13. MARINHO, Eduardo A.V.; OLIVEIRA-LIMA, ALEXANDRE J.; SANTOS, RENAN; HOLLAIS, ANDRÉ W.; BALDAIA, MARILIA A.; Wuo-Silva, Raphael; YOKOYAMA, THAIS S.; TAKATSU-COLEMAN, ANDRÉ L.; PATTI, CAMILLA L.; LONGO, BEATRIZ M.; BERRO, LAÍS F.; Frussa-Filho, Roberto

Effects of rimonabant on the development of single dose-induced behavioral sensitization to ethanol, morphine and cocaine in mice. PROGRESS IN NEURO-PSYCHOPHARMACOLOGY & BIOLOGICAL PSYCHIATRY. Fator de Impacto(2018 JCR): 4,3150, v.58, p.22 - 31, 2015.

14. PAULA FREIRE, L. I. G.; MALPEZZI-MARINHO, E. L. A.; MOLSKA, G. R.; Kohn, D.O.; CORREA, L.; MARINHO, E. A. V.

Evaluation of the Acute Toxicity of the Hydroalcoholic Extract of Solidago chilensis Meyen (Arnica Do Campo) in Mice. American Journal of Phytomedicine and Clinical Therapeutics. , v.2, p.217 - 228, 2014.

15. MARINHO, EDUARDO A. V.; OLIVEIRA-LIMA, ALEXANDRE J.; Wuo-Silva, Raphael; SANTOS, RENAN; BALDAIA, MARILIA A.; HOLLAIS, ANDRÉ W.; LONGO, BEATRIZ M.; BERRO, LAÍS F.; Frussa-Filho, Roberto

Selective action of an atypical neuroleptic on the mechanisms related to the development of cocaine addiction: a pre-clinical behavioural study. INTERNATIONAL JOURNAL OF NEUROPSYCHOPHARMACOLOGY. Fator de Impacto(2018 JCR): 4,2070, v.17, p.613 - 623, 2014.

16. PROCÓPIO-SOUZA, ROBERTA; FUKUSHIRO, DANIELA F.; TROMBIN, THAÍS F.; SILVA, R. W.; ZANLORENCI, LINEANE H.F.; LIMA, ALEXANDRE J.O.; RIBEIRO, LUCIANA T.C.; CORRÊA, JUSSARA M.R.M.; MARINHO, E. A. V.; KAMEDA, SONIA R.; ANDERSEN, MONICA L.; TUFIK, SERGIO; FRUSSA-FILHO, ROBERTO

Effects of group exposure on single injection-induced behavioral sensitization to drugs of abuse in mice. Drug and Alcohol Dependence. Fator de Impacto(2018 JCR): 3,4660, v.118, p.349 - 359, 2011.

17. TAMURA, EDUARDO KOJI; JIMENEZ, RENATA SPADA; WAISMAM, KALINE; GOBBO-NETO, LEONARDO; LOPES, NORBERTO PEPORINE; MALPEZZI-MARINHO, ELENA A.L.; MARINHO, EDUARDO A.V.; FARSKY, SANDRA H.P.

Inhibitory effects of Solidago chilensis Meyen hydroalcoholic extract on acute inflammation. JOURNAL OF ETHNOPHARMACOLOGY. Fator de Impacto(2018 JCR): 3,4140, v.122, p.478 - 485, 2009.

EXHIBIT 6