CHARLES CARREON (CSB #127139)
7 N, Ridge Crest Circle
Silver City, New Mexico 88061
Tel: 928-975-2191

JOHN SULLIVAN (CSB#204648) Pro Hac Vice
17532 Miranda Street
Encino, California 91316-1249
Tel:818-769-7236 Fax:818-301-2175
Email: Sullivan.John84@gmail.com

Email: chascarreon@gmail.com
Attorney for Plaintiffs
Arizona Yagé Assembly and
Winfield Scott Stanley III

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

Arizona Yagé Assembly; Winfield Scott Stanley III, in his capacity as Founder and Director of Arizona Yagé Assembly,

          Plaintiffs,

     v.

Merrick B. Garland, Attorney General of the United States, *et al.*,

          Defendants.

No. 2:20-cv-2373-ROS

**PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO STAY**

1. **Defendants cannot credibly assert prejudice from delay, as they sought a stay of this litigation from their very first filing.**

    On July 14, 2020, the Defendants filed the Declaration of Drug Enforcement Administration ("DEA") Agent Brinks in support of the governments motion for stay of these proceedings. (Brinks Declaration, Dkt. 19-1.) The Brinks Declaration provides evidence in support of a motion for stay by the DEA on the grounds that the agency was

"actively engaged in updating and revising DEA's existing regulations to incorporate consideration of issues arising under the Religious Freedom Restoration Act (RFRA) and to lay out the procedures by which applications for religious exemptions are to be handled." Dkt. 19-1, ¶5 2:21-24. More than three years later, the Brinks Declaration has yet to be factually substantiated and there is a high likelihood that the statements made by the government have become so much fiction.

In May 2024, the United States Government Accountability Office ("GAO") published a report to Congress titled "*GAO-24-106630 - Drug Control: DEA Should Improve its Religious Exemptions Petition Process for Psilocybin (Mushrooms) and Other Controlled Substances.*" The GAO found the DEA's "Guidance" letter for religious exemptions does not "provide the standard the agency will use to assess 'religious sincerity' or any other aspects of its application," and that "over an 8-year period—fiscal year 2016 through January 2024—DEA reported that 24 petitioners requested a religious exemption from the Controlled Substances Act under the Religious Freedom Restoration Act. As of January 2024, the DEA's information indicated that none of these petitioners were granted a religious exemption and two petitioners were denied." Pg. 38-39

Based on its review and evaluation of the DEA, the US Government Accountability Office made the following four recommendations:

> • The DEA Administrator should more clearly communicate the types of information that Religious Freedom Restoration Act petitioners should provide to allow DEA to evaluate petitions for religious sincerity. (Recommendation 1)
> • The DEA Administrator should more clearly communicate the standards and relevant factors to Religious Freedom Restoration Act petitioners in making a determination related to religious sincerity. (Recommendation 2)
> • The DEA Administrator should establish timeframes for DEA to make determinations on completed religious exemption petitions to provide Religious Freedom Restoration Act petitioners with DEA's final determinations. (Recommendation 3)

• The DEA Administrator should provide Religious Freedom Restoration Act petitioners with information for petitioners to be able to receive updates on the agency's progress related to exemption reviews. (Recommendation 4)

Pg. 45

The GAO report helps to explain why the DEA still is unable to articulate a clear methodology or process for conducting discovery in this matter that would meet the most basic requirement of exacting scrutiny – to show the government's need for the information it seeks – leave aside the issue of narrow tailoring to achieve the government's ends with the least intrusive means

**2. Plaintiff Stanley's Declaration is not conclusory and specifically states averments of associational harm that are substantiated by record evidence and personal knowledge.**

Plaintiffs Stanley has been consistent throughout this litigation in stating specific averments of associational harm based on his personal knowledge. Dkt. 222-1, ¶6 3:13-21 and ¶8 4:9-13; Dkt. 177-1, ¶3 2:14-22, ¶4 2:23-3:7, ¶7 3:27-28, 4:1-3, ¶8 4:14-15, ¶9 4:22-24.

**3. Plaintiffs made First, Fourth, and Fifth Amendment objections to the government's discovery requests before this Court entered the Disclosure Order; therefore, Plaintiffs assertions of privacy and associational privileges were timely made.**

On November 14, 2024, Plaintiffs timely produced Supplemental Responses to First Set of Interrogatories from Defendants.  On February 9, 2024, Plaintiffs timely produced a Confidential Witness List and Corrected Responses to First Set of Requests for Admissions from Defendants. Plaintiffs also timely produced Responses to First Set of Requests for Production from Defendants.  In all of the discovery produced to the Defendants prior to the Disclosure Order entered on February 22, 2024, Plaintiffs made First, Fourth, Fifth Amendment objections and raised assertions of privacy and associational privileges.  A

timely objection in the 9th Circuit is generally one that is made as soon as the party knows, or should know, that the objection is applicable.  Plaintiffs' objections were timely made.

**4. The Protective Order does not mitigate the chilling effect on the First Amendment rights of Plaintiffs and the Proposed Intervenor Plaintiff Class, and provides no protection from the threat of the government's infringement upon Plaintiffs Fourth and Fifth Amendment rights.**

"[A]ssurances of confidentiality may reduce the burden of disclosure to the State, they do not eliminate it." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616(2021) (California AG's claimed use of information required by nonprofit donor disclosure law did not warrant disclosure, and risks of disclosure not been mitigated). The protective order entered in this case does not even purport to address the situation presented by Plaintiffs' claims. The protective order is only "intended to provide a mechanism for handling the disclosure or production of Protected Information ***to which there is no objection other than confidentiality***." (Dkt. # 217, Protective Order, 28:19-21) (emphasis added). The protective order is not intended to affect Plaintiffs' right to withhold, redact documents or seek to designate information as "otherwise exempted from discovery under any other law" nor should it "***prejudice Plaintiffs the right to seek additional protective treatment for any information it considers to be highly sensitive, or otherwise exempt from disclosure, such that protections in this Order would be insufficient.***" (Dkt. # 217, , Protective Order, 28:21-29:3) (emphasis added).

In fact, the Order does not constitute any ruling on the question of whether any particular document or category of information is otherwise properly discoverable and does not constitute any ruling on the potential objection to the discoverability, relevance, or admissibility of any document or information. (Dkt. # 217, Protective Order, 29:7-10). Finally, the Order shall not be construed as a waiver of any defense, right, objection, or claim by Plaintiffs including any objection to the production of documents and any claim of privilege or other protection from disclosure and shall not be precedent for adopting any procedure with respect to the disclosure of any such other information. (Dkt. # 217,

Protective Order, 31:14-18). Just as in *Perry* and *Ams. for Prosperity Found.*, even when the evidence presented by Plaintiffs is arguably lacking in particularity and even though a protective order is in place, the evidentiary burden shifts to the Defendants to demonstrate a sufficient need for the discovery to counterbalance the infringement on First Amendment associational rights. To date, Defendants have not produced any record evidence to demonstrate this need; regardless of the type of association, when a prima facie case is shown of arguable first amendment infringement, compelled disclosure requirements are to be reviewed under the exacting scrutiny standard.

**5. The Ninth Circuit stayed the Disclosure Order and found a case to answer; further, the Ninth Circuit directed plaintiffs to file this pending motion because it lacked jurisdiction over the proceedings**

The Ninth Circuit did not adjudicate any of the claims to be raised via the petition for certiorari after initially finding a case to answer and grounds to issue a stay. The issuance of a stay is unusual and implies the facial legitimacy of the allegations of the petition. The denial of the petition and the petition for rehearing were devoid of explanatory argument; thus, the defendants' Ninth Circuit "stare decisis" argument is meritless. The writ for mandamus to the Ninth Circuit was to direct the District Court to use the Exacting Scrutiny standard, and the writ for certiorari seeks the same relief. Finally, the Ninth Circuit denied the plaintiff-petitioners' motion for stay in the appellate court as moot for lack of jurisdiction, and pointed plaintiff to the District Court and the Supreme Court as alternative venues that would have jurisdiction to issue the stay. Accordingly, plaintiffs filed the indicated motion.

**6. The balance of the hardships tips sharply toward the moving parties.**

The defendant agencies are unable to show any hardship from delay whatsoever, because they have no rights to advance in this litigation, and sought a stay under apparently false pretenses as the first order of business when the case was filed. Since then, nothing has changed, and neither DEA, CBP, or DHS have shown a scintilla of evidence of hardship. That is because they will suffer none.

When the right of associational privacy is threatened for an organization like AYA,

the hardship of delay in receiving a fair and lawful adjudication falls on the group whose members' associational rights have been infringed.  As the declarations submitted by plaintiffs establish, enforcing the Disclosure Order would essentially destroy AYA and end Mr. Stanley's work as the head of the congregation (Cox Dec. ¶ 29; Huyn Dec. ¶¶ 20; Ziebol Dec. ¶ 21.)  Because the threat is existential, all lawful means must be used to seek relief from it, even if that becomes a labor of years.  That was certainly how matters went in *NAACP v. Alabama, supra*, as District Judge Robert L. Carter, who argued the case before the Supreme Court, noted in his memoir:

> ***Justice John Marshall Harlan***, whose grandfather had filed the only dissent in Plessy v. Ferguson, was a new member of the Court. He ***wrote the opinion holding that as long as the officers of the NAACP in Alabama were revealed, the rank-and-file members of the organization had the right to assemble anonymously to agitate peacefully through the NAACP against racial discrimination. This was a great victory, but enforcement took years***. The case was sent back to the Alabama Supreme Court, which did nothing for a while. Then it again dismissed the case, this time on the ground that we had failed to meet some other conditions.
>
> We took this back to the Supreme Court, which rejected this holding on the ground that the case had been presented by both parties on one set of issues and the Court opinion was based on those issues. It was now too late to raise new ones. The supreme court of Alabama just let the matter sit without taking any action. Finally, I filed suit in the federal court to have it issue the necessary order allowing resumption of our activities in the state. The federal litigation succeeded in bypassing the state court's stalling tactics, and ***in 1964 the NAACP was finally able to resume operations in Alabama***.
>
> USDC Judge Robert L. Carter, *A Matter of Law: A Memoir of Struggle*, 154-155 (New York, The New Press 2005)(emphasis added).

Thus, for six years, the NAACP was unable to work in Alabama, because that is the cost of getting associational privacy wrong.  Further, the cost is entirely born by the group whose associational privacy has been infringed. Not until six years after the Supreme Court overruled the $100,000 sanction imposed by the trial judge and upheld by the Alabama Supreme Court, was the NAACP able to begin serving its people again in Alabama.  During this time, Alabama harvested the "benefit" of silencing the only legal representatives of

black Americans during the long fight against segregation.  This is the cost in time that results from ignoring the right of associational privacy – years of injustice borne by the organization that must litigate to preserve its very right to exist.

It's likely the Alabama Attorney General, like the DEA in this case, felt "plagued" by the NAACP's commitment to associational privacy; however, history provides a different view, placing Alabama in the role of the villain, the abuser of the legal process.

Similarly shortsighted in its litigation strategy, the DEA fails to consider the claims of the plaintiffs and their congregation seriously.  (Stanley Dec. ¶¶ 12 – 20.) The DEA appears to be institutionally incapable of seeing a religious organization except through the lens of illegality, and thus pursues a litigation strategy that burdens associational privacy, and exceeds all reasonable discovery demands.  The DEA is unable to see that the search for justice by people who are being denied their Constitutional rights by governmental agencies is precisely one of the primary purposes for which the federal courts exist and have jurisdiction over federal agencies.

Thus, the Government's brief presents a plethora of statements that the Stanley Declaration has been required to rebut, page and line number, in order to not have its claims misunderstood by the Court.  (Stanley Dec. ¶¶ 2 – 9.)  In truth and in fact, the Government will suffer no prejudice from a stay, because it has no claims pending, no interests to advance, and sought a stay at the outset of the matter because the *status quo* was then most desirable to it.  Nothing has changed.  Accordingly, the *status quo* should be preserved.

**7. The Pending Intervention Claims Present a Serious Risk of Inconsistent Adjudications in This Very Action, and The Demands of Judicial Efficiency Compel a Stay.**

Rather than actually consider the merits of plaintiffs' case, the DEA seeks to lead this Court into error by urging it to push litigation forward in the District Court while a writ of certiorari is being pursued.  This is a recipe for generating multiple inconsistent adjudications.  *First*, the lifting of the stay has activated the *Taylor Cox v. Garland* Intervention action; *second*, the class plaintiffs had no notice of the entry of the Disclosure

Order that abridges their rights, and thus have a Fourteenth Amendment Due Process right to present the objections set forth in their respective declarations; *third*, determination of the motion to intervene will affect the enforceability of the Disclosure Order because enforcement would abridge Intervenor Plaintiffs' Constitutional rights; and *fourth*, denial of a motion to intervene is immediately appealable.   Thus -- leave aside the risk of inconsistent adjudications between the District Court and the Supreme Court in this main action -- the proposed Intervention action could be a fertile source of inconsistent decisions between and among the District Court, the Ninth Circuit and the Supreme Court.

Obvious issues of judicial efficiency virtually compel the issuance of a stay of the entire action.  The DEA's idea of pursuing interim production of discovery would be highly impractical.  When the rules of discovery are unknown, because the Court has followed a path of error indicated by the defendants, who resist application of exacting scrutiny when it is clearly required, further adjudications while the petition for certiorari is pending will simply create more work to be later undone.

**8. The government has an alternate Source of Relevant Information, because Plaintiffs have disclosed the identities of their intended witnesses from their congregation, much as the NAACP did in *NAACP v. Alabama*.**

This litigation is very costly, and it taxes the church's resources to a great extent; plaintiffs would much prefer to not have to litigate a discovery dispute where the government seeks to avoid the narrow tailoring required under strict and exacting scrutiny. (Stanley Dec. ¶ 10.)  Plaintiffs have revealed the identities of eight witnesses who can provide knowledge of the core functions of AYA.  The government is in fact delaying this litigation by failing to recognize that they have obtained, due to circumstances well discussed in our appellate briefings, a disclosure order that will not stand final appellate scrutiny because it is destructive of Plaintiffs associational privacy and was not a product of the exacting scrutiny process required by *NAACP v. Alabama* and its progeny.  Likely it will now claim to be surprised by the contents of the Cox, Ziebol, and Huyn declarations;

1  however, the defendants have long had their names and detailed descriptions of their

2  anticipated testimony, but have never sought to depose them.

3          Further, the government claims that the information sought in written discovery is

4  highly relevant to determine the sincerity of Plaintiffs' religious beliefs and seemingly

5  suggests that the value of deposition testimony from the already produced witnesses list is

6  inherently compromised "In light of the fleeting nature of memory." Dkt. 248, 11:2-12:15.

7  The contention is bizarre.    In *United States v. Hoffman*, the numerous defendants

8  established their RFRA defense with very simple averments of faith given as oral testimony

9  at a criminal trial.   Notwithstanding the "fleeting nature of memory," they were able to

10  establish their sincerely held beliefs and religious free exercise under RFRA without resort

11  to documents, because the standard for showing religious sincerity is a reasonable case by

12  case standard that is easily met by plaintiffs in this case. *United States v. Hoffman*, 436 F.

13  Supp. 3d 1272 (D. Ariz. 2020); see also, *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir.

14  2004).

15          As in *Hoffman*, the Government has not identified any evidence in the record that

16  would support a conclusion that Arizona Yage Assembly and Scott Stanley are "patently

17  devoid of religious sincerity" or that it is even remotely conceivable that a RFRA plaintiff's

18  religious beliefs could be reasonably affected by "the fleeting nature of memory."

19          Additionally, the government attempts to distinguished itself from *Perry* asserting

20  that here, "there is no other source through which Defendants can obtain highly relevant

21  discovery regarding AYA's practices or the sincerity of its members." However, this is

22  misguided because in *Perry*, as the Defendants pointed out in their motion, "expert

23  testimony" is a viable alternative source of obtaining discovery. Dkt. 248, 11:10-19.

24          Nevertheless, Defendants continue to rely on conclusory arguments that the

25  information sought in the overly broad discovery demands is relevant to "evaluating the

26  safety and sincerity of Plaintiff's practices," "for identifying potential witnesses," and "to

27  the potential health or safety risks posed by Plaintiffs' practices." See generally, (Dkt. #

28

220; Disclosure Order Joint Stipulation).  Such general responses to fail to satisfy the requirements of exacting scrutiny.

**9. A Stay Should Be Granted to Avoid the Irreparable Injury to the Plaintiffs and their Congregation that Would Result from the Compelled Disclosure of the Identities, Emails, Medical Records, Ceremonial Attendance and Donation Records of the Rank-and-File AYA Membership**

The Stanley declaration explains the distress that he and the AYA congregation are suffering right now due to the effects of the Disclosure Order, and the frustration felt that this litigation, intended to protect the AYA congregation from undue burdens has become the vehicle for the DEA to impose burdensome demands upon them through the Disclosure Order. (Dkt. # 220.)  The declarations of the class representative of the proposed class of Intervenor Plaintiffs, and of two class members, establish that the compelled disclosure of the names, email addresses, emails, medical records, ceremonial attendance and donation records of the 5,239 class members would destroy the AYA church.  (Cox Dec. ¶ 29; Huyn Dec. ¶¶ 20; Ziebol Dec. ¶ 21.)  And it is apparent from these declarations that the religious practices at AYA are reverently conducted ceremonies that are literally saving the lives of victims of trauma and PTSD from suicide, transforming their life sufferings into a meaningful path of recovery and spiritual growth.  (See, Cox Dec. ¶¶ 1 – 28; Huyn Dec. ¶¶ 1-19; Ziebol Dec. ¶¶ 1- 20.)    As Mr. Stanley notes in paragraphs 19 and 20 of his declaration, AYA's mission to save veterans from suicide through the healing power of Ayahuasca ceremony is timely, since 22 veterans die from suicide each day, veterans like class representative Taylor Cox, whose inspiring story of trauma, PTSD, homelessness, drug addiction, and recovery through AYA ceremonies is, amazingly, not an uncommon one among the AYA congregation.  (Cox Dec., generally.)

Accordingly, it is clear that in the absence of a stay, the balance of the hardships tips towards plaintiffs.  On the other hand, the defendants will suffer no prejudice from delay that they have sought from the outset.  Further, the public interest in religious freedom and allowing churches to provide healing services to the community favors a stay. Finally, so that the stability of the *status quo* may be preserved, inconsistent adjudications

10

avoided, judicial efficiency promoted, and the rights of the parties submitted for dispositive determination by the Supreme Court, this Court is respectfully requested to stay this action pending the resolution of plaintiffs' pending petition for writ of certiorari.

Dated:  October 7, 2024

CHARLES CARREON
/s/Charles Carreon
CHARLES CARREON (127139)

Attorney for Plaintiffs
Arizona Yagé Assembly, and
Winfield Scott Stanley III