CHARLES CARREON (CSB #127139)
7 N. Ridge Crest Drive
Silver City, New Mexico 88061
Tel: 928-975-2191
Email: chascarreon@gmail.com

JOHN SULLIVAN (CSB#204648) Pro Hac Vice
17532 Miranda Street
Encino, California 91316-1249
Tel:818-769-7236 Fax:818-301-2175
Email:Sullivan.John84@gmail.com

Attorneys for Plaintiffs Arizona Yagé Assembly and
Winfield Scott Stanley III

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ArizonaYagé Assembly,  and Winfield Scott Stanley III, in his capacity as Founder and Director of Arizona Yagé Assembly, ,<br><br>            Plaintiffs,<br><br>      vs.<br><br>Merrick Garland Attorney General of the United States; et al.<br><br>            Defendants. | Case No.:20-CV-02373-ROS<br><br>REPLY MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE |

## MEMORANDUM OF POINTS AND AUTHORITIES

### ARGUMENT

**1.  Intervention is Appropriate as of Right**

The Ninth Circuit test for intervention pursuant to "Rule 24(a)(2) requires a prospective intervenor to show that: (1) its 'motion is 'timely'; (2) it 'has 'a significantly protectable interest relating to . . . the subject of the action'; (3) it is 'so situated that the disposition of the action may as a practical matter impair or impede [its] ability to protect that interest'; and (4) its interest is 'inadequately represented by the parties to the action.'" *Kalbers v. United States DOJ*, 22 F.4th

816, 822 (9th Cir. 2021); *United States v. Oregon*, 839 F.2d 635, 637 (9th Cir. 1988).[1] This intervention test is "broadly construed in favor of proposed intervenors." *United States ex rel. McGough v. Covington Techs. Co.*, 967 F.2d 1391, 1394 (9th Cir. 1992); see *Sw. Ctr. for Biological Diversity*, 268 F.3d at 818 ("In general, we construe Rule 24(a) liberally in favor of potential intervenors."); *United States v. Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) ("A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts.").

The Intervenors filed their motion promptly after their claims accrued, upon the entry of the Disclosure Order on February 22, 2024 (Dkt. # 220.)  The proposed Amended Complaint filed October 11, 2024 (Dkt. # 252.) asserts a protectable interest in their Personal Property & Information ("PP&I") in the custody of AYA and Stanley, and viable claims for relief against the Agency Defendants under 5 U.S.C. § 702, the Constitution, and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1.

By contrast, AYA and Stanley's Fifth Amended Complaint (Dkt. # 159.) alleges one claim under RFRA for an exemption from the Controlled Substances Act ("CSA") to allow the importation and distribution of Ayahuasca without fear of prosecution, seizure of sacrament, or other enforcement activity that imposes a substantial burden on AYA and Stanley's religious free exercise.

The action of the Agency Defendants in targeting the Intervenors' PP&I for disclosure, however, has caused injury to the Intervenors' Constitutional rights to privacy in their personal religious communications, and given rise to their decision to seek relief by way of intervention, which is the appropriate procedure, suited to their situation.

### a.   The Intervenors are Non-Parties to the Litigation and are Moving to Intervene to Protect Personal Civil Rights

"[A]n association does not have standing to represent the members of the association in a civil rights suit where there are alleged violations of the members' rights, but not the association's

---

[1] See also, *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817-18 (9th Cir. 2001*); Sierra Club v. U.S. Envtl. Prot. Agency*, 995 F.2d 1478, 1481 (9th Cir. 1993).

rights." *Richmond Black Police Officers Asso. v. Richmond*, 386 F. Supp. 151, 155 (E.D. Va. 1974).  See also, *League of Women Voters v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984)(restricted organizational standing under § 1983 by interpreting the rights it secures to be personal).

AYA and Stanley are the only plaintiffs in this action. The Intervenors were not consulted on the filing of the case, not named in the pleadings, not joined as fictitiously named parties, and received no notice that the Disclosure Order was in the works until it had already been issued. (Dkt. # 220; Cox Dec. ¶ 30.)

AYA and Stanley sued the Agency Defendants under RFRA, but that did not diminish the legal rights of the Intervenors to demand that the Agency Defendants respect their rights under the Constitution, nor did it deprive them of the right to allege claims for relief against the Agency Defendants for damages suffered due to unlawful administrative action. AYA and Stanley's allegations regarding associational standing could not divest the Intervenors of their rights under 5 U.S.C. § 702, the Constitution, the Declaratory Relief Act, and RFRA, to bring claims for relief against the Agency Defendants.

> **i.    The District Court's conclusions in the Disclosure Order do not bind Intervenors, who were and remain Non-Parties to the Litigation until this Court grants the instant motion to intervene**

This principle is supported by the case of *Kalbers v. United States DOJ*, where the Ninth Circuit reversed the district court's order denying, as untimely, Volkswagen's motion to intervene in a FOIA lawsuit concerning an order which "expanded the universe of VW's documents at issue from around 300 to nearly 6 million." *Id*. at 821. The Court held that the proposed intervenor met all the requirements to intervene as of right under Fed. R. Civ. P. 24(a), highlighting that due to the court's disclosure order, VW's interests were not adequately represented by the existing parties. *Kalbers*, 22 F.4th at 828.

This is further supported in *Venegas v. Skaggs*, 867 F.2d 527, 530 (9th Cir. 1989*)*, where the district court issued an attorney's fees judgment after a trial attorney successfully obtained a civil rights jury verdict. When the client substituted counsel for the appeal, the trial attorney sought permissive intervention for the purpose of confirming a lien on the prior judgment. *Id*. The Ninth

Circuit held it was error for the district court to deny the attorney's permissive intervention because it chose to rule on issues central to the attorney's claim and should have allowed the non-party to intervene in the appeal so that he could defend his position. *Id*.

Lastly, in *Formulabs, Inc. v. Hartley Pen Co.*, 318 F.2d 485 (9th Cir. 1963), even though the district court's disclosure order contained protective measures for the preservation of the trade secrets of a non-party to the litigation, the Ninth Circuit found that the intervenor dye company had the right to intervene in the discovery proceedings in an action between the pen developers and ink company. This was because the intervenors were so situated as to be adversely affected by a disposition of their property which was in the custody or subject to the control or disposition of the district court. *Id*. at 490.

Just as in *Kalbers*, Taylor Cox and the Intervenors are non-parties (similar to VW) who are not bound by the prior Disclosure Order which compels the disclosure of privileged religious communications and documents from their church, AYA and their minister, Stanley, until they are formally recognized as parties to the litigation.

Similar to *Venegas* and *Formulabs, Inc.*, the prior Disclosure Order rules on issues central to the proposed Intervenors' constitutional rights and even though there is a Protective Order, the non-parties should be permitted to intervene in the discovery proceedings to defend their privacy and property interests. However, until this Court grants the instant motion to intervene, the proposed Intervenors remain non-parties to the litigation and are not bound by the conclusions in the Disclosure Order.

> ii. **Intervention is the Standard Way for Non-Parties to Assert Their Rights to Protect Privileged Property and Information in the Custody of Third Parties**

Rule 24 Intervention is the correct way for a party whose privileged documents in the custody of a third party are threatened with disclosure by the custodian, to obtain a protective order to bar their disclosure.  The rationale is that intervenors defending their evidentiary privileges must be allowed to proceed in their own behalf, because the custodian of their privileged informational property will see no advantage and perhaps suffer sanction for refusing production of the documents.

Intervenors in the Ninth Circuit have successfully defended various types of privileges through intervention in legal proceedings. One notable example is the protection of trade secrets. In *Formulabs, Inc.*, the court allowed intervenors to join in opposing efforts to compel the disclosure of any secret formula, secret process, or other trade secrets in which they claimed a property right or other legally cognizable interest. *Id*. at 490.

Another example involves the protection of constitutional rights. In *United States v. Oregon*, 839 F.2d 635 (9th Cir. 1988*)*, residents of a state institution were allowed to intervene because the federal government's arguments did not adequately represent the constitutional deficiencies they wished to address. The court found that the litigation could impair the intervenors' ability to obtain effective remedies in later litigation. *Id*. at 638.

Additionally, in *Southwest Ctr. for Biological Diversity*, intervenors were allowed to protect their interests as third-party beneficiaries of a land management plan. The court recognized that the relief requested by the plaintiffs would have affected the intervenors' rights, thus supporting their intervention as of right. *Southwest Ctr. for Biological Diversity*, 268 F.3d at 820.

These cases illustrate that in the Ninth Circuit, intervenors have successfully defended evidentiary privileges related to trade secrets, constitutional rights, and specific legal interests tied to ongoing projects or plans. Similarly, the proposed Intervenors in the case at bar are non-parties seeking to assert their constitutional privacy and property rights pursuant to the Rule 24 procedure by opposing the threatened compelled disclosure by the Plaintiff custodians, AYA and Stanley, to the Agency Defendants.

   **b.  Timeliness: The Motion is Timely, Because the Entry of the Disclosure Order Effected a Change in Circumstances and was the Major Reason for Filing the Motion to Intervene**

The first element, timeliness, "is the threshold requirement for intervention." *Kalbers*, 22 F.4th at 822. Timeliness is "determined by the totality of the circumstances" facing the would-be intervenors and hinges on "three primary factors: '(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay.'" *Id*. at 822-23; *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016). In analyzing these factors, courts must make a fact-specific inquiry is required to determine the

"crucial date" to assess when the "proposed intervenors should have been aware that their interests would not be adequately protected by the existing parties." *Id*. at 822; *Smith*, 830 F.3d at 854.

### i.   Stage of the Proceedings: *Intervenors Were Not Parties to the Protective Order, and Its Provisions May Not Be Construed to Diminish Their Rights*

In analyzing the "stage of the proceedings" factor, the "[m]ere lapse of time alone is not determinative." *Smith*, 830 F.3d at 854. "Where a change of circumstances occurs, and that change is the "major reason" for the motion to intervene, the stage of proceedings factor should be analyzed by reference to the change in circumstances, and not the commencement of the litigation." *Id*. This inquiry requires courts to take a "nuanced, pragmatic approach" as substance prevails over form: Neither the formal "stage" of the litigation nor the "length of time that has passed since a suit was filed" is dispositive. *Kalbers*. 22 F.4th at 826.

When construing whether circumstances have changed, the District Court must take a plausible view of the facts, otherwise it abuses its discretion.  The only plausible view of the facts here is that the Disclosure Order is the first order that in any way affects the Property and Private Information of the Intervenors.  Intervenors moved to intervene on March 12, 2024, after the entry of the Disclosure Order, as soon as possible after the decision to proceed with the action was reached.  (Cox Dec., ¶ 33.)

### ii.   Prejudice to the Parties: *The Agency Defendants Have Shown No Cognizable Prejudice That Would Result from Intervention*

"[P]rejudice must be connected in some way to the timing of the intervention motion—and 'the fact that including another party in the case might make resolution more 'difficult' does not constitute prejudice." *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs & Nat'l Marine Fisheries Serv.*, No. 3:18-cv-00437-HZ, 2024 U.S. Dist. LEXIS 117501, at *6 (D. Or. July 2, 2024), quoting *Smith*, 830 F.3d at 857; *Kalbers v. United States DOJ*, 22 F.4th 816, 825 (9th Cir. 2021).

"[T]he only "prejudice" that is relevant under this factor is that which flows from a prospective intervenor's failure to intervene after he knew, or reasonably should have known, that his interests were not being adequately represented—and not from the fact that including another party in the case might make resolution more "difficult," [because] the relevant issue is not how much prejudice would result from allowing intervention, but rather how much prejudice would

result from the would-be intervenor's failure to request intervention as soon as he knew or should have known of his interest in the case …." *Smith*, 830 F.3d at 857, quoting *United States v. Oregon*, 745 F.2d 550, 552-53 (9th Cir. 1984) and *Stallworth*, 558 F.2d at 267.

"When the Court's inquiry is properly narrowed to the prejudice attributable to the intervenor's delay in moving to after the time the intervenors knew, or reasonably should have known, that their interests were not being adequately represented by existing parties, the prejudice to existing parties becomes nominal at best." *Smith*, 830 F.3d at 859-60. "Every motion to intervene will complicate or delay a case to some degree—three parties are more than two. That is not a sufficient reason to deny intervention." *Kalbers*, 22 F.4th at 825. The lack of prejudice weighs heavily in favor of timeliness. *Id*.

In *State of Oregon*, various Indian tribes and the States of Washington and Oregon argued that permitting the State of Idaho to intervene in litigation fifteen years after the commencement of the litigation regarding the regulation of fishing would jeopardize the existing parties' negotiations. *State of Oregon*, 745 F.2d at 552-53. The "changed circumstances" giving rise to the motion to intervene occurred "in 1982 … yet the proposed intervenors did not file until late August 1983." The Court held that the "reason for and length of delay" factor weighed in favor of intervention. *Id*. Accordingly, here the factor also weighs in favor of Taylor Cox and the Intervenor class who filed their motion to intervene less than a month after the entry of the Disclosure Order.

In *Smith*, the intervenors moved to intervene approximately one year after the change in circumstances prompting their motion but as discussed below, only weeks after definitively learning that their interests were not adequately represented by the existing parties. *Smith*, 830 F.3d at 860. Even after it became clear that intervention was necessary to protect Appellants' interests, it simply took time to organize and gather evidence to support Appellants' motions to intervene. *Smith*, 830 F.3d at 862.

    iii. **Length of and Reason for Delay:** *Intervenors Moved to Intervene As Soon as Their Claims Accrued, To Wit, When the Disclosure Order Was Entered; Wherefore, Intervenors Engaged in No Delay. and the Agency Defendants Suffered No Prejudice*

To determine whether the length of delay weighs in favor of or against timeliness, the Ninth Circuit's "crucial date" rule is clear: Delay is measured from the date the proposed intervenor knew or should have known that the parties would no longer adequately protect its interests – "*not the date it learned of the litigation*." *Kalbers*, 22 F.4th at 823-24.

The district court abused its discretion in *Kalbers* when it focused exclusively on the date that VW (the would-be intervenors) learned of the lawsuit. The Ninth Circuit found that when "properly measured," the delay between when VW should have known that its interests might be inadequately protected by the parties…and when VW filed its motion…**was just a few weeks**," concluding that this short delay weighed in favor of timeliness, rather than against it. *Id*. at 825.

In *Smith*, the district court concluded that the intervenor class of parents of disabled children were arguably on notice from the beginning of the litigation that intervention was necessary to protect their interests because "the inclusion of special education students into the general education program [was] a primary issue" from the start. *Smith*, 830 F.3d at 860. The Ninth Circuit did not agree, concluding that the school district's argument missed the point – that, despite years of negotiations and litigation, the parent's interests were not being adequately represented by the existing parties. *Id*. Because the intervenors were not a sophisticated or unified body, but rather a consortium of parents of special education students, it took the class nearly 80 days to file their motion—yet here, the Court found this to be a reasonable explanation for delay. *Id*.

Defendants' argument that the proper measure of delay should begin when the First Complaint was filed on May 5, 2020, is baseless. The Disclosure Order was entered on February 22, 2024 (Dkt. # 220); this is the event which substantially changed the circumstances affecting the protection of the proposed Intervenors' asserted rights. The Intervenors' motion was filed on March 12, 2024 (Dkt. #232). Just as in *Kalbers*, application of the correct "crucial date" rule to the facts establishes **a mere 19-day delay** between when the Intervenors' should have known that their interests might be inadequately protected by the parties and when their motion was filed. Applying the correct rule to the facts makes it clear that Taylor Cox and the Intervenor class did not need to intervene before March 2024. Like the parents in *Smith*, the Intervenors are not a sophisticated or unified group of organizers comparable to the NAACP – however, the Intervenors

swiftly retained legal representation and filed their motion. (Cox Dec., ¶32). Such a short delay weighs in favor of timeliness, rather than against it.

As in *Smith*, Defendants argue that intervenors should have known from the outset of this lawsuit that their "religious rights," would be at issue in, and affected by, the outcome of this litigation – this argument clearly misses the point. Because Intervenors were and are non-parties to this litigation, they were not privy to the negotiations between the existing parties that led to the Rule 16 Scheduling Order (Dkt. #195); the Protective Order (Dkt. # 217), or the three months of settlement negotiations (Dkts. #163, 173). As non-parties, Intervenors had no opportunity to object to the discovery that was only served upon AYA and Stanley.[2] Throughout this litigation, Defendants have vigorously litigated to advance their position of destroying Intervenors' associational privacy rights and infringing upon their Fourth and Fifth Amendment rights, while Plaintiffs have repeatedly and consistently argued that the disputed discovery requests are constitutionally privileged and protected, thereby attempting to protect Intervenors' rights.

Intervenors acted timely by moving to intervene as soon as their claims accrued, specifically when the Disclosure Order was entered in March 2024. (Cox Dec., ¶31). These facts taken together, and in light of all the circumstances presented, weigh in favor of this timeliness factor and support that there was no undue delay or prejudice to the Agency Defendants.

### c. The Intervenors' Reasonable Expectation of Privacy in their Personal Identity, Mobile Phone Numbers, and Emailed Religious Communications is a Bundle of Legally Protectable Property, Privacy, and Associational Interests

Our constitutional protection of religious observance supports finding a reasonable expectation of privacy in sacred spaces and communications, where privacy concerns are acknowledged and protected, especially during worship and other religious observance. *Fazaga v. FBI*, 965 F.3d 1015, 1037 (9th Cir. 2020)[3]; *Cf. Mockaitis v. Harcleroad*, 104 F.3d 1522, 1533 (9th

---

[2] See Dkt. 202 at (joint statement on protective order); Dkt. 212 (dispute over joint statement process); Dkt. 213 (detailing breakdown in conferral process and extending discovery deadlines); Dkt. 219 (87-page joint statement on deficiencies in first set of discovery requests); Dkt. 225 (51-page joint statement on deficiencies in second set of discovery requests); Dkt. 228 (opposition to extension of time to comply with Court's discovery order).

[3] Overruled on other grounds, (not relevant in the case at bar), specifically the Ninth Circuit's reasoning that §1806(f) displaced the state secret privilege. See, *FBI v. Fazaga*, 595 U.S. 344 (2022).

Cir. 1997).[4] "[W]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Fazaga*, 965 F.3d at 1037. Essential to the free exercise of religion is the evidentiary priest-penitent privilege which has been broadly recognized in the United States and affirmed in dicta by the Supreme Court – especially when Fourth Amendment values are implied. *Mockaitis*, 104 F.3d at 1532.[5] In *Grand Jury Subpoena v. Kitzhaber*, 828 F.3d 1083 (9th Cir. 2016), the Court emphasized that emails contain intimate details of our lives and are expected to be kept private, a standard that society recognizes as reasonable. *Id*. at 1086.

These cases collectively support the Intervenor's assertions that their personal identity, mobile phone numbers, and emailed religious communications ("PP&I") are protected under the reasonable expectation of privacy, aligning with the First, Fourth, Fifth, and Fourteenth amendment rights in this RFRA litigation.

> ### i. The Agency Defendants' Characterization of Intervenors' PP&I as "Organizational Records" is Specious – Religious Emails to a Church Do Not Lose Their Privileged Nature Simply Because The Church is Their Custodian

Just as in *Kalbers v. United States DOJ*, the second element—whether "the disposition of the action may, as a practical matter, impair or impede VW's ability to protect its interest,"—is even more clear-cut in the case a bar. *Id*. at 827-28. Taylor Cox and the Intervenors' interest in keeping their PP&I confidential would obviously be impaired by the order to disclose such privileged religious communications and records to the government in a RFRA lawsuit.

Because the Federal Rules of Civil Procedure are "neutral toward religion" and generally applicable to all civil litigation, the Court must apply RFRA[6] to determine whether compelling

---

[4] Overruled on other grounds by the Supreme Court's decision in *City of Boerne*, where the Court found RFRA unconstitutional as applied to the States and their subdivisions. See *City of Boerne*, 521 U.S. at 532, 536.

[5] All fifty states have enacted statutes "granting some form of testimonial privilege to clergy-communicant communications. Neither scholars nor courts question the legitimacy of the privilege, and attorneys rarely litigate the issue." *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1532 (9th Cir. 1997).

[6] The Federal Rules place at least three limitations on discovery: (i) the requested material must be "relevant to any party's claim or defense," in that it "appears reasonably calculated to lead to the discovery of admissible evidence"; (ii) the requested material cannot be privileged; and (iii) producing the requested material cannot be overly burdensome. F.R.C.P. 26(b)(1), (b)(2)(C)(iii).

disclosure of Intervenors' PP&I burdens their legally protectable interests in religious exercise. *Mockaitis*, 104 F.3d at 1528. Under RFRA, the government shall not impose a substantial burden on a person's free exercise of religion unless the Agency Defendants can demonstrate that the burden to the individual [1] is in furtherance of a compelling government interest and [2] is the least restrictive means of furthering that compelling governmental interest. *United States v. Vasquez-Ramos*, 531 F.3d 987, 990 (9th Cir. 2008).

The Ninth Circuit's application of RFRA is particularly instructive in *Mockaitis v. Harcleroad*, and provides significant support for Intervenors' assertions of First, Fourth, Fifth, and Fourteenth Amendment rights regarding the privileged nature of religious emails sent to AYA and Stanley, even when the church is the custodian of those records. In that case, the Court found that government officials substantially burdened a priest's free exercise when a prison confession was taped and seized by the prosecutor's office for use at trial. *Mockaitis*, 104 F.3d at 1533. Here, the priest was reasonable in relying on the nation's history of respect for religion and the sanctity of the secrets of confession in particular and therefore, had a reasonable expectation of privacy. *Id.* at 1533. Regardless of the government's compelling interest to secure relevant evidence, the district attorney substantially burdened the free exercise of religion, making it impossible for the priests to administer the sacrament in prison in violation of RFRA. *Id.*

In *Fazaga v. FBI*, the Court held that Muslims' expectation that their conversations within the mosque prayer hall would be confidential with other co-religionists (unless shared by one of them with others), and so would not be intercepted by government agents was objectively reasonable. *Fazaga*, 965 F.3d at 1037.

The significance of the substantial burden the Disclosure Order (Dkt. # 220) places on the Intervenors ability to adequately protect their interests is clear – religious communications, such as emails sent to AYA and Stanley, are protected under RFRA and the First Amendment, and any government action burdening these communications must meet strict scrutiny standards.

Given the risk of irreparable injury hanging over the Intervenors, the Agency Defendants' claims that judicial enforcement of their blunderbuss discovery demands is the "least restrictive means" of securing needed evidence rings hollow.

ii.    **The Fourth Amendment Claims are Viable Under the Holdings of Carpenter (SCOTUS), Kitzhaber and Riley (Ninth Circuit) Because They Have a Reasonable Expectation of Privacy in their PP&I, Including Privileged Religious Communications (Mockaitis) in Password Secured Emails**

The Intervenors have a substantial and legally protectable interest in their private email addresses, email communications, telephone numbers, and other personal data. (Cox Dec., ¶26, 27). These interests are protected under the Fourth Amendment, which guards against unreasonable searches and seizures, and this protection extends to digital records. (U.S. Const. Amend. 4.) The Intervenors' expectation of privacy is evidenced by their habitual use of secret passwords and two-factor authentication systems to secure their communications devices and media contents. (Cox Dec., ¶26, 27).

In *Carpenter v. United States*, 585 U.S. 296 (2018), the Supreme Court held that accessing historical cell phone location records constitutes a search under the Fourth Amendment, requiring a warrant supported by probable cause. The Court emphasized that individuals have a reasonable expectation of privacy in their physical movements as captured through cell phone location data even if that information is obtained from a third party. *Id*. at 313.

Emails are property and digital papers. Emails are treated like physical mail when determining whether an individual has a reasonable expectation of privacy in its content. *Kitzhaber*, 828 F.3d at 1090. The Supreme Court has also emphasized the corresponding need for our jurisprudence to reflect the changing technological landscape and the ability of digital troves to contain "the sum of an individual's private life," "a digital record of nearly every aspect of their lives, information that "could reveal an individual's private interests or concerns" and "location information…that can reconstruct someone's specific movements down to the minute." *Riley v. California*, 573 U.S. 373, 393-95 (2014). It follows that personal email can, and often does, contain all the information once found in the "papers and effects" the Framers mentioned explicitly in the Fourth Amendment. *Kitzhaber*, at 1090. The content of email is presumed to be read only by the intended recipient and even though the form is digital, there is a reasonable expectation of privacy in one's mail. *Id*.

Similarly, the PP&I of AYA's Members and Donors, which include names, emails, mobile phone numbers, ceremonial attendance, and donation records, are digital records that disclose personal details and are thus protected under the Fourth Amendment. Moreover, the Members and Donors have demonstrated a subjective expectation of privacy in their PP&I by using password protection to keep their emails private. (Cox Dec. ¶26, 27). The rationale underlying the privilege for confidential communications to religious officials, as recognized under federal common law, supports the argument that such information should remain confidential and not be disclosed without the consent of the individuals involved. *Mockaitis*, 104 F.3d at 1532.

The Third-Party doctrine, which generally holds that individuals have no reasonable expectation of privacy in information voluntarily disclosed to third parties, does not apply in this context. *Carpenter*, 585 U.S. at 315. The Members and Donors' use of password protection and AYA's confidentiality policy indicate a clear intent to maintain the privacy of their PP&I. Therefore, the disclosure of this information to AYA does not waive their Fourth Amendment rights. *Fazaga*, 965 F.3d at 1037. The courts have been reluctant to impose Fourth Amendment protections in the area of compelled production of materials, stating that a subpoena does not present the same kind of potential for intrusion on the rights of privacy that a forcible search entails. However, the unique circumstances of this case, involving sensitive religious information and the demonstrated expectation of privacy, warrant a different conclusion.

The Ninth Circuit's decision in *Kitzhaber* further strengthens this argument. In *Kitzhaber*, the court quashed a grand jury subpoena for the former Oregon governor's personal emails, recognizing the significant privacy interests at stake. The court held that the subpoena was overly broad and infringed upon the governor's reasonable expectation of privacy. *Kitzhaber*, 828 F.3d at 1088. This decision underscores the principle that digital communications, such as emails, are protected under the Fourth Amendment and cannot be disclosed without a warrant supported by probable cause.

### iii.  The Fifth Amendment Claim is Viable Under *Marchetti* and *Leary* Because Mere Membership is Incriminating, and the Disclosure Order Compels Disclosure of Testimonial Information

To advance their position in this litigation, Defendants secured an Order from this Court holding that Plaintiffs, AYA and Stanley, could not assert the Fifth Amendment rights of Intervenors. (Dkt. # 210, 2:11-12.) Using the Joint Statement procedure, the Defendant Agencies secured the Disclosure Order from this Court. (Dkt. # 220.) Agency Defendants are Federal law enforcement agencies vested with authority to prosecute narcotics violations and demanded every single record pertaining to Intervenors' ceremonial participation in a religious practice that Defendants deem illegal.

In light of the conflict with their First Amendment religious and associational rights, the Intervenors' Fifth Amendment claim is viable. Just as in *Marchetti v. United States*, 390 U.S. 39, 48, 88 S. Ct. 697, 702 (1968), in these circumstances, it can scarcely be denied that the burden imposed by the Disclosure Order creates for the Intervenors "real and appreciable," and not merely "imaginary and unsubstantial," hazards of self-incrimination. The Intervenors can reasonably expect that ***compliance with the Disclosure Order will significantly enhance the likelihood of their prosecution for future religious participation in visionary religion, and that compelled disclosure of their PP&I will readily provide evidence which will facilitate their convictions***. Indeed, they can reasonably fear that Agency Defendants' acquisition of their overly broad discovery demands may serve as decisive evidence that Intervenors have in fact subsequently violated CSA prohibitions."[7]

Similar to the disputed Marijuana Tax Act in *Leary v. United States*, 395 US 6 (1969), the Disclosure Order imposes punitive consequences upon the Intervenors, AYA and Stanley for not complying with the self-disclosure requirements of the Discovery Demand and (if enforced) would legitimate a form of compelled self-incrimination. *Id*. at 29. In short, the Intervenor's Fifth Amendment claim is viable because the compliance with the Disclosure Order would expose each individual to a real and appreciable risk of self-incrimination, requiring each individual to identify as a violator of the CSA who has not obtained a religious use exemption, and this information could be conveyed by Agency Defendants to state and local law enforcement. *Id*. at 18

---

[7] *United States v. Marchetti,* 390 US at 55 (emphasis added).

What *Marchetti* and *Leary* stand for is simply that, whenever the government directs the members of a highly selective group inherently suspect of criminal activities to disclose their identities and the nature of the conduct that brings them into suspicion, any member of that group, or the group itself on behalf of its members, can refuse to make those disclosures by invoking the Fifth Amendment, and thus avoid compelled self-incrimination.

      **iv.**   **The First Amendment Claim is Viable Because The Intervenors Have Individual Rights of Freedom of Association and Assembly and Privacy of Religious Communications that are Infringed by the Disclosure Order and Sunder Their Religious Bonds With Other Class Members**

In *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021), the Supreme Court summarized the history of NAACP v. Ala. ex rel. Patterson, 357 U.S. 449, 78 S. Ct. 1163 (1958):

> "As part of an effort to oust the [NAACP] from the State, the Alabama Attorney General sought the group's membership lists. We held that the First Amendment prohibited such compelled disclosure. We explained that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and we noted "the vital relationship between freedom to associate and privacy in one's associations." Because NAACP members faced a risk of reprisals if their affiliation with the organization became known—and because Alabama had demonstrated no offsetting interest "sufficient to justify the deterrent effect" of disclosure, we concluded that the State's demand violated the First Amendment."
> *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021)(citations omitted).

Although Alabama officials likely intended to impede NAACP's political organizing by procuring the judicial disclosure order for its member list, Justice Harlan emphasized that it was unconstitutional because it "inevitably" abridged associational rights. "The fact that Alabama, so far as is relevant to the validity of the contempt judgment presently under review, has taken no direct action, [citations] to restrict the right of petitioner's members to associate freely, does not end inquiry into the effect of the production order.  [Citations.] In the domain of these indispensable liberties, whether of

speech, press, or association, the decisions of this Court recognize that abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action.

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 461, 78 S. Ct. 1163, 1171 (1958)(emphasis added). No clearer case of a need for the protection of associational privacy for a religious group could be presented that that of the Intervenors here.

### d. No Presumption of Adequacy of Representation Can Arise Here, Because AYA and Stanley Have Requested and Been Denied Standing to Raise Constitutional Claims on Behalf of Intervenors to Alter Their Duties of Production Under the Discovery Order

The third element, adequacy of representation, "is satisfied if the applicant shows that representation of his interest may be inadequate"—this is a "minimal" burden. *Kalbers*, F.4th at 828. Particularly relevant factors here include "whether the present party is capable and willing to make [the intervenor's] arguments" and "whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Id.*

### i. No Presumption of Adequacy of Representation Arises Simply Because AYA and Intervenors are Represented by the Same Attorney

*In re Weingarten*, 492 D.App'x 754, 756 (9th Cir. 2012)(unpublished) is not contra, because in that case the lawyer representing both an existing party to the case and the proposed intervenor claimed he could make "the same arguments" on behalf of the intervenors as a representative of the existing parties. Here, the attorney has said no such thing. As this submission argues from start to finish, AYA and Stanley do not have the procedural ability to present arguments on behalf of the Intervenors. And this is not a matter of speculation, because AYA and Stanley tried to present arguments on behalf of the Intervenors, and they were rejected. (Order finding No Fifth Amendment standing and Order 220 Dismissing Fourth and First Amendment arguments presented by AYA and Stanley).

### ii. AYA and Stanley Cannot Provide Adequate Representation Because they Have No Standing to Advance the Interests of the Intervenors

The Intervenors' Amended Complaint alleges violations of individual rights that AYA and Stanley do not have standing to maintain and have not been alleged in the operative Fifth Amended

Complaint (Dkt. # 159.)   Comparing the claims, the gravamen of the harms alleged, and the remedies sought in the two complaints, are entirely different.

The Intervenors allege claims that accrued on February 22, 2024 when the Agency Defendants' procured the order, and Intervenors suffered actionable damage due to that administrative action, thus triggering the Intervenors' rights to sue under 5 U.S.C. § 702.  "A claim accrues when the plaintiff has the right to assert it in court—and in the case of the APA, that is when the plaintiff is injured by final agency action."  *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2448 (2024).  Simultaneously, Intervenors' Declaratory Relief claims under the First, Fourth, Fifth and Fourteenth Amendments accrued, because the injury in fact to Intervenors provides Article III standing for all claims for relief.

Although AYA and Stanley filed a Section 702 claim along with their RFRA claim, that was years before the Disclosure Order (Dkt. # 220) was entered, and in any event, the claim was dismissed on statute of limitations grounds.  AYA and Stanley's operative Fifth Amended Complaint for constitutional claims does not allege injuries arising from the Disclosure Order, and provides no basis for AYA or Stanley to seek injunctive relief to prevent the disclosure of Intervenors' PP&I.

The burden of showing inadequacy of representation is satisfied if the applicant can demonstrate that representation of its interests "may be" inadequate. *W. Watersheds Project v. Haaland,* 22 F.4th 828, 840 (9th Cir. 2022).  Taylor Cox and the Intervenors meet all the requirements to intervene as of right. Therefore, Intervenors respectfully request the Court to grant their Rule 24(a) motion.

**2.  Permissive Intervention should be Granted because Obtaining the Disclosure Order for the Purposes of Seizing Intervenors' Protected Property Without Notice and Due Process, Provides the Agency Defendants With No Defense to Claims of Unconstitutional Administrative Action Violating Section 702, the Constitution, and RFRA.**

Even if the Court finds that the Intervenors do not meet the requirements for intervention as of right, permissive intervention is appropriate under FRCP 24(b) *Donaldson Lufkin & Jenrette Sec. Corp. v. National Gypsum Co. (In re National Gypsum Co.)*, 1999 U.S. Dist. LEXIS 231, *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246. The Intervenors' claims share common questions

of law and fact with the main action, particularly regarding the alleged unconstitutional administrative actions and the violation of Fourth Amendment rights. Permissive intervention will not cause undue prejudice or delay to the existing parties, as the Intervenors seek only to protect their privacy interests without disrupting the broader litigation.


Dated: October 31, 2024

                                        CHARLES CARREON
                                        /s/Charles Carreon
                                        CHARLES CARREON (127139)
                                        Attorney for Plaintiffs
                                        Arizona Yagé Assembly,
                                        Winfield Scott Stanley III