CHARLES CARREON (CSB #127139)
7 N. Ridge Crest Drive
Silver City, New Mexico 88061
Tel: 928-975-2191
Email: chascarreon@gmail.com

MELISSA DEAN (FLSB#1031982)
111 N. Orange Ave, Ste. 800
Orlando, FL 32801
Tel: 772-919-2748
Email:melissadeanesq@gmail.com

Attorneys for Plaintiffs Arizona Yagé Assembly and
Winfield Scott Stanley III
*Pro hac vice*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Yagé Assembly, and Winfield Scott Stanley III, in his capacity as Founder and Director of Arizona Yagé Assembly,<br><br>        Plaintiffs,<br><br>  vs.<br><br>Merrick Garland Attorney General of the United States; et al.<br><br>        Defendants. | Case No.2:20-CV-02373-DJH<br><br>**PLAINTIFFS' CERTIFICATE OF SUBSTANTIAL COMPLIANCE** |

## PLAINTIFFS' CERTIFICATE OF SUBSTANTIAL COMPLIANCE WITH ORDERS DKT. NOS. 309, 315 and 318

To confirm their compliance with this Court's Orders dated April 18, 2025 (Dkt. 309), April 29, 2025 (Dkt. 315) and May 14, 2025 (Dkt. 318), Plaintiffs' respectfully submit this Certificate of Substantial Compliance, and are in the meet and confer process to submit the Categorical Privilege Log served on Defendants on May 16, 2025 under seal so the Court can directly confirm the facts asserted below.

**The Orders**

On April 18, 2025, the parties were directed to meet and confer and file a Rule 26(f) Report, a proposed ESI protocol, and proposed search terms by May 9, 2025 (Order Dkt. 309). The parties were also directed to supplement their interrogatory questions and answers by May 16, 2025. *Id.*

Order Dkt. 309 further ordered Plaintiffs to produce and exchange a revised categorical privilege log that sufficiently describes the nature of any withheld documents "in a matter that, without revealing information itself privilege or protected, will enable other parties to assess the privilege claim." Rule 26(b)(5)(A)(ii). *Id.*

On April 29, 2025, the Court issued Order Dkt. 315, confirming a May 16 deadline for Plaintiffs to produce a revised privilege log and supplement interrogatory responses. At that time, the Court reiterated its expectation of adequate privilege descriptions consistent with prior rulings, without modifying the previously accepted categorical log structure.

On May 14, 2025, two days before the privilege log service deadline, the Court issued Order Dkt. 318, stating that the revised log must include granular identification of document types, authors, time frames, and subject matter; a detailed privilege justification per category; an individualized showing of how disclosure would burden associational rights, while prohibiting broad categorical descriptions.

Constrained by the comprehensive scheduling order (Dkt. 319), Plaintiffs had no meaningful opportunity to adjust scope, confer with Defendants on sampling, or request relief. Plaintiffs thus undertook an intensive review of all of categories of documents, examining samples for their informational contents, combing through the vast amount of ESI to find privileged information, and refine privilege groupings. When Plaintiffs retained the DISCO project management team to assist in complying with Order Dkt. 318, the team confirmed that Plaintiffs' counsel was doing exactly what was needed to develop the privilege log using the DISCO platform. However, it was a disappointment to discover that actually, there is no technical capacity in DISCO for creating categorical privilege logs based on tags or folders, and there was no way to export the category data that Plaintiffs counsel's intensive DISCO

work revealed within the interface. The only option was to manually construct a log, which counsel for Plaintiffs did, despite the considerable technical obstacles cited above.

Plaintiffs have made enormous efforts by conducting a document-level review, refining category definitions, tailoring privilege justifications, and offering to confer with Defendants on redactions and sampling. Plaintiffs respectfully submit that this work reflects a good-faith, legally adequate response to a complex and time-constrained discovery obligation, and respectfully preserve any objections to the fairness or feasibility of the underlying compliance framework.

**Good Faith, Effective Efforts Have Brought Plaintiffs into Substantial Compliance With all Discovery Orders**

Following the April 16th status conference hearing, Plaintiffs' counsel emailed Defendants on April 23, 2025 to request at least two dates to meet and confer on discovery issues. Plaintiffs' counsel then drafted a proposed ESI protocol modeled after the Sedona Conference Principles and other Ninth Circuit district court model ESI protocols. As directed by Order Dkt. 309, the parties met and conferred on May 2, 2025 and again on May 9, 2025. During the May 9 meeting, the parties reached numerous agreements and subsequently submitted: (1) a jointly revised Rule 26(f) report (Dkt. 317), (2) a proposed ESI protocol (Dkt. 317-1), and (3) a proposed set of search terms (Dkt. 317-2). Plaintiffs' counsel spent approximately 23.1 hours in total on tasks related to compliance with Order Dkt. 309, including drafting the ESI protocol, analyzing proportionality, negotiating search terms, and finalizing the joint filings.

In parallel, Plaintiffs' counsel engaged in approximately 12.8 hours of client meetings to refine privilege categories and draft supplemental responses as required by Dkt. 309 and in anticipation of compliance with Dkt. 315 and Dkt. 318.

To support this process, Plaintiffs' counsel further invested time in technical training and restructuring the administrative setup necessary to execute within the DISCO platform, including advanced tagging, folder structuring, and filtering necessary to manually build a usable and reviewable categorical privilege log. This required incurring $350 in costs for

support from DISCO's project management team, who assisted with logic-based folder restructuring and privilege tagging strategies. Since the April 16th status conference, Plaintiffs' counsel has logged approximately 75.2 hours searching, reviewing, tagging, and categorizing documents for inclusion or exclusion from the privilege log to comply with the Court's directives.

Attached as Exhibit 1 are screenshots of Plaintiffs' workflow on DISCO, demonstrating the privilege tagging scheme and folder structure used to generate the revised log in line with the Ninth Circuit categorical privilege log model.

### The Adoption of the ESI Protocol Was a Great Help

Prior to the Court's April 16th directive, much of Plaintiffs' e-discovery efforts were conducted in good faith but without the benefit of a clearly established ESI protocol or agreed upon search terms. Much of this early effort conducted by Plaintiffs' counsel required trial and error, internal eDiscovery training, and the self-development of developing administrative structures and privilege review protocols while navigating complex constitutional standards.[1]

Until the parties' negotiated ESI protocol and initial search terms were finalized and submitted on May 9, 2025 and approved by the Court on May 14, 2025 (Order Dkt. No. 319), Plaintiffs' were constrained in their ability to structure review workflows that would satisfy the Court's specificity and formatting demands of Order Dkt. 318. Despite these limitations, Plaintiffs moved forward with substantial efforts towards compliance.

Despite the adoption of an ESI protocol, Plaintiffs had to overcome logistical and personnel obstacles because of the substantially large amount of data requiring manual review, the limited practical experience with complex e-discovery among Plaintiffs' small litigation team—comprised of only two attorneys and no support staff[2]—and the complexity of

---

[1] *See e.g.,* Dkt. 288-2 ¶¶ 10–18; Dkt. 288-4 ¶¶ 4–8; Dkt. 288-5 ¶¶ 7–15 (declarations previously filed in connection with stricken motion, offered here solely to provide historical context on Plaintiffs' early e-discovery efforts).

[2] *See e.g.,* Dkt. 288-4 at ¶ 5; Dkt. 288-2 ¶¶ 7–9, 12–15 (declarations submitted in support of a motion stricken for procedural reasons; offered here solely to provide factual context regarding team size and technical capacity).

applying multiple overlapping privilege frameworks in DISCO (e.g., associational, attorney-client, religious/spiritual, and medical privacy).

While Order 309 expressly acknowledged Plaintiffs' early-stage development in e-discovery practices and granted an opportunity to implement foundational tools such as vendor-assisted review process and search term negotiation, Orders 318 and 319 issued on May 14, 2025, impose rigid compliance obligations without accounting for these limitations. Notably, both the ESI Protocol and proposed search terms were not approved until just two days before the Court's deadline for Plaintiffs to submit a revised privilege log. As a result, Plaintiffs had no realistic opportunity to meaningfully incorporate those essential frameworks into their privilege log workflow.

Upon review of Order 318, Plaintiffs immediately sought to clarify the scope and expectations of compliance. On the same day the Order issued, Plaintiffs emailed a sample of the revised privilege log format to Defendants to confirm whether the format counsel had been developing would be accepted as sufficient. Plaintiffs also requested that, if Defendants had objections, they provide a specific explanation of any proposed changes along with the legal or procedural basis for those objections. This outreach was made in good faith to address concerns collaboratively and, if necessary, to meet and confer regarding scope, format, or redactions in advance of the May 16th deadline.

That same day, Plaintiffs also contacted DISCO for technical assistance in meeting the requirements of Order 318. Following consultation with the DISCO project management team, Plaintiffs learned that while DISCO is highly effective for document-level review, it does not support categorical privilege logging out of the box. Instead, the platform is designed to create individual document privilege logs, where tags and notes are created/applied and exported in addition to standard metadata fields to create a draft privilege log.

Later that evening, in response to Plaintiffs' email sharing a sample of the revised privilege log and requesting input, Defendants declined to engage in further conferral, stating that the privilege log issue was "beyond the conferral stage" and would be resolved by the Court. While acknowledging the gesture as a matter of professional courtesy, Defendants

summarily asserted that Plaintiffs' privilege log did not comply with Order 318, citing concerns about overly broad categories, lack of individualized legal analysis, and failure to describe or categorize each document as required.

As a result, in order to comply with the newly imposed requirements of Order 318, Plaintiffs were required to manually reconfigure their document review workflow—creating new folder structures and privilege tag groupings and tracking justification narratives across large previously reviewed datasets. This process was labor-intensive and applying mass overlays of note fields could not be automated without substantial technical customization, all of which had to occur within a 48-hour period.[3]

Additionally, the Orders do not reflect the constitutional complexity of asserting First Amendment associational privilege over sacred, non-commercial communications, many of which involve substantially similar documents that nonetheless require individualized legal analysis to determine whether compelled disclosure would chill protected religious association. By directing this review to be completed in bulk, on an expedited timeline, and without the benefit of implementing the parties' agreed-upon ESI protocol and search terms, the Orders left Plaintiffs with limited opportunity to present "a document-by-document basis" and apply the constitutional protections necessary to safeguard their rights.[4]

Finally, no accommodation was made for the resource disparity between the parties. Plaintiffs' litigation team is small, modestly-resourced, and must balance constitutional advocacy with complex technical eDiscovery management, without dedicated litigation support staff.[5]  Defendants are the world's most powerful civil litigants, with no financial

---

[3] "Defendants' discovery demands encompass over 100,000 pages—enough, if printed on bond paper, to form a 36-foot stack, towering as high as a three-story building." *See* Dkt. 288, pg. 10 ¶¶ 17–18 (quoted for illustrative purposes only; the motion was stricken for procedural noncompliance and not adjudicated on the merits).

[4] "[Defendants'] requests extend to nearly every digital record within AYA's possession—communications, membership lists, donor details, and anything else they perceive as relevant, regardless of actual necessity or narrower alternatives… Disclosing personal or institutional data about sincere religious adherents to law enforcement fosters an immediate chilling effect." *See* Dkt. 288, pg. 7 ¶¶ 8–13 (offered here solely for factual context; the underlying motion was stricken for procedural reasons and not adjudicated on the merits).

[5] "Well-resourced parties like the federal government can leverage discovery to exhaust financially weaker opponents…"*If the demands of discovery in this case are proving to be too taxing or time-intensive, Plaintiffs may dismiss this lawsuit or hire additional counsel beyond the second attorney retained last month.*" *See* Dkt. 288, pg. 11 ¶¶ 1–7

limitations, and their attorneys are past masters at eDiscovery tasks, who have the most powerful tools at their fingertips.

Despite these obstacles, Plaintiffs have invested heavily in internal restructuring, technical training, and outside support to comply with the evolving discovery obligations. Plaintiffs are now well-positioned to coordinate with the DISCO project management team, move forward with rolling productions of non-privileged documents and continuing to refine their privilege assertions in good faith. The recent approval of the parties' ESI Protocol and search terms has enabled Plaintiffs to implement their review workflows in a routine manner and ensure compliance moving forward. Additionally, as of today, Plaintiffs have confirmed the onboarding of a law student to assist with document review through a law school-approved Civil Litigation Externship for the summer semester. This additional support will further enhance Plaintiffs' capacity to meet discovery obligations in a timely and efficient manner.

In summary, Plaintiffs' counsel have reviewed thousands of nearly identical documents withheld under assertions of First Amendment associational privacy privilege, in a manner consistent with the Court's instructions. Each type of document was reviewed and assigned to thirteen (13) narrowly tailored privilege log categories—each supported by a narrative grounded in the Stanley Declaration submitted with Plaintiffs' first categorical privilege log (Dkt. 285-2) and directly tied to associational privacy.[6] The revised privilege log reflects hours of extensive manual document review and classification by counsel with information that includes document type, date range, authors/recipients/or roles, custodians, a specific

---

(quoting Dkt. 277 at 17, Ex. 7). (Offered solely for factual context to illustrate resource imbalance; Dkt. 288 was stricken for procedural reasons).

[6] "A declaration stating, 'that producing these communications will chill associational rights [is] sufficient to establish this prima facie case because it is common sense that forcing *[the responding party] to produce these materials will chill the willingness of members of these industry groups to have candid communications with each other [even though] commercial speech is entitled to less protection than … religious … speech*….'" *LeGrand v. Abbott Labs.,* No. 22-cv-05815-TSH, 2024 U.S. Dist. LEXIS 184790, at *3 (N.D. Cal. Oct. 9, 2024), citing *In re Anonymous Online Speakers,* 661 F.d 1168, 1177 (9th Cir. 2011). The Declaration of Mr. Stanley, filed under seal in support of the Privilege Log (Dkt. 285-2), the Supplemental Stanley Declaration filed with this motion, and the declarations of Taylor Cox (Ex. 2-1 ¶ 28), Huy Hunh (Ex. 3 ¶ 20), Rodney Ziebol (Ex. 4 ¶ 21), Mr. Garcia (Dkt. 53-6) and Mr. Goldman (148-2) each establish that Defendants' discovery demands threaten the very existence of AYA as a religious organization." *See* Dkt. 288, pg. 14 ¶¶ 3–16 (Offered here for factual context only; the underlying motion was stricken for procedural reasons and not resolved on the merits).

privilege assertion and a detailed justification that links the religious and associational function of each category of document to the specific harms caused by compelled disclosure.

Plaintiffs' submit that this revised privilege log substantially complies with the Court's Orders, reflects a good faith effort to balance the burden of production with the protections guaranteed by *NAACP v. Alabama*, 357 U.S. 449 (1958), *Ams. for Prosperity v. Bonta*, 594 U.S. 595*, 141 S. Ct. 2373 (2021), *Perry v. Schwarzenegger*, 591 F.3d 1126 (9th Cir. 2009), *Mi Familia Vota v. Fontes*, 344 F.R.D. 496 (D. Ariz. 2023) and Rule 26(b)(5) and provides Defendants and the Court with sufficient information to assess the privilege claim asserted and apply exacting scrutiny to the disputed discovery demands.

Dated May 20, 2025                                      MELISSA DEAN

_____
MELISSA DEAN (FLB #103182)
Attorney for Plaintiffs
Arizona Yagé Assembly,
Winfield Scott Stanley III
*Pro hac vice*